**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EMERALD OIL, INC., *et al.*,[1] | ) Case No. 16-10704 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| EMERALD OIL, INC., *et al.*, | ) |
| | ) |
| | ) Adversary Proceeding No. 16-__ |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| DAKOTA MIDSTREAM, LLC; DAKOTA ENERGY CONNECTION, LLC; AND DAKOTA FLUID SOLUTIONS, LLC F/K/A MESA OIL SERVICES, LLC, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Emerald Oil, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") file this Complaint for declaratory judgment against Defendants Dakota Midstream, LLC ("Dakota Midstream"), Dakota Energy Connection, LLC ("Dakota Energy"), and Dakota Fluid Solutions f/k/a Mesa Oil Services, LLC ("Dakota Fluid," and together with Dakota Midstream and Dakota Energy, "DMS"). As the basis for their Complaint, Plaintiffs state the following:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887). The location of the Debtors' service address is: 200 Columbine Street, Suite 500, Denver, Colorado 80206.

**Nature of the Action**

1.      In connection with the sale of substantially all of the Plaintiffs' assets in its chapter 11 cases, this adversary proceeding seeks a declaration that certain covenants and equitable servitudes (if any)  contained in the DMS Agreements (as defined herein) between DMS and certain of the Debtors do not "run with the land."  A true and correct copy of the DMS Agreements are attached hereto as **Exhibit A**, **Exhibit B**, **Exhibit C**, and **Exhibit D**.

**Jurisdiction and Venue**

2.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157, 1334, and 2201.  The proceeding arises from the above-captioned chapter 11 cases and seeks a declaratory judgment that certain covenants and equitable servitudes (if any) contained in the DMS Agreements between DMS and certain of the Debtors do not run with the land.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Parties**

4.      Plaintiffs are debtors-in-possession in the above-captioned bankruptcy proceedings by virtue of filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on March 22, 2016 (the "Petition Date").

5.      Defendant Dakota Midstream, LLC, upon information and belief, is a Delaware limited liability company with its principal place of business at 1400 Wewatta St., Suite 310, Denver, Colorado 80202-5553.

6. Defendant Dakota Energy Connection, LLC, upon information and belief, is a Delaware limited liability company with its principal place of business at 1600 Broadway, Suite 1330, Denver, Colorado 80202-4927.

7. Defendant Dakota Fluid Solutions f/k/a Mesa Oil Services, LLC, upon information and belief, is a Delaware limited liability company with its principal place of business at 1400 Wewatta St., Suite 310, Denver, Colorado 80202-5553.

### Factual Allegations

**A.     The Gas Gathering Agreement.**

8. Debtors Emerald Oil, Inc. ("Emerald Oil") and Emerald WB LLC ("Emerald WB," and together with Emerald Oil, the "Debtor Parties") entered into that certain Amended and Restated Gas Dedication and Gathering Agreement having an effective date of July 1, 2014 (the "Gas Gathering Agreement") with Dakota Midstream.  The Gas Gathering Agreement has a term of "fifteen (15) years [. . .] and shall continue year to year thereafter until terminated by either Party."  (Exh. A, § 7.1.)

9. Pursuant to the terms of the Gas Gathering Agreement, the Debtor Parties agreed to have Dakota Midstream "receive, gather, and redeliver all of the Gas owned by [the Debtor Parties] which is produced from the Wells (as defined herein) and Leases" in an area specified in more detail in the Gas Gathering Agreement (the "Dedicated Gas Area").  (Exh. A, Recital B.)

10. The parties further agreed pursuant to the terms of the Gas Gathering Agreement that the Debtor Parties would "deliver all of [the Debtor Parties'] Gas to [Dakota Midstream] at the Receipt Points without other disruption except as otherwise provided in this Agreement." (Exh. A, § 1.2.)

