**Exhibit A**

AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
BETWEEN
DAKOTA MIDSTREAM, LLC
AND
EMERALD OIL, INC. & EMERALD WB LLC

<u>AMENDED AND RESTATED GAS DEDICATION</u>
<u>AND GATHERING AGREEMENT</u>

THIS AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT ("*Agreement*") is entered into on April __, 2015, but effective as of the 1st day of July, 2014 (the *"Effective Date"*) by and between DAKOTA MIDSTREAM, LLC (*"Gatherer"*), and EMERALD OIL, INC. and EMERALD WB LLC (collectively *"Producer"*). The term "Producer" shall also include any other Affiliates of Emerald Oil, Inc. or Emerald WB LLC that own or control leasehold interests or Gas from leasehold interests located within the Area of Dedication at any time while this Agreement remains in effect. Producer and Gatherer are sometimes referred to herein individually as a *"Party"* and collectively as the *"Parties"*.

## RECITALS

A.     Producer is a working interest owner in certain oil and gas leases, wells, and/or lands within the area described in Exhibit "A" attached hereto and by reference made a part hereof (the *"Area of Dedication"*), and may acquire additional interests in oil and gas leases and/or lands within the Area of Dedication during the term of this Agreement (such current and future interests are referred to as the *"Leases"*).

B.     Producer desires to have Gatherer receive, gather and redeliver all of the Gas owned by Producer which is produced from the Wells (as defined herein) and Leases within the Area of Dedication.

C.     Gatherer desires to receive Producer's Gas at the Receipt Points and redeliver Producer's Gas at the Delivery Points (as such terms are defined herein), utilizing the facilities constructed, owned and operated by Gatherer.

D.     The Parties entered into that certain Gas Dedication and Gathering Agreement dated effective July 1, 2014, as amended by that certain Amendment No. 1 dated effective November 19, 2014 (the *"Original Agreement"*), and desire now to amend and restate the Original Agreement in its entirety, effective as of July 1, 2014, to address and incorporate additional facilities to be constructed and operated by Gatherer at the request of Producer to receive Producer's Gas, from the same Initial System DSUs as identified in Exhibit B-1 herein at certain new "Infill Receipt Points" in exchange for additional consideration to Gatherer.

E.     The Parties also desire now to name and include Emerald WB LLC as a Producer Party to this Agreement and to have Emerald WB LLC ratify the Original Agreement.

Now therefore, in consideration of the mutual covenants and agreements contained in this Agreement, the Parties agree as follows:

2

ARTICLE I
REPRESENTATIONS & COMMITMENTS OF PRODUCER

1.1    Producer's Representations.  Producer represents and warrants to Gatherer, its successors and assigns, that Producer has the right to operate the Wells listed on Exhibit B-2 and owns and has the right to dedicate and commit for physical delivery to and gathering by Gatherer, Producer's Gas as defined in Section 1.2 below, and that Producer has constructed, intends to construct, or shall cause to be constructed, the facilities necessary, if any, to enable Producer to deliver to Gatherer at the Receipt Points all of Producer's Gas, in accordance with the terms and provisions of this Agreement, as well as any other facilities committed to by Producer under this Agreement.

1.2    Dedication. Producer hereby dedicates and commits to the performance of this Agreement and all of the terms and conditions herein for the Primary Term, as defined herein, as a covenant running with the land the following:  (i) all of Producer's working interest share of Gas produced from the Wells operated by Producer; and (ii) all of Producer's working interest share of Gas from wells operated by parties other than Producer in which Producer takes its share of production in kind, if applicable (collectively "*Producer's Gas*").  Notwithstanding the foregoing, Producer's Gas shall not include: (i) Gas subject to a prior Gas dedication as of the Effective Date of this Agreement for the minimum duration of that prior Gas dedication; (ii) Gas produced from any lands or Leases that Producer in the future acquires in the Area of Dedication that are subject to a prior Gas dedication entered into by Producer's predecessor-in-interest for the minimum duration of the prior Gas dedication; (iii) Gas from Leases that are subject to a Temporary Release (for so long as such Temporary Release remains in effect) or a Permanent Release, all in accordance with the terms of this Agreement; and (iv) Gas produced from any Leases otherwise subject to this Agreement that are no longer held by production or upon their termination, expiration or release if such Leases are not cured, renewed, top leased, re-acquired or newly acquired in whole or in part by Producer, its successor-in-interest, their respective Affiliates, or any of their respective officers, directors, employees, agents or representatives.  Subject to the remaining terms of this Agreement, including the rights of Producer in the event of a Temporary Release or Permanent Release, as defined herein, either exclusion applies only for the remaining minimum duration of the prior Gas dedication, Producer will take all action necessary not to extend the duration of such prior Gas dedication, and upon the expiration of that prior Gas dedication, such interest will automatically be dedicated and committed hereunder.  Producer shall promptly furnish Gatherer with notices of the termination of all prior Gas dedication arrangements and the anticipated date of first delivery of those volumes to Gatherer's Gas System.  Producer covenants to deliver all of Producer's Gas to Gatherer at the Receipt Points without other disposition except as otherwise provided in this Agreement.

1.3    Producer's Reservations.

        i.        Producer, as a reasonable and prudent operator, hereby expressly reserves the following rights with respect to Producer's Gas and the Leases subject hereto:

            a.  The right to use and consume the Gas produced from the Leases prior to delivery to Gatherer for the following purposes:

3

(i)     For consumption as fuel in the development and operation of the Leases from which the Gas is produced.

(ii)     For delivery to the lessors and owners of overriding royalties or other interests in the Leases, if such lessors and owners are entitled to use such Gas or take such Gas in kind under the terms of the Leases and other definitive instruments creating their interests entered into (1) prior to the Effective Date, with respect to Leases owned by Producer at the Effective Date, or (2) prior to the date such Leases are acquired by Producer, with respect to Leases acquired by Producer after the Effective Date.

(iii)     For consumption as fuel in the operation of the facilities which Producer may install in order to deliver Gas hereunder in accordance with the terms hereof.

(iv)     Reasonable and customary amounts of Gas for its operational needs including gas lift (estimated not to exceed 500 Mcfd as of the Effective Date) and secondary or tertiary recovery projects to the extent communicated to Gatherer pursuant to Section 2.7.

b.   The right to pool or unitize the Leases (or any portion thereof) with other lands and leases. In the event of any such pooling or unitization, the Agreement will cover Producer's interest in the pool or unit and the Gas attributable thereto to the extent that such interest is derived from Producer's interest in the Leases.

ii.     Producer reserves the right to operate its Leases and Wells free of any control by Gatherer and in such a manner as Producer, in its sole discretion, may deem advisable, including without limitation, the right to enter into farmouts of any Lease subject to this Agreement, to abandon any Well and surrender any Lease. Producer reserves the right to determine the maximum efficient rate of flow for any Well (including the right to curtail production due to low market demand for Gas) and shall not be required to produce any Well or Wells in any manner which in its sole judgment and discretion would not constitute good operating practice, nor shall Producer be obligated to drill additional Wells or to deepen, repair or rework any existing Wells.

1.4     Release Rights.

i.     Temporary Release.   Notwithstanding any other provision herein, during any period after the Initial System In-Service Date, as defined in Section 2.4, when Gatherer is unable or fails to accept delivery of any of Producer's Gas in accordance with the terms of this Agreement for any reason whatsoever, including, without limitation, curtailment, Force Majeure or maintenance affecting Gatherer's Gas System or any downstream pipeline or processing plant, and there exists no uncured material breach of this Agreement on the part of Producer, then Producer may temporarily elect to deliver the quantities of Producer's Gas which Gatherer has failed to or is unable to accept to alternative gathering facilities, upon delivering written notice to Gatherer of its intent to do so (a "*Temporary Release*"). Failure of Gatherer to respond (or accept delivery of the

4

Excess Volumes of Producer's Gas) within twenty-four (24) hours to a waiver request from Producer shall be deemed to be a confirmation by Gatherer of a lack of capacity on Gatherer's Gas System. The Temporary Release of Producer's Gas shall only apply to those certain volumes of Producer's Gas which Gatherer is unable to so accept (the "*Released Volumes*"). Furthermore, during any Accounting Period in which a Temporary Release occurs, the applicable Minimum Volume for such Accounting Period shall be reduced by an amount equal to the total of Released Volumes for such Accounting Period. Within thirty (30) days after Gatherer's delivery of written notice to Producer of its ability to again accept delivery of the Released Volumes in whole or in part, the Temporary Release will terminate as to the quantity Gatherer has specified in its written notice that it is able to receive and Producer shall resume delivery of such Released Volumes to Gatherer.

ii.    Permanent Release. Except for the six (6) month period commencing as of the Initial System In-Service Date, and subject to Section 2.5 in the context of future expansion beyond the Initial System, as applicable, in the event Gatherer has not accepted delivery of the entire quantity of Producer's Gas made available by Producer at the Receipt Points for any reason whatsoever, including, without limitation, curtailment, Force Majeure or maintenance affecting Gatherer's Gas System or any downstream pipeline or processing plant, for a continuous period of ninety (90) consecutive days, or one hundred and twenty (120) days within a one hundred eighty (180) day period, Producer shall have the right to have the Leases and Wells affected thereby permanently released from this Agreement (a "*Permanent Release*") by delivering written notice thereof to Gatherer within thirty (30) days after the expiration of any such ninety (90) consecutive day period or one hundred eighty (180) day period, as applicable. Furthermore, the applicable Minimum Volume for each Accounting Period remaining during the Commitment Period shall be reduced by the estimated average daily volumes subject to Permanent Release for each such Accounting Period, in accordance with estimates of anticipated volumes previously provided by Producer pursuant to Section 2.7 that would have been delivered to Gatherer's Gas System had the Permanent Release not occurred (the "*Permanently Released Volumes*").

1.5    Allocations. Producer shall provide to Gatherer all information reasonably requested by Gatherer to assist Gatherer in making Receipt Point allocations called for herein or required by Gatherer's normal and customary accounting or contract administration practices. The Parties shall cooperate in providing allocation information to operators of facilities downstream of the Delivery Point to assist such operators in making allocations concerning Producer's Gas.

1.6    Memorandum of Agreement. Upon execution of this Agreement, the Parties shall concurrently execute a new Memorandum of this Agreement, in substantially the same form attached as Exhibit "D" including a legal description of the Area of Dedication that corrects and replaces the Memorandum of the Original Agreement by expressly including Emerald WB LLC as a dedicating party, together with any of Producer's other Affiliates which own or control leasehold interests or Gas from leasehold interests located within the Area of Dedication, during the Primary Term or Extended Term of this Agreement. Such Memorandum shall be placed of record in each county in which the Leases are located with Producer to bear all costs. In the event of any Permanent Release or termination of this Agreement, in whole or in part, the Parties shall execute

5

appropriate instruments to be placed of record in each county in which the Leases are located, providing notice of the amended Area of Dedication or termination of this Agreement.

1.7     Gas Purchaser. It is understood that Producer may enter into arrangements with purchasers of Gas under which Producer's Gas may be sold to the purchaser (*"Gas Purchaser"* whether one or more) at or near the well pads and prior to delivery to Gatherer, or downstream of the Delivery Points. If such arrangements are entered into by Producer, Producer will require the Gas Purchaser to deliver all of Producer's Gas to Gatherer under the terms of this Agreement and, subject to the terms and provisions hereof, all of Producer's Gas shall remain dedicated and committed to this Agreement and subject to all provisions contained in this Agreement and Producer shall cause the Gas Purchaser to execute an adoption and ratification of this Agreement in a form and substance reasonably acceptable to Gatherer.

1.8     Further Arrangements. Producer commits that, during the term of this Agreement, it will maintain, or cause its Gas Purchasers, if applicable, to maintain all necessary arrangements to provide for the further transportation and disposition of Producer's Gas at the Delivery Points. Gatherer will use reasonable efforts to enter into interconnect agreements at the Delivery Points with third party pipelines to facilitate the further transport and disposition of Producer's Gas. Further, Producer agrees that any connection fees, throughput fees or similar charges to flow Producer's Gas into a downstream interconnecting pipeline at the Delivery Points shall be borne by Producer.

1.9     Other Owner Gas. It is expressly agreed by the Parties that, except as specifically provided herein, Producer does not dedicate to the performance of this Agreement any Gas attributable to the interests of other non-Affiliate working interest owners, non-Affiliate overriding royalty owners or royalty owners (*"Other Owners"*) in the Wells or Leases operated by Producer within the Area of Dedication. However, in the event Other Owners fail to take their shares of production in kind from time to time and such shares of production are not subject to prior dedications to third party gatherers, and Producer elects to arrange for the temporary disposition of the shares of production of such Other Owners, then the Gas attributable to such shares of Other Owners (*"Other Owner Gas"*) shall be deemed to be "Producer's Gas"; provided, however, that such Other Owner Gas shall not thereby become dedicated to this Agreement and shall not be entitled to receive the highest priority of service afforded Producer's Gas pursuant to Section 3.5 without ratification or other formal agreement by the Other Owners, and such Other Owners shall retain their right and obligation to take their share of production in kind. To the extent Producer tenders Other Owner Gas, Producer represents and warrants to Gatherer, its successors and assigns, that Producer has the right to deliver for gathering to Gatherer, the allocated share of Other Owner Gas tendered by Producer and indemnifies Gatherer accordingly.

ARTICLE II
FACILITIES

2.1     Gatherer's Gas System. Gatherer will construct, operate and maintain a Gas gathering system comprised of the Initial System, and any Future Receipt Points, Future Delivery Points, additional Field Compression and expansions of Gatherer's Gas System constructed pursuant to Section 2.5 (collectively *"Gatherer's Gas System"*) located as necessary to enable Gatherer to

6

receive and gather Producer's Gas from the Area of Dedication at the Receipt Points and redeliver an equivalent Thermal Content of Producer's Gas, less Fuel, Field Condensate, and Lost and Unaccounted for Gas as defined herein, to Producer or Producer's designee at the Delivery Points. Gatherer shall construct and operate Gatherer's Gas System in a workman-like manner and in accordance with good oilfield practices and in compliance with any applicable permits and licenses and all applicable rules, laws and regulations. Gatherer's Gas System will consist of:

i.     "*Gathering Lines*" means various pipeline gathering facilities from the Receipt Points to the Delivery Points, together with appurtenances thereto, with sufficient capacity across Gatherer's Gas System to receive, gather and deliver Producer's Capacity, as defined in Section 3.1, attributable to such Receipt Point (as defined immediately below).

ii.    "*Receipt Points*" shall be at the inlet of Gatherer's metering facilities located at the locations described on Exhibit "B" as RP1 through RP8 (the "*Initial Receipt Points*") and as RP10 through RP14 and RP16 (the "*Infill Receipt Points*"), together with any additional locations installed as part of any expansion of Gatherer's Gas System beyond the Initial System (the "*Future Receipt Points*"), and shall mean the facilities needed to connect Producer's Wells or Producer's facilities described below in Section 2.3 to the Gathering Lines, including metering and telemetry equipment, as may be further depicted on Exhibit "B" and Exhibit "B-2". Gatherer shall furnish, own and operate all Receipt Point meters.

iii.   "*Delivery Points*" include the facilities required to redeliver an equivalent Thermal Content of Producer's Gas to Producer or its designee at locations described on Exhibit "B" (the "*Initial Delivery Points*"), together with any additional locations installed as part of any expansion of Gatherer's Gas System beyond the Initial System (the "*Future Delivery Points*"). Gatherer will use its commercially reasonable efforts and Producer will support and assist Gatherer to obtain physical Delivery Point interconnections with downstream third party facilities. Producer shall bear its pro rata share of all Actual Construct Costs of interconnection of Gatherer's Gas System with third party facilities with the interconnection to be owned and operated by Gatherer. Gatherer shall furnish, own and operate all Delivery Point meters if such meters are not furnished, owned and operated by third party operators of downstream interconnecting third party facilities.

