**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EMERALD OIL, INC., *et al.*,[1] | ) Case No. 16-10704 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| EMERALD OIL, INC., *et al.*, | ) |
| | ) |
| | ) Adversary Proceeding No. 16-50998 |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| DAKOTA MIDSTREAM, LLC; DAKOTA | ) |
| ENERGY CONNECTION, LLC; AND DAKOTA | ) |
| FLUID SOLUTIONS, LLC F/K/A MESA OIL | ) |
| SERVICES, LLC, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887). The location of the Debtors' service address is: 200 Columbine Street, Suite 500, Denver, Colorado 80206.

KE 41882063

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................1

SUMMARY JUDGMENT STANDARD ...........................................................................2

BACKGROUND ................................................................................................................3

ARGUMENT .....................................................................................................................6

I.   COUNTS I-IV OF THE COMPLAINT ARE RIPE FOR SUMMARY
     JUDGMENT BECAUSE THEY SEEK DECLARATORY JUDGMENT
     INVOLVING PURELY LEGAL ISSUES OF CONTRACTUAL
     INTERPRETATION.................................................................................................6

II.  NONE OF THE DMS CONTRACTS CONTAIN COVENANTS RUNNING
     WITH THE LAND. ..................................................................................................7

     A.   None of the DMS Contracts Grant an Estate in Real Property. ..............9

          1.   The Subject Matter of the DMS Service Contracts Is Personal
               Property and Not Real Property. ................................................9

          2.   The DMS Contracts Do Not Contain Grants of Real Property. .................11

          3.   The DMS Contracts Disclaim Granting an Interest in Real
               Property. ....................................................................................13

     B.   The DMS Contracts Do Not Contain Any Covenants That Benefit the
          Land. .......................................................................................................13

CONCLUSION...................................................................................................................16

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................ 2

*Anderson v. Marshall-Malaise Lumber Co.*,
263 N.W. 721 (N.D. 1935) ............................................................................ 12

*Beeter v. Sawyer Disposal LLC*,
771 N.W.2d 282 (N.D. 2009) ............................................................... 7, 12, 13

*Breene v. Plaza Tower Ass'n*,
310 N.W.2d 730 (N.D. 1981) .......................................................................... 1

*Bull v. Beiseker*,
16 N.D. 290 (1907) ..................................................................................... 8, 10

*Burtch v. Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.)*,
453 B.R. 518 (Bankr. D. Del. 2011) ............................................................... 2

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................. 1, 2, 6

*F.D.I.C. v. Bathgate*,
27 F.3d 850 (3d Cir. 1994) .............................................................................. 2

*Fed. Land Bank of St. Paul v. State*,
274 N.W.2d 580 (N.D. 1979) ....................................................................... 8, 9

*First Intern. Bank and Trust v. Peterson*,
797 N.W.2d 316 (N.D. 2011) .......................................................................... 1

*Habeck v. MacDonald*,
520 N.W.2d 808 (N.D. 1994) .......................................................................... 6

*In re Arithson*,
175 B.R. 313 (D.N.D. 1994) ......................................................................... 8, 9

*In re Burger*,
125 B.R. 894 (Bankr. D. Del. 1991) ............................................................... 7

*In re Sabine Oil & Gas Corp.*,
2016 WL 890299 (Bankr. S.D.N.Y. Mar. 8, 2016) .................................... 5, 10

*Ives v. Hanson*,
66 N.W.2d 802 (N.D. 1954) ........................................................................................... 8

*Matter of Estate of Murphy*,
554 N.W.2d 432 (N.D. 1996) ......................................................................................... 7

*Matter of GEC Indus., Inc.*,
128 B.R. 892 (Bankr. D. Del. 1991) .............................................................................. 6

*Mullendore Theatres v. Growth Realty Inv. Co.*,
691 P.2d 970 (Wash. 1984) .......................................................................................... 12

*Red River Human Scvs. Found. v. State.*,
477 N.W.2d 225 (N.D. 1991) ........................................................................................ 6

*Reliance Ins. Co. v. Colonial Penn Franklin Ins. Co.*
*(In re Montgomery Ward & Co., Inc.)*,
344 B.R. 256 (D. Del. 2006) .......................................................................................... 2

*Riverside Park Condo Unit Owners Ass'n v. Lucas*,
691 N.W.2d 862 (N.D. 2005) ........................................................................................ 1

