**Exhibit B**

AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
BETWEEN
DAKOTA MIDSTREAM, LLC & DAKOTA ENERGY CONNECTION, LLC
AND
EMERALD OIL, INC. & EMERALD WB LLC

<u>AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT</u>

THIS AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT COMMITMENT TRANSPORTATION AGREEMENT *("Agreement")* is entered into on May __, 2015, but effective as of the 1st day of July, 2014 (the *"Effective Date"*) by and between DAKOTA MIDSTREAM, LLC & DAKOTA ENERGY CONNECTION, LLC (Dakota Midstream, LLC being the *"Transporter* prior to its March 23, 2015 assignment of interests and Dakota Energy Connection, LLC being the *"Transporter"* thereafter), and EMERALD OIL, INC. and EMERALD WB LLC (collectively *"Producer" or "Shipper"*). The terms "Producer" and "Shipper" shall also include any other Affiliates of Emerald Oil, Inc. or Emerald WB LLC that own or control leasehold interests or Crude from leasehold interests located within the Area of Dedication at any time while this Agreement remains in effect. Producer and Transporter are sometimes referred to herein individually as a *"Party"* and collectively as the *"Parties"*.

RECITALS

A.      Producer is a working interest owner in certain oil and gas leases, wells, and/or lands within the area described in Exhibit "A" attached hereto and by reference made a part hereof (the *"Area of Dedication"*), and may acquire additional interests in oil and gas leases, and/or lands within the Area of Dedication during the term of this Agreement (such current and future interests are referred to as the *"Leases"*).

B.      Producer desires to have Transporter receive, gather or transport and redeliver all of Crude Oil owned by Producer which is produced from the Wells (as defined herein) and Leases within the Area of Dedication.

C.      Transporter desires to receive Producer's Crude at the Receipt Points and redeliver Producer's Crude at the Delivery Points (as such terms are defined herein), utilizing the facilities constructed, owned and operated by Transporter.

D.      Emerald Oil, Inc. and Dakota Midstream, LLC entered into that certain Crude Oil Dedication & Throughput Commitment Transportation Agreement dated effective July 1, 2014, as amended by that certain Amendment No. 1 dated effective November 19, 2014 (the *"Original Agreement"*), and Dakota Midstream, LLC assigned its interest under the Original Agreement to its Affiliate, Dakota Energy Connection, LLC effective March 23, 2015.

E.      Transporter initiated an open season and has filed a Tariff with the Federal Energy Regulatory Commission (*"FERC"*) based on the Original Agreement (*"Original Tariff"*).

E.      The Parties desire now to amend and restate the Original Agreement in its entirety, effective as of July 1, 2014, to address and incorporate additional facilities to be constructed and operated by Transporter at the request of Producer to receive Producer's Crude from the same Initial System DSUs as identified in Exhibit "B-1" herein at certain new "Infill Receipt Points" in exchange for additional consideration to Transporter, with Transporter to modify the Original Tariff as needed to conform to the changes made herein.

2

F.      The Parties also desire now to name and include Emerald WB LLC as a Producer Party to this Agreement and to have Emerald WB LLC ratify the Original Agreement.

Now therefore, in consideration of the mutual covenants and agreements contained in this Agreement, the Parties agree as follows:

## ARTICLE I
### REPRESENTATIONS & COMMITMENTS OF PRODUCER

1.1   <u>Producer's Representations</u>.   Producer represents and warrants to Transporter, its successors and assigns, that Producer has the right to operate the Wells listed on Exhibit "B-2" and owns and has the right to dedicate and commit for physical delivery to and gathering by Transporter, Producer's Crude, as defined in Section 1.2 below, and that Producer has constructed, intends to construct, or shall cause to be constructed, the facilities necessary, if any, to enable Producer to deliver to Transporter at the Receipt Points all of Producer's Crude, in accordance with the terms and provisions of this Agreement, as well as any other facilities committed to by Producer under this Agreement.

1.2   <u>Dedication</u>. Producer hereby dedicates and commits to the performance of this Agreement and all of the terms and conditions herein for the Primary Term, as defined herein, as a covenant running with the land the following:  (i) all of Producer's working interest share of Crude produced from the Wells operated by Producer; and (ii) all of Producer's working interest share of Crude from wells operated by parties other than Producer in which Producer takes its share of production in kind, if applicable (collectively "*Producer's Crude*").  Notwithstanding the foregoing, Producer's Crude shall not include:  (i) Crude subject to a prior Crude dedication as of the Effective Date of this Agreement for the minimum duration of that prior Crude dedication; (ii) Crude produced from any lands or Leases that Producer in the future acquires in the Area of Dedication that are subject to a prior Crude dedication entered into by Producer's predecessor-in-interest for the minimum duration of the prior Crude dedication; (iii) Crude from Leases that are subject to a Temporary Release (for so long as such Temporary Release remains in effect) or a Permanent Release, all in accordance with the terms of this Agreement; and (iv) Crude produced from any Leases otherwise subject to this Agreement that are no longer held by production or upon their termination, expiration or release if such Leases are not cured, renewed, top-leased, re-acquired or newly acquired in whole or in part by Producer, its successor-in-interest, their respective Affiliates, or any of their respective officers, directors, employees, agents, or representatives. Subject to the remaining terms of this Agreement, including the rights of Producer in the event of a Temporary Release or Permanent Release, as defined herein, either exclusion applies only for the remaining minimum duration of the prior Crude dedication, Producer will take all action necessary not to extend the duration of such prior Crude dedication, and upon the expiration of that prior Crude dedication such interest will automatically be dedicated and committed hereunder. Producer shall promptly furnish Transporter with notices of the termination of all prior Crude dedication arrangements and the anticipated date of first delivery of those barrels to Transporter's Crude System. Producer covenants to deliver all of Producer's Crude to Transporter at the Receipt Points without other disposition except as otherwise provided in this Agreement.

3

1.3     Producer's Reservations.

        i.      Producer, as a reasonable and prudent operator, hereby expressly reserves the following rights with respect to Producer's Crude and the Leases subject hereto:

        a.      The right to deliver Crude to the lessors and owners of overriding royalties or other interests in the Leases if such owners are entitled to take such Crude in kind under the terms of the Leases and other instruments creating their interests entered into (1) prior to the Effective Date, with respect to Leases owned by Producer at the Effective Date, or (2) prior to the date such Leases are acquired by Producer, with respect to Leases acquired by Producer after the Effective Date;

        b.      The right to pool or unitize the Leases (or any portion thereof) with other lands and leases. In the event of any such pooling or unitization, the Agreement will cover Producer's interest in the pool or unit and the Crude attributable thereto to the extent that such interest is derived from Producer's interest in the Leases.

        ii.      Producer reserves the right to operate its Leases and Wells free of any control by Transporter in such a manner as Producer, in its sole discretion, may deem advisable, including without limitation the right to enter into farmouts of any Lease subject to this Agreement, to abandon any Well and surrender any Lease. Producer reserves the right to determine the maximum efficient rate of flow for any Well (including the right to curtail production due to low market demand for Crude) and shall not be required to produce any Well or Wells in any manner which in its sole judgment and discretion would not constitute good operating practice, nor shall Producer be obligated to drill additional Wells or to deepen, repair or rework any existing Wells.

1.4     Release Rights.

        i.      Temporary Release. Notwithstanding any other provision herein, during any period after the Initial System In-Service Date, as defined in Section 2.4, when Transporter is unable or fails to accept delivery of any of Producer's Crude into Transporter's Crude System or provide alternative trucking transportation for Producer's Crude, in accordance with the terms of this Agreement for any reason whatsoever, including, without limitation, curtailment, Force Majeure or maintenance affecting Transporter's Crude System or any downstream pipeline or transporter, and there exists no uncured material breach of this Agreement on the part of Producer, then Producer may temporarily elect to deliver the Barrels of Producer's Crude which Transporter has failed to or is unable to accept to alternative facilities or transporters, or to provide its own trucking services, upon delivering written notice to Transporter of its intent to do so (a "*Temporary Release*"). Failure of Transporter to respond (or accept delivery of the excess Barrels of Producer's Crude) within twenty-four (24) hours to waiver request from Producer shall be deemed to be a confirmation by Transporter of lack of capacity on Transporter's Crude System. The Temporary Release of Producer's Crude shall only apply to those certain Barrels of Producer's Crude which Transporter is unable to so accept (the "*Released Barrels*"). Furthermore, during any Accounting Period in which a

4

Temporary Release occurs, the applicable Minimum Barrels for such Accounting Period shall be reduced by an amount equal to the total of Released Barrels for such Accounting Period. Within thirty (30) days after Transporter's delivery of written notice to Producer of its ability to again accept delivery of the Released Barrels in whole or in part, the Temporary Release will terminate as to the quantity Transporter has specified in its written notice that it is able to receive and Producer shall resume delivery of such Released Barrels to Transporter.

       ii.      <u>Permanent Release</u>. Except for the six (6) month period commencing as of the Initial System In-Service Date, and subject to Section 2.5 in the context of future expansion beyond the Initial System, as applicable, in the event Transporter has not accepted delivery of the entire quantity of Producer's Crude made available by Producer at the Receipt Points for any reason whatsoever, including, without limitation, curtailment, Force Majeure or maintenance affecting Transporter's Crude System or any downstream pipeline or transporter, for a continuous period of ninety (90) consecutive days, or one hundred and twenty (120) days within a one hundred eighty (180) day period, Producer shall have the right to have the Leases and Wells affected thereby permanently released from this Agreement (a "*Permanent Release*") by delivering written notice thereof to Transporter within thirty (30) days after the expiration of any such ninety (90) consecutive day period or one hundred eighty (180) day period, as applicable. Furthermore, the applicable Minimum Barrels for each Accounting Period remaining during the Commitment Period shall be reduced by the Barrels produced from the Leases and Wells subject to Permanent Release for each such Accounting Period, in accordance with estimates of anticipated barrels previously provided by Producer pursuant to Section 2.7 that would have been delivered to Transporter's Crude System had the Permanent Release not occurred (the "*Permanently Released Barrels*").

1.5    <u>Disposition Other than Delivery to Transporter</u>. In consideration for the undertakings of Transporter under this Agreement, in the event that Producer, for any reason other than a failure of Transporter to accept delivery of any of Producer's Crude in accordance with this Agreement, transports for further disposition any of Producer's Crude by any means other than by delivery to Transporter, Producer shall promptly provide accurate records of such transport to Transporter. Producer shall be charged and shall pay the applicable Crude Transportation Fees to Transporter as though such Crude was delivered to Transporter at the Receipt Points for transportation on Transporter's Crude System (as such terms are defined herein) plus fifteen percent (15%). Upon Transporter's receipt of Producer's payment in full for such Barrels, such Barrels shall be deemed to be "Delivered Barrels" for purposes of calculation of the Shortfall Payment described in Exhibit "E". For the avoidance of doubt, this Section 1.5 shall not apply to Released Barrels or Permanently Released Barrels.

1.6    <u>Memorandum of Agreement</u>. Upon execution of this Agreement, the Parties shall concurrently execute a new Memorandum of this Agreement, in substantially the same form attached as Exhibit "D" including a legal description of the Area of Dedication that corrects and replaces the Memorandum of the Original Agreement by expressly including Emerald WB LLC as a dedicating party, together with any of Producer's other Affiliates which own or control leasehold interests or Crude from leasehold interests located within the Area of Dedication, during the Primary Term or Extended Term of this Agreement. Such Memorandum shall be

5

placed of record in each county in which the Leases are located with Producer to bear all costs. In the event of any Permanent Release or termination of this Agreement, in whole or in part, the Parties shall execute appropriate instruments to be placed of record in each county in which the Leases are located, providing notice of the amended Area of Dedication or termination of this Agreement.

1.7     Crude Purchaser.   It is understood that Producer may enter into arrangements with purchasers of Crude Oil under which Producer's Crude may be sold to the purchaser *("Crude Purchaser"* whether one or more*)* at or near the well pads and prior to delivery to Transporter, or downstream of the Delivery Points.  If such arrangements are entered into by Producer, Producer will require the Crude Purchaser to deliver all of Producer's Crude to Transporter under the terms of this Agreement and, subject to the terms and provisions hereof, all of Producer's Crude shall remain dedicated and committed to this Agreement and subject to all provisions contained in this Agreement and Producer shall cause the Crude Purchaser to execute an adoption and ratification of this Agreement in a form and substance reasonably acceptable to Transporter.

1.8     Further Arrangements.  Producer commits that, during the term of this Agreement, it will maintain, or cause its Crude Purchaser, if applicable, to maintain all necessary arrangements to provide for the further shipment or disposition of Producer's Crude at the Delivery Points. Transporter will use reasonable efforts to enter into interconnect agreements at the Delivery Points with third party pipelines and/or rail loading facilities to facilitate the further shipment or disposition of Producer's Crude.  Further, Producer agrees that any connection fees, transfer fees, throughput fees or similar charges to flow Producer's Crude into a third party facility at the Delivery Points shall be borne by Producer.

1.9     Other Owner Crude. It is expressly agreed by the Parties that, except as specifically provided herein, Producer does not dedicate to the performance of this Agreement any Crude Oil attributable to the interests of other non-Affiliate working interest owners, non-Affiliate overriding royalty owners or royalty owners (*"Other Owners"*) in the Wells or Leases operated by Producer within the Area of Dedication. However, in the event Other Owners fail to take their shares of production in kind from time to time, and such shares of production are not subject to prior dedications to third party gatherers, and Producer elects to arrange for the temporary disposition of the shares of production of such Other Owners, then the Crude attributable to such shares of Other Owners (*"Other Owner Crude"*) shall be deemed to be *"Producer's Crude"*; provided, however, that such Other Owner Crude shall not thereby become dedicated to this Agreement and shall not be entitled to receive the highest priority of service afforded Producer's Crude pursuant to Section 3.5 except as required by law or applicable tariff without ratification or other formal agreement by the Other Owners, and such Other Owners shall retain their right and obligation to take their share of production in kind. To the extent Producer tenders Other Owner Crude, Producer represents and warrants to Transporter, its successors and assigns, that Producer has the right to deliver for gathering to Transporter the allocated share of Other Owner Crude tendered by Producer and indemnifies Transporter accordingly.

