UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

Case No. 16-10704 (KG) Adv. Pro. No. 16-50998 (KG)

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

EMERALD OIL, INC., et al.,

              Debtors.

- - - - - - - - - - - - - - - - - - - - - -x

EMERALD OIL, INC.,

              Plaintiff,

          - against -

DAKOTA MIDSTREAM, LLC; DAKOTA ENERGY CONNECTION, LLC; AND

DAKOTA FLUID SOLUTIONS, LLC F/K/A MESA OIL SERVICES, LLC,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - -x

              United States Bankruptcy Court

              824 North Market Street

              Wilmington, Delaware

              August 22, 2016

              1:58 PM

B E F O R E:

HON. KEVIN GROSS

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:  BRANDON MCCARTHY

Telephonic hearing regarding scheduling of

Plaintiffs' Motion for Summary Judgement [Adv. Pro. Docket No. 6]

Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts with the Dakota Midstream Parties and (II) Granting Related Relief [Docket No. 362].

Transcribed by:  Hana Copperman

eScribers, LLC │ (973) 406-2250
operations@escribers.net │ www.escribers.net

A P P E A R A N C E S : (ALL TELEPHONIC)

KIRKLAND & ELLIS LLP

     Attorneys for the Debtors

BY:   RYAN BENNETT, ESQ.

     ANNA ROTMAN, ESQ.

     WILLIAM E. ARNAULT, ESQ.

     TRAVIS M. BAYER, ESQ.

PACHULSKI STANG ZIEHL & JONES

     Attorneys for the Debtors

BY:   LAURA DAVIS JONES, ESQ.

     JOSEPH M. MULVIHILL, ESQ.

OFFICE OF THE UNITED STATES TRUSTEE

     Attorneys for the United States Trustee

BY:   HANNAH M. MCCOLLUM, ESQ.

AKIN GUMP STRAUSS HAUER & FELD LLP

     Attorneys for the Creditors' Committee

BY:   DAVID BOTTER, ESQ.

     SARAH L. SCHULTZ, ESQ.

WHITEFORD, TAYLOR & PRESTON LLC

        Attorneys for the Creditors' Committee

BY:   CHRISTOPHER M. SAMIS, ESQ.


YOUNG CONAWAY STARGATT & TAYLOR, LLP

        Attorneys for Dakota Midstream, LLC

BY:   M. BLAKE CLEARY, ESQ.

        PATRICK JACKSON, ESQ.

        JOHN DORSEY, ESQ.

        MICHAEL S. NEIBURG, ESQ.


SHEPPARD MULLIN RICHTER & HAMPTON, LLP

        Attorneys for New Emerald Holdings

BY:   ALAN M. FELD, ESQ.

        TED A. COHEN, ESQ.


WOMBLE CARLYLE SANDRIDGE & RICE, LLP

        Attorneys for Wells Fargo Bank, N.A.

BY:   ERICKA JOHNSON, ESQ.

VINSON & ELKINS LLP

    Attorneys for Wells Fargo Bank, N.A.

BY:   KARL M. SIGWARTH, ESQ.

     REBECCA L. PETEREIT, ESQ.


RICHARDS, LAYTON & FINGER, PA

    Attorneys for Cortland Capital Market Services

BY:   ZACHARY SHAPIRO, ESQ.


WEIL, GOTSHAL & MANGES LLP

    Attorneys for Cortland Capital Market Services

BY:   JOSEPH H. SMOLINSKY, ESQ.


ALSO PRESENT:

    TIMOTHY L. REYNOLDS, Dakota Midstream, LLC

    RAHUL VAID, Cortland Capital Market Services

P R O C E E D I N G S

THE COURT:  Counsel, good afternoon.  Judge Gross is on the telephone, and this is a teleconference, of course, in the Emerald Oil matter.

I have reviewed the scheduling order proposed by the debtors, and I have reviewed Mr. Cleary's letter of even date, and I just have a couple of preliminary questions, I think, that I'd like to start off with, if I may.  And that is are the debtors intending to file an amended complaint?

MR. BENNETT:  Your Honor, Ryan Bennett of Kirkland & Ellis.  Nice to speak with you today, sir.

THE COURT:  Yes.  Mr. Bennett.  Good to hear from you.

MR. BENNETT:  Thank you.  I'm also accompanied today with my colleague and partner Anna Rotman, who you may remember from the Magnum Hunter days.

THE COURT:  Yes, I do.

MS. ROTMAN:  Hi, Judge.

THE COURT:  Good afternoon.

MS. ROTMAN:  Good afternoon.

MR. BENNETT:  So, Judge, with respect to the amended complaint, the debtors do not intend to amend their complaint at this time.

THE COURT:  Okay.

MR. BENNETT:  We believe that going forward with the counts that are in the complaint as of today is the appropriate

course, and that's the path that we're hoping to follow up.

THE COURT:  Okay.  So that answers that question.  My next question is, is it true that you just produced about 30,000 documents yesterday to Dakota Midstream?

MS. ROTMAN:  Your Honor, this is Anna Rotman from Kirkland.  Yes, that is correct.

THE COURT:  Okay.  All right.  Now I'm prepared to hear from you.

MS. ROTMAN:  Great.

MR. BENNETT:  All right.  Thank you.  Thank you, Your Honor.  So as Your Honor is aware, we did send email to you last week requesting the scheduling conference, and Mr. Cleary did file his letter brief this afternoon, which we'll address in due course, as necessary today.

As a general matter, Judge, we recognize that given some of the sequencing thus far in the case the Court's hands have been somewhat tied when it comes to evaluating and insuring that the debtors can benefit from some of the protections provided by the codes, just contract rejection that, as the case here, really help ensure the debtors long-term viability.

At the same time, Judge, given some of the events from the past couple of weeks, the Court's been requested to rule on issues surrounding the relationship between the debtors and DMS without yet adjudicating or even getting full briefing on the

key underlying legal issues as to whether the Dakota agreements contain covenants that run with the land and the issues with respect to whether the rejection of those gathering agreements is a reasonable exercise of our business judgment.

And the goal today is really to address those sequencing issues with an appropriate schedule.  And we think that the Court and parties-in-interest will be benefitted by that.

While we filed our motions back on June 3rd, we temporarily withheld from requesting a schedule at that time, in an attempt to avoid incurring a bunch of unnecessary discovery costs.  Instead, we tried to focus on reaching a market deal with DMS, and we spent multiple weeks attempting to engage them, but those attempts failed, Judge.

Rule 408 prohibits us from getting into the details, but where we left things last week, DMS summarily rejected our last settlement offer and refused to provide a counter or even to engage further.

So in the meantime, and despite the TRO expiring last week -- I understand there's some dispute with Mr. Cleary on that issue, but let's just say that the debtors believe it expired, so -- but in the meantime, despite it expiring, the debtors continue to use DMS while our motions are pending.  So we have not gone back or attempted to go back to trucking, Judge.

EMERALD OIL, ET AL.; EMERALD OIL V. DAKOTA MIDSTREAM, ET AL. 9

But we're now to the point where the Court's decisions and the schedule with respect to these, our pending motions, are more important than ever.

Per my email from last week, and as a result of the TRO and our agreed admin order that proceeded it, the debtors are going to be out of money the week of September 30.  And the debtors liquidity profile, though, in this case, Judge, while thin, does provide path, as Ms. Rotman will address shortly, and that path provides us with the greatest likelihood of sustaining the going concern business, adjudicating the disputes, effecting a sale process, and avoiding a liquidity wall.

But we must adhere to it, and that's why we're in front of Your Honor seeking the schedule today versus in two or three weeks, when it would be, quite frankly, too late.

Mr. Cleary's client has the luxury of focusing on its own interests, and it has shown in its letter today not needing to even propose a schedule to you, Judge.  The debtors have no such luxury.  We are duty bound to preserve and maximize value. While our options are limited today, we have a path, which Ms. Rotman will propose, to get us to a ruling and a successful sale, versus the alternative, which is likely oblivion.

Judge, to underscore also the importance of moving ahead here, the debtors have reached settlements with all of our other key parties in these Chapter 11 cases.  The pre and

post-petition lenders, the unsecured creditors' committee, management; but each and every one of those settlements and arrangements is predicated on either (a) reaching a commercial settlement with DMS, which factors in and considers the true strength of the debtors' arguments, which, as I noted, we haven't been able to reach, or (b) obtaining rulings from Your Honor on the legal issues before you.

Since our discussions have reached an impasse -- our discussions with DMS have reached an impasse -- we now need Your Honor's help so we can set that schedule and move forward and preserve value.

So I'm going to hand the podium to Ms. Rotman to walk Your Honor through what we've done to date and the schedule that we propose going forward and the reasons behind it.

THE COURT:  All right.  Thank you, Mr. Bennett.

MS. ROTMAN:  Good afternoon, Your Honor.

THE COURT:  Good afternoon, Ms. Rotman.

MS. ROTMAN:  Thank you.  So my part of the discussion is to explain to you why we should have a hearing on September 14th.  And, of course, it's for all of the reasons that Mr. Bennett just laid out but also to highlight why there's no reason not to.

So, as Mr. Bennett explained, as part of the consensus building process there has been some delay in moving forward with the complaint that we had originally filed back on the 3rd

of June in our motion for summary judgment, which was filed on the 17th of June.  But we've been working very diligently, especially with respect to the discovery requests.

To be clear, Your Honor, there are no document requests issued in the context of the adversary proceeding. And, of course, the summary judgment motion, which is set for September 14th, arises in that adversary proceeding, which presents a legal issue of contract interpretation.

I know that our adversaries today, in their filings, set out some principles of North Dakota law, and what they set out as principles of North Dakota law I would, then, just highlight for Your Honor that under North Dakota law, which, I think, for better or for worse you may become familiar with, construction of written contracts to determine your legal effect is a pure question of the law.  That's a case called Red River Human Services Foundation v. State, out of the North Dakota Supreme Court in 1991.  Of course that is the law across all jurisdictions, so just to make sure you're clear, North Dakota law doesn't deviate from that.

Now, the document requests that we have that were issued in the context of the bankruptcy case, and so they relate to the rejection motion.  The substance events do relate to the rejection motion and the sales process, which do involve factual issues.

So our discovery process has been (1) and you see in

the letter that you received from our adversary they don't, sort of, complain about the process.  Now it appears they're complaining a little bit about the results.  But in terms of the process, we gave them all the custodians that they requested.  We worked with them on search terms and provided them everything they asked for.

So, yes, there's a lot of documents, but that is because DMS asked for broad search terms.  A few that they asked for -- which added significantly to the volume -- for example, they asked that we add the word "commission".  That pulled in at least 24,000 documents.  They asked that we add the word "resource" as a search term.  This pulled in another 13,000 documents.

And the fact is we've met and conferred multiple times, but in the interest of moving forward we did provide them what they asked for.  We hired twenty-eight contract lawyers at tens of thousands of dollars to get the documents to them.  And we've done it as quickly as possible, given what they insisted on us providing to them.

Let's be clear, though, that more time -- I mean, we read the letter that came in this afternoon -- particularly with respect to the adversary proceeding, more time doesn't do anything for us.  The issue is a pure legal issue.  We seek summary judgment as a matter of law.  And if we can get a ruling from the Court before the liquidity shortfall that Mr.

Bennett explained, we should be able to move forward.

So I believe this morning, Your Honor, we filed with the Court a proposed schedule that would ensure that the parties get to the September 14th hearing -- it's twenty-three days from today, so more than three weeks -- in an orderly fashion.  And we haven't received any particular responses from DMS's lawyers when we uploaded the schedule to them.  So I don't have -- I don't have an opportunity to say where we, whatever, could have comprised, and we certainly are open to discussing particular dates.

