**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: EMERALD OIL, INC., *et al.*,[1] <br><br> Debtors. | ) Chapter 11 <br> ) Case No. 16-10704 (KG) <br> ) (Jointly Administered) |
| EMERALD OIL, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DAKOTA MIDSTREAM, LLC; DAKOTA ENERGY CONNECTION, LLC; and DAKOTA FLUID SOLUTIONS, LLC f/k/a MESA OIL SERVICES, LLC, <br><br> Defendants. | ) <br> ) <br> ) <br> ) Adversary Proceeding No. 16-50998(KG) <br> ) <br> ) **Ref. Dkt. Nos. 6 & 7** <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Dated:  September 14, 2016

**YOUNG CONAWAY
 STARGATT & TAYLOR, LLP**
M. Blake Cleary (No. 3614)
John T. Dorsey (No. 2988)
Patrick A. Jackson (No. 4976)
Michael S. Neiburg (No. 5275)
Shane M. Reil (No. 6195)
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

**BARNET B. SKELTON, JR. P.C.**
Barnet B. Skelton, Jr. (admitted *pro hac vice*)
JP Morgan Chase Bank Building
712 Main, Suite 1610
Houston, Texas 77002
Telephone: (713) 659-8761
Facsimile: (713) 659-8764

**NILLES LAW FIRM**
Mark R. Western (*pro hac vice* pending)
Thaddeus E. Swanson (*pro hac vice* pending)
1800 Radisson Tower
201 North Fifth Street
Fargo, North Dakota 58108-2626
Telephone: (701) 237-5544
Facsimile: (701) 280-0762

*Counsel to the Defendants*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887).  The location of the Debtors' service address is: 200 Columbine Street, Suite 500, Denver, Colorado 80206.

01:19121175.9

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARDS ................................................................................................. 5

BACKGROUND REGARDING NORTH DAKOTA LAW ......................................... 8

I.       History and Application of the North Dakota Century Code ............................ 9

II.      The Nature of North Dakota Mineral Rights and Interests Therein ............... 15

GLOSSARY OF LEGAL TERMS/CONCEPTS ........................................................ 22

ADDITIONAL FACTUAL BACKGROUND ............................................................. 25

I.       Background Regarding the Parties................................................................... 26

II.      Commercial Aspects of the Midstream Industry; Dedications ....................... 28

III.     North Dakota Public Policy Favoring the Midstream Industry ...................... 32

IV.      Circumstances Surrounding the Dedication Agreements at Issue ................... 34

ARGUMENT ............................................................................................................... 39

I.       THE COVENANTS IN EMERALD'S DEDICATION AGREEMENTS  ARE
         ENFORCEABLE AT LAW AGAINST ASSIGNEES OF  EMERALD'S
         WORKING INTERESTS AS REAL COVENANTS ...................................... 40

         A.       There Was Horizontal Privity Between Emerald and Dakota (i.e., the
                  Dedication Agreements Granted an Estate in Real Property).............. 41

         B.       Vertical Privity is Not in Dispute........................................................ 60

         C.       The Parties Intended to Create Covenants Running With the Land ..... 60

         D.       Emerald's Covenants under the Dedication Agreements "Touch and
                  Concern" its Working Interests............................................................ 62

II.      IN ANY EVENT, THE COVENANTS IN EMERALD'S DEDICATION
         AGREEMENT ARE ENFORCEABLE IN EQUITY AGAINST ASSIGNEES OF
         EMERALD'S WORKING INTERESTS AS EQUITABLE SERVITUDES ................. 74

         A.       North Dakota Law Does Not Limit Equitable Servitudes to the
                  Condominium Context.......................................................................... 75

         B.       The Requirements of an Equitable Servitude Are Satisfied ............... 79

CONCLUSION............................................................................................................. 81

01:19121175.9

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams County Record v. Greater North Dakota Ass'n.*,
    564 N.W.2d 304 (N.D. 1997) ...............................................................................1, 7

*Anderson v. Marshall-Malaise Lumber Co.*,
    263 N.W. 721 (N.D. 1935) ............................................................................. passim

*ANR W. Coal Dev. Co. v. Basin Elec. Power Co-op.*,
    276 F.3d 957 (8th Cir. 2002) ......................................................................................18

*Beeter v. Sawyer Disposal LLC*,
    771 N.W.2d 282 (N.D. 2009) ...............................................................................63, 64

*Beulah Coal Mining Co. v. Heihn*,
    180 N.W. 787 (N.D. 1920) ...................................................................................16

*Bice v. Petro-Hunt, LLC*,
    768 N.W.2d 496 (2009) ......................................................................................66

*Breene v. Plaza Tower Ass'n*,
    310 N.W.2d 730 (N.D. 1981) ...............................................................................71

*Burlington Northern and Santa Fe Ry. Co. v. Burlington Resources Oil & Gas Co.*,
    590 N.W.2d 433 (N.D. 1999) .................................................................................7

*Butner v. United States*,
    440 U.S. 48 (1979)................................................................................................6

*Capsco Products, Inc. v. Savageau*,
    493 N.W.2d 650 (N.D. 1992) .................................................................................7

*Christman v. Emineth*,
    212 N.W.2d 543 (N.D. 1973) ...............................................................................16

*Corbett v. LaBere*,
    68 N.W.2d 211 (N.D. 1955) .............................................................18, 19, 20, 47

*Eakman v. Robb*,
    237 N.W.2d 423 (N.D. 1975) .....................................................................43, 45, 46

*Fed. Land Bank of St. Paul v. State*,
    274 N.W.2d 580 (N.D. 1979) ...............................................................................18

*Feland v. Placid Oil Co.*,
    171 N.W.2d 829 (N.D. 1969) ...........................................................................17, 20

*First Intern. Bank and Trust v. Peterson*,
   797 N.W.2d 316 (N.D. 2011) ................................................................................... passim

*Hill v. Lindner*,
   769 N.W.2d 427 (N.D. 2009) .................................................................................75, 76, 77

*Hunt Oil. v. Kerbaugh*,
   283 N.W.2d 131 (N.D. 1979) .......................................................................................5, 16

*Hyde v. Liebelt*,
   391 N.W.2d 186 (S.D. 1986) ...........................................................................................73

*In re Arithson*,
   175 B.R. 313 (Bankr. D.N.D. 1994) ................................................................................18

*In re Sabine Oil & Gas Corp.*,
   547 B.R. 66 (Bankr. S.D.N.Y. 2016) ...............................................................................15

*In re Sabine Oil & Gas Corp.*,
   550 B.R. 59 (Bankr. S.D.N.Y. 2016) ........................................................................ passim

*Kowalsky v. Long Beach Twp.*,
   72 F.3d 385 (3d Cir. 1995) ................................................................................................6

*Liquidating Trust of the Lovesac Corp. v. Cox (In re Lovesac Corp.)*,
   422 B.R. 478 (Bankr. D. Del. 2010) .................................................................................7

*Marra v. Aetna Const. Co.*,
   101 P.2d 490 (Cal. 1940) ...........................................................................................73, 74

*Mehus v. Thompson*,
   266 N.W.2d 920 (N.D.,1978) ..........................................................................................41

*Miller v. Schwartz*,
   354 N.W. 2d 685 (N.D. 1984) ...........................................................................17, 19, 20

*Monaco v. Bennion*,
   585 P.2d 608 (Idaho 1999)...............................................................................................52

*Northern Pac. R.R. Co. v. Herbert*,
   116 U.S. 642 (1886)..........................................................................................10, 11, 13

*Northern Pac. Ry. Co. v. McClure*,
   81 N.W. 52 (N.D. 1899) ........................................................................................ passim

*Pennington v. Flaherty*,
   303 P.3d 274 (Mont.,2013)...............................................................................................73

*Perschke v. Burlington Northern, Inc.*,
    311 N.W.2d 564 (N.D. 1981) ..............................................................................53

*Plante v. Columbia Paints*,
    494 N.W.2d 140 (N.D. 1992) ...............................................................................7

*Reeves & Co. v. Russell*,
    148 N.W. 654 (N.D. 1914) ........................................................................ passim

*Reichert v. Weeden*,
    618 P.2d 1216 (Mont. 1980) ..................................................................... passim

*Riverside Park Condo Unit Owners Ass'n v. Lucas*,
    691 N.W.2d 862 (N.D. 2005) .............................................................................71

*Slaaten v. Cliffs Drilling Co.*,
    748 F.2d 1275 (8th Cir. 1984) ................................................................6, 17, 20

*St. Clair v. Krueger*,
    769 P.2d 579 (Idaho 1989).................................................................................73

*Vanover v. Kansas City Life Ins. Co.*,
    438 N.W.2d 524 (N.D. 1989) ...............................................................................7

*Wheeler v. Southport Seven Planned Unit Dev.*,
    821 N.W.2d 746 (N.D. 2000) ...............................................................................7

**STATUTES**

49 U.S.C. App. (1988) ..............................................................................................36

49 U.S.C. §§ 60101-60503 ......................................................................................36

N.D. Cent. Code § 1-01-04 ......................................................................................11

N.D. Cent. Code § 1-02-01 ......................................................................................13

N.D. Cent. Code § 9-07-03 ......................................................................................42

N.D. Cent. Code § 9-07-06 ......................................................................................54

N.D. Cent. Code § 9-07-07 ......................................................................................47

N.D. Cent. Code § 9-07-10 ...................................................................................8, 51

N.D. Cent. Code § 9-07-12 ........................................................................................7

N.D. Cent. Code § 31-11-05 .....................................................................................40

N.D. Cent. Code § 38-08-01 .................................................................................................32

N.D. Cent. Code § 38-08-03 .................................................................................................32

N.D. Cent. Code §§ 38-08-04, *et seq.* ...................................................................................32

N.D. Cent. Code § 38-08-06.4 .......................................................................................32, 36

N.D. Cent. Code §§ 45-07-01-02, -04 ...................................................................................73

N.D. Cent. Code § 47-01-06 .....................................................................................17, 47, 67

N.D. Cent. Code § 47-04.1 ....................................................................................................71

N.D. Cent. Code § 47-04-01 ....................................................................................................6

N.D. Cent. Code § 47-04.1-04 ...............................................................................................72

N.D. Cent. Code § 47-04-24 .....................................................................................22, 38, 67

N.D. Cent. Code §§ 47-04-24-26 ...........................................................................................63

N.D. Cent. Code § 47-04-26 ........................................................................................ passim

N.D. Cent. Code §§ 47-04-26-47-04-32 ................................................................................22

N.D. Cent. Code § 47-05-01 .....................................................................................16, 17, 47

N.D. Cent. Code § 47-05-02.1 ...............................................................................................77

N.D. Cent. Code § 47-05-02.1(1) ..........................................................................................77

N.D. Cent. Code § 47-05-02.1(2) ..........................................................................................77

N.D. Cent. Code § 47-05-02.1(3) ..........................................................................................77

N.D. Cent. Code § 47-05-03 ..................................................................................................23

N.D. Cent. Code § 47-05-04 ..................................................................................................23

N.D. Cent. Code § 47-05-05 ..................................................................................................77

N.D. Cent. Code § 47-09-11 ............................................................................................41, 54

N.D. Cent. Code § 47-09-13 ..................................................................................................53

N.D. Cent. Code § 47-09-13 (ii) ............................................................................................52

N.D. Cent. Code § 47-10-01 ..................................................................................................40

N.D. Cent. Code § 47-19-42 ...................................................................................44, 46

N.D. Cent. Code § 47-10-06 ........................................................................................41

**RULES**

Fed. R. Civ. P. 56................................................................................................................7

Fed. R. Civ. P. 56(a) ........................................................................................................25

Fed. R. Civ. P. 56(d) ..........................................................................................................8

**OTHER AUTHORITIES**

Black's Law Dictionary (10th ed. 2014).................................................................18, 52

Max Frumes, *Texas Showdown in Bankruptcy Court: How Texas Judges May Challenge New York Decisions That Have Proved Friendly for Oil and Gas Drillers* ............................15

Merriam-Webster's Collegiate Dictionary ....................................................................51

William B. Fisch, *The Dakota Civil Code: Notes for an Uncelebrated Centennial*, 43 N.D. L. Rev. 485 (1966) ..........................................................................9, 10

William B. Fisch, *The Dakota Civil Code: More Notes for an Uncelebrated Centennial*, 45 N.D. L. Rev. 9 (1968) ..........................................................................9, 10

Andrew Scott Graham, *Real or Personal?: The Area of Mutual Interest Covenant in the Williston Basin After Golden v. SM Energy Company*, 89 N.D. L. Rev. 241 (2013) ...........................................................................38

Brief of Appellant, *Beeter v. Sawyer Disposal LLC*, No. 20080346, 2009 WL 1023586 (N.D. Feb. 2009) (Appellate Brief) .......................................66

Brief of Appellee, *Beeter v. Sawyer Disposal LLC*, No. 20080346, 2009 WL 1023585 (N.D. Feb. 2009) (Appellate Brief) .......................................66

**INTRODUCTION**[2]

1.      Defendants Dakota Midstream, LLC ("Dakota Midstream"), Dakota Energy Connection, LLC ("Dakota Energy"), and Dakota Fluid Solutions, LLC f/k/a Mesa Oil Services, LLC ("Dakota Fluid") (collectively, "Dakota") hereby file this answering brief in opposition to the motion for summary judgment [D.I. 6] and opening brief [D.I. 7] filed by the above-captioned debtor-plaintiffs (collectively, "Emerald").

2.      Emerald is not entitled to summary judgment on its request for a declaration that the Dedication Agreements did not give rise to covenants or servitudes "running with the land" under North Dakota law.  Emerald's legal analysis rests upon several false premises, including (but not limited to), the following:

- that statutes are the sole source of substantive law in North Dakota (they are not—the common law provides the necessary backdrop for interpretation of the statutes, as well as the rule of decision in unprovided-for cases);

- that the subject matter of the Dedication Agreements is "personal property" and not "real property," because the agreements refer to produced oil, gas, and saltwater (not true—the agreements concern *both* personal property and real property);

- that particular words are necessary to grant an interest in real property (they are not—the intent of the parties, in light of the circumstances of their transaction, is what matters);

- that determination whether a covenant "touches and concerns the land" is a pure question of law (to the contrary—it is a pure question of fact); and

- that equitable servitudes apply only in the condominium context (not so—the North Dakota Century Code has an entire chapter devoted to servitudes, and common law principles continue to apply).

---

[2] Capitalized terms not defined in this Introduction have the meanings ascribed to them in the body of this brief.

01:19121175.9

3.      As a result of Emerald's flawed (and mostly unexplained) legal assumptions, Emerald's opening brief fails to mention, let alone discuss, much of the law and factual context that is relevant to this dispute.  Accordingly, to ensure full and fair consideration of the important issues at stake, Dakota sets out the applicable legal standards in detail below, including the following:

- the Court's duty, under the *Erie* doctrine, to predict how the North Dakota Supreme Court would rule on the issues presented (which precludes reliance on *Sabine*, a New York federal court decision dealing with Texas law);

- the role and continued viability of the common law in North Dakota despite the State's adoption of an extensive civil code (which requires consideration of common law norms when interpreting the statutes, and application of common law rules where the statutes are silent); and

- the nature of mineral rights and interests therein under North Dakota law (which demonstrates that the right to construct pipelines and associated infrastructure necessary to transport oil, gas, and saltwater, and the right to transport, are interests in real property—or "sticks" included in Emerald's "working interest" bundle—which were capable of being bargained away and were in fact conveyed to Dakota in the Dedication Agreements).

Thereafter, Dakota will provide additional legal and factual background, including:

- the prevalence of "dedication" arrangements in the oil and gas industry, and the commercial expectations associated with those arrangements;

- the strong public policy in North Dakota favoring the midstream services industry, particularly as it relates to the capture of natural gas, including associated natural gas from oil wells, that would otherwise be flared to the detriment of the environment or cause wells to be shut in and not produce; and

- the particular circumstances of the parties' negotiation and entry into the Dedication Agreements at issue in this case.

4.      **Against this backdrop, Dakota will establish that its Dedication Agreements gave rise to covenants that run with Emerald's Working Interests and are enforceable at**

01:19121175.9

2

**law against Emerald's assignees, specifically: (i) an affirmative covenant to deliver to Dakota all of its production of oil, gas, and saltwater within the Area of Dedication, subject to the terms and conditions of the Dedication Agreements, and (ii) a restrictive covenant *not* to deliver any such production to another transporter.**

5.    Emerald's arguments to the contrary—i.e., that the Dedication Agreements do not convey an interest in real property and do not touch and concern "the land" (which, for sake of discussion, Dakota will assume is intended to refer to Emerald's Working Interests[3])—miss the mark.

6.    To the former point, Emerald's Working Interests are interests in real property. Using the familiar "bundle of sticks" analogy, Emerald's "working interest" bundle includes sticks representing (i) the right to explore for oil on particular land, (ii) the right to produce oil, gas, and saltwater from that land (gas and saltwater being byproducts of the production of oil in these wells), (iii) the right to transport produced oil, gas, and saltwater off of that land, and (iv) the right to make reasonable use of the surface of the land for said exploration, production, and transportation.  By the Dedication Agreements, and in consideration for use of Dakota's gathering systems and for Dakota's provision of firm (for oil) and highest-priority (for gas and saltwater) transportation service, Emerald conveyed to Dakota sticks representing (i) the right to transport produced oil, gas, and saltwater (i.e., by "dedicating and committing" to the performance of the contract all of its working interest share in production of oil, gas, and

---

[3] Throughout its Opening Brief, Emerald refers to "the land" generically, perhaps because it did not know (or for strategic reasons, did not want to say) what specific interest in real property Dakota would argue is burdened by the Dedication Agreements.  Since Emerald presumably intended the arguments in its Opening Brief to be responsive to the legal positions actually taken by Dakota, Dakota will treat references to "the land" in Emerald's Opening Brief as meaning its working interests in oil and gas leases, wells or lands in McKenzie County, North Dakota (collectively, the "Working Interests").

01:19121175.9

3

saltwater) from designated receipt points to designated re-delivery points within a geographical area defined by specific township and range legal land description (the "Area of Dedication"),[4] and (ii) the right to make use of the surface of the land for said purpose (i.e., by assigning to Dakota the easements and rights under Emerald's oil and gas leases necessary for Dakota to build its pipeline infrastructure).[5]  This was clearly a grant of an interest in real property—indeed, *several* interests, including an affirmative covenant, a restrictive covenant, and easements.  And to suggest otherwise evidences a fundamental misunderstanding of the Dedication Agreements, North Dakota law, or both.

7.      To Emerald's latter point, the Dedication Agreements do in fact "touch and concern" the Working Interests because they provide for the transportation of produced oil, gas, and saltwater, without which the Working Interests would be functionally worthless, as the production would be shut-in and stranded in place.  To further illustrate in terms of the "sticks" analogy, imagine if Emerald's "working interest" bundle included only the rights to explore and produce, with no right to *transport* the production to market—whatever Emerald paid for its Working Interests would have been too much.  The value of the "working interest" bundle to Emerald was its combination of exploration, production, *and* transportation rights.  The oil and gas leases that are the source of Emerald's Working Interests, and indeed all oil and gas leases, expressly contemplate off-lease transport of the minerals to downstream markets in their royalty and other provisions.  Thus, to suggest that transportation of the production, especially the most

---

[4] A legal description of the Area of Dedication is attached as Exhibit A to each of the Dedication Agreements.

[5] The dedication agreements at issue in *Sabine*, by contrast, did not itself assign any easements to the midstream company.  *See In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 63 (Bankr. S.D.N.Y. 2016) ("*Sabine II*") (noting Nordheim agreement contemplated "a separate and subsequent conveyance" of a tract of land and easements necessary for Nordheim to construct its gas gathering system).

critical first transportation link off the lease, is a mere "service" unrelated to the value of the Working Interests is untenable.[6]  Indeed, if anything, the value of Emerald's Working Interests was increased by the construction of the Dakota infrastructure pursuant to the Dedication Agreements, which infrastructure provides take-away to markets, high grading of production, and disposal of wastes.

8.      **Even if the technical requirements for a covenant running with the land were not met, Emerald's covenant under the Dedication Agreements not to deliver its production to any other transporter would be enforceable in equity against Emerald's assignees as an equitable servitude.**

9.      To prevail on its motion for summary judgment, Emerald would need to show that there is *no legal or equitable theory* under which the Court could conclude that the Dedication Agreements give rise to burdens upon Emerald's Working Interests that are binding on Emerald's assignees under North Dakota law.  Emerald cannot do so.  Accordingly, Emerald's motion for summary judgment must be denied.

## LEGAL STANDARDS

10.      ***Butner v. United States***.  By this action, Emerald seeks a determination regarding the existence, nature, and scope of Dakota's rights in Emerald's Working Interests arising under the Dedication Agreements.  "Property interests are created and defined by state law," and uniform treatment of property interests by state and federal courts "serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy."  *Butner v. United States*, 440 U.S. 48, 55 (1979) (internal

---

[6] *See Hunt Oil. v. Kerbaugh*, 283 N.W.2d 131, 135 (N.D. 1979) (noting that absent the ability to transport minerals to market, "the mineral estate would be meaningless and worthless").

01:19121175.9

5

quotation marks, citation omitted).  Emerald's Working Interests in North Dakota are governed by North Dakota law.  N.D. Cent. Code § 47-04-01 (real property located in North Dakota is governed by North Dakota law).  In addition, the Dedication Agreements have a choice-of-law provision specifying North Dakota law.  (Ded. Agmts. § 8.9.)  Accordingly, North Dakota law governs all aspects of this dispute, which Emerald appears to acknowledge.  (Op. Br. at 6).

11.     *Erie* **Doctrine.**  When deciding a case under state law, a federal court "must predict how the highest court of that state would decide the relevant legal issues." *Kowalsky v. Long Beach Twp.*, 72 F.3d 385, 388 (3d Cir. 1995).  Thus, "[i]n interpreting a state statute, a federal court is bound by the construction given the statute by the highest court within the state." *Slaaten v. Cliff's Drilling Co.*, 748 F.2d 1275, 1277 (8th Cir. 1984).  And in the absence of precedent directly on point, "it is the duty of the federal court, in dealing with matters of either common law or statute, to have regard for any persuasive data that is available, such as compelling inferences or logical implications from other related adjudications." *Id.* (internal quotation marks, citation omitted).  As discussed further below, there is no decision of the North Dakota Supreme Court directly on point concerning the matters raised in this case.  Accordingly, this Court must resort to other persuasive authorities, which in North Dakota include (i) principles of common law in the United States around the time of the enactment of the "Field Code" by the Dakota territorial legislature in 1866; (ii) case law from other "Field Code" States (i.e., California, South Dakota, Montana, Idaho), and (iii) other sources of modern common law

(e.g., the *Restatement (Third) of Property: Servitudes* (the "*Restatement*")),[7] to the extent not inconsistent with the North Dakota statutes. Against this backdrop, and as will be demonstrated below, the *Sabine* decision upon which the Debtors have placed so much reliance—where a federal judge in New York considered issues of Texas law—is not even *probative*, much less determinative, of how the North Dakota Supreme Court would decide the issues presented in this case.

12. **Fed. R. Civ. P. 56.** Dakota agrees with the general standards governing summary judgment set forth in Emerald's opening brief (Op. Br. at 1-2), with the important addition that "all reasonable inferences must be drawn in favor of" and "all doubt must be read in favor of" Dakota as the non-moving party. *Liquidating Trust of the Lovesac Corp. v. Cox (In re Lovesac Corp.)*, 422 B.R. 478, 482 (Bankr. D. Del. 2010) (footnotes omitted). Dakota disagrees, however, with Emerald's assertions that this mater "can be resolved as a matter of law" and is "ideally suited" for summary judgment. While the construction of a contract is typically a question of law, factual issues can arise where, as here, the circumstances of the transaction shed light on the intent of the parties, or where the contract uses technical terms that must be accorded their meaning within the applicable industry. *See* N.D. Cent. Code §9-07-12 ("A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates.") and § 9-07-10 ("Technical words are to be interpreted as usually understood by

---

[7] The North Dakota Supreme Court regularly cites with approval the Restatements of the Law. *See, e.g., Wheeler v. Southport Seven Planned Unit Dev.*, 821 N.W.2d 746, 752 (N.D. 2000) (*Restatement*); *Burlington Northern and Santa Fe Ry. Co. v. Burlington Resources Oil & Gas Co.*, 590 N.W.2d 433, 437 (N.D. 1999) (Restatement (Second) of Agency)); *Adams County Record v. Greater North Dakota Ass'n.*, 564 N.W.2d 304, 306 (N.D. 1997) (Restatement (Second) of Contracts)); *Capsco Products, Inc. v. Savageau*, 493 N.W.2d 650, 653 (N.D. 1992) (Restatement (Second) of Torts)); *Plante v. Columbia Paints*, 494 N.W.2d 140, 142-43 (N.D. 1992) (Restatement (Second) of Conflict of Laws)); *Vanover v. Kansas City Life Ins. Co.*, 438 N.W.2d 524, 526 (N.D. 1989) (Restatement (Second) of Judgments)).

01:19121175.9

7

persons in the profession or business to which they relate, unless clearly used in a different sense."). In addition, the determination whether a covenant "touches and concerns land," which is squarely at issue in this case, is "*wholly one of fact.*" *Anderson v. Marshall-Malaise Lumber Co.*, 263 N.W. 721, 724 (N.D. 1935) (emphasis added). And while Dakota has done its best under the circumstances to obtain necessary discovery on these factual matters on an expedited time frame, it is possible that additional facts may be required in support of Dakota's opposition to Emerald's summary judgment motion, e.g., depending on what Emerald may say by way of reply to this brief. Accordingly, Dakota reserves the right to request appropriate relief under Fed. R. Civ. P. 56(d), to the extent necessary.

## BACKGROUND REGARDING NORTH DAKOTA LAW

13. As noted above, Emerald's arguments are premised upon a number of erroneous assumptions regarding North Dakota law. Two such assumptions are particularly pervasive in Emerald's opening brief, and must be corrected at the outset here in order to properly frame the factual background and legal argument that follows.

14. First, Emerald seems to think that statutes are the sole source of substantive law in North Dakota. As discussed below, this is not at all the case—the common law continues to apply, both to inform the application of statutes and to provide the rules of decision where the statutes are silent.

15. Second, Emerald seems to think that because oil, gas, and saltwater become "personal property" once removed from the ground, a contract providing for the transportation of oil, gas, and saltwater *yet to be* removed from the ground concerns solely "personal property" and cannot convey an interest in "real property." But as discussed below, the distinction between minerals in the ground and minerals severed from the ground has no bearing on

01:19121175.9

Emerald's Working Interests themselves, which are the real property interests under North Dakota law that are at issue in this case.

## I.      History and Application of the North Dakota Century Code

16.      At the August 1, 2016, hearing Emerald's counsel suggested to the Court that the issues involved in this case were "straightforward" because North Dakota has a statute that applies to real covenants.  (Hr'g Tr. 8/1/16 at 9:8-16; *see id.* at 24:3-5 ("And so we have a statute and . . . we have a contract.  And we just take the two and we see how they add up.")).  While North Dakota is indeed a "civil code" jurisdiction with extensive statutory law, this does not mean what Emerald thinks it means.

17.      The genesis of much of North Dakota's statutory law, now known as the Century Code, was a draft civil code (the "Field Code") promulgated in 1865 for (but never enacted in) the State of New York by a commission headed by David Dudley Field II, an American lawyer and legal reformer.[8]  *See generally* William B. Fisch, *Civil Code: Notes for an Uncelebrated Centennial*, 43 N.D. L. Rev. 485 (1966) ("Fisch I"); William B. Fisch, *The Dakota Civil Code: More Notes for an Uncelebrated Centennial*, 45 N.D. L. Rev. 9 (1968) ("Fisch II").  The Field Code was enacted in 1866 by the legislature of the Dakota Territory, which included all of present-day North Dakota and South Dakota.  Fisch I, *supra*, at 485; Fisch II, *supra*, at 37.  It was later enacted, with certain amendments, by California (in 1872), Idaho (in 1887), and Montana (in 1895).  Fisch I, *supra*, at 485-86.  The provisions of the Field Code were consolidated and reordered in South Dakota and North Dakota in 1939 and 1943, respectively, but the provisions themselves were largely retained.  Fisch II, *supra*, at 51; Fisch I, *supra*, at 486

---

[8] Field was also the driving force behind the more famous Code of Civil Procedure, which was adopted in New York and several other states, and served as an intermediate step between the common law and modern civil procedure rules.  References to the "Field Code" in this brief refer to Field's civil law code, not his civil procedure code.

(noting "in North Dakota, the better portion of the original provisions remains in pieces scattered throughout the consolidated Century Code").

18.    The Field Code was not intended to be all-encompassing, to supplant the entire body of then-extant common law, or to prohibit the further development of the common law. This is evident from Field's own introduction to the proposed legislation, where he stated:

> [I]f there be an existing rule of law omitted from this code, and not inconsistent with it, that rule will continue to exist in the same form in which it now exists, and if new cases arise, as they will, which have not been foreseen, they may be decided, if decided at all, by analogy to some rule in the Code, or to some rule omitted from the Code and therefore still existing, or by the dictates of natural justice.

Fisch I, *supra*, at 501 (citation omitted).  This is precisely how the United States Supreme Court understood the Field Code, as enacted in the Dakota Territory, to operate—as explained in an opinion penned by Field's brother, Justice Stephen Johnson Field.  *See Northern Pac. R.R. Co. v. Herbert*, 116 U.S. 642, 654 (1886) (Field, J.).

19.    In *Herbert*, an employer sought to avail itself of a statutory defense to liability for an on-the-job injury to an employee, and the viability of the defense turned upon whether the maintenance of rail cars would be considered the "same general business" as the operation of rail cars within the meaning of the statute.  116 U.S. at 652-53.  The statute codified a well-established common-law defense to liability for employers, but under the common law it was equally well-established that an employer could not avail itself of this defense under the circumstances presented.  *Id.* at 653-54.  The Court took this established common law into account when construing the statute, reasoning, in pertinent part, as follows:

> We do not perceive that the provision of the sixth section of the Civil Code of Dakota, that in the territory "there is no common law

in any case where the law is declared by the Codes,"[9] at all affects the question before us.  There cannot be two rules of law on the same subject contradicting each other; therefore where the Code declares the law there can be no occasion to look further; but where the Code is silent the common law prevails.  What constitutes the "same general business" is not defined by the Code, but may be explained by the adjudged cases.  The declaration by the Code of a general rule, which is conformable to the existing law, does not prevent the courts from looking to those cases for explanation any more than it prevents them from looking into the dictionary for the meaning of words.

*Herbert*, 116 U.S. at 654.

20.    *Herbert* is consistent with the North Dakota Supreme Court's application of the Field Code following North Dakota's statehood in 1889.  *See Reeves & Co. v. Russell*, 148 N.W. 654 (N.D. 1914); *Northern Pac. Ry. Co. v. McClure*, 81 N.W. 52 (N.D. 1899).

21.    In *McClure*, the North Dakota Supreme Court considered whether a lease provision requiring the lessee of real property to indemnify and hold the lessor harmless from certain claims was enforceable by the purchaser of the real property as a covenant running with the land.  81 N.W. at 53.  The lessee argued that the indemnification provision could not be enforced as a covenant running with the land because, among other reasons, indemnification was not one of the covenants specifically enumerated in the applicable statutory provisions.[10]  *Id.* at 54.  The North Dakota Supreme Court rejected this argument, finding the statute's enumeration of some of the most common covenants did not mean that all others were excluded, because it was "not conceivable that the legislature intended to limit such covenants to those mentioned, and exclude the great number which have for generations been held as covenants running with the land, and as binding assigns."  *Id.*  The court went on to identify seventeen such covenants

---

[9] This provision persists in section 1-01-04 of the North Dakota Century Code, which states, "In this state there is no common law in any case in which the law is declared by the code."

[10] The provisions cited by the lessee in *McClure* persist in sections 47-04-24 through 47-04-27 of the North Dakota Century Code and are discussed further below.

(which it characterized as "but a few"), arising in cases "as various as the particular covenants upon which they are based," and instructed that "in the future *each particular case must be determined by itself*, by the application of the principle declared by common law or by statutes, where they exist." *Id.* at 55 (emphasis added).

22.      The North Dakota Supreme Court reaffirmed the continued vitality and role of the common law in North Dakota in *Russell*, which involved a priority dispute between the holder of an artisan's lien and the holder of a chattel mortgage upon the same property. 148 N.W. at 655-56. The North Dakota statutes in effect at the time of the chattel mortgage's creation in 1906 (i) recognized artisan's liens, without specifying their priority vis-à-vis chattel mortgages, and (ii) provided that, "[o]ther things being equal, different liens upon the same property have priority according to the time of their creation . . . ." *Id.* at 657 (internal quotation marks, citations omitted). The statutes were amended in 1907 to expressly provide that artisan's liens have priority over chattel mortgages. *Id.* at 656. The artisan's lien arose in 1911; thereafter, the mortgagee foreclosed on the collateral and sought turnover from the artisan, who refused and sought to foreclose in its own right on the basis that its lien was superior to the mortgage. *Id.* The mortgagee argued the statute affording artisan's liens priority over chattel mortgages was unconstitutional to the extent it affected the priority of a pre-existing mortgage. *Id.* The court found it unnecessary to reach this constitutional question because the artisan's lien had priority over the mortgage under the common law at the time the mortgage was created, irrespective of the later-enacted statute:

> Whether the statute is thus retrospective or not is immaterial, under the law controlling this decision. In construing statutes on liens, the first consideration is whether the lien is one given at common law, or is instead dependent for its existence solely upon the terms of the statute. *Where the statute is merely declaratory of the common law, it is construed together with, and in the light of, the*

> *common law; the Legislature being presumed to know the common law on the subject and to enact the statute as merely declaratory thereof, and to be so interpreted in the light of its origin and common-law definition, where the statute does not depart from the governing common-law principles.*  And this here applies, as artisans' liens are a creation of the common law and not a special lien originating under, and dependent upon, statute for its creation and existence.

*Id.* (emphasis added).

23.    The mortgagee petitioned for rehearing, challenging the court's consideration of the common-law priority of artisans' liens at the time of the mortgage's creation as "judicial legislation" in light of the statutory provisions (i) stating that "there is no common law in any case where the law is declared by the Codes" (as discussed in *Herbert*, above); (ii) stating that "[t]he rule of the common law that statutes in derogation thereof are to be strictly construed have no application to this Code[, which] establishes the law of this state respecting the subjects to which it relates,"[11] (iii) recognizing artisan's liens, but not expressly granting them priority over chattel mortgages, and (iv) establishing a first-in-time-first-in-right rule of priority among competing liens upon the same property.  *Russell*, 148 N.W. at 657 ("In other words, appellant asserts that, in the determination of this question, we are limited to a construction of the statutes, and cannot resort to the common-law rights of the parties to determine the question of priority, where the statute is silent thereon.").  The court rejected this argument, reasoning, in pertinent part, as follows:

> In its last analysis the decision resolves to whether the provisions of our Civil Code are to be considered as continuations of the common law as well as continuations of statute, or whether, on the contrary, the fact that a common-law lien has been declared by

---

[11] This provision persists in section 1-02-01 of the North Dakota Century Code, which states, "The rule of the common law that statutes in derogation thereof are to be construed strictly has no application to this code.  The code establishes the law of this state respecting the subjects to which it relates . . . ."

statute makes all rights thereunder dependent solely on the statute, without regard to common-law incidents, rights, or history, in which case a priority that would here exist under the same circumstances at common law as an incident to the same lien given by common law as here declared, also by statute, would be negative and defeated by the mere silence of the statute on priority. . . .

The conclusions in the main opinion are sustained by all authority, and appellant's attack thereon loses all force in the face of the fact that the common law is by statute (sections 4003, 4004, 4005, R. C. 1905)[12] declared to be the basic law, thereby requiring statutory enactment, to be considered but a continuation of the common law as to civil rights and liabilities. . . .

. . . . Manifestly civil statutes must be regarded as they have always been construed to be, but continuations, affirmances, modifications, or repeals of basic common law governing principles, and to be interpreted in the light of the common law as has been done for generations. . . .

*Id.* at 658. Quoting from a variety of treatises, the court then endorsed several principles of

statutory interpretation, including the following:

- "[S]tatutes are not presumed to make any alteration in the common law further or otherwise than the act does expressly declare."

- "[T]he rules of the common law are not to be changed by doubtful implication."

- "First in importance is the consideration of what was the rule at the common law[.]  To know what the common law was before the making of a statute whereby it may be seen whether the statute was introductory of a new law or only affirmative of the common law, is the very lock and key to set open the windows of the statute."

- "In all doubtful matters, and when the statute is in general terms, it is subject to the principles of the common law; it is to receive such construction as is agreeable to that law in cases of the same nature."

*Id.* at 659 (internal quotation marks, citations omitted).

---

[12] The cited provisions of the 1905 statute persist in sections 1-01-03 through 1-01-05 of the North Dakota Century Code.

24.     Against this backdrop, the suggestion that resolution of the issues presented by this case are "straightforward" simply because North Dakota has a civil code is misguided.  The Court cannot simply look at the statutes, look at the Dedication Agreements, and "see how they add up."  A far more nuanced analysis is required, taking into consideration common law norms when interpreting the statutes and applying common law rules where the statutes are silent.  As discussed below, this analysis will establish that Emerald's covenants under the Dedication Agreements constitute burdens on Emerald's Working Interests that are enforceable against assignees of such Working Interests (i) at law, as real covenants and (ii) in equity, as equitable servitudes.

**II.     The Nature of North Dakota Mineral Rights and Interests Therein**

25.     In its opening brief, Emerald asserts that, "[u]nder North Dakota law, the severance of oil and gas from the ground marks a change in the nature of any interest therein from real property to personal property."  (Op. Br. at 9).  From this premise, Emerald reasons that the Dedication Agreements could not give rise to an interest in real property, because the agreements concern the transportation of oil, gas, and saltwater that have become personal property upon severance from the ground.  (*Id.* at 9-10).  The *Sabine* court employed similar reasoning to conclude that the right to transport produced minerals was not one of the "sticks" within the bundle of real property rights comprising the debtors' mineral interests under Texas law; as a result, the court concluded the dedication agreements at issue in that case did not give rise to an interest in real property.  *In re Sabine Oil & Gas Corp.*, 547 B.R. 66, 76 (Bankr.

S.D.N.Y. 2016) ("*Sabine I*").  Whatever the merits of this reasoning under Texas law,[13] it is inconsistent with North Dakota law, under which the right to transport produced minerals is clearly one of the "sticks" within the bundle of real property rights comprising Emerald's Working Interests, which Emerald was free to (and in fact did, for a term of years) bargain away to Dakota via the Dedication Agreements.  The importance of this issue to the overall analysis cannot be overstated, since in order to determine whether a covenant "runs with the land" one must begin with an understanding of what "the land" is, exactly.

26.     In North Dakota, as elsewhere, a fee-simple absolute interest in real property is akin to a bundle of sticks that can be separated into distinct bundles comprising "surface" rights and "mineral" rights.  *See Beulah Coal Mining Co. v. Heihn*, 180 N.W. 787, 790 (N.D. 1920).  Severance of the mineral estate from the surface estate creates two separate estates in land, "as distinct as if they constituted two different parcels of land."  *Id.*[14]  However, because ownership of the minerals in place would be worthless without the means to remove them from the land and transport them to market for sale, the law implies an easement by necessity upon the surface estate, for the benefit of the mineral estate, which permits the use of "so much of the surface . . . as [is r]easonably necessary to explore, develop, *and transport* the minerals."  *Hunt Oil. v.*

---

[13] The *Sabine* decision is on appeal, and Judge David Jones from the United States Bankruptcy Court for the Southern District of Texas, who is presiding over the chapter 11 case of SandRidge Energy, Inc., said earlier this summer that he has "been looking for an opportunity to correct the state of New York."  Max Frumes, *Texas Showdown in Bankruptcy Court: How Texas Judges May Challenge New York Decisions That Have Proved Friendly for Oil and Gas Drillers*, available at http://www.forbes.com/sites/maxfrumes/2016/08/09/texas-showdown-in-bankruptcy-court-how-texas-judges-may-challenge-new-york-decisions-that-have-proved-friendly-for-oil-and-gas-drillers/ (last visited September 1, 2016).

[14] Actually, as the *Beulah* court noted, there can be as many "mineral estates" as there are minerals in the ground, and each can be owned by a different person.  180 N.W. at 789 ("There may be as many different owners as there are strata; thus one person may own the surface, another may be entitled, by conveyance, to the iron, another to the limestone, and still another to the stratum of coal.").

*Kerbaugh*, 283 N.W.2d 131, 135 (N.D. 1979) (emphasis added);[15] *see Christman v. Emineth*, 212 N.W.2d 543, 551 (N.D. 1973) ("[U]nless the language of the conveyance repels such a construction, as a general rule a grant of . . . minerals gives to the owner of the minerals the incidental right of entering, occupying, and making such use of the surface lands as is reasonably necessary in exploring, removing, and marketing the minerals." (internal quotation marks, citation omitted)).  This easement is, of course, an interest in real property.  *See* N.D. Cent. C. § 47-01-03 (defining real property to include "[t]hat which is incidental or appurtenant to land"), § 47-01-06 (deeming a thing to be "incidental or appurtenant to land" when "it by right is used with the land for its benefit"), and § 47-05-01 (describing easements for taking water and minerals as "incidents or appurtenances" to land).

27.    The owner of a mineral estate can separate its bundle of sticks by "leasing" all or a portion of its mineral rights to another (or several others) for a term of years.  The interest conveyed to a lessee under a mineral lease, commonly referred to as a "working interest," vests in its owner "the exclusive right to exploit the minerals on the land" for the lease term.  *Miller v. Schwartz*, 354 N.W. 2d 685, 688 (N.D. 1984) (internal quotation marks, citation omitted).  However, as with the mineral estate itself, a mineral lease "would be meaningless and worthless unless the mineral lessee were allowed to use the surface to develop its leasehold interest."  *Slaaten v. Cliff's Drilling Co.*, 748 F.2d 1275, 1277 (8th Cir. 1984) (citing *Hunt Oil*, 283 N.W.2d at 135).  Accordingly, the law also implies an easement upon the surface estate for the benefit of the owner of the working interest in the mineral lease, to make reasonable use of the surface as is

---

[15] The *Hunt Oil* court used the term "servitude" rather than "easement," but easements are a form of servitude, and were the particular form at issue in the *Hunt Oil* case.  *See* Restatement (Third) of Property: Servitudes § 1.1(2) and cmt. d; N.D. Cent. Code § 47-05-01 ("The following land burdens or servitudes upon land may be attached to other land as incidents or appurtenances and then are called easements . . . .").

reasonably necessary to explore, develop, and transport the minerals. *See id.*; *Feland v. Placid Oil Co.*, 171 N.W.2d 829, 834 (N.D. 1969) ("An oil and gas lease carries with it the right to possession of the surface to the extent reasonably necessary to enable the lessee to perform the obligations imposed upon him by the lease" (internal quotation marks, citation omitted)).[16] Under North Dakota law, the total bundle of sticks held by the owner of a working interest in a mineral lease is an estate in real property known as a *profit à prendre* ("profit of taking"), which is an incorporeal hereditament (i.e., intangible right in land that can pass by inheritance) consisting of an easement *plus* the right to take minerals from the land. *Corbett v. LaBere*, 68 N.W.2d 211, 214 (N.D. 1955); Black's Law Dictionary (10th ed. 2014) ("*profit à prendre*" and "incorporeal hereditament"); Restatement § 1.2(2) and cmts. d & e.

28.     The grantor or owner of a mineral estate can divide their respective bundles of sticks by reserving from the grant of the mineral estate or from the mineral lease, as applicable, "royalty interests" for themselves.[17] A royalty interest entitles its owner to a percentage share of "all the [minerals] produced and saved from the land in question," *Corbett*, 68 N.W.2d at 212, payable in kind at the wellhead (in the case of oil) or in cash from the proceeds of the sale of the minerals. A royalty interest is considered "unaccrued" as to any minerals that have not yet been produced, and "accrued" as to any minerals that have been produced. *ANR W. Coal Dev. Co. v. Basin Elec. Power Co-op.*, 276 F.3d 957, 965 n.11 (8th Cir. 2002). An *accrued* royalty is an interest in personal property because, as Emerald correctly observes, severance of minerals from

---

[16] This easement also encompasses the disposal of saltwater from oil drilling operations. *See Feland*, 171 N.W.2d at 834-35 (holding mineral lessee had the right "to dig an additional [saltwater disposal] pit if . . . reasonable for the purpose of extracting gas and oil contemplated by the lease" irrespective of the mineral lessors' consent to the same).

[17] While typically created by reservation from a grant, a royalty interest can also be created by a grant. *See, e.g., Corbett*, 68 N.W.2d at 212 (royalty interest conveyed by fee owner of real property).

the ground converts them from real property into personal property. *See Fed. Land Bank of St. Paul v. State*, 274 N.W.2d 580, 582 (N.D. 1979) (holding tax on accrued royalties was not a tax on real estate); *In re Arithson*, 175 B.R. 313, 322 (Bankr. D.N.D. 1994) (holding U.C.C. Article 9 governed the perfection of security interest in accrued royalties). An *unaccrued* royalty, by contrast, is an "estate in real property in the nature of an incorporeal hereditament." *Corbett*, 68 N.W.2d at 214. This is so even though the instrument granting the royalty is phrased in terms of "produced" minerals. *See id.* at 213 (royalty expressed as a percentage "of all the oil and of all the gas produced and saved from the hereinafter described lands").

29. The owner of a working interest in a mineral lease can divide its bundle of sticks by conveying a percentage of its working interest to another. *See, e.g., Miller*, 354 N.W.2d at 686 (involving partial conveyances of working interests). It can also divide its bundle of sticks by conveying present interests in its future production of minerals, as Emerald itself acknowledged in its first-day motion seeking authority to make "Mineral Payments" [D.I. 8] (the "Mineral Payment Motion"). In that motion (which was granted by the Court [D.I. 44 & 204]), Emerald represented that a working interest in an oil and gas lease may be "subject to or burdened by *various other interests in . . . production*," which can take "*many forms* including, *but not limited to*, the following" (emphasis added):

- overriding royalty interests, i.e., "non-possessory *interests in oil and gas produced at the surface*, free of the expense of production" (emphasis added);

- non-participating royalty interests, i.e., "expense-free *interests in oil and gas as, if, and when produced*" (emphasis added);

- net profits interests, i.e., "*shares of gross production* from a property, measured by net profits from operation of a property" (emphasis added); and

- production payments, i.e., "*shares of the minerals*, up to a specified quantum of production or dollar amount, *produced from*

01:19121175.9

19

*the described premises*, free of the costs of production at the surface" (emphasis added).

(Min. Pymt. Mot. ¶ 8 and n. 4-7 (citing Patrick J. Martin & Bruce M. Kramer, *Williams & Meyers, Oil & Gas Law* §§ 418, 301, 424 & 422 (LexisNexis Matthew Bender 2015)). Emerald further represented that the foregoing interests in production are "considered interests in real property in North Dakota," which "vest with the [holders thereof] upon the creation, assignment, or other conveyance of such interest[s]." (*Id.* ¶ 25 (citing *ANR W. Coal Dev. Co.*, 276 F.3d at 965; *Corbett*, 68 N.W.2d at 214)). These representations in the Mineral Payment Motion are difficult to square with Emerald's suggestion in its opening brief that a contract concerning produced minerals cannot give rise to a real property interest. But the best illustration of the flaws in Emerald's reasoning is to "follow the sticks" that make up the Working Interests that are at the center of this dispute.

30.     Included in the appendix to this brief is an oil and gas lease in which Emerald owns a working interest, which is typical of Emerald's other leases and contains a grant clause that describes the sticks being conveyed thereby as follows:

> Lessor . . . by these presents does grant, demise, lease and let exclusively unto the said Lessee, the land hereinafter described, with the exclusive right for the purpose of mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and all gas of whatsoever nature or kind, with rights of way and easements for laying pipe lines, and erection of structures thereon to produce, save and take care of said products . . . .

(Lease at 1). Emerald's "working interest" bundle under this oil and gas lease includes the following sticks:

- the exclusive right to explore for leased minerals during the lease term;

- the exclusive right to develop/produce the leased minerals during the lease term;

01:19121175.9

20

- the exclusive right to transport the produced leased minerals during the lease term;

- the right to make reasonable use of the surface for the foregoing purposes during the lease term;

- the exclusive right to retain and/or use leased minerals produced during the lease term; and

- the exclusive right to sell leased minerals produced during the lease term and receive the proceeds thereof, whether at the lease or downstream of the lease.

(*See id.*); *see also Slaaten*, 748 F.2d at 1277; *Miller*, 354 N.W. 2d at 688; *Feland*, 171 N.W.2d at 834; *Corbett*, 68 N.W.2d at 214.

31.    Emerald can convey a fractional interest in each of these sticks—i.e., a percentage of its entire working interest under the lease—to another, and the fractional interest so conveyed will retain its character as real property. *See, e.g., Miller*, 354 N.W.2d at 686 (involving partial conveyances of working interests). Emerald can also convey a fractional interest in the particular sticks relating to produced minerals to another (e.g., as an overriding royalty interest, non-participating royalty interest, net profits interest, or production payment), and the fractional interest so conveyed will retain its character as real property. (Min. Pymt. Mot. ¶ 25). But if Emerald conveys the sticks pertaining to the *transportation* of produced minerals and related use of the surface estate, then by Emerald's flawed reasoning *those* sticks would somehow lose their character as interests in real property. (*See* Op. Br. at 8). Thus, under Emerald's view of the world, one is left with the odd situation where (i) oil and gas in the ground is considered real property, (ii) a right to take produced oil kind at the wellhead is considered real property, to the extent that right is unaccrued, (iii) a right to the proceeds of the sale of produced oil or gas at market is considered real property, to the extent that right is unaccrued, but (iv) the right to *transport* the produced oil and gas on its journey between points (ii) and (iii) is considered

personal property, regardless whether that right is accrued or unaccrued.  This makes no sense, and it is not the law of North Dakota.

32.    The following discussion will demonstrate that, through the Dedication Agreements, Emerald conveyed to Dakota its sticks relating to (i) the transportation of oil, gas, and saltwater produced during the term of the agreements, and (ii) use of the surface estate for such purposes, which conveyance gave rise to a vested interest in real property in favor of Dakota that is enforceable against assignees of Emerald's Working Interests at law as real covenants, or in equity as equitable servitudes.

## **GLOSSARY OF LEGAL TERMS/CONCEPTS**

33.    Real covenants and equitable servitudes are among the most arcane and incomprehensible concepts known to Western law, and part of the problem is the lack of clear, uniform terminology in the authorities discussing them.  For example, a court describing a covenant as "personal" in nature could mean any one (or more) of the following: (i) that the parties did not intend the covenant to be transferable (i.e., "personal" used as a synonym for "nontransferable"), (ii) that the covenant is not transferable for a technical reason (e.g., lack of horizontal privity, failure of "touch and concern" test) despite the parties' intent that it be transferable (i.e., "personal" used as an antonym for "running with the land"), or (iii) that the burden or benefit of the covenant is not tied to the ownership of a particular interest in real property (i.e., "personal" used as a synonym for "in gross").  *Restatement* § 1.5(3) and cmts. a-c (discussing care that should be taken when reading older cases as a result of imprecise use of the term "personal").

34.    For ease of discussion, this brief uses the terminology set forth in the *Restatement* except where different terminology is necessary in light of North Dakota law.  Below is a

01:19121175.9

22

glossary of the key terms and concepts that will recur throughout this brief, which should help

put Dakota's arguments in proper context when evaluating them under the applicable legal

authorities.[18]

- **Servitude.** "Servitude" is the generic term for a legal device that creates a right or an obligation that "runs with" real property or an interest in real property. § 1.1(1) and cmt. a. The *Restatement* divides servitudes into the following general categories: covenants running with the land, easements, and *profits à prendre*. §§ 1.1(2), 1.2(2), and 1.4. The *Restatement* abandons the traditional distinction between "real covenants" and "equitable servitudes" (discussed below) and treats both as subsumed within the more general category "covenants running with the land." § 1.4. Consistent with its roots in 19th century common law, however, the North Dakota Century Code treats "covenants running with the land" as distinct from other "servitudes." *Compare* N.D. Cent. Code §§ 47-04-26-47-04-32 (concerning "covenants running with the land") with *id.* §§ 47-05-01-47-05-17 (concerning "servitudes"). Accordingly, this brief will retain and use the traditional terms "real covenant" and "equitable servitude."

- **Running with the land.** A right or obligation "runs with the land" if it passes automatically to (and is enforceable by or against, as applicable) successive owners of the real property or interest in real property with which the right or obligation runs. § 1.1(1)(a); *accord* N.D. Cent. Code § 47-04-24 (stating covenants that run with the land "bind the assigns of the covenantor and . . . vest in the assigns of the covenantee in the same manner as if they personally had entered into them"). "The land" that a right or obligation can "run with" can be either the fee-simple absolute or a lesser interest in real property, including a *profit à prendre* or easement. § 1.1 cmt. b. ***Here, Emerald's Working Interests, which are* profits à prendre *under North Dakota law as discussed above, together comprise "the land" for purposes of the real covenant/equitable servitude analysis.***

- **Burden; servient estate/tenement.** An *obligation* that runs with the land is called a "burden," and the interest in real property with which it runs is known as the "burdened estate" or "servient estate" (under the *Restatement* and more modern case law), or the "servient tenement" (under older case law and the North Dakota Century Code). § 1.1(1)(c) and cmt. c; N.D. Cent. Code § 47-05-04. ***Here, the Dedication Agreements imposed "burdens" upon Emerald's Working Interests, which Working Interests together comprise the "servient tenement" for purposes of the real covenant/equitable servitude analysis.***

- **Benefit; dominant estate/tenement.** A *right* that runs with the land is called a "benefit," and the interest in real property with which it runs is known as the

---

[18] Except as otherwise indicated, all "§ __" citations are to the *Restatement*.

"benefited estate" or "dominant estate" (under the *Restatement* and more modern case law), or the "dominant tenement" (under older case law and the North Dakota Century Code). § 1.1(1)(b) and cmt. c; N.D. Cent. Code § 47-05-03. ***Here, the Dedication Agreements conferred "benefits" upon the easements assigned to Dakota and the infrastructure constructed upon those easements. These easements and infrastructure together comprise the "dominant tenement" for purposes of the real covenant/equitable servitude analysis.***

- **Personal.**  A "personal" right or obligation is one that (i) is non-transferable *and* (ii) does not run with the land. § 1.5(3).

- **Appurtenant.**  An "appurtenant" right or obligation is one that is tied to ownership of a particular interest in real property. § 1.5(1). "The right to enjoyment of an easement or profit, or to receive the performance of a covenant that can be held only by the owner or occupier of a particular unit or parcel, is an appurtenant benefit. A burden that obligates the owner or occupier of a particular unit or parcel in that person's capacity as owner or occupier is an appurtenant burden." *Id.* "Appurtenant benefits and burdens ordinarily run with the land, but they may be made personal to particular owners or occupiers of land." § 1.5(3), cmt. a, and illustration 3. ***Here, (i) the burdens arising under the Dedication Agreements are appurtenant to and "run with" Emerald's Working Interests and (ii) the benefits arising under the Dedication Agreements are appurtenant to and "run with" the easements assigned to Dakota and the infrastructure constructed upon those easements.***

- **In gross.**  A right or obligation "in gross" is one that is not tied to ownership or occupancy of a particular unit or parcel of land. § 1.5(2). Interests held in gross may be either transferable or personal. § 1.5(3) and cmt. b.

- **Covenant.**  "Covenant" is the generic term for "a solemn or formal obligation binding upon the covenantor, but not necessarily binding on others." § 1.3 cmt. a.

  o **Affirmative covenant.**  An "affirmative" covenant requires the covenantor to do something. § 1.3(2). ***As discussed below, the Dedication Agreements contain a number of affirmative covenants by Emerald, including particularly the covenant to deliver to Dakota all of the oil, gas, and saltwater produced from Emerald's Working Interests within the Area of Dedication.***

  o **Negative covenant.**  A "negative" covenant requires the covenantor to refrain from doing something. § 1.3(2). ***As discussed below, the Dedication Agreements contain a number of negative covenants by Emerald, including particularly the covenant not to deliver to another transporter any of the oil, gas, or saltwater produced from Emerald's Working Interests within the Area of Dedication.***

- o **Restrictive covenant.** A "restrictive" covenant (a.k.a "negative easement") is a negative covenant that limits permissible uses of real property. § 1.3(3). *Here, Emerald's covenant not to deliver to another transporter any of the oil, gas, or saltwater produced within the Area of Dedication is a restrictive covenant because it limits the permissible uses of Emerald's Working Interests.*

- **Real covenant vs. equitable servitude.** "In the 19th century, the law of running covenants split into two branches, one governing covenants enforceable at law, which became known as 'real covenants,' and the other governing covenants enforceable in equity, which became known as 'equitable servitudes.'" § 1.4 cmt. a. As used in this brief, the term "real covenant" means a covenant that is enforceable by damages or injunctive relief against assignees of the covenantor, and the term "equitable servitude" means a covenant that is enforceable by injunctive relief against assignees of the covenantor. *Thus, the terms "real covenant" and "equitable servitude" are not meant to distinguish between types of covenants themselves—but rather, to denote the mode of enforcement of the covenant.*

- **Easement.** An easement is a servitude consisting of "a nonpossessory right to enter and use land in the possession of another," which "obligates the possessor not to interfere with the uses authorized by the easement." § 1.2(1).

- *Profit à prendre.* A *profit à prendre* is a servitude consisting of an easement "plus the right to remove something from the land." § 1.2 cmt. e. *As discussed above, Emerald's Working Interests are* **profits à prendre, which are estates in real property** *under North Dakota law*.

## ADDITIONAL FACTUAL BACKGROUND

35. Dakota submits that the following facts are material for purposes of analyzing the legal issues presented by Emerald's motion for summary judgment. Many of these facts were set forth in Dakota's prior pleadings in the main bankruptcy case, including its motion to compel payment of administrative expenses [D.I. 432]. In its objection to that motion [D.I. 485], Emerald asserted that Dakota had "present[ed] a number of unfounded allegations, distorted facts, and misconstrued interpretations of the [Dedication Agreements] central to the parties' relationship," and stated that it "contest[ed] the accuracy of much of the background set forth by [Dakota] in the Motion." (Emerald Obj. ¶ 4 and n. 4). It is unclear which of Dakota's previous

allegations are disputed by Emerald.  ***Of course, if Emerald genuinely disputes any of Dakota's factual assertions set forth in this brief and the accompanying evidentiary materials, then summary judgment must be denied.***  See Fed. R. Civ. P. 56(a) (requiring movant to show "that there is no genuine dispute as to any material fact").

## I.      Background Regarding the Parties

36.      The Oil and Gas industry is made up of three distinct sectors:  upstream, midstream, and downstream.  (Adair Dec. ¶ 12).

### *Emerald and the Upstream Sector*

37.      Activities in the upstream sector are focused on finding and developing oil and gas reserves through the exploration for, and the production of, oil and gas.  Upstream companies focus on: (i) finding economic oil and gas reserves; (ii) drilling wells to bring oil and gas to the surface; (iii) developing treating and conditioning facilities located close to the wellhead; (iv) operating the wells and associated surface facilities necessary to deliver the oil and gas off the producing lease; (v) managing the disposition of any associated by-products; and (vi) selling the raw oil and gas at or near the point of the production and/or delivering the products for transport away from the producing lease or field and into midstream facilities.  (Adair Dec. ¶ 13).

38.      Emerald is an upstream company, and it owns certain working interests in oil and gas leases, wells or lands in McKenzie County, North Dakota, which are referred to herein as the "Working Interests."  The Working Interest were acquired through purchases of existing producing wells and associated leases, leasing property from mineral owners, and by drilling and completing new horizontal wells in the Bakken and Three Forks formations.  The primary target of new well development for Emerald has been oil production.  However, crude oil, gas, and saltwater are produced as a combined stream from these wells.  (Adair Dec. ¶ 14).

01:19121175.9

26

### *Dakota and the Midstream Sector*

39. The role of participants in the midstream sector is to provide the necessary assets, facilities, pipelines, and services to move raw hydrocarbons from the producing field and deliver oil, natural gas, and natural gas liquids ("NGL") to meet the specifications of end users and consumers in downstream markets. In general, the range of available midstream services includes the following: (i) crude oil gathering; (ii) water gathering and disposal; (iii) gas gathering and compression; (iv) gas treating; (v) gas processing; (vi) natural gas transmission; (vii) NGL gathering and transmission; (viii) crude oil transmission; and (ix) trucking. (Adair Dec. ¶ 15).

40. Oil production typically flows to the surface with varying amounts of associated natural gas and water. The expected associated gas and/or water production for any particular well is unique and often varies over the producing life of the well. On-lease, or so-called "field" facilities, are utilized to separate the oil from any associated gas and produced water. As the oil, gas, and water are separated, the oil and water are typically stored in tanks installed nearby to the producing well or wells (if multi-well drilling pads are utilized) or at central delivery locations within the geographic area of the producing field. Oil inventories are allowed to build up in local storage facilities and are transported from the producing field by truck or pipeline depending on the available field facilities installed. Midstream providers supply the trucking assets and/or the pipeline facilities necessary to transport the oil away from the producing area for delivery into mainline transmission pipelines or rail facilities that serve end users, typically refineries, or to regional trading centers where supplies of oil are aggregated prior to injection into mainline transmission pipeline or rail cars for delivery to refiners. (Adair Dec. ¶ 16).

01:19121175.9

27

41.     Raw natural gas typically flows away from the producing wellhead in a gaseous state and must, therefore, be captured and transported in a pipeline system, rather than by truck. A gas gathering system is a series of pipe connecting one or more natural gas wells which is used to deliver gas into a mainline transmission system.  (Adair Decl. ¶ 17).

42.     To avoid interruption in the production of crude oil from any well, it is essential to be able to capture and remove the associated gas and produced water from the well site and the field.  (Adair Decl. ¶ 18).

43.     Dakota is a midstream company, and pursuant to the Dedication Agreements it built, operates, and maintains co-located oil, gas, and saltwater gathering and saltwater disposal well systems and facilities located in McKenzie County, North Dakota.  These systems run around the clock, 365 days per year, for the benefit of the Debtors' Working Interests, utilizing a combined 60+ miles of oil, gas, and water pipelines; disposal wells, and related facilities such as pumps, tanks, and compressors.  (Reynolds Dec. ¶ 4).

44.     Pipelines serve as the principal commercial method of gathering gas for further processing and treatment.  Dakota's pipelines provide the first and most critical link of the transport process of Emerald's gas; without Dakota's gathering, Emerald would not be able to meet its existing downstream commitments for the processing of gas.  (Reynolds Dec. ¶ 5).

## II.     Commercial Aspects of the Midstream Industry; Dedications

45.     The design and configuration of midstream facilities varies significantly throughout the oil and gas industry.  Oil and gas gathering facilities serve the specific needs of the producers in each unique geographic area.  The capacities and design characteristics of the equipment utilized such as pipelines, pumps, compressors, storage tanks, truck loading/unloading, rail loading facilities and gas processing plants are dictated by the relative

01:19121175.9

28

volumes of the oil, gas and by-products being produced, the physical makeup of each produced stream, and the expected production profile or decline curve associated with the producing wells, as well as the disposition specifications for each component in the downstream markets. As such, midstream companies provide "custom" solutions to many upstream producers. (Adair Dec. ¶ 19).

46. As the link between the upstream and the downstream segments of the industry, midstream companies adjust to meet the needs of both the upstream and downstream sectors. Midstream providers control neither the rate of supply development in the upstream sector, nor end-user hydrocarbon demand in the downstream sector. Oil and gas markets are subject to cyclic price behavior driven by factors out of the control of most market participants. Depending on the geographic location of the downstream end users and the markets that each serves, downstream participants are subject to varying levels of exposure to elasticity of demand and market price risk. (Adair Dec. ¶ 20).

47. Producers enter into agreements with midstream providers for oil and natural gas gathering, treating, and conditioning, as well as natural gas processing and related services for by-product gathering and disposition. Under such contracts, producers typically provide a "reserve dedication" in exchange for the midstream companies' capital commitments to construct and operate specific facilities required for oil and gas production. Dedication agreements pledge the reserve developed in specific geographic areas, sometimes as limited to certain producing horizons or depths, to a counterparty providing such services as gathering, treating, conditioning, compression, or processing. Such reserve dedications, which in commercial parlance are sometimes referred to as "acreage dedications," are customary in wellhead contracts. Industry participants recognize and understand the meaning of such

dedications and recognize the commercial implications associated with dedication agreements when evaluating alternative offers for gathering-related services, performing due diligence for asset purchase and sale, and when completing valuation analyses for acquisitions and divestitures.  (Adair Dec. ¶ 21).

48.     The specific terms and conditions of any dedication are subject to negotiations between the parties with the term of the dedication taking different forms, for example: (i) a reserve dedication for all production from a specific geographic area for as long as economic production continues from wells in the subject area; (ii) all of the producer's deliveries from wells in the subject area for the primary term of the midstream services agreement; or (iii) a defined cumulative volume of deliveries from wells in the subject area, regardless of the time period required.  (Adair Dec. ¶ 22).

49.     Regardless of the particular form of dedication, the understanding within the oil and gas industry is that once a producer has dedicated its production within a defined area such producer is precluded from using alternative midstream providers during the term of the dedication commitment and constitutes a cloud on title to the dedicated working interests. (Reynolds Dec. ¶ 6).

50.     Reserve dedications are commonly utilized in oil and gas contracts to offset producer performance risk.  Typical risks which can impact midstream providers can best be understood by the following hypothetical:

> A gas gatherer contracts with a producer to build a new gathering system to serve the producer's planned development of a new gas field.  The producer specifies that 50 wells will be drilled in a three-year period and provides the midstream company with the prospective well locations, initial well volumes, well producing pressures, and gas component characteristics.  The producer represents that the raw gas must flow to a regional gas processor's facilities located 10 miles away.  The midstream company designs

the required facilities, borrows a good portion of the funds required for the project, constructs and commissions the gathering facilities necessary to meet the producer's needs based on the representations made. The midstream company invests $175 million within a 12-month period to meet the producer's requirement to monetize the reserves as quickly as possible after drilling and completion.

- Scenario A - Twelve months after startup, the producer has drilled only 20 wells and reports to the midstream company that the wells drilled to date are only half as prolific as had been expected. The producer has reassessed the original 50-well program and will terminate field development at only 25 wells. The expected production profile for the field is now expected to average barely 25 percent (%) of the system capacity and the full life cycle of the project has also been drastically reduced.

- Scenario B - Between the time that the parties execute a formal agreement and system startup, gas prices drop from $4.50 per million British thermal units (MMBtu) to $2/MMBtu. The producer has drilled and completed only 5 wells which are 1.5 times more prolific than the producer had anticipated. Regardless, the midstream company has designed and constructed a system capable of moving the gas produced from 50 less prolific wells and must now operate with only 15 percent of the expected throughput.

- Scenario C - The midstream provider doubles the size of its gathering system with the expectation that other producers will follow suit and begin drilling in the area. Installation of the initial gathering system assets is completed ahead of schedule allowing the producer to monetize gas reserves several months ahead of the original schedule. After 12 months of successful operations, the midstream provider approaches the producer to inquire about additional development plans and the potential for system expansion to meet longer-term producer needs. The producer politely informs the midstream provider that all further midstream development would be completed in-house, including the development of a new gas processing facility expected to be in service within 18 months.

(Adair Dec. ¶ 23).

51.    Midstream providers are subject to performance and operating risk due to the interaction with both upstream producers and downstream end users. Dedication agreements

01:19121175.9

31

have been utilized in the oil and gas industry for decades as a means to offset some of the risk concentrated in the midstream sector.  Without such dedication agreements, midstream providers would be forced to rely on higher service rates to offset the potential downside risks.  Further, the lack of dedication agreements would likely tend to limit the participation of small to mid-sized service providers for whom the geographic concentration risk could not be sufficiently diversified with investments in a relatively small number of midstream systems with a limited number of producing counterparties.  (Adair Dec. ¶ 24).

52.     For producers, the elimination of dedication agreements would likely result in greater reliance on cumulative or ratable volume commitments.  Alternatively, midstream providers may require producers to otherwise guarantee losses in the event that well development or productivity do not meet project expectations.  With potentially fewer midstream providers, producers may also be faced with very limited choice in midstream counterparties when new fields or producing areas are developed.  With limited choice, producers may be forced to divert capital from reserve development and allocate such funds instead to the development of producer-owned gathering assets until the economic risk of field development has subsided.  (Adair Dec. ¶ 25).

## III.     North Dakota Public Policy Favoring the Midstream Industry

53.     The State of North Dakota has declared that its public policy (regarding control of oil and gas resources) is to

> promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as *will prevent waste*; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had and that the correlative rights of all owners be fully protected; and to encourage and to authorize cycling, recycling, pressure maintenance, and secondary recovery operations in order that *the greatest possible*

> *economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources.*

N.D. Cent. Code § 38-08-01 (emphasis added).

54.     In North Dakota, the "waste" of oil and gas is prohibited. *See* N.D. Cent. Code § 38-08-03. The State of North Dakota, by and through the State Industrial Commission (the "NDIC") and its authority derived from N.D. Cent. Code §§ 38-08-04, *et seq.*, has made it a public policy of the State that the amount of gas flaring in Bakken Pool wells be reduced substantially. *See* Order 24665, dated July 1, 2014 ("*NDIC Order*"). The NDIC, made up of Governor Jack Dalrymple, Agriculture Commissioner Doug Goehring, and Attorney General Wayne Stenhjem, made a finding that reducing gas flaring would, among other things, "provide for the effective and efficient recovery of oil from the Bakken Pool, encourage rapid development, avoid the drilling of unnecessary wells, and prevent waste in a manner that will protect correlative rights." *Id.* ¶ 25. Additionally, the NDIC set forth goals to eliminate flaring by capturing 85% of all natural gas out of Bakken wells on or by January 1, 2016, and up to 90% by October 1, 2020. *Id.* ¶ 15. Further, the NDIC ordered that "all wells completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool that have received an exemption to the North Dakota Century Code Section 38-08-06.4 shall be allowed to produce at a maximum efficient rate," *id.* at 5 § 3, and that all infill horizontal wells completed in a Bakken, Bakken Three Forks, and/or Three Forks pool "shall be allowed to continue or produce at the maximum efficient rate *if the well or operator meets or exceeds the Commission approved gas capture goals*," *id.* at 5 § 4 (emphasis added).

55.     Dakota's gas gathering system allows Emerald to meet or exceed the NDIC gas capture goals for the foreseeable future. (Reynolds Dec. ¶ 7.)

56.     Currently, associated gas from the fifty Emerald wells connected to the Dakota gathering system is compressed and delivered to the gathering facilities supplying the True Red Wing Creek Gas Plant.  At the True Gas Plant, the raw natural gas produced by Emerald is treated and processed to produce commercial quality residue gas, NGLs, and condensate. Emerald receives 85% of the net proceeds for each of these product streams.  (Adair Dec. ¶ 26).

57.     Absent connection to a gathering system, Emerald's only alternative to remain compliant with NDIC regulations would be to choke back wells producing over 100 bbl/day and flare the associated gas.  Flaring would essentially abandon the installed gathering facilities, pipelines, and operational interconnection to the provider currently contracted to process the gas. Potential risks associated with the flaring option include increased regulation or regulatory oversight from the State of North Dakota.  Indeed, according to Ceres, a nonprofit organization mobilizing business leadership on sustainability challenges such as climate change and water scarcity, flaring is "a potential threat to the industry's long-term license to operate."  (Adair Dec. ¶ 27).

## IV.     Circumstances Surrounding the Dedication Agreements at Issue

58.     As of the beginning of 2014, Emerald did not have sufficient access to gathering systems for oil and saltwater and was trucking all of its oil and saltwater production.  It had no viable means of gathering its associated gas production and had no choice but to dispose of the gas by flaring, which was obviously a terrible waste of resources and put Emerald in noncompliance with NDIC regulations.  (Reynolds Dec. ¶ 8.)

59.     Trucking typically provides the lowest startup costs and the broadest geographic coverage for gathering of crude oil from remote areas and in newly developed areas where pipeline capacity is not readily available.  From time to time, depending upon market cycles,

trucking may also present short-term cost advantages; however, in the long term the

disadvantages of trucking tend to overshadow any short-term upside.  For example, trucking

operations are subject to the following: (i) potential spills (Emerald averaged 1.5-2.0 spills per

month when trucking); (ii) road closures resulting in well shut-ins once on-site storage fills up;

(iii) road weight limitations (e.g., reducing max weight from 80,000 lbs to 12,000 lbs) resulting

in potential rate increases and the need for additional loads; (iv) human error (delays, wrecks,

animal strikes); (v) unpredictable price fluctuations, as crude oil gathered by truck is typically

priced for sale based on the prevailing prices of the day of loading (unless otherwise agreed by

contract), rather than on monthly average prices as is common in the industry; and (vi) regulatory

risks.  (Adair Dec. ¶ 28.)

60.     The safest and most efficient way to transport crude oil is by pipeline.  For the

most part, crude pipelines operate 24 hours a day, seven days a week.  (Adair Dec. ¶ 29.)

61.     The principals of Emerald and Dakota began discussions about construction of

comprehensive oil and gas gathering systems in the first half of 2014.  These discussions

ultimately led to the formation of Dakota and the execution, in July 2014, of the key dedication

agreements for crude oil, gas, and saltwater (as amended in May 2015) that are at issue in this

case, specifically:

> ***Crude Oil Dedication Agreement.***  Emerald Oil, Inc. and Dakota
> Midstream, LLC entered into that certain Crude Oil Dedication &
> Throughput Commitment Transportation Agreement dated
> effective July 1, 2014, as amended by that certain Amendment No.
> 1 dated effective November 19, 2014 (the "Original COD
> Agreement"), and Dakota Midstream, LLC assigned its interest
> under the Original Agreement to its affiliate, Dakota Energy
> Connection, LLC effective March 23, 2015.  On May 26, 2015,
> Emerald Oil, Inc., Emerald WB, LLC, Dakota Midstream, LLC
> and Dakota Energy Connection, LLC executed that certain
> Amended and Restated Crude Oil Dedication & Throughput
> Commitment Transportation Agreement ("Amended and Restated

Crude Oil Dedication Agreement"). The Original COD Agreement, as amended by the November 19, 2014 Amendment, and the Amended and Restated Crude Oil Dedication Agreement shall be referred to as the "Crude Oil Dedication Agreement."

***Gas Dedication Agreement.*** Emerald Oil, Inc. and Dakota Midstream, LLC entered into that certain Gas Dedication and Gathering Agreement dated effective July 1, 2014, as amended by that certain Amendment No. 1 dated effective November 19, 2014 (the "Original GD Agreement"). On May 26, 2015, Emerald Oil, Inc., Emerald WB, LLC, and Dakota Midstream, LLC executed that certain Amended and Restated Gas Gathering and Dedication Agreement ("Amended and Restated Gas Dedication Agreement"). The Original GD Agreement, as amended by the November 19, 2014 Amendment, and the Amended Gas Dedication Agreement shall be referred to as the "Gas Dedication Agreement."

***Water Dedication Agreement.*** Emerald Oil, Inc. and Mesa Oil Services, LLC entered into that certain Disposal Well Services Agreement dated December 14, 2012, for the disposal of Debtors' water in the Sanders and Spackler Salt Water Disposal Wells (as amended July 1, 2014, the "Original SWD Agreement"). On May 26, 2015, Emerald Oil, Inc., Emerald WB, LLC, and Dakota Fluid Solutions, LLC, f/k/a Mesa Oil Services, LLC executed that certain Amended and Restated Water Dedication and Gathering Agreement ("Amended and Restated Water Dedication Agreement"). The Original SWD Agreement and the Amended and Restated Water Dedication Agreement shall be referred to as the "Water Dedication Agreement".

(Reynolds Dec. ¶ 9). The Crude Oil Dedication Agreement, Gas Dedication Agreement, and Water Dedication Agreement are referred to herein, collectively, as the "Dedication Agreements." Citations to the Dedication Agreements are to the agreements as amended in May 2015.

62. In reliance on the Dedication Agreements, Dakota built infrastructure co-located, configured, and designed specifically to serve Emerald's current and future wells in the Area of Dedication, and the required operational capacity pursuant to the Dedication Agreements. As a critical component of the consideration supporting Dakota's substantial investment in this infrastructure, Dakota and Emerald agreed that Emerald's "dedication" of the production from its

Working Interests as provided therein was a "covenant running with the land" (Ded. Agmts. § 1.2), which was to be "binding upon the Parties, and their respective successors and assigns including any purchaser of [Emerald's Working Interests] that are dedicated under this Agreement . . ." (*Id.* § 8.1.)  A Memorandum of Dedication for each Dedication Agreement was properly recorded in the McKenzie County Recorder's Office, as required of all real property conveyances under North Dakota law.  (Reynolds Dec. ¶ 10).

63.     Emerald also caused the assignment to Dakota of 33 separately recorded rights of way and/or easements, certain of which are with the mineral estate owners who lease their oil and gas interests to Emerald for exploration and development.  Each assignment is in the form attached as Exhibit G to the Dedication Agreements, is incorporated by reference into the Dedication Agreements themselves, and provides that the "burdens, terms, covenants, reservations, restrictions and conditions [contained in the assignment] are covenants running with the land and with each subsequent transfer or assignment of any interest acquired or conveyed by Assignor and/or Assignee hereunder."  (Assign. ¶ H.)  These assignments were also duly recorded in the McKenzie County Recorder's Office, as required of all real property conveyances under North Dakota law.  (Reynolds Dec. ¶ 11).

64.     Paragraph 6 of the General Terms and Conditions of the Crude Oil Dedication Agreement acknowledges the applicability of regulation of the Crude Oil System by the Federal Energy Regulatory Commission ("FERC") under the Interstate Commerce Act, 49 U.S.C. App. (1988) (the "ICA").[19]  As contemplated by the Crude Oil Dedication Agreement, Dakota filed a tariff with FERC, which was accepted and is currently effective.  The tariff governs the transportation of oil by Dakota and provides the rates to be charged Emerald (including

---

[19] The ICA was repealed in 1978 but remained in effect for oil pipelines. *See generally* 49 U.S.C. §§ 60101-60503.

01:19121175.9

37

committed service rates, uncommitted service rates and deficiency rates for failure to meet minimum volume commitments) and remedies for default (including the requirement of providing adequate financial assurance, notice requirements, and the procedures for suspending delivery of oil and ultimate sale of oil in the event of non-payment). The filed tariff enjoys the force of law. Thus, it prohibits Dakota from charging more than the tariff rates for the transportation of Emerald's crude oil. But by the same token, it prevents Dakota from being forced to transport Emerald's crude oil for less than the tariff rates. (Reynolds Dec. ¶ 12).

65. The service provided to Emerald pursuant to the Dedication Agreements is "firm transportation" of its oil and "highest priority" transportation of its gas and saltwater. Firm transportation service guarantees delivery without interruption (except in extraordinary circumstances) at the customer's primary firm delivery point. Interruptible transportation services, by contrast, may be suspended, reduced, or not scheduled in accordance with the pipeline's tariff and FERC policy. (Reynolds Dec. ¶ 13).

66. Emerald would not have been able to obtain customized gathering from a midstream company, much less priority or firm service, without making a commitment rising to the level of a real property dedication. As a result of the dedication to Dakota, Emerald was able to redeploy its capital towards development of its Working Interests, achieving compliance with North Dakota law, meeting certain of its obligations under the terms of certain of its leases, minimizing surface disturbance and adverse impacts to the landowners overlying the leasehold interests, and maximizing production and therefore proceeds to all interest owners in the wells connected to the Dakota systems. All of these benefits inured directly to the benefit of Emerald's Working Interests. (Reynolds Dec. ¶ 14).

**ARGUMENT**

67.    In this action, Emerald seeks a declaration that "certain covenants and equitable servitudes (if any) contained in the [Dedication Agreements] . . . do not 'run with the land.'" (Compl. ¶ 1).  To put it more precisely, in terms of the terminology outlined above, Emerald seeks a declaration that its covenants under the Dedication Agreements would not be enforceable against assignees of its Working Interests (i) at law, as real covenants, or (ii) in equity, as equitable servitudes.

68.    As noted above, "real covenants" and "equitable servitudes" are simply *modes of enforcement* of contractual covenants—one at law, the other in equity.  They are two sides to the same coin.  But due to legal structures inherited from English common law and codified, in part, in the North Dakota Century Code, these modes of enforcement have slightly different requirements and follow slightly different rules.  But at bottom, both modes of enforcement accomplish the same thing—they burden real property and bind subsequent owners of that real property to act, or refrain from acting, in accordance with the covenants entered into by their predecessor.

69.    To defeat Emerald's summary judgment motion, Dakota need only establish it would be possible to enforce Emerald's covenants under the Dedication Agreements against a subsequent owner of Emerald's Working Interests using one or the other mode of enforcement—i.e., at law as a real covenant, or in equity as an equitable servitude.  As discussed below, however, both modes would be available to Dakota.  Accordingly, summary judgment must be denied.

II.     **THE COVENANTS IN EMERALD'S DEDICATION AGREEMENTS ARE ENFORCEABLE AT LAW AGAINST ASSIGNEES OF EMERALD'S WORKING INTERESTS AS REAL COVENANTS**

70.     At common law, the elements for a real covenant were as follows: (i) "horizontal privity" (a.k.a. "privity of estate") between the original covenantor and covenantee; (ii) "vertical privity" between the party seeking enforcement of the covenant and the original covenantee, or between the party against whom enforcement is sought and the original covenantor, as applicable; (iii) intent that the covenant would run with the land; and (iv) the covenant "touches and concerns" the land.  *See* Andrew Scott Graham, *Real or Personal?: The Area of Mutual Interest Covenant in the Williston Basin After Golden v. SM Energy Company*, 89 N.D. L. Rev. 241, 251 (2013) (citing *Spencer's Case*, 77 Eng. Rep. 72, 74 (K.B. 1583)); *see also Restatement* § 2.4 and cmt. a (explaining horizontal privity requirement), § 5.2 cmt. b (explaining vertical privity requirement), § 3.2 and cmt. b (explaining "touch and concern" requirement).

71.     Against this backdrop, the North Dakota Century Code provides, in pertinent part, as follows:

- "Certain covenants contained in grants of estates in real property are appurtenant to such estates and pass with them so as to bind the assigns of the covenator and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them.  Such covenants are said to run with the land."  N.D. Cent. Code § 47-04-24.

- "The only covenants that run with the land are those specified in this chapter and those which are incidental thereto."  *Id.* § 47-04-25.

- "All covenants contained in a grant of an estate in real property, which are made for the direct benefit of the property or some part of it then in existence, run with the land.  Such covenants include covenants: 1. Of warranty; 2. For quiet enjoyment; 3. For further assurance on the part of a grantor; or 4. For the payment of rent, taxes, or assessments upon the land on the part of a grantee."  *Id.* § 47-04-26.

01:19121175.9

40

In *Northern Pac. Ry. Co. v. McClure*, discussed above, the North Dakota Supreme Court held

that these requirements merely codified the common law elements of a real covenant, and did not

impose additional or more stringent requirements:

> At common law the principle which determined whether a covenant run with the land required that it be, in a sense, inherent in the estate demised, or connected with it, or that it touched the land or its value, or the value of the reversion or of the term, or went to fix the amount of the rent. *Certainly our statute does not restrict us to narrower limits*, for its express language extends to covenants "appurtenant to such estates," covenants "for the direct benefit of the property or some part of it then in existence," and those which "are incidental thereto."

81 N.W. 52, 54 (N.D. 1899) (internal citations omitted, emphasis added).  Accordingly, the

following analysis focuses on the common law elements, with discussion of the statute as

necessary to address Emerald's arguments in its opening brief.

**B.      There Was Horizontal Privity Between Emerald and Dakota (i.e., the Dedication Agreements Granted an Estate in Real Property)**

72.      Under English common law, a special relationship between the covenantor and

covenantee—"privity of estate"—was required for a covenant burden to run with the land and be

enforceable at law.  *Restatement* § 2.4 cmt. a.  The required privity of estate was provided "by a

tenurial relationship between the covenanting parties, a relationship most commonly found in

leases."  *Id.*  As a result, the only covenants running with the land at law tended to be in leases.

*Id.*

> This privity requirement, known today as the "horizontal privity" requirement, was carried into the American law of servitudes, where it was substantially transformed.  First, the Massachusetts court found privity of estate between the dominant and servient owners of land touched by an easement.  Later, other state courts found privity between the grantor and grantee of any estate in land. In this American form, the rule prevented enforcement of covenant burdens against successors only when the covenant was not created in conjunction with the transfer of some other interest in land.

*Id.* The horizontal privity requirement is codified in section 47-04-26 of the North Dakota Century Code, which requires a real covenant to be "contained in a grant of an estate in real property."

73. "In American law, the horizontal-privity requirement serves no function beyond insuring that most covenants intended to run with the land will be created in conveyances," which "is desirable because it tends to assure that they will be recorded." *Restatement* § 2.4 cmt. b. "However, the horizontal-privity requirement is no longer needed for this purpose" because "the Statute of Frauds and recording acts perform that function." *Id.*[20]

74. North Dakota has a Statute of Frauds, N .D. Cent. Code § 47-10-01, and a recording statute, *id.* § 47-19-41-42. And the Dedication Agreements at issue here were in fact recorded. Accordingly, there is *literally no purpose* that would be served by enforcement of the horizontal privity requirement in this case—it is a pointless legal technicality. This would no doubt inform the North Dakota Supreme Court's interpretation and application of the "grant" requirement of section 47-04-26 of the North Dakota Century Code were it called upon to decide this case. *See* N.D. Cent. Code § 31-11-05 (maxims of jurisprudence "to aid in the[] just application" of the laws of North Dakota, including (1) "When the reason of a rule ceases so should the rule itself," (19) "The law respects form less than substance," and (23) "The law neither does nor requires idle acts."). As discussed below, that court would likely conclude that the requirement is satisfied by one or more of the following: (i) the creation of a restrictive covenant, which is itself a grant of an interest in real property, (ii) the grant of easements to Dakota, and (iii) by the "dedication" of Emerald's production to the performance of the

---

[20] For this reason, the *Restatement* rejects horizontal privity as a requirement of modern servitudes law. However, the commentary provides useful discussion of the origin and application of the doctrine.

Dedication Agreements, which conveyed the portion of Emerald's Working Interests representing its right to transport produced oil, gas, and saltwater.

### 1. No "magic words" are required under North Dakota law to grant an estate in real property; general contract interpretation principles apply

75.     In its opening brief Emerald appears to suggest that North Dakota Century Code § 47-10-06, which provides that "[a] grant of an estate in real property may be made in substance as follows" and provides form grant language, sets forth the exclusive means to grant an interest in real property in North Dakota.  (Op. Br. at 10).  This is wrong, because "North Dakota law prescribes no particular form to be used in a grant of real property." *Mehus v. Thompson*, 266 N.W.2d 920, 925 (N.D.,1978).[21]  Section 47-10-06 simply provides a "short form" that "may be used, but . . . is not required."  *Id.*  Indeed, the only absolute requirement for the "grant" of an estate in real property is that it be in "'an instrument in writing subscribed by the [grantor],'" *id.* (quoting N.D. Cent. Code § 47-10-01), which is satisfied here because the Dedication Agreements are written instruments executed by Emerald.

76.     Beyond this threshold requirement, the North Dakota Century Code provides, in pertinent part, as follows, with respect to grants of an estate in real property:

- "Grants shall be interpreted in like manner with contracts in general except so far as is otherwise provided by this chapter.  If the operative words of a grant are doubtful, recourse may be had to its recitals to assist the construction, and if several parts of a grant are absolutely irreconcilable, the former part shall prevail.  A clear and distinct limitation in a grant is not controlled by other words less clear and distinct."  N.D. Cent. Code § 47-09-11 (emphasis added).

---

[21] According to the *Sabine* court, by contrast, Texas law "requires certain operative language" to grant an interest in real property, which language the court found lacking in the dedication agreements at issue in that case. *Sabine II*, 550 B.R. at 70.

- "A grant shall be interpreted in favor of the grantee, except that a reservation in any grant . . . is to be interpreted in favor of the grantor." *Id.* § 47-09-13.

The principles of contract interpretation applicable to grants of an estate in real property include

the following, among others:

- "A contract must be interpreted so as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is ascertainable and lawful." N.D. Cent. Code § 9-07-03.

- "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable.  Each clause is to help interpret the others." *Id.* § 9-07-06.

- "Several contracts relating to the same matters between the same parties and made as parts of substantially one transaction are to be taken together." *Id.* § 9-07-07.

- "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." *Id.* § 9-07-09.

- "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." *Id.* § 9-07-10.

- "A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." *Id.* § 9-07-12.

- "Particular clauses of a contract are subordinate to its general intent." *Id.* § 9-07-15.

- "Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clause subordinate to the general intent and purposes of the whole contract." *Id.* § 9-07-17.

- "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.  The promisor is presumed to be such party . . . ." *Id.* § 9-07-19.

01:19121175.9

44

The foregoing principles, taken together, are the proper backdrop against which to consider whether the Dedication Agreements granted an estate in real property.  And as discussed below, they clearly did so.

### 2. *The Dedication Agreements granted three distinct estates in real property*

77.    To satisfy the horizontal privity requirement, the grant of a single estate in real property under the Dedication Agreements would suffice.  But there were at least three estates in real property granted by the Dedication Agreements, namely: (i) a restrictive covenant, (ii) easements, and (iii) a present interest in Emerald's right to transport its future production, known in the industry as a "dedication."  And each of these estates is in the Working Interests that constitute the servient tenement, thus satisfying the horizontal privity requirement for enforcement of Emerald's covenants under the Dedication Agreements as real covenants.

### (a)    **The Dedication Agreements created restrictive covenants**

78.    Emerald's covenant in the Dedication Agreements to deliver its production to Dakota "without other disposition except as otherwise provided in this Agreement" (Ded. Agmts. § 1.2) is a negative covenant, i.e., not to provide its production to another transporter.  *See Restatement* § 1.3(2).  It is also a restrictive covenant, because it limits the permissible uses of Emerald's Working Interests, which are real property. *Id.* § 1.3(3).  Prior to making this covenant, Emerald was free to provide its production to any transporter of its choosing (or to transport it itself); by making this covenant, it gave up its right to provide its production to any transporter but Emerald.  (*See* Ded. Agmts. Ex. D (form of Memorandum of Dedication stating, in pertinent part, that Emerald had "agreed on an exclusive basis" to provide its production to Dakota)).  This satisfies the "grant of an estate in real property" requirement under section 47-04-26 of the North Dakota Century Code, because the creation of a restrictive covenant *is itself* a

grant or conveyance of an interest in real property. *See Reichert v. Weeden*, 618 P.2d 1216, 1220 (Mont. 1980); *Eakman v. Robb*, 237 N.W.2d 423, 428 (N.D. 1975).

79.     In *Reichert*, restauranteur-landowners (Covenantors) settled litigation concerning their disputed liquor license application by entering into an "Agreement and Land Use Restrictions" with other area landowners (Covenantees), pursuant to which (i) Covenantees agreed not to challenge Covenantors' operation of a restaurant on their property for a period of ten years, and (ii) Covenantors agreed not to use their property for the sale of beer or liquor, as a covenant that "shall run with the land and bind the present owners and their heirs and assigns." 618 P.2d at 1218-19. The agreement was recorded in the county registry of deeds, but eight years later Covenantors brought suit to have the agreement declared void. *Id.* Like Emerald, Covenantors argued that a "grant" of an estate in real property was a requirement for the creation of a covenant running with the land under the relevant Montana statutes (which, being derived from the Field Code, are substantially identical to the relevant North Dakota statutes), and that the agreement at issue did not contain such a "grant." *Id.* at 1219. The Montana Supreme Court disagreed, reasoning as follows:

> [Covenantors] were aware of their actions, and their intent was clear. Not only did they grant away a present interest, but also a future interest that will bind their heirs and assigns. This interest in the land is the right to sell liquor or operate a bar on the land after a particular date. *[Covenantors] took away from the land that interest and conveyed it to [Covenantees] by means of a written, recorded agreement.* They gave away an interest in the land by creating a negative easement binding not only themselves, but their heirs and assigns.
>
> Montana recognizes negative easements. A negative easement created by an agreement, a deed or a lease is enforceable against grantees or purchasers of the servient tenement. Easements may be created by a contract or covenant; *such agreements are grants in effect. . . .*

[Covenantors]' present claims that the magical words "grant or convey" were not used, cannot now be used by them to set aside that which the parties intended and later entered into.

"The term 'conveyance' as used [here] ... embraces every instrument in writing by which any estate or interest in real property in created, aliened, mortgaged, or encumbered or by which the title to real property may be affected . . . ." Section 70-21-301, MCA.[22]

This definition of a conveyance of real property is sufficiently comprehensive to include the written agreement that placed a covenant on the real property which is the basis of the present controversy. *A negative easement can be created by a grant or agreement, the agreement being construed as a grant, and is binding upon purchasers of the servient tenement who have actual or constructive notice of it.*

*Id.* at 1219-20 (case citations omitted, emphasis added).

80.     In *Eakman*, the North Dakota Supreme Court employed similar reasoning to conclude that the imposition of restrictive covenants by the filing of a plat for a residential subdivision constituted a "conveyance" of an interest in real property.  237 N.W.2d at 428.  The owners and developers of the subdivision (collectively, Developer) filed the plat in February 1973, which created 33 lots and included a covenant that "[t]he property herein conveyed shall not be resubdivided into building lots, nor shall any building be erected on a lot other than as conveyed by [Developer]," which covenant was "to run with the land and [] be binding on all parties and all persons claiming under them."  *Id.* at 425.  The Eakmans subsequently purchased Lot 3 in the subdivision constructed a house thereon.  *Id.*  Developer constructed houses on Lots 4 and 5, but later resubdivided Lots 4 and 5 and commenced construction of houses on the resubdivided portions of the lots.  *Id.*  The Eakmans sued Developer for breach of the restrictive

---

[22] The quotation is from Montana's recording statute.  The North Dakota Century Code has a substantially identical definition of "conveyance" in its recording statute.  N.D. Cent. Code § 47-19-42.

covenants and were awarded damages and injunctive relief requiring Developer to tear down the then-completed house on Lot 5, and to fill in the excavation on Lots 4 and 5 so as to return them to their prior condition. *Id.* at 425-27.

81.    Developer appealed, arguing that the restrictive covenants in the plat only prohibited resubdivision of the "property herein conveyed," and Lots 4 and 5 were never "conveyed" because they had been retained by Developer. *Id.* The Eakmans argued that the imposition of restrictive covenants by the filing of the plat itself constituted a "conveyance," and thus, the covenants were binding on Developer in addition to any subsequent grantees. *Id.* The North Dakota Supreme Court agreed with the Eakmans, noting that the North Dakota Century Code defines "conveyance" broadly to include "[e]very instrument in writing by which any estate or interest in real property is created, aliened, mortgaged, or encumbered, or by which the title to any real property may be affected," N.D. Cent. Code § 47-19-42, and following the weight of authority to conclude that the creation of a restrictive covenant is itself a "conveyance" of real property. *Eakman*, 237 N.W.2d at 428.[23]

82.    In light of its decision in *Eakman*, the North Dakota Supreme Court would likely follow the Montana Supreme Court's decision in *Reichert* to conclude that the Dedication Agreements' creation of restrictive covenants was a "grant of an estate in real property" within the meaning of section 47-04-26 of the North Dakota Century Code.

---

[23] Developer also argued that the injunction requiring removal of the already-constructed house and filling in the excavation was unduly harsh, but the court rejected this plea, noting Developer had proceeded with construction "at his own risk, with full knowledge that serious questions about the permissibility of the resubdivision and building were being raised by the Eakmans." *Id.* at 430. The North Dakota Supreme Court's affirmance of the injunction in *Eakman* underscores the propriety of this Court's August 1, 2016, order [Adv. D.I. 11] temporarily restraining Emerald from trucking oil and saltwater in violation of the restrictive covenants in its Dedication Agreements.

83. Emerald does not discuss any of the foregoing in its opening brief, and the issue of restrictive covenants does not appear to have come up in *Sabine*.

### (b) The Dedication Agreements assigned easements

84. Emerald assigned easements to Dakota upon the closing of the Dedication Agreements, by means of (i) separate assignment instruments executed pursuant to the Dedication Agreements (Ded. Agmts. § 2.2 and Ex. G), and (ii) a residual grant to Dakota of "the right to utilize [Emerald]'s rights under its Leases to install, own and operate the necessary . . . surface or pipeline facilities within the scope of [Emerald]'s right to do so" (*id.* Ex. C § 3). The form of assignment instrument was attached as an exhibit to the Dedication Agreements and was incorporated by reference as a part of the agreements themselves (Ded. Agmts. § 8.4 ("Subject to Section 8.3, this Agreement together with the Exhibits attached hereto, constitutes the entire agreement and understanding between the Parties . . . .")). And in any event, the assignment instruments relate "to the same subject matter between the same parties" and were "made as parts of substantially one transaction," so must be "taken together" with the Dedication Agreements under North Dakota law. *See* N.D. Cent. Code § 9-07-07.

85. Easements are interests in real property. *See* N.D. Cent. C. § 47-01-03 (defining real property to include "[t]hat which is incidental or appurtenant to land"), § 47-01-06 (deeming a thing to be "incidental or appurtenant to land" when "it by right is used with the land for its benefit"), and § 47-05-01 (describing easements for taking water and minerals as "incidents or appurtenances" to land). Thus, the assignment of an easement satisfied the "grant of an estate in real property" requirement under section 47-04-26 of the North Dakota Century Code. *See Corbett v. LaBere*, 68 N.W.2d 211, 215 (N.D. 1955) (holding that the assignment of a royalty interest, which is an interest in real property, "is clearly a grant").

86.    Emerald does not discuss any of the foregoing in its opening brief, but the topic of easements did come up in *Sabine*.  The midstream companies in that case argued that their dedication agreements gave rise to covenants that burdened Sabine's mineral rights.  Nordheim, one of the midstream companies in that case, argued the horizontal privity requirement was satisfied by virtue of Sabine's subsequent conveyance to Nordheim of a portion of a tract of land it owned, with a pipeline easement across the remaining portion of the tract, for the construction of a gas gathering facility.  *Sabine II*, 550 B.R. at 68-69.  The court rejected this argument for two independent reasons.  First, it held that horizontal privity requires "conveyance of an interest in property that itself is being burdened with the relevant covenant," but found that the land and pipeline easement were "distinct from (even if somewhat related to)" Sabine's mineral rights under Texas law.  *Id.* at 69.  Second, it held that the *possibility* of horizontal privity at some later time by virtue of a provision in the dedication agreement "that contemplates but does not effectuate a future assignment by Sabine of real property interests to Nordheim" did not constitute *actual* horizontal privity at the time of creation of the alleged real covenants under Texas law.  *Id.*  Whatever the merit of these conclusions under Texas law, they have no bearing upon this case, because (i) the easements here are not "distinct from" Emerald's Working Interests (i.e., the burdened property) under North Dakota law—rather, they are *part and parcel of* Emerald's Working Interests, which, as *profits à prendre*, consist of easements plus the right to take minerals; and (ii) the easements here were conveyed under and pursuant to the Dedication Agreements.

**(c)** **The Dedication Agreements conveyed the portion of Emerald's Working Interests representing its right to transport produced oil, gas, and saltwater**

87.     Section 1.2 of the Crude Oil and Gas Dedication Agreements, titled "Dedication," provides, in pertinent part, that Emerald

> dedicates and commits to the performance of this Agreement . . . , as a covenant running with the land the following: (i) all of [its] working interest share of [Crude/Gas] produced from the Wells operated by [it]; and (ii) all of [its] working interest share of [Crude/Gas] from wells operated by parties other than [Emerald] in which [Emerald] takes its share of production in kind, if applicable (collectively, "*Producer's [Crude/Gas]*").

(Crude Ded. Agmt. § 1.2 and Gas Ded. Agmt. § 1.2 (emphasis in original)).  The Water Gathering Agreement similarly provides that Emerald "dedicates and/or commits to the performance of this Agreement . . . , as a covenant running with the land all of [its] Water produced from the Wells."  (Water Ded. Agmt. § 1.2).

88.     The term "Wells" is defined as the "surface location[s] within the Area of Dedication of one or more wells operated by [Emerald] . . . from which [Emerald's Crude/Gas/Water] that is dedicated and committed hereunder is (*or will be*) produced" (emphasis added).  (Crude Ded. Agmt. Ex. C § 1(p); Gas Ded. Agmt. Ex. C § 1(aa); Water Ded. Agmt. Ex. C § 1(h)).  **Thus, the dedication's reference to oil, gas, and saltwater "produced from the Wells" expressly includes oil, gas, and saltwater *to be produced* in the future.**

89.     By these "dedications," Emerald conveyed to Dakota its right to transport produced oil, gas, and saltwater—which, as discussed above, is clearly a "stick" within the bundle of real property rights constituting Emerald's Working Interests under North Dakota law.  This conveyance is corroborated by numerous other provisions in the Dedication Agreements, including the following:

51

- Express carve-outs from the "Producer's [Crude/Gas]" in section 1.2 of the Crude Oil and Gas Dedication Agreements for:

  o "[Crude/Gas] subject to a prior [Crude/Gas] dedication as of the Effective Date of this Agreement for the minimum duration of that prior [Crude/Gas] dedication" (*evidencing the parties' understanding that Emerald could only "dedicate" its production to one midstream provider at a time*);

  o "[Crude/Gas] produced from any lands or Leases that [Emerald] in the future acquires in the Area of Dedication that are subject to a prior [Crude/Gas] dedication entered into by [Emerald's] predecessor-in-interest for the minimum duration of the prior [Crude/Gas] dedication" (*evidencing the parties' understanding that "dedications" are binding upon assignees of the dedicated working interests*); and

  o "[Crude/Gas] from Leases that are subject to a Temporary Release (for so long as such Temporary Release remains in effect) or a Permanent Release, all in accordance with the terms of this Agreement" (*evidencing the parties' understanding the "dedication" bound Emerald's Working Interests unless and until they were "Released" from the dedication to Dakota*).

- The requirement in each of the Dedication Agreements that Emerald deliver its production of oil, gas, or saltwater to Dakota "at the Receipt Points without other disposition except as provided in this Agreement" (*establishing that Emerald had relinquished its right to use alternative midstream providers*);

- A "Producer's Reservations" clause in section 1.3 of each Dedication Agreements (*suggesting the parties understood the immediately preceding dedication clause to have been a grant*);

- References throughout to Emerald's Leases being "subject to" the Dedication Agreements (*again evidencing the parties' understanding the dedication of Emerald's production affected its Working Interests*);

- The "Release Rights" provision in section 1.4 of the Crude Oil and Gas Gathering Agreements, which:

  o sets forth conditions upon which Emerald may "have the Leases and Wells affected [by the relevant condition] permanently released from this Agreement" (*again evidencing*

*the parties' understanding that the "dedication" bound Emerald's Working Interests themselves*); and

o   phrases the "Temporary Release" rights in terms of quantities of Crude and Gas, but the "Permanent Release" rights in terms of "Leases and Wells" (*establishing the parties understood the difference between produced oil and gas, on the one hand, and Working Interests, on the other hand, and specifically understood the contracts to cover both*);

- The requirement in section 1.6 of each Dedication Agreement that the parties (i) concurrently with the Dedication Agreements, execute a memorandum of the agreement to "be placed of record in each county in which the Leases are located" and (ii) in the event of any Permanent Release or termination of the agreement, in whole or in part, "execute appropriate instruments to be placed of record in each county in which the Leases are located, providing notice of the amended Area of Dedication or termination of this Agreement" (*evidencing the parties' understanding that the Dedication Agreements affected Emerald's Working Interests so as to necessitate recording of public notice pursuant to the recording statutes*);

- Language in the Memorandum of Dedication attached as Exhibit D to each Dedication Agreement stating, "In the event [Emerald] . . . owns or controls leasehold interests or [Crude/Gas/Water] from leasehold interests owned by [Emerald] in the Area of Dedication, . . . such leasehold interests and/or [Crude/Gas/Water] shall be dedicated to [Dakota] on the terms and conditions set forth in the Agreement . . . ." (*again evidencing the parties' understanding that the "dedication" bound Emerald's Working Interests themselves*); and

- The provision in section 8.1 of each Dedication Agreement that the agreement will be binding upon Emerald's successors and assigns, including any purchaser of Emerald's "interests in the Leases that are dedicated under this Agreement" (*again evidencing the parties understood the "dedication" bound Emerald's Working Interests themselves, and that Emerald could not convey greater rights in those Working Interests than it had left after making the dedication to Dakota*).

90.    Emerald disputes that the "dedication" of its production constituted a conveyance of any interest in real property and instead asserts, without textual analysis or citation to record evidence or legal authority, that "the purpose of the dedication in each of the [Dedication

Agreements] is to merely identify what property and products are the subject of the contracts and what will be made available to [Dakota] pursuant to those contracts." (Op. Br. at 10). Of course, if that had been the parties' sole purpose then they would not have needed the dozen-or-so provisions discussed above, or to negotiate an Area of Dedication defined by township and range legal description, since it would have sufficed merely to reference a volume or supply of oil, gas, and saltwater. Also, the parties probably would have called their contracts simply "Throughput Commitment Transportation Agreement" (for oil) or "Gathering Agreement" (for gas and saltwater), rather than "*Dedication &* Throughput Commitment Transportation Agreement" and "*Dedication and* Gathering Agreement" (emphasis added).

91.      Emerald also invokes Merriam-Webster's Collegiate Dictionary to argue that "dedicate" is not a word of grant or conveyance. (Op. Br. at 11). This argument fails for several reasons. First, the dictionary definition is irrelevant because "dedication" is a term of art in the oil and gas industry, and is used in its technical sense in the Dedication Agreements—as evidenced, e.g., by the agreements' references to "a prior [Crude/Gas] dedication," which presupposes a common frame of reference and knowledge of what "a dedication" is. As noted above, under North Dakota law, technical words in a grant "are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." N.D. Cent. Code § 9-07-10. And the understanding within the oil and gas industry is that a producer's "dedication" of its production within a given area to the performance of a midstream contract (i) precludes the producer or its assigns from using alternative midstream providers during the term of the dedication commitment and (ii) constitutes a cloud on title to the producer's working interests.

92.     Second, the dictionary definition of "dedicate" cited by Emerald—i.e., "to set apart to a definite use"—is perfectly consistent with the conveyance of an interest in real property.  Indeed, the "dedication" of real property to the public's use is a well-established mode of conveyance.  *See Black's Law Dictionary* (10th ed. 2014) ("dedication") ("The donation of land or creation of an easement for public use.").  And the Supreme Court of Idaho—which, like North Dakota, is a Field Code jurisdiction—has recognized the "dedication" of real property to a *private use* can convey an interest in real property.  *Monaco v. Bennion*, 585 P.2d 608, 609, 612 (Idaho 1999) (recorded plat for residential development included provisions stating, "We dedicate the roads herein as private roads for the use of the lot owners"; held: "the legal effect of illustrating a private road on a file plat and 'dedicating' it is the creation of an easement in favor of the lot purchasers").  Emerald offers no explanation why the "setting apart of real property to a definite use" could not be a valid mode of conveyance under North Dakota law, which, as discussed above, does not require any particular words of grant.

93.     Finally, under North Dakota law, a grant must be interpreted (i) in favor of the grantee, N.D. Cent. Code § 47-09-13, (ii) "so as to give effect to the mutual intention of the parties as it existed at the time of contracting," *id.* § 9-07-03, (iii) as a whole "so as to give effect to every part," with each clause "help[ing] interpret the others," *id.* § 9-07-06; and (iv) in light of "the circumstances under which it was made and the matter to which it relates," *id.* § 9-07-12. Under these principles of interpretation, and given the overwhelming textual and circumstantial evidence of the parties' intent and purpose to create a real covenant binding upon Emerald's Working Interests, if it is at all possible to read the Dedication Agreements to grant an interest in real property (which it clearly is), then the court must do so.

### 3.    The disclaimer and reservation provisions cited by Emerald are irrelevant or immaterial

94.    Emerald argues that the Dedication Agreements could not have granted an estate in real property by virtue of provisions stating "[Emerald] expressly does not by the terms of this agreement, sell, transfer or assign unto [Dakota] any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by [Emerald] in the operation of [Emerald]'s Wells and the Leases" (the "Disclaimer Clause").  (Op. Br. at 11 (quoting Oil Ded. Agmt. § 2.8; Gas Ded. Agmt. § 2.8; Water Ded. Agmt. § 2.9)).  Emerald also notes that the Dedication Agreements contain provisions reserving its right "to operate its Leases and Wells free of any control by [Dakota] and in such a manner as [Emerald], in [its] sole discretion, may deem advisable" (the "Reservation Clause"), which it appears to believe is inconsistent with a grant of an estate in real property.  (*Id.* (quoting Oil Ded. Agmt. § 1.3(ii); Gas Ded. Agmt. § 1.3(ii); Water Ded. Agmt. § 1.3).  These arguments do not hold water under the principles of interpretation applicable to grants under North Dakota law.[24]

95.    As noted above, grants in North Dakota are interpreted in favor of the grantee.  N.D. Cent. Code § 47-09-13.  And while reservations in a grant are interpreted in favor of the grantor, *id.*, if the reservation as worded is repugnant to the grant itself, the reservation will be interpreted in a manner that gives effect to both.  *See, e.g., Perschke v. Burlington Northern, Inc.*, 311 N.W.2d 564, 567 (N.D. 1981) (construing the term "lands" within a reservation clause to mean "interests," so that the reservation would not be repugnant to the grant itself); *accord* N.D. Cent. Code § 9-07-06 ("The whole of a contract is to be taken together so as to give effect to

---

[24] The dedication agreements at issue in *Sabine* appear to have included language similar to the Disclaimer Clauses, which the court found supportive of its conclusion that the dedication agreements did not grant any interest in real property. *See Sabine II*, 550 B.R. at 70.  The *Sabine* court was interpreting those dedication agreements under Texas law, however, and did not employ any of the interpretive principles that are applicable to grants under North Dakota law.

every part if reasonably practicable."), § 9-08-15 ("Particular clauses of a contract are subordinate to its general intent."), & § 9-07-17 ("Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give effect to the repugnant clause subordinate to the general intent and purposes of the whole contract."). If after application of these principles parts of a grant remain "absolutely irreconcilable," then "the former part shall prevail." N.D. Cent. Code § 47-09-11.

96.     The Disclaimer Clause appears at the end of Article II of the Dedication Agreements ("Facilities"), under the heading "Ownership of Facilities." Article II sets forth the parties' respective obligations with respect to the construction, operation, maintenance, and possible future expansions of facilities necessary to transport oil, gas, and saltwater (i) from the well head to the "Receipt Points" (which is Emerald's responsibility) and (ii) from the Receipt Points to the "Delivery Points" (which is Dakota's responsibility). In context, the Disclaimer Clause appears to simply clarify that Emerald retains ownership of all of its operating rights under its Working Interests (i.e., to explore, produce, and transport minerals and saltwater from the well heads to the Receipt Points), as well as any facilities and equipment used in those operations; it then goes on to state that Dakota similarly does not transfer any rights in its facilities to Emerald. (*See* Oil Ded. Agmt. § 2.8; Gas Ded. Agmt. § 2.8; Water Ded. Agmt. § 2.9 (referring to "any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature *owned or used by Producer in the operation of Producer's Wells and the Leases*" (emphasis added))). But this does not mean there has been no "transfer or assignment" of rights under Emerald's Working Interests as to the transportation of produced oil, gas, and saltwater from the Receipt Points. To the contrary, section 8.1 of the Dedication Agreements provides, in pertinent part, that

> no sale, assignment, conveyance or other transfer (collectively, a *"Transfer"*) of [Emerald's] Leases . . . or any part thereof or interest therein . . . shall be made unless the transferee thereof shall assume and agree to be bound by this Agreement insofar as the same shall affect and relate to the Leases . . . or interests so transferred.

(Ded. Agmts. § 8.1). If the Dedication Agreements had no effect on Emerald's Working Interests, as Emerald's reading of the Disclaimer Clause suggests, then the requirement that Emerald's assignee "agree to be bound . . . insofar as the [Dedication Agreements] shall affect and relate to the Leases" would be a nullity.

97.    Even if Emerald's construction of the Disclaimer Clause could be squared with section 8.1 of the Dedication Agreements, it is impossible to square with the "Dedication" provision in section 1.2, which, as discussed above, (i) conveyed to Dakota a stick within Emerald's Working Interests bundle representing the right to transport produced oil, gas, and saltwater from the Receipt Points, and (ii) at a minimum, created a restrictive covenant precluding Emerald from transporting oil, gas or water other than through Dakota's gathering system, which itself constituted a conveyance of an interest in real property. Emerald's construction of the Disclaimer Clause is also impossible to square with the express assignment in section 2.2 of the easements that make up a portion of Emerald's Working Interests under North Dakota law. Thus, even if Emerald's construction were plausible viewing the Disclaimer Clause in isolation, North Dakota law would require the Disclaimer Clause to be interpreted in a manner that (i) gives effect to all provisions of the Dedication Agreements in light of the general purposes of the agreements, including the parties' stated intent to create enforceable covenants running with the land; (ii) favors Dakota, as grantee; and (iii) in the event of irreconcilable inconsistency with earlier provisions of the contracts, yields to those earlier provisions.

01:19121175.9

58

98.   The Reservation Clause simply clarifies that Emerald retains the operating rights under its Working Interests,

> including without limitation the right to enter into farmouts of any Lease subject to this Agreement, to abandon any Well and surrender any Lease, . . . . [and] to determine the maximum efficient rate of flow for any Well (including the right to curtail production due to low market demand for Crude)[, with no requirement] to produce any Well or Wells in any manner which in its sole judgment and discretion would not constitute good operating practice, [and no obligation] to drill additional Wells or to deepen, repair or rework any existing Wells.

(Oil Ded. Agmt. § 1.3(ii); Gas Ded. Agmt. § 1.3(ii); Water Ded. Agmt. § 1.3).  Conspicuously absent from this list of reserved rights is the right to deliver oil, gas, or saltwater produced within Dakota's Area of Dedication to anyone other than Dakota—which is not surprising, since that right was expressly given up in the immediately preceding "Dedication" provision.  (Ded. Agmts. § 1.2).  Emerald appears to suggest that in order to grant an interest in its Working Interests, it would have had to cede control over its operations.  But Emerald offers no legal authority for such a requirement, and it makes little sense.  For instance, in *Reichert v. Weeden*, discussed above, the court determined that a restauranteur-landowner conveyed an interest in real property when it entered into a restrictive covenanted not to use its property for the sale of beer or liquor.  618 P.2d 1216, 1218 (Mont. 1980).  The agreement at issue in *Reichert* did not give the nearby landowners who benefited from the covenant any control over the grantor's business operations.  Yet by Emerald's reasoning, had that agreement included an express "reservation" of the grantor's right to operate its business, the court would have had to find there was no conveyance of an interest in real property.  There is no reason to believe *Reichert* would have come out differently had there been such a reservation by the restauranteur-landowner.  *See* 618 P.2d at 1219 (finding the "right to sell liquor or operate a bar on the land after a particular date" was an interest in real property, which was "grant[ed] away" by the restrictive covenant).

99.     Even if the Reservation Clause were arguably inconsistent with the grant of an interest in real property, North Dakota law would require the Reservation Clause to be interpreted in a manner that (i) gives effect to all provisions of the Dedication Agreements in light of the general purposes of the agreements, including the parties' stated intent to create enforceable covenants running with the land; (ii) favors Dakota, as grantee; and (iii) in the event of irreconcilable inconsistency with the earlier "Dedication" provision, yields to that provision.

### C.     Vertical Privity is Not in Dispute

100.    "To establish vertical privity, a chain of title must be established between the original covenantor or covenantee and the person claimed to be bound by the covenant or entitled to its benefit." *Restatement* § 5.2 cmt. b.[25]  Since Emerald and Dakota are the original covenantor and covenantee, respectively, vertical privity is not at issue in this case.  And if Emerald were to sell its Working Interests, vertical privity would be established because there would be a clear chain of title between Emerald and the buyer.  Presumably for these reasons, Emerald does not address the vertical privity requirement in its opening brief, and does not appear to dispute that it would be satisfied.

### D.     The Parties Intended to Create Covenants Running With the Land

101.    Emerald appears to concede that the parties intended to create covenants running with the land, since it acknowledges that Section 1.2 of each Dedication Agreements refers to Emerald's promises therein specifically as "a covenant running with the land."  (Op. Br. at 7). Lest there be any doubt on this point, the following circumstances and provisions of the

---

[25] While the *Restatement* rejects vertical privity as a requirement of modern servitudes law, the commentary provides useful discussion of the origin and application of the doctrine.

Dedication Agreements all corroborate the parties' mutual understanding and intent that

Emerald's obligations would be more than "personal" undertakings:

- The provision in section 8.1 of each Dedication Agreement that the agreement will be binding upon Emerald's successors and assigns, including any purchaser of Emerald's "interests in the Leases that are dedicated under this Agreement," *see Restatement* § 2.2 cmt. d ("Commonly used formulas for stating intent to create servitudes include statements that the interests created . . . 'bind' . . . 'heirs and assigns' or 'successors' of the parties.");

- References throughout the Dedication Agreements to Emerald's Leases being "subject to" the agreements; *see id.* ("If no previous servitude of the type described burdened the land, the inference is normally justified that the parties used the 'subject to' language to create a servitude.");

- The fact that the Dedication Agreements have a minimum fifteen-year term (Ded. Agmts. § 7.1), *see Restatement* § 2.2 cmt. h ("If the object of the arrangement requires that it remain in effect for some period of time, regardless of the ownership of the land involved, a servitude was probably intended.");

- The fact that Dakota made a substantial capital investment in constructing infrastructure upon the assigned easements, all in reliance upon Emerald's dedication of its production, *see Restatement* § 2.2 cmt. h ("If an investment by the grantee is contemplated by the parties . . . the extent to which the value of that investment is related to the [burden upon] the grantor's land is a significant factor in determining the parties' intent. The greater the extent to which the value of the investment is dependent on permanence of the [burden upon] the grantor's land, the more likely it is that the parties intended to create a servitude. . . . Subsequent acts of the grantee in improving . . . the dominant estate may also provide significant evidence of the intent of the parties. The fact that the expenditure of labor or funds on the improvements would have been unreasonable if [the burden upon] the grantor's property could be revoked at will suggest that the parties intended to create a servitude."); and

- The fact that the delivery of produced oil, gas, and saltwater within Dakota's Area of Dedication in accordance with the Dedication Agreements could only be accomplished by the owner of the Working Interests within that Area of Dedication, *see id.* cmt. i ("If the contract calls for a performance that can only be rendered by someone who owns or occupies a particular parcel of land, or if it

would have little value to the other party if it could be terminated by a conveyance of that land, the burden was probably intended to run with the land of the promisor.").

In sum, there can be no question that the parties understood and intended that Emerald's obligations under the Dedication Agreements would be burdens upon the Working Interests themselves, and not mere "personal" obligations of Emerald.

### E.    Emerald's Covenants under the Dedication Agreements "Touch and Concern" its Working Interests

102.    Under traditional common law, for a covenant to run with the land at law, either the benefit or the burden of the covenant needed to "touch and concern" the land. *Restatement* § 3.2 cmt. a.[26]  The touch-and-concern requirement originated in *Spencer's Case*, 77 Engl. Rep. 72 (K.B. 1583), where the court stated in dictum that "if the thing to be done be merely collateral to the land, and doth not touch and concern the thing demised in any sort," the covenant would not bind the tenant's assignee. *Restatement* § 3.2 Reporter's Note.  The touch-and-concern doctrine has "proved confusing despite the efforts of [commentators] to explain it," *id.*, and in America, it has generally operated to "provid[e] courts with a flexible, discretionary power to disallow and terminate servitudes . . . . they found unwise or pernicious without articulating the policy reasons for their decisions." *Restatement* § 3.2 cmt. b.  In North Dakota, the touch-and-concern doctrine is borne out in the case law and several provisions of the North Dakota Century Code.

103.    In *Northern Pac. Ry. Co. v. McClure*, discussed above, the North Dakota Supreme Court described the requirement that a covenant running with the land (i) "be, in a sense, inherent in the estate demised, or connected with it," (ii) "touch[] the land or its value, or the

---

[26] While the *Restatement* rejects the "touch and concern" doctrine as a requirement of modern servitudes law, the commentary provides useful discussion of the origin and application of the doctrine.

value of the reversion or of the term," or (iii) "[go] to fix the amount of the rent."  81 N.W. 52, 54 (N.D. 1899) (internal citations omitted).  The court noted that these principles were codified in North Dakota's statutes referring to (i) covenants "appurtenant to such estates," (ii) covenants "for the direct benefit of the property or some part of it then in existence," and (iii) covenants which "are incidental thereto."  *Id.* (internal quotation marks, citations omitted).  It then applied these principles to conclude that a lease covenant requiring the lessee to indemnify the lessor against claims for damages for losses of property upon the leased premises was sufficiently connected to the leasehold estate as to be enforceable by the lessor's assignee as a covenant running with the land.  *Id.* at 55-56.

104.    The lessor in *McClure*, a railroad company (Lessor), owned a right of way adjacent to its tracks and leased a portion of this right of way to warehousemen (Lessees), for a term of five years.  *Id.* at 52.  The lease "was for the benefit and advantage of both parties, through the facilities furnished to [Lessees] for carrying on their business of storing and shipping merchandise; and to [Lessor], by reason of the increased traffic acquired thereby for its road." *Id.*  The lease consideration consisted of nominal rent and a covenant by Lessees that they would "assume all risks of loss or damage to any property upon the leased premises," and "save harmless [Lessor] from all damages or claims for losses or injury suffered to such property."  *Id.* During the lease term Lessor reorganized and conveyed the leased premises, and the lease itself, to a new railroad company (Assignee).  *Id.* at 53.  Later during the lease term, some personal property was accidentally destroyed by fire upon the leased premises, and the property's owner sued Assignee.  *Id.*  Assignee requested indemnity from Lessee, but Lessee refused; Assignee defended the suit, lost, and paid the judgment.  *Id.*  It then sued Lessee upon the indemnity covenant in the lease.  *Id.*  Lessee argued that the indemnification covenant was not enforceable

by Assignee because it did not meet the requirements under North Dakota law for a covenant running with the land. *Id.* at 54. The court disagreed, finding both vertical and horizontal privity, and reasoning, in pertinent part, as follows with respect to the "touch and concern" requirement:

> [I]t must be conceded that covenants and stipulations may be, and often are, inserted, which are wholly foreign to the subject-matter of the lease, and, while they are binding between the immediate parties thereto, are so disconnected with the estate that they do not pass by assignment, but remain as covenants between the original parties. But the covenant here involved is not of that nature. We think it is a covenant directly connected with the estate, and within the meaning of our statutes. [The covenant] has to do with determining the compensation which the lessor is to receive for the use of the premises. It is perfectly apparent that the agreement to pay $10 per year as rent was merely a nominal sum, and that the real consideration for the use of the lands was this particular agreement that the lessor should not suffer loss from damage suits brought to recover for the destruction of property upon the premises so leased to the defendants. If . . . this covenant did not pass, then the only obligation [Lessees] would owe [Assignee] for the use of the property is the payment of the nominal rent of $10 per year, and that would be the extent of their liability; for it is clear that they can incur no liability to [Lessor], in fact or in law. For, by reason of the sale of all of its property to [Assignee], it cannot be the moving agent in negligently setting fire to property on the premises from which alone the liability would arise. . . . It would also seem that the covenant in question was one which directly affected the value of the property. It certainly would during the five years in which the lease run. For, without this covenant to save the lessor harmless, the lease of the property would, as this case shows, have been productive of loss, instead of profit, to the lessor or its assigns.

*Id.* at 55-56.

105.    In *Anderson v. Marshall-Malaise Lumber Co.*, the North Dakota Supreme Court addressed the touch-and-concern requirement in the context of a restrictive deed covenant. 263 N.W. 721 (N.D. 1935). A bank (Grantor) owned lots 8 and 9 and conducted its business on a portion of lot 8. *Id.* A lumber company (Grantee) carried on its business on nearby lots, and

bought lot 9 and the vacant portion of lot 8 from Grantor for the purpose of constructing an additional building for its business. *Id.* The deed conveying the property to Grantee contained a restrictive covenant specifying the manner of construction of any building on the premises and providing that the south and west walls of any such building would be party walls usable by Grantor. *Id.* at 721-22. The portion of lot 8 owned by Grantor was later purchased by another (Assignee); thereafter, Grantee commenced construction of a building on its portion of lot 8 that did not comply with the deed covenant. *Id.* at 722. Assignee sued to enjoin the construction, and Grantee argued that the benefit of the restrictive deed covenant was personal to Grantor and did not run with the land so as to be enforceable by Assignee. *Id.* Assignee argued the restrictive deed covenant was for the benefit of the portion of lot 8 that had been retained by Grantor and did run with the land so as to be enforceable by Assignee. *Id.* The trial court ruled for Grantee; the North Dakota Supreme Court reversed. *Id.* at 724.

106. Relying on *McClure* and the statutes cited therein, the court framed the question presented as "whether the restriction in the deed . . . was personal to [Grantor] or was for the benefit of and thus appurtenant to that portion of lot 8 retained by [Grantor]." *Anderson*, 263 N.W.2d at 723. If the covenant was "imposed for [Grantor's] personal benefit or convenience," then only Grantor could enforce it. *Id.* But if the covenant was "imposed for the benefit of adjoining land of which [Grantor] remain[ed] the owner, then the right to enforce the same passed to [Grantor's] grantees." *Id.* Whether the covenant was for the personal benefit of Grantor or for the benefit of the portion of lot 8 owned by Grantor, the court concluded, "*is a matter of fact*—of intention—to be determined from the wording of the restrictive provision itself *in the light of the circumstances attendant on the transaction.*" *Id.* (emphasis added); *see id.* at 724 ("[A]s we have said above, the question here is *wholly one of fact* . . . ." (emphasis

added)).  Grantee argued that it was clear from the face of the deed that the covenant was for Grantor's personal benefit or convenience because it provided that Grantor would have the right to use the south and west walls as party walls.  *Id.*  The court disagreed, finding "it would be a great benefit to that portion of the property which [Grantor] retained to be insured that no building would be erected on the adjoining premises . . . that was not of fireproof character."  *Id.*  It also noted that Grantor was "a domestic corporation [whose] life was limited to a definite period," but the covenant was not limited to that period, which further supported the conclusion that the covenant was for the benefit of the property rather than Grantor personally.  *Id.*

107.   The statutory provisions at issue in *McClure* and *Anderson* persist in sections 47-04-24-26 of the North Dakota Century Code, and were cited by the North Dakota Supreme Court in *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282 (N.D. 2009).  In *Beeter*, the owners of a 940-acre tract of land containing a landfill (collectively, Seller) granted a landfill operator (Buyer) an option to purchase the land for a purchase price consisting of a cash component plus "six percent (6%) of the total gross revenue derived from [Buyer's] operating of the premises."  771 N.W.2d at 283.  The option further provided (i) that if the option were exercised, then in addition to the purchase price, Buyer "or [its] assigns agrees to pay Seller six percent (6%) of the total gross revenue derived from any expansion or extension of [Buyer's] operation of a waste disposal facility . . . within a five mile radius," and (ii) that "[t]he right to receive the six percent (6%) of the total gross revenue derived from the operation of a waste disposal facility is perpetual and a covenant running with the real estate."  *Id.* at 283-84.  Buyer exercised the option and purchased the land, and the warranty deed from Seller to Buyer included the above-quoted language.  *Id.* at 284.  Buyer paid the agreed percentage of revenue to Seller for several years, but then sold the land to another company (Assignee), which notified Buyer that no further

payments would be made. *Id.* Buyer sued Assignee to enforce the deed covenant. *Id.* And the trial court found "that the covenant in the deed was *not* a covenant running with the land, which would be binding on subsequent purchasers" (emphasis added), but nonetheless enforced the original parties' stated intent to create a perpetual payment obligation and entered a money judgment against Assignee. *Id.* at 285.

108.   Assignee appealed, arguing the enforcement against a covenantor's assignee of a deed covenant that did not qualify as a covenant running with the land under North Dakota law was reversible error. Brief of Appellant, *Beeter v. Sawyer Disposal LLC*, No. 20080346, 2009 WL 1023586, at *14 (N.D. Feb. 2009) (Appellate Brief) ("Having correctly concluded that [Seller was] not the holder of a covenant that runs with the land . . . the trial judge's inquiry should have ended, and judgment should have been entered in favor of [Assignee]."). Seller did not dispute the trial court's finding that the deed covenant did not qualify as a covenant running with the land, and did not otherwise respond to Assignee's central assignment of error. *See generally* Brief of Appellee, *Beeter v. Sawyer Disposal LLC*, No. 20080346, 2009 WL 1023585 (N.D. Feb. 2009) (Appellate Brief). Rather, it offered a variety of novel arguments (several of which were raised for the first time on appeal) why the trial court's judgment should be upheld. *Id.*;[27] *Beeter*, 771 N.W.2d at 287-88. The North Dakota Supreme Court rejected these arguments and, perhaps unsurprisingly, agreed with Assignee that a covenant that did not meet the requirements of a covenant running with the land could not be enforced as a covenant running with the land. *See Beeter*, 771 N.W. 2d at 287. In arriving at this conclusion, the court discussed the "touch and concern" requirement, and followed the general rule that "a covenant to pay for

---

[27] That the covenant was enforceable in equity as an equitable servitude was *not* among these arguments, presumably because the relief sought by Seller—payment of money damages—was purely legal in nature.

land in a particular way is a personal covenant and does not run with the land" because it confers no benefit upon the land itself, but rather provides a personal benefit to the seller. *Id.* at 285-86.

109. Emerald contends that *Beeter* is "analogous" to the case at bar (Op. Br. at 12), but it does not explain how. Dakota did not sell land to Emerald, so Emerald's covenants in the Dedication Agreements cannot be considered covenants "to pay for land in a particular way." And Dakota has never contended that the covenants in the Dedication Agreements are real covenants simply because the parties said they were—that is a straw man of Emerald's own making. (*See* Op. Br. at 7 ("[A] covenant running with the land is not created by simply being named as such in a contract. That proposition 'is in direct contradiction to the settled principle that the parties' intent, no matter how clearly expressed, cannot make a personal covenant run with the land . . . .'" (quoting *Beeter*, 771 N.W. at 286))). Indeed, if anything, Dakota would state the converse—that the parties said that Emerald's covenants in the Dedication Agreements were real covenants *because they are* real covenants.

110. Rather than make its "touch and concern" determination based on imperfect analogies to sparse case law (none of which is particularly apposite), the Court should instead approach the issue the way the North Dakota Supreme Court would, *based on first principles*. As discussed below, reading the applicable statutes in light of common law principles, it is clear that Emerald's covenants in the Dedication Agreements "touch and concern" Emerald's Working Interests. Emerald's arguments to the contrary are unavailing.

### 1.   Emerald's covenants were "made for the direct benefit of," and are otherwise "appurtenant to," the Working Interests

111. A covenant "made for the direct benefit of" real property satisfies the touch-and-concern requirement as to that real property. *See* N.D. Cent. Code § 47-04-26; *McClure*, 81 N.W. at 55-56; *Anderson*, 263 N.W. at 723-24. And Emerald's covenants in the Dedication

Agreements were clearly made for the direct benefit of its Working Interests. Before dedicating its Working Interests to Dakota, Emerald was free to design, construct and operate its own midstream infrastructure at its own risk and expense. However, Emerald chose to give Dakota, a midstream provider, dedications and other commitments in exchange for Dakota undertaking the risk and funding of co-located crude, gas, and saltwater gathering systems designed and located uniquely to receive and gather the production from Emerald's Working Interests. At the time the Dedication were negotiated, Emerald was flaring the associated gas component of its production stream and was not optimally served by trucking for its valuable crude oil production component, or the vast amounts of its saltwater production that had to be moved off-lease. Under these circumstances, and in order to avoid shut-in and to fulfill its lease obligations, Emerald had to make a commitment—either to its own build-out commitments or to a midstream company. Emerald would not have been able to obtain customized gathering from a midstream company, much less priority or firm service, without making a commitment rising to the level of a real property dedication. As a result of the dedication to Dakota, Emerald was able to redeploy its capital towards development of its Working Interests, achieving compliance with North Dakota law, meeting its obligations under the terms of its joint-operating agreements and leases, minimizing surface disturbance and adverse impacts to the landowners overlying the leasehold interests,[28] and maximizing production and therefore proceeds to all interest owners in the wells connected to the Dakota systems. In addition, Emerald was able to obtain commitments from Dakota for a future customized expansion beyond the Initial Receipt Points specifically for the purpose of connecting to Emerald's as-yet undrilled leasehold Working Interests within the Area of Dedication. (*See* Ded. Agmts. § 5). Indeed, the foregoing illustrates just some of the benefits

---

[28] *Cf. Bice v. Petro-Hunt, LLC*, 768 N.W.2d 496, 503 (2009) (holding minimization of surface disturbance was beneficial to owner of working interests in oil and gas leases).

conferred upon Emerald's Working Interests by virtue of its entry into the Dedication

Agreements.  By virtue of these benefits, Emerald's covenants in the Dedication Agreements

touch and concern Emerald's Working Interests.  *Cf. McClure*, 81 N.W. at 55-56 (finding touch

and concern requirement was satisfied as to lessee's covenant to indemnify lessor, where the

covenant was the *quid pro quo* for lessor's agreement to charge only nominal rent).

112.    A covenant "appurtenant to" real property also satisfies the touch-and-concern

requirement as to that real property.  *See* N.D. Cent. Code § 47-04-24; *McClure*, 81 N.W. at

55-56; *Anderson*, 263 N.W. at 723-24.  According to the *Restatement*, an "appurtenant" covenant

benefit or burden is one that is tied to ownership of a particular interest in real property.

*Restatement* § 1.5(1); *accord* N.D. Cent. Code § 47-01-06 ("A thing is deemed to be . . .

appurtenant to land when it by right is used with the land for its benefit, as in the ease of a way

or a watercourse, or of a passage for light, air, or heat from or across the land of another.").

Thus, with respect to the *benefit* of a covenant:

> The fact that the benefit serves a purpose that is only or primarily
> useful to the holder of a particular interest in land, which was held
> by the original beneficiary at the time the [covenant] was created,
> strongly suggests that the benefit is appurtenant.  The fact that the
> benefit serves a purpose that would be more useful to a successor
> to an interest in land held by the original beneficiary than to the
> original beneficiary after having parted with that interest in land
> should also lead to the conclusion that the benefit is appurtenant.

*Id.* § 4.5 cmt. d.; *accord McClure*, 81 N.W. at 55-56 (concluding benefit of lessee's covenant to

indemnify lessor from claims arising from property damage upon the leased premises was

appurtenant to the leased premises because, following original lessor's conveyance the property

to a successor, only the successor could be held liable for property damage claims arising upon

the leased premises); *Anderson*, 263 N.W. at 723 (concluding benefit of deed covenant requiring

construction of any building on land adjacent to bank's land to be of a fireproof nature was

01:19121175.9

appurtenant to the bank's land because the covenant would provide a benefit to that land even if the bank went out of business).

113.   With respect to the *burden* of a covenant (which is the issue presented here): (i) the burden of a restrictive covenant is always appurtenant, because the covenant limits what can be done with the real property; and (ii) if an affirmative covenant "calls for performance on or from specific property," the burden of that covenant is appurtenant. *Id.* The *Restatement* illustrates the latter point as follows:

> In the original deeds to all lots in the Orchard Hill subdivision, the Developer covenanted to supply water for domestic use to each lot from a well located on Lot 26. Developer then sold Lot 26 to Delta. Because the deeds specify that the water is to come from a well in a specific location, the burden of the developer's covenant is appurtenant to Lot 26. In the absence of facts establishing that the obligation was personal to Developer, Delta is bound by the covenant to supply water from Lot 26.

*Id.* § 4.5 Illustration 6. Here, the burdens of Emerald's covenants under the Dedication Agreements are clearly "appurtenant to" the Working Interests—the restrictive covenant, because it limits Emerald's freedom of action with respect to its Working Interests (e.g., to truck its oil and saltwater production), the affirmative covenant, because it calls for performance from specific property (i.e., the Working Interests within the Area of Dedication).

114.   In sum, Emerald's covenants under the Dedication Agreements are not "foreign to the subject-matter of the [agreements]" or "disconnected with the [Working Interests]" so as to "not pass by assignment, but [rather] remain as covenants between the original parties." *McClure*, 81 N.W. at 55. To the contrary, Emerald's covenants are *part and parcel* of the Dedication Agreements, and they have a direct, substantial relationship with the Working Interests, which they were "made for the benefit of" and are "appurtenant to" within the meaning of sections 47-04-26 and 47-04-24, respectively.

### 2.    *Emerald's touch-and-concern arguments are unavailing*

115.    Emerald argues that the Dedication Agreements cannot touch or concern the Working Interests because the Dedication Agreements "are, at their core, service contracts: [Dakota] provide[s Emerald] with a service and [Emerald] provide[s Dakota] a payment for those services." (Op. Br. at 13).  Of course, Emerald offers no legal authority the proposition that a "service contract" cannot touch or concern an interest in real estate.  And in any event, its characterization of the Dedication Agreements as a "service contract" is inaccurate because it ignores the "dedication" component of the agreements, which, as discussed above, conveyed an interest in real property.  Indeed, by Emerald's reasoning, one could characterize a lease of real property as an "annuity contract" by focusing solely on the lessee's obligation to make a stream of payments over time.  But doing so would obscure the true nature of the transaction.

116.    Emerald next argues that three provisions in the Dedication Agreements weigh in favor of finding that Emerald's covenants do not touch and concern its Working Interests.  The first such provision is the Reservation Clause discussed above, which Emerald describes as "underscoring the nature of the [Dedication Agreements] as service agreements." (Op. Br. at 13).  But this argument makes no more sense with respect to the touch-and-concern requirement than it did with respect to the grant requirement for real covenants.  For instance, in *Northern Pac. Ry. Co. v. McClure*, discussed above, the court determined that a lessee's obligation to indemnify and hold the lessor harmless from certain claims touched and concerned the leased premises.  81 N.W. at 53.  The agreement at issue in *McClure* did not give the lessor any control over the lessee's business operations.  Yet by Emerald's reasoning, had that agreement included an express "reservation" of the lessee's right to operate its business, the court would have had to find that the indemnification covenant did not touch and concern the leased premises.  There is no reason to believe *McClure* would have come out differently had there been such a reservation

by the lessee. *See* 81 N.W. at 55-56 (finding the indemnification covenant was "directly connected with the [leasehold] estate" because, among other reasons, "the real consideration for the use of the lands was this particular agreement that the lessor should not suffer loss from damage suits brought to recover for the destruction of property upon the premises so leased to the defendants").

117.   The second provision relied upon by Emerald is section 2.1(ii) of the Dedication Agreements, which defines the "Receipt Points" to which Dakota's gathering and pipeline systems connect. According to Emerald, this provision means that Emerald's obligations under the Dedication Agreements "begin and end at the Receipt Points, and by the time any oil, gas, or water reaches [Dakota], it has been severed from [Emerald's] real property and has converted to personalty" so that Emerald's obligations cannot "'touch' the land." (Op. Br. at 13-14). There are at least two problems with this argument. First, while certain *payment* obligations "begin and end" with the delivery of oil, gas, and saltwater to the Receipt Points (to the extent such payments are keyed to delivered volumes), these are by no means Emerald's only obligations under the Dedication Agreements.[29]   Indeed, Emerald conveniently ignores a very important obligation that arises prior to, and independent of, any delivery of oil, gas, or saltwater to a Receipt Point, namely: Emerald's obligation *to deliver* to Dakota all of its production of oil, gas and saltwater within the Area of Dedication "without other disposition except as otherwise provided in the [Dedication Agreements]." (Ded. Agmts. § 1.2). Second, while it is true that any minerals that have been severed from the ground are personal property, this is irrelevant because the "servient estate" for analytical purposes—i.e., the thing that a real covenant must

---

[29] Other payment obligations do not depend upon delivery, most notably the obligation to make shortfall payments in the event that delivered volumes fall below committed minimum volumes. (Ded. Agmts. Ex. E).

touch and concern—is not made up of severed minerals, but rather the *Working Interests themselves*, which are interests in real property.

118. The final provision (or rather, series of provisions) relied upon by Emerald is the fee schedule for the Dedication Agreements. Emerald asserts that these fees "are triggered by [Dakota's] receipt of severed oil, gas, and water, and not by the actual extraction of gas, oil, or water from the ground." (Op. Br. at 14). But Emerald no further explanation or citation to legal authority explaining how or why this is relevant to the touch-and-concern analysis. And as discussed above, the distinction between severed and non-severed oil, gas, and saltwater is irrelevant to the real covenant analysis, because the property burdened by the covenants at issue here are *the Working Interests* themselves (which are the servient tenement for analytical purposes), not the severed oil, gas, and saltwater.

119. In sum, none of the contractual provisions relied upon by Emerald even calls into question—much less "negates the possibility" (Op. Br. at 14)—that Emerald's covenants under the Dedication Agreements touch and concern the Working Interests.

### III. IN ANY EVENT, THE COVENANTS IN EMERALD'S DEDICATION AGREEMENTS ARE ENFORCEABLE IN EQUITY AGAINST ASSIGNEES OF EMERALD'S WORKING INTERESTS AS EQUITABLE SERVITUDES

Regardless whether Emerald's covenants under the Dedication Agreements would be enforceable at law against subsequent owners of Emerald's Working Interests as real covenants, they would be enforceable in equity as equitable servitudes as discussed below. Because Emerald seeks a declaration that there would be *no mode of enforcement* available to Dakota vis-à-vis subsequent purchasers of Emerald's Working Interests, the possibility of enforcement in equity suffices to defeat summary judgment.

### A.    North Dakota Law Does Not Limit Equitable Servitudes to the Condominium Context

120.    The entirety of Emerald's briefing on the topic of equitable servitudes is a footnote stating: "Equitable servitudes in North Dakota arise only in the condominium context." (Op. Br. at 1 n.3).  For this proposition Emerald cites three cases dealing with chapter 47-04.1 of the North Dakota Century Code (governing "Condominium Ownership of Real Property"),[30] which requires the owner of a condominium project, "prior to the conveyance of any condominium therein, [to] record a declaration of restrictions relating to such project, *which restrictions shall be enforceable as equitable servitudes where reasonable*, and shall inure to and bind all owners of condominiums in the project."  N.D. Cent. Code § 47-04.1-04 (emphasis added).  The cases cited by Emerald appear to be the only reported opinions from the North Dakota Supreme Court where the term "equitable servitude" was used, which is presumably why Emerald concludes that equitable servitudes do not exist in North Dakota outside the condominium context.  But that is not a valid conclusion for a number of reasons.

121.    First, as is evident from the North Dakota Supreme Court's decision in *Reeves & Co. v. Russell*, discussed above, the partial codification of a common-law rule in North Dakota does not imply a repeal of those parts of the rule not so codified.  *See* 148 N.W. at 658 (rejecting the assertion that "the fact that a common-law lien has been declared by statute makes all rights thereunder dependent solely on the statute, without regard to common-law incidents, rights, or history," such that "a priority that would . . . exist under the same circumstances at common law . . . would be negative and negative and defeated by the mere silence of the statute on priority").  Equitable servitudes have existed at common law since the 19th century.  *Restatement*

---

[30] *First Intern. Bank and Trust v. Peterson*, 797 N.W.2d 316 (N.D. 2011); *Riverside Park Condo Unit Owners Ass'n v. Lucas*, 691 N.W.2d 862 (N.D. 2005); *Breene v. Plaza Tower Ass'n*, 310 N.W.2d 730 (N.D. 1981).

§ 1.4 cmt. a.  Statues in North Dakota are "not presumed to make any alteration in the common law further or otherwise than the act does expressly declare," and "rules of the common law are not to be changed by doubtful implication."  *Russell*, 148 N.W. at 159 (internal quotation marks, citations omitted).  The condominium statute does not appear to alter the common law of equitable servitudes, except perhaps insofar as it (i) specifies the time and manner of notice to subsequent owners of the servient tenement, and (ii) imposes an express "reasonableness" requirement upon enforcement.  Any broader changes to the common law, such as a wholesale abrogation of the equitable servitudes doctrine outside the condominium context, as Emerald seems to suggest, simply cannot be inferred from the statute.

122.    Second, the North Dakota Century Code has an entire chapter devoted to "Servitudes," which describes a "servitude" simply as a burden upon land.  N.D. Cent. Code §§ 45-07-01-02, -04.  The statute imposes relatively few requirements upon a "servitude," all of which are consistent with the common law of equitable servitudes as discussed below.  This strongly suggests that the North Dakota Century Code in no way displaces the common law of equitable servitudes.  This conclusion is bolstered by decisions from the other Field Code jurisdictions expressly recognizing equitable servitudes.  *Pennington v. Flaherty*, 303 P.3d 274, 278 (Mont.,2013) ("An implied [deed] restriction can be enforced as an equitable servitude."); *St. Clair v. Krueger*, 769 P.2d 579, 580 n.1 (Idaho 1989) (noting restrictive covenant was enforceable by injunctive relief as an equitable servitude despite the lack of horizontal privity that would preclude enforcement at law); *Hyde v. Liebelt*, 391 N.W.2d 186, 187 (S.D. 1986) ("Although a promise is unenforceable as a covenant at law, because of failure to meet one of the requirements, the promise may be enforced as an equitable servitude against the promisor or a subsequent taker who acquired the land with notice of restrictions on it."); *Marra v. Aetna Const.*

*Co.*, 101 P.2d 490, 492 (Cal. 1940) ("Even though a covenant does not run with the land, it may be enforceable in equity against a transferee of the covenantor who takes with knowledge of its terms . . . .").

123.    Third, not all cases dealing with equitable servitudes use the phrase "equitable servitude."  An equitable servitude is a covenant that is enforceable in equity against successors to the servient tenement, in contrast with a real covenant, which is enforceable at law.  Dakota submits that the North Dakota Supreme Court's decision in *Allen v. Minot amusement Corp.*, which dealt with equitable enforcement of a restrictive covenant in a shopping center lease, is properly viewed as an "equitable servitude" case and establishes the continued viability of equitable servitudes in North Dakota.

124.    In *Allen*, the owner of a shopping center (Lessor) entered into a lease with an anchor tenant (Lessee), which included a restrictive covenant that the shopping center would only be used for businesses of the "same kind and nature" as those identified in an exhibit to the lease.  312 N.W.2d at 699.  This exhibit was not included in the short form of lease that was recorded in the registry of deeds.  *Id.* at 699-700.  Lessor later sought Lessee's agreement that part of the shopping center could be used as a movie theater, which was not among the types of businesses identified in the exhibit to the lease, and thus was not permitted by the restrictive covenant.  *Id.* at 700.  Lessee consented to the particular use but reserved all other rights with respect to enforcement of the restrictive covenant.  *Id.*  Lessor leased the movie theater for a few years, then sold it to another operator (Assignee 1).  *Id.*  The deed from Lessor to Assignee 1 referred generally to the use and occupancy restrictions in the lease between Lessor and Lessee, but Assignee 1 was not furnished with a list of the restrictions.  *Id.*  Assignee 1 vacated the theater site and moved to a new shopping center; thereafter, it sought permission from Lessee to

sell the theater site to a religious congregation (Assignee 2) for use as a church, which was inconsistent with the restrictive covenant. *Id.* at 701. Lessee refused, but Assignees 1 and 2 nonetheless went through with the sale, and Assignee 2 thereafter began using the theater site as a church. *Id.* Lessee commenced an action seeking entry of an injunction enforcing the restrictive covenant against Assignee 2. *Id.* The trial court found for Assignee 2, holding that "the restrictive covenant did not run with the theater site because the restrictions were of no conceivable benefit to the theater" as required by section 47-04-26 of the North Dakota Century Code (concerning real covenants). *Id.* Lessor appealed, and the North Dakota Supreme Court reversed, concluding that the lower court had "abused its discretion in denying the injunctive relief and determining that the restrictive covenant was a nullity." *Id.* at 704.

125.    The North Dakota Supreme Court began its analysis by noting that Lessee was seeking injunctive relief. *Id.* at 702. It then stated that a landowner "may sell his land subject to such reservations or restrictions as he may see fit to impose, provided they are not contrary to public policy," and that such reservations and restrictions "will be given force and effect when clearly established." *Id.* (citing *Anderson*, 263 N.W. 721). The court noted that Assignees 1 and 2 were both on constructive knowledge of the restrictive covenant in the lease between Lessor and Lessee, and that the court had previously held, in the easement context, that "[a] subsequent purchaser of a servient tenement is bound to take notice of rights . . . of which he may learn by an inspection of the records, and where a reasonably careful . . . inquiry would disclose the existence of an easement, the grantee of the servient tenement takes title subject to the easement to the extent that his grantor is bound thereby." *Id.* at 703 (internal quotation marks, citation omitted). The court held this rule applied to Assignees 1 and 2 with respect to the restrictive covenant in the lease, ***without any discussion of the general requirements of real covenants***

*under section 47-04-26 or the lower court's specific finding that the touch-and-concern requirement had not been met.* *Id.; accord Hill v. Lindner*, 769 N.W.2d 427 (N.D. 2009) (enforcing restrictive covenant as between successors to dominant and servient tenements without discussing any of the statutory requirements for a real covenant).[31]   And importantly for present purposes, the court was not swayed by the assertions that that the church represented the highest and best use of the theater site and that the cost of remodeling the theater for a conforming use would be cost-prohibitive, stating: "[T]he mere fact that the removal of the restrictive covenant will greatly enhance the value of land will not justify its removal.  Neither will mere pecuniary loss prevent the enforcement of a restrictive covenant." *Allen*, 312 N.W.2d at 703 (citations omitted).

126.    In sum, the equitable servitude doctrine is alive and well in North Dakota, particularly with respect to the enforcement of restrictive covenants.  Because Emerald seeks a declaration that its covenants under the Dedication Agreements are not enforceable as real covenants *or* equitable servitudes, the Court must deny summary judgment if Dakota can establish the elements of an equitable servitude.  As discussed below, it can.

### B.    The Requirements of an Equitable Servitude Are Satisfied

127.    As noted above, the traditional common-law requirements for enforcement of a covenant in equity as an equitable servitude differed from the requirements for enforcement at law as a real covenant in that: (i) a real covenants required horizontal privity between the original covenantor and covenantee, whereas an equitable servitude required only notice of the burden to subsequent owners of the servient tenement; (ii) equitable servitudes traditionally could not

---

[31] The instrument at issue in *Hill* was a Declaration of Restrictive Covenants and Reservation of Public Utility Easements filed by property developers stating that the restrictions set forth therein "shall apply to and be a part of every conveyance or deed . . . and be deemed and considered as covenants running with the land."  769 N.W. 2d at 428.

create affirmative burdens; and (iii) equitable servitudes traditionally could not create benefits in gross. *Id.* The notice requirement is satisfied here because memoranda evidencing the Dedication Agreements were recorded, thus putting future owners of Emerald's Working Interests on constructive notice of Emerald's covenants under the Dedication Agreements. *See Allen*, 312 N.W.2d at 703. And assuming arguendo that North Dakota law would prohibit enforcement of affirmative burdens as equitable servitudes,[32] this would not preclude enforcement of restrictive covenants in the Dedication Agreements. *See id.* Finally, assuming arguendo that North Dakota law would not recognize an equitable servitude whose benefit was held in gross, this would not preclude enforcement of the restrictive covenants in the Dedication Agreements because the benefit of those covenants is appurtenant to the easements assigned to Dakota and the infrastructure constructed thereon. *See Restatement* § 4.5 (benefit of a servitude is held in gross only "if created in a person who held no property that benefited from the servitude, or if it serves a purpose that would be more useful to the original beneficiary than it would be to a successor to an interest in property held by the original beneficiary at the time the servitude was created").

128.    The restrictive covenants in the Dedication Agreements also satisfy the requirements imposed upon servitudes by the North Dakota Century Code, which are as follows:

- "A servitude can be created only by one who has a vested estate in the servient tenement." N.D. Cent. Code § 47-05-05. (This requirement is satisfied because Emerald owned the Working Interests at the time it entered into the Dedication Agreements, as it represented in Recital A of each Dedication Agreement.)

- "The area of land covered by the . . . servitude . . . shall be properly described and shall set out the area of land covered by the interest in real property." N.D. Cent. Code § 47-05-02.1(1). (This

---

[32] *But see Restatement* § 1.4 cmt. a (noting that American courts have enforced affirmative burdens in equitable proceedings).

requirement is satisfied by the legal description of the Area of Dedication attached as Exhibit A to each of the Dedication Agreements.)

- "The duration of the . . . servitude . . . must be specifically set out, and in no case may the duration of any interest in real property regulated by this section exceed ninety-nine years." N.D. Cent. Code § 47-05-02.1(2). (This requirement is satisfied by section 7.1 of the Dedication Agreements, which provides that the term of the agreements is fifteen years, subject to continuation year to year until terminated by the parties—the 99-year outside limitation on the term is "deemed a part of" the Dedication Agreements by statute, N.D. Cent. Code § 47-05-02.1.)

- "No increase in the area of real property subject to the . . . servitude . . . shall be made except by negotiation between the owner of the . . . servitude . . . and the owner of the servient tenement." N.D. Cent. Code § 47-05-02.1(3). (This requirement is satisfied because nothing in the Dedication Agreements permits Dakota to unilaterally increase its Area of Dedication.)

129.    In sum, even if Emerald's covenants under the Dedication Agreements failed to qualify as real covenants enforceable at law against assignees of Emerald's Working Interests, the restrictive covenants would be enforceable in equity as equitable servitudes.

## CONCLUSION

130.    For the reasons set forth above, Dakota respectfully requests that the Court deny Emerald's motion for summary judgment and award Dakota such other and further relief as is just and proper.

Dated:  September 14, 2016
Wilmington, Delaware

*/s/ M. Blake Cleary*

M. Blake Cleary (No. 3614)
John T. Dorsey (No. 2988)
Patrick A. Jackson (No. 4976)
Michael S. Neiburg (No. 5275)
Shane M. Reil (No. 6195)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

Barnet B. Skelton, Jr. (admitted *pro hac vice*)
**BARNET B. SKELTON, JR. P.C.**
JP Morgan Chase Bank Building
712 Main, Suite 1610
Houston, Texas 77002
Telephone: (713) 659-8761
Facsimile: (713) 659-8764

-and-

Mark R. Western (*pro hac vice* pending)
Thaddeus E. Swanson (*pro hac vice* pending)
**NILLES LAW FIRM**
1800 Radisson Tower
201 North Fifth Street
Fargo, North Dakota 58108-2626
Telephone: (701) 237-5544
Facsimile: (701) 280-0762

*Counsel to Defendants Dakota Midstream, LLC,*
*Dakota Energy Connection, LLC, and*
*Dakota Fluid Solutions, LLC*

01:19121175.9

82