IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: EMERALD OIL, INC., *et al.*,[1]<br><br>    Debtors. | Chapter 11<br>Case No. 16-10704 (KG)<br>(Jointly Administered) |
| EMERALD OIL, INC., *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>DAKOTA MIDSTREAM, LLC; DAKOTA ENERGY CONNECTION, LLC; and DAKOTA FLUID SOLUTIONS, LLC f/k/a MESA OIL SERVICES, LLC,<br><br>    Defendants. | Adversary Proceeding No. 16-50998(KG)<br><br>**Ref. Dkt. Nos. 6, 7** |

**DECLARATION OF LESA S. ADAIR IN SUPPORT OF DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Lesa S. Adair, declare as follows under penalty of perjury under 28 U.S.C. § 1746:

1.  I am a founding partner of Pearson Adair & Co ("Pearson Adair"). My business address is 6860 Dallas Parkway, Suite 125, Plano, Texas 75024.

2.  I am authorized to submit this declaration (the "Declaration") on behalf of Pearson Adair and Dakota Midstream, LLC, Dakota Energy Connection, LLC and Dakota Fluid Solutions, LLC f/k/a Mesa Oil Services, LLC (collectively, the "Defendants" or "Dakota") in support of the *Defendants' Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment* (the "Opposition"),[2] to which this Declaration is annexed.

3.  Unless otherwise noted, the statements in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents, including documents produced by the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887). The location of the Debtors' service address is: 200 Columbine Street, Suite 500, Denver, Colorado 80206.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Opposition.

above-captioned plaintiffs (collectively, the "Plaintiffs" or the "Debtors"); (c) information supplied to me by other professionals retained by Dakota; and (d) my views, based upon my experience in the oil and gas industry. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## PROFESSIONAL BACKGROUND

4. Pearson Adair is a firm that provides consulting services to various stakeholders in the energy sector, which services include providing expert testimony and litigation support in energy-related cases, energy asset and company valuation, construction and project development, and mergers and acquisition due diligence.

## EXPERT QUALIFICATION

5. I have a B.S. in chemical engineering from Oklahoma State University.

6. I have an M.B.A. with a concentration in finance from Southern Methodist University.

7. I am licensed Professional Engineer in the states of Oklahoma and Texas.

8. I am a member of the American Institute of Chemical Engineers and the National Society of Professional Engineers.

9. I have more than 30 years' experience in the oil and gas industry, including as (a) among other things, an engineer and marketing representative at ARCO Oil and Gas Company, (b) CEO, CFO and Director of Muse, Stancil & Co., an oil and gas consulting firm, and (c) a founding partner of Pearson Adair.

10. I have written numerous articles regarding the oil and gas industry, which have been published in, among other publications, the *Oil & Gas Journal* and the *American Oil & Gas Reporter*.

01:19285672.2

11. I have appeared as an expert witness in sixteen (16) oil and gas related litigations since 2010.

**DECLARATION**

12. The Oil and Gas industry is made up of three distinct sectors: upstream, midstream, and downstream.

13. Activities in the upstream sector are focused on finding and developing oil and gas reserves through the exploration for, and the production of, oil and gas. Upstream companies focus on: (i) finding economic oil and gas reserves; (ii) drilling wells to bring oil and gas to the surface; (iii) developing treating and conditioning facilities located close to the wellhead; (iv) operating the wells and associated surface facilities necessary to deliver the oil and gas off the producing lease; (v) managing the disposition of any associated by-products; and (vi) selling the raw oil and gas at or near the point of the production and/or delivering the products for transport away from the producing lease or field and into midstream facilities.

14. Emerald is an upstream company, and it owns certain working interests in oil and gas leases, wells or lands in McKenzie County, North Dakota, which are referred to herein as the "Working Interests." The Working Interest were acquired through purchases of existing producing wells and associated leases, leasing property from mineral owners, and by drilling and completing new horizontal wells in the Bakken and Three Forks formations. The primary target of new well development for Emerald has been oil production. However, crude oil, gas, and saltwater are produced as a combined stream from these wells.

15. The role of participants in the midstream sector is to provide the necessary assets, facilities, pipelines, and services to move raw hydrocarbons from the producing field and deliver oil, natural gas, and natural gas liquids ("NGL") to meet the specifications of end users and

consumers in downstream markets. In general, the range of available midstream services includes the following: (i) crude oil gathering; (ii) water gathering and disposal; (iii) gas gathering and compression; (iv) gas treating; (v) gas processing; (vi) natural gas transmission; (vii) NGL gathering and transmission; (viii) crude oil transmission; and (ix) trucking.

16.     Oil production typically flows to the surface with varying amounts of associated natural gas and water. The expected associated gas and/or water production for any particular well is unique and often varies over the producing life of the well. On-lease, or so-called "field" facilities, are utilized to separate the oil from any associated gas and produced water. As the oil, gas, and water are separated, the oil and water are typically stored in tanks installed nearby to the producing well or wells (if multi-well drilling pads are utilized) or at central delivery locations within the geographic area of the producing field. Oil inventories are allowed to build up in local storage facilities and are transported from the producing field by truck or pipeline depending on the available field facilities installed. Midstream providers supply the trucking assets and/or the pipeline facilities necessary to transport the oil away from the producing area for delivery into mainline transmission pipelines or rail facilities that serve end users, typically refineries, or to regional trading centers where supplies of oil are aggregated prior to injection into mainline transmission pipeline or rail cars for delivery to refiners.

17.     Raw natural gas typically flows away from the producing wellhead in a gaseous state and must, therefore, be captured and transported in a pipeline system, rather than by truck. A gas gathering system is a series of pipe connecting one or more natural gas wells which is used to deliver gas into a mainline transmission system.

18.     To avoid interruption in the production of crude oil from any well, it is essential to be able to capture and remove the associated gas and produced water from the well site and the field.

19.     The design and configuration of midstream facilities varies significantly throughout the oil and gas industry.  Oil and gas gathering facilities serve the specific needs of the producers in each unique geographic area.  The capacities and design characteristics of the equipment utilized such as pipelines, pumps, compressors, storage tanks, truck loading/unloading, rail loading facilities and gas processing plants are dictated by the relative volumes of the oil, gas and by-products being produced, the physical makeup of each produced stream, and the expected production profile or decline curve associated with the producing wells, as well as the disposition specifications for each component in the downstream markets.  As such, midstream companies provide "custom" solutions to many upstream producers.

20.     As the link between the upstream and the downstream segments of the industry, midstream companies adjust to meet the needs of both the upstream and downstream sectors.  Midstream providers control neither the rate of supply development in the upstream sector, nor end-user hydrocarbon demand in the downstream sector.  Oil and gas markets are subject to cyclic price behavior driven by factors out of the control of most market participants.  Depending on the geographic location of the downstream end users and the markets that each serves, downstream participants are subject to varying levels of exposure to elasticity of demand and market price risk.

21.     Producers enter into agreements with midstream providers for oil and natural gas gathering, treating, and conditioning, as well as natural gas processing and related services for by-product gathering and disposition.  Under such contracts, producers typically provide a "reserve dedication" in exchange for the midstream companies' capital commitments to construct and

01:19285672.2

operate specific facilities required for oil and gas production. Dedication agreements pledge the reserved developed in specific geographic areas, sometimes as limited to certain producing horizons or depths, to a counterparty providing such services as gathering, treating, conditioning, compression, or processing. Such reserve dedications, which in commercial parlance are sometimes referred to as "acreage dedications," are customary in wellhead contracts. Industry participants recognize and understand the meaning of such dedications and recognize the commercial implications associated with dedication agreements when evaluating alternative offers for gathering-related services, performing due diligence for asset purchase and sale, and when completing valuation analyses for acquisitions and divestitures.

22. The specific terms and conditions of any dedication are subject to negotiations between the parties with the term of the dedication taking different forms, for example: (i) a reserve dedication for all production from a specific geographic area for as long as economic production continues from wells in the subject area; (ii) all of the producer's deliveries from wells in the subject area for the primary term of the midstream services agreement; or (iii) a defined cumulative volume of deliveries from wells in the subject area, regardless of the time period required.

23. Reserve dedications are commonly utilized in oil and gas contracts to offset producer performance risk. Typical risks which can impact midstream providers can best be understood by the following hypothetical:

> A gas gatherer contracts with a producer to build a new gathering system to serve the producer's planned development of a new gas field. The producer specifies that 50 wells will be drilled in a three-year period and provides the midstream company with the prospective well locations, initial well volumes, well producing pressures, and gas component characteristics. The producer represents that the raw gas must flow to a regional gas processor's facilities located 10 miles away. The midstream company designs the required facilities, borrows a good portion of the funds required for the project, constructs and commissions the gathering facilities

necessary to meet the producer's needs based on the representations made. The midstream company invests $175 million within a 12-month period to meet the producer's requirement to monetize the reserves as quickly as possible after drilling and completion.

- Scenario A - Twelve months after startup, the producer has drilled only 20 wells and reports to the midstream company that the wells drilled to date are only half as prolific as had been expected. The producer has reassessed the original 50-well program and will terminate field development at only 25 wells. The expected production profile for the field is now expected to average barely 25 percent (%) of the system capacity and the full life cycle of the project has also been drastically reduced.

- Scenario B - Between the time that the parties execute a formal agreement and system startup, gas prices drop from $4.50 per million British thermal units (MMBtu) to $2/MMBtu. The producer has drilled and completed only 5 wells which are 1.5 times more prolific than the producer had anticipated. Regardless, the midstream company has designed and constructed a system capable of moving the gas produced from 50 less prolific wells and must now operate with only 15 percent of the expected throughput.

- Scenario C - The midstream provider doubles the size of its gathering system with the expectation that other producers will follow suit and begin drilling in the area. Installation of the initial gathering system assets is completed ahead of schedule allowing the producer to monetize gas reserves several months ahead of the original schedule. After 12 months of successful operations, the midstream provider approaches the producer to inquire about additional development plans and the potential for system expansion to meet longer-term producer needs. The producer politely informs the midstream provider that all further midstream development would be completed in-house, including the development of a new gas processing facility expected to be in service within 18 months.

24.     Midstream providers are subject to performance and operating risk due to the interaction with both upstream producers and downstream end users. Dedication agreements have been utilized in the oil and gas industry for decades as a means to offset some of the risk concentrated in the midstream sector. Without such dedication agreements, midstream providers

would be forced to rely on higher service rates to offset the potential downside risks. Further, the lack of dedication agreements would likely tend to limit the participation of small to mid-sized service providers for whom the geographic concentration risk could not be sufficiently diversified with investments in a relatively small number of midstream systems with a limited number of producing counterparties.

25.     For producers, the elimination of dedication agreements would likely result in greater reliance on cumulative or ratable volume commitments. Alternatively, midstream providers may require producers to otherwise guarantee losses in the event that well development or productivity do not meet project expectations. With potentially fewer midstream providers, producers may also be faced with very limited choice in midstream counterparties when new fields or producing areas are developed. With limited choice, producers may be forced to divert capital from reserve development and allocate such funds instead to the development of producer-owned gathering assets until the economic risk of field development has subsided.

26.     Currently, associated gas from the fifty Emerald wells connected to the Dakota gathering system is compressed and delivered to the gathering facilities supplying the True Red Wing Creek Gas Plant. At the True Gas Plant, the raw natural gas produced by Emerald is treated and processed to produce commercial quality residue gas, NGLs, and condensate. Emerald receives 85% of the net proceeds for each of these product streams.

27.     Absent connection to a gathering system, Emerald's only alternative to remain compliant with NDIC regulations would be to choke back wells producing over 100 bbl/day and flare the associated gas. Flaring would essentially abandon the installed gathering facilities, pipelines, and operational interconnection to the provider currently contracted to process the gas. Potential risks associated with the flaring option include increased regulation or regulatory

01:19285672.2

oversight from the State of North Dakota. Indeed, according to Ceres, a nonprofit organization mobilizing business leadership on sustainability challenges such as climate change and water scarcity, flaring is "a potential threat to the industry's long-term license to operate."

28.     Trucking typically provides the lowest startup costs and the broadest geographic coverage for gathering of crude oil from remote areas and in newly developed areas where pipeline capacity is not readily available. From time to time, depending upon market cycles, trucking may also present short-term cost advantages; however, in the long term the disadvantages of trucking tend to overshadow any short-term upside. For example, trucking operations are subject to the following: (i) potential spills (Emerald averaged 1.5-2.0 spills per month when trucking); (ii) road closures resulting in well shut-ins once on-site storage fills up; (iii) road weight limitations (e.g., reducing max weight from 80,000 lbs to 12,000 lbs) resulting in potential rate increases and the need for additional loads; (iv) human error (delays, wrecks, animal strikes); (v) unpredictable price fluctuations, as crude oil gathered by truck is typically priced for sale based on the prevailing prices of the day of loading (unless otherwise agreed by contract), rather than on monthly average prices as is common in the industry; and (vi) regulatory risks.

29.     The safest and most efficient way to transport crude oil is by pipeline. For the most part, crude pipelines operate 24 hours a day, seven days a week.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Dated: September 14, 2016
        Plano, Texas

_Lesa A. Adair_
Lesa S. Adair

01:19285672.2