11. The Gas Gathering Agreement is construed in accordance with and is governed by North Dakota law. (Exh. A., § 8.9.)

**B. The Crude Oil Gathering Agreement.**

12. Debtors Emerald Oil and Emerald WB entered into that certain Amended and Restated Crude Oil Dedication & Throughput Commitment Transportation Agreement having an effective date of July 1, 2014 (the "Crude Oil Gathering Agreement") with Dakota Midstream and Dakota Energy. The Crude Oil Gathering Agreement has a term of "fifteen (15) years [. . .] and shall continue year to year thereafter until terminated by either Party." (Exh. B, § 7.1.)

13. Pursuant to the terms of the Crude Oil Gathering Agreement, the Debtor Parties agreed to have Dakota Midstream and Dakota Energy "receive, gather or transport, and redeliver all of Crude Oil owned by [the Debtor Parties'] which is produced from the Wells (as defined herein) and Leases" in an area specified in more detail in the Crude Oil Gathering Agreement (the "Dedicated Oil Area"). (Exh. B, Recital B.)

14. The parties further agreed pursuant to the terms of the Crude Oil Gathering Agreement that the Debtor Parties would "deliver all of [the Debtor Parties'] Crude to [Dakota Midstream] at the Receipt Points without other disposition except as otherwise provided in this Agreement." (Exh. B, § 1.2.)

15. The Crude Oil Gathering Agreement is construed in accordance with and is governed by North Dakota law. (Exh. B., § 8.9.)

**C. The Water Gathering Agreement and the Disposal Well Services Agreement.**

16. Debtors Emerald Oil and Emerald WB entered into that certain Amended and Restated Water Dedication and Gathering Agreement having an effective date of July 1, 2014 (the "Water Gathering Agreement," and together with the Gas Gathering Agreement and the

4

Crude Oil Gathering Agreement, the "Gathering Agreements") with Dakota Fluid.  The Water Gathering Agreement has a term of "fifteen (15) years [. . .] and shall continue year to year thereafter until terminated by either Party." (Exh. C, § 7.1.)

17.   Pursuant to the terms of the Water Gathering Agreement, the Debtor Parties agreed to have Dakota Fluid "receive, gather, and deliver all the Water, as defined in Exhibit "C" of the [Water Gathering Agreement], produced from the Wells and Leases" in an area specified in more detail in the Water Gathering Agreement (the "Dedicated Water Area"). (Exh. C, Recital B.)

18.   The parties further agreed pursuant to the terms of the Water Gathering Agreement that the Debtor Parties would "deliver all of [the Debtor Parties'] Water to [Dakota Midstream] at the Receipt Points without other disposition except as otherwise provided in this Agreement." (Exh. C, § 1.2.)

19.   The Water Gathering Agreement is construed in accordance with and is governed by North Dakota law.  (Exh. C., § 8.9.)

20.   Pursuant to section 1.7 of the Water Gathering Agreement, and as a condition precedent to the Water Gathering Agreement, Emerald Oil and Dakota Fluid entered into that certain Amended and Restated Disposal Well Services Agreement (the "Disposal Well Services Agreement," and together with the Gathering Agreements, the "DMS Agreements").  The Disposal Well Services Agreement has a term of "ten (10) years [. . .] and shall continue year to year thereafter until terminated by either Party."  (Exh. D , § 2(a).)

21.   Pursuant to the Disposal Well Services Agreement, Emerald Oil agreed to exclusively deliver saltwater waste to Dakota Fluid from its natural gas and crude oil production in an area specified in more detail in the Disposal Well Services Agreement (the "Dedicated

Disposal Area," and together with the Dedicated Gas Area, the Dedicated Oil Area, and the Dedicated Water Area, the "Dedicated Area"). (Exh. D , §§ 2–3.)

22.     Furthermore, pursuant to the terms of the Disposal Well Services Agreement, Dakota Fluid agreed to "dispose of all Saltwater delivered by [Emerald Oil] to the SWD Wells during an Applicable Delivery Time and [. . .] operate the SWD Wells in accordance with good operating practice for saltwater disposal and all applicable laws, including without limitation, all environmental laws." (Exh. D , § 4(a).)

23.     The Disposal Well Services Agreement is construed in accordance with and is governed by North Dakota law. (Exh. D., § 14.)

### Claims for Relief

24.     The allegations set forth above are incorporated herein by reference.

25.     Covenants running with the land under North Dakota law are defined, in the first instance, by statute. Specifically, N.D.C.C. 47-04-01 states that: "Certain covenants contained in grants of estates in real property are appurtenant to such estates and pass with them so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them. Such covenants are said to run with the land."

26.     A covenant runs with the land in North Dakota only:  (a) when it is contained in a grant of a real property estate, and (b) when it touches and concerns the occupation or enjoyment of the land, thereby directly benefiting the property. *See Matter of Estate of Murphy*, 554 N.W.2d 432, 436 (N.D. 1996); *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282, 286 (N.D. 2009) (holding that "[i]f the covenant does not touch or concern the occupation or enjoyment of

6

the land, it is the collateral and personal obligation of the grantor or lessor and does not run with the land).

27.    The conclusion that a covenant runs with the land based simply on the language set forth in a recorded instrument—even where the covenant does not benefit the land— "is in direct contradiction to the settled principle that the parties' intent, no matter how clearly expressed, cannot make a personal covenant run with the land . . . ." *Beeter*, 771 N.W.2d at 286 (holding that the original intent of the parties in attempting to create a perpetual covenant running with the land, no matter how clearly expressed, did not make the covenant binding upon subsequent purchasers).

## COUNT I
### (Gas Gathering Agreement – Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a))

28.    The allegations set forth above are incorporated herein by reference.

29.    The Gas Gathering Agreement does not include any covenants or equitable servitudes (if any) that run with the land under North Dakota law.  In particular, the Debtor Parties' promise to allow Dakota Midstream to receive, gather, and redeliver natural gas attributable to the Debtor Parties' natural gas production in the Dedicated Gas Area in section 1.2 of the Gas Gathering Agreement is not a covenant that runs with the land.

30.    First, the covenants and obligations in the Gas Gathering Agreement do not "touch and concern" the land.  Instead of benefitting the Dedicated Gas Area, the Gas Gathering Agreement's terms and conditions benefit the parties personally and thus serve "no real benefit to the land," making them "personal in nature"  *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282, 286 (N.D. 2009) (citations omitted).

31.    Second, the only interest at issue in the Gas Gathering Agreement is natural gas— not real property.  *See Matter of Estate of Murphy*, 554 N.W.2d at 436.  The Gas Gathering

7

Agreement constitutes a contractual agreement whereby Dakota Midstream shall "receive, gather, and redeliver all of the Gas" owned by the Debtor Parties as the exclusive gatherer in exchange for compensation. (*See* Ex. A, Recital B, § 5.1.) Additionally, the Debtor Parties agreed to "deliver all of [the Debtor Parties'] Gas to [Dakota Midstream] at the Receipt Points without other disruption except as otherwise provided in this Agreement." (Exh. A, § 1.2.)

32. Neither provision amounts to a conveyance of real property because there is no language of conveyance, such as a "grant of an interest" in any leasehold, fee, or other property interest. The language of the Gas Gathering Agreement does not grant Dakota Midstream any interest in the Debtor Parties' real property but rather merely "identif[ies] and delineat[es] the contractual rights and obligations with respect to the services to be provided." *In re Sabine Oil & Gas Corp.*, 2016 WL 890299, at *7 (Bankr. S.D.N.Y. Mar. 8, 2016). As the Gas Gathering Agreement concerns personal property rather than real property, the agreement has no direct impact on the land itself and thus does not run with the land in North Dakota.

33. Moreover, pursuant to section 2.8 of the Gas Gathering Agreement, "[the Debtor Parties] expressly [do] not by the terms of this Agreement, sell, transfer or assign unto [Dakota Midstream] any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by [the Debtor Parties] in the operation of [the Debtor Parties'] Wells and the Leases." (Exh. A, § 2.8.)

34. Regardless of the language of section 1.2 of the Gas Gathering Agreement purporting to make the promises therein run with the land, the intent of the parties in attempting to create a perpetual covenant is not dispositive in North Dakota. *Beeter*, 771 N.W.2d at 286.

35. For the foregoing reasons, the Debtors are entitled to a judicial declaration that the covenants and equitable servitudes (if any) contained in the Gas Gathering Agreement between the Debtor Parties and Dakota Midstream do not run with the land.

36. Such a declaration will serve the twin interests of judicial efficiency and cost-effectiveness by terminating the substantial and actual controversy between the parties, or resolving some part of it.[2] It will also serve a useful purpose by enabling the Court to determine whether the Gas Gathering Agreement and all obligations thereunder may be rejected under section 365 of the Bankruptcy Code.

## COUNT II
**(Crude Oil Gathering Agreement – Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a))**

37. The allegations set forth above are incorporated herein by reference.

38. The Crude Oil Gathering Agreement does not include any covenants or equitable servitudes (if any) that run with the land under North Dakota law. In particular, the Debtor Parties' promise to allow Dakota Midstream and Dakota Energy to receive, gather or transport, and redeliver crude oil attributable to the Debtor Parties' crude oil production in the Dedicated Oil Area in section 1.2 of the Crude Oil Gathering Agreement is not a covenant that runs with the land.

39. First, the covenants and obligations in the Crude Oil Gathering Agreement do not "touch and concern" the land. Instead of benefitting the Dedicated Oil Area, the Crude Oil Gathering Agreement's terms and conditions benefit the parties personally and thus serve "no

---

[2] Contemporaneously herewith, the Debtors are filing a motion to reject the Gas Gathering Agreement pursuant to section 365 of the Bankruptcy Code. Bankruptcy courts have expressed a preference for the simultaneous adjudication of the issues raised in this adversary proceeding with a motion to reject the underlying executory contract. *In re Sabine*, 2016 WL 890299 at *4 ("[B]ifurcating the motion to reject and further proceedings to finally resolve the underlying property law dispute is an inefficient use of judicial and private resources; it would have been far preferable for the Court to hear the two together.").

real benefit to the land," making them "personal in nature" *Beeter* , 771 N.W.2d at 286 (citations omitted).

40.     Second, the only interest at issue in the Crude Oil Gathering Agreement is crude oil—not real property.  *See Matter of Estate of Murphy*, 554 N.W.2d at 436.  The Crude Oil Gathering Agreement constitutes a contractual agreement whereby Dakota Midstream and Dakota Energy shall "receive, gather or transport, and redeliver all of Crude Oil owned by the Debtor Parties as the exclusive gatherers in exchange for compensation.  (*See* Ex. A, Recital B, § 5.1.)  Additionally, the parties further agreed that the Debtor Parties would "deliver all of [the Debtor Parties'] Crude to [Dakota Midstream] at the Receipt Points without other disposition except as otherwise provided in this Agreement."  (Exh. B, § 2.1.)

41.     Neither provision amounts to a conveyance of real property because there is no language of conveyance, such as a "grant of an interest" in any leasehold, fee, or other property interest.  The language of the Crude Oil Gathering Agreement does not grant Dakota Midstream or Dakota Energy any interest in the Debtor Parties' real property but rather "identif[ies] and delineat[es] the contractual rights and obligations with respect to the services to be provided." *In re Sabine*, 2016 WL at *7.  As the Crude Oil Gathering Agreement concerns personal property rather than real property, the agreement has no direct impact on the land itself and thus does not run with the land in North Dakota.

42.     Moreover, pursuant to section 2.8 of the Crude Oil Gathering Agreement, "[the Debtor Parties] expressly [do] not by the terms of this Agreement, sell, transfer or assign unto [Dakota Midstream or Dakota Energy] any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by [the Debtor Parties] in the operation of [the Debtor Parties'] Wells and the Leases."  (Exh. B, § 2.8.)

43.     Regardless of the language of section 1.2 of the Oil Gathering Agreement purporting to make the promises therein run with the land, the intent of the parties in attempting to create a perpetual covenant is not dispositive in North Dakota.  *Beeter*, 771 N.W.2d at 286.

44.     For the foregoing reasons, the Debtors are entitled to a judicial declaration that the covenants and equitable servitudes (if any) contained in the Crude Oil Gathering Agreement between the Debtor Parties, Dakota Midstream, and Dakota Energy do not run with the land.

45.     Such a declaration will serve the twin interests of judicial efficiency and cost-effectiveness by terminating the substantial and actual controversy between the parties, or resolving some part of it.[3]  It will also serve a useful purpose by enabling the Court to determine whether the Crude Oil Gathering Agreement and all obligations thereunder may be rejected under section 365 of the Bankruptcy Code.

## COUNT III
**(Water Gathering Agreement – Declaratory Judgment Pursuant to 28 U.S.C. § 2201(a))**

46.     The allegations set forth above are incorporated herein by reference.

47.     The Water Gathering Agreement does not include any covenants or equitable servitudes (if any) that run with the land under North Dakota law.  In particular, the Debtor Parties' promise to allow Dakota Fluid to receive, gather, and deliver all of the water recovered as part of the Debtor Parties' natural gas and crude oil production in the Dedicated Water Area in section 1.2 of the Water Gathering Agreement is not a covenant that runs with the land.

48.     First, the covenants and obligations in the Water Gathering Agreement do not "touch and concern" the land.  Instead of benefitting the Dedicated Water Area, the Water Gathering Agreement's terms and conditions benefit the parties personally and thus serve "no

---

[3]     Contemporaneously herewith, the Debtors are filing a motion to reject the Crude Oil Gathering Agreement pursuant to section 365 of the Bankruptcy Code.

real benefit to the land," making them "personal in nature" *Beeter*, 771 N.W.2d at 286 (citations omitted).

49.     Second, the only interest at issue in the Water Gathering Agreement is water recovered as part of the Debtor Parties' natural gas and crude oil production in the Dedicated Water Area —not real property. *See Matter of Estate of Murphy*, 554 N.W.2d at 436.  The Water Gathering Agreement constitutes a contractual agreement pursuant to which Dakota Fluid shall "receive, gather, and deliver all the Water" produced from the Debtor Parties' natural gas and crude oil production in the Designated Water Area as the exclusive gatherer in exchange for compensation.  (*See* Ex. C, Recital B, § 5.1.)   Additionally, under the Water Gathering Agreement, the parties further agreed that the Debtor Parties would "deliver all of [the Debtor Parties'] Water to [Dakota Midstream] at the Receipt Points without other disposition except as otherwise provided in this Agreement."  (Exh. C, § 1.2.)

50.     Neither provision amounts to a conveyance of real property because there is no language of conveyance, such as a "grant of an interest" in any leasehold, fee, or other property interest.  The language of the Water Gathering Agreement does not grant Dakota Fluid any interest in the Debtor Parties' real property but rather "identif[ies] and delineat[es] the contractual rights and obligations with respect to the services to be provided." *In re Sabine*, 2016 WL at *7.  As the Water Gathering Agreement concerns personal property rather than real property, the agreement has no direct impact on the land itself and thus does not run with the land in North Dakota.

51.     Moreover, pursuant to section 2.9 of the Water Gathering Agreement, "[the Debtor Parties] expressly [do] not by the terms of this Agreement, sell, transfer or assign unto [Dakota Fluid] any title or interest whatsoever in the Wells or any pipe, lines or other equipment

of any nature owned or used by [the Debtor Parties] in the operation of [the Debtor Parties']

Wells, [the Debtor Parties'] Water Facilities, Wells, or Leases." (Exh. C, § 2.9.)

52. Regardless of the language of section 1.2 of the Water Gathering Agreement

purporting to make the promises therein run with the land, the intent of the parties in attempting

to create a perpetual covenant is not dispositive in North Dakota. *Beeter*, 771 N.W.2d at 286.

53. For the foregoing reasons, the Debtors are entitled to a judicial declaration that the

covenants and equitable servitudes (if any) contained in the Water Gathering Agreement between

the Debtor Parties and Dakota Fluid do not run with the land.

54. Such a declaration will serve the twin interests of judicial efficiency and

cost-effectiveness by terminating the substantial and actual controversy between the parties, or

resolving some part of it.[4] It will also serve a useful purpose by enabling the Court to determine

whether the Water Gathering Agreement and all obligations thereunder may be rejected under

section 365 of the Bankruptcy Code.

**<u>COUNT IV</u>**
**(Disposal Well Services Agreement – Declaratory**
**Judgment Pursuant to 28 U.S.C. § 2201(a))**

55. The allegations set forth above are incorporated herein by reference.

56. The Disposal Well Services Agreement does not include any covenants or

equitable servitudes (if any) that run with the land under North Dakota law. In particular,

Emerald Oil's promise to allow Dakota Fluid to exclusively dispose saltwater waste from

Emerald Oil's natural gas and crude oil production in the Dedicated Disposal Area is not a

covenant that runs with the land.

---

[4] Contemporaneously herewith, the Debtors are filing a motion to reject the Water Gathering Agreement pursuant to section 365 of the Bankruptcy Code.

57.     First, the covenants and obligations exclusively requiring Emerald Oil to deliver saltwater waste to Dakota Fluid from its natural gas and crude oil production in the Disposal Well Services Agreement do not "touch and concern" the land.   Instead of benefitting the Dedicated Disposal Area, the Disposal Well Services Agreement's terms and conditions benefit the parties personally and thus serve "no real benefit to the land," making them "personal in nature" *Beeter*, 771 N.W.2d at 286 (citations omitted).

58.     Second, the only interest at issue in the Disposal Well Services Agreement is saltwater recovered as part of the Emerald Oil's natural gas and crude oil production in the Dedicated Disposal Area —not real property.  (Exh. D, §§ 2–3); *see Matter of Estate of Murphy*, 554 N.W.2d at 436.   Also, pursuant to the Disposal Well Services Agreement, Dakota Fluid agreed to "dispose of all Saltwater delivered by [Emerald Oil] to the SWD Wells during an Applicable Delivery Time and [. . .] operate the SWD Wells in accordance with good operating practice for saltwater disposal and all applicable laws, including without limitation, all environmental laws."  (Exh. D , § 4(a).)

59.     The language of the Disposal Well Services Agreement does not grant Dakota Fluid any interest in the Debtor Parties' real property but rather "identif[ies] and delineat[es] the contractual rights and obligations with respect to the services to be provided."  *In re Sabine*, 2016 WL at *7.  As the Disposal Well Services Agreement concerns personal property rather than real property, the agreement has no direct impact on the land itself and thus does not run with the land in North Dakota.

60.     For the foregoing reasons, the Debtors are entitled to a judicial declaration that the covenants and equitable servitudes (if any) contained in the Disposal Well Services Agreement between Emerald Oil and Dakota Fluid do not run with the land.

61.     Such a declaration will serve the twin interests of judicial efficiency and cost-effectiveness by terminating the substantial and actual controversy between the parties, or resolving some part of it.[5] It will also serve a useful purpose by enabling the Court to determine whether the Disposal Well Services Agreement and all obligations thereunder may be rejected under section 365 of the Bankruptcy Code.

## **Prayer for Relief**

WHEREFORE, the Debtors respectfully request that the Court enter judgment in favor of the Debtors as follows:

(a)     Declaring that the covenants and equitable servitudes (if any) contained in the DMS Agreements do not run with the land.

(b)     Granting Debtors such other relief as the Court deems appropriate under the circumstances.

---

[5]     Contemporaneously herewith, the Debtors are filing a motion to reject the Disposal Well Services Agreement pursuant to section 365 of the Bankruptcy Code.

Wilmington, Delaware
Dated:  June 3, 2016

*/s/ Laura Davis Jones*

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:          ljones@pszjlaw.com
                      crobinson@pszjlaw.com
                      jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:          james.sprayregen@kirkland.com
                      ryan.bennett@kirkland.com
                      travis.bayer@kirkland.com

*Counsel to the Debtors*

16