iv.    "*Field Compression*" includes compression facilities appurtenant to Gatherer's Gathering Lines, as needed to provide the Nominal Average Pressure, as defined herein, at the Initial and Infill Receipt Points, and a pressure with respect to the transport of Gas on the Gathering Lines or the redelivery of Gas at the Initial Delivery Points at the pressures prevailing at the known interconnecting facilities as identified on Exhibit "B" (the "*Initial Compression Facilities*"), together with any additional compression installed as part of any expansion of Gatherer's Gas System beyond the Initial System pursuant to this Agreement. As part of the Field Compression facilities, Gatherer may install, at its sole cost and expense, which costs shall be expressly excluded from the Actual Construct Costs, a dehydration system such as a TEG or EG dehydration system operating up to 740 Psig with stabilizer vessel and reboilers to eliminate excess water from the Gas stream and minimize the hazards presented by hydrate formation. Field

7

Compression shall be owned and operated by Gatherer and Gatherer shall assess a *"Compression Fee,"* as further described in this Agreement and Exhibit "E".

v.    The portion of Gatherer's Gas System that consists of the Initial System as described below, will be designed and constructed to: (a) be capable of handling the Gas volumes existing and anticipated from the drilling spacing units described on Exhibit "B-1" (the *"Initial System DSUs"*); (b) provide a nominal average operating pressure at the individual Initial Receipt Points, RP1 through RP8 as described more specifically on Exhibit "B", of approximately 55 Psig (the *"Nominal Average Pressure"*) based on eight thousand (8000) Mcfd in the aggregate across the Initial System; and (c) provide the Nominal Average Pressure at the individual Receipt Points, RP10 through RP14 and RP16 as described more specifically on Exhibit "B" so long as no single Receipt Point exceeds one thousand (1000) Mcfd. In the event the nominal average operating pressure at any Receipt Point is in excess of the Nominal Average Pressure during any Accounting Period in which Producer's Gas volumes are 8000 Mcfd or less, Producer may provide written notice (a *"Compression Notice"*) to Gatherer requesting that Gatherer decrease the nominal average operating pressure at such Receipt Point. If the nominal average operating pressure at such Receipt Point is not brought within the range of the Nominal Average Pressure within forty-five (45) days following receipt of the Compression Notice, Producer shall have the right to install compression facilities upstream of such Receipt Point, at Producer's sole cost and expense, whereupon Producer shall not owe any Compression Fees for Producer's Gas delivered to such Receipt Point, until such time as the amount of Compression Fees otherwise attributable to such Gas, but retained by Producer, is equal to the total of Actual Construct Costs incurred by Producer to install such compression facilities. In the event the nominal average operating pressure at any Receipt Point is in excess of the Nominal Average Pressure during any Accounting Period in which Producer's Gas volumes are more than 8000 Mcfd, Gatherer shall propose a plan to modify or expand its Gas Gathering System as necessary to achieve and maintain the Nominal Average Pressure at the affected Receipt Points, and shall modify or expand its Gas Gathering System as necessary to achieve and maintain the Nominal Average Pressure at the affected Receipt Points within forty-five (45) days following receipt of the Compression Notice. Subject to Force Majeure, in the event Gatherer fails or elects not to modify or expand its Gas Gathering System as necessary to achieve and maintain the Nominal Average Pressure at the affected Receipt Points within forty-five (45) days following receipt of the Compression Notice, Producer shall have the right to install compression facilities upstream of such Receipt Point, at Producer's sole cost and expense, whereupon Producer shall not owe any Compression Fees for Producer's Gas delivered to such Receipt Point, until such time as the amount of Compression Fees otherwise attributable to such Gas, but retained by Producer, is equal to the total of Actual Construct Costs incurred by Producer to install such compression facilities.

2.2    Rights-of-Way. At the time of executing this Agreement, Producer has completed its acquisition of rights-of-way (the *"ROW"* or *"ROWs"*) from certain landowners within the Area of Dedication (*"Landowners"*) authorizing the construction, installation and operation of multiple pipelines within the same right-of-way corridor. Producer shall be able to assign the ROWs in part to Gatherer, so as to grant Gatherer the right to install a single gas gathering line and related facilities in the corridor of the ROW in connection with the construction, installation and operation

8

of the Initial System. Due to Producer's existing relationship with the Landowners and in an effort to maximize efficiency, Producer will continue to interface directly with the Landowners until such time as the ROWs have been partially assigned to Gatherer, except as described below. Producer has tendered compensation to the respective Landowner and has recorded the respective ROW with the McKenzie County Clerk and Recorder. With respect to each ROW, until such time as Producer assigns the ROWs to Gatherer, Producer shall indemnify and hold harmless Gatherer, its Affiliates, and their respective employees, officers, directors, contractors and subcontractors (collectively, "*Gatherer Indemnified Parties*") from and against any and all trespass claims or claims arising out of the invalidity of any ROW brought by third party landowners arising from Gatherer's ingress to, egress from, entry upon, and use of such ROWs for survey, construction, installation and operation of the Gas Gathering System except to the extent arising from the gross negligence or willful misconduct of Gatherer Indemnified Parties.

Producer shall use commercially reasonable efforts to obtain any third party consents required to assign its ROWs to Gatherer (each a "*Consent to Assign*"). In the event Producer, despite commercially reasonable efforts, is unable to obtain any Consent to Assign Producer shall continue to hold such ROW for the benefit of Gatherer until such time as the Consent to Assign is obtained. Concurrently with the execution of this Agreement, Producer shall partially assign the ROWs to Gatherer, pursuant to the form of assignment attached hereto as Exhibit "G", and within thirty (30) days of receipt of detailed invoice and reasonably requested supporting documentation, Gatherer shall pay Producer twenty percent (20%) of the actual and direct costs incurred in obtaining the ROWs (based on five (5) pipelines allowed within a ROW and adjusted up or down for fewer or more pipelines properly located within a single ROW).

However, if Gatherer determines that any ROW is unnecessary for the Initial System or is insufficient, lacking, or otherwise defective, such that Gatherer in its reasonable discretion must acquire a new right-of-way in lieu thereof, such ROW shall not be assigned to Gatherer and Gatherer shall not pay any portion of the costs associated with such ROW.

Gatherer may proceed to interface with and acquire the real property interests it requires, including additional rights-of-way or amendments to ROWs to serve the Infill Receipt Points directly from the Landowners or other owners of such interests ("*Gatherer ROWs*"). In the event that Gatherer, despite commercially reasonable efforts, is unable to obtain any right-of-way deemed necessary for Gatherer in its reasonable discretion to construct and install the portions of the Initial System serving the Infill Receipt Points prior to May 31, 2015 (an "*Outstanding ROW*"), Gatherer may proceed with re-routing the course of the affected portion of the Initial System and acquire additional Gatherer ROWs to circumvent any uncooperative third party landowners with Gatherer to bear such Outstanding ROW costs and re-routing costs in the aggregate up to Eighty-Three Thousand Three Hundred and Thirty-Three dollars($83,333), which costs shall not be included in the Actual Construct Costs. In the event the Outstanding ROW costs are anticipated to exceed $83,333 the Parties shall promptly meet to develop a mutually agreeable plan to complete acquisition of Outstanding ROW. The Initial System Target In-Service Date shall be extended, as an Excused Delay as defined in Section 2.4 below, by the number of days, if any, that the construction and installation of the Initial System is delayed in order to acquire Outstanding ROW or agree on a course of action, or otherwise due directly to the Outstanding ROW.

9

2.3    Producer's Facilities and Construction.    Producer, at its own expense, shall construct, equip, maintain and operate all facilities upstream of the Receipt Points necessary to enable Producer to deliver all of Producer's Gas to Gatherer at the Receipt Points, including without limitation, flowlines and pipelines to move Producer's Gas from its Wells to the Receipt Points as identified in Exhibits "B" and "B-2" and mechanical separation equipment and all necessary facilities or equipment arising from any dual, split or additional connects if Producer's Wells are subject, in whole or in part, to existing dedications and connections to third party gatherers prior to the Effective Date.    Producer shall be responsible for the delivery of Producer's Gas at pressures sufficient to enter the respective Receipt Point at the Nominal Average Pressure.

2.4    Initial System.    The "*Initial System*" will consist of the initial facilities of Gatherer, described generally above and on Exhibit "B", as necessary to connect the Initial Receipt Points and Infill Receipt Points with the Initial Delivery Points, also described on Exhibit "B".    The Parties have agreed upon the configuration, design and construction of Gatherer's Gas System and have deemed the Initial System as sufficient to serve all of Producer's Minimum Volume commitment stated in Exhibit "E", and that the Initial System is sufficient to serve all of Producer's anticipated volumes of Producer's Gas from the Wells identified on Exhibit "B-2" (collectively, the "*Initial System Wells*") at the Initial Receipt Point or Infill Receipt Point listed in the column "Gatherer Receipt Point Construction Responsibilities" next to each such Well.

Subject to events of Force Majeure, severe winter weather, frost laws, road restrictions and other requirements or delays imposed by government agencies including without limitation delays in issuing ROWs on federal lands needed for the portion of Gatherer's Gas System serving the Infill Receipt Points, whether or not within the scope of Force Majeure that would make the diligent pursuit of similar construction or installation operations unreasonable for a reasonably prudent McKenzie County North Dakota gatherer faced with similar conditions (whether one or more, "*Excused Delays*"), Gatherer shall diligently construct, install and complete (y) the portion of Gatherer's Gas System serving the Initial Receipt Points as described on Exhibit "B" and Exhibit "B-2" on or before May 1, 2015 (the "*Start-Up Target Date*"), and (z) all of the Initial System including the Initial and Infill Receipt Points, on or before August 31, 2015, as extended by the number of Days equal to any Excused Delay event (the "*Initial System Target In-Service Date*"). The Parties each agree that their respective obligations to meet the Start-Up Target Date are on a reasonable commercial efforts basis with no credits or penalties applicable to either Party for non-achievement.    Producer acknowledges and agrees that any receipt, gathering and delivery of Gas by Producer prior to the Initial System In-Service Date shall incur the applicable Gas Gathering Fees and shall be provided on an interruptible basis at Gatherer's sole discretion as Gatherer may be completing the installation and construction of its Gas System and may also need to undertake calibration and other activities to achieve the Initial System In-Service Date during that period, *provided however*, that Gatherer shall notify Producer 24 hours or as soon as practicable prior to any activities of Gatherer that may reasonably be expected to cause an interruption or otherwise prevent Gatherer from receiving Gas from any Receipt Point from which Gatherer has previously accepted Gas, and Gatherer shall keep Producer fully informed of the progress of such activities and any anticipated resumption of service from such Receipt Point(s). The date on which Gatherer has completed the construction and installation of the Initial System, in its entirety so as to be capable of receiving Producer's Gas from all of the Initial Receipt Points and Infill Receipt Points identified on Exhibits "B" and "B-2", shall be the "*Initial System In-Service Date*".    For avoidance of doubt, such completion by Gatherer shall be a deemed

10

achievement of the Initial System In-Service Date notwithstanding the Initial System's partial or complete inability to accept and flow Gas on the Initial System when such inability arises solely from Producer's delay or failure to complete its responsibilities and obligations under this Agreement, as extended by Force Majeure or in the case of delay or failure to complete re-run piping if caused by frost laws imposed by government agencies.

i. In the event, subject to Force Majeure or Excused Delay, Gatherer fails to complete its construction of the Initial System, in its entirety per Section 2.4, Exhibit "B" and Exhibit "B-2", on or before the Initial System Target In-Service Date, and Producer has completed all facilities upstream of the Initial and Infill Receipt Points per Section 2.3, Exhibit "B" and Exhibit "B-2", and is otherwise ready, willing and able to deliver Producer's Gas to that portion of the Initial System that is not completed, the following shall occur:

a. the applicable Minimum Volume for each Accounting Period, or portion thereof, between the Initial System Target In-Service Date and the Initial System In-Service Date, shall be reduced by the estimated average daily volumes of Producer's Gas from the Initial System In-Service Date Wells for each such Accounting Period that would have been otherwise delivered to Gatherer's uncompleted portion of the Initial System during such Accounting Periods, in accordance with estimates of anticipated volumes previously provided by Producer to Gatherer pursuant to Section 2.7 (the "*Gatherer's Initial System Delay Pre-Inservice Volumes*"); and

b. Producer shall receive a credit against the Gas Gathering Fees owed by Producer in that Accounting Period (or if none are owed in that Accounting Period, beginning in the next occurring Accounting Period in which Gas Gathering Fees are owed by Producer and continuing for each successive Accounting Period until the credit is used in full, with the credit amount equal to Two dollars and Fifty cents ($2.50) per Mcf for the Gatherer's Initial System Delay Pre-Inservice Volumes, up to a maximum total credit of Two Million dollars ($2,000,000) for all Gatherer's Initial System Delay Pre-Inservice Volumes under this Agreement together with all "Gatherer's Initial System Delay Pre-Inservice Barrels" as defined under the Related Dedication Agreements described in Section 8.3 herein ("*Initial System Pre-Inservice Credit*").

ii. In the event Gatherer has completed its construction of the Initial System, in its entirety per Section 2.4, Exhibit "B" and Exhibit "B-2", on or before the Initial System Target In-Service Date, but, subject to Force Majeure or in the case of delay or failure to complete re-run piping if caused by frost laws imposed by government agencies, Producer has failed to complete all facilities upstream of the Initial and Infill Receipt Points per Section 2.3, Exhibit "B" and Exhibit "B-2", and Gatherer is otherwise ready, willing and able to receive and gather Producer's Gas on that portion of the Initial System, then the following shall occur:

a. the applicable Minimum Volume for each Accounting Period, or portion thereof, between the Initial System Target In-Service Date and the Initial System In-Service Date, shall be reduced by the estimated average daily volumes of Producer's

11

Gas from the Initial System In-Service Date Wells for each such Accounting Period that would have been otherwise delivered to the Initial System during such Accounting Periods if Producer had completed all facilities upstream of the Initial and Infill Receipt Points in accordance with estimates of anticipated volumes previously provided by Producer to Gatherer pursuant to Section 2.7 (the *"Producer's Initial System Delay Pre-Inservice Volumes"*).

b. Producer shall pay Gatherer an amount equal to Two dollars and Fifty cents ($2.50) per Mcf for the Producer's Initial System Delay Pre-Inservice Volumes beginning in the first Accounting Period following the Initial System In-Service Date and continuing for each successive Accounting Period until the payment is satisfied in full, up to a maximum total payment of Two Million dollars ($2,000,000) for all Producer's Initial System Delay Pre-Inservice Volumes under this Agreement together with all "Producer's Initial System Delay Pre-Inservice Barrels" as defined under the Related Dedication Agreements described in Section 8.3 herein (*"Initial System Pre-Inservice Fee"*).

iii. In addition to Producer's remedies under Section 2.4(i), in the event Gatherer fails to complete its construction of the Initial System, in its entirety per Section 2.4, Exhibit "B" and Exhibit "B-2", on or before the date that is sixty (60) Days after the Initial System Target In-Service Date, and Producer has completed all facilities upstream of the Initial and Infill Receipt Points per Section 2.3, Exhibit "B" and Exhibit "B-2" and is otherwise ready, willing and able to deliver Producer's Gas to that portion of the Initial System that is not completed, Producer shall have the option, exercisable in its sole discretion, to elect by written notice to Gatherer to construct and install the remainder of the Initial System, at Producer's sole cost and expense, whereupon Producer shall not owe any Gas Gathering Fees for any Gas delivered to the Initial and Infill Receipt Points or flowing through that portion of the Initial System constructed and installed by Producer, until such time as the amount of Gas Gathering Fees otherwise attributable to such Gas, but retained by Producer, is equal to one hundred and ten percent (110%) of the total of Actual Construct Costs incurred by Producer to complete the construction and installation of the remainder of the Initial System.

iv. Gatherer shall keep Producer reasonably informed of the progress on the construction and installation of the Initial System, and any Excused Delays in connection therewith. Producer shall have the right to have its representative present during any onsite construction or installation operations of the Initial System.

2.5 <u>Future Expansion Beyond the Initial System</u>. After installation of the Initial System, Gatherer will install and connect such Future Receipt Points, Future Delivery Points, additional Field Compression and expansions of Gatherer's Gas System, including but not limited to, installing additional or "looped" gathering lines or a larger diameter pipe that Gatherer in its sole judgment determines are necessary or desirable to gather Producer's Gas dedicated under this Agreement from subsequent completed Wells drilled or acquired by Producer within the Area of Dedication as set forth in this Section 2.5. For avoidance of doubt, any expansion of Gatherer's Gas System to serve Producer's Wells located outside of the Area of Dedication is not

12

contemplated by or covered under the scope of this Agreement. The Parties agree that Gatherer will own and operate any and all future expansions to Gatherer's Gas System including any Producer Built Gathering Facility, as defined in Section 2.6 herein.

       i.     In addition to providing Gatherer with annual drilling plans and quarterly updates to those plans under Section 2.7 below, Producer shall give Gatherer written notice (a "*Connection Notice*") one hundred twenty (120) to ninety (90) Days prior to the completion of any new Well located within the Area of Dedication but outside of the Initial System DSUs, or within ten (10) days after acquiring any such completed Well, specifying: the Well name; Well location; the location of the nearest Receipt Point or proposed Future Receipt Point, as applicable, for such Well; drilling, completions and anticipated recompletion details; the minimum anticipated initial and annual volumes of Producer's Gas from such Well together with the anticipated available volumes of Producer's Gas and Other Owner Gas from the drilling spacing unit ("*DSU*") in which the Well is located as may be requested by Gatherer; and if a Distant Expansion under subsection (iv) below applies, also specifying up to four (4) DSUs that are each directly adjacent to or cornering the DSU (the "*Contiguous DSUs*") of the Distant Well (defined below) for possible Permanent Release at Producer's sole discretion under subsection (iv)(a) below if (iv)(a) applies and the anticipated available volumes of Producer's Gas from the four (4) Contiguous DSUs as may be requested by Gatherer (the anticipated volumes from the DSU of the Distant Well and the four (4) Contiguous DSU volumes if requested, are collectively the "*Connection Volumes*"). Concurrently with its Connection Notice under this Agreement, Producer shall provide Gatherer with "Connection Notices" concerning the Well as required under the Related Dedication Agreements described in Section 8.3 of this Agreement. If a Well that is the subject of a Connection Notice is not completed within one hundred twenty (120) days of the Connection Notice, following good faith discussions with Producer, Gatherer shall then have the option to deem the Connection Notice as invalid and of no further effect.

       ii.     In the event the Well, or the Future Receipt Point, if applicable, as identified in the Connection Notice requires less than or equal to a three (3) mile expansion of Gatherer's Gas System from an existing Receipt Point or Delivery Point, as Gatherer's Gas System exists as of the date of the Connection Notice (a "*Nearby Well*"), Gatherer shall have the first option to construct, install and place into operation an expansion of Gatherer's Gas System to connect to the Nearby Well at Gatherer's sole cost and expense, in exchange for Gatherer's ability to charge Producer an additional fee per Mcf for any Gas from such Nearby Well or any other Well Producer flows through such expansion constructed by Gatherer based on the sample calculation set forth in Exhibit "H," such that Gatherer has recouped its Actual Construct Costs incurred by Gatherer to construct the expansion plus incremental operating expenses and capital expenditures, including capital expenditures needed to modify or upsize the Initial System or a prior expansion of the Initial System to accommodate the Connection Volumes, over a five (5) year period and receive a seven and a half percent (7.5%) internal rate of return ("*IRR*" as calculated by the Microsoft Excel IRR function financial formula) and trued up quarterly ("*Expansion Fee*"). For the avoidance of doubt the Expansion Fee shall be in addition to all other Gas Gathering Fees due for the Connection Volumes and such Expansion Fee shall be reduced equitably if Gatherer, in its sole discretion, elects to construct and install an expansion of

13

larger size or greater capacity than requested by Producer in its Connection Notice or required to serve Producer's Connection Volumes.

       iii.      Subject to Force Majeure and the condition that Producer has in fact completed such a Nearby Well, in the event Gatherer fails to timely construct, install and make available for operation on or before the later of ninety (90) days from receipt of the Connection Notice or the date the Well identified in the respective Connection Notice is completed, an expansion of Gatherer's Gas System to connect the Connection Volumes from the Nearby Well, following good faith discussions with Gatherer, Producer shall then have the option either to:

       a.      Construct and install an expansion of Gatherer's Gas System to connect Gatherer's Gas System existing at that time to the Nearby Well, at Producer's sole cost and expense, in exchange for Producer receiving a credit against any Base Fee component of the Gas Gathering Fees otherwise owed Gatherer for any Gas from such Nearby Well or any other Well flowing through such expansion constructed by Producer, until such time as the amount of the Base Fee component of the Gas Gathering Fees otherwise attributable to such Gas, but retained by Producer, is equal to the total of Actual Construct Costs incurred by Producer to construct the expansion based on the sample calculation set forth in Exhibit "H," such that Producer has recouped its Actual Construct Costs incurred by Producer to construct the expansion plus incremental operating expenses and capital expenditures, including capital expenditures needed to modify or upsize the Initial System or a prior expansion of the Initial System to accommodate the Connection Volumes, over a five (5) year period and receive a seven and a half percent (7.5%) IRR and trued up quarterly (*"Expansion Credit"*); or

       b.      Subject to Section 1.4(ii), obtain a Permanent Release from this Agreement of the Nearby Well and any of the Leases located within the same DSU as the Nearby Well but not located within an Initial System DSU.

       iv.      In the event the Well, or the Future Receipt Point or Delivery Point, if applicable, as identified in the Connection Notice requires more than a three (3) mile expansion of Gatherer's Gas System, as Gatherer's Gas System exists as of the date of the Connection Notice (*"Distant Well"*), or involves a connection of Gatherer's Gas System with facilities of third parties not connected to Gatherer's Gas System as of the date of the Connection Notice (one or both situations, a *"Distant Expansion"*), the Parties shall promptly pursue good faith negotiations of mutually agreeable terms and conditions of such an expansion and strive to enter into a definitive separate agreement or written amendment setting forth a definitive agreement as to such Distant Expansion. In the event the Parties have not reached agreement, on or before the later of ninety (90) days from receipt of the Connection Notice or the date the Well identified in the respective Connection Notice is completed, for the terms of such a Distant Expansion of Gatherer's Gas System, following good faith discussions with Gatherer, Producer shall have the option to:

14

a. Subject to Section 1.4(ii), obtain a Permanent Release from this Agreement of any of the Leases located within the DSU of the Distant Well, and the four (4) Contiguous DSUs but only if such Leases are not located within an Initial System DSU.

v.      Gatherer shall keep Producer reasonably informed of the progress on the construction and installation of any expansion of Gatherer's Gas System. Producer shall have the right to have its representative present during any onsite construction or installation operations of any expansion of Gatherer's Gas System.

2.6     Construction or Expansion by Producer. In the event Producer elects to construct, install or expand any portion of Gatherer's Gas System pursuant to an express right provided under this Agreement, which express right does not extend to a gas processing facility or compression above what is required for a similar gas gathering facility (a "*Producer Built Gathering Facility*"), the following shall apply:

i.      Each Producer Built Gathering Facility shall be constructed and installed by Producer according to the reasonable design and construction specifications of Gatherer. In constructing and installing the Producer Built Gathering Facility, Producer shall have the right to utilize any available gas pipeline right-of-way or easement rights of Gatherer and any materials of Gatherer, at cost.

ii.      Upon completion of any Producer Built Gathering Facility, Producer shall assign such Producer Built Gathering Facility to Gatherer, at no charge to Gatherer, but expressly subject to the terms of this Agreement, whereupon it shall become part of Gatherer's Gas System.

iii.      If Producer has incurred Actual Construct Costs pursuant to Section 2.5(iii)(a), once Producer has recouped all of such Costs pursuant to Section 2.5, Gatherer may begin to assess the applicable Base Fee component of Gas Gathering Fees for all Gas delivered by Producer into or flowing through such Producer Built Gathering Facility. Gatherer may begin to assess all other components of the Gas Gathering Fees for all Gas delivered by Producer beginning upon the commencement of receipt into or flow through such Producer Built Gathering Facility.

iv.      For the avoidance of doubt, for purposes of determining whether Producer has delivered the Minimum Volume in any Accounting Period pursuant to the terms and conditions set forth on Exhibit "E", any Gas delivered during such Accounting Period for which Producer does not owe any Base Fee component of the Gas Gathering Fees pursuant to its incurrence of Actual Construct Costs pursuant to Article 2 of this Agreement shall be included in the Delivered Volume.

2.7     Producer's Anticipated Volumes. Upon the execution of this Agreement, and thereafter by October first (1st) of each calendar year, Producer shall communicate its drilling, completion and recompletion plans to Gatherer in writing, including locations, anticipated spud dates, together with anticipated volumes to be delivered to Gatherer, for the next calendar year. Additionally,

15

during Gatherer's construction of facilities to serve the Infill Receipt Points, Producer shall promptly notify Gatherer of any delay in its drilling and completion schedules for the Wells identified in Exhibit "B-2", including without limitation delays in completion of any Wells on Exhibit "B-2" later than May 1, 2015. At all other times during the Primary Term or Extended Term, no later than the last day of each calendar quarter, Producer shall notify Gatherer in writing with reasonable detail of any changes or additions to its drilling plans for the succeeding twelve (12) Accounting Periods. In addition to providing Connection Notices, pursuant to Section 2.5(i), Producer shall provide updates to Gatherer, as needed, of specific drilling and completion plans, actual initial production dates, and additional volumes from Other Owner Gas or from prior dedications.

2.8    Ownership of Facilities. Producer expressly does not by the terms of this Agreement, sell, transfer or assign unto Gatherer any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by Producer in the operation of Producer's Wells and the Leases. Gatherer expressly does not by the terms of this Agreement, sell, transfer or assign unto Producer any title or interest whatsoever in Gatherer's Gas System, or any pipelines or other equipment of any nature owned and used by Gatherer in the operation of Gatherer's Gas System or its performance of services under this Agreement.

ARTICLE III
GATHERING SERVICE

3.1    Producer's Capacity. Commencing on the Initial System In-Service Date, Gatherer shall make available Capacity equal to Producer's anticipated volumes of Producer's Gas to be delivered pursuant to Sections 2.4 and 2.7 ("*Producer's Capacity*") in the aggregate, for the benefit of Producer's Gas, subject to Force Majeure. On a daily basis, any capacity available in the Gatherer's Gas System in excess of the lesser of Producer's Capacity or the actual amount of Producer's Gas nominated by Producer to Gatherer each Day hereunder, shall be available to Gatherer for Third Party Gas volumes on such Days. Producer's Capacity shall be adjusted upward by additional Connection Volumes served by expansions of Gatherer's Gas System pursuant to Section 2.5 of this Agreement, and downward by Permanently Released Volumes pursuant to Section 1.4(ii) of this Agreement.

3.2    Gathering. Subject to the terms and conditions of this Agreement, Gatherer shall receive at the Receipt Points and gather Producer's Gas utilizing Gatherer's Gas System, up to Producer's Capacity, and redeliver an equivalent Thermal Content quantity of Gas, less Fuel, Field Condensate, and Lost and Unaccounted for Gas, to Producer or its designee at the Delivery Points in consideration of Producer's payment of the Gas Gathering Fees provided on Exhibit "E". To the extent of available capacity, Gatherer also agrees to receive and gather any of Producer's Gas in excess of Producer's Capacity and Other Owner Gas on an interruptible basis and to redeliver to Producer or its designee the equivalent Thermal Content quantity of such Gas, less Fuel, Field Condensate, and Lost and Unaccounted for Gas to Producer or its designee at the Delivery Points in consideration of Producer's payment of the Gas Gathering Fees provided on Exhibit "E" for such Producer's Gas and Other Owner Gas. For purposes of Thermal Content determination under this Agreement, Gas will be measured by Gatherer using an ABB Flow Totalizer with volumes

16

adjusted for gas composition and reported in Btus. Gas sample analysis will be made at least quarterly and analysis results will be the composition basis for the period.

3.3    No Processing. Gatherer shall not process Producer's Gas for the removal of liquefiable hydrocarbons after receipt of Producer's Gas at the Receipt Points and prior to its delivery to the Delivery Points, other than by the use of conventional mechanical type Gas liquid separators commonly used in the industry to separate liquid hydrocarbons and free water from Gas which shall include without limitation the dehydration system identified in Section 2.1(iv). The Parties acknowledge and agree that Field Condensate may separate from Producer's Gas as a result of Gatherer's normal gathering and compression operations and that Gatherer shall be allowed to remove and retain for its own account such Field Condensate.

3.4    Third Party Gas. Producer acknowledges and understands that Gatherer will receive Producer's Gas utilizing Gatherer's Gas System which may also receive and commingle Producer's Gas with Third Party Gas delivered to Gatherer by other parties, at all times subject to Producer's Capacity and such Third Party Gas meeting the Gas Quality Specifications set forth in the attached Exhibit "F." Accordingly, the Gas delivered to the Producer or Producer's designee at the Delivery Points may not be the same Gas, or have the same characteristics, as Producer's Gas delivered to the Receipt Points.

3.5    Priority of Service. Except for any Other Owner Gas that has not been dedicated to this Agreement by ratification or other formal agreement entered into by such Other Owner, Producer's Gas, up to Producer's Capacity, shall be accorded highest priority on Gatherer's Gas System with respect to capacity allocations, interruptions, or curtailments. On a Receipt Point or Delivery Point basis as applicable, Producer's Gas will be the last Gas curtailed from Gatherer's Gas System in the event of an interruption or curtailment affecting specific Receipt Points or Delivery Points rather than Gatherer's Gas System as a whole, and all of Producer's Gas affected by a particular Receipt Point or Delivery Point will be treated in the same manner in the event an allocation is necessary. Gatherer agrees not to contract to provide, at any time, gathering service on Gatherer's Gas System on a basis that has a priority higher than what Producer's Gas is entitled to pursuant to this Section 3.5 and under this Agreement.

ARTICLE IV
EXHIBITS

4.1    Exhibits. All Exhibits attached to this Agreement are incorporated into and made an integral part of this Agreement by reference including the General Terms and Conditions set forth in the attached Exhibit "C" (the "*GT&C*").

4.2    Order of Precedence. In the event of any conflict between the terms as set out in the body of this Agreement and those set out in the GT&C, the terms in the body of this Agreement shall control.

ARTICLE V
CONSIDERATION & FEES

17

5.1   Fees.  Gatherer shall charge and Producer shall pay the applicable "*Gas Gathering Fees*" and any "*Shortfall Payment*" described on Exhibit "E" based on the total Mcf of Gas delivered by Producer and received at the Receipt Points.   If and as applicable under Section 2.4(ii)(b), Gatherer shall charge and Producer shall pay the Initial System Pre-Inservice Fee.   If and as applicable under Section 2.5, Gatherer shall charge and Producer shall pay the Expansion Fee.

5.2   Annual Fee Adjustments.  The Base Fee, Meter Fee, Compression Fee, and Expansion Fee components of the Gas Gathering Fees may be adjusted annually during the term of this Agreement, for the prospective calendar year, the first prospective calendar year being 2020, based on the percentage change in the annual average in the "Consumer Price Index for All Urban Consumers (CPI-U) : U.S. city average - All items" which occurred in the preceding calendar year as published by the United States Department of Labor, Bureau of Labor Statistics for the previous calendar year, but shall never be less than the Base Fee, Meter Fee or Compression Fee, as applicable, set forth in Exhibit "E".

5.3   Utilities.  Producer shall furnish utilities needed for Gatherer's Gas System at the Receipt Points.  In addition to the Gas Gathering Fees and utilities furnished by Producer, Gatherer shall charge and Producer shall pay its pro rata share of the actual utility costs incurred by Gatherer in connection with operating Gatherer's Gas System including any necessary power costs incurred in connection with Field Compression or with the Delivery Points.  The actual utility costs shall be allocated on a pro-rata basis to each shipper of Gas on Gatherer's Gas System each Accounting Period based upon throughput of all Gas through Gatherer's Gas System during such Accounting Period.

5.4   Lost and Unaccounted for Gas.  The difference between the volume of Producer's Gas, as measured in MMBtus at the Receipt Points and the measurements provided by the interconnecting parties in MMBtus at the Delivery Points, less Field Condensate and Fuel, shall be considered as Lost and Unaccounted for Gas sustained on Gatherer's Gas System due to evaporation, measurement and other losses in transit.  The Lost and Unaccounted for Gas shall be allocated on a pro-rata basis to each shipper of Gas on Gatherer's Gas System each Accounting Period based upon throughput of all Gas through Gatherer's Gas System during such Accounting Period.  Gatherer shall not be responsible to Producer for the Lost and Unaccounted for Gas.

5.5   Fuel.  Gatherer may retain for its own account so much Gas as reasonably necessary for Gatherer to use and consume as fuel to operate Gatherer's Gas System ("*Fuel*").  The Fuel shall be allocated on a pro-rata basis to each shipper of Gas on Gatherer's Gas System each Accounting Period based upon throughput of all Gas through Gatherer's Gas System during such Accounting Period.

5.6   Limitation.  Notwithstanding anything to the contrary herein, the equivalent Thermal Content quantity of Producer's pro rata share of the sum of (i) all Lost and Unaccounted for Gas, and (ii) Fuel, for any Accounting Period, shall not exceed four percent (4.0%) of the equivalent Thermal Content quantity of Producer's Gas transported on Gatherer's Gas System for such Accounting Period.

18

ARTICLE VI
NOTICES

6.1     Notice Process.   All notices and communications required or permitted under this Agreement shall be in writing and shall be considered as having been given if delivered personally, or when received by mail, by electronic means (confirmed as received before 5 p.m. at the place of receipt), or by express courier, postage prepaid, by either Party to the other at the addresses given below. Routine communications, including monthly statements, shall be considered as duly delivered when mailed by ordinary mail or by electronic means.

6.2     Addresses for Notice.   Unless changed upon written notice by either Party, the addresses for notice purposes are as follows:

TO:     Emerald Oil, Inc.
        1600 Broadway, Suite 1360
        Denver, CO 80202
        Phone: 303-595-5629
        Contact:  James Muchmore

TO:     Dakota Midstream, LLC
        1600 Broadway, Suite 1330
        Denver, CO 80202
        Phone: 202-213-5998
        Contact:  Tim Reynolds

ARTICLE VII
TERM

7.1     Primary and Extended Terms.   This Agreement shall commence as of the Effective Date and shall remain in full force and effect for a primary term of fifteen (15) years (the "*Primary Term*") and shall continue year to year thereafter until terminated by either Party (the "*Extended Term*") by providing written notice of termination to the other Party at least sixty (60) days prior to the expiration of the Primary Term or any subsequent annual expiration date.

7.2     Capacity Adjustment.   During any Extended Term, Producer's Capacity will be the average daily volume of Producer's Gas delivered to Gatherer's Gas System during the prior twelve (12) month period.

7.3     Uneconomic Operations.   Subject to any Force Majeure event affecting Producer's obligations to deliver Gas hereunder, in addition to all other rights of Gatherer under this Agreement, in the event the sum of actual direct costs (for the avoidance of doubt, excluding overhead, depreciation, amortization and capital expenditures) incurred by Gatherer to operate any portion of Gatherer's Gas System (the "*Uneconomic Segment*") during any ninety (90) day period are in excess of the total net revenue attributable to the Uneconomic Segment (including all Gas Gathering Fees paid by Producer or any third party attributable to the Uneconomic Segment) during such ninety (90) day period, Gatherer shall have the right to send written notice (an

19

"*Uneconomic Notice*") to Producer of its intent to terminate receipts of Gas into the Uneconomic Segment unless the Gas Gathering Fees owed by Producer for Producer's Gas delivered to the Uneconomic Segment are increased such that Gatherer's total anticipated net revenue attributable to the Uneconomic Segment is projected to equal one hundred ten percent (110%) of Gatherer's actual direct costs (for the avoidance of doubt, excluding overhead, depreciation, amortization and capital expenditures) incurred by Gatherer to operate the Uneconomic Segment. Any increased Gas Gathering Fee shall be borne pro-rata by Producer and any third party shipper on the Uneconomic Segment according to the anticipated volumes of Producers Gas and Third Party Gas to be delivered to or flowed through the Uneconomic Segment. Within ten (10) days of Producer's receipt of notice from Gatherer, Producer shall elect by written notice sent to Gatherer either to:

       i.      Accept the increased Gas Gathering Fees, or portion thereof, effective as of the beginning to the next Accounting Period, owed by Producer for Producer's Gas delivered to the Uneconomic Segment, whereupon Gatherer shall not send another Uneconomic Notice pursuant to this Section 7.3 for at least ninety (90) days; or

      ii.     Obtain a Temporary Release of the Leases and Wells directly affected by the Uneconomic Segment, with Producer able to elect, by delivery of written notice to Gatherer, to obtain a Permanent Release and terminate the Agreement, insofar as it pertains to the Uneconomic Segment after one hundred eighty (180) days of Producer's receipt of the Uneconomic Notice under this Section 7.3.

## ARTICLE VIII
## MISCELLANEOUS

8.1    Assignment. This Agreement, including, without limitation, any and all renewals, extensions, amendments and/or supplements hereto shall extend to and inure to the benefit of and be binding upon the Parties, and their respective successors and assigns, including any purchaser of Producer's Gas or Producer's interests in the Leases that are dedicated under this Agreement or subsequent operator of the Wells, and any purchaser of Gatherer's Gas System, or any part or interest therein which are subject to this Agreement; provided, however, (i) this Agreement shall not be assigned by a Party without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned or delayed, and (ii) no sale, assignment, conveyance or other transfer (collectively, a "*Transfer*") of Producer's Leases or Wells, or any part thereof or interest therein, or any part of Gatherer's Gas System, shall be made unless the transferee thereof shall assume and agree to be bound by this Agreement insofar as the same shall affect and relate to the Leases, Wells, Gatherer's Gas System or interests so Transferred. Notwithstanding the conditions and restrictions set forth on assignment in this Section 8.1, each Party retains the right to freely assign this Agreement to an Affiliate within the first year following the Effective Date. Interests owned in the Area of Dedication by a transferee of any of Producer's Leases or Wells that were owned prior to the effective date of such Transfer shall not become subject to this Agreement by virtue of such Transfer. It is further agreed, however, that nothing herein contained shall in any way prevent a Party from pledging or mortgaging, all or any part of such Producer's Leases if Producer, or Gatherer's Gas System if Gatherer, as security under any mortgage, deed of trust, or other similar lien, or from pledging this Agreement or any benefits accruing hereunder to the Party

20

making the pledge without the assumption of obligations hereunder by the mortgagee, pledgee or other grantee under such instrument.

8.2    No Third Party Beneficiaries. Nothing in this Agreement, expressed or implied, confers any rights or remedies on any person or entity not a party hereto other than successors and assigns of the Parties.

8.3    Cooperation Under Related Dedication Agreements. The Parties expressly acknowledge that this Agreement is one of several agreements executed contemporaneously herewith by Producer, Gatherer, or an Affiliate of Gatherer pertaining to the gathering or transportation of Crude and water, and the disposal of water from the same Leases and Wells and covering the same Area of Dedication (the "Related Dedication Agreements"), with certain facilities to be located, and services to be provided, under this Agreement in proximity to those covered under the Related Dedication Agreements. The cooperation and performance by the Parties and their respective Affiliates of all of the obligations under this Agreement and each of the Related Dedication Agreements is essential for the Parties to receive the full benefit of their bargain under this Agreement and the Related Dedication Agreements. Subject to Force Majeure and any other applicable provisions under this Agreement or any Related Dedication Agreement, Gatherer and each Affiliate of Gatherer which is a party to a Related Dedication Agreement, shall construct, install and put into service the Initial System, pursuant to this Agreement, and the corresponding Initial Systems for Crude transportation and water gathering as described in the Related Dedication Agreements, in each case, in their entirety, as to all of the Initial and Infill Receipt Points together with any future expansions beyond the Initial System undertaken pursuant to this Agreement and under the corresponding provisions of the Related Dedication Agreements.

8.4    Entirety; Amendment. Subject to Section 8.3, this Agreement, together with the Exhibits attached hereto, constitutes the entire agreement and understanding between the Parties hereto and supersedes and renders null and void and of no further force and effect any prior proposals, understandings, negotiations or agreements between the Parties relating to the subject matter hereof, and all amendments and letter agreements in any way relating thereto. No provision of this Agreement may be changed, modified, waived or discharged orally, and no change, modification, waiver or amendment of any provision will be effective except by written instrument executed by the Parties.

8.5    Severability. Should any part of this Agreement be found to be void, unenforceable or be required to be modified by a court or governmental authority, then only that part of this Agreement shall be voided, unenforceable, or modified accordingly. The remainder of this Agreement shall remain in force and unmodified, subject to Section 7 of the GT&C.

8.6    Additional Gas Services; Area of Interest. In the event Producer desires to construct, install, operate or perform gas delivery, gas quality enhancement, gas lift or re-injection, compression or other field services or Producer desires gas gathering services in areas of McKenzie County south of Township 150, Billings County, or Stark County, North Dakota ("Area of Interest") (such additional types of locations or desired services collectively "Additional Gas Services"), Producer shall give notice to Gatherer regarding such Additional Gas Services before soliciting such Additional Gas Services or entering into any binding agreements with any third

21

parties to perform such Additional Gas Services. The selection of Gatherer or any third party to perform such Additional Gas Services shall be in the sole discretion of Producer, and the performance of such Additional Gas Services shall be governed by a separate agreement containing mutually agreeable terms and conditions.

8.7     Audit Rights.

i.      Except for Actual Construct Costs  for which a process of disclosure and agreement is provided within Section 1(b) of the GT&C and Initial System Costs which are further addressed in Exhibit "E", upon ten (10) days prior written notice, either Party shall have the right, at reasonable times during normal business hours, but no more frequently than once each calendar year, at its own expense, to examine the books and records of the other Party to the extent necessary to audit and verify the accuracy of any statement, charge, or computation made under or pursuant to this Agreement. All statements, allocations, measurement, and payments made in any Accounting Period prior to the twenty-four (24) Month period preceding the Month in which notice of audit is given by the auditing Party shall be conclusively deemed to be true and correct and the scope of such audit shall be limited to statements, allocations, measurements and payments made during such twenty-four (24) Month period.

ii.     The auditing Party shall have ninety (90) days after commencement of the audit in which to submit a written claim, with supporting detail, for proposed adjustments. If the auditing Party fails to submit a written report to the audited Party within the ninety (90) day period, then all statements, charges and computations made under or pursuant to this Agreement that were within the audit period shall be deemed to be appropriate and accurate. Upon receipt of an audit report, the audited Party shall have ninety (90) days to make all recommended adjustments, or to notify the auditing Party that it does not agree and its basis for disagreement. Any unresolved disagreements shall be resolved pursuant to Section 11 of the GT&C.

8.8     Amendment and Restatement of Original Agreement.  Upon execution of this Agreement by Gatherer and Producer, this Agreement shall amend, restate, supersede and replace the Original Agreement, including any amendments thereto, in its entirety and for all purposes, effective as of the Effective Date.

8.9     Governing Law; Venue.  THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NORTH DAKOTA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. EXCLUSIVE VENUE FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT BY EITHER PARTY IN CONNECTION WITH THIS AGREEMENT OR ARISING OUT OF THE EFFECTIVE TERMS OR CONDITIONS HEREOF SHALL BE IN THE CITY AND COUNTY OF DENVER, COLORADO.

8.10    Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which, when construed together, shall constitute one and the same instrument.

8.11    Ratification. Emerald WB LLC hereby ratifies, confirms and approves the Agreement in all respects and adopts it as Emerald WB LLC's act and deed to the same extent as if the Agreement had been executed by Emerald WB LLC on the date of its original execution, effective as of the Effective Date.

THE PARTIES HERETO have executed this Agreement effective as of the Day and year first above written.

GATHERER                                      PRODUCER
DAKOTA MIDSTREAM, LLC                          EMERALD OIL, INC.


By: _____                  By: _____

Name:  Tim Reynolds                            Name:  McAndrew Rudisill

Title:  Founding Partner                       Title:  Chief Executive Officer and
                                                       President

Date:  April __, 2015                          Date:  April __, 2015



                                               EMERALD WB LLC


                                               By: _____

                                               Name:  McAndrew Rudisill

                                               Title:  President

                                               Date:  April __, 2015


23

24

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

AREA OF DEDICATION

The following lands located in McKenzie County, North Dakota:

| Section | Township | Range |
|---------|----------|-------|
| 1-36 | 148N | 102W |
| 1-36 | 148N | 103W |
| 1-36 | 149N | 102W |
| 1-36 | 149N | 103W |

EXHIBIT "B"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

GATHERER'S INITIAL SYSTEM

Initial Receipt Points and Infill Receipt Points
Gathering pipeline connecting Initial Receipt Points and Infill Receipt Points with Initial Delivery Points
Initial Receipt Point and Infill Receipt Point Meters
Compressor Station

PRODUCER'S INITIAL FACILITIES

All facilities upstream of Initial Receipt Points and Infill Receipt Points
See Section 2.3 and Exhibit "B-2" for details

INITIAL RECEIPT POINTS (RECEIPT INTO INITIAL SYSTEM ONLY)*

- RP1    NW/4 of NE/4 of Section 2, T149N, R102W
- RP2    NE/4 of NW/4 of Section 16, T149N, R102W
- RP3    NW/4 of NW/4 of  Section 25, T149N, R102W
- RP4    SW/4 of SW/4 of Section 33, T149N, R102W
- RP5    NW/4 of NE/4 of Section 18, T148N, R102W
- RP6    NW/4 of SW/4 of Section 27, T149N, R102W
- RP7    SE/4 of SE/4 of Section 22, T149N, R102W
- RP8    NW/4 of NE/4 of Section 16, T149N, R102W

INFILL RECEIPT POINTS

- RP10   SE/4 of SW/4 of Section 10, T149N, R102W
- CP11   SE/4 of SE/4 of Section 8, T149N, R102W [valve & riser only]**
- RP12   SE/4 of SW/4 of Section 8, T149N, R102W
- RP13   NE/4 of NW/4 of Section 25, T149N, R102W
- RP14   SE/4 of SE/4 of Section 32, T149N, R102W
- RP16   SE/4 of SW/4 of Section 8, T148N, R102W

INITIAL SYSTEM DELIVERY POINTS (DELIVERY OFF OF INITIAL SYSTEM ONLY)*

- NE/4 of NE/4 of Section 30, T149N, R101W

*The Initial System does not include any co-located Gas Receipt and Delivery Points.

25

\*\*CP11 may be referred to as either CP11 or RP11 due to this Receipt Point including a valve and riser only.

EXHIBIT "B-1"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

<u>DSUs SUFFICIENTLY SERVED BY THE INITIAL SYSTEM</u>

| **DSUs** |
|---|
| Arsenal (Fed) |
| Billy Ray Valentine |
| Caper |
| Clark Griswold |
| D'Annunzio |
| Dean Wormer |
| Dudley Dawson |
| Excalibur |
| Hot Rod |
| Joel Goodsen |
| Mongoose |
| Noonan (Fed) |
| Pirate |
| Slugger |
| Talon |
| Ty Webb |

27

EXHIBIT "B-2"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

INITIAL SYSTEM INCLUDING INFILL RESPONSIBILITIES
(as additional detail to Article II)

| WELL NAME | Gatherer Receipt Point Construction Responsibilities | Producer Construction Responsibilities |
|---|---|---|
| Arsenal (Fed) 1-17-20H – Active | RP12 | |
| Arsenal (Fed) 6-17-20H – Future | CP11 (valve & riser only) | |
| Arsenal (Fed) 7-17-20H – Future | CP11 (valve & riser only) | |
| Billy Ray Valentine 1-8-5H – Active | RP16 | |
| Billy Ray Valentine 2-8-5H – Active | RP16 | |
| Billy Ray Valentine 3-8-5H – Active | RP16 | |
| Caper 1-15-22H – Active | Gatherer to complete connection to RP10 | Producer to build to RP10 |
| Caper 2-15-22H – Active | RP10 – see above | See above |
| Caper 3-15-22H – Active | RP10 – see above | See above |
| Caper 4-15-22H – Active | RP10 – see above | See above |
| Caper 5-22-15H – Active | RP7 | |
| Caper 6-22-15H – Active | RP7 | |
| Clark Griswold Federal 3-36-25H | RP16 | |
| D'Annunzio 3-7-6H – Active | RP5 | |
| D'Annunzio 4-7-6H – Active | RP5 | |
| D'Annunzio 5-7-6H – Active | RP5 | |
| Dean Wormer 1-33-28H – Active | RP4 | |
| Dean Wormer 2-33-28H – Active | RP4 | |
| Dudley Dawson 6-2-11H | RP14 | |
| Dudley Dawson 7-2-11H | RP14 | |
| Excalibur 1-25-36H – Active | RP3 | |
| Excalibur 2-25-36H – Active | RP3 | |
| Excalibur 3-25-36H – Active | Gatherer to complete connection to RP13 | See below – Producer to build to RP13 |
| Excalibur 4-25-36H – Active | RP13 – see above | See below |
| Excalibur 5-25-36H – Active | RP13 – see above | See below |
| Excalibur 6-25-36H | RP13 – see above | Producer to build to RP13 |
| Excalibur 7-25-36H | RP13 – see above | Producer to build to RP13 |
| Hot Rod 1-27-26H – Active | RP6 | |

28

| | | |
|---|---|---|
| Hot Rod 4-27-26H – Active | RP6 | |
| Joel Goodsen 5-32-29H | RP14 | |
| Joel Goodsen 6-32-29H | RP14 | |
| Joel Goodsen 7-32-29H | RP14 | |
| Mongoose 1-8-5H – Active | RP12 | |
| Mongoose 6-8-5H – Future | CP11 (valve & riser only) | |
| Mongoose 7-8-5H – Future | CP11 (valve & riser only) | |
| Noonan Federal 3-18-19H | RP 14 | |
| Pirate 1-2-11H – Active | RP1 | |
| Pirate 2-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 3-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 4-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 5-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 6-2-11H – Active | RP1 | Producer to build to RP1 |
| Slugger 1-16-21H - Active | RP2 | |
| Slugger 3-16-21H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Slugger 5-16-21H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Slugger 6-16-21H - Active | RP8 – Link Facility | Producer to build to RP8 |
| Slugger 7-16-21H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 1-9-4H – Active | RP2 | |
| Talon 3-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 5-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 6-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 7-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Ty Webb 1-1-12H – Active | RP4 | |
| Ty Webb 3-1-12H - Active | RP4 | |

29

EXHIBIT "B-3"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

INITIAL SYSTEM MAP INCLUDING INFILL RECEIPT POINTS



EXHIBIT "C"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

GENERAL TERMS AND CONDITIONS ("GT&C")

1.    DEFINITIONS

For the purposes of the Agreement to which this Exhibit is attached, unless the context of the Agreement requires otherwise, the following terms and expressions used therein and in these GT&C shall be defined as follows:

(a)    *"Accounting Period"* shall mean a period of one calendar Month, commencing at 7:00 a.m. Central Standard Time on the first day of each Month, and ending at 7:00 a.m. Central Standard Time on the first day of the succeeding calendar Month.

(b)    *"Actual Construct Costs"* means the actual and direct costs to install and construct Gatherer's Gas System, or any portion thereof, as applicable, together with appurtenant facilities under this Agreement, and shall include, all third party or field personnel costs of engineering, design and survey, easements and rights of way, procurement of equipment, facility parts and appurtenances including any metering facilities, permitting, and construction and installation of the facility and the appurtenances, together with any other third party or field personnel costs or expenses incurred by the constructing Party in connection with the installation of the facilities that are normally capitalized pursuant to generally accepted accounting principles. Subject to Section 2.2, Actual Construct Costs shall include payments for ROWs made by Gatherer to Producer but not payments made by Gatherer to any third party. Whenever Actual Construct Costs are provided for under this Agreement and are subject to reimbursement by the non-constructing Party, the constructing Party shall provide itemized costs together with reasonable supporting documentation to the non-constructing Party. The non-constructing Party shall have thirty (30) days from receipt of the statement of Actual Construct Costs to notify the constructing Party in writing with reasonable specificity of any dispute relating to the Actual Construct Costs together with reasonable supporting documentation of its basis for such dispute. Any dispute arising from the determination of Actual Construct Costs that is not resolved within thirty (30) days of the constructing Party's receipt of the non-constructing Party's dispute notice shall be subject to dispute resolution under Section 11 of the GT&C.

(c)    *"Affiliate"* with respect to any Party shall mean any other party that controls, is controlled by or is under common control with such Party (whether directly or through one or more intermediaries). For purposes of this definition, "control" of an entity includes the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity whether by contract or otherwise.

32

(d)     *"Btu"* (British thermal unit) shall mean the amount of heat required to raise the temperature of one (1) avoirdupois pound of pure water from fifty-eight and five-tenths degrees (58.5°) Fahrenheit to fifty-nine and five-tenths degrees (59.5°) Fahrenheit.

(e)     *"Central Standard Time"* shall mean Central Standard Time throughout the year not adjusted for Central Daylight Time.

(f)     *"Crude"* or *"Crude Oil"* means the mixture of hydrocarbons that exist in natural underground reservoirs after passing through surface separation and well site treatment facilities and remain liquid at atmospheric pressure.

(g)     *"Cubic Foot of Gas"* shall mean the amount of Gas required to fill a cubic foot of space when the Gas is at a base pressure of 14.73 psia and at a base temperature of sixty degrees (60°) Fahrenheit.

(h)     *"Day"* or *"day"* shall mean the 24-hour period beginning and ending at 7:00 a.m. Central Standard Time.

(i)     *"Delivery Points"* shall mean the mutually agreed upon points at which Gas is delivered from Gatherer's Gas System.

(j)     *"Field Condensate"* shall mean any condensate or any other liquids or drip hydrocarbons, which have condensed or collected in and are removed from Gatherer's Gas System upstream of the Delivery Points, subject to Section 3.3.

(k)     *"Gas"* shall mean the effluent vapor stream including all of the constituents thereof, including liquefiable hydrocarbons associated with the vapor stream, as produced from a Well, whether a gas Well or an oil Well, and delivered into Gatherer's Gas System by Producer and other producers, if any, at their respective Receipt Points.

(l)     *"Gross Heating Value"* shall mean the total or gross Btus produced by the complete combustion, at constant pressure, of the amount of Gas which would occupy a volume of one (1.0) cubic foot at a temperature of sixty degrees (60° F) Fahrenheit saturated with water vapor and under a pressure of 14.73 Psia with air of the same temperature and pressure as the Gas, when the products of combustion are cooled to the initial temperature of the Gas and air and when the water formed by combustion is condensed to the liquid state.

(m)     *"Initial Compressor Facilities"* shall mean the Gas compression facility located at 14316 20th Street NW, Alexander, ND 58331.

(n)     *"Lost and Unaccounted For Gas"* shall mean meter variance and any other quantities of Gas lost or otherwise not accounted for incident to or occasioned by the gathering or compressing and redelivery, as applicable of Gas, including Gas released through leaks, instrumentation, relief valves, unmeasured flares, ruptured pipelines, and blow downs of pipelines, vessels, and equipment.

(o)    *"MCF" or "Mcf"* shall mean one thousand (1,000) cubic feet of Gas at a temperature of sixty degrees (60° F) Fahrenheit and under a pressure of 14.73 Psia.

(p)    *"Mcfd"* shall mean 1,000 Cubic Feet of Gas per day.

(q)    *"MMBtu"* shall mean one million (1,000,000) Btus.

(r)    *"Month"* or *"month"* shall mean the period beginning at 7:00 a.m. Central Standard Time on the first Day of a calendar Month and ending at 7:00 a.m. Central Standard Time on the first Day of the next succeeding calendar Month.

(s)    *"Other Owner Gas"* shall have the meaning set forth in Section 1.9 of the Agreement.

(t)    *"Producer's Gas"* shall have the meaning set forth in Section 1.2 of the Agreement.

(u)    *"Producer's Capacity"* shall have the meaning set forth in 3.1 of the Agreement.

(v)    *"Psia"* shall mean pounds per square inch absolute; *"Psig"* shall mean pounds per square inch gauge.

(w)    *"Receipt Points"* shall mean the mutually agreed upon points at which Gas is received into Gatherer's Gas System.

(x)    *"Term"* shall mean the Primary Term together with any Extended Term as set forth in Article VII of the Agreement.

(y)    *"Thermal Content"* shall mean, with respect to Gas, the product of a volume of Gas and the Gross Heating Value of such Gas, adjusted to a pressure base of 14.73 psia, as expressed in MMBtu.

(z)    *"Third Party Gas"* shall mean any Gas produced from wells operated by parties other than Producer and Gas produced from wells operated by others in which Producer owns an interest but does not take in kind

(aa)    *"Well"* or *"Wells"* means a surface location within the Area of Dedication of one or more wells operated by Producer, whether deemed Crude or Gas Wells, from which Producer's Gas that is dedicated and committed hereunder is (or will be) produced.

2.    <u>TITLE</u>

(a)    Except for the portion of Producer's Gas provided to Gatherer constituting Fuel, Field Condensate or Lost and Unaccounted for Gas, for which title will transfer to and remain with Gatherer at the Receipt Points, and subject to Section 6(b) of these GT&C as between the Parties, title to all of Producer's Gas shall at all times remain in Producer.

34

(b)     Producer hereby warrants title to Producer's Gas delivered hereunder, and the right of Producer to deliver Producer's Gas (including any Other Owner Gas) that it may tender for delivery to Gatherer for the purposes of this Agreement; and Producer warrants that all such Gas is owned by Producer, or that Producer has the right to market said Gas, free from all liens and adverse claims of title ("*Adverse Claims*"), excluding liens to secure payments of production taxes, severance taxes, and other taxes. Producer agrees to indemnify Gatherer and save it harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses arising from or out of Adverse Claims, whether meritorious or not, of any and all persons, firms, or corporations to said Gas or to royalties, overriding royalties, severance taxes or other taxes levied against Producer's Gas, license fees, or charges thereon. Gatherer shall be entitled to recover all reasonable costs and attorneys' fees incurred by it as a result of its involvement in any action or claim involving Adverse Claims. When it shall appear to Gatherer by reason of receipt of written notice of claim or dispute that the ownership or title to all or part of the Leases, or Producer's Gas, may be in a party or parties other than Producer or the Other Owners, then Gatherer may take such actions as required under applicable law.

(c)     Producer shall have the sole and exclusive obligation and liability for the payment of all persons due any proceeds derived from Producer's Gas delivered under this Agreement, including royalties, overriding royalties, and similar interests, in accordance with the provisions of the Leases or agreements creating those rights to proceeds. In no event will Gatherer have any obligation to those persons due any of those proceeds of production attributable to Producer's Gas.

(d)     Producer shall pay and be responsible for all taxes levied against or with respect to Producer's Gas delivered under this Agreement. Gatherer shall under no circumstances become liable for those taxes, unless designated to remit those taxes on behalf of Producer by any duly constituted jurisdictional agency having authority to impose such obligations on Gatherer, in which event the amount of those taxes remitted on Producer's behalf shall be reimbursed by Producer upon receipt of invoice, with corresponding documentation from Gatherer setting forth such payments.

3.     EASEMENTS

The pipeline rights-of-way and easements to be provided by Producer to Gatherer for the Initial System are addressed specifically under Section 2.2. Gatherer shall independently confirm that Gatherer's contemplated use of any ROW is authorized by the terms and conditions of such ROW, and shall not be entitled to rely on any representations by Producer regarding the same following the acceptance of assignment, or partial assignment, of such ROW from Producer. Gatherer shall be bound by all of the terms and conditions of such ROW that concern Gatherer's use of the ROW and that have been made of public record or otherwise disclosed to Gatherer. Subject to the terms of the ROW, it is intended that any property of Gatherer placed in or upon any of such land shall remain the personal property of Gatherer, subject to removal by it upon the expiration or termination of the Agreement for any reason, and Gatherer shall have a reasonable time after the expiration or termination of the Agreement to remove same and restore any of Producer's property to the extent of disturbance by Gatherer. Producer and Gatherer understand and agree that the ROWs may not be of sufficient length, width or general configuration to allow for the installation of the Gatherer's Gas System. Subject to Section 2.2, Gatherer shall be free and unhindered to

35

acquire or modify existing easements or rights-of-way to the extent not timely provided by Producer for any segment of the Initial System, as applicable, as well as for any expansion of Gatherer's Gas System as Gatherer deems necessary and appropriate.  If Gatherer is unable to obtain necessary pipeline rights-of-way or easements, or surface rights for any appurtenant surface facilities, for Gatherer's Gas System under reasonable terms, Gatherer shall have the right to utilize Producer's rights under its Leases to install, own and operate the necessary the necessary surface or pipeline facilities within the scope of Producer's rights to do so.  Both Parties acknowledge that (i) the scope of such Lease rights might not encompass the gathering of Gas from other Leases, (ii) the use by of Producer's rights under its Leases to install, own and operate the necessary the necessary surface or pipeline facilities shall be at Gatherer's sole risk, and (iii) Producer shall incur no liability to Gatherer in the event such Lease expires or terminates.

4.      GAS MEASUREMENT AND QUALITY

(a)      Subject to Meter Fees as applicable under this Agreement, Gatherer, at its expense, shall furnish, install, operate and maintain suitable measurement equipment, including orifice meters, meter tubes and electronic flow measurement computers accessed by supervisory control and data acquisition equipment at all Receipt Points and Delivery Points for the accurate measurement and real-time reporting of the volume and Thermal Content of Producer's Gas and Other Owner Gas delivered by Producer to Gatherer at the Receipt Points.  Each meter installed by Gatherer shall be a meter acceptable in the industry and each meter shall be installed and operated in accordance with the requirements of applicable provisions in ANSI/API 2530, *"Orifice Metering of Natural Gas"* (American Gas Association Gas Measurement Committee Report No. 3) of the Natural Gas Department of the American Gas Association, as amended from time to time, or by any other method commonly used in the industry and mutually acceptable to the Parties. Gatherer will have the right to utilize v-cone measurement facilities as considered acceptable in the industry; unless prohibited by statute or by any rule, regulation or order of any agency having jurisdiction over such issue. Any meter installed hereunder shall be open to inspection by Producer, or its designee, at all reasonable times. The charts and records pertaining to measurement hereunder shall be kept on file by Gatherer, for the mutual use of the Parties, for a period of three (3) years after the Accounting Period to which such charts and records pertain. Gatherer shall furnish to Producer direct access to meter data on meters installed by Gatherer, allowing Producer to use the communications infrastructure installed by Gatherer or Gatherer shall allow Producer to build a separate communications infrastructure which includes but is not limited to placing separate radios on meters and towers owned by Gatherer. If installing separate radios on towers owned by Gatherer is not possible then, to the extent that Gatherer's rights-of-way and easements allow for same, Gatherer will allow Producer to position separate towers on Gatherer's surface rights-of-way. On or before the tenth (10th) day of each Accounting Period Gatherer shall furnish to Producer a production statement for the prior Accounting Period, including the volume in Mcf of the Gas received by Gatherer at each of Producer's Receipt Points and allocations of Fuel, Field Condensate, and Lost and Unaccounted For Gas allocated between the Delivery Points and all Receipt Points on Gatherer's Gas System.

i.      Producer may, at its option and sole expense, install, maintain and operate check meters and other equipment to check Gatherer's meters; provided, however, that such check meters and other equipment shall be installed by Producer so as not to interfere with the operation of any of Gatherer's Gas System. Gatherer and Producer shall have

36

access to each other's measuring equipment at all times during business hours, but the reading, calibrating and adjustment thereof and the changing of charts shall be done only by the employees or agents of Gatherer and Producer, respectively, as to meters or check meters so installed hereunder.

ii.     For each new meter installed by Gatherer, once each month during the first three (3) Accounting Periods and then quarterly thereafter, unless otherwise required by statute, Gatherer shall verify the calibration of such meter and make adjustments as necessary. Gatherer shall give notice to Producer of the time of such calibrations sufficiently in advance of holding same in order that Producer may have its representative present. With respect to any test made hereunder, a registration within two percent (2%) of correct shall be considered correct. However, the meter or meters shall be adjusted to read as accurately as practicable, as soon as possible thereafter. Either Party at any time may request a special test of any meter. The expense of any such special test shall be borne by the Party requesting same if the meter registration is found to be correct and by Gatherer if found to be incorrect. Settlement for any period during which the meter registration deviates by more than two percent (2%) and by more than 100 Mcf per Month shall be corrected at the rate of inaccuracy for any period of inaccuracy which is definitely known or agreed upon; but in case the period is not definitely known or agreed upon, then for a period covering one-half (1/2) of the time elapsed since the date of the last test. The rate of the inaccuracy shall be estimated and agreed upon by the Parties hereto on the basis of the best available data, using the first of the following methods which is feasible:

1)     By using the registration of any check meter or meters if installed and accurately registering; or, in the absence thereof;

2)     By calibration, test, or mathematical calculation; or

3)     By estimation based on comparison of the quantity of deliveries with deliveries during preceding periods under similar conditions when the meter was registering accurately.

iii.    All fundamental constants, observations, records and procedures involved in the determination and/or verification of the quantity and other characteristics of Gas measured hereunder, unless otherwise specified herein, shall be in accordance with the applicable provisions in ANSI/API 2530, *"Orifice Metering of Natural Gas"* (American Gas Association Gas Measurement Committee Report No. 3) of the Natural Gas Department of the American Gas Association, as amended from time to time, or by any other method commonly used in the industry and mutually acceptable to the Parties. The average local atmospheric pressure shall be assumed to be 13.8 Psia. The temperature of Gas flowing through each meter shall be determined by a recording thermometer, installed by Gatherer at its sole cost and expense to properly record the temperature of the flowing Gas, and the arithmetical average of the temperature recorded while the Gas is flowing during each meter chart interval shall be used in correcting amounts delivered hereunder to a temperature base of sixty degrees Fahrenheit (60° F) and to a pressure base of 14.73 Psia. Should the recording thermometer malfunction, Gatherer shall assume a reasonable temperature for the period in question.

37

iv.     Producer agrees that all Gas it delivers to Gatherer under the Agreement shall meet the most restrictive quality specification required of any downstream interconnecting party receiving Gas from Gatherer at the Delivery Points, as such quality specifications from time to time exist as well as the Quality Specifications set forth in Exhibit "F" to this Agreement.  Gatherer may test Producer's Gas delivered hereunder for adherence to required specifications, such testing to be in accordance with generally accepted industry standards and procedures. Gatherer shall give notice to Producer of the time of such testing sufficiently in advance in order that Producer may have its representative present. If the Gas so delivered by Producer does not meet the specifications set forth above, Gatherer, at its option, may refuse to accept delivery of said Gas into Gatherer's Gas System.  If Producer shall deliver Gas to Gatherer which exceeds the maximum pressure specifications, or fails to meet the quality specifications above-referenced, and Gatherer elects to accept such non-conforming Gas, then Gatherer shall be responsible for any damages caused thereby; provided, however, Producer will be responsible for any damages occurring prior to the time that Gatherer became aware of the non-conformity.  If Gatherer elects not to receive such non-conforming Gas, Producer shall have the right to conform Producer's Gas to the above specifications. Should Producer fail to do so, Gatherer, at its option, may elect to accept such non-conforming Gas, condition the same to conform to the above specifications, and charge Producer a mutually acceptable conditioning fee. If neither Party elects to condition the Gas to conform to the above specifications, then Producer, at its option, and upon sixty (60) days prior written notice to Gatherer, shall have the right to obtain the release of such non-conforming Gas from the Agreement, but only as to the formation from which said Gas is produced. Notwithstanding anything hereinabove to the contrary, should Gatherer elect to accept non-conforming Gas, Gatherer shall not be deemed to have waived any of its rights to reject any future non-conforming Gas and shall nevertheless be entitled, at any time and from time to time, to enforce the Quality Specifications hereof and refuse to accept delivery of any volumes of nonconforming Gas from Producer.

v.     To the extent that measurement in MMBtu is required or otherwise agreed upon by the Parties under this Agreement but not otherwise specified in this Agreement, at least quarterly, unless otherwise required by statute, Gatherer shall take samples at each of the meters described these GT&C and have such samples analyzed by chromatograph analysis to determine the liquids content by component and the Gross Heating Value of such Gas. Gatherer shall have the right to take and analyze a spot sample prior to the regularly scheduled sampling. Additionally, upon Producer's written request to Gatherer and at Producer's sole cost, risk and expense, Gatherer shall take and analyze samples more frequently. All samples taken hereunder shall be taken at such times that are reasonably mutually agreeable, must be representative of the Gas produced, and shall be analyzed using the most current industry standards and procedures. Gatherer shall give sufficient prior notice to Producer of the time of such sampling in order that Producer may have its representative present. Producer shall be permitted to take a split sample. If Producer's representative is not present, Gatherer shall proceed with the taking and analysis of samples. The test samples shall be analyzed through the use of a calorimeter (acceptable to both Parties) that employs the Thomas Principle of Calorimetry described in Research Paper #519, published by the U.S. Department of Commerce or by the use of gas

38

chromatography equipment. The Gross Heating Value calculation will use the Btu values assigned to the various hydrocarbon components as adjusted and updated from time to time by Gatherer using as a base those values set forth in the most current GPA Publication 2145 in effect at the time the Gross Heating Value calculation is derived under the provisions of the Agreement. Measurement shall be determined as delivered on a saturated basis or consistent with the basis applied to all producers delivering Gas to Gatherer. The percentages of the individual components through normal pentane shall be reported and heavier components shall be reported as hexanes plus. The components shall be reported in mole percent and ethane and heavier components shall also be reported in gallons per Mcf. All Third Party Gas which may be delivered by Gatherer to the Delivery Points shall be tested and the hydrocarbon content thereof determined or caused to be determined by Gatherer, using the same sampling and test methods. Gatherer shall provide a copy to Producer of the results of any sample analysis performed by Gatherer pursuant to this Section.

vi.      As long as the quality of Producer's Gas at the Receipt Points meets the Quality Specifications set forth in this Agreement, the Quality Specification of the Gas redelivered at the Delivery Points shall meet the Quality Specifications of the downstream interconnecting facilities.

5.    ALLOCATIONS AND NOMINATIONS

(a)      Allocations required for Gas delivered to Gatherer's Gas System shall be made by Gatherer in accordance with accepted industry standards and the following provisions and shall be based upon the measurements taken and quantities determined for the applicable Accounting Period.

(b)      Allocations shall be made to each Receipt Points in the manner set forth in this Section. Allocations will be made separately to each Receipt Point.  As used in this Section "Receipt Points" means all receipt points on Gatherer's Gas System including the Receipt Points at which Producer's Gas is delivered to Gatherer.  For example, Gas that is used as Field Compression Fuel shall be allocated to each Receipt Point by multiplying the total MMBtus of the Field Compression Fuel by a fraction, the numerator of which is the MMBtus attributable to the Receipt Point, and the denominator of which is the total MMBtus of the Gas attributable to all Receipt Points.

(c)      Scheduling of receipts and deliveries of Gas between Receipt Points and Delivery Points shall be in accordance with Gatherer's reasonable nomination and scheduling procedures and with the nomination and scheduling procedures of the downstream transporters. Producer shall submit Nominations (defined below) for the processing of Gas hereunder to Gatherer in writing or by electronic delivery. No later than two (2) business Days prior to the end of each Month, Producer shall provide to Gatherer in writing, the quantity of Gas in Mcf Producer expects to make available and deliver at each Receipt Point and receive at each Delivery Point hereunder each day of the following Month (the "*Nomination*"). Should Producer desire to change the Nomination during such Month, such change to the Nomination shall be in accordance with the nomination procedures of the downstream transporters. Gas shall be delivered by Gatherer in accordance with

39

confirmation by the downstream transporters of the Nomination and/or changes to the Nomination.

(d) Any variance between the thermally equivalent volume of Producer's Gas delivered at the Delivery Points for Producer's account and the thermally equivalent volume of Producer's Gas received at the Receipt Points (less Field Condensate, and Fuel and Lost and Unaccounted For Gas) (the "*Imbalance*") will be recorded in a Gas Imbalance Account. Any physical flow adjustments will be made as mutually agreed to by the Parties (which shall be confirmed in writing via fax or email by Gatherer, with an acknowledgement to be returned to Gatherer by Producer) to adequately control imbalance levels. The daily and cumulative Imbalances will be determined at the end of each Gas Day. Gatherer may assist Producer in managing the Imbalance and may, at any time and from time to time, reasonably request that Producer change its Nominations at the Delivery Points or, with notice to Producer, restrict, interrupt, or reduce its receipts or deliveries of Producer's Gas at the Receipt Points or Delivery Points and direct Producer to make adjustments in its receipts and deliveries, in order to maintain a daily and monthly balance or to correct an Imbalance. Notwithstanding the foregoing, in the event that Gatherer is assessed a cash out penalty by the downstream transporter, to the extent such penalty is solely attributable to Producer, Producer shall reimburse Gatherer for the actual amount of such cash out penalty and any associated fees.

6. PAYMENT

(a) After delivery of Producer's Gas has commenced on Gatherer's Gas System, Gatherer shall mail a settlement statement to Producer on or before the tenth (10th) day of the Month following the Month of deliveries hereunder. Such statement shall include but is not limited to:

i. The volume of Producer's Gas delivered to the Receipt Points and the volume of Producer's Gas redelivered to the Delivery Points, net of applicable Fuel and Lost and Unaccounted for Gas.

ii. An itemization of all fees due (and the credits applied against such fees, if applicable) under this Agreement for such Month, including without limitation, the Gas Gathering Fees and the Shortfall Payment.

(b) Gatherer shall provide Producer an invoice of the settlement statement by the tenth (10th) day of the month following service. Producer shall pay, or cause to be paid, the settlement statement amount in full within thirty (30) days of receipt of the settlement statement. Past due amounts shall accrue interest from the due date until paid in full at the rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, multiplied by 125%; or (ii) the maximum applicable lawful interest rate. If any undisputed past due amounts remain unpaid for thirty (30) days after notice to Producer, Gatherer shall have the right to suspend redeliveries of Producer's Gas at the Delivery Points; and, if such undisputed past due amounts remain unpaid for thirty (30) days after further notice to Producer, Gatherer shall have the right to suspend its obligations under this Agreement until such time as Producer is no longer in payment arrears as to undisputed past due amounts and arrange for the

40

disposition and sale of such portions of Producer's Gas at auction or otherwise as necessary to reimburse Gatherer for all then undisputed past due amounts, including interest.

(c)     If either Party has reasonable grounds for insecurity regarding the performance of any obligation under this Agreement (whether or not then due) by the other Party (including, without limitation, the occurrence of a material change in a Party's creditworthiness) the insecure Party may demand Adequate Assurance. In the event the Party requested to provide Adequate Assurance fails to give Adequate Assurance of its ability to perform its further payment obligations under this Agreement within three (3) business Days of a reasonable request therefore, the Party requesting Adequate Assurance may suspend its obligations under this Agreement until such time as the Party requested to provide such Adequate Assurance, does not provide such Assurance. "*Adequate Assurance*" of the purposes of this Agreement may include, but is not limited to, providing an irrevocable letter of credit or prepayment in an amount equal to ninety (90) Days of average payment obligation incurred under this Agreement, or a guarantee from a creditworthy entity.  No course of dealing between the Parties will modify or act as a waiver of Gatherer's continuing right to demand Adequate Assurances.

(d)     Gatherer and Producer shall bear separately and be individually responsible for any and all taxes imposed upon and/or attributable to each Party's properties, facilities and/or operations hereunder. These taxes shall include, but not be limited to, all state severance taxes, ad valorem taxes, franchise taxes, sales and use taxes and state and federal income taxes.

## 7.     REGULATION

The Agreement is subject to all present and future valid laws and lawful orders of all regulatory bodies now or hereafter having jurisdiction over the Parties, or either of them, and should either of the Parties, by force of such law or regulation imposed at any time during the term of the Agreement, be ordered or required to do any act inconsistent with the provisions of the Agreement, the Parties shall attempt to modify this Agreement to conform with the requirements of such law or regulation and to maintain the economic benefits of each Party under this Agreement.  Nothing in the Agreement or these GT&C shall prohibit either Party from obtaining or seeking to obtain modification or repeal of such law or regulation or restrict either Party's right to legally contest the validity of such law or regulation, and each Party reserves the right to file with such regulatory bodies any material necessary to implement the terms of the Agreement and these GT&C as they existed prior to the modification. Notwithstanding the foregoing, in the event Gatherer's Gas System and/or Gatherer is deemed to be a public utility or FERC-regulated interstate pipeline company, and due to such determination, Producer's rights to Producer's Capacity or any other benefit provided Producer herein are diminished or terminated, or Gatherer's rights or obligations, or its ability to receive the compensation set forth in the Agreement, or other conditions are imposed on Gatherer which adversely affects the economic benefits to either Party originally contemplated hereunder, the affected Party shall have the right to notify the other Party that it has been adversely affected ("*Adverse Effect Notice*"). Upon the other Party receiving the Adverse Effect Notice, the Parties shall negotiate in good faith upon modifications to this Agreement as necessary to put each Party in the economic position similar to that was originally provided under this Agreement. If the Parties are unable to agree on modifications within ninety (90) days following the date of the Adverse Effect Notice, then either Party shall have the right to terminate this Agreement.

8.    FORCE MAJEURE

(a)    Except for the obligation to make payments, in the event either Gatherer or Producer is rendered unable, by reason of an event of Force Majeure to perform, wholly or in part, any obligation or commitment set forth in the Agreement, then upon such Party giving notice and full particulars (including reasonably sufficient supporting documentation) of such event as soon as practicable after the occurrence thereof, the obligations of both Parties shall be suspended to the extent and for the period of such Force Majeure provided that the Party claiming an event of Force Majeure shall make all commercially reasonable attempts to remedy the same with all reasonable dispatch, and shall promptly notify the other Party of attempts to remedy and of final resolution of the events.

(b)    The term *"Force Majeure"*, as used herein, shall mean acts of God, strikes, lockouts or industrial disputes or disturbances, civil disturbances, arrest and restraint of rulers or people, interruptions imposed by any government or court orders, law, statute, ordinance or regulation promulgated by any governmental or regulatory authority having proper jurisdiction, acts of the public enemy, wars, riots, blockades, insurrections, epidemics, landslides, lightning, earthquakes, fires, storm, floods, washouts, explosions, unforeseeable failure of machinery or lines of pipe, freezing of wells or pipelines, the interruption or suspension of the receipt of Gas deliveries hereunder by Gatherer due to the declaration of Force Majeure by third party transporters, delays in receiving, withdrawals or suspensions of necessary permits or approvals from governmental or regulatory authorities having proper jurisdiction, or any other cause whether of the kind herein enumerated or otherwise, not within the reasonable control of the Party claiming an event of Force Majeure.

(c)    Neither Party shall be entitled to the benefit of the provisions of this Section under either or both of the following circumstances;

i.    To the extent that the failure was caused by the Party claiming suspension having failed to remedy the condition by taking all reasonable acts, short of litigation, if such remedy requires litigation, and having failed to resume performance of such commitments or obligations with reasonable dispatch; or

ii.    If the failure was caused by lack of funds, or with respect to the payment of any amount or amounts then due hereunder.

(d)    Settlement of strikes and lockouts shall be entirely within the discretion of the Party affected, and the duty that any event of Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes and lockouts by acceding the demands of the parties directly or indirectly involved in such strikes or lockouts when such course is inadvisable in the discretion of the Party having such difficulty.

9.    DEFAULTS

42

(a)    It is covenanted and agreed that if either Party shall fail to perform any of the covenants or obligations imposed upon it under and by virtue of the Agreement or these GT&C, in addition to its other rights and remedies, the other Party may initiate termination of the Agreement by proceeding as follows:

i.    The Party not in default shall cause a written notice to be served on the other Party in default, stating specifically the cause for terminating the Agreement, and declaring it to be the intention of the Party giving notice to terminate the same; thereupon, the Party in default shall have thirty (30) Days after the service of the aforesaid notice in which to remedy or remove the cause or causes stated in the notice for terminating the Agreement. If within said thirty (30) Days the Party in default does so remove and remedy said cause or causes, or fully indemnifies the Party not in default for any and all consequences of such breach, then such notice shall be withdrawn and the Agreement shall continue in full force and effect.

ii.    In case the Party in default does not remedy and remove the cause or causes, or does not indemnify the Party giving the notice for any and all consequences of such breach, within said period of thirty (30) Days, then the Party claiming default shall thereafter have the option to terminate this Agreement which option shall be exercised, if at all, by delivering written notice to the Party in default no later than ten (10) Days after the end of such thirty (30) Day period. In the event there is a dispute regarding whether a default exists, such dispute shall be governed by the arbitration provisions of these GT&C and the thirty (30) Day cure period shall begin on the first (1st) Day after the date of the arbitration award.

iii.    Any cancellation of the Agreement pursuant to the provisions of this Section shall be without prejudice to the obligation of Producer to make payments due hereunder prior to the time of cancellation, and without waiver of any remedy to which the Party not in default may be entitled for violations of the Agreement.

(b)    No waiver by either Producer or Gatherer of any default of the other under the Agreement shall operate as a waiver of any future default, whether of like or different character or nature, nor shall any failure to exercise any right hereunder be considered as a waiver of such right in the future.

10.    LIABILITY, INDEMNIFICATION AND INSURANCE

(a)    Except for the portion of Producer's Gas provided to Gatherer as Fuel or Field Condensate or Lost and Unaccounted for Gas, for which custody will transfer to and remain with Gatherer at the Receipt Points, as between the Parties hereto, Producer and any of its designees shall be in custody, control and possession of Producer's Gas until Producer's Gas is delivered to the Receipt Points, and after any portion of Producer's Gas is redelivered at the Delivery Points, subject to Section 6(b) of these GT&Cs. Gatherer and any of its designees shall be in custody, control and possession of Producer's Gas after Producer's Gas is delivered at the Receipt Points and until redelivery of Producer's Gas to Producer or its designee at the Delivery Points, subject to Section 6(b) of these GT&Cs.

43

(b)     Each Party ("*Indemnifying Party*") hereby covenants and agrees with the other Party, and its Affiliates, and each of their directors, officers and employees, co-owners, partners, independent contractors, agents and representatives ("*Indemnified Parties*"), that except to the extent caused by the Indemnified Parties' gross negligence or willful conduct, the Indemnifying Party shall protect, defend, indemnify and hold harmless the Indemnified Parties from, against and in respect of any and all losses of any kind and character, including reasonable attorney fees ("*Losses*") incurred by the Indemnified Parties to the extent those Losses arise from or are related to: (a) the Indemnifying Party's facilities; or (b) the Indemnifying Party's possession and control of Producer's Gas.

(c)     At all times during the term of this Agreement, and for all applicable statutes of limitations periods, each of the Parties agrees to maintain and keep in force and effect, at their own expense, the following insurance coverages and minimum amounts: (i) Workman's Compensation in full compliance with all applicable state and federal laws and regulations; (ii) Employer's Liability in the minimum limits of $1,000,000 per accident covering injury or death to any employee which may be outside the Workman's Compensation statute of the state in which the work is performed; (iii) Commercial General Liability insurance with minimum limits of $1,000,000 combined single limit for injury or death of any one person and for property damage; (iv) Excess Liability Insurance Umbrella Form with minimum limits not less than $5,000,000 per occurrence and aggregate (or any other combination of coverages that is sufficient to produce the same minimum limits set forth above); and (v) Automobile Liability Insurance covering owned, non-owned and hired automotive equipment with minimum limits of $1,000,000 combined single limit for injury or death of any one person and property damage.  To the extent of the liabilities assumed hereunder, each Party shall be named an additional insured on all such insurance policies of the other Party (with the exception of Workers' Compensation coverage) with all such insurance being primary to any insurance of the Indemnified Party that may apply to such occurrence, accident or claim.  No "other insurance" provision shall be applicable to the Indemnified Party by virtue of having been named an additional insured under any policy of insurance. Each Party agrees to furnish the other Party with a certificate or certificates evidencing insurance coverage in accordance with the above requirements.

11.     DAMAGES AND ARBITRATION

(a)     NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, UNDER ANY THEORY OF LIABILITY, WHETHER TORT, NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT, WARRANTY, INDEMNITY OR OTHERWISE, NEITHER PARTY SHALL BE LIABLE FOR, AND LOSSES SHALL NOT INCLUDE, ANY DAMAGES OTHER THAN ACTUAL AND DIRECT DAMAGES, AND EACH PARTY EXPRESSLY WAIVES ANY RIGHT TO CLAIM ANY OTHER DAMAGES, INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT BE CONSTRUED AS LIMITING THE OBLIGATION OF EITHER PARTY HEREUNDER TO INDEMNIFY THE OTHER PARTY AGAINST CLAIMS ASSERTED BY UN-AFFILIATED THIRD PARTIES, INCLUDING, BUT NOT LIMITED TO,

UN-AFFILIATED THIRD PARTY CLAIMS FOR CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES.

(b)     The Parties shall strive to resolve any disputes that may arise under this Agreement amicably and informally.  Any claim, demand, cause of action, dispute or controversy exclusively between the Parties relating to the subject matter of this Agreement, whether sounding in contract, tort or otherwise, at law or in equity, for damages or other relief that is not resolved to the satisfaction of the Parties by informal negotiations ("*Dispute*"), may be noticed in writing accompanied by reasonable supporting documentation by the disputing Party ("*Dispute Notice*"). If senior management of each of the Parties cannot resolve the Dispute within ninety (90) days of receipt of the Dispute Notice, either Party may initiate arbitration by serving written notice of arbitration ("*Arbitration Notice*") upon the other.  Within twenty (20) days following service of the Arbitration Notice, the Parties shall either agree upon a single arbitrator if the amount in dispute is less than $100,000, or for disputes with amounts in dispute $100,000 or greater, each Party shall select one arbitrator, who shall together select a third.  The third or the single arbitrator shall have more than ten (10) years professional experience in the oil and gas industry, be neutral, and have not worked for a Party or Affiliate.  The arbitration shall be conducted according to the rules of the Federal Arbitration Act, and to the extent an issue is not addressed thereby, by the Commercial Arbitration Rules of the American Arbitration Association.  The arbitration shall be conducted within the City and County of Denver, Colorado.  Each Party shall be entitled to a reasonable amount of prehearing discovery as allowed by the arbitrator(s), provided the discovery period shall not exceed thirty (30) days; the Parties and the arbitrators shall endeavor to hold the arbitration hearing within thirty (30) days thereafter and to render the decision within fifteen (15) days following the hearing.  Each Party shall bear its own costs of arbitration.  Interpretation of this Agreement to arbitrate and procedures shall be decided by the arbitrators.  The arbitration and the award shall be final, binding and confidential.

(c)     Each Party is required to continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of this Agreement.

(d)     In the event of litigation to enforce the arbitration provisions of this Section 11 of these GT&C or any arbitration award, the prevailing Party, after the entry of a final non-appealable order, shall be entitled to recover from the other Party, as a part of said judgment, all actual court costs, fees and expenses of such litigation, including reasonable attorneys' fees.

12.     CONFIDENTIALITY

Except for the filing of public record the Memorandum of Dedication under this Agreement, the Parties agree that they will maintain the Agreement, and all parts and contents thereof, in strict confidence, and that they will not cause or permit disclosure of same to any third party without the express written consent of the other Party; provided however, that disclosure by a Party is permitted in the event and to the extent:

(a)     disclosure is required by a court or agency or stock exchange exercising jurisdiction over the subject matter thereof, by order or by regulation or rule or law, to disclose; provided that in the event either Party becomes aware of a judicial or administrative proceeding that has resulted or may result in such an order requiring disclosure, it shall (i) so notify the other Party immediately

45

and (ii) support all actions of the non-disclosing Party reasonably necessary to prevent disclosure to the public as a result of disclosure to the court or administrative body; or

(b)    disclosure is required in the course of routine audit procedures; provided, however, that any such disclosure shall be made upon the condition that the recipient shall in turn hold such information confidential from further disclosure; or

(c)    disclosure to (i) non-operator co-owners or (ii) royalty owners, overriding royalty owners, and taxing authorities on whose behalf Producer markets production from the Area of Dedication is required in connection with Producer's distribution of revenues from the sale of production and payment of royalties and taxes on production; or

(d)    disclosure to Affiliates, consultants and advisors of a Party, or potential investors or purchasers of Producer's Gas or Leases, Wells and/or lands and formations thereunder or Gatherer's Gas System; provided, however, that any such disclosure shall be made upon the condition that the recipient shall in turn hold such information confidential from further disclosure; or

(e)    disclosure that Gatherer is providing Gas gathering services for Producer, although not the terms or conditions on which those services are provided.

13.    PUBLIC ANNOUNCEMENTS

(a)    The Parties agree that prior to making any public announcement or statement with respect to this Agreement or the transaction represented herein, the Party desiring to make such public announcement or statement shall provide the other Party with a copy of the proposed announcement or statement prior to the intended release date of such announcement. The other Party shall thereafter consult with the Party desiring to make the release, and the Parties shall exercise their reasonable efforts prior to release to (i) agree upon the text of a joint public announcement or statement to be made by both such Parties or (ii) in the case of a statement to be made solely by one Party, obtain approval of the other Party to the text of a public announcement or statement. Nothing contained in this Section 13(a) shall be construed to require either Party to obtain approval of the other Party to disclose information with respect to this Agreement or the transaction represented herein to any state or federal governmental authority or agency to the extent required by applicable law or necessary to comply with disclosure requirements of the Securities and Exchange Commission, New York Stock Exchange, American Stock Exchange, or any other regulated stock exchange.

EXHIBIT "D"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

FORM OF CORRECTION MEMORANDUM OF DEDICATION

This CORRECTION MEMORANDUM OF DEDICATION (the "Memorandum") is to supersede and replace that earlier Memorandum of Dedication filed in the real property records of McKenzie County, North Dakota as instrument #475259 and to impart notice to all persons of the Gas Dedication and Gathering Agreement (the "Agreement") having an effective date of July 1, 2014 (the "Effective Date") between Emerald Oil, Inc. and Emerald WB LLC each with offices at 1600 Broadway, Suite 1360, Denver, CO 80202 (collectively "Producer"), and Dakota Midstream, LLC, doing business as Dakota Infrastructure in North Dakota, with offices at 1600 Broadway, Suite 1330, Denver, CO 80202 ("Gatherer"), pursuant to which Producer has agreed on an exclusive basis to dedicate to Gatherer or cause its purchasers or affiliates to make, physical delivery to Gatherer of the entirety of the Gas owned by Producer which is produced at the wellhead from the Wells operated by Producer as of the Effective Date on the lands described on Schedule A attached hereto and incorporated herein (the "Area of Dedication") for a term of fifteen (15) years (the "Primary Term") and year to year thereafter until terminated by either Producer or Gatherer (an "Extended Term"). The Area of Dedication shall terminate, in part or in its entirety, pursuant to the terms and conditions of the Agreement.

Additionally, Producer has granted rights-of-way and rights-of-access to Gatherer to own and operate gas gathering lines and other appurtenant equipment on or under the real property interests owned by Producer in the Area of Dedication, to the extent Producer has rights to do so during the Primary Term and any Extended Term of the Agreement.

In the event Producer, or any Affiliate of Producer, owns or controls leasehold interests or Gas from leasehold interests are located within the Area of Dedication, during the Primary Term or Extended Term of this Agreement, such leasehold interests and/or Gas shall be dedicated to Gatherer on the terms and conditions set forth in the Agreement and as summarized above. The terms and conditions of the Agreement shall be covenants running with the lands.

This Memorandum may be executed in multiple counterparts, each of which shall constitute an original and all of which, when construed together, shall constitute one and the same instrument.

This MEMORANDUM OF DEDICATION is executed and delivered to be effective as of the Effective Date of the Agreement.

47

EMERALD OIL, INC.

By: _____

Name: _____

Title: _____

Date: _____

EMERALD WB LLC

By: _____

Name: _____

Title: _____

Date: _____

DAKOTA MIDSTREAM, LLC

By: _____

Name: Tim Reynolds
Title: Founding Partner

Date: 5/26/15

STATE OF New York )
                    ) §
COUNTY OF Manhattan )

On this 26th day of May _____, 2015, before me personally appeared Timothy Reynolds, known to me to be the founding partner of Dakota Midstream, LLC.

(Seal)

Notary Public in and for the State of New York

Printed Name: Guy Howard

Commission Expires: 2/17/2019

ID# 01HO631940b

48

STATE OF Colorado )
                                                    ) §
COUNTY OF Denver )

On this 26 day of May , 2015, before me personally appeared McAndrew Rudisi, known to me to be the CEO + President of Emerald Oil, Inc.

(Seal)

~~KELSEY E. SILIPO~~
~~NOTARY PUBLIC~~
~~STATE OF COLORADO~~
~~NOTARY ID # 20124036301~~
~~MY COMMISSION EXPIRES JUNE 18, 2016~~

_Keenye Silipo_
Notary Public in and for the State of Colorado
Printed Name: Kelsey Silipo
Commission Expires: 6 | 18 | 16


STATE OF Colorado )
                                                    ) §
COUNTY OF Denver )

On this 26 day of May , 2015, before me personally appeared McAndrew Rudisill, known to me to be the President of Emerald WB LLC.

(Seal)

~~KELSEY E. SILIPO~~
~~NOTARY PUBLIC~~
~~STATE OF COLORADO~~
~~NOTARY ID # 20124036301~~
~~MY COMMISSION EXPIRES JUNE 18, 2016~~

_Kenny Silipo_
Notary Public in and for the State of Colorado
Printed Name: Kelsey Silipo
Commission Expires: 6 | 18 | 16

49

Schedule A

AREA OF DEDICATION

The following lands located in McKenzie County, North Dakota:

| Section | Township | Range |
|---------|----------|-------|
| 1-36 | 148N | 102W |
| 1-36 | 148N | 103W |
| 1-36 | 149N | 102W |
| 1-36 | 149N | 103W |

50

EXHIBIT "E"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING
AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

FEES

For each Accounting Period, Producer shall pay the sum of the Base Fee, Meter Fees, Compression Fees, and Miscellaneous Fees (together the *"Gas Gathering Fees"*) and any applicable Shortfall Payment:

Base Fee: The *"Base Fee"* shall equal One dollar and Sixty-seven cents ($1.67) per Mcf of Producer's Gas received at any Receipt Point beginning on the date of first flow. The amount of this initial Base Fee shall be subject to redetermination and annual adjustment as set forth in herein, and for avoidance of doubt the Base Fee as it may be increased through redetermination and adjustment shall apply to all Gas delivered by Producer at each Receipt Point throughout the Primary Term of this Agreement. Except for the annual adjustment as set forth in Section 5.2, the Base Fee, as it shall be redetermined per the paragraph below, shall not exceed Two dollars ($2.00) per Mcf throughout the Primary Term of the Agreement.

Redetermination of Base Fee: The Parties acknowledge that Gatherer based the Base Fee on estimates of the cost of constructing the Initial System to serve the Initial Receipt Points but not the Infill Receipt Points, the anticipated volume of throughput of Producer's Gas received into the Initial System, and the resulting Gas Gathering Fees arising from such throughput, over the first five (5) years of operation of the Initial System. Therefore, the Base Fee shall increase upon Gatherer's completion of the additional portions of the Initial System that will serve the Infill Receipt Points. Within fifteen (15) days of the Initial System In-Service Date, unless already done so, Gatherer shall furnish Producer with an itemized documentation of both the Actual Construct Costs for the portion of the Initial System that will serve the Initial Receipt Points (the *"Initial System Cost"*) and the incremental Actual Construct Costs for the incremental portion of the Initial System that will serve the Infill Receipt Points (the *"Infill Cost"*). Both Initial System Cost and Infill Cost shall be exclusive of any additional Initial Compressor Facilities costs and expenses to be incurred by Gatherer. The initial Base Fee shall then be redetermined according to the following formula:

The product of (i) The Infill Cost divided by the Initial System Cost plus 1.0, and (i.e. multiplied by) (ii) the Base Fee.

The Base Fee, as redetermined pursuant to the above formula, shall be effective for all purposes herein, as of the first full Accounting Period following the Initial System In-Service Date.

Throughput Commitment and Shortfall Payment: Gatherer's design, capacity and configuration of the Initial System was based upon projected volumes of Producer's Gas from the Initial System DSUs and other information provided by Producer with an estimated total of approximately 12 million Mcf of Producer's Gas anticipated as throughput through the Initial System over the first five (5) years following May 1, 2015 (the "*Commitment Period*"). Producer agrees to deliver to Gatherer an average, determined over the course of an Accounting Period, minimum volume of 4,000 Mcf of Producer's Gas per day for each Accounting Period (the "*Initial Minimum Volume*") during the first two (2) years during the Commitment Period, and an average, determined monthly, minimum volume of 8,000 Mcf of Producer's Gas per day for each Accounting Period (the "*Extended Minimum Volume*") for the remaining three (3) years. Collectively, the Initial Minimum Volume and the Extended Minimum Volume shall be the "*Minimum Volume*". For purposes of determining whether Producer has met the Minimum Volume, any Gas delivered prior to May 1, 2015 shall be deemed to be Delivered Volumes attributable to the first Accounting Period following the commencement of the Commitment Period. Subject to Force Majeure, if, after the first forty-five (45) days of the commencement of the Commitment Period, Producer fails to deliver the applicable Minimum Volume within any Accounting Period during the Commitment Period, Producer shall pay, in addition to Gas Gathering Fees due for Producer's Gas delivered to Gatherer, an amount (the "*Shortfall Payment*") calculated according to the following formula:

Shortfall Payment = [(Minimum Volume – Gatherer's Initial System Delay Pre-Inservice Volumes – Producer's Initial System Delay Pre-Inservice Volumes – Released Volumes – Permanently Released Volumes) – (Delivered Volumes + Excess Volumes)] x Base Fee

Notwithstanding anything herein to the contrary, if during any Accounting Period during the Commitment Period, the daily volumes of Producer's Gas actually delivered to Gatherer during that Accounting Period (the "*Delivered Volumes*") is in excess of the applicable Minimum Volume, the average daily volumes in excess of the applicable Minimum Volume (the "*Excess Volumes*") shall be carried forward and taken into account in calculating any Shortfall Payment for the next subsequent Accounting Period. Furthermore, in the event a Shortfall Payment is made by Producer, but for the one (1) year period ending with the next anniversary date of the commencement of the Commitment Period the Delivered Volumes are in excess of the applicable Minimum Volume, such Shortfall Payment shall be offset and credited against Gas Gathering Fees incurred by Producer, beginning with the next Accounting Period following such one (1) year period.

Meter Fees:   In addition to the Base Fees, Gatherer shall charge and Producer shall pay a "*Meter Fee*" equal to Four hundred and Seventy-five dollars ($475) per meter at each Receipt Point per Accounting Period.

Compression Fees:  Gatherer shall charge and Producer shall pay a *"Compression Fee"* equal to Fifty-five cents ($0.55) per Mcf multiplied by the total of Producer's Gas received into the Initial System at the Initial Receipt Points during each Accounting Period.

Miscellaneous Fees:  If and when applicable, Gatherer shall charge and Producer shall pay the Pre-Inservice Fee as provided in Section 2.4(ii)(b), and the "Expansion Fee" to recoup Gatherer's expansion costs as provided in Section 2.5 and Exhibit "H."  From time to time under this Agreement, the Parties may agree in writing upon other fees.

EXHIBIT "F"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

GAS QUALITY SPECIFICATIONS

Unless specifically agreed to in writing by the Parties or except to the extent Gatherer undertakes services to improve the quality of Gas pursuant to the terms of this Agreement, Gas delivered to each Receipt Point shall meet the more restrictive of the following quality specifications or the quality specifications of the downstream interconnecting facilities at the Delivery Points as either may vary from time to time during the Term of this Agreement ("*Quality Specifications*"). The quality of the Gas redelivered at the Delivery Points shall meet the quality specifications of the downstream interconnecting facilities if the quality of Producer's Gas delivered at the Receipt Points meets the Quality Specifications.

- o Carbon Dioxide: The Gas shall not contain in excess of two percent (2%) by volume of carbon dioxide.
- o Hazardous Waste: The Gas shall be free from all "hazardous waste" as defined in the Resources Conservation and Recovery Act, 42 USC 6901, *et seq.*
- o Heating Value: Contain a Gross Heating Value of at least one thousand two hundred fifty (1,250) Btu per cubic foot.
- o Hydrogen Sulfide: The Gas shall not contain more than ten parts per million (10 ppm) of hydrogen sulfide by volume as determined by a method generally acceptable for use in the gas industry and to the Parties hereto.
- o Mercaptans: The Gas shall have a mercaptan content not in excess of one tenth of one part per million (0.1 ppm) by volume.
- o Nitrogen: The Gas shall not contain in excess of three percent (3%) by volume of nitrogen.
- o Objectionable Liquids, Solids, Contaminants: The Gas shall be free of liquids and solids and other potentially harmful contaminants such as arsenic, mercury, selenium, radon, or antimony, well treating chemicals, dust, gums, gum-forming constituents, or other objectionable liquid or solid matter.
- o Oxygen: The Gas shall not contain any oxygen.
- o Temperature: The Gas shall not have a temperature of less than fifteen degrees Fahrenheit (15° F) nor more than one hundred twenty degrees Fahrenheit (120° F).
- o Water: The Gas shall not contain any free water.

**GATHERER MAY, AT GATHERER'S SOLE DISCRETION, ACCEPT GAS WHICH DOES NOT CONFORM TO THE QUALITY SPECIFICATIONS**

REQUIRED HEREIN PROVIDED THAT SUCH ACCEPTANCE DOES NOT INTERFERE, IN GATHERER'S SOLE JUDGMENT, WITH THE OPERATIONS OF GATHERER'S FACILITIES AND/OR ANY DOWNSTREAM FACILITY OR PIPELINE INTERCONNECT GAS DELIVERIES MADE BY GATHERER ON BEHALF OF PRODUCER OR PRODUCER'S DESIGNEE. THE QUALITY SPECIFICATIONS DESCRIBED IN THIS AGREEMENT SHALL, AT ALL TIMES, BE SUBORDINATE TO THE MORE STRINGENT QUALITY SPECIFICATIONS OF ANY OR ALL DOWNSTREAM INTERCONNECTING PIPELINE(S) AND/OR FACILITIES.

EXHIBIT "G"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

FORM OF PARTIAL ASSIGNMENT AND ASSUMPTION OF PIPELINE
RIGHTS-OF-WAY AND EASEMENTS

This **PARTIAL ASSIGNMENT OF PIPELINE RIGHTS-OF-WAY AND EASEMENTS** (this "Partial Assignment"), is made and entered into effective _____, 2015 (the "Effective Date") by and among Emerald Oil, Inc. ("Assignor") and Dakota Midstream, LLC ("Assignee"). Assignor and Assignee are referred to herein, individually, as a "Party" and, collectively, as the "Parties."

WHEREAS, Assignor is the owner of various pipeline easements and rights-of-way grants and agreements as described on Annex 1 to this Partial Assignment (collectively the "Rights-of-Way");

WHEREAS, Assignor and Assignee are parties to that certain Amended and Restated Gas Dedication and Gathering Agreement dated effective July 1, 2014 (the "Gathering Agreement");

WHEREAS, pursuant to the terms of the Gathering Agreement, Assignee shall construct, own and operate a gas gathering system ("Assignee's Gathering System"); and

WHEREAS, Assignor and Assignee desire that Assignor partially assign, on a non-exclusive basis, certain of its right, title, interest and obligations under the Rights-of-Way to Assignee as necessary to facilitate the construction and operation of Assignee's Gathering System, and for Assignor to reserve all other rights under the Rights-of-Way, subject to the terms and conditions set forth herein.

NOW, THEREFORE, For Ten Dollars ($10.00), and other good and valuable consideration, including the mutual covenants and benefits to be derived hereunder, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

A.     Grant. Solely to the extent Assignor has the right and power to do so under the terms of the Rights-of-Way, Assignor does hereby assign, transfer and convey unto Assignee, on a non-exclusive basis, such portion of its right, title and interest in and to the Rights-of-Way, together with such rights (including ingress and egress) as necessary for Assignee to lay, construct, install, operate, maintain, replace, maintain, repair and remove Assignee's Gathering System (the "Assigned ROW"). This Partial Assignment is made subject to all valid and subsisting oil, gas or other

mineral leases, deeds, easements, rights-of-way, restrictive covenants, reservations, or other matters of record in the real property records of McKenzie County, North Dakota, which burden or otherwise affect the Rights-of-Way.

B.   Reservation.  All rights and interests in the Rights-of-Way assigned, transferred, or conveyed hereunder are non-exclusive and only insofar as they are described herein, and Assignor specifically reserves unto itself all other right, title, interests in the Rights-of-Way, including but not limited to those rights necessary to lay, construct, install, operate, maintain, replace, repair and remove one or more pipelines, and ingress and egress with respect to the same, except as necessary for Assignee's Gathering System, or to grant such rights and interests in the Rights-of-Way to third parties.

C.   Disclaimer of Warranty.  ASSIGNEE ACKNOWLEDGES THAT THE INTERESTS AND RIGHTS CONVEYED BY THIS PARTIAL ASSIGNMENT ARE BEING CONVEYED "AS IS AND WHERE IS" AND ASSIGNOR HAS MADE, MAKES NO AND EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, VERBAL OR OTHERWISE, WHETHER EXPRESS OR IMPLIED, IN FACT OR IN LAW, OF MERCHANTABILITY, FITNESS, ADEQUACY OR SUFFICIENCY FOR ANY PURPOSE, VALIDITY, SCOPE, TITLE, CONDITION OR SAFETY OF THE RIGHTS-OF-WAY, THE RIGHT AND POWER OF ASSIGNOR UNDER THE TERMS OF THE RIGHTS-OF-WAY TO CONVEY THE INTERESTS AND RIGHTS CONVEYED BY THIS PARTIAL ASSIGNMENT, OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION PROVIDED TO ASSIGNEE REGARDING THE RIGHTS-OF-WAY.  BY EXECUTING THIS PARTIAL ASSIGNMENT, ASSIGNEE ACKNOWLEDGES THAT IT HAS RELIED AND WILL SOLELY RELY UPON ITS INDEPENDENT INVESTIGATION AND JUDGMENT WITH RESPECT TO THE RIGHTS-OF-WAY, AND THE ASSIGNABILITY, TERMS, USE AND VALUE THEREOF.

D.   Assumption.  Assignee, by acceptance of this Partial Assignment, hereby assumes and agrees to be bound by all of the terms, covenants and conditions of the Rights-of-Way, and from the Effective Date, to pay, perform, comply with and discharge all of the obligations of Assignor to the extent such obligations are related to the Assigned ROW, including, without limitation, Assignee's Gathering System facilities located upon the Assigned ROW.

E.   Consents to Assign.  In the event any Right-of-Way are subject to a valid consent to assign or other restriction on transfer of which this Partial Assignment would be a breach thereof, or result in the termination of such Right-of-Way, then any rights or interests in and to such Right-of-Way shall be deemed not conveyed hereunder unless and until such consent or other restriction is obtained or waived from or by the third party having such right.

F.   Further Assurances.  The Parties shall take all further actions and execute, acknowledge and deliver all such further documents that are necessary or useful in carrying out the purposes of this Partial Assignment.

G.    <u>Counterparts</u>. This Partial Assignment may be executed in multiple counterparts, all of which together shall constitute a single instrument, even though all Parties do not sign the same counterpart.

H.    <u>Successors in Interest</u>. The burdens, terms, covenants, reservations, restrictions and conditions contained in this Partial Assignment are binding upon and shall inure to the benefit of the Parties, and their respective successors, heirs, and assigns. Such burdens, terms, covenants, reservations, restrictions, and conditions are covenants running with the land and with each subsequent transfer or assignment of any interest acquired or conveyed by Assignor and/or Assignee hereunder.

I.    <u>Gathering Agreement</u>. This Partial Assignment is being made pursuant to the terms of the Gathering Agreement executed contemporaneously with this Partial Assignment. If there is a conflict between the terms of this Partial Assignment and the Gathering Agreement, the terms of the Gathering Agreement shall control to the extent of the conflict.

J.    <u>Recording</u>. Assignee shall record this Partial Assignment in the real property records of McKenzie County, North Dakota.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed this Partial Assignment as of the Effective Date.


ASSIGNEE
**Dakota Midstream, LLC**


By:_____

Name:_____

Title:_____

Date:_____




ASSIGNOR
**Emerald Oil, Inc.**

By:_____

Name:_____

Title:_____

Date:_____

## ANNEX I

[TO BE ADJUSTED/REDUCED TO COVER THE FOOTPRINT OF THE GATHERING SYSTEM]

**Right-of-Way #1**

Lessor:
Lessee:
Contract Date:
Recording Number:          _____
Description:


**Right-of-Way #2**

Lessor:
Lessee:
Contract Date:
Recording Number:          _____
Description:


**Right-of-Way #3**

Lessor:
Lessee:
Contract Date:
Recording Number:          _____
Description:

EXHIBIT "H"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED GAS DEDICATION AND GATHERING AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC, as "Gatherer" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

<u>EXPANSION FEE OR CREDIT FORMULA</u>

Expansion Fee or Credit per Mcf $= \dfrac{(A \times B)}{(C \times D \times E)}$

A = Actual Construct Costs of future expansion plus 20% OPEX ratio plus 7.5% IRR (with IRR adjustable for CPI-U, as described in Section 5.2)
B = Expansion distance in miles from Gatherer's Gas System to the requested receipt point for each DSU identified in the Connection Notice
C = Number of Wells per DSU identified in the Connection Notice
D = Average Gas volume receipts per Well in Mcf (based on Connection Volumes in the Connection Notice with Producer's Gas and Other Owner Gas volumes to be detailed separately in such Connection Notice)
E = Payback target in Days (shall equal 1825 Days unless expressly agreed to in writing otherwise)