**Statutes**

28 U.S.C. § 2201 ................................................................................................................ 5

**Other Authorities**

N.D. Cent. Code § 47-10-06 ............................................................................................ 10

N.D. Cent. Code Ann. § 41-09-05(1)(h) (Supp. 1993) ............................................... 9, 10

N.D. Cent. Code Ann. § 47-04-01 ..................................................................................... 7

N.D. Cent. Code Ann. § 9-07-02 ....................................................................................... 6

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................................... 1

## INTRODUCTION

Plaintiffs, Emerald Oil, Inc. ("Emerald Oil") and Emerald Oil WB LLC ("Emerald WB," and together with Emerald Oil, the "Plaintiffs"), through counsel, file this *Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment* pursuant to rule 56 of the Federal Rules of Civil Procedure (the "Federal Rules") and rules 7001 and 7056 of Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order granting summary judgment in the Plaintiffs' favor and against Defendants Dakota Midstream, LLC ("Dakota Midstream"), Dakota Energy Connection, LLC ("Dakota Energy"), and Dakota Fluid Solutions, LLC f/k/a Mesa Oil Services, LLC ("Dakota Fluid," and together with Dakota Midstream and Dakota Energy, the "Defendants").

The Plaintiffs are entitled to summary judgment as a matter of law because the DMS Contracts (as defined herein) do not contain covenants or equitable servitudes (if any)[2] that run with the land.  Specifically, the Defendants cannot meet their burden to establish the two separate and independent elements that are required to prove that the agreements contain any covenants run with the land under North Dakota law:  that (a) they are contained in a grant of a real property estate, and (b) they touch and concern the occupation or enjoyment of the land, thereby directly benefiting the property.  Summary judgment for the Plaintiffs is thus appropriate as a matter of law.

## SUMMARY JUDGMENT STANDARD

Reviewing courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

---

[2]   Equitable servitudes in North Dakota arise only in the condominium context.  *See e.g.*, *Breene v. Plaza Tower Ass'n*, 310 N.W.2d 730 (N.D. 1981); *First Intern. Bank and Trust v. Peterson*, 797 N.W.2d 316 (N.D. 2011); *Riverside Park Condo Unit Owners Ass'n v. Lucas*, 691 N.W.2d 862 (N.D. 2005).

(holding that summary judgment is a favored procedure). In considering whether summary judgment is appropriate, courts may consider pleadings, admissions, and any affidavits or declarations on file. *See, e.g.*, *F.D.I.C. v. Bathgate*, 27 F.3d 850, 860 (3d Cir. 1994). The existence of some factual dispute will not defeat summary judgment; rather, the requirement is that no *genuine* issue of *material* fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added); *Celotex Corp.*, 477 U.S. at 327 (holding that when a movant's evidence demonstrates the lack of a genuine issue, the burden shifts to the opposing party to demonstrate the existence of a genuine issue for trial).

Where the movant has produced evidence in support of its motion for summary judgment, the nonmoving party cannot rest on the allegations of pleadings and "must do more than create some metaphysical doubt." *Burtch v. Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.)*, 453 B.R. 518, 525 (Bankr. D. Del. 2011). If the nonmoving party fails to come forward with evidence that would "reasonably permit the finder of fact to find in his favor on a material question, the court must enter summary judgment against him." *Reliance Ins. Co. v. Colonial Penn Franklin Ins. Co. (In re Montgomery Ward & Co., Inc.)*, 344 B.R. 256, 258–59 (D. Del. 2006).

This action is ripe for summary judgment on Counts I–IV of the *Complaint for Declaratory Judgment* [Docket No. 363] (the "Complaint"). The DMS Contracts and the relief requested in the Complaint involve contractual interpretation and can be resolved as a matter of law. As such, all four counts of the Complaint are ideally suited for the Court's determination based upon the pleadings, exhibits, and declarations in support.

## BACKGROUND

The Plaintiffs are party to four agreements with Dakota Midstream, Dakota Energy and, Dakota Fluid, each having an effective date of July 1, 2014.  The DMS Contracts are agreements pursuant to which the Defendants agreed to perform certain transportation services in return for compensation.

*Gathering Agreements.*

Pursuant to their recitals, the named Defendants promised pursuant to the Gas Gathering Agreement, Crude Oil Gathering Agreement, and Water Gathering Agreement (each as defined herein) to "receive, gather, and redeliver all of the [Gas, Crude Oil, or Water] owned by [the Plaintiffs] which is produced from the Wells and Leases" in an area specified therein. (Stubblefield Decl.[3], Exh. A–C, Recital B.)  The terms of the Gas Gathering Agreement, Crude Oil Gathering Agreement and Water Gathering Agreement are substantially similar in all material respects.

Plaintiffs Emerald Oil and Emerald WB LLC entered into the Amended and Restated Gas Dedication and Gathering Agreement (the "Gas Gathering Agreement") with Dakota Midstream—the terms of which relate to natural gas produced by the Plaintiffs.  Pursuant to the Gas Gathering Agreement, the parties agreed that the Plaintiffs would "deliver all of [the Plaintiffs'] Gas to [Dakota Midstream] at the Receipt Points without other disruption except as otherwise provided in this Agreement." (*Id.*, Exh. A, § 1.2.)

Debtors Emerald Oil and Emerald WB entered into the Amended and Restated Crude Oil Dedication & Throughput Commitment Transportation Agreement (the "Crude Oil Gathering Agreement") with Dakota Midstream and Dakota Energy—the terms of which relate to crude oil

---

[3]    The *Declaration of Wade Stubblefield in Support of the Motion for Summary Judgment* is filed contemporaneously herewith.

3

produced by the Plaintiffs.  Pursuant to the Crude Oil Gathering Agreement, the parties further agreed that the Plaintiffs would "deliver all of [the Plaintiffs'] Crude to [Dakota Midstream] at the Receipt Points without other disposition except as otherwise provided in this Agreement." (*Id.*, Exh. B, § 1.2.)

Debtors Emerald Oil and Emerald WB entered into the Amended and Restated Water Dedication and Gathering Agreement (the "Water Gathering Agreement," and together with the Gas Gathering Agreement and the Crude Oil Gathering Agreement, the "Gathering Agreements") with Dakota Fluid—the terms of which relate to water produced by the Plaintiffs. Pursuant to the Water Gathering Agreement, the parties further agreed that the Plaintiffs would "deliver all of [the Plaintiffs'] Water to [Dakota Midstream] at the Receipt Points without other disposition except as otherwise provided in this Agreement."  (*Id.*, Exh. C, § 1.2.)

*Disposal Well Services Agreement.*

Pursuant to section 1.7 of the Water Gathering Agreement, and as a condition precedent to the Water Gathering Agreement, Emerald Oil and Dakota Fluid entered into that certain Amended and Restated Disposal Well Services Agreement (the "Disposal Well Services Agreement," and together with the Gathering Agreements, the "DMS Contracts").

Pursuant to the Disposal Well Services Agreement, Emerald Oil agreed to exclusively deliver saltwater waste to Dakota Fluid from the Plaintiffs' natural gas and crude oil production in an area specified in more detail in the Disposal Well Services Agreement.  (*Id.*, Exh. D , §§ 2–3.)

Furthermore, under the terms of the Disposal Well Services Agreement, Dakota Fluid agreed to "dispose of all Saltwater delivered by [Emerald Oil] to the SWD Wells during an Applicable Delivery Time and [. . .] operate the SWD Wells in accordance with good operating

practice for saltwater disposal and all applicable laws, including without limitation, all environmental laws." (*Id.*, Exh. D , § 4(a).)

*Rejection.*

On June 3, 2016, the Plaintiffs filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts with the Dakota Midstream Parties and (II) Granting Related Relief* [Docket No. 362], seeking authority to reject the DMS Contracts pursuant to section 365 of the Bankruptcy Code.  The Plaintiffs simultaneously seek the relief requested in the Complaint and the rejection of the DMS Contracts because bankruptcy courts have expressed a preference for the simultaneous adjudication of the issues raised in this adversary proceeding with a motion to reject the underlying executory contract.  *In re Sabine*, 2016 WL 890299 at \*4 ("[B]ifurcating the motion to reject and further proceedings to finally resolve the underlying property law dispute is an inefficient use of judicial and private resources; it would have been far preferable for the Court to hear the two together.").

## ARGUMENT[4]

### I.  COUNTS I-IV OF THE COMPLAINT ARE RIPE FOR SUMMARY JUDGMENT BECAUSE THEY SEEK DECLARATORY JUDGMENT INVOLVING PURELY LEGAL ISSUES OF CONTRACTUAL INTERPRETATION.

Counts I–IV of the Complaint are ripe for summary judgment because each count seeks declaratory judgment that the DMS Contracts do not contain covenants or equitable servitudes that run with the land.

Each Count of the Complaint seeks relief under the Declaratory Judgment Act.  Pursuant to 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction, [. . .] any court of

---

[4]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Motion for Summary Judgment* filed contemporaneously herewith, the Complaint commencing the above-captioned adversary proceeding, or the DMS Contracts, as applicable.

the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

Under North Dakota law, construction of written contracts to determine their legal effect is a pure question of law.  *Red River Human Scvs. Found. v. State.*, 477 N.W.2d 225, 227 (N.D. 1991) (citations omitted).  Pursuant to N.D. Cent. Code Ann. § 9-07-02, "the language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity."  Whenever possible, reviewing courts ascertain the intent of the parties from the writing alone.  *Habeck v. MacDonald*, 520 N.W.2d 808, 811 (N.D. 1994) (citations omitted); *Red River.*, 477 N.W.2d at 227–28 ("[W]e must be guided first by the language of the contract itself, and where the contract is clear and unambiguous there is no reason to go further." (citations omitted)).

Because the issues in the Complaint can be resolved as a matter of law, no factual disputes exist to preclude summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## II.    NONE OF THE DMS CONTRACTS CONTAIN COVENANTS RUNNING WITH THE LAND.

North Dakota law governs the issues arising under the Complaint because each of the DMS Contracts contains a North Dakota choice of law provision.  Courts in this district routinely respect the agreement of the parties and interpret contracts according to the choice of law set forth in the agreement.  *See, e.g.*, *Matter of GEC Indus., Inc.*, 128 B.R. 892, 896 (Bankr. D. Del. 1991) (upholding the enforceability of express contractual choice of law provisions in

Delaware); *In re Burger*, 125 B.R. 894, 900 (Bankr. D. Del. 1991); (Stubblefield Decl., Exh. A–C, § 8.9; Exh. D. § 14).

Covenants running with the land under North Dakota law are narrowly defined, in the first instance, by statute.  Specifically, N.D. Cent. Code Ann. § 47-04-01 states that covenants that run with the land are those covenants "contained in grants of estates in real property [and] are appurtenant to such estates," and which "pass with them so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them."

While Section 1.2 of each of the Gathering Agreements purports to make the promises therein "a covenant running with the land," under settled North Dakota law, a covenant running with the land is not created simply by being named as such in a contract.  That proposition "is in direct contradiction to the settled principle that the parties' intent, no matter how clearly expressed, cannot make a personal covenant run with the land . . . ."  *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282, 286 (N.D. 2009) (the original intent of the parties in attempting to create a perpetual covenant running with the land, no matter how clearly expressed, did not make the covenant binding upon subsequent purchasers).

Rather, a covenant runs with the land in North Dakota only when (a) it is contained in a grant of a real property estate, and (b) it touches and concerns the occupation or enjoyment of the land, thereby directly benefiting the property.  *See Matter of Estate of Murphy*, 554 N.W.2d 432, 436 (N.D. 1996); *Beeter*, 771 N.W.2d at 286 ("[i]f the covenant does not touch or concern the occupation or enjoyment of the land, it is the collateral and personal obligation of the grantor or lessor and does not run with the land") (internal citations omitted).

7

A plain reading of the DMS Contracts makes it clear that the Defendants cannot satisfy these elements with respect to the DMS Contracts, and thus the Plaintiffs are entitled to summary judgment as a matter of law on Counts I–IV of the Complaint.

**A.     None of the DMS Contracts Grant an Estate in Real Property.**

In order for a covenant to run with the land, it is "apparent that some interest in the property must be granted." *Bull v. Beiseker*, 16 N.D. 290 (1907); *see also Ives v. Hanson*, 66 N.W.2d 802, 802–03 (N.D. 1954) (holding that "fee-simple title is presumed to be intended to pass by a grant of real property unless it appears from the grant that a lesser estate was intended"). Because none of the DMS Contracts granted DMS an estate in real property, the covenants therein cannot run with the land.

**1.     The Subject Matter of the DMS Service Contracts Is Personal Property and Not Real Property.**

The interests at issue in the Gathering Agreements (*i.e.*, natural gas, crude oil, and water) are personal property interests—not real property—because those interest have been severed from the ground. *Fed. Land Bank of St. Paul v. State*, 274 N.W.2d 580, 583 (N.D. 1979) (holding that "produced or severed minerals are personal property, not real estate"); *In re Arithson*, 175 B.R. 313 (D.N.D. 1994) (holding that "at the moment of extraction or severance from the subsurface estate, however, mineral interests immediately transform from realty into personalty and become subject to the requirements of Article 9"). "Gas" is defined in Exhibit C of the Gas Gathering Agreement as "effluent vapor stream including all of the constituents thereof, including liquefiable hydrocarbons associated with the vapor stream, ***as produced from a Well*** . . . ." (Stubblefield Decl., Exh. A., Exh C. § 1(k)) (emphasis added). "Crude Oil" is defined in the Crude Oil Gathering Agreement as "the mixture of hydrocarbons that exist in natural underground reservoirs ***after passing through surface separation*** and well site treatment

facilities and remain liquid at atmospheric pressures." (*Id.*, Exh B., Exh C. § 1(f)) (emphasis added). Water is defined in the Water Gathering Agreement as "water originating from subsurface formations ***produced concurrently with oil and gas*** from wells operated by [the Plaintiffs]." (*Id.*, Exh B., Exh C. § 1(g)) (emphasis added).

Similarly, the only interest at issue in the Disposal Well Services Agreement is saltwater recovered as part of the Emerald Oil's natural gas and crude oil production in the area referenced in the agreement—not real property. (Stubblefield Decl., Exh. D §§ 2–3); *see Fed. Land Bank of St. Paul*, 274 N.W.2d at 583; *Arithson*, 175 B.R. at 322. Also, pursuant to its plain language, Dakota Fluid agreed to "dispose of all Saltwater delivered by [Emerald Oil] to the SWD Wells during an Applicable Delivery Time . . . ." (Stubblefield Decl., Exh. D, § 4(a).) And, unlike the Gathering Agreements, the Disposal Well Services Agreement does not even purport to grant any covenants running with the land.

The DMS Contracts and the covenants therein relate to the receipt of personal property, and not to any interest of the Plaintiffs' in real property. Under North Dakota law, the severance of oil and gas from the ground marks a change in the nature of any interest therein from real property to personal property. *See Fed. Land Bank of St. Paul*, 274 N.W.2d at 583 (deciding for tax purposes that "'produced' or 'severed' minerals are personal property, not real estate"); N.D. Cent. Code Ann. § 41-09-05(1)(h) (Supp. 1993) (defining "goods" for UCC purposes to include "all things which are movable at the time the security interest attaches," and not including "minerals or the like (including oil and gas) ***before*** extraction") (emphasis added).

At the core of each of the DMS Contracts is an agreement for payment for services provided. By the time the Plaintiffs' oil and gas reach the Defendants and the receipt points, they have each been extracted and severed from the ground and are considered personal property

under North Dakota law. Similarly, as a "movable" liquid, water subject to the DMS Contracts is not a real property interest of the Debtors, and rather in the nature of personal property. N.D. Cent. Code Ann. § 41-09-05(1)(h) (Supp. 1993). While the Plaintiffs dedicate their gas, crude, and water, as applicable, to the performance of the Gathering Agreements, such "dedication" does not constitute a burdening of the Plaintiffs' real property interests because the property being dedicated is personal property. The purpose of the dedication in each of the DMS Contracts is to merely identify what property and products are the subject of the contracts and what will be made available to the gatherer pursuant to those contracts.

### 2.    The DMS Contracts Do Not Contain Grants of Real Property.

None of the remaining provisions contained in the DMS Contracts amount to a conveyance of real property because there is simply no granting clause or other language of conveyance, such as a "grant" of an "interest" in any leasehold, fee, or other property interest, in any of the DMS Contracts. *Beiseker*, 16 N.D. at 290 (holding that for a covenant to run with the land, it is "apparent that some interest in the property must be granted"); *see also* N.D. Cent. Code § 47-10-06 ("A grant of an estate in real property may be made in substances as follows: ***This grant made*** the _____ day of _____, in the year of _____, between A.B., of _____, of the first part, and C.D., of _____, of the second part . . . ." (emphasis added)).

The language of the DMS Contracts does not grant the Defendant counterparties any interest in the Plaintiffs' real property but rather merely "identif[ies] and delineat[es] the contractual rights and obligations with respect to the services to be provided." *In re Sabine Oil & Gas Corp.*, 2016 WL 890299, at *7 (Bankr. S.D.N.Y. Mar. 8, 2016). The plain language of section 1.2 of each of the Gas and Crude Oil Gathering Agreements states only that the Plaintiffs "dedicate and commit" "all of [Plaintiffs'] working interest share of [Gas/ Crude Oil] produced

10

from the Wells operated by the Plaintiffs." Section 1.2 of the Water Gathering Agreement states that the "[Plaintiffs hereby dedicate and/ or commit to the performance of this Agreement [. . .] all of [Plaintiffs'] Water produced from the Wells." A plain reading of the words "dedicate" ("to set apart to a definite use")[5] and "commit" ("to pledge . . . to some particular course or use")[6] makes clear that the Plaintiffs have not granted or conveyed any property by this language. As the Gathering Agreements concern personal property rather than real property, and as there is no operative language in the Gathering Agreements indicating a grant, sale, transfer, or other conveyance of property, the Gathering Agreements do not contain any covenants running with the land.

### 3.    The DMS Contracts Disclaim Granting an Interest in Real Property.

Pursuant to section 2.8 and 2.9 of each of the Gathering Agreements, "[the Plaintiffs] expressly [do] not by the terms of this Agreement, sell, transfer or assign unto [the Defendant counterparties] any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by [the Plaintiffs] in the operation of [the Plaintiffs'] Wells and the Leases." (Stubblefield Decl., Exh. A–B, § 2.8; Exh C, § 2.9.)

Further, the Gathering Agreements do not give DMS any rights to interfere with the Plaintiffs' use or enjoyment of their real property. For example, the Gas Gathering Agreement specifically reserves the Plaintiffs' rights "to operate its Leases and Wells free of any control by [Dakota Midstream] and in such a manner as [Plaintiffs], in their sole discretion, may deem advisable . . . ." (Stubblefield Decl., Exh. A, § 1.3(ii)). Section 1.3(ii) of the Crude Oil Gathering Agreement and 1.3 of the Water Gathering Agreement state substantially the same. Thus, by

---

[5]    "Dedicate." Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003).

[6]    "Commit." Merriam-Webster's Collegiate Dictionary 324 (11th ed. 2003).

11

their express terms, the Gathering Agreements impose no limitations on the Plaintiffs' use of their real property.

Based on the foregoing, summary judgment should be granted on Counts I–IV of the Complaint because the DMS Contracts do not contain any grants of any interests in real property and thus there can be no covenants or equitable servitudes running with the land.

**B.      The DMS Contracts Do Not Contain Any Covenants That Benefit the Land.**

The DMS Contracts are devoid of any covenants that benefit the land and thus those covenants that exist in the contracts are merely personal in nature.  In order to benefit the land, a covenant must be "so related to the land as to enhance its value and confer a benefit upon it." *Beeter*, 771 N.W.2d at 285–86 (quoting *Mullendore Theatres v. Growth Realty Inv. Co.*, 691 P.2d 970, 971 (Wash. 1984); *Anderson v. Marshall-Malaise Lumber Co.*, 263 N.W. 721, 723 (N.D. 1935) (holding that the covenant to pay for land in a particular way is a personal covenant that does not run with the land).  Such personal covenants do not "touch and concern" the land and are not binding upon successors.  *Beeter,* 771 N.W.2d at 286 (holding that "[i]f a covenant or deed restriction benefits the grantor personally, and serves no real benefit to the land, then the covenant is personal in nature and does not 'run with the land' upon a subsequent sale of the property").  Under North Dakota law, in order to benefit the land, a covenant must be "so related to the land as to enhance its value and confer a benefit upon it."  *Beeter*, 771 N.W.2d at 285–86 (quoting *Mullendore Theatres v. Growth Realty Inv. Co.*, 691 P.2d 970, 971 (Wash. 1984).  Moreover, as discussed, the covenanting parties' intent, no matter how clearly expressed, cannot make a personal covenant run with the land and bind subsequent purchasers.  *Id.*at 286.

In a case analogous to the Plaintiffs', the Supreme Court of North Dakota held in *Beeter v. Sawyer* that a covenant in a deed granting real property that required the payment of six

percent of gross revenues from waste disposal operations did not "touch and concern" the land. Specifically, the court noted that this was a "purely personal benefit to the [recipient]" which did not "benefit the land and did not run with the land." *Id.* at 286. Nor did the intent of the parties that the covenant would result in payments as long as waste disposal occurred on the property make the covenant one that ran with the land. *Id.* As is more fully set forth below, here the covenants between the Defendants and the Plaintiffs are also personal obligations because the covenants do not benefit the land.

To be clear, the DMS Contracts are, at their core, service contracts: the Defendants provide the Plaintiffs with a service and the Plaintiffs provide the Defendants a payment for those services. Thus, there is no benefit to the land with respect to any covenants or dedications contained in the DMS Contracts as all of the benefit from those covenants inure to the Plaintiffs and the Defendants.

At least three additional provisions in the DMS Contracts weigh in favor of finding that the covenants contained therein are personal to the Plaintiffs and do not "touch and concern" the land. *First*, pursuant to the Gathering Agreements, the Plaintiffs reserve the rights to operate their oil and gas properties independent of and without interference from the Defendants—further underscoring the nature of the DMS Contracts as service agreements. (Stubblefield Decl., Exh. A–B § 1.3(ii); Exh. C § 1.3). *Second*, the obligations of the DMS Contracts attach to certain "Receipt Points" (as defined in the DMS Contracts) and not directly to the Plaintiffs' wells. (Stubblefield Decl., Exh. A-C § 2.1(ii)); Exh D, § 3). The Defendants' pipeline does not touch the Plaintiffs' wells, and instead adjoins to structures owned by the Plaintiffs which serve as the intermediary between the Receipt Points and the wells. As such, the rights and obligations appurtenant to the DMS Contracts begin and end at the Receipt Points, and by the time any oil,

13

gas, or water reaches DMS, it has been severed from the Plaintiffs' real property and has converted to personalty, as discussed previously. Thus the obligations do not "touch" the land. ***Lastly***, the gathering fees payable to the Defendants are triggered by the Defendants' receipt of severed oil, gas, and water, and not by the actual extraction of gas, oil, or water from the ground. (Stubblefield Decl., Exh. A-C, Exh. E; Exh. D., § 2).

Each of these provisions negates the possibility that the DMS Contracts "touch and concern" the land. The covenants in the DMS Contracts are personal covenants and do not bear any of the hallmark attributes that would otherwise transform them into covenants running with the land. Indeed, the DMS Contracts accomplish this by drawing a bright line whereby all of the Defendants' rights and obligations under the contracts explicitly do not involve, or purport to touch and concern, the Plaintiffs' real property. Accordingly, the DMS Contracts contain no covenants that enhance the value of the Plaintiff's land or confer a benefit upon it and thus they cannot run with the land.

## CONCLUSION

In light of the foregoing, Counts I–IV of the Complaint are ripe for summary judgment as a matter of law. The DMS Contracts are quintessentially service contracts pursuant to which the respective Defendants named therein agreed to gather minerals severed from the land and dispose of wastewater provided in connection therewith. Because none of the DMS Contracts contain a grant of interest in real estate or otherwise contain covenants that benefit the land, none of the agreements contain covenants or equitable servitudes running with the land as a matter of law.

Wilmington, Delaware         */s/ Laura Davis Jones*
Dated: June 17, 2016         Laura Davis Jones (DE Bar No. 2436)
                             Colin R. Robinson (DE Bar No. 5524)
                             Joseph M. Mulvihill (DE Bar No. 6061)
                             **PACHULSKI STANG ZIEHL & JONES LLP**
                             919 North Market Street, 17th Floor
                             P.O. Box 8705
                             Wilmington, Delaware 19899-8705 (Courier 19801)
                             Telephone:   (302) 652-4100
                             Facsimile:   (302) 652-4400
                             Email:       ljones@pszjlaw.com
                                          crobinson@pszjlaw.com
                                          jmulvihill@pszjlaw.com

                             - and -

                             James H.M. Sprayregen, P.C.
                             Ryan Blaine Bennett (admitted *pro hac vice*)
                             Travis M. Bayer (admitted *pro hac vice*)
                             **KIRKLAND & ELLIS LLP**
                             **KIRKLAND & ELLIS INTERNATIONAL LLP**
                             300 North LaSalle
                             Chicago, Illinois 60654
                             Telephone:   (312) 862-2000
                             Facsimile:   (312) 862-2200
                             Email:       james.sprayregen@kirkland.com
                                          ryan.bennett@kirkland.com
                                          travis.bayer@kirkland.com

                             *Counsel to the Debtors*

15