ARTICLE II
FACILITIES

2.1     Transporter's Crude System.  Transporter will construct, operate and maintain a Crude Oil gathering system comprised of the Initial System, and any Future Receipt Points, Future Delivery Points and expansions of Transporter's Crude System constructed pursuant to Section 2.5 (collectively "*Transporter's Crude System*") located as necessary to enable Transporter to receive and transport Producer's Crude from the Area of Dedication at the Receipt Points and redeliver equivalent Barrels of Crude, less Pipeline Loss Allowance and Crude provided as line fill, as defined herein, to Producer or Producer's designee at the Delivery Points.  Transporter shall construct and operate the Transporter's Crude System in a workman-like manner and in accordance with good oilfield practices and in compliance with any applicable permits and licenses and all applicable rules, laws and regulations.  Transporter's Crude System will consist of:

        i.      "*Pipelines*" mean various gathering or transportation pipelines from the Receipt Points to the Delivery Points, together with appurtenances thereto, with sufficient capacity across Transporter's Crude System, to receive, transport and redeliver Producer's Capacity, as defined in Section 3.1, attributable to such Receipt Point (as defined immediately below).

        ii.     "*Receipt Points*" shall mean the facilities needed to connect Producer's facilities located at the locations described on Exhibit "B" as RP1 through RP8 (the "*Initial Receipt Points*") and as RP10 through RP14 and RP16 (the "*Infill Receipt Points*") together with any additional locations installed as part of any expansion of Transporter's Crude System beyond the Initial System (the "*Future Receipt Points*"). The "*Custody Transfer Point*" shall be the same point as the "*Receipt Point*", which for both shall be the connection with Transporter's Crude System, the first flange downstream of the lease automatic custody transfer facilities *("LACTs")* assembly.

        iii.    "*Delivery Points*" include the following facilities for the purpose of redelivery of Crude to Producer or its Crude Purchaser or other designee at locations described on Exhibit "B" (the "*Initial Delivery Points*") together with any additional locations installed as part of any expansion of Transporter's Crude System (the "*Future Delivery Points*"):

                a.      Sufficient storage capacity to provide for proper operation of Transporter's System.

                b.      Pump facilities, as necessary, to transfer Producer's Crude from the storage facilities to the Delivery Points (as described below in Section 2.3 and on Exhibit "B"), with custody transfer metering provided by the interconnecting parties. The Barrels of Producer's Crude delivered at the Delivery Points shall be based on the measurements provided by the interconnecting parties' metering.

                c.      Transporter will use its commercially reasonable efforts, and Producer will support and assist Transporter, to obtain physical Delivery Point

7

interconnections with downstream third party facilities.   Producer shall bear its pro rata share of all Actual Construct Costs of interconnection of Transporter's Crude System with third party facilities with the interconnection to be owned and operated by Transporter.   Transporter shall furnish, own and operate all Delivery Point meters if such meters are not furnished, owned and operated by third party operators of downstream interconnecting third party facilities.

iv.      Transporter's Initial System will also include actual line fill supplied by Producer to Transporter, at no cost or expense to Transporter, during the month of injection of the Crude for line fill from the Wells connected to Transporter's Crude System.  For the avoidance of doubt, line fill shall be considered to be Delivered Barrels. To the extent that Transporter provides transportation services on any part of Transporter's Crude System to a party other than Producer, Producer's Crude Purchaser, or other designee, Transporter shall require the third party or Producer, as applicable, to provide its pro rata share of additional line fill (and credit Producer accordingly) for the portion of Transporter's Crude System used by that party.

v.      The portion of Transporter's Crude System that consists of the Initial System, as described below, will be designed and constructed to be capable of handling the Crude Barrels existing and anticipated from the Initial System DSUs defined herein.

2.2     Rights-of-Way.   At the time of executing this Agreement, Producer has completed its acquisition of rights-of-way (the "*ROW*" or "*ROWs*") from certain landowners within the Area of Dedication ("*Landowners*") authorizing the construction, installation and operation of multiple pipelines within the same right-of-way corridor.  Producer shall be able to assign the ROWs in part to Transporter, so as to grant Transporter the right to install a single crude gathering line and related facilities in the corridor of the ROW in connection with the construction, installation and operation of the Initial System.  Due to Producer's existing relationship with the Landowners and in an effort to maximize efficiency, Producer will continue to interface directly with the Landowners until such time as the ROWs have been partially assigned to Transporter, except as described below.   Producer has tendered compensation to the respective Landowner and has recorded the respective ROW with the McKenzie County Clerk and Recorder.  With respect to each ROW, until such time as Producer assigns the ROWs to Transporter, Producer shall indemnify and hold harmless Transporter, its Affiliates, and their respective employees, officers, directors, contractors and subcontractors (collectively, "*Transporter Indemnified Parties*") from and against any and all trespass claims or claims arising out of the invalidity of any ROW brought by third party landowners arising from Transporter's ingress to, egress from, entry upon, and use of such ROWs for survey, construction, installation and operation of the Transporter's Crude System except to the extent arising from the gross negligence or willful misconduct of Transporter Indemnified Parties.

Producer shall use commercially reasonable efforts to obtain any third party consents required to assign its ROWs to Transporter (each a "*Consent to Assign*").   In the event Producer, despite commercially reasonable efforts, is unable to obtain any Consent to Assign, Producer shall continue to hold such ROW for the benefit of Transporter until such time as the Consent to Assign is obtained.  Concurrently with the execution of this Agreement, Producer shall partially assign the ROWs to Transporter, pursuant to the form of assignment attached hereto as Exhibit

8

"G", and within thirty (30) days of receipt of detailed invoice and reasonably requested supporting documentation, Transporter shall pay Producer twenty percent (20%) of the actual and direct costs incurred in obtaining the ROWs (based on five (5) pipelines allowed within a ROW and adjusted up or down for fewer or more pipelines properly located within a single ROW).

However, if Transporter determines that any ROW is unnecessary for the Initial System, or is insufficient, lacking, or otherwise defective, such that Transporter in its reasonable discretion must acquire a new right-of-way in lieu thereof, such ROW shall not be assigned to Transporter and Transporter shall not pay any portion of the costs associated with such ROW.

Transporter may proceed to interface with and acquire the real property interests it requires, including additional rights-of-way or amendments to ROWs to serve the Infill Receipt Points directly from the Landowners or other owners of such interests ("*Transporter ROWs*"). In the event that Transporter, despite commercially reasonable efforts, is unable to obtain any right-of-way deemed necessary for Transporter in its reasonable discretion to construct and install the portions of the Initial System serving the Infill Receipt Points prior to May 31, 2015 (an "*Outstanding ROW*"), Transporter may proceed with re-routing the course of the affected portion of the Initial System and acquire additional Transporter ROWs to circumvent any uncooperative third party landowners with Transporter to bear such Outstanding ROW costs and re-routing costs in the aggregate up to Eighty-Three Thousand Three Hundred and Thirty Three dollars ($83,333), which costs shall not be included in the Actual Construct Costs. In the event the Outstanding ROW costs are anticipated to exceed $83,333 the Parties shall promptly meet to develop a mutually agreeable plan to complete acquisition of Outstanding ROW. The Initial System Target In-Service Date shall be extended, as an Excused Delay as defined in Section 2.4 below, by the number of days, if any, that the construction and installation of the Initial System is delayed in order to acquire Outstanding ROW or agree on a course of action, or otherwise due directly to the Outstanding ROW.

2.3     Producer's Facilities and Construction. Producer, at its own expense, shall construct, equip, maintain and operate all facilities upstream of the Receipt Points necessary to enable Producer to deliver all of Producer's Crude to Transporter at the Receipt Points, including without limitation the following listed facilities together with all other facilities upstream of the Receipt Points as identified in Exhibits "B" and "B-2" necessary to enable Producer to deliver all of Producer's Crude to Transporter at the Receipt Points, including without limitation, mechanical separation equipment. Producer shall provide the following facilities:

     i.     "*Well Meters*" meaning the meters designated from time to time by Producer, located upstream of the LACT units, for metering Crude Oil on a Well-by-Well basis for Wells located on the Well Pad delivering to the Receipt Points LACTs. Producer shall install, own and operate the Well Meters. The Well Meters will be used for any required allocations to the individual wells as determined by Producer, but will not be used for determining the volumes of Producer's Crude delivered to Transporter. For all purposes under this Agreement, the volume of Producer's Crude delivered to Transporter will be determined by custody transfer measurement at the Receipt Points, not the Well Meters.

ii.      "*LACTs*" shall mean the lease automatic custody transfer facilities to be supplied, owned and operated by Producer for Producer's Crude, with Transporter having a preferential right to purchase and operate such LACTs in the absence of Producer's continued ownership and operation;

iii.      rerun piping from the outlet of each Receipt Point and as otherwise needed to Producer's tankage for the return of rejected Crude Oil;

iv.      all pumps and other facilities upstream of the Receipt Points necessary to enable Producer to deliver all of Producer's Crude to the Receipt Points and able to provide a pressure necessary for delivery into Transporter's Crude System; and

v.      power and other utilities for Producer's facilities.  Additionally, Producer will provide Transporter with power and other utilities for use by Transporter's Crude System.

2.4   Initial System.  The "*Initial System*" will consist of the initial facilities of Transporter, described generally above and on Exhibit "B", as necessary to connect the Initial Receipt Points and Infill Receipt Points with the Initial Delivery Points, also described on Exhibit "B".  The Parties have agreed upon the configuration, design and construction of Transporter's Crude System and have deemed the Initial System as sufficient to serve all of Producer's Minimum Barrels commitment stated in Exhibit "E", and that the Initial System is sufficient to serve all of Producer's anticipated Barrels of Producer's Crude from the Wells identified on Exhibit "B-2" (collectively, the "*Initial System Wells*") at the Initial Receipt Point or Infill Receipt Point listed in the column "Transporter Receipt Point Construction Responsibilities" next to each such Well.

Subject to events of Force Majeure, severe winter weather, frost laws, road restrictions and other requirements or delays imposed by government agencies including without limitation delays in issuing ROWs on federal lands needed for the portion of Transporter's Crude System serving the Infill Receipt Points, whether or not within the scope of Force Majeure, that would make the diligent pursuit of similar construction or installation operations unreasonable for a reasonably prudent McKenzie County North Dakota gatherer faced with similar conditions (whether one or more, "*Excused Delays*"), Transporter shall diligently construct, install and complete (y) the portion of Transporter's Crude System serving the Initial Receipt Points as described on Exhibit "B" and Exhibit "B-2" on or before June 1, 2015 (the "*Start-Up Target Date*"), and (z) all of the Initial System including the Initial and Infill Receipt Points, on or before August 31, 2015, as extended by the number of Days equal to any Excused Delay event (the "*Initial System Target In-Service Date*").  The Parties each agree that their respective obligations to meet the Start-Up Target Date are on a reasonable commercial efforts basis with no credits or penalties applicable to either Party for non-achievement.  Producer acknowledges and agrees that any receipt, gathering and delivery of Crude by Producer prior to the Initial System In-Service Date shall incur the applicable Crude Delivery Fees and shall be provided on an interruptible basis at Transporter's sole discretion as Transporter may be completing the installation and construction of its Crude System and may also need to undertake calibration and other activities to achieve the Initial System In-Service Date during that period, *provided however*, that Transporter shall notify Producer 24 hours or as soon as practicable prior to any activities of Transporter that may reasonably be expected to cause an interruption or otherwise prevent Transporter from receiving

Crude from any Receipt Point from which Transporter has previously accepted Crude, and Transporter shall keep Producer fully informed of the progress of such activities and any anticipated resumption of service from such Receipt Point(s). The date on which Transporter has completed the construction and installation of the Initial System, in its entirety so as to be capable of receiving Producer's Crude from all of the Initial Receipt Points and Infill Receipt Points identified on Exhibits "B" and "B-2", shall be the *"Initial System In-Service Date"*. For avoidance of doubt, such completion by Transporter shall be a deemed achievement of the Initial System In-Service Date notwithstanding the Initial System's partial or complete inability to accept and flow Crude on the Initial System when such inability arises solely from Producer's delay or failure to complete its responsibilities and obligations under this Agreement, as extended by Force Majeure or in the case of delay or failure to complete re-run piping if caused by frost laws imposed by government agencies.

i.    In the event, subject to Force Majeure or Excused Delay, Transporter fails to complete its construction of the Initial System, in its entirety per Section 2.4, Exhibit "B" and Exhibit "B-2", on or before the Initial System Target In-Service Date, and Producer has completed all facilities upstream of the Initial and Infill Receipt Points per Section 2.3, Exhibit "B" and Exhibit "B-2", and is otherwise ready, willing and able to deliver Producer's Crude to that portion of the Initial System that is not completed, the following shall occur:

a.    the applicable Minimum Barrels for each Accounting Period, or portion thereof, between the Initial System Target In-Service Date and the Initial System In-Service Date, shall be reduced by the Barrels of Producer's Crude produced from the Initial System In-Service Date Wells that would have been transported on the Initial System had such System been in operation for each such Accounting Period (the *"Transporter's Initial System Delay Barrels"*); and

b.    In lieu of Producer receiving a credit against the Crude Transportation Fees owed by Producer, Producer may assess a per diem penalty against Transporter for each day of delay with the per diem penalty amount equal to Twenty-One cents ($0.21) per Barrel for the Transporter's Delay Barrels (*"Initial System Transporter Delay Fee"*) up to a maximum total payment of Two Million dollars ($2,000,000) in the aggregate for all Transporter's Initial System Delay Penalty under this Agreement together with all "Transporter's [or Gatherer's] Initial System Delay Pre-Inservice Barrels [or Volumes]" as defined under the Related Dedication Agreements described in Section 8.3 herein as the *"Initial System Pre-Inservice Credit"*. The Parties acknowledge and agree that any Initial System Transporter Delay Fee arises wholly from construction delays of Transporter, and is unrelated to transportation services provided by Transporter under its Tariff. In the event this limitation on payment to Producer is inconsistent with any FERC requirements, the Parties agree to pursue a mutually fair and equitable solution.

ii.   In the event Transporter has completed its construction of the Initial System, in its entirety per Section 2.4, Exhibit "B" and Exhibit "B-2", on or before the Initial System Target In-Service Date, but, subject to Force Majeure or in the case of

11

delay or failure to complete re-run piping if caused by frost laws imposed by government agencies, Producer has failed to complete all facilities upstream of the Initial and Infill Receipt Points per Section 2.3, Exhibit "B" and Exhibit "B-2", and Transporter is otherwise ready, willing and able to receive and gather Producer's Crude on that portion of the Initial System, then the following shall occur:

a.    the applicable Minimum Barrels for each Accounting Period, or portion thereof, between the Initial System Target In-Service Date and the Initial System In-Service Date, shall be reduced by the Barrels of Producer's Crude produced from the Initial System In-Service Date Wells that would have been transported on the Initial System had Producer's Crude Facilities been in operation for each such Accounting Period (the "*Producer's Initial System Delay Barrels*").

b.    Producer shall pay Transporter an amount equal to Twenty-One cents ($0.21) per Barrel for the Producer's Initial System Delay Barrels ("*Initial System Producer Delay Fee*") beginning in the first Accounting Period following the Initial System In-Service Date and continuing for each successive Accounting Period until the payment is satisfied in full, up to a maximum total payment of Two Million dollars ($2,000,000) for all Producer's Initial System Delay Barrels under this Agreement together with all "Producer's Initial System Delay Pre-Inservice Barrels [or Volumes]" as defined under the Related Dedication Agreements described in Section 8.3 herein ("*Initial System Pre-Inservice Fee*"). The Parties acknowledge and agree that any Initial System Producer Delay Fee arises wholly from construction delays of Producer, and is unrelated to transportation services provided by Transporter under its Tariff. In the event this limitation on payment by Producer is inconsistent with any FERC requirements, the Parties agree to pursue a mutually fair and equitable solution.

iii.    In addition to Producer's remedies under Section 2.4(i), in the event Transporter fails to complete its construction of the Initial System, in its entirety per Section 2.4, Exhibit "B" and Exhibit "B-2", on or before the date that is sixty (60) Days after the Initial System Target In-Service Date, and Producer has completed all facilities upstream of the Initial and Infill Receipt Points per Section 2.3, Exhibit "B" and Exhibit "B-2" and is otherwise ready, willing and able to deliver Producer's Crude to that portion of the Initial System that is not completed, Producer shall have the option, exercisable in its sole discretion, to elect by written notice to Transporter to construct and install the remainder of the Initial System, at Producer's sole cost and expense, whereupon Producer shall not owe any Crude Transportation Fees for any Crude delivered to the Initial and Infill Receipt Points or flowing through that portion of the Initial System constructed and installed by Producer, until such time as the amount of Crude Transportation Fees otherwise attributable to such Crude, but retained by Producer, is equal to one hundred and ten percent (110%) of the total of Actual Construct Costs incurred by Producer to complete the construction and installation of the remainder of the Initial System.

iv.    Transporter shall keep Producer reasonably informed of the progress on the construction and installation of the Initial System, and any Excused Delays in

12

connection therewith.  Producer shall have the right to have its representative present during any onsite construction or installation operations of the Initial System.

2.5   Future Expansion Beyond the Initial System.  After installation of the Initial System, Transporter will install and connect such Future Receipt Points, Future Delivery Points, and expansions of Transporter's Crude System, including but not limited to, installing additional or "looped" gathering lines or a larger diameter pipe that Transporter in its sole judgment determines are necessary or desirable to gather or transport Producer's Crude dedicated under this Agreement from subsequent completed Wells drilled or acquired by Producer within the Area of Dedication as set forth in this Section 2.5.  For avoidance of doubt, any expansion of Transporter's Crude System to serve Producer's Wells located outside of the Area of Dedication is not contemplated by or covered under the scope of this Agreement.  The Parties agree that Transporter will own and operate any and all future expansions to Transporter's Crude System including any Producer Built Transportation Facility, as defined in Section 2.6 herein.

> i.   In addition to providing Transporter with annual drilling plans and quarterly updates to those plans under Section 2.7 below, Producer shall give Transporter written notice (a "*Connection Notice*") one hundred twenty (120) to ninety (90) Days prior to the completion of any new Well located within the Area of Dedication but outside of the Initial System DSUs, or within ten (10) days after acquiring any such completed Well, specifying: the Well name; Well location; the location of the nearest Receipt Point or proposed Future Receipt Point, as applicable, for such Well; drilling, completions and anticipated recompletion details; the minimum anticipated initial and annual Barrels of Producer's Crude from such Well together with the anticipated available Barrels of Producer's Crude and Other Owner Crude from the drilling spacing unit ("*DSU*") in which the Well is located as may be requested by Transporter; and if a Distant Expansion under subsection (iv) below applies, also specifying up to four (4) DSUs that are each directly adjacent to or cornering the DSU (the "*Contiguous DSUs*") of the Distant Well (defined below) for possible Permanent Release at Producer's sole discretion under subsection (iv)(a) below if (iv)(a) applies and the anticipated available volumes of Producer's Crude  from the four (4) Contiguous DSUs as may be requested by Transporter (the anticipated volumes from the DSU of the Distant Well and the four (4) Contiguous DSU Barrels if requested, are collectively the "*Connection Barrels*"). Concurrently with its Connection Notice under this Agreement, Producer shall provide Transporter with "Connection Notices" concerning the Well as required under the Related Dedication Agreements described in Section 8.3 of this Agreement.  If a Well that is the subject of a Connection Notice is not completed within one hundred twenty (120) days of the Connection Notice, following good faith discussions with Producer, Transporter shall then have the option to deem the Connection Notice as invalid and of no further effect.

> ii.   In the event the Well, or the Future Receipt Point, if applicable, as identified in the Connection Notice requires less than or equal to a three (3) mile expansion of Transporter's Crude System from an existing Receipt Point or Delivery Point, as Transporter's Crude System exists as of the date of the Connection Notice (a "*Nearby Well*"), Transporter shall have the first option to construct, install and place into operation an expansion of Transporter's Crude System to connect to the Nearby Well at Transporter's sole cost and expense, in exchange for  Transporter's ability to charge

13

Producer an additional fee per Barrel for any Crude from such Nearby Well or any other Well Producer flows through such expansion constructed by Transporter based on the sample calculation set forth in Exhibit "H," such that Transporter has recouped its Actual Construct Costs incurred by Transporter to construct the expansion plus incremental operating expenses and capital expenditures, including capital expenditures needed to modify or upsize the Initial System or a prior expansion of the Initial System to accommodate the Connection Volumes, over a five (5) year period and receive a seven and a half percent (7.5%) internal rate of return ("IRR" as calculated by the Microsoft Excel IRR function financial formula) and trued up quarterly ("*Expansion Fee*"). For the avoidance of doubt the Expansion Fee shall be in addition to all other Crude Transportation Fees due for the Connection Volumes and such Expansion Fee shall be reduced equitably if Transporter, in its sole discretion, elects to construct and install an expansion of larger size or greater capacity than requested by Producer in its Connection Notice or required to serve Producer's Connection Barrels.

iii.      Subject to Force Majeure and the condition that Producer has in fact completed such a Nearby Well, in the event Transporter fails to timely construct, install and make available for operation on or before the later of ninety (90) days from receipt of the Connection Notice or the date the Well identified in the respective Connection Notice is completed, an expansion of Transporter's Crude System to connect the Connection Barrels from the Nearby Well, following good faith discussions with Transporter, Producer shall then have the option either to:

a.      Construct and install an expansion of Transporter's Crude System to connect Transporter's Crude System existing at that time to the Nearby Well, at Producer's sole cost and expense, in exchange for Producer receiving a credit against any Base Fee component of the Crude Transportation Fees otherwise owed Transporter for any Crude from such Nearby Well or any other Well flowing through such expansion constructed by Producer, until such time as the amount of the Base Fee component of the Crude Transportation Fees otherwise attributable to such Crude, but retained by Producer, is equal to the total of Actual Construct Costs incurred by Producer to construct the expansion based on the sample calculation set forth in Exhibit "H," such that Producer has recouped its Actual Construct Costs incurred by Producer to construct the expansion plus incremental operating expenses and capital expenditures, including capital expenditures needed to modify or upsize the Initial System or a prior expansion of the Initial System to accommodate the Connection Volumes, over a five (5) year period and receive a seven and a half percent (7.5%) IRR and trued up quarterly ("*Expansion Credit*"); or

b.      Subject to Section 1.4(ii), obtain a Permanent Release from this Agreement of the Nearby Well and any of the Leases located within the same DSU as the Nearby Well but not located within an Initial System DSU.

iv.      In the event the Well, or the Future Receipt Point or Delivery Point, if applicable, as identified in the Connection Notice requires more than a three (3) mile expansion of Transporter's Crude System, as Transporter's Crude System exists as of the

14

date of the Connection Notice ("*Distant Well*"), or involves a connection of Transporter's Crude System with facilities of third parties not connected to Transporter's Crude System as of the date of the Connection Notice (one or both situations, a "*Distant Expansion*"), the Parties shall promptly pursue good faith negotiations of mutually agreeable terms and conditions of such an expansion and strive to enter into a definitive separate agreement or written amendment setting forth a definitive agreement as to such Distant Expansion. In the event the Parties have not reached agreement, on or before the later of ninety (90) days from receipt of the Connection Notice or the date the Well identified in the respective Connection Notice is completed, for the terms of such a Distant Expansion of Transporter's Crude System, following good faith discussions with Transporter, Producer shall have the option to:

        a.     Subject to Section 1.4(ii), obtain a Permanent Release from this Agreement of any of the Leases located within the DSU of the Distant Well and the four (4) Contiguous DSUs but only if such Leases are not located within an Initial System DSU.

        v.     Transporter shall keep Producer reasonably informed of the progress on the construction and installation of any expansion of Transporter's Crude System. Producer shall have the right to have its representative present during any onsite construction or installation operations of any expansion of Transporter's Crude System.

        vi.     The Parties agree that the terms and conditions of any future expansion beyond the Initial System that are not related to transportation service may be addressed in a separate facilities construction agreement between the Parties on the condition that they remain consistent with this Agreement.

2.6    <u>Construction or Expansion by Producer</u>. In the event Producer elects to construct, install or expand any portion of Transporter's Crude System pursuant to an express right provided under this Agreement (a "*Producer Built Transportation Facility*"), the following shall apply:

        i.     Each Producer Built Transportation Facility shall be constructed and installed by Producer according to the reasonable design and construction specifications of Transporter. In constructing and installing the Producer Built Transportation Facility, Producer shall have the right to utilize any available crude pipeline right-of-way or easement rights of Transporter and any materials of Transporter, at cost.

        ii.     Upon completion of any Producer Built Transportation Facility, Producer shall assign such Producer Built Transportation Facility to Transporter, at no charge to Transporter, but expressly subject to the terms of this Agreement, whereupon it shall become part of Transporter's Crude System.

        iii.     If Producer has incurred Actual Construct Costs pursuant to Section 2.5(iii)(a), once Producer has recouped all of such Costs pursuant to Section 2.5, Transporter may begin to assess the applicable Base Fee component of Crude Transportation Fees for all Crude delivered by Producer into or flowing through such Producer Built Transportation Facility. Transporter may begin to assess all other

15

components of the Crude Transportation Fees for all Crude delivered by Producer beginning upon the commencement of receipt into or flow through such Producer Built Transportation Facility.

        iv.    For the avoidance of doubt, for purposes of determining whether Producer has delivered the Minimum Barrels in any Accounting Period pursuant to the terms and conditions set forth on Exhibit "E", any Crude delivered during such Accounting Period for which Producer does not owe any Base Fee component of the Crude Transportation Fees pursuant to its incurrence of Actual Construct Costs pursuant to Article 2 of this Agreement shall be included in the Delivered Barrels.

2.7    <u>Producer's Anticipated Barrels</u>.  Upon the execution of this Agreement, and thereafter by October first (1st) of each calendar year, Producer shall communicate its drilling, completion and recompletion plans to Transporter in writing, including locations, anticipated spud dates, together with anticipated Barrels to be delivered to Transporter, for the next calendar year.  Additionally, during Transporter's construction of facilities to serve the Infill Receipt Points, Producer shall promptly notify Transporter of any delay in its drilling and completion schedules for the Wells identified in Exhibit "B-2", including without limitation delays in completion of any Wells on Exhibit "B-2" later than June 1, 2015.  At all other times during the Primary Term or Extended Term, no later than the last day of each calendar quarter, Producer shall notify Transporter in writing with reasonable detail of any changes or additions to its drilling plans for the succeeding twelve (12) Accounting Periods.  In addition to providing Connection Notices, pursuant to Section 2.5(i), Producer shall provide updates to Transporter, as needed, of specific drilling and completion plans, actual initial production dates, and additional volumes from Other Owner Crude or from prior dedications.

2.8    <u>Ownership of Facilities</u>.  Producer expressly does not by the terms of this Agreement, sell, transfer or assign unto Transporter any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by Producer in the operation of Producer's Wells and the Leases.  Transporter expressly does not by the terms of this Agreement, sell, transfer or assign unto Producer any title or interest whatsoever in Transporter's Crude System, or any pipelines or other equipment of any nature owned and used by Transporter in the operation of Transporter's Crude System or its performance of services under this Agreement.

ARTICLE III
<u>TRANSPORTATION SERVICE</u>

3.1    <u>Producer's Capacity</u>.  Commencing on the Initial System In-Service Date and subject to the capacity allocation and apportionment provisions of Transporter's Tariff, Transporter shall make available Capacity equal to Producer's anticipated Barrels of Producer's Crude to be delivered pursuant to Sections 2.4 and 2.7 *("Producer's Capacity")* in the aggregate, for the benefit of Producer's Crude, subject to Force Majeure and the capacity of the Initial System.  On a daily basis, any capacity available in the Transporter's Crude System in excess of the lesser of Producer's Capacity or the actual amount of Producer's Crude made available for delivery by Producer to Transporter each Day hereunder, shall be available to Transporter for third party Barrels on such Days.  Producer's Capacity shall be adjusted upward by additional Connection Barrels served by expansions of Transporter's Crude System pursuant to Section 2.5 of this

16

Agreement, and downward by Permanently Released Barrels pursuant to Section 1.4(ii) of this Agreement.

3.2     Transportation.  Subject to the terms and conditions of this Agreement and subject to Transporter's Tariff, Transporter shall receive at the Receipt Points and gather Producer's Crude utilizing Transporter's Crude System, up to Producer's Capacity, and redeliver the same quantity, quality and API gravity in Barrels of Producer's Crude less the Pipeline Loss Allowance to Producer or its designee at the Delivery Points in consideration of Producer's payment of the Crude Transportation Fees provided on Exhibit "E".   In accordance with and subject to Transporter's Tariff, Transporter also agrees to receive and transport any of Producer's Crude in excess of Producer's Capacity and Other Owner Crude on an uncommitted basis and to redeliver to Producer or its designee the equivalent Barrels of Crude, less Pipeline Loss Allowance to Producer or its designee at the Delivery Points in consideration of Producer's payment of the Crude Transportation Fees provided on Exhibit "E" for such Producer's Crude and Other Owner Crude.

3.3     Uniform Delivery Rate.  Producer's Crude will be delivered and redelivered on a uniform basis consistently and Producer may not vary its production or utilize portions of Transporter's Crude System in a manner designed to take advantage of market changes, obtain storage services or act as peaking service.

3.4     Third Party Crude.  Producer acknowledges and understands that Transporter will receive Producer's Crude utilizing Transporter's Crude System which may also receive and commingle Producer's Crude with Third Party Crude delivered to Transporter by other parties, at all times subject to Transporter's Tariff, Producer's Capacity and such Third Party Crude meeting the Crude Oil Quality Specifications set forth in the attached Exhibit "F." Accordingly, the Crude Oil delivered to the Producer or Producer's Crude Purchaser or other designee at the Delivery Points may not be the same Crude Oil, but shall have the same quality, API gravity and other characteristics, as Producer's Crude delivered to the Receipt Points.

3.5     Priority of Service.  Except for any Other Owner Crude that has not been dedicated to this Agreement by ratification or other formal agreement entered into by such Other Owners and in accordance with and subject to Transporter's Tariff, Producer's Crude, up to Producer's Capacity, shall obtain highest priority on Transporter's Crude System with respect to capacity allocations, interruptions, or curtailments.  On a Receipt Point or Delivery Point basis as applicable, in accordance with and subject to Transporter's Tariff Producer's Crude will be the last Crude curtailed from Transporter's Crude System in the event of an interruption or curtailment affecting specific Receipt Points or Delivery Points rather than Transporter's Crude System as a whole, and all of Producer's Crude affected by a particular Receipt Point or Delivery Point will be treated in the same manner in the event an allocation is necessary except as otherwise provided in Transporter's Tariff. Transporter agrees not to contract to provide, at any time, transportation service on Transporter's Crude System on a basis that has a priority higher than what Producer's Crude is entitled to pursuant to this Section 3.5 and under this Agreement, except as otherwise provided in Transporter's Tariff.

ARTICLE IV
EXHIBITS

4.1     Exhibits.  All Exhibits attached to this Agreement are incorporated into and made an integral part of this Agreement by reference including the General Terms and Conditions set forth in the attached Exhibit "C" (the "*GT&C*").

4.2     Order of Precedence.  In the event of any conflict between the terms as set out in the body of this Agreement and those set out in the GT&C, the terms in the body of this Agreement shall control.  In the event of any conflict between the terms as set out in the body of this Agreement and those set out in Transporter's Tariff, the terms in the Tariff shall control.

ARTICLE V
CONSIDERATION & FEES

5.1     Fees.    Transporter  shall  charge  and  Producer  shall  pay  the  applicable  "*Crude Transportation Fees*" and any "*Shortfall Payment*" described on Exhibit "E" based on the total Barrels of Crude delivered by Producer or its Crude Purchaser and received at the Receipt Points. If and as applicable under Section 2.4(ii)(b), Transporter shall charge and Producer shall pay the Initial System Pre-Inservice Fee.  If and as applicable under Section 2.5, Transporter shall charge and Producer shall pay the Expansion Fee.

5.2     Annual Fee Adjustments.  The Base Fee and any applicable Miscellaneous Fees including without limitation the Expansion Fee may be adjusted annually during the term of this Agreement, effective July 1 for the prospective twelve-month annual period ending June 30, the first prospective annual period beginning July 1, 2020, by multiplying the rate in effect on June 30 immediately prior to the annual period to which the adjustment shall apply by the index published by the FERC pursuant to Section 342.3(d) of the oil pipeline rate regulations of the FERC, but shall never be less than the Base Fee set forth in Exhibit "E".

5.3     Utilities.  Producer shall furnish utilities needed for Transporter's Crude System at the Receipt Points.  In addition to the Crude Transportation Fees and utilities furnished by Producer, Transporter shall charge and Producer shall pay its pro rata share of the actual utility costs incurred by Transporter in connection with operating its Crude Transportation System including any necessary power costs incurred in connection with the Delivery Points. The actual utility costs shall be allocated on a pro-rata basis to each shipper of Crude Oil on Transporter's Crude System each Accounting Period based upon throughput of all Crude through Transporter's Crude System during such Accounting Period, or as otherwise provided in applicable tariff.

5.4     Pipeline Loss Allowance.  The difference between the Barrels of Producer's Crude as measured at the Receipt Points and the summation of the measurements provided by the interconnecting parties at the Delivery Points shall be considered as a pipeline loss allowance for all losses sustained on Transporter's Crude System due to evaporation, measurement and other losses in transit *("Pipeline Loss Allowance")*.  The Pipeline Loss Allowance shall be allocated on a pro-rata basis to each shipper of Crude Oil on Transporter's Crude System.  Transporter shall

18

not be responsible to Producer for the Pipeline Loss Allowance.  Notwithstanding anything to the contrary herein, Producer's pro rata share of Pipeline Loss Allowance for any Accounting Period, shall not exceed one percent (1.0%) Producer's Crude delivered to Transporter's Crude System for such Accounting Period.

ARTICLE VI
NOTICES

6.1    Notice Process. All notices and communications required or permitted under this Agreement shall be in writing and shall be considered as having been given if delivered personally, or when received by mail, by electronic means (confirmed as received before 5 p.m. at the place of receipt), or by express courier, postage prepaid, by either Party to the other at the addresses given below.   Routine communications, including monthly statements, shall be considered as duly delivered when mailed by ordinary mail or by electronic means.

6.2    Addresses for Notice. Unless changed upon written notice by either Party, the addresses for notice purposes are as follows:

> TO: Emerald Oil, Inc. and/or Emerald WB LLC
> 1600 Broadway, Suite 1360
> Denver, CO 80202
> Phone: 303-595-5629
> Contact: James Muchmore
>
> TO: Dakota Midstream, LLC or Dakota Energy Connection, LLC
> 1600 Broadway, Suite 1330
> Denver, CO 80202
> Phone: 202-213-5998
> Contact: Tim Reynolds

ARTICLE VII
TERM

7.1    Primary and Extended Terms. This Agreement shall commence as of the Effective Date and shall remain in full force and effect for a primary term of fifteen (15) years (the *"Primary Term"*) and shall continue year to year thereafter until terminated by either Party (the *"Extended Term"*) by providing written notice of termination to the other Party at least sixty (60) days prior to the expiration of the Primary Term or any subsequent annual expiration date.

7.2    Capacity Adjustment.  During any Extended Term, Producer's Capacity will be the average daily Barrels of Producer's Crude delivered to Transporter's Crude System during the prior twelve (12) month period.

7.3    Uneconomic Operations.  Subject to any Force Majeure event affecting Producer's obligations to deliver Crude hereunder, in addition to all other rights of Transporter under this Agreement, in the event the sum of actual direct costs (for the avoidance of doubt, excluding overhead, depreciation, amortization and capital expenditures) incurred by Transporter to operate

19

any portion of Transporter's Crude System (the "*Uneconomic Segment*") during any ninety (90) day period are in excess of the total net revenue attributable to the Uneconomic Segment (including all Crude Transportation Fees paid by Producer or any third party attributable to the Uneconomic Segment) during such ninety (90) day period, Transporter shall have the right to send written notice (an "*Uneconomic Notice*") to Producer of its intent to terminate receipts of Crude into the Uneconomic Segment unless the Crude Transportation Fees owed by Producer for Producer's Crude delivered to the Uneconomic Segment are increased such that Transporter's total anticipated net revenue attributable to the Uneconomic Segment is projected to equal one hundred ten percent (110%) of Transporter's actual direct costs (for the avoidance of doubt, excluding overhead, depreciation, amortization and capital expenditures) incurred by Transporter to operate the Uneconomic Segment. Any increased Crude Transportation Fee shall be borne pro-rata by Producer and any third party shipper on the Uneconomic Segment according to the anticipated Barrels of Producer's Crude and Third Party Barrels to be delivered to or flowed through the Uneconomic Segment. Within ten (10) days of Producer's receipt of notice from Transporter, Producer shall elect by written notice sent to Transporter either to:

      i.     Accept the increased Crude Transportation Fees, or portion thereof, effective as of the beginning of the next Accounting Period, owed by Producer for Producer's Crude delivered to the Uneconomic Segment, whereupon Transporter shall not send another Uneconomic Notice pursuant to this Section 7.3 for at least ninety (90) days; or

      ii.     Obtain a Temporary Release of the Leases and Wells directly affected by the Uneconomic Segment, with Producer able to elect, by delivery of written notice to Transporter, to obtain a Permanent Release and terminate the Agreement, insofar as it pertains to the Uneconomic Segment after one hundred eighty (180) days of Producer's receipt of the Uneconomic Notice under this Section 7.3.

ARTICLE VIII
MISCELLANEOUS

8.1    <u>Assignment</u>. This Agreement, including, without limitation, any and all renewals, extensions, amendments and/or supplements hereto shall extend to and inure to the benefit of and be binding upon the Parties, and their respective successors and assigns, including any purchaser of Producer's Crude or Producer's interests in the Leases that are dedicated under this Agreement or subsequent operator of the Wells, and any purchaser of Transporter's Crude System, or any part or interest therein which are subject to this Agreement; provided, however, (i) this Agreement shall not be assigned by a Party without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned or delayed, and (ii) no sale, assignment, conveyance or other transfer (collectively, a "*Transfer*") of Producer's Leases or Wells, or any part thereof or interest therein, or any part of Transporter's Crude System, shall be made unless the transferee thereof shall assume and agree to be bound by this Agreement insofar as the same shall affect and relate to the Leases, Wells, Transporter's Crude System or interests so Transferred. Notwithstanding the conditions and restrictions set forth on assignment in this Section 8.1, each Party retains the right to freely assign this Agreement to an Affiliate within the first year following the Effective Date. Interests owned in the Area of Dedication by a transferee of any of Producer's Leases or Wells that were owned prior to the effective date of such Transfer

20

shall not become subject to this Agreement by virtue of such Transfer. It is further agreed, however, that nothing herein contained shall in any way prevent a Party from pledging or mortgaging, all or any part of such Producer's Leases if Producer, or Transporter's Crude System if Transporter, as security under any mortgage, deed of trust, or other similar lien, or from pledging this Agreement or any benefits accruing hereunder to the Party making the pledge without the assumption of obligations hereunder by the mortgagee, pledgee or other grantee under such instrument.

8.2    No Third Party Beneficiaries. Nothing in this Agreement, expressed or implied, confers any rights or remedies on any person or entity not a party hereto other than successors and assigns of the Parties.

8.3    Cooperation Under Related Dedication Agreements. The Parties expressly acknowledge that this Agreement is one of several agreements executed contemporaneously herewith by Producer, Transporter, or an Affiliate of Transporter pertaining to the gathering or transportation of Gas and water, and the disposal of water from the same Leases and Wells and covering the same Area of Dedication (the "*Related Dedication Agreements*"), with certain facilities to be located, and services to be provided, under this Agreement in proximity to those covered under the Related Dedication Agreements. The cooperation and performance by the Parties and their respective Affiliates of all of the obligations under this Agreement and each of the Related Dedication Agreements is essential for the Parties to receive the full benefit of their bargain under this Agreement and the Related Dedication Agreements. Subject to Force Majeure and any other applicable provisions under this Agreement or any Related Dedication Agreement, Transporter and each Affiliate of Transporter which is a party to a Related Dedication Agreement, shall construct, install and put into service the Initial System, pursuant to this Agreement, and the corresponding Initial Systems for Gas gathering and water gathering as described in the Related Dedication Agreements, in each case, in their entirety, as to all of the Initial and Infill Receipt Points together with any future expansions beyond the Initial System undertaken pursuant to this Agreement and under the corresponding provisions of the Related Dedication Agreements.

8.4    Entirety; Amendment. Subject to Section 8.3, this Agreement together with the Exhibits attached hereto, constitutes the entire agreement and understanding between the Parties hereto and supersedes and renders null and void and of no further force and effect any prior proposals, understandings, negotiations or agreements between the Parties relating to the subject matter hereof, and all amendments and letter agreements in any way relating thereto. No provision of this Agreement may be changed, modified, waived or discharged orally, and no change, modification, waiver or amendment of any provision will be effective except by written instrument executed by the Parties.

8.5    Severability. Should any part of this Agreement be found to be void, unenforceable or be required to be modified by a court or governmental authority, then only that part of this Agreement shall be voided, unenforceable, or modified accordingly. The remainder of this Agreement shall remain in force and unmodified, subject to Section 6 of the GT&C.

8.6    Additional Crude Services; Area of Interest. In the event Producer desires to construct, install, operate or perform other LACT operation and measurement other than as set forth in this

21

Agreement, Crude conditioning or other Crude field services or Producer desires crude transportation services in areas of McKenzie County south of Township 150, Billings County, or Stark County, North Dakota ("*Area of Interest*") (such additional types of locations or desired services collectively "*Additional Crude Services*"), Producer shall give notice to Transporter regarding such Additional Crude Services before soliciting such Additional Crude Services or entering into any binding agreements with any third parties to perform such Additional Crude Services. The selection of Transporter or any third party to perform such Additional Crude Services shall be in the sole discretion of Producer, and the performance of such Additional Crude Services shall be at governed by a separate agreement containing mutually agreeable terms and conditions.

8.7     Audit Rights.

i.      Except for Actual Construct Costs for which a process of disclosure and agreement is provided within Section 1(b) of the GT&C and Initial System Costs which are further addressed in Exhibit "E", upon ten (10) days prior written notice, either Party shall have the right, at reasonable times during normal business hours, but no more frequently than once each calendar year, at its own expense, to examine the books and records of the other Party to the extent necessary to audit and verify the accuracy of any statement, charge, or computation made under or pursuant to this Agreement. All statements, allocations, measurement, and payments made in any Accounting Period prior to the twenty-four (24) Month period preceding the Month in which notice of audit is given by the auditing Party shall be conclusively deemed to be true and correct and the scope of such audit shall be limited to statements, allocations, measurements and payments made during such twenty-four (24) Month period.

ii.     The auditing Party shall have ninety (90) days after commencement of the audit in which to submit a written claim, with supporting detail, for proposed adjustments. If the auditing Party fails to submit a written report to the audited Party within the ninety (90) day period, then all statements, charges and computations made under or pursuant to this Agreement that were within the audit period shall be deemed to be appropriate and accurate. Upon receipt of an audit report, the audited Party shall have ninety (90) days to make all recommended adjustments, or to notify the auditing Party that it does not agree and its basis for disagreement. Any unresolved disagreements shall be resolved pursuant to Section 10 of the GT&C.

8.8     Amendment and Restatement of Original Agreement.

i.      Upon execution of this Agreement by Transporter and Producer, this Agreement shall amend, restate, supersede and replace the Original Agreement, including any amendments thereto, in its entirety and for all purposes, effective as of the Effective Date.

ii.     Notwithstanding anything to the contrary herein, the provisions of the Original Agreement relating to transportation services shall remain effective with respect to transportation services provided by Transporter for Producer under the terms of the Original Tariff until such time as amendments to Transporter's Tariff have been filed and

22

become effective to implement the additional Receipt Points, revised rates, and other conforming Tariff revisions required to implement the amended provisions of this Agreement. Thereafter, the provisions of this Agreement relating to transportation services provided by Transporter under the terms of its amended Tariff shall become effective prospectively for all purposes.

8.9     Governing Law; Venue. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NORTH DAKOTA WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. EXCLUSIVE VENUE FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT BY EITHER PARTY IN CONNECTION WITH THIS AGREEMENT OR ARISING OUT OF THE EFFECTIVE TERMS OR CONDITIONS HEREOF SHALL BE IN THE CITY AND COUNTY OF DENVER, COLORADO.

8.10    Counterparts. This Agreement may be executed in multiple counterparts, each of which shall constitute an original and all of which, when construed together, shall constitute one and the same instrument.

8.11    Ratification. Emerald WB LLC hereby ratifies, confirms and approves the Agreement in all respects and adopts it as Emerald WB LLC's act and deed to the same extent as if the Agreement had been executed by Emerald WB LLC on the date of its original execution, effective as of the Effective Date.

*[Signature Page Follows]*

23

THE PARTIES HERETO have executed this Agreement effective as of the Day and year first above written.

TRANSPORTER
DAKOTA MIDSTREAM, LLC

By:_____

Name: ~~Thomas Heath Norman~~  Tim Reynolds

Title: Founding Partner

Date: May 26 2015


PRODUCER
EMERALD OIL, INC.

By:_____

Name: McAndrew Rudisill

Title:  Chief Executive Officer and
        President

Date: May 16, 2015


DAKOTA ENERGY CONNECTION, LLC

By: Tim Reynolds

Name: Tim Reynolds

Title: Founding Partner

Date: May 26, 2015


EMERALD WB LLC

By:_____

Name: McAndrew Rudisill

Title:  Chief Executive Officer and
        President

Date: May 16, 2015

EXHIBIT "A"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
Dakota Midstream, LLC or Dakota Energy Connection, LLC, as "Transporter" and
Emerald Oil, Inc. & Emerald WB LLC, as "Producer"

AREA OF DEDICATION

The following lands located in McKenzie County, North Dakota:

| Section | Township | Range |
|---------|----------|-------|
| 1-36 | 148N | 102W |
| 1-36 | 148N | 103W |
| 1-36 | 149N | 102W |
| 1-36 | 149N | 103W |

25

EXHIBIT "B"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
Dakota Midstream, LLC or Dakota Energy Connection, LLC, as "Transporter" and
Emerald Oil, Inc. & Emerald WB LLC, as "Producer"

TRANSPORTER'S INITIAL SYSTEM

Initial Receipt Points and Infill Receipt Points
Pipelines connecting Initial Receipt Points and Infill Receipt Points with Initial Delivery Points
Tanks located at Initial Delivery Points
Pumps at the Initial Delivery Points
Line Fill sufficient for the Initial System (supplied by Producer but once supplied, owned by
Transporter)

PRODUCER'S INITIAL FACILITIES

LACTS
Rerun piping
Pumps & other facilities as needed to effectuate delivery of Crude through the Initial Receipt
Points and Infill Receipt Points
All facilities upstream of Initial Receipt Points and Infill Receipt Points
See Section 2.3 and Exhibit "B-2" for details

INITIAL RECEIPT POINTS (RECEIPT INTO INITIAL SYSTEM ONLY)*

- RP1    NW/4 of NE/4 of Section 2, T149N, R102W
- RP2    NE/4 of NW/4 of Section 16, T149N, R102W
- RP3    NW/4 of NW/4 of Section 25, T149N, R102W
- RP4    SW/4 of SW/4 of Section 33, T149N, R102W
- RP5    NW/4 of NE/4 of Section 18, T148N, R102W
- RP6    NW/4 of SW/4 of Section 27, T149N, R102W
- RP7    SE/4 of SE/4 of Section 22, T149N, R102W
- RP8    NW/4 of NE/4 of Section 16, T149N, R102W

INFILL RECEIPT POINTS

- RP10    SE/4 of SW/4 of Section 10, T149N, R102W
- CP11    SE/4 of SE/4 of Section 8, T149N, R102W [valve & riser only]**
- RP12    SE/4 of SW/4 of Section 8, T149N, R102W

26

- RP13   NE/4 of NW/4 of Section 25, T149N, R102W
- RP14   SE/4 of SE/4 of Section 32, T149N, R102W
- RP16   SE/4 of SW/4 of Section 8, T148N, R102W

INITIAL SYSTEM DELIVERY POINTS (DELIVERY OFF OF INITIAL SYSTEM ONLY)*

- DP 1:   N/2 Section 16, T149N, R102W
- DP 2:   N/2 Section 30, T149N, R101W

* The Initial System does not include any co-located Crude Receipt and Delivery Points .
**CP11 may be referred to as either CP11 or RP11 due to this Receipt Point including a valve and riser only.

EXHIBIT "B-1"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
Dakota Midstream, LLC or Dakota Energy Connection, LLC, as "Transporter" and
Emerald Oil, Inc. & Emerald WB LLC, as "Producer"

DSUs SUFFICIENTLY SERVED BY THE INITIAL SYSTEM

| DSUs |
| --- |
| Arsenal (Fed) |
| Billy Ray Valentine |
| Caper |
| Clark Griswold |
| D'Annunzio |
| Dean Wormer |
| Dudley Dawson |
| Excalibur |
| Hot Rod |
| Joel Goodsen |
| Mongoose |
| Noonan (Fed) |
| Pirate |
| Slugger |
| Talon |
| Ty Webb |

EXHIBIT "B-2"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC or DAKOTA ENERGY CONNECTION, LLC, as "Transporter"
and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

INITIAL SYSTEM INCLUDING INFILL RESPONSIBILITIES
(as additional detail to Article II)

| WELL NAME | Transporter Receipt Point Construction Responsibilities | Producer Construction Responsibilities |
|---|---|---|
| Arsenal (Fed) 1-17-20H – Active | RP12 | |
| Arsenal (Fed) 6-17-20H – Future | CP11 (valve & riser only) | |
| Arsenal (Fed) 7-17-20H – Future | CP11 (valve & riser only) | |
| Billy Ray Valentine 1-8-5H – Active | RP16 | |
| Billy Ray Valentine 2-8-5H – Active | RP16 | |
| Billy Ray Valentine 3-8-5H – Active | RP16 | |
| Caper 1-15-22H – Active | Transporter to complete connection to RP10 | Producer to build to RP10 |
| Caper 2-15-22H – Active | RP10 – see above | See above |
| Caper 3-15-22H – Active | RP10 – see above | See above |
| Caper 4-15-22H – Active | RP10 – see above | See above |
| Caper 5-22-15H – Active | RP7 | |
| Caper 6-22-15H – Active | RP7 | |
| Clark Griswold Federal 3-36-25H | RP16 | |
| D'Annunzio 3-7-6H – Active | RP5 | |
| D'Annunzio 4-7-6H – Active | RP5 | |
| D'Annunzio 5-7-6H – Active | RP5 | |
| Dean Wormer 1-33-28H – Active | RP4 | |
| Dean Wormer 2-33-28H – Active | RP4 | |
| Dudley Dawson 6-2-11H | RP14 | |
| Dudley Dawson 7-2-11H | RP14 | |
| Excalibur 1-25-36H – Active | RP3 | |
| Excalibur 2-25-36H – Active | RP3 | |
| Excalibur 3-25-36H – Active | Transporter to complete connection to RP13 | See below – Producer to build to RP13 |
| Excalibur 4-25-36H – Active | RP13 – see above | See below |
| Excalibur 5-25-36H – Active | RP13 – see above | See below |
| Excalibur 6-25-36H | RP13 – see above | Producer to build to RP13 |

29

| | | |
|---|---|---|
| Excalibur 7-25-36H | RP13 – see above | Producer to build to RP13 |
| Hot Rod 1-27-26H – Active | RP6 | |
| Hot Rod 4-27-26H – Active | RP6 | |
| Joel Goodsen 5-32-29H | RP14 | |
| Joel Goodsen 6-32-29H | RP14 | |
| Joel Goodsen 7-32-29H | RP14 | |
| Mongoose 1-8-5H – Active | RP12 | |
| Mongoose 6-8-5H – Future | CP11 (valve & riser only) | |
| Mongoose 7-8-5H – Future | CP11 (valve & riser only) | |
| Noonan Federal 3-18-19H | RP 14 | |
| Pirate 1-2-11H – Active | RP1 | |
| Pirate 2-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 3-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 4-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 5-2-11H – Active | RP1 | Producer to build to RP1 |
| Pirate 6-2-11H – Active | RP1 | Producer to build to RP1 |
| Slugger 1-16-21H - Active | RP2 | |
| Slugger 3-16-21H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Slugger 5-16-21H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Slugger 6-16-21H - Active | RP8 – Link Facility | Producer to build to RP8 |
| Slugger 7-16-21H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 1-9-4H – Active | RP2 | |
| Talon 3-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 5-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 6-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Talon 7-9-4H – Active | RP8 – Link Facility | Producer to build to RP8 |
| Ty Webb 1-1-12H – Active | RP4 | |
| Ty Webb 3-1-12H - Active | RP4 | |

EXHIBIT "B-3"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC or DAKOTA ENERGY CONNECTION, LLC, as "Transporter"
and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

INITIAL SYSTEM MAP INCLUDING INFILL RECEIPT POINTS



EXHIBIT "C"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC or DAKOTA ENERGY CONNECTION, LLC, as "Transporter"
and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

GENERAL TERMS AND CONDITIONS ("GT&C")

1.    DEFINITIONS

For the purposes of the Agreement to which this Exhibit is attached, unless the context of the Agreement requires otherwise, the following terms and expressions used therein and in these GT&C shall be defined as follows:

(a)    *"Accounting Period"* shall mean a period of one calendar Month, commencing at 7:00 a.m. Central Standard Time on the first day of each Month, and ending at 7:00 a.m. Central Standard Time on the first day of the succeeding calendar Month.

(b)    *"Actual Construct Costs"* means the actual and direct costs to install and construct Transporter's Crude System, or any portion thereof, as applicable, together with appurtenant facilities under this Agreement, and shall include, all third party or field personnel costs of engineering, design and survey, easements and rights of way, procurement of equipment, facility parts and appurtenances including any metering facilities, permitting, and construction and installation of the facility and the appurtenances, together with any other third party or field personnel costs or expenses incurred by the constructing Party in connection with the installation of the facilities that are normally capitalized pursuant to generally accepted accounting principles.  Subject to Section 2.2, Actual Construct Costs shall include payments for ROWs made by Transporter to Producer but not payments made by Transporter to any third party. Whenever Actual Construct Costs are provided for under this Agreement and are subject to reimbursement by the non-constructing Party, the constructing Party shall provide itemized costs together with reasonable supporting documentation to the non-constructing Party.  The non-constructing Party shall have thirty (30) days from receipt of the statement of Actual Construct Costs to notify the constructing Party in writing with reasonable specificity of any dispute relating to the Actual Construct Costs together with reasonable supporting documentation of its basis for such dispute.  Any dispute arising from the determination of Actual Construct Costs that is not resolved within thirty (30) days of the constructing Party's receipt of the non-constructing Party's dispute notice shall be subject to dispute resolution under Section 10 of the GT&C.

(c)    *"Affiliate"* with respect to any Party shall mean any other party that controls, is controlled by or is under common control with such Party (whether directly or through one or more intermediaries).  For purposes of this definition, *"control"* of an entity includes the

33

possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity whether by contract or otherwise.

(d)     *"Barrel"* means a liquid measure equal to forty-two (42) U.S. gallons.

(e)     *"Central Standard Time"* shall mean Central Standard Time throughout the year not adjusted for Central Daylight Time.

(f)     *"Crude"* or *"Crude Oil"* means the mixture of hydrocarbons that exist in natural underground reservoirs after passing through surface separation and well site treatment facilities and remain liquid at atmospheric pressure.

(g)     *"Day"* or *"day"* shall mean the 24-hour period beginning and ending at 7:00 a.m. Central Standard Time.

(h)     *"Month"* or *"month"* shall mean the period beginning at 7:00 a.m. Central Standard Time on the first Day of a calendar Month and ending at 7:00 a.m. Central Standard Time on the first Day of the next succeeding calendar Month.

(i)     *"Other Owner Crude"* shall have the meaning set forth in Section 1.9 of the Agreement.

(j)     *"Producer's Capacity"* shall have the meaning set forth in Section 3.1 of the Agreement.

(k)     *"Producer's Crude"* shall have the meaning set forth in Section 1.2 of the Agreement.

(l)     *"Psia"* shall mean pounds per square inch absolute; *"Psig"* shall mean pounds per square inch gauge.

(m)     *"Receipt Points"* shall mean the agreed upon points at which Crude is received into Transporter's Crude System.

(n)     *"Term"* shall mean the Primary Term together with any Extended Term as set forth in Article VII of the Agreement.

(o)     *"Third Party Crude"* shall mean any Crude produced from wells operated by parties other than Producer and Crude produced from wells operated by others in which Producer owns an interest but does not take in kind.

(p)     *"Well"* or *"Wells"* means a surface location within the Area of Dedication of one or more wells operated by Producer, whether deemed Crude or Gas Wells, from which Producer's Crude that is dedicated and committed hereunder is (or will be) produced.

(q)     *"Well Pad"* means a surface location from which one or more Wells are drilled.

34

2.    <u>TITLE</u>

(a)    Except for the portion of Producer's Crude provided to Transporter as Pipeline Loss Allowance, for which title will transfer to and remain with Transporter at the Receipt Points, and subject to Section 5(b) of these GT&C as between the Parties, title to all of Producer's Crude shall at all times remain in Producer, subject to Section 1.7 of the Agreement.

(b)    Producer hereby warrants title to Producer's Crude delivered hereunder, and the right of Producer to deliver Producer's Crude (including any Other Owner Crude) that it may tender for delivery to Transporter for the purposes of this Agreement; and Producer warrants that all such Crude is owned by Producer, or that Producer has the right to market said Crude, free from all liens and adverse claims of title *("Adverse Claims"),* excluding liens to secure payments of production taxes, severance taxes, and other taxes.  Producer agrees to indemnify Transporter and save it harmless from all suits, actions, debts, accounts, damages, costs, losses and expenses arising from or out of Adverse Claims, whether meritorious or not, of any and all persons, firms, or corporations to said Crude or to royalties, overriding royalties, severance taxes or other taxes levied against Producer's Crude, license fees, or charges thereon.  Transporter shall be entitled to recover all reasonable costs and attorneys' fees incurred by it as a result of its involvement in any action or claim involving Adverse Claims. When it shall appear to Transporter by reason of receipt of written notice of claim or dispute that the ownership or title to all or part of the Leases, or Producer's Crude, may be in a party or parties other than Producer or the Other Owners, then Transporter may take such actions as required under applicable law.

(c)    Producer shall have the sole and exclusive obligation and liability for the payment of all persons due any proceeds derived from Producer's Crude delivered under this Agreement, including royalties, overriding royalties, and similar interests, in accordance with the provisions of the Leases or agreements creating those rights to proceeds.  In no event will Transporter have any obligation to those persons due any of those proceeds of production attributable to Producer's Crude.

(d)    Producer shall pay and be responsible for all taxes levied against or with respect to Producer's Crude delivered under this Agreement.  Transporter shall under no circumstances become liable for those taxes, unless designated to remit those taxes on behalf of Producer by any duly constituted jurisdictional· agency having authority to impose such obligations on Transporter, in which event the amount of those taxes remitted on Producer's behalf shall be reimbursed by Producer upon receipt of invoice, with corresponding documentation from Transporter setting forth such payments.

3.    <u>EASEMENTS</u>

The pipeline rights-of-way and easements to be provided by Producer to Transporter for the Initial System are addressed specifically under Section 2.2.  Transporter shall independently confirm that Transporter's contemplated use of any ROW is authorized by the terms and conditions of such ROW, and shall not be entitled to rely on any representations by Producer regarding the same following the acceptance of assignment, or partial assignment, of such ROW from Producer.  Transporter shall be bound by all of the terms and conditions of such ROW that concern Transporter's use of the ROW and that have been made of public record or otherwise

disclosed to Transporter.  Subject to the terms of the ROW, it is intended that any property of Transporter placed in or upon any of such land shall remain the personal property of Transporter, subject to removal by it upon the expiration or termination of the Agreement for any reason, and Transporter shall have a reasonable time after the expiration or termination of the Agreement to remove same and restore any of Producer's property to the extent of disturbance by Transporter. Producer and Transporter understand and agree that the ROWs may not be of sufficient length, width or general configuration to allow for the installation of the Transporter's Crude System. Subject to Section 2.2, Transporter shall be free and unhindered to acquire or modify existing easements or rights-of-way to the extent not timely provided by Producer for any segment of the Initial System, as applicable, as well as for any expansion of Transporter's Crude System as Transporter deems necessary and appropriate. If Transporter is unable to obtain necessary pipeline rights-of-way or easements, or surface rights for any appurtenant surface facilities, for Transporter's Crude System under reasonable terms, Transporter shall have the right to utilize Producer's rights under its Leases to install, own and operate the necessary the necessary surface or pipeline facilities within the scope of Producer's rights to do so.  Both Parties acknowledge that (i) the scope of such Lease rights might not encompass the gathering of Crude from other Leases, (ii) the use by of Producer's rights under its Leases to install, own and operate the necessary the necessary surface or pipeline facilities shall be at Transporter's sole risk, and (iii) Producer shall incur no liability to Transporter in the event such Lease expires or terminates.

4.    CRUDE MEASUREMENT AND QUALITY

(a)    For all measurement equipment operated by Producer and all measurement performed by Producer as the measuring Party, Transporter shall have the right to inspect, witness the proving and obtain any data from the LACTs at any time.

(b)    To the extent measurement equipment is not furnished, installed, operated, and maintained by Producer, or otherwise upon Producer's written request and conditioned upon mutually agreeable meter fees assessed by Transporter, Transporter at its expense, shall furnish, install, operate and maintain suitable measurement equipment, including any meters requested by Producer, for the accurate measurement of the Barrels of Producer's Crude delivered by Producer to Transporter at the Receipt Points.

(c)    Quantities, quality and gravities of Crude shall be determined in accordance with generally accepted industry practices in the effect at the time, using the latest American Society for Testing and Materials or American Petroleum Institute ("*API*") test methods and the latest edition of API volume correction tables.  Corrections shall be made for temperature to correct from actual observed temperatures to 60 degrees Fahrenheit; and to correct actual pressures to 14.696 psia.

(d)    The measuring Party shall verify the calibration of its meters and make adjustments as necessary at least once per calendar quarter, or more frequently if required by governmental authorities having jurisdiction.  With respect to any test made hereunder, a registration within one quarter of one percent (0.25%) of the previous meter calibration shall be considered correct.  However, the meter shall be adjusted to read as accurately as practicable. Either Party at any time may request a special test of any meter.  Each Party shall notify the other at least three (3) days in advance of any testing, and each Party shall have the right to have a

36

representative witness all tests and measurements. The expense of any special test requested by the non-measuring Party shall be borne by the non-measuring Party if the meter registration is found to be correct and by the measuring Party if found to be incorrect. Settlement for any period during which the meter registration deviates by more than 0.25% shall be corrected at the rate of inaccuracy for any period of inaccuracy which is definitely known or agreed upon; but in case the period is not definitely known or agreed upon, then for a period of one-half of the time since the date of the last test.

(e)     Producer's Crude delivered to Transporter under the Agreement shall meet the most restrictive quality specifications required of any downstream interconnecting party receiving Crude from Transporter at the Delivery Points, as such quality specifications from time to time exist including without limitation water, $H_2S$, Reid Vapor Pressure and BS&W. A sample of such quality specifications is attached hereto as Exhibit "F" for general reference. Transporter shall have no obligations with respect to, or liability for, the quality of Producer's Crude. Producer shall be fully responsible for analyzing the composition of Producer's Crude and ensuring that all of Producer's Crude may lawfully be gathered by Transporter and transported beyond the Delivery Points. Producer shall maintain all records required by applicable law, regulation or permit, or contractual or leasehold obligation on quantity and quality of Producer's Crude. Producer shall provide Transporter with composition analyses of representative samples of Producer's Crude quarterly, or at such other frequency as the Parties agree is appropriate.

(f)     Producer acknowledges that because it controls and operates the LACTs, Producer is solely and wholly responsible for the quality of Producer's Crude and testing and accuracy of Producer's Crude quality at the Receipt Points into Transporter's Crude System. If Producer's Crude does not conform to specifications, Producer will be solely and wholly responsible for all liability and costs incurred by Transporter with respect to the non-conforming Crude, including without limitation, costs to: (i) conform Producer's Crude to meet specifications; (ii) dispose of non-conforming Producer's Crude or any component thereof; (iii) remove any contamination from Transporter's Crude System; and (iv) address damages of any kind to the facilities of downstream interconnecting parties or to pay any penalties or damages imposed by downstream interconnecting parties.

5.     PAYMENT

(a)     After delivery of Producer's Crude has commenced on Transporter's Crude System, Transporter shall mail a settlement statement to Producer, or Producer's Crude Purchaser if directed by Producer, on or before the tenth (10th) day of the Month following the Month of deliveries hereunder. Such statement shall include but is not limited to:

i.     The Barrels of Producer's Crude delivered to the Receipt Points and the Barrels of Producer's Crude redelivered to the Delivery Points, net of the Pipeline Loss Allowance, and the Barrels of Producer's Crude in tanks awaiting redelivery at the Delivery Points.

ii.     An itemization of all fees due (and the credits applied against such fees, if applicable) under this Agreement for such Month, including without limitation, the Crude Transportation Fees and the Shortfall Payment.

(b)     Transporter shall provide Producer an invoice of the settlement statement by the tenth (10th) day of the month following service.  Producer shall pay, or cause to be paid, the settlement statement amount in full within thirty (30) days of receipt of the settlement statement.  Past due amounts shall accrue interest from the due date until paid in full at the rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, multiplied by 125%; or (ii) the maximum applicable lawful interest rate.  If any undisputed past due amounts remain unpaid for thirty (30) days after notice to Producer, Transporter shall have the right to suspend redeliveries of Producer's Crude at the Delivery Points; and, if such undisputed past due amounts remain unpaid for thirty (30) days after further notice to Producer, Transporter shall have the right to suspend its obligations under this Agreement until such time as Producer is no longer in payment arrears as to undisputed past due amounts and arrange for the disposition and sale of such portions of Producer's Crude at auction or otherwise as necessary to reimburse Transporter for all then undisputed past due amounts, including interest.

(c)     If either Party has reasonable grounds for insecurity regarding the performance of any obligation under this Agreement (whether or not then due) by the other Party (including, without limitation, the occurrence of a material change in a Party's creditworthiness) the insecure Party may demand Adequate Assurance.  In the event the Party requested to provide Adequate Assurance fails to give Adequate Assurance of its ability to perform its further payment obligations under this Agreement within three (3) business Days of a reasonable request therefore, the Party requesting Adequate Assurance may suspend its obligations under this Agreement until such time as the Party requested to provide such Adequate Assurance, does not provide such Assurance.  "*Adequate Assurance*" of the purposes of this Agreement may include, but is not limited to, providing an irrevocable letter of credit or prepayment in an amount equal to ninety (90) Days of average payment obligation incurred under this Agreement, or a guarantee from a creditworthy entity.  No course of dealing between the Parties will modify or act as a waiver of Transporter's continuing right to demand Adequate Assurances.

(d)     Transporter and Producer shall bear separately and be individually responsible for any and all taxes imposed upon and/or attributable to each Party's properties, facilities and/or operations hereunder.  These taxes shall include, but not be limited to, all state severance taxes, ad valorem taxes, franchise taxes, sales and use taxes and state and federal income taxes.

6.     REGULATION

(a)     Transporter is expected to be a common carrier subject to the jurisdiction of the Federal Energy Regulatory Commission ("*FERC*") under the Interstate Commerce Act ("*ICA*") as a result of Producer's Crude destined for interstate shipment and sale.  The transportation of any Crude Oil hereunder that is subject to the ICA shall be based on the applicable rules, regulations and rates set forth in Transporter's Tariff filed with the FERC, and shall conform to the maximum extent reasonably possible with the terms and conditions set forth in this Agreement.  In the event any terms or conditions set forth in this Agreement are inconsistent

38

with any requirements of the FERC, the Parties agree to pursue a mutually fair and equitable solution.

(b)    In this Agreement, Shipper is making a firm volume commitment and agreeing to a premium rate. Prior to the Initial System In-Service Date, to the extent required by the FERC Transporter shall, or otherwise at Transporter's sole discretion Transporter may conduct an open season, utilizing Transporter's Tariff and this Agreement together as the base form of Agreement for the open season, without significant modification except as required to meet FERC requirements and as expressly agreed to by Shipper in writing with Shipper's agreement not unreasonably withheld, delayed or conditioned, and proposing the form of Tariff for successful bidders in the open season, including Shipper. Transporter shall provide the form of Tariff, or amended Tariff, to Shipper within a reasonable period prior to the start of an open season so that Shipper may ensure that the form of Tariff or amended Tariff does not conflict with this Agreement. In the event Shipper notifies Transporter within a reasonable period following Shipper's receipt of the form of Tariff and prior to the start of the open season of any specific areas within the proposed form of Tariff that Shipper believes are in conflict with this Agreement, the Parties shall promptly meet in good faith to attempt to resolve the conflict. As long as the open season agreement, form of Tariff or amended Tariff and other required documents do not conflict with this Agreement, Shipper agrees that it will provide a waiver for a new open season, or to the extent necessary bid for capacity on the terms and rates provided herein, and make all required filings with FERC, incorporating the necessary terms of this Agreement, to ensure that Shipper receives the service contemplated by this Agreement and the firm priority set forth in Section 3.5 of this Agreement. The Parties will not take any action to delay or thwart the receipt of approval of the Tariff without modification. Shipper shall: (a) take all such actions and do all such things as Transporter shall reasonably request in connection with Transporter's applications for, and the processing of, certificates, approvals, and authorizations of any Governmental Authority; (b) support the Crude Transportation Fees as a negotiated or settlement rate; (c) support the Tariff Rate, so long as Shipper is entitled to service at the Crude Transportation Fees; and (d) not directly or indirectly take any action that delays review or approval of any application by Transporter to the FERC. Neither Party will make any filings with the FERC or take any positions at the FERC or before any other Governmental Authority (or cause any other person to do so) that are inconsistent with this Agreement or the jurisdiction of the FERC over Transporter; provided, however, nothing herein shall prevent Transporter from making changes to Transporter's Tariff: (i) as required by Law, (ii) so long as Shipper's rights hereunder are not materially affected, or (iii) with Shipper's written consent. Notwithstanding the foregoing, Shipper shall be entitled to fully participate in any FERC proceeding to protect its interests, including, without limitation, to ensure that Transporter's Tariff(s) with the FERC are not amended hereafter so as to change Transporter's obligations under this Agreement, but not including actively seeking better terms for Shipper or worse terms for Transporter than in this Agreement. In the event the FERC-approved Transporter's Tariff contains material terms and conditions that conflict with or materially impact the terms and conditions set forth in this Agreement, the Parties agree during the fifteen (15) days after Shipper's receipt from Transporter of copies of the FERC-approved Tariff, first to attempt to negotiate in good faith a mutually agreeable solution to restore the economic benefit to the Party deprived, consistent with the intent reflected in this Agreement, and, if they are unable to agree, then during the next fifteen (15) days to promptly to seek advice and counsel from a mutually agreeable third party expert in FERC jurisdictional and tariff matters. If the Parties are unable to agree upon such a solution

39

after good faith efforts to work together with the expert, as a third step, either Party may proceed to dispute resolution under Section 10 of the GT&C and seek a remedy of termination of this Agreement from the Arbitrator(s).

(c)     The Agreement is subject to all present and future valid laws and lawful orders of all regulatory bodies now or hereafter having jurisdiction over the Parties, or either of them.

(d)     Both Parties expressly agree that it is not the intention of either Party to violate public policy, or state or federal statutory or common laws, and that if any sentence, paragraph, clause, or combination thereof in this Agreement is in violation of the same, such paragraph, clause, or sentence, or combination of the same shall be inoperative, and the remainder of this Agreement shall remain binding upon the Parties hereto, provided that the reasonable expectation of each Party at the time it entered into this Agreement is not materially impaired (or, in the event of such material impairment, provided that the Parties are able to negotiate, in good faith, reasonable and valid provisions to restore the economic benefit to the Party deprived, consistent with the intent reflected in this Agreement).

(e)     In the event that, due to any regulatory orders, Shipper's rights to a level of service, the Crude Transportation Fees or any other benefit provided Shipper herein are materially diminished or terminated, or Transporter's rights or obligations, or its ability to charge and receive the Crude Transportation Fees, or other conditions are imposed on Transporter which materially and adversely affects the economic benefits to Transporter originally contemplated hereunder, the affected Party shall have the right to notify the other Party that it has been adversely affected ("*Adverse Effect Notice*"). Upon the other Party receiving the Adverse Effect Notice, the Parties shall negotiate in good faith upon modifications to this Agreement as necessary to put each Party in the economic position that was originally provided under this Agreement. If the Parties are unable to agree on modifications within ninety (90) days following the date of the Adverse Effect Notice, then either Party shall have the right to terminate this Agreement.

7.     FORCE MAJEURE

(a)     Except for the obligation to make payments, in the event either Transporter or Producer is rendered unable, by reason of an event of Force Majeure to perform, wholly or in part, any obligation or commitment set forth in the Agreement, then upon such Party giving notice and full particulars (including reasonably sufficient supporting documentation) of such event as soon as practicable after the occurrence thereof, the obligations of both Parties shall be suspended to the extent and for the period of such Force Majeure provided that the Party claiming an event of Force Majeure shall make all commercially reasonable attempts to remedy the same with all reasonable dispatch, and shall promptly notify the other Party of attempts to remedy and of final resolution of the events.

(b)     The term *"Force Majeure",* as used herein, shall mean acts of God, strikes, lockouts or industrial disputes or disturbances, civil disturbances, arrest and restraint of rulers or people, interruptions imposed by any government or court orders, law, statute, ordinance or regulation promulgated by any governmental or regulatory authority having proper jurisdiction, acts of the public enemy, wars, riots, blockades, insurrections, epidemics, landslides, lightning,

40

earthquakes, fires, storm, floods, washouts, explosions, unforeseeable failure of machinery or lines of pipe, freezing of wells or pipelines, the interruption or suspension of the receipt of Crude deliveries hereunder by Transporter due to the declaration of Force Majeure by third-party transporters, delays in receiving, withdrawals or suspensions of necessary permits or approvals from governmental or regulatory authorities having proper jurisdiction, or any other cause whether of the kind herein enumerated or otherwise, not within the reasonable control of the Party claiming an event of Force Majeure.

(c)     Neither Party shall be entitled to the benefit of the provisions of this Section under either or both of the following circumstances;

i.     To the extent that the failure was caused by the Party claiming suspension having failed to remedy the condition by taking all reasonable acts, short of litigation, if such remedy requires litigation, and having failed to resume performance of such commitments or obligations with reasonable dispatch; or

ii.     If the failure was caused by lack of funds, or with respect to the payment of any amount or amounts then due hereunder.

(d)     Settlement of strikes and lockouts shall be entirely within the discretion of the Party affected, and the duty that any event of Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes and lockouts by acceding the demands of the parties directly or indirectly involved in such strikes or lockouts when such course is inadvisable in the discretion of the Party having such difficulty.

8.   DEFAULTS

(a)     It is covenanted and agreed that if either Party shall fail to perform any of the covenants or obligations imposed upon it under and by virtue of the Agreement or these GT&C, in addition to its other rights and remedies, the other Party may initiate termination of the Agreement by proceeding as follows:

i.     The Party not in default shall cause a written notice to be served on the other Party in default, stating specifically the cause for terminating the Agreement, and declaring it to be the intention of the Party giving notice to terminate the same; thereupon, the Party in default shall have thirty (30) Days after the service of the aforesaid notice in which to remedy or remove the cause or causes stated in the notice for terminating the Agreement. If within said thirty (30) Days the Party in default does so remove and remedy said cause or causes, or fully indemnifies the Party not in default for any and all consequences of such breach, then such notice shall be withdrawn and the Agreement shall continue in full force and effect.

ii.     In case the Party in default does not remedy and remove the cause or causes, or does not indemnify the Party giving the notice for any and all consequences of such breach, within said period of thirty (30) Days, then the Party claiming default shall thereafter have the option to terminate this Agreement which option shall be exercised, if at all, by delivering written notice to the Party in default no later than ten (10) Days after

41

the end of such thirty (30) Day period. In the event there is a dispute regarding whether a default exists, such dispute shall be governed by the arbitration provisions of these GT&C and the thirty (30) Day cure period shall begin on the first (1st) Day after the date of the arbitration award.

iii.     Any cancellation of the Agreement pursuant to the provisions of this Section shall be without prejudice to the obligation of Producer to make payments due hereunder prior to the time of cancellation, and without waiver of any remedy to which the Party not in default may be entitled for violations of the Agreement.

(b)     No waiver by either Producer or Transporter of any default of the other under the Agreement shall operate as a waiver of any future default, whether of like or different character or nature, nor shall any failure to exercise any right hereunder be considered as a waiver of such right in the future.

9.     LIABILITY, INDEMNIFICATION AND INSURANCE

(a)     Except for the portion of Producer's Crude provided to Transporter as Pipeline Loss Allowance, for which custody will transfer to and remain with Transporter at the Receipt Points, as between the Parties hereto, Producer and any of its designees shall be in custody, control and possession of Producer's Crude, until Producer's Crude is delivered to the Receipt Points, and after any portion of Producer's Crude is redelivered at the Delivery Points, subject to Section 5(b) of these GT&Cs. Transporter and any of its designees shall be in custody, control and possession of Producer's Crude after Producer's Crude is delivered at the Receipt Points and until redelivery of Producer's Crude to Producer or its designee at the Delivery Points, subject to Section 5(b) of these GT&Cs.

(b)     Each Party ("*Indemnifying Party*") hereby covenants and agrees with the other Party, and its Affiliates, and each of their directors, officers and employees, co-owners, partners, independent contractors, agents and representatives ("*Indemnified Parties*"), that except to the extent caused by the Indemnified Parties' gross negligence or willful conduct, the Indemnifying Party shall protect, defend, indemnify and hold harmless the Indemnified Parties from, against and in respect of any and all losses of any kind and character, including reasonable attorney fees ("*Losses*") incurred by the Indemnified Parties to the extent those Losses arise from or are related to: (a) the Indemnifying Party's facilities; or (b) the Indemnifying Party's possession and control of Producer's Crude.

(c)     At all times during the term of this Agreement, and for all applicable statutes of limitations periods, each of the Parties agrees to maintain and keep in force and effect, at their own expense, the following insurance coverages and minimum amounts: (i) Workman's Compensation in full compliance with all applicable state and federal laws and regulations; (ii) Employer's Liability in the minimum limits of $1,000,000 per accident covering injury or death to any employee which may be outside the Workman's Compensation statute of the state in which the work is performed; (iii) Commercial General Liability insurance with minimum limits of $1,000,000 combined single limit for injury or death of any one person and for property damage; (iv) Excess Liability Insurance Umbrella Form with minimum limits not less than $5,000,000 per occurrence and aggregate (or any other combination of coverages that is

42

sufficient to produce the same minimum limits set forth above) and (v) Automobile Liability Insurance covering owned, non-owned and hired automotive equipment with minimum limits of $1,000,000 combined single limit for injury or death of any one person and property damage. To the extent of the liabilities assumed hereunder, each Party shall be named an additional insured on all such insurance policies of the other Party (with the exception of Workers' Compensation coverage) with all such insurance being primary to any insurance of the Indemnified Party that may apply to such occurrence, accident or claim. No "other insurance" provision shall be applicable to the Indemnified Party by virtue of having been named an additional insured under any policy of insurance. Each Party agrees to furnish the other Party with a certificate or certificates evidencing insurance coverage in accordance with the above requirements.

10. DAMAGES AND ARBITRATION

(a)   NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, UNDER ANY THEORY OF LIABILITY, WHETHER TORT, NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT, WARRANTY, INDEMNITY OR OTHERWISE, NEITHER PARTY SHALL BE LIABLE FOR, AND LOSSES SHALL NOT INCLUDE, ANY DAMAGES OTHER THAN ACTUAL AND DIRECT DAMAGES, AND EACH PARTY EXPRESSLY WAIVES ANY RIGHT TO CLAIM ANY OTHER DAMAGES, INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES; PROVIDED, HOWEVER, THE FOREGOING SHALL NOT BE CONSTRUED AS LIMITING THE OBLIGATION OF EITHER PARTY HEREUNDER TO INDEMNIFY THE OTHER PARTY AGAINST CLAIMS ASSERTED BY UN-AFFILIATED THIRD PARTIES, INCLUDING, BUT NOT LIMITED TO, UN-AFFILIATED THIRD PARTY CLAIMS FOR CONSEQUENTIAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES.

(b)   The Parties shall strive to resolve any disputes that may arise under this Agreement amicably and informally. Any claim, demand, cause of action, dispute or controversy exclusively between the Parties relating to the subject matter of this Agreement, whether sounding in contract, tort or otherwise, at law or in equity, for damages or other relief that is not resolved to the satisfaction of the Parties by informal negotiations ("*Dispute*"), may be noticed in writing accompanied by reasonable supporting documentation by the disputing Party ("*Dispute Notice*"). If senior management of each of the Parties cannot resolve the Dispute within ninety (90) days of receipt of the Dispute Notice, either Party may initiate arbitration by serving written notice of arbitration ("*Arbitration Notice*") upon the other. Within twenty (20) days following service of the Arbitration Notice, the Parties shall either agree upon a single arbitrator if the amount in dispute is less than $100,000, or for disputes with amounts in dispute $100,000 or greater, each Party shall select one arbitrator, who shall together select a third. The third or the single arbitrator shall have more than ten (10) years professional experience in the oil and gas industry, be neutral, and have not worked for a Party or Affiliate. The arbitration shall be conducted according to the rules of the Federal Arbitration Act, and to the extent an issue is not addressed thereby, by the Commercial Arbitration Rules of the American Arbitration Association. The arbitration shall be conducted within the City and County of Denver, Colorado. Each Party shall be entitled to a reasonable amount of prehearing discovery as allowed by the arbitrator(s), provided the discovery period shall not exceed thirty (30) days; the Parties and the arbitrators shall endeavor to hold the arbitration hearing within thirty (30) days

43

thereafter and to render the decision within fifteen (15) days following the hearing. Each Party shall bear its own costs of arbitration. Interpretation of this Agreement to arbitrate and procedures shall be decided by the arbitrators. The arbitration and the award shall be final, binding and confidential.

(c)    Each Party is required to continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of this Agreement.

(d)    In the event of litigation to enforce the arbitration provisions of this Section 10 of these GT&C or any arbitration award, the prevailing Party, after the entry of a final non-appealable order, shall be entitled to recover from the other Party, as a part of said judgment, all actual court costs, fees and expenses of such litigation, including reasonable attorneys' fees.

## 11. CONFIDENTIALITY

Except for the filing of public record the Memorandum of Dedication under this Agreement, the Parties agree that they will maintain the Agreement, and all parts and contents thereof, in strict confidence, and that they will not cause or permit disclosure of same to any third party without the express written consent of the other Party; provided however, that disclosure by a Party is permitted in the event and to the extent:

(a)    disclosure is required by a court or agency or stock exchange exercising jurisdiction over the subject matter thereof, by order or by regulation or rule or law, to disclose; provided that in the event either Party becomes aware of a judicial or administrative proceeding that has resulted or may result in such an order requiring disclosure, it shall (i) so notify the other Party immediately and (ii) support all actions of the non-disclosing Party reasonably necessary to prevent disclosure to the public as a result of disclosure to the court or administrative body; or

(b)    disclosure is required in the course of routine audit procedures; provided, however, that any such disclosure shall be made upon the condition that the recipient shall in turn hold such information confidential from further disclosure; or

(c)    disclosure to (i) non-operator co-owners or (ii) royalty owners, overriding royalty owners, and taxing authorities on whose behalf Producer markets production from the Area of Dedication is required in connection with Producer's distribution of revenues from the sale of production and payment of royalties and taxes on production; or

(d)    disclosure to Affiliates, consultants and advisors of a Party, or potential investors or purchasers of Producer's Crude or Leases, Wells and/or lands and formations thereunder or Transporter's Crude System; provided, however, that any such disclosure shall be made upon the condition that the recipient shall in turn hold such information confidential from further disclosure; or

(e)    disclosure that Transporter is providing Crude Oil transportation services for Producer, although not the terms or conditions on which those services are provided.

44

12.    <u>PUBLIC ANNOUNCEMENTS</u>

(a)    The Parties agree that prior to making any public announcement or statement with respect to this Agreement or the transaction represented herein, the Party desiring to make such public announcement or statement shall provide the other Party with a copy of the proposed announcement or statement prior to the intended release date of such announcement.  The other Party shall thereafter consult with the Party desiring to make the release, and the Parties shall exercise their reasonable efforts prior to release to (i) agree upon the text of a joint public announcement or statement to be made by both such Parties or (ii) in the case of a statement to be made solely by one Party, obtain approval of the other Party to the text of a public announcement or statement.  Nothing contained in this Section 12 shall be construed to require either Party to obtain approval of the other Party to disclose information with respect to this Agreement or the transaction represented herein to any state or federal governmental authority or agency to the extent required by applicable law or necessary to comply with disclosure requirements of the Securities and Exchange Commission, New York Stock Exchange, American Stock Exchange, or any other regulated stock exchange.

EXHIBIT "D"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
DAKOTA MIDSTREAM, LLC or DAKOTA ENERGY CONNECTION, LLC, as "Transporter"
and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

FORM OF CORRECTION MEMORANDUM OF DEDICATION

This CORRECTION MEMORANDUM OF DEDICATION (the "Memorandum") is to supersede and replace that earlier Memorandum of Dedication filed in the real property records of McKenzie County, North Dakota as instrument #475257 and to impart notice to all persons of the Crude Dedication and Throughput Commitment Transportation Agreement (the "Agreement") having an effective date of July 1, 2014 (the "Effective Date") between Emerald Oil, Inc. and Emerald WB LLC, each with offices at 1600 Broadway, Suite 1360, Denver, CO 80202 (collectively "Producer"), and Dakota Energy Connection, LLC with offices at 1600 Broadway, Suite 1330, Denver, CO 80202 ("Transporter"), pursuant to which Producer has agreed on an exclusive basis to dedicate to Transporter or cause its purchasers or affiliates to make, physical delivery to Transporter of the entirety of the Crude owned by Producer which is produced at the wellhead from the Wells operated by Producer as of the Effective Date on the lands described on Schedule A attached hereto and incorporated herein (the "Area of Dedication") for a term of fifteen (15) years (the "Primary Term") and year to year thereafter until terminated by either Producer or Transporter (an "Extended Term"). The Area of Dedication shall terminate, in part or in its entirety, pursuant to the terms and conditions of the Agreement.

Additionally, Producer has granted rights-of-way and rights-of-access to Transporter to own and operate crude transportation lines and other appurtenant equipment on or under the real property interests owned by Producer in the Area of Dedication, to the extent Producer has rights to do so during the Primary Term and any Extended Term of the Agreement.

In the event Producer, or any Affiliate of Producer, owns or controls leasehold interests or Crude from leasehold interests located within the Area of Dedication, during the Primary Term or Extended Term of this Agreement, such leasehold interests and/or Crude shall be dedicated to Transporter on the terms and conditions set forth in the Agreement and as summarized above. The terms and conditions of the Agreement shall be covenants running with the lands.

This Memorandum may be executed in multiple counterparts, each of which shall constitute an original and all of which, when construed together, shall constitute one and the same instrument.

This MEMORANDUM OF DEDICATION is executed and delivered to be effective as of the Effective Date of the Agreement.

46

EMERALD OIL, INC.

By: _____

Name: _McAndrew Rudisill_

Title: _CEO_

Date: _May 26, 2015_

EMERALD WB LLC

By: _____

Name: _McAndrew Rudisill_

Title: _CEO_

Date: _May 26, 2015_

DAKOTA MIDSTREAM, LLC

By: _____

Name: _Tim Reynolds_

Title: _Founding Partner_

Date: _5/26/15_

DAKOTA ENERGY CONNECTION, LLC

By: _____

Name: _Tim Reynolds_

Title: _Founding Partner_

Date: _5/26/15_

47

STATE OF _New York_ )
                                            ) §
COUNTY OF _New York_ )

On this _26th_ day of _May_ _____, 2015, before me personally appeared _Timothy Reynolds_ , known to me to be the _Founding Partner_ of Dakota Midstream, LLC.

(Seal)                    _Clorise Beasley_

                          Notary Public in and for the State of _New York_

                          Printed Name: _Clorise Beasley_

                          Commission Expires: _04/04/2017_

```
CLORISE BEASLEY
Notary Public - State of New York
NO. 01BE6125044
Qualified in Bronx County
My Commission Expires 04/04/2017
```

STATE OF _New York_ )
                                            ) §
COUNTY OF _New York_ )

On this _26th_ day of _May_ _____, 2015, before me personally appeared _Timothy Reynolds_ , known to me to be the _Founding Partner_ of Dakota Energy Connection, LLC.

(Seal)                    _Clorise Beasley_

                          Notary Public in and for the State of _New York_

                          Printed Name: _Clorise Beasly_

                          Commission Expires: _04/04/2017_

```
CLORISE BEASLEY
Notary Public - State of New York
NO. 01BE6125044
Qualified in Bronx County
My Commission Expires 04/04/2017
```

48

STATE OF _Colorado_ )
                                           ) §
COUNTY OF _Denver_ )

On this _26_ day of _May_ _____, 2015, before me personally appeared _McAndrew Rudisill_, known to me to be the _CEO + President_ of Emerald Oil, Inc.

(Seal)

_Kelsey Silipo_

Notary Public in and for the State of _Colorado_

Printed Name: _Kelsey Silipo_

Commission Expires: _6/18/16_

KELSEY E. SILIPO
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID # 20124036301
MY COMMISSION EXPIRES JUNE 18, 2016


STATE OF _Colorado_ )
                                           ) §
COUNTY OF _Denver_ )

On this _26_ day of _May_ _____, 2015, before me personally appeared _McAndrew Rudisill_ known to me to be the _President_ of Emerald WB LLC.

(Seal)

_Kelsey Silipo_

Notary Public in and for the State of _Colorado_

Printed Name: _Kelsey Silipo_

Commission Expires: _6/18/16_

KELSEY E. SILIPO
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID # 20124036301
MY COMMISSION EXPIRES JUNE 18, 2016

Schedule A

AREA OF DEDICATION

The following lands located in McKenzie County, North Dakota:

| Section | Township | Range |
|---------|----------|-------|
| 1-36 | 148N | 102W |
| 1-36 | 148N | 103W |
| 1-36 | 149N | 102W |
| 1-36 | 149N | 103W |

50

EXHIBIT "E"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
Dakota Midstream, LLC, or Dakota Energy Connection, LLC as "Transporter" and
Emerald Oil, Inc. & Emerald WB LLC, as "Producer"

FEES

For each Accounting Period, Producer shall pay the Committed Firm Service Rate and the Uncommitted Rate, as applicable, and any applicable Miscellaneous Fee components (together the *"Crude Transportation Fees")* and any applicable Shortfall Payment:

Committed Firm Service Rate: The *"Committed Firm Service Rate"* shall equal One dollar and Twenty-One cents ($1.21) per Barrel of Producer's Crude and shall apply to Producer's Dedicated Volumes delivered by Producer at each Receipt Point throughout the Primary Term of this Agreement, including deliveries during the period from June 1, 2015 through the Initial System In-Service Date. The amount of this initial Committed Firm Service Rate shall be subject to redetermination and annual adjustment as set forth herein and in Transporter's Rules Tariff. The term "Dedicated Volume" means all of Producer's working interest share of Crude Oil produced (1) from Wells operated by Producer in the Area of Dedication, and (2) from wells in the Area of Dedication operated by third parties where Producer takes its working interest share of Crude Oil production in kind.

"Uncommitted Rate" means the rate per Barrel charged to Producer for transportation of Uncommitted Volumes pursuant to Transporter's Rate Tariff. The Uncommitted Rate shall be one cent per Barrel ($0.01/Bbl) less than the Committed Firm Service Rate. "Uncommitted Volume" mean (1) volumes received from Producer from wells located outside the Area of Dedication or from wells located within the Area of Dedication operated by a third party where the Crude Oil was not Producer's in-kind working interest share of Crude Oil production; and (2) Other Owner Crude.

Redetermination of Committed Firm Service Rate: The Parties acknowledge that Transporter based the initial Committed Firm Service Rate on estimates of the cost of constructing the Initial System to serve the Initial Receipt Points but not the Infill Receipt Points, the anticipated Barrels of throughput of Producer's Crude received into the Initial System, and the resulting Crude Transportation Fees arising from such throughput, over the first five (5) years of operation of the Initial System. Therefore, the Committed Firm Service Rate shall increase upon Transporter's completion of the additional portions of the Initial System that will serve the Infill Receipt Points. Within fifteen (15) days of the Initial System In-Service Date, unless already done so, Transporter shall furnish Producer with an itemized documentation of both the Actual Construct Costs for the portion of the Initial System that will serve the Initial Receipt Points (the *"Initial System Cost"*) and the incremental Actual Construct Costs for the incremental portion of the

51

Initial System that will serve the Infill Receipt Points (the "*Infill Cost*"). Both Initial System Cost and Infill Cost shall be exclusive of any additional Initial Compression Facilities, as that term is defined in the Related Dedication Agreement concerning gas, costs and expenses to be incurred by Transporter; however, the amount of $1,286,010 shall be added to the Infill Cost to reflect additional facilities installed by Transporter to handle Producer's Crude prior to receipt into the Initial System for transportation. The initial Committed Firm Service Rate shall be redetermined according to the following formula:

$$\text{Redetermined Rate} = [1.0 + ((\text{Infill Cost} + \$1,286,010 \div \text{Initial System Cost})] \text{ X [initial Committed Firm Service Rate]}.$$

The Committed Firm Service Rate, as redetermined pursuant to the above formula, shall be effective for all purposes herein, as of the first full month Accounting Period following the later of (i) the Initial System In-Service Date; or (ii) the effective date of Transporter's Tariff amendment authorizing such rate.

Throughput Commitment and Shortfall Payment: Transporter's design, capacity and configuration of the Initial System was based upon projected Barrels of Producer's Crude from the Initial DSUs and other information provided by Producer with an estimated total of approximately eighteen million (18,000,000) Barrels of Producer's Crude anticipated as throughput through the Initial System over the first five (5) years commencing June 1, 2015 (the "*Commitment Period*"). The Commitment Period will be reset on the Initial System In-Service Date, such that the Commitment Period then runs five (5) years from the Initial System In-Service Date. Producer agrees to deliver to Transporter a minimum number of Barrels per year (singly or collectively, "*Minimum Barrels*") as follows: eight thousand (8,000) Barrels of Producer's Crude per day of each Accounting Period for the first year during the Commitment Period; nine thousand (9,000) Barrels of Producer's Crude per day of each Accounting Period for the second year of the Commitment Period; ten thousand (10,000) Barrels of Producer's Crude per day of each Accounting Period for the third year of the Commitment Period; and eleven thousand (11,000) Barrels of Producer's Crude per day of each Accounting Period for the fourth and fifth years of the Commitment Period. For purposes of determining whether Producer has met the Minimum Barrels, any Crude delivered prior to June 1, 2015 shall be deemed to be Delivered Barrels attributable to the first Accounting Period following the commencement of the Commitment Period. Subject to Force Majeure, if, after the first forty-five (45) days of the commencement of the Commitment Period, Producer fails to deliver the Minimum Barrels within any Accounting Period during the Connection Period, Producer shall pay, in addition to the Crude Transportation Fees due for Producer's Crude delivered to Transporter, an amount (the "*Shortfall Payment*") calculated according to the following formula:

Shortfall Payment = [(Minimum Barrels − Transporter's Initial System Delay Barrels − Producer's Initial System Delay Barrels − Released Barrels − Permanently Released Barrels) − (Delivered Barrels + Excess Barrels) x (Committed Firm Service Rate)

Notwithstanding anything herein to the contrary, if during any Accounting Period during the Commitment Period, the daily Barrels of Producer's Crude actually delivered to Transporter during that Accounting Period (the "*Delivered Barrels*") exceed the Minimum Barrels, the average daily Barrels in excess of the monthly-equivalent Minimum Barrels (the "*Excess*

52

*Barrels*") shall be carried forward and taken into account in calculating any Shortfall Payment for the next subsequent Accounting Period. Furthermore, in the event a Shortfall Payment is made by Producer, but for the one (1) year period ending with the next anniversary date of the commencement of the Commitment Period, the Delivered Barrels are in excess of the applicable Minimum Barrels, such Shortfall Payment shall be offset and credited against Crude Transportation Fees incurred by Producer, beginning with the next Accounting Period following such one (1) year period to the extent allowed by Transporter's Tariff or otherwise allowed by the FERC.

Miscellaneous Fees: If and when applicable, each Party shall pay to the other the "*Initial System* [Producer or Transporter as appropriate] *Delay Fee*" as provided in Section 2.4, and Producer shall pay the "*Expansion Fee*" to recoup Transporter's expansion costs as provided in Section 2.5 and Exhibit "H." From time to time under this Agreement, the Parties may agree in writing upon other fees.

EXHIBIT "F"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
Dakota Midstream, LLC or Dakota Energy Connection, LLC, as "Transporter" and
Emerald Oil, Inc. & Emerald WB LLC, as "Producer"

<u>SAMPLE CRUDE QUALITY SPECIFICATION</u>

[Based on F.E.R.C. 112.8.0 Belle Fourche Rules and Regulations]

Item No. 15 Specifications as to Quality Received

No Petroleum will be accepted for transportation except good merchantable Crude Oil of the gravity of fifteen degrees (15°) A.P.I. (American Petroleum Institute) or higher which is properly settled and weathered, as determined by Transporter, and contains not more than one half of one percent (1/2 of 1%) of basic sediment, water and other impurities, no more than two tenths of one percent (.2%) of which is water, above a point four inches (4") below the pipe line connection with the tank from which it enters Transporter's facilities. No Crude Oil will be accepted unless its gravity, viscosity and other characteristics are such that it will be readily susceptible of transportation through the Transporter's existing facilities and it will not materially affect the quality of other shipments or cause disadvantage to other shippers and/or the Transporter.

(a) The presence of contaminants in Crude Oil, including but not limited to chemicals such as chlorinated and/or oxygenated hydrocarbons and/or lead, shall be reason for Transporter to reject any Petroleum, and in the event any Shipper has tendered, and Transporter is transporting or has transported, contaminated Crude Oil such Shipper shall be liable for any and all direct and consequential damages resulting therefrom and such Shipper shall save Transporter harmless from any and all claims, suits, costs, expenses, and/or judgments, arising from, directly or indirectly, the presence of contaminated Crude Oil.

(b) Transporter reserves the right to reject any Crude Oil received or offered for transportation that exceeds 0.2% sulfur content by weight at a Receipt Point.

(c) Transporter reserves the right to reject any Crude Oil received or offered for transportation that exceeds 10 ppm hydrogen sulfide (H2S) at a Receipt Point using ASTM D5705-12 methodology.

54

EXHIBIT "G"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
DAKOTA ENERGY CONNECTION, LLC, as "Transporter" and
EMERALD OIL, INC. & EMERALD WB LLC, as "Producer"

<u>FORM OF PARTIAL ASSIGNMENT AND ASSUMPTION OF PIPELINE
RIGHTS-OF-WAY AND EASEMENTS</u>

This **PARTIAL ASSIGNMENT OF PIPELINE RIGHTS-OF-WAY AND EASEMENTS** (this "Partial Assignment"), is made and entered into effective _____, 2015 (the "Effective Date") by and among Emerald Oil, Inc. ("Assignor") and Dakota Energy Connection, LLC ("Assignee"). Assignor and Assignee are referred to herein, individually, as a "Party" and, collectively, as the "Parties."

WHEREAS, Assignor is the owner of various pipeline easements and rights-of-way grants and agreements as described on <u>Annex 1</u> to this Partial Assignment (collectively the "Rights-of-Way");

WHEREAS, Assignor and Assignee are parties to that certain Amended and Restated Crude Oil Dedication & Throughput Commitment Transportation Agreement dated effective July 1, 2014 (the "Gathering Agreement");

WHEREAS, pursuant to the terms of the Gathering Agreement, Assignee shall construct, own and operate a crude oil gathering system ("Assignee's Gathering System"); and

WHEREAS, Assignor and Assignee desire that Assignor partially assign, on a non-exclusive basis, certain of its right, title, interest and obligations under the Rights-of-Way to Assignee as necessary to facilitate the construction and operation of Assignee's Gathering System, and for Assignor to reserve all other rights under the Rights-of-Way, subject to the terms and conditions set forth herein.

NOW, THEREFORE, For Ten Dollars ($10.00), and other good and valuable consideration, including the mutual covenants and benefits to be derived hereunder, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

A.  <u>Grant</u>.  Solely to the extent Assignor has the right and power to do so under the terms of the Rights-of-Way, Assignor does hereby assign, transfer and convey unto Assignee, on a non-exclusive basis, such portion of its right, title and interest in and to the Rights-of-Way, together with such rights (including ingress and egress) as necessary for Assignee to lay, construct, install, operate, maintain, replace, maintain, repair and remove Assignee's Gathering System (the "Assigned ROW"). This Partial Assignment is made subject to all valid and subsisting oil, gas or other mineral leases, deeds, easements,

55

rights-of-way, restrictive covenants, reservations, or other matters of record in the real property records of McKenzie County, North Dakota, which burden or otherwise affect the Rights-of-Way.

B. <u>Reservation</u>. All rights and interests in the Rights-of-Way assigned, transferred, or conveyed hereunder are non-exclusive and only insofar as they are described herein, and Assignor specifically reserves unto itself all other right, title, interests in the Rights-of-Way, including but not limited to those rights necessary to lay, construct, install, operate, maintain, replace, repair and remove one or more pipelines, and ingress and egress with respect to the same, except as necessary for Assignee's Gathering System, or to grant such rights and interests in the Rights-of-Way to third parties.

C. <u>Disclaimer of Warranty</u>. ASSIGNEE ACKNOWLEDGES THAT THE INTERESTS AND RIGHTS CONVEYED BY THIS PARTIAL ASSIGNMENT ARE BEING CONVEYED "AS IS AND WHERE IS" AND ASSIGNOR HAS MADE, MAKES NO AND EXPRESSLY DISCLAIMS ANY REPRESENTATION OR WARRANTY, VERBAL OR OTHERWISE, WHETHER EXPRESS OR IMPLIED, IN FACT OR IN LAW, OF MERCHANTABILITY, FITNESS, ADEQUACY OR SUFFICIENCY FOR ANY PURPOSE, VALIDITY, SCOPE, TITLE, CONDITION OR SAFETY OF THE RIGHTS-OF-WAY, THE RIGHT AND POWER OF ASSIGNOR UNDER THE TERMS OF THE RIGHTS-OF-WAY TO CONVEY THE INTERESTS AND RIGHTS CONVEYED BY THIS PARTIAL ASSIGNMENT, OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION PROVIDED TO ASSIGNEE REGARDING THE RIGHTS-OF-WAY. BY EXECUTING THIS PARTIAL ASSIGNMENT, ASSIGNEE ACKNOWLEDGES THAT IT HAS RELIED AND WILL SOLELY RELY UPON ITS INDEPENDENT INVESTIGATION AND JUDGMENT WITH RESPECT TO THE RIGHTS-OF-WAY, AND THE ASSIGNABILITY, TERMS, USE AND VALUE THEREOF.

D. <u>Assumption</u>. Assignee, by acceptance of this Partial Assignment, hereby assumes and agrees to be bound by all of the terms, covenants and conditions of the Rights-of-Way, and from the Effective Date, to pay, perform, comply with and discharge all of the obligations of Assignor to the extent such obligations are related to the Assigned ROW, including, without limitation, Assignee's Gathering System facilities located upon the Assigned ROW.

E. <u>Consents to Assign</u>. In the event any Right-of-Way are subject to a valid consent to assign or other restriction on transfer of which this Partial Assignment would be a breach thereof, or result in the termination of such Right-of-Way, then any rights or interests in and to such Right-of-Way shall be deemed not conveyed hereunder unless and until such consent or other restriction is obtained or waived from or by the third party having such right.

F. <u>Further Assurances</u>. The Parties shall take all further actions and execute, acknowledge and deliver all such further documents that are necessary or useful in carrying out the purposes of this Partial Assignment.

G. <u>Counterparts</u>. This Partial Assignment may be executed in multiple counterparts, all of which together shall constitute a single instrument, even though all Parties do not sign the same counterpart.

H.    <u>Successors in Interest</u>.    The burdens, terms, covenants, reservations, restrictions and conditions contained in this Partial Assignment are binding upon and shall inure to the benefit of the Parties, and their respective successors, heirs, and assigns.    Such burdens, terms, covenants, reservations, restrictions, and conditions are covenants running with the land and with each subsequent transfer or assignment of any interest acquired or conveyed by Assignor and/or Assignee hereunder.

I.    <u>Gathering Agreement</u>.    This Partial Assignment is being made pursuant to the terms of the Gathering Agreement executed contemporaneously with this Partial Assignment.    If there is a conflict between the terms of this Partial Assignment and the Gathering Agreement, the terms of the Gathering Agreement shall control to the extent of the conflict.

J.    <u>Recording</u>.    Assignee shall record this Partial Assignment in the real property records of McKenzie County, North Dakota.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed this Partial Assignment as of the Effective Date.


ASSIGNEE
**Dakota Energy Connection, LLC**


By:_____

Name:_____

Title:_____

Date:_____



ASSIGNOR
**Emerald Oil, Inc.**

By:_____

Name:_____

Title:_____

Date:_____

58

STATE OF _____ )
                                        ) §
COUNTY OF _____ )

On this _____ day of _____

_____, 2015, before me personally appeared _____,

known to me to be the _____ of Emerald Oil, Inc.

(Seal)                          _____
                                Notary Public in and for the State of _____
                                Printed Name:_____
                                Commission Expires:_____


STATE OF _____ )
                                        ) §
COUNTY OF _____ )

On this _____ day of _____

_____, 2015, before me personally appeared _____,

known to me to be the _____ of       Dakota       Energy

Connection, LLC.

(Seal)                          _____
                                Notary Public in and for the State of _____
                                Printed Name:_____
                                Commission Expires:_____

**ANNEX I**

[TO BE ADJUSTED/REDUCED TO COVER THE FOOTPRINT OF THE
TRANSPORTATION SYSTEM]

**Right-of-Way #1**

Lessor:
Lessee:
Contract Date:
Recording Number:    _____
Description:

**Right-of-Way #2**

Lessor:
Lessee:
Contract Date:
Recording Number:    _____
Description:

**Right-of-Way #3**

Lessor:
Lessee:
Contract Date:
Recording Number:    _____
Description:

EXHIBIT "H"

ATTACHED TO AND MADE A PART OF THAT CERTAIN
AMENDED AND RESTATED CRUDE OIL DEDICATION & THROUGHPUT
COMMITMENT TRANSPORTATION AGREEMENT
by and between
Dakota Midstream, LLC or Dakota Energy Connection, LLC, as "Transporter" and
Emerald Oil, Inc. & Emerald WB, LLC, as "Producer"

EXPANSION FEE OR CREDIT FORMULA

$$\text{Expansion Fee or Credit per Barrel} = \frac{(A \times B)}{(C \times D \times E)}$$

A = Actual Construct Costs of future expansion plus 20% OPEX ratio plus 7.5% IRR (with IRR adjustable for CPI-U, as described in Section 5.2)
B = Expansion distance in miles from Transporter's Crude System to the requested receipt point for each DSU identified in the Connection Notice
C = Number of Wells per DSU identified in the Connection Notice
D = Average Crude receipts per Well in Barrels (based on Connection Barrels in the Connection Notice with Producer's Crude and Other Owner Crude Barrels to be detailed separately in such Connection Notice)
E = Payback target in Days (shall equal 1825 Days unless expressly agreed to in writing otherwise)

The Expansion Fee is in addition to any and all other applicable Crude Transportation Fees.


**In the event this Expansion Fee formula is inconsistent with any FERC requirements, the Parties agree to pursue a mutually fair and equitable solution

61