The September 14th date is key for the reasons Mr. Bennett explained and also to ensure that the Court has time to be able to adjudicate this important issue.

THE COURT:  By what date would you need a decision from the Court?  I know the sale hearing is what?  The sale hearing is the 30th?

UNIDENTIFIED SPEAKER:  Right.

MS. ROTMAN:  Correct.  So I would say anytime -- really, anytime prior to the 30th would be ideal.  The more time the better.  But that's not for us to put that type of pressure on you.  But yes, by the end of the month.

THE COURT:  Okay.  And the decision will not affect the auction?

MS. ROTMAN:  No.  I don't believe so.

THE COURT:  Okay.

MR. BENNETT:  And, Judge, and if it -- this is Ryan Bennett.  If it does, we can restructure, put off the timing of the auction to accommodate when Your Honor could rule.  But I think that getting the ruling is the key dispositive factor that we're pushing for.  That we need.

THE COURT:  Okay.  Thank you, Mr. Bennett.

MR. BOTTER:  Your Honor, it's David Botter from Akin Gump on behalf of the creditors' committee.  I wonder if I could be heard very briefly before Your Honor goes to Mr. Cleary and DMS?

THE COURT:  Yes.  Certainly, Mr. Botter.

MR. BOTTER:  Thank you, Your Honor, and good afternoon.

THE COURT:  Good afternoon.

MR. BOTTER:  And nice to speak to you on the phone again.

THE COURT:  Yes, sir.

MR. BOTTER:  And state for the record, David Botter, Akin Gump Strauss Hauer & Feld, on behalf of the committee.

Your Honor, I would just second what the Kirkland lawyers have said today.  I think Your Honor knows that we started this case in a fairly rocky way.  We've made a lot of progress.  There's been a lot of hard work that's gone into that progress, and a lot of agreements that have been reached that will hopefully get us to a successful conclusion of these

cases.  And successful where we, frankly, thought it might very well not be successful.

It is important, obviously, that we continue to move forward.  I think that everyone on this phone has moved mountains within a twenty-three day period.  I'm certainly not asking Your Honor to necessarily move mountains, but we all know that we've worked hard and gone through tremendous discovery, just issued and worked hard to get to a hearing in a lot shorter time than twenty-three days.

We finally can see, hopefully, the end of these cases. And, again, it's our hope that it will be -- that all of our hard work will come to fruition and that it will be a successful case where unsecured creditors actually will get the benefit of the deal that they cut.

A lot of this is contingent, though, on the conclusion of this dispute, and we would respectfully ask Your Honor to streamline this process as best as we can.  We are obviously happy to help in any way that we can, whether it be getting between the parties to get to a resolution or helping in the litigation itself, but we do see the necessity here to get this done and get it done quickly.

With that, Your Honor, I would turn it over to anyone else who would like to speak.

THE COURT:  Would anyone like --

MR. SMOLINSKY:  Your Honor, can you hear me?

THE COURT:  Ye --

MR. SMOLINSKY:  Your Honor, can you hear me?

THE COURT:  Yes.

MR. SMOLINSKY:  Your Honor, this is Joe Smolinsky of Weil, Gotshal & Manges on behalf of Cortland as the lender's agent.

THE COURT:  Yes, Mr. Smolinsky.  It's good to hear from you.

MR. SMOLINSKY:  Same here, Your Honor.  I just wanted to note that with respect to your question about whether or not it affects the sale process to have this matter adjudicated quickly, with full respect for Your Honor's time and need to consider these important matters, it very much, in my mind, would impact the outcome of the sale.

We are obviously trying to get as robust an auction as possible.  The fact that the stalking horse bid is contingent upon the outcome of the litigation, and other bids may be similarly concerned about how the currency in that contract affects the value of this company, it is important, I think, that to the extent we could have the matters adjudicated and resolved before the auction, I think that that could be a very significant benefit to the estate.

THE COURT:  All right. Thank you, Mr. Smolinsky.

That reminds me of a question I had for Mr. Bennett, and that is when you extended the bidding deadline, had you

received any bids?

MR. BENNETT:  Not yet, Your Honor.

THE COURT:  Okay.  All right.  Thank you.

MR. BENNETT:  Yes.

THE COURT:  Anyone else on the, if you will, the debtors' side of this argument or this hearing

All right.  I think, then, it is now time to hear from my friends at Young Conaway.

MR. CLEARY:  Good afternoon, Your Honor.  Blake Cleary here.  I'm joined by John Dorsey in the conference room with Mike Neiburg.  Patrick Jackson is on vacation this week and is also on the phone.

I don't believe we have Barnet Skelton, who we're working with on this matter, as he did not -- on vacation in Europe this week, and I don't believe he could join us.

But we are prepared to go forward.  We understand that today, it's on -- that's been -- that we've -- that's been scheduled to discuss status of the adversary and the motion to reject.  And I guess I wanted to start, really, at the outset --

THE COURT:  And if I may just interrupt you, Mr. Cleary, and as well a scheduling order.

MR. CLEARY:  A scheduling order?

THE COURT:  Yes.

MR. CLEARY:  Yes.  I wanted to, kind of, start at the

outset with respect to Mr. Bennett's email to the Court and address the status of the negotiations, because, I guess, I don't recall, and I will confess I was out late last week, but I don't recall that we did receive a response that was quite characterized the way that Mr. Bennet did today.  I think my impression was that Dakota had outlined parameters under which the parties could reach an agreement.  And I guess I will leave it at that.  I won't go into the details.  But I didn't -- I didn't understand the state of play to be the state of play that Mr. Bennett has represented to the Court.  But if that is the state of play, I don't believe it's for lack of good faith on Dakota's part, or, for that matter, the debtors' part.

We've tried to, in good faith, negotiate, come to some resolution that would avoid the litigation.

If that's where we are, that's where we are, but we're still prepared to talk.  We're still prepared to negotiate. Again, under the confines of what we had outlined in our response.  And for that matter, we did receive a response, a proposal, last weekend.  Not this weekend, last weekend.  And before we were able to respond to that the letter came to the Court, and so I don't want Your Honor to walk away with the impression that we weren't timely responding to proposals as they went back and forth, because that's certainly not the case.

THE COURT:  All right. And I don't want to get into

settlement discussions necessarily, but Mr. Bennett, I think, assumes that there are no further discussions to be had.  And what you're suggesting to me is that may not be the case.

MR. CLEARY:  Well, I guess what I'm suggesting, Your Honor, is that we have outlined -- we've outlined certain parameters under which we think we can reach an agreement with the debtors.  And if the debtors are not prepared to work within the confines of those parameters, then I think that's probably right.  We're not going to be able to reach an agreement.

THE COURT:  Okay.

MR. BENNETT:  Judge, Ryan Bennett.  I mean, just to respond.  I mean, without dipping any further into the 408 pond, those parameters are not parameters that the debtor is not prepared to respond to.  They are parameters that the debtor can simply not function under long term.  And we cannot -- and so it creates a universe where -- that doesn't change our current position, right, when we're suffering under these agreements, and they're -- we're not being able to preserve the business long-term through a consensual negotiation, and hence we have to proceed, unfortunately, toward the litigation route.  But at least we have that for now.

THE COURT:  Okay.  That's fair enough.

MR. CLEARY:  Your Honor, with respect to the TRO, we

read Your Honor's order.  We looked at the transcript.  And we believe that we addressed that issue in the papers and that it's in place.  It stays in place under Rule 65(b)(2).  It was perfectly acceptable under the Rules for Your Honor to enter that order and not have it expire after fourteen days.  It was not an ex parte request, pursuant to the Rules, and so we think that's in place.

Your Honor, it brings us to the larger issue of the scheduling and the request for a scheduling order.  We did immediately respond to basically the timelines that the debtors have proposed.  And I'll let Mr. Dorsey get into the nitty-gritty details of why the timeline doesn't work.

We'd hoped to have had a meet and confer with the debtors, rather than having this before the Court, but I think we need to evaluate the prejudice to Dakota versus the benefit to the estate.

I know the bid deadline has been extended.  I don't know where that -- the status, other than to what Mr. Bennett has reflected today on the record.  We did make a request, got no response on that.  But we certainly will know more -- the debtors will know and the parties will know more at the end of the week, when the bid deadline occurs.

THE COURT:  Right.

MR. CLEARY:  And so that could help guide the parties whether this is an emergency or not.  And I appreciate that the

debtors want to create some urgency here.  I think it benefits the negotiations, and I think it benefits in getting everybody focused and moving.  But, as we've said from the very, very beginning, this is a matter of due process.  This is Dakota's -- Dakota does have the benefit of focusing solely on this matter with respect to their issues, because it's their sole customer.  It's their sole source of revenue.  And we're not trying to gain a tactical advantage.  We simply have said from the very outset that we want to protect our due diligence, our due process rights -- sorry, there's a little feedback on the phone -- protect our due process rights, and to do this in a manner where we have a full opportunity to present our case to Your Honor, because they are novel issues of law, and I think it's important to put those issues before the Court.

So with respect to the timing and the prejudice to the debtors, certainly we'll know more at the end of the week, but given the status of where things are we question whether there really is this impediment or requirement that things be pushed forward.  Obviously we've addressed the issues on the timing of the discovery.  That was one of your questions.  And I don't think that it's unfair for us to ask Your Honor to give us time to review the documents that have been provided before we start going to each one of these events as listed in the scheduling order and responding and checking off those boxes and filling in dates.

So what my letter requested was that we come back before Your Honor on a status conference. And we said on the 14th, but certainly after we've had -- given an opportunity to look at the discovery, meet and confer with the debtors to propose some dates.

I guess I'll stop there and let Mr. Dorsey, kind of, address the particulars with respect to the proposed scheduling and the infirmities with respect to it.

THE COURT: Mr. Cleary, let me ask you this question, Mr. Cleary, and if you want Mr. Dorsey can answer it instead, but the debtors have said they run out of money at the end of September.

MR. CLEARY: You know --

THE COURT: What do we do about that?

MR. CLEARY: You know, that's a good question, Your Honor. And I simply don't know, and I don't think the Court -- it's fair to actually ask the Court to make a ruling with respect to that with zero evidence in the record on how that is the case.

I mean, what we do know is that the lenders, who are the current lenders, bought into this situation, meaning they bought their debt from the Wells Fargo and other parties during the bankruptcy case. So I think they came in eyes wide open with the funding needs. I think they came in wide open with respect to the timing and the need to have a full and fair

hearing.

And so what was really going on is you've got this artificially created deadlines, when it appears to us to be really a two-party dispute between the lenders who bought in and Dakota in a lot of ways.

THE COURT:  Okay.

MR. CLEARY:  But I don't know.  We'd have to -- they'd have to bring a motion.  We'd have to be able to review it, respond to it.  We've looked at the monthly operating reports. You know, we may have a different view.

MR. SMOLINSKY:  Your Honor, this is Joe Smolinsky again.  Just to address that point.

THE COURT:  Yes.

MR. SMOLINSKY:  This is not an artificially created situation between the lenders and DMS.  We did go in with our eyes wide open, but we went in with our eyes wide open understanding that when this comes down to a legal determination as to the relative merits the debtors are fully able to, under the law, reject these agreements.  So this is the terms upon which we understood and we got involved in this situation.

The lenders are extremely disappointed with where things currently stand.  We thought we would have an agreement with DMS that would work for both parties.  I understand Mr. Cleary continues to say that its survival is at stake.  We're

prepared to support an agreement that would certainly ensure DMS's long-term survival just like ours.

The sale has not been concluded in accordance with the schedule that the DIP lenders required as part of the financing here. This is not artificially created. This is actually a schedule that was subject to court order, which required that the sale hearing would be completed by July. That hasn't happened. We've given the estate free opportunity in order to try to resolve these issues consensually.

The company, when we sat before Your Honor and we talked about the segregation of funds or the minimum buying commitment, the company at that point told us that they had twelve million dollars in cash.

We were notified a couple of weeks ago, or a week ago, that, in fact, there is no money left at the end of September. This is not a game that the lenders are playing. We have a limited runway. We have good legal arguments on our side. And we think that the estate should have every opportunity to use that runway to get to the answer and to move forward with the reorganization that everyone else is in support of.

MR. BOTTER: Your Honor, it's David Botter. Just to chime in. You know, I take a little bit of offense at Mr. Cleary's being cavalier that this is a two-party dispute. It has major implications for everyone in this case, and I think Mr. Smolinsky just made that clear as to how major it may have

implications for alternate unsecured creditor recovery, because to the extent that we don't move forward, and to the extent that the debtors are not able to reject the contract which is smothering them at this point, it may endanger everybody's recoveries, including the secured lenders.

THE COURT:  Okay.  Thank you, gentlemen.  Now Mr. Dorsey.

MR. DORSEY:  Yes, Your Honor.  Thank you.  Just to address the discovery issues, Your Honor, and how we ended up in this position where we now have 30,000 documents produced just a little over 3 weeks before a hearing is supposed to take place.  And I think Your Honor is familiar with some of this already, but I'm going to repeat it anyway, just to make sure we have it on the record.

Our document requests were served back on June 29. The debtors took no action whatsoever to respond to those discovery requests until after the August 1st hearing, a telephonic hearing with Your Honor, in which Your Honor said look, I don't have it in front of me.  There's no way you can tell.  But in my view you better start producing documents, basically.  And it was only then that the debtors finally started to engage with us.

It's now fifty-three days since the time we filed -- served our document request, and we just now are getting their documents.

When we had the meet and confers, soon after the August 1st hearing with Your Honor, we talked about the search terms. We asked the debtor to give us the hit report once they filed those search terms, so that we could see if there were problems with the search terms that we were requesting. They declined and said no, we're just going to give you everything you've asked for.

Clearly that was intended to prejudice Dakota, because I think they knew already that there was going to be a large number of documents that came back from those hits, but they refused to let us know what they were. Ms. Rotman's comments on the phone today, where she talks about certain terms and how many documents were returned because of that, that's the first we've heard of it. First we have heard of it. And this could have all been avoided. We asked them on Sunday, when they produced these 30,000 documents, to give us the hit report, so we could see. Maybe we can narrow this down. Never responded to that request.

This is all part of the game, Your Honor, to jam Dakota, to make it difficult for -- as difficult as possible for Dakota to defend its position, to present its evidence in a clear fashion. They continually argue this -- make this argument that this is all a legal argument. Summary judgment is a legal argument. We disagree with that, number one, because one, we think the intent of the parties is going to be

relevant, and we think what happens in this particular industry is going to be relevant.  And Your Honor is going to want to hear that testimony and see those documents to understand the context in which the parties entered into this agreement and whether or not those covenants run with the land or not.

Plus there's other issues involving -- that were laid out in our letter with -- that I won't get into any further detail on that at this point.

The other thing, then, Your Honor, they have scheduled the motion, the rejection motion, for the same day.  There are business judgment issues.  The debtors, on August 1st during the hearing, indicated that they were going to immediately produce those documents relating to at least that portion of it.  It took another three weeks before they produced anything.  And we still -- actually, we haven't had time to even look at what they produced to understand what's in there and understand whether they actually responded to what we requested.

So there's still a lot of work to be done here, Your Honor.  The current schedule of September 14th simply is not going to give Dakota enough time to be able to review these documents, identify who witnesses are going to be, take depositions, expert reports and expert depositions.  It's just not feasible to me that the debtors can take fifty-three days to respond to document requests, and then expect us to identify our fact witnesses and experts within two days after they

produced the documents.  It's just unfathomable to me, Your Honor.

And for those reasons, Your Honor, we would request that the Court continue the hearing until sometime in mid to late October, to give us an opportunity to be able to review the documents and proceed in a coherent fashion.

And, as Mr. Cleary pointed out, this is our only customer.  If this contract is rejected, there are serious, serious implications for Dakota.  And we can't just -- we just can't focus solely on the debtor, because there are other parties here, particularly Dakota, who are at serious risk.

THE COURT:  Help me out for one minute, Mr. Dorsey. Now, we have a motion for summary judgment, and we have the rejection motion.  I understand that the rejection motion may involve witnesses.

MR. DORSEY:  Yes, Your Honor.

THE COURT:  But the motion for summary judgment does not.  Is that right?

MR. DORSEY:  No, I believe it does, Your Honor, because we want to put on evidence to show what the intent of the parties was when they entered into this agreement, to show that everyone understood going into this agreement that the debtors intended to burden their working interests with Dakota's rights, property rights.  Real property rights.  And that's the entire issue in connection with the summary judgment

motion.

THE COURT:  Okay.  All right.  So you're suggesting moving the hearing to mid to late October?

MR. DORSEY:  Yes, Your Honor.  That's still in what I would consider optimal for me in terms of trying to get the work done.  But we understand we need to move things along, and so we're trying to be as reasonable as possible.

THE COURT:  All right.

MS. ROTMAN:  Your Honor, this is Anna Rotman from Kirkland.  May I address a few of the points?

THE COURT:  Yes, you may.

MS. ROTMAN:  Thank you.  So I just wanted to first address the idea of due process.  And I know this is a bit tit for tat on base, Your Honor, but if you'll bear with me.  We filed a complaint on June 3rd.  They haven't answered that complaint.  There's no answer.  They haven't responded to our MSJ, which is understandable because it still is within their time.  But they haven't any this -- in the adversary proceeding.  So at the end, we did provide them with access to our data room, which has all of our projections in it, on August 1st.  And so, to the extent that that comes in, in the business judgment analysis, they do have that, and they have had that for quite some time.

We, of course, have a disagreement with them as to whether or not the MSJ requires us to involve evidence.  I will

point out already on the record are the agreements themselves. The agreements all have the typical language that you would see, the merger clause that sets forth that the agreements themselves constitute the entire agreement and understanding between the parties, and "supersedes, renders null and voice and of no further force and effect any prior proposal, understanding, negotiations or agreements between the parties relating to the subject matter hereof".  That's language that you can plainly see, and it's found in these contracts.

Now, Your Honor, I want to make clear that, with respect to the documents, we have produced the documents to them.  There are more documents coming, because last Wednesday they asked us to extend our dates -- the date range for the production, so they're going to get additional documents tomorrow.  I just wanted to explain to you and make sure you are aware of that.  But again, none of this is in the context of the adversary proceeding.  It was in the context of the rejection motion.

The final thing I have to say is that with respect to the TRO, and this is a bit of a nit point, but to the extent that we are reading of the rule, Federal Rule of Civil Procedure 65(b)(2) is that this TRO would automatically expire at the end of fourteen days.  But to the extent that that's not the case, we then find ourselves in a situation where we have a TRO out there without any bond.  And as Your Honor may recall,

EMERALD OIL, ET AL.; EMERALD OIL V. DAKOTA MIDSTREAM, ET AL.31

in a TRO, a court must require security in the amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

We didn't raise this before, Your Honor, because we are moving with alacrity towards the September 14th deadline. I think you can understand, from the arguments that have been made today by the number of is that even though -- the damage of us continuing to operate under this contract are -- it's severe.  And so I just wanted to -- that's just a mishmash of different things that respond to Mr. Dorsey, but I wanted to make sure that you understand our position on them.

MR. DORSEY:  Your Honor, if I may respond?

THE COURT:  Yes, Mr. Dorsey, please.

MR. DORSEY:  Yes.  First of all, Your Honor, the fact that the complaint hasn't been answered, that was at the debtors' request.

THE COURT:  That's right, and I think that -- yes.

MR. DORSEY:  And the reason the discovery was not filed in connection with the adversary is because we didn't answer the complaint.  So there's no complaint joined, there's no action joined until we answer that complaint.  The discovery that we did serve in the main case covers issues relating to the adversary proceeding as well as the motion for rejection. So that's not an issue at this point, Your Honor.

The fact that we haven't responded to the summary judgment motion, there's been no schedule in place.  Again, parties were negotiating when that response would be filed, and our time hasn't come, under the rules, to file a response, in any event.

And the issue about the TRO, Your Honor, that is a completely new issue.  If they believe that the Court has to impose upon, I think they should have to file something to that effect and we'll respond in due course.

THE COURT:  And I don't understand them to be arguing with the bond as long as the hearing is not long delayed.

MS. ROTMAN:  Yes, that's correct, Your Honor.  That's why we haven't raised it yet.

MR. SMOLINSKY:  Yeah, Your Honor.  Joe Smolinsky again.

I think the suggestion that the summary judgment hearing be put off till October really puts this whole thing in a nutshell and indicates to the lenders, as well as should indicate to the Court, that their goal here is to drag this out and delay.  By doing discovery and taking evidence in connection with the summary judgment motion, you're really arguing that they want to try the case as part of the summary judgment.  That's not what summary judgment is for.  We are -- you know, we're confident that we could put on our case in connection with summary judgment, and they could raise

whatever facts they want in declarations.  But we really need to move forward, and it really just shows that they're being the aggressor here, and we're just trying to get to the right legal outcome.

THE COURT:  All right.  Well, the case has been pending for some time.  The parties have been negotiating.  Those negotiations apparently have not been successful.  And we're left now with a need for a result, and the Court recognizes that need.  At the same time, the Court recognizes that the discovery is not quite completed, or the document discovery has not yet been completed and will be completed in a day or so.

Let me ask a question.  If I schedule the hearing, and it's not a lot of time, but if I moved it to September 23rd, which is about nine days later, which would then give -- it'll be cutting on my time to decide the case; I recognize that, and I'll have to work harder to get a result out.  But if I continue it to September 23rd, it would give the parties a little more time, not as much, I know, as Dakota wants; maybe more than the debtors and associated parties want.

But react to that, if you will, Mr. Bennett and others.  First Mr. Bennett.  Or Ms. Rotman; either one.

MR. BENNETT:  Thank you, Your Honor.  Ryan Bennett.

I do see that as a possible path, and I appreciate Your Honor, kind of, taking the pressure timing on the Court to

get things done before that liquidity wall.

I do want to -- and ordinarily would if we were in court -- would coordinate with the other folks whose interests are up in the air, while we're running up against this liquidity wall that will be upon us shortly after that proposed hearing date.  But from my vantage point, I think that that should work, provided it's okay with them.

THE COURT:  All right.  And by the way, I am prepared to take -- you know, if we recess here, if you want an opportunity to talk among yourselves.  I'll hear, of course, from Dakota, but --

MR. BOTTER:  Your Honor, just -- it's David Botter for the committee.

I would just note, on my calendar, the DIP termination date is September 23rd.  So obviously, we'd need to get past that as well, Your Honor.

THE COURT:  Okay.  And I know that then that brings in Mr. Smolinsky.

MR. SMOLINSKY:  I don't have an answer on that; I'd have to confer with my clients.  One thought is perhaps to have the summary judgment motion on for the 14th and evaluate whether or not there needs to be evidence.  But if we could put in our case for the 14th, the real discovery on business judgment could be a week later.  That's one possibility, as opposed to moving the whole thing to the 23rd, because I just

fear that we're going to get to the end of September and we're going to have payrolls that need to be made, and the company is not going to have the cash flow to honor its obligations.

THE COURT:  Okay.

MR. FELD:  Your Honor, this is Alan Feld of Sheppard Mullin.  Mr. Cohen and me, we represent New Emerald Holdings, the stalking horse.

And I haven't said anything up until now, but because of the dates being discussed and everything, and Your Honor did ask a question about how this all may affect the auction.  We do believe, because our stalking-horse bid, our asset purchase agreement, has very explicit and express conditions relating to the outcome of both of these matters that Your Honor is considering, that Mr. Smolinsky's suggestion, of keeping at least the summary judgment hearing on the 14th as scheduled, would at least allow the possibility of the auction to remain on track.

We do think there'll be an extremely material effect on the auction, based on Your Honor's rulings.  And without the benefit of at least a ruling on one of the motions, we believe there will not be a robust auction and there'll be difficulty in proceeding with the auction.  We think potentially bifurcating the hearings and keeping at least one of them on track, and the possibility of keeping the auction on schedule, will help -- will be a help to all parties.

THE COURT:  All right.

MR. CLEARY:  Your Honor, it's Blake Cleary on behalf of Dakota.

THE COURT:  Yes, please.

MR. CLEARY:  You know, we appreciated the fact that the Court would try to accommodate all parties, and so when Mr. Dorsey suggested the middle of October, we had had a dialogue amongst ourselves to not ask for too much but to ask for just the amount of time that we thought we could reasonably get to under a truncated time line that the debtors needed.  I think what I'm hearing is that there's this overhang of the sale and the auction.  Well, we're going to know on Friday whether that's real or that's fake because the bid deadline is Friday.

Number two, the liquidity crisis that -- and I don't doubt what they said, but the way I understand that the crisis has happened, or what's been told to me, is that it's basically a 500,000-dollar issue.  It's one additional or two additional escrows of the administrative expense claim which the parties, again, with eyes wide open, agreed to, to resolve the admin claim motion.

So I'm a bit shocked, I'm a bit perplexed that it's unreasonable for us to have a hearing in the middle of October.

THE COURT:  Well, that is what the debtors and related parties in distress, as well as the stalking horse, whose bid is dependent upon the Court's ruling.

MR. CLEARY:  Correct.  But it doesn't have to happen by the time line that's being proposed.

THE COURT:  All right.

MR. CLEARY:  And then certainly, you know, there are a lot of moving pieces; I appreciate all of that.  Again, we tried, and we're continuing to try to get ahead of this so that all parties can have their day in court and Your Honor can have everything put forward so you can make a ruling.  This is complex.  This is novel.  This is going to disrupt an industry, perhaps.  So this is important litigation.  This should not --

THE COURT:  I would have to --

MR. CLEARY:  It should not be done with great haste because when you do things with great haste there's mistakes made.  I don't want to make any mistakes, Your Honor.

THE COURT:  Well, I'm going to continue both matters to September 23rd.  That is, I think, about as much time as the parties can afford and the Court can afford to make a decision by the end of September.  It puts a lot of pressure on the parties.  I recognize the pressure on the Court.  But I think that's where the result is.  I can't see bifurcating matters.  And I know that that will make the 23rd a busy day, and we'll start at 9:30.  But I think that's the best that I can do and the best that the Court can do for all concerned.

And with that in mind, I don't know if the parties want to discuss the scheduling order, or if the parties would

like the Court to simply take the scheduling order that was submitted and make changes.

MR. BENNETT:  Your Honor, I'm happy to have Your Honor set the scheduling order so that we can get this done and don't have to come back again.

THE COURT:  Do you think --

MS. ROTMAN:  Your Honor, this --

THE COURT:  Yes.  Yes, Ms. Rotman?

MS. ROTMAN:  I agree.  That would be fine.

THE COURT:  Okay.  All right.  Then that's what I'm going to do.  We'll have a hearing on the 23rd beginning at 9:30, and we'll go as late as we need to on that particular day and get finished.

MR. DORSEY:  Thank you, Your Honor.

THE COURT:  All right, everyone, I thank you

MR. BENNETT:  Thank you, Judge.

THE COURT:  And I will revise the scheduling order.

MR. BOTTER:  Thank you, Your Honor.

MS. ROTMAN:  Thanks, Your Honor.

THE COURT:  All right, everyone; good day to you.

IN UNISON:  Thank you, Your Honor.

(Whereupon these proceedings were concluded at 2:47 PM)

C E R T I F I C A T I O N

I, Hana Copperman, certify that the foregoing transcript is a true and accurate record of the proceedings.

August 26, 2016

_____          _____

HANA COPPERMAN                             DATE

AAERT Certified Electronic Transcriber CET**D 487

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

(973)406-2250

operations@escribers.net

Case 16-50998-KG    Doc 15    Filed 08/26/16    Page 40 of 48

EMERALD OIL, INC., et al.
Case No. 16-10704(KG)                                                            August 22, 2016

## A

**able (11)**
10:6;13:1,13;
18:20;19:9,19;23:8,
19;25:3;27:20;28:5
**acceptable (1)**
20:4
**access (1)**
29:19
**accommodate (2)**
14:3;36:6
**accompanied (1)**
6:13
**accordance (1)**
24:3
**across (1)**
11:17
**action (2)**
25:16;31:22
**actually (5)**
15:13;22:17;24:5;
27:15,17
**add (2)**
12:10,11
**added (1)**
12:9
**additional (3)**
30:14;36:17,17
**address (9)**
7:13;8:5;9:8;18:2;
22:7;23:12;25:9;
29:10,13
**addressed (2)**
20:2;21:19
**adhere (1)**
9:13
**adjudicate (1)**
13:13
**adjudicated (2)**
16:11,20
**adjudicating (2)**
7:25;9:10
**admin (2)**
9:5;36:19
**administrative (1)**
36:18
**advantage (1)**
21:8
**adversaries (1)**
11:9
**adversary (9)**
11:5,7;12:1,22;
17:18;29:18;30:17;
31:20,24
**affect (2)**
13:22;35:10
**affects (2)**
16:11,19
**afford (2)**
37:17,17
**afternoon (10)**

6:2,18,19;7:13;
10:16,17;12:21;
14:13,14;17:9
**again (10)**
14:16;15:11;
18:17;23:12;30:16;
32:2,15;36:19;37:5;
38:5
**against (1)**
34:4
**agent (1)**
16:6
**aggressor (1)**
33:3
**ago (2)**
24:14,14
**agree (1)**
38:9
**agreed (2)**
9:5;36:19
**agreement (10)**
18:7;19:6,10;
23:23;24:1;27:4;
28:21,22;30:4;35:12
**agreements (9)**
8:1,3;14:24;19:19;
23:19;30:1,2,3,7
**ahead (2)**
9:24;37:6
**air (1)**
34:4
**Akin (2)**
14:7,19
**alacrity (1)**
31:6
**ALAN (2)**
4:17;35:5
**allow (1)**
35:16
**along (1)**
29:6
**alternate (1)**
25:1
**alternative (1)**
9:22
**amend (1)**
6:21
**amended (2)**
6:9,20
**among (1)**
34:10
**amongst (1)**
36:8
**amount (2)**
31:1;36:9
**analysis (1)**
29:22
**Anna (3)**
6:14;7:5;29:9
**answered (2)**
29:15;31:16
**apparently (1)**
33:7

**appears (2)**
12:2;23:3
**appreciate (3)**
20:25;33:24;37:5
**appreciated (1)**
36:5
**appropriate (2)**
6:25;8:6
**argue (1)**
26:22
**arguing (2)**
32:10,22
**argument (4)**
17:6;26:23,23,24
**arguments (3)**
10:5;24:17;31:7
**arises (1)**
11:7
**arrangements (1)**
10:3
**artificially (3)**
23:3,14;24:5
**asset (1)**
35:11
**associated (1)**
33:20
**assumes (1)**
19:2
**attempt (1)**
8:11
**attempted (1)**
8:24
**attempting (1)**
8:13
**attempts (1)**
8:14
**Attorneys (7)**
4:3,8,16,22;5:3,9,
14
**auction (11)**
13:23;14:3;16:15,
21;35:10,16,19,21,
22,24;36:12
**August (4)**
25:17;26:2;27:11;
29:21
**automatically (1)**
30:22
**avoid (2)**
8:11;18:14
**avoided (1)**
26:15
**avoiding (1)**
9:11
**aware (2)**
7:11;30:16
**away (1)**
18:21

## B

**back (9)**
8:9,24,24;10:25;

18:23;22:1;25:15;
26:10;38:5
**Bank (2)**
4:22;5:3
**bankruptcy (2)**
11:21;22:23
**Barnet (1)**
17:13
**base (1)**
29:14
**based (1)**
35:19
**basically (3)**
20:10;25:21;36:16
**bear (1)**
29:14
**become (1)**
11:13
**beginning (2)**
21:4;38:11
**behalf (4)**
14:8,19;16:5;36:2
**behind (1)**
10:14
**benefit (6)**
7:18;15:14;16:22;
20:15;21:5;35:20
**benefits (2)**
21:1,2
**benefitted (1)**
8:7
**Bennet (1)**
18:5
**BENNETT (29)**
6:10,10,12,13,20,
24;7:10;10:15,21,23;
13:1,12;14:1,2,6;
16:24;17:2,4;18:10;
19:1,12,12;20:18;
33:21,22,23,23;38:3,
16
**Bennett's (1)**
18:1
**best (3)**
15:17;37:22,23
**better (3)**
11:13;13:20;25:20
**bid (6)**
16:16;20:17,22;
35:11;36:13,24
**bidding (1)**
16:25
**bids (2)**
16:17;17:1
**bifurcating (2)**
35:23;37:20
**bit (6)**
12:3;24:22;29:13;
30:20;36:21,21
**BLAKE (3)**
4:9;17:9;36:2
**bond (2)**
30:25;32:11

**both (3)**
23:24;35:13;37:15
**BOTTER (12)**
14:7,7,11,12,15,
18,18;24:21,21;
34:12,12;38:18
**bought (3)**
22:21,22;23:4
**bound (1)**
9:19
**boxes (1)**
21:24
**brief (1)**
7:13
**briefing (1)**
7:25
**briefly (1)**
14:9
**bring (1)**
23:8
**brings (2)**
20:8;34:17
**broad (1)**
12:8
**building (1)**
10:24
**bunch (1)**
8:11
**burden (1)**
28:23
**business (6)**
8:4;9:10;19:20;
27:11;29:22;34:23
**busy (1)**
37:21
**buying (1)**
24:11

## C

**calendar (1)**
34:14
**called (1)**
11:15
**came (5)**
12:21;18:20;
22:23,24;26:10
**can (25)**
7:18;10:10;12:24;
14:2;15:10,17,18,25;
16:2;19:6,16;22:10;
25:19;26:17;27:23;
30:9;31:7;37:7,7,8,
17,17,22,23;38:4
**Capital (3)**
5:9,14,19
**CARLYLE (1)**
4:21
**case (20)**
7:16,20;9:7;11:15,
21;14:22;15:13;
18:24;19:3;21:12;
22:19,23;24:24;

EMERALD OIL, INC., et al.
Case No. 16-10704(KG)

August 22, 2016

30:24;31:23;32:22,
24;33:5,16;34:23
**cases (3)**
9:25;15:1,10
**cash (2)**
24:13;35:3
**cavalier (1)**
24:23
**certain (2)**
19:5;26:12
**certainly (9)**
13:9;14:11;15:5;
18:23;20:20;21:16;
22:3;24:1;37:4
**change (1)**
19:18
**changes (1)**
38:2
**Chapter (1)**
9:25
**characterized (1)**
18:5
**checking (1)**
21:24
**chime (1)**
24:22
**CHRISTOPHER (1)**
4:4
**Civil (1)**
30:21
**claim (2)**
36:18,20
**clause (1)**
30:3
**clear (6)**
11:4,18;12:20;
24:25;26:22;30:10
**Clearly (1)**
26:8
**CLEARY (25)**
4:9;7:12;8:20;
14:10;17:9,9,22,23,
25;19:4,25;20:24;
22:9,10,13,15;23:7,
25;28:7;36:2,2,5;
37:1,4,12
**Cleary's (3)**
6:6;9:16;24:23
**client (1)**
9:16
**clients (1)**
34:20
**codes (1)**
7:19
**COHEN (2)**
4:18;35:6
**coherent (1)**
28:6
**colleague (1)**
6:14
**coming (1)**
30:12
**comments (1)**

26:11
**commercial (1)**
10:3
**commission (1)**
12:10
**commitment (1)**
24:12
**Committee (5)**
4:3;10:1;14:8,19;
34:13
**company (4)**
16:19;24:10,12;
35:2
**complain (1)**
12:2
**complaining (1)**
12:3
**complaint (11)**
6:9,21,21,25;
10:25;29:15,16;
31:16,21,21,22
**completed (4)**
24:7;33:10,11,11
**completely (1)**
32:7
**complex (1)**
37:9
**comprised (1)**
13:9
**CONAWAY (2)**
4:7;17:8
**concern (1)**
9:10
**concerned (2)**
16:18;37:23
**concluded (2)**
24:3;38:22
**conclusion (2)**
14:25;15:15
**conditions (1)**
35:12
**confer (3)**
20:13;22:4;34:20
**conference (3)**
7:12;17:10;22:2
**conferred (1)**
12:14
**confers (1)**
26:1
**confess (1)**
18:3
**confident (1)**
32:24
**confines (2)**
18:17;19:8
**connection (4)**
28:25;31:20;
32:21,25
**consensual (1)**
19:20
**consensually (1)**
24:9
**consensus (1)**

10:23
**consider (2)**
16:13;29:5
**considering (1)**
35:14
**considers (2)**
10:4;31:2
**constitute (1)**
30:4
**construction (1)**
11:14
**contain (1)**
8:2
**context (5)**
11:5,21;27:4;
30:16,17
**contingent (2)**
15:15;16:16
**continually (1)**
26:22
**continue (5)**
8:23;15:3;28:4;
33:18;37:15
**continues (1)**
23:25
**continuing (2)**
31:9;37:6
**contract (7)**
7:19;11:8;12:16;
16:18;25:3;28:8;
31:9
**contracts (2)**
11:14;30:9
**coordinate (1)**
34:3
**Cortland (4)**
5:9,14,19;16:5
**costs (2)**
8:12;31:2
**Counsel (1)**
6:2
**counter (1)**
8:17
**counts (1)**
6:25
**couple (3)**
6:7;7:23;24:14
**course (9)**
6:3;7:1,14;10:20;
11:6,17;29:24;32:9;
34:10
**COURT (87)**
6:2,12,16,18,23;
7:2,7;8:7;10:15,17;
11:17;12:25;13:3,12,
14,15,22,25;14:6,11,
14,17;15:24;16:1,3,
7,23;17:3,5,21,24;
18:1,10,21,25;19:11,
24;20:14,23;21:14;
22:9,14,17,17;23:6,
13;24:6;25:6;28:4,
12,17;29:2,8,11;

31:1,2,14,18;32:7,
10,19;33:5,8,9,25;
34:3,8,17;35:4;36:1,
4,6,23;37:3,7,11,15,
17,19,23;38:1,6,8,10,
15,17,20
**Court's (4)**
7:16,23;9:1;36:25
**covenants (2)**
8:2;27:5
**covers (1)**
31:23
**create (1)**
21:1
**created (3)**
23:3,14;24:5
**creates (1)**
19:17
**creditor (1)**
25:1
**creditors (1)**
15:13
**Creditors' (3)**
4:3;10:1;14:8
**crisis (2)**
36:14,15
**currency (1)**
16:18
**current (3)**
19:18;22:21;27:19
**currently (1)**
23:23
**custodians (1)**
12:4
**customer (2)**
21:7;28:8
**cut (1)**
15:14
**cutting (1)**
33:16

**D**

**Dakota (22)**
4:8;5:18;7:4;8:1;
11:10,11,12,17,19;
18:6;20:15;21:5;
23:5;26:8,20,21;
27:20;28:9,11;
33:19;34:11;36:3
**Dakota's (3)**
18:12;21:5;28:24
**damage (1)**
31:8
**damages (1)**
31:2
**data (1)**
29:20
**date (7)**
6:6;10:13;13:11,
14;30:13;34:6,15
**dates (5)**
13:10;21:25;22:5;

30:13;35:9
**David (4)**
14:7,18;24:21;
34:12
**day (7)**
15:5;27:10;33:12;
37:7,21;38:12,20
**days (9)**
6:15;13:5;15:9;
20:5;25:23;27:23,
25;30:23;33:15
**deadline (5)**
16:25;20:17,22;
31:6;36:13
**deadlines (1)**
23:3
**deal (2)**
8:13;15:14
**debt (1)**
22:22
**debtor (4)**
19:14,16;26:3;
28:10
**debtors (31)**
6:6,9,21;7:18,20,
24;8:21,23;9:5,7,18,
24;19:7,7;20:10,14,
21;21:1,16;22:4,11;
23:18;25:3,16,21;
27:11,23;28:23;
33:20;36:10,23
**debtors' (4)**
10:5;17:6;18:12;
31:17
**decide (1)**
33:16
**decision (3)**
13:14,22;37:17
**decisions (1)**
9:1
**declarations (1)**
33:1
**declined (1)**
26:6
**defend (1)**
26:21
**delay (2)**
10:24;32:20
**delayed (1)**
32:11
**dependent (1)**
36:25
**depositions (2)**
27:22,22
**despite (2)**
8:19,22
**detail (1)**
27:8
**details (3)**
8:15;18:8;20:12
**determination (1)**
23:18
**determine (1)**

11:14
**deviate (1)**
11:19
**dialogue (1)**
36:7
**different (2)**
23:10;31:11
**difficult (2)**
26:20,20
**difficulty (1)**
35:21
**diligence (1)**
21:9
**diligently (1)**
11:2
**DIP (2)**
24:4;34:14
**dipping (1)**
19:13
**disagree (1)**
26:24
**disagreement (1)**
29:24
**disappointed (1)**
23:22
**discovery (14)**
8:12;11:3,25;15:8;
21:20;22:4;25:9,17;
31:19,22;32:20;
33:10,11;34:23
**discuss (2)**
17:18;37:25
**discussed (1)**
35:9
**discussing (1)**
13:10
**discussion (1)**
10:18
**discussions (4)**
10:8,9;19:1,2
**dispositive (1)**
14:4
**dispute (4)**
8:20;15:16;23:4;
24:23
**disputes (1)**
9:11
**disrupt (1)**
37:9
**distress (1)**
36:24
**DMS (10)**
7:24;8:13,16,23;
10:4,9;12:8;14:10;
23:15,24
**DMS's (2)**
13:7;24:2
**document (6)**
11:4,20;25:15,24;
27:24;33:10
**documents (21)**
7:4;12:7,11,13,17;
21:22;25:10,20,25;

26:10,13,16;27:3,13,
21;28:1,6;30:11,11,
12,14
**dollars (2)**
12:17;24:13
**done (9)**
10:13;12:18;
15:21,21;27:18;
29:6;34:1;37:12;
38:4
**DORSEY (18)**
4:11;17:10;20:11;
22:6,10;25:7,8;
28:12,16,19;29:4;
31:11,13,14,15,19;
36:7;38:14
**doubt (1)**
36:15
**down (2)**
23:17;26:17
**drag (1)**
32:19
**due (7)**
7:14;21:4,9,10,11;
29:13;32:9
**during (2)**
22:22;27:11
**duty (1)**
9:19

## E

**effect (4)**
11:15;30:6;32:9;
35:18
**effecting (1)**
9:11
**either (2)**
10:3;33:22
**ELKINS (1)**
5:2
**Ellis (1)**
6:11
**else (3)**
15:23;17:5;24:20
**email (3)**
7:11;9:4;18:1
**Emerald (3)**
4:16;6:4;35:6
**emergency (1)**
20:25
**end (10)**
13:21;15:10;
20:21;21:16;22:11;
24:15;29:19;30:23;
35:1;37:18
**endanger (1)**
25:4
**ended (1)**
25:9
**engage (3)**
8:14,18;25:22
**enjoined (1)**

31:3
**enough (2)**
19:24;27:20
**ensure (4)**
7:20;13:3,12;24:1
**enter (1)**
20:4
**entered (2)**
27:4;28:21
**entire (2)**
28:25;30:4
**ERICKA (1)**
4:23
**escrows (1)**
36:18
**especially (1)**
11:3
**ESQ (12)**
4:4,9,10,11,12,17,
18,23;5:4,5,10,15
**estate (4)**
16:22;20:16;24:8,
18
**Europe (1)**
17:15
**evaluate (2)**
20:15;34:21
**evaluating (1)**
7:17
**even (6)**
6:6;7:25;8:17;
9:18;27:15;31:8
**event (1)**
32:5
**events (3)**
7:22;11:22;21:23
**everybody (1)**
21:2
**everybody's (1)**
25:4
**everyone (6)**
15:4;24:20,24;
28:22;38:15,20
**evidence (6)**
22:18;26:21;
28:20;29:25;32:20;
34:22
**ex (1)**
20:6
**example (1)**
12:10
**exercise (1)**
8:4
**expect (1)**
27:24
**expense (1)**
36:18
**expert (2)**
27:22,22
**experts (1)**
27:25
**expire (2)**
20:5;30:22

**expired (1)**
8:22
**expiring (2)**
8:19,22
**explain (2)**
10:19;30:15
**explained (3)**
10:23;13:1,12
**explicit (1)**
35:12
**express (1)**
35:12
**extend (1)**
30:13
**extended (2)**
16:25;20:17
**extent (6)**
16:20;25:2,2;
29:21;30:20,23
**extremely (2)**
23:22;35:18
**eyes (4)**
22:23;23:16,16;
36:19

## F

**fact (7)**
12:14;16:16;
24:15;27:25;31:15;
32:1;36:5
**factor (1)**
14:4
**factors (1)**
10:4
**facts (1)**
33:1
**factual (1)**
11:24
**failed (1)**
8:14
**fair (3)**
19:24;22:17,25
**fairly (1)**
14:22
**faith (2)**
18:11,13
**fake (1)**
36:13
**familiar (2)**
11:13;25:12
**far (1)**
7:16
**Fargo (3)**
4:22;5:3;22:22
**fashion (3)**
13:6;26:22;28:6
**fear (1)**
35:1
**feasible (1)**
27:23
**Federal (1)**
30:21

**feedback (1)**
21:10
**FELD (4)**
4:17;14:19;35:5,5
**few (2)**
12:8;29:10
**fifty-three (2)**
25:23;27:23
**file (4)**
6:9;7:13;32:4,8
**filed (9)**
8:9;10:25;11:1;
13:2;25:24;26:4;
29:15;31:20;32:3
**filings (1)**
11:9
**filling (1)**
21:24
**final (1)**
30:19
**finally (2)**
15:10;25:21
**financing (1)**
24:4
**find (1)**
30:24
**fine (1)**
38:9
**FINGER (1)**
5:8
**finished (1)**
38:13
**first (5)**
26:13,14;29:12;
31:15;33:22
**flow (1)**
35:3
**focus (2)**
8:12;28:10
**focused (1)**
21:3
**focusing (2)**
9:16;21:5
**folks (1)**
34:3
**follow (1)**
7:1
**force (1)**
30:6
**forth (2)**
18:23;30:3
**forward (13)**
6:24;10:10,14,24;
12:15;13:1;15:4;
17:16;21:19;24:19;
25:2;33:2;37:8
**found (2)**
30:9;31:3
**Foundation (1)**
11:16
**fourteen (2)**
20:5;30:23
**frankly (2)**

Case 16-50998-KG    Doc 15    Filed 08/26/16    Page 43 of 48

EMERALD OIL, INC., et al.
Case No. 16-10704(KG)                                                                    August 22, 2016

9:15;15:1
**free (1)**
    24:8
**Friday (2)**
    36:12,13
**friends (1)**
    17:8
**front (2)**
    9:14;25:19
**fruition (1)**
    15:12
**full (4)**
    7:25;16:12;21:12;
    22:25
**fully (1)**
    23:18
**function (1)**
    19:16
**funding (1)**
    22:24
**funds (1)**
    24:11
**further (5)**
    8:18;19:2,13;27:7;
    30:6

**G**

**gain (1)**
    21:8
**game (2)**
    24:16;26:19
**gathering (1)**
    8:3
**gave (1)**
    12:4
**general (1)**
    7:15
**gentlemen (1)**
    25:6
**given (6)**
    7:15,22;12:18;
    21:17;22:3;24:8
**goal (2)**
    8:5;32:19
**goes (1)**
    14:9
**good (15)**
    6:2,12,18,19;
    10:16,17;14:12,14;
    16:7;17:9;18:11,13;
    22:15;24:17;38:20
**GOTSHAL (2)**
    5:13;16:5
**Great (3)**
    7:9;37:12,13
**greatest (1)**
    9:9
**gritty (1)**
    20:12
**Gross (1)**
    6:2
**guess (5)**

17:19;18:2,7;19:4;
    22:6
**guide (1)**
    20:24
**Gump (2)**
    14:8,19

**H**

**HAMPTON (1)**
    4:15
**hand (1)**
    10:12
**hands (1)**
    7:16
**happen (1)**
    37:1
**happened (2)**
    24:8;36:16
**happens (1)**
    27:1
**happy (2)**
    15:18;38:3
**hard (4)**
    14:23;15:7,8,12
**harder (1)**
    33:17
**haste (2)**
    37:12,13
**Hauer (1)**
    14:19
**hear (8)**
    6:12;7:8;15:25;
    16:2,7;17:7;27:3;
    34:10
**heard (3)**
    14:9;26:14,14
**hearing (23)**
    10:19;13:4,15,16;
    15:8;17:6;23:1;24:7;
    25:11,17,18;26:2;
    27:12;28:4;29:3;
    32:11,17;33:13;
    34:6;35:15;36:11,
    22;38:11
**hearings (1)**
    35:23
**help (7)**
    7:20;10:10;15:18;
    20:24;28:12;35:25,
    25
**helping (1)**
    15:19
**hence (1)**
    19:21
**hereof (1)**
    30:8
**Hi (1)**
    6:17
**highlight (2)**
    10:21;11:12
**hired (1)**
    12:16

**hit (2)**
    26:3,16
**hits (1)**
    26:10
**Holdings (2)**
    4:16;35:6
**Honor (82)**
    6:10;7:5,11,11;
    9:14;10:7,13,16;
    11:4,12;13:2;14:3,7,
    9,12,20,21;15:6,16,
    22,25;16:2,4,9;17:2,
    9;18:21;19:5,25;
    20:4,8;21:13,21;
    22:2,16;23:11;24:10,
    21;25:8,9,12,18,18;
    26:2,19;27:2,9,19;
    28:2,3,16,19;29:4,9,
    14;30:10,25;31:5,13,
    15,25;32:6,12,14;
    33:23,25;34:12,16;
    35:3,5,9,13;36:2;
    37:7,14;38:3,3,7,14,
    18,19,21
**Honor's (4)**
    10:10;16:12;20:1;
    35:19
**hope (1)**
    15:11
**hoped (1)**
    20:13
**hopefully (2)**
    14:25;15:10
**hoping (1)**
    7:1
**horse (3)**
    16:16;35:7;36:24
**Human (1)**
    11:16
**Hunter (1)**
    6:15

**I**

**idea (1)**
    29:13
**ideal (1)**
    13:19
**identify (2)**
    27:21,24
**immediately (2)**
    20:10;27:12
**impact (1)**
    16:14
**impasse (2)**
    10:8,9
**impediment (1)**
    21:18
**implications (3)**
    24:24;25:1;28:9
**importance (1)**
    9:23
**important (7)**

9:3;13:13;15:3;
    16:13,19;21:14;
    37:10
**impose (1)**
    32:8
**impression (2)**
    18:6,22
**including (1)**
    25:5
**incurring (1)**
    8:11
**indicate (1)**
    32:19
**indicated (1)**
    27:12
**indicates (1)**
    32:18
**industry (2)**
    27:1;37:9
**infirmities (1)**
    22:8
**insisted (1)**
    12:19
**Instead (2)**
    8:12;22:10
**insuring (1)**
    7:18
**intend (1)**
    6:21
**intended (2)**
    26:8;28:23
**intending (1)**
    6:9
**intent (2)**
    26:25;28:20
**interest (1)**
    12:15
**interests (3)**
    9:17;28:23;34:3
**interpretation (1)**
    11:8
**interrupt (1)**
    17:21
**into (11)**
    8:15;14:23;18:8,
    25;19:13;20:11;
    22:21;27:4,7;28:21,
    22
**involve (3)**
    11:23;28:15;29:25
**involved (1)**
    23:20
**involving (1)**
    27:6
**issue (12)**
    8:21;11:8;12:23,
    23;13:13;20:2,8;
    28:25;31:25;32:6,7;
    36:17
**issued (3)**
    11:5,21;15:8
**issues (15)**
    7:24;8:1,2,6;10:7;

11:24;21:6,13,14,19;
    24:9;25:9;27:6,11;
    31:23

**J**

**JACKSON (2)**
    4:10;17:11
**jam (1)**
    26:19
**Joe (3)**
    16:4;23:11;32:14
**JOHN (2)**
    4:11;17:10
**JOHNSON (1)**
    4:23
**join (1)**
    17:15
**joined (3)**
    17:10;31:21,22
**JOSEPH (1)**
    5:15
**Judge (13)**
    6:2,17,20;7:15,22;
    8:14,25;9:7,18,23;
    14:1;19:12;38:16
**judgment (19)**
    8:4;11:1,6;12:24;
    26:23;27:11;28:13,
    17,25;29:22;32:2,16,
    21,23,23,25;34:21,
    24;35:15
**July (1)**
    24:7
**June (5)**
    8:9;11:1,2;25:15;
    29:15
**jurisdictions (1)**
    11:18

**K**

**KARL (1)**
    5:4
**keeping (3)**
    35:14,23,24
**key (4)**
    8:1;9:25;13:11;
    14:4
**kind (3)**
    17:25;22:6;33:25
**Kirkland (4)**
    6:10;7:6;14:20;
    29:10
**knew (1)**
    26:9
**knows (1)**
    14:21

**L**

**lack (1)**
    18:11

Case 16-50998-KG    Doc 15    Filed 08/26/16    Page 44 of 48

EMERALD OIL, INC., et al.
Case No. 16-10704(KG)

August 22, 2016

laid (2)
  10:21;27:6
land (2)
  8:2;27:5
language (2)
  30:2,8
large (1)
  26:9
larger (1)
  20:8
last (9)
  7:12;8:16,17,19;
  9:4;18:3,19,19;30:12
late (5)
  9:15;18:3;28:5;
  29:3;38:12
later (2)
  33:15;34:24
law (9)
  11:10,11,12,15,17,
  19;12:24;21:13;
  23:19
lawyers (3)
  12:17;13:7;14:21
LAYTON (1)
  5:8
least (7)
  12:11;19:22;
  27:13;35:15,16,20,
  23
leave (1)
  18:7
left (3)
  8:16;24:15;33:8
legal (10)
  8:1;10:7;11:8,14;
  12:23;23:17;24:17;
  26:23,24;33:4
lenders (10)
  10:1;22:20,21;
  23:4,15,22;24:4,16;
  25:5;32:18
lender's (1)
  16:5
letter (8)
  6:6;7:13;9:17;
  12:1,21;18:20;22:1;
  27:7
likelihood (1)
  9:9
likely (1)
  9:22
limited (2)
  9:20;24:17
line (2)
  36:10;37:2
liquidity (6)
  9:7,11;12:25;34:1,
  5;36:14
listed (1)
  21:23
litigation (5)
  15:20;16:17;

  18:14;19:22;37:10
little (5)
  12:3;21:10;24:22;
  25:11;33:19
LLC (3)
  4:2,8;5:18
LLP (5)
  4:7,15,21;5:2,13
long (3)
  19:16;32:11,11
long- (1)
  7:20
long-term (2)
  19:20;24:2
look (3)
  22:4;25:19;27:15
looked (2)
  20:1;23:9
lot (11)
  12:7;14:22,23,24;
  15:9,15;23:5;27:18;
  33:14;37:5,18
luxury (2)
  9:16,19

**M**

Magnum (1)
  6:15
main (1)
  31:23
major (2)
  24:24,25
management (1)
  10:2
MANGES (2)
  5:13;16:5
manner (1)
  21:12
many (1)
  26:13
Market (4)
  5:9,14,19;8:13
material (1)
  35:18
matter (10)
  6:4;7:15;12:24;
  16:11;17:14;18:12,
  18;21:4,6;30:8
matters (5)
  16:13,20;35:13;
  37:15,20
maximize (1)
  9:19
may (15)
  6:8,14;11:13;
  16:17;17:21;19:3;
  23:10;24:25;25:4;
  28:14;29:10,11;
  30:25;31:13;35:10
Maybe (2)
  26:17;33:19
mean (4)

  12:20;19:12,13;
  22:20
meaning (1)
  22:21
meantime (2)
  8:19,22
meet (3)
  20:13;22:4;26:1
merger (1)
  30:3
merits (1)
  23:18
met (1)
  12:14
MICHAEL (1)
  4:12
mid (2)
  28:4;29:3
middle (2)
  36:7,22
Midstream (3)
  4:8;5:18;7:4
might (1)
  15:1
Mike (1)
  17:11
million (1)
  24:13
mind (2)
  16:13;37:24
minimum (1)
  24:11
minute (1)
  28:12
mishmash (1)
  31:10
mistakes (2)
  37:13,14
money (3)
  9:6;22:11;24:15
month (1)
  13:21
monthly (1)
  23:9
more (11)
  9:3;12:20,22;13:5,
  20;20:20,21;21:16;
  30:12;33:19,20
morning (1)
  13:2
motion (19)
  11:1,6,22,23;
  17:18;23:8;27:10,
  10,28:13,14,14,17;
  29:1;30:18;31:24;
  32:2,21;34:21;36:20
motions (4)
  8:9,23;9:2;35:20
mountains (2)
  15:5,6
move (8)
  10:10;13:1;15:3,6;
  24:19;25:2;29:6;

  33:2
moved (2)
  15:4;33:14
moving (8)
  9:23;10:24;12:15;
  21:3;29:3;31:6;
  34:25;37:5
MSJ (2)
  29:17,25
much (4)
  16:13;33:19;36:8;
  37:16
MULLIN (2)
  4:15;35:6
multiple (2)
  8:13;12:14
must (2)
  9:13;31:1

**N**

NA (2)
  4:22;5:3
narrow (1)
  26:17
necessarily (2)
  15:6;19:1
necessary (1)
  7:14
necessity (1)
  15:20
need (13)
  10:9;13:14;14:5;
  16:12;20:15;22:25;
  29:6;33:1,8,9;34:15;
  35:2;38:12
needed (1)
  36:10
needing (1)
  9:17
needs (2)
  22:24;34:22
negotiate (2)
  18:13,16
negotiating (2)
  32:3;33:6
negotiation (1)
  19:21
negotiations (4)
  18:2;21:2;30:7;
  33:7
NEIBURG (2)
  4:12;17:11
New (3)
  4:16;32:7;35:6
next (1)
  7:3
Nice (2)
  6:11;14:15
nine (1)
  33:15
nit (1)
  30:20

nitty- (1)
  20:11
none (1)
  30:16
North (5)
  11:10,11,12,16,18
note (2)
  16:10;34:14
noted (1)
  10:5
notified (1)
  24:14
novel (2)
  21:13;37:9
null (1)
  30:5
number (4)
  26:10,24;31:8;
  36:14
nutshell (1)
  32:18

**O**

obligations (1)
  35:3
oblivion (1)
  9:22
obtaining (1)
  10:6
obviously (5)
  15:3,17;16:15;
  21:19;34:15
occurs (1)
  20:22
October (5)
  28:5;29:3;32:17;
  36:7,22
off (4)
  6:8;14:2;21:24;
  32:17
offense (1)
  24:22
offer (1)
  8:17
Oil (1)
  6:4
once (1)
  26:3
one (12)
  10:2;21:20,23;
  26:24,25;28:12;
  33:22;34:20,24;
  35:20,23;36:17
only (2)
  25:21;28:7
open (6)
  13:9;22:23,24;
  23:16,16;36:19
operate (1)
  31:9
operating (1)
  23:9

**opportunity (7)**
13:8;21:12;22:3;
24:8,18;28:5;34:10
**opposed (1)**
34:25
**optimal (1)**
29:5
**options (1)**
9:20
**order (14)**
6:5;9:5;17:22,23;
20:1,5,9;21:24;24:6,
8;37:25;38:1,4,17
**orderly (1)**
13:5
**ordinarily (1)**
34:2
**originally (1)**
10:25
**others (1)**
33:22
**ours (1)**
24:2
**ourselves (2)**
30:24;36:8
**out (14)**
9:6;10:21;11:10,
11,16;18:3;22:11;
27:7;28:7,12;30:1,
25;32:19;33:17
**outcome (4)**
16:14,17;33:4;
35:13
**outlined (4)**
18:6,17;19:5,5
**outset (3)**
17:20;18:1;21:9
**over (2)**
15:22;25:11
**overhang (1)**
36:11
**own (1)**
9:17

**P**

**PA (1)**
5:8
**papers (1)**
20:2
**parameters (6)**
18:6;19:6,8,14,14,
15
**part (7)**
10:18,23;18:12,
12;24:4;26:19;32:22
**parte (1)**
20:6
**particular (4)**
13:6,10;27:1;
38:12
**particularly (2)**
12:21;28:11

**particulars (1)**
22:7
**parties (27)**
9:25;13:4;15:19;
18:7;20:21,24;
22:22;23:24;26:25;
27:4;28:11,21;30:5,
7;32:3;33:6,18,20;
35:25;36:6,18,24;
37:7,17,19,24,25
**parties-in-interest (1)**
8:7
**partner (1)**
6:14
**party (1)**
31:3
**past (2)**
7:23;34:15
**path (5)**
7:1;9:8,9,20;33:24
**PATRICK (2)**
4:10;17:11
**pay (1)**
31:2
**payrolls (1)**
35:2
**pending (3)**
8:23;9:2;33:6
**Per (1)**
9:4
**perfectly (1)**
20:4
**perhaps (2)**
34:20;37:10
**period (1)**
15:5
**perplexed (1)**
36:21
**PETEREIT (1)**
5:5
**phone (5)**
14:15;15:4;17:12;
21:11;26:12
**pieces (1)**
37:5
**place (5)**
20:3,3,7;25:12;
32:2
**plainly (1)**
30:9
**play (3)**
18:9,9,11
**playing (1)**
24:16
**please (2)**
31:14;36:4
**Plus (1)**
27:6
**PM (1)**
38:22
**podium (1)**
10:12
**point (9)**

9:1;23:12;24:12;
25:4;27:8;30:1,20;
31:25;34:6
**pointed (1)**
28:7
**points (1)**
29:10
**pond (1)**
19:14
**portion (1)**
27:13
**position (4)**
19:18;25:10;
26:21;31:12
**possibility (3)**
34:24;35:16,24
**possible (5)**
12:18;16:16;
26:20;29:7;33:24
**post-petition (1)**
10:1
**potentially (1)**
35:22
**pre (1)**
9:25
**predicated (1)**
10:3
**prejudice (3)**
20:15;21:15;26:8
**preliminary (1)**
6:7
**prepared (8)**
7:7;17:16;18:16,
16;19:7,15;24:1;
34:8
**PRESENT (3)**
5:17;21:12;26:21
**presents (1)**
11:8
**preserve (3)**
9:19;10:11;19:20
**pressure (4)**
13:21;33:25;
37:18,19
**PRESTON (1)**
4:2
**principles (2)**
11:10,11
**prior (2)**
13:19;30:6
**probably (1)**
19:9
**problems (1)**
26:5
**Procedure (1)**
30:22
**proceed (2)**
19:21;28:6
**proceeded (1)**
9:5
**proceeding (7)**
11:5,7;12:22;
29:19;30:17;31:24;

35:22
**proceedings (1)**
38:22
**process (12)**
9:11;10:24;11:23,
25;12:2,4;15:17;
16:11;21:4,10,11;
29:13
**produce (1)**
27:13
**produced (7)**
7:3;25:10;26:16;
27:14,16;28:1;30:11
**producing (1)**
25:20
**production (1)**
30:14
**profile (1)**
9:7
**progress (2)**
14:23,24
**prohibits (1)**
8:15
**projections (1)**
29:20
**proper (1)**
31:2
**property (2)**
28:24,24
**proposal (2)**
18:19;30:6
**proposals (1)**
18:22
**propose (4)**
9:18,21;10:14;
22:5
**proposed (6)**
6:5;13:3;20:11;
22:7;34:5;37:2
**protect (2)**
21:9,11
**protections (1)**
7:19
**provide (4)**
8:17;9:8;12:15;
29:19
**provided (4)**
7:19;12:5;21:22;
34:7
**provides (1)**
9:9
**providing (1)**
12:19
**pulled (2)**
12:11,12
**purchase (1)**
35:11
**pure (2)**
11:15;12:23
**pursuant (1)**
20:6
**pushed (1)**
21:18

**pushing (1)**
14:5
**put (8)**
13:20;14:2;21:14;
28:20;32:17,24;
34:22;37:8
**puts (2)**
32:17;37:18

**Q**

**quickly (3)**
12:18;15:21;16:12
**quite (4)**
9:15;18:4;29:23;
33:10

**R**

**RAHUL (1)**
5:19
**raise (2)**
31:5;32:25
**raised (1)**
32:13
**range (1)**
30:13
**rather (1)**
20:14
**reach (4)**
10:6;18:7;19:6,9
**reached (4)**
9:24;10:8,9;14:24
**reaching (2)**
8:12;10:3
**react (1)**
33:21
**read (2)**
12:21;20:1
**reading (1)**
30:21
**Real (3)**
28:24;34:23;36:13
**really (11)**
7:20;8:5;13:19;
17:19;21:18;23:2,4;
32:17,21;33:1,2
**reason (2)**
10:22;31:19
**reasonable (2)**
8:4;29:7
**reasonably (1)**
36:9
**reasons (4)**
10:14,20;13:11;
28:3
**REBECCA (1)**
5:5
**recall (3)**
18:3,4;30:25
**receive (2)**
18:4,18
**received (3)**

| | | | | |
|---|---|---|---|---|
| 12:1;13:6;17:1 | 26:18;28:3;31:17 | 6:5,6 | | 38:4 |
| **recess (1)** | **requested (4)** | **revise (1)** | **S** | **sets (1)** |
| 34:9 | 7:23;12:5;22:1; | 38:17 | | 30:3 |
| **recognize (3)** | 27:17 | **REYNOLDS (1)** | **sale (9)** | **settlement (3)** |
| 7:15;33:16;37:19 | **requesting (3)** | 5:18 | 9:11,22;13:15,15; | 8:17;10:4;19:1 |
| **recognizes (2)** | 7:12;8:10;26:5 | **RICE (1)** | 16:11,14;24:3,7; | **settlements (2)** |
| 33:9,9 | **requests (6)** | 4:21 | 36:11 | 9:24;10:2 |
| **record (5)** | 11:3,5,20;25:15, | **RICHARDS (1)** | **sales (1)** | **severe (1)** |
| 14:18;20:19; | 17;27:24 | 5:8 | 11:23 | 31:10 |
| 22:18;25:14;30:1 | **require (1)** | **RICHTER (1)** | **same (4)** | **SHAPIRO (1)** |
| **recoveries (1)** | 31:1 | 4:15 | 7:22;16:9;27:10; | 5:10 |
| 25:5 | **required (2)** | **right (23)** | 33:9 | **SHEPPARD (2)** |
| **recovery (1)** | 24:4,6 | 7:7,10;10:15; | **SAMIS (1)** | 4:15;35:5 |
| 25:1 | **requirement (1)** | 13:17;16:23;17:3,7; | 4:4 | **shocked (1)** |
| **Red (1)** | 21:18 | 18:25;19:9,18; | **SANDRIDGE (1)** | 36:21 |
| 11:15 | **requires (1)** | 20:23;28:18;29:2,8; | 4:21 | **shorter (1)** |
| **reflected (1)** | 29:25 | 31:18;33:3,5;34:8; | **sat (1)** | 15:9 |
| 20:19 | **resolution (2)** | 36:1;37:3;38:10,15, | 24:10 | **shortfall (1)** |
| **refused (2)** | 15:19;18:14 | 20 | **schedule (15)** | 12:25 |
| 8:17;26:11 | **resolve (2)** | **rights (5)** | 8:6,10;9:2,14,18; | **shortly (2)** |
| **reject (3)** | 24:9;36:19 | 21:10,11;28:24,24, | 10:10,13;13:3,7; | 9:8;34:5 |
| 17:19;23:19;25:3 | **resolved (1)** | 24 | 24:4,6;27:19;32:2; | **show (2)** |
| **rejected (2)** | 16:21 | **risk (1)** | 33:13;35:24 | 28:20,21 |
| 8:16;28:8 | **resource (1)** | 28:11 | **scheduled (3)** | **shown (1)** |
| **rejection (9)** | 12:12 | **River (1)** | 17:18;27:9;35:15 | 9:17 |
| 7:19;8:3;11:22,23; | **respect (17)** | 11:16 | **scheduling (12)** | **shows (1)** |
| 27:10;28:14,14; | 6:20;8:3;9:2;11:3; | **robust (2)** | 6:5;7:12;17:22,23; | 33:2 |
| 30:18;31:24 | 12:22;16:10,12; | 16:15;35:21 | 20:9,9;21:23;22:7; | **side (2)** |
| **relate (2)** | 18:1;19:25;21:6,15; | **rocky (1)** | 37:25;38:1,4,17 | 17:6;24:17 |
| 11:22,22 | 22:7,8,18,25;30:11, | 14:22 | **search (6)** | **significant (1)** |
| **related (1)** | 19 | **room (2)** | 12:5,8,12;26:2,4,5 | 16:22 |
| 36:23 | **respectfully (1)** | 17:10;29:20 | **second (1)** | **significantly (1)** |
| **relating (4)** | 15:16 | **Rotman (23)** | 14:20 | 12:9 |
| 27:13;30:8;31:23; | **respond (10)** | 6:14,17,19;7:5,5,9; | **secured (1)** | **SIGWARTH (1)** |
| 35:12 | 18:20;19:13,15; | 9:8,21;10:12,16,17, | 25:5 | 5:4 |
| **relationship (1)** | 20:10;23:9;25:16; | 18;13:18,24;29:9,9, | **security (1)** | **similarly (1)** |
| 7:24 | 27:24;31:11,13;32:9 | 12;32:12;33:22; | 31:1 | 16:18 |
| **relative (1)** | **responded (4)** | 38:7,8,9,19 | **seek (1)** | **simply (5)** |
| 23:18 | 26:17;27:17; | **Rotman's (1)** | 12:23 | 19:16;21:8;22:16; |
| **relevant (2)** | 29:16;32:1 | 26:11 | **seeking (1)** | 27:19;38:1 |
| 27:1,2 | **responding (2)** | **route (1)** | 9:14 | **situation (4)** |
| **remain (1)** | 18:22;21:24 | 19:22 | **segregation (1)** | 22:21;23:15,21; |
| 35:16 | **response (6)** | **rule (6)** | 24:11 | 30:24 |
| **remember (1)** | 18:4,18,18;20:20; | 7:23;8:15;14:3; | **send (1)** | **Skelton (1)** |
| 6:14 | 32:3,4 | 20:3;30:21,21 | 7:11 | 17:13 |
| **reminds (1)** | **responses (1)** | **Rules (3)** | **September (15)** | **SMOLINSKY (16)** |
| 16:24 | 13:6 | 20:4,6;32:4 | 9:6;10:19;11:7; | 5:15;15:25;16:2,4, |
| **renders (1)** | **restrained (1)** | **ruling (7)** | 13:4,11;22:12; | 4,7,9,23;23:11,11, |
| 30:5 | 31:4 | 9:21;12:25;14:4; | 24:15;27:19;31:6; | 14;24:25;32:14,14; |
| **reorganization (1)** | **restructure (1)** | 22:17;35:20;36:25; | 33:14,18;34:15; | 34:18,19 |
| 24:20 | 14:2 | 37:8 | 35:1;37:16,18 | **Smolinsky's (1)** |
| **repeat (1)** | **result (4)** | **rulings (2)** | **sequencing (2)** | 35:14 |
| 25:13 | 9:4;33:8,17;37:20 | 10:6;35:19 | 7:16;8:6 | **smothering (1)** |
| **report (2)** | **results (1)** | **run (3)** | **serious (3)** | 25:4 |
| 26:3,16 | 12:3 | 8:2;22:11;27:5 | 28:8,9,11 | **sole (2)** |
| **reports (2)** | **returned (1)** | **running (1)** | **serve (1)** | 21:7,7 |
| 23:9;27:22 | 26:13 | 34:4 | 31:23 | **solely (2)** |
| **represent (1)** | **revenue (1)** | **runway (2)** | **served (2)** | 21:5;28:10 |
| 35:6 | 21:7 | 24:17,19 | 25:15,24 | **sometime (1)** |
| **represented (1)** | **review (4)** | **Ryan (4)** | **Services (4)** | 28:4 |
| 18:10 | 21:22;23:8;27:20; | 6:10;14:1;19:12; | 5:9,14,19;11:16 | **somewhat (1)** |
| **request (7)** | 28:5 | 33:23 | **set (5)** | 7:17 |
| 20:6,9,19;25:24; | **reviewed (2)** | | 10:10;11:6,10,10; | **soon (1)** |

26:1
**sorry (1)**
    21:10
**sort (1)**
    12:2
**source (1)**
    21:7
**speak (3)**
    6:11;14:15;15:23
**SPEAKER (1)**
    13:17
**spent (1)**
    8:13
**stake (1)**
    23:25
**stalking (3)**
    16:16;35:7;36:24
**stalking-horse (1)**
    35:11
**stand (1)**
    23:23
**STARGATT (1)**
    4:7
**start (6)**
    6:8;17:19,25;
    21:22;25:20;37:22
**started (2)**
    14:22;25:22
**State (5)**
    11:16;14:18;18:9,
    9,11
**status (5)**
    17:18;18:2;20:18;
    21:17;22:2
**stays (1)**
    20:3
**still (6)**
    18:16,16;27:15,
    18;29:4,17
**stop (1)**
    22:6
**Strauss (1)**
    14:19
**streamline (1)**
    15:17
**strength (1)**
    10:5
**subject (2)**
    24:6;30:8
**submitted (1)**
    38:2
**substance (1)**
    11:22
**successful (6)**
    9:21;14:25;15:1,2,
    13;33:7
**suffering (1)**
    19:18
**suggested (1)**
    36:7
**suggesting (3)**
    19:3,4;29:2
**suggestion (2)**

32:16;35:14
**summarily (1)**
    8:16
**summary (15)**
    11:1,6;12:24;
    26:23;28:13,17,25;
    32:1,16,21,22,23,25;
    34:21;35:15
**Sunday (1)**
    26:15
**supersedes (1)**
    30:5
**support (2)**
    24:1,20
**supposed (1)**
    25:11
**Supreme (1)**
    11:17
**sure (4)**
    11:18;25:13;
    30:15;31:12
**surrounding (1)**
    7:24
**survival (2)**
    23:25;24:2
**sustained (1)**
    31:2
**sustaining (1)**
    9:10

**T**

**tactical (1)**
    21:8
**talk (2)**
    18:16;34:10
**talked (2)**
    24:11;26:2
**talks (1)**
    26:12
**tat (1)**
    29:14
**TAYLOR (2)**
    4:2,7
**TED (1)**
    4:18
**teleconference (1)**
    6:3
**telephone (1)**
    6:3
**telephonic (1)**
    25:18
**temporarily (1)**
    8:10
**tens (1)**
    12:17
**term (3)**
    7:21;12:12;19:16
**termination (1)**
    34:14
**terms (9)**
    12:3,5,8;23:20;
    26:3,4,5,12;29:5

**testimony (1)**
    27:3
**Thanks (1)**
    38:19
**there'll (2)**
    35:18,21
**thin (1)**
    9:8
**though (4)**
    9:7;12:20;15:15;
    31:8
**thought (4)**
    15:1;23:23;34:20;
    36:9
**thousands (1)**
    12:17
**three (3)**
    9:15;13:5;27:14
**thus (1)**
    7:16
**tied (1)**
    7:17
**till (1)**
    32:17
**timeline (1)**
    20:12
**timelines (1)**
    20:10
**timely (1)**
    18:22
**times (1)**
    12:15
**timing (5)**
    14:2;21:15,19;
    22:25;33:25
**TIMOTHY (1)**
    5:18
**tit (1)**
    29:13
**today (16)**
    6:11,13,25;7:14;
    8:5;9:14,17,20;11:9;
    13:5;14:21;17:17;
    18:5;20:19;26:12;
    31:8
**told (2)**
    24:12;36:16
**tomorrow (1)**
    30:15
**took (2)**
    25:16;27:14
**toward (1)**
    19:22
**towards (1)**
    31:6
**track (2)**
    35:17,24
**transcript (1)**
    20:1
**tremendous (1)**
    15:7
**tried (3)**
    8:12;18:13;37:6

**TRO (8)**
    8:19;9:5;19:25;
    30:20,22,25;31:1;
    32:6
**trucking (1)**
    8:24
**true (2)**
    7:3;10:4
**truncated (1)**
    36:10
**try (4)**
    24:9;32:22;36:6;
    37:6
**trying (5)**
    16:15;21:8;29:5,7;
    33:3
**turn (1)**
    15:22
**twelve (1)**
    24:13
**twenty-eight (1)**
    12:16
**twenty-three (3)**
    13:4;15:5,9
**two (4)**
    9:14;27:25;36:14,
    17
**two-party (2)**
    23:4;24:23
**type (1)**
    13:21
**typical (1)**
    30:2

**U**

**under (12)**
    11:12;18:6,17;
    19:6,16,18;20:3,4;
    23:19;31:9;32:4;
    36:10
**underlying (1)**
    8:1
**underscore (1)**
    9:23
**understandable (1)**
    29:17
**understood (2)**
    23:20;28:22
**unfair (1)**
    21:21
**unfathomable (1)**
    28:1
**unfortunately (1)**
    19:21
**UNIDENTIFIED (1)**
    13:17
**UNISON (1)**
    38:21
**universe (1)**
    19:17
**unnecessary (1)**
    8:11

**unreasonable (1)**
    36:22
**unsecured (3)**
    10:1;15:13;25:1
**up (5)**
    7:1;25:9;34:4,4;
    35:8
**uploaded (1)**
    13:7
**upon (5)**
    16:17;23:20;32:8;
    34:5;36:25
**urgency (1)**
    21:1
**use (2)**
    8:23;24:18

**V**

**vacation (2)**
    17:11,14
**VAID (1)**
    5:19
**value (3)**
    9:19;10:11;16:19
**vantage (1)**
    34:6
**versus (3)**
    9:14,22;20:15
**viability (1)**
    7:21
**view (2)**
    23:10;25:20
**VINSON (1)**
    5:2
**voice (1)**
    30:5
**volume (1)**
    12:9

**W**

**walk (2)**
    10:12;18:21
**wall (3)**
    9:12;34:1,5
**wants (1)**
    33:19
**way (6)**
    14:22;15:18;18:5;
    25:19;34:8;36:15
**ways (1)**
    23:5
**Wednesday (1)**
    30:12
**week (12)**
    7:12;8:16,20;9:4,
    6;17:11,15;18:3;
    20:22;21:16;24:14;
    34:24
**weekend (3)**
    18:19,19,19
**weeks (7)**

EMERALD OIL, INC., et al.
Case No. 16-10704(KG)

August 22, 2016

7:23;8:13;9:15;
13:5;24:14;25:11;
27:14
**WEIL (2)**
5:13;16:5
**Wells (3)**
4:22;5:3;22:22
**weren't (1)**
18:22
**what's (2)**
27:16;36:16
**whatsoever (1)**
25:16
**Whereupon (1)**
38:22
**WHITEFORD (1)**
4:2
**whole (2)**
32:17;34:25
**whose (2)**
34:3;36:24
**wide (5)**
22:23,24;23:16,
16;36:19
**withheld (1)**
8:10
**within (4)**
15:5;19:8;27:25;
29:17
**without (4)**
7:25;19:13;30:25;
35:19
**witnesses (3)**
27:21,25;28:15
**WOMBLE (1)**
4:21
**wonder (1)**
14:8
**word (2)**
12:10,12
**work (9)**
14:23;15:12;19:7;
20:12;23:24;27:18;
29:6;33:17;34:7
**worked (3)**
12:5;15:7,8
**working (3)**
11:2;17:14;28:23
**worse (1)**
11:13
**written (1)**
11:14
**wrongfully (1)**
31:3

## Y

**Ye (1)**
16:1
**yesterday (1)**
7:4
**YOUNG (2)**
4:7;17:8

## Z

**ZACHARY (1)**
5:10
**zero (1)**
22:18

## 1

**1 (1)**
11:25
**11 (1)**
9:25
**13,000 (1)**
12:13
**14th (10)**
10:20;11:7;13:4,
11;22:3;27:19;31:6;
34:21,23;35:15
**17th (1)**
11:2
**1991 (1)**
11:17
**1st (4)**
25:17;26:2;27:11;
29:21

## 2

**2:47 (1)**
38:22
**23rd (7)**
33:14,18;34:15,
25;37:16,21;38:11
**24,000 (1)**
12:11
**29 (1)**
25:15

## 3

**3 (1)**
25:11
**30 (1)**
9:6
**30,000 (3)**
7:4;25:10;26:16
**30th (2)**
13:16,19
**3rd (3)**
8:9;10:25;29:15

## 4

**408 (2)**
8:15;19:13

## 5

**500,000-dollar (1)**
36:17

## 6

**65b2 (2)**
20:3;30:22

## 9

**9:30 (2)**
37:22;38:12