**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| EMERALD OIL, INC., *et al.*,[1] | ) Case No. 16-10704 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| EMERALD OIL, INC., *et al.*, | ) |
| | ) |
| | ) Adversary Proceeding No. 16-50998 |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| DAKOTA MIDSTREAM, LLC; DAKOTA | ) |
| ENERGY CONNECTION, LLC; AND DAKOTA | ) |
| FLUID SOLUTIONS, LLC F/K/A MESA OIL | ) |
| SERVICES, LLC, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Emerald Oil, Inc. (9000); Emerald DB, LLC (2933); Emerald NWB, LLC (7528); Emerald WB LLC (8929); and EOX Marketing, LLC (4887). The location of the Debtors' service address is: 200 Columbine Street, Suite 500, Denver, Colorado 80206.

## TABLE OF CONTENTS

**Page**

I. North Dakota Law Governs this Dispute. .......................................................................4

II. Under North Dakota Law, North Dakota Century Code § 47-04-25 Provides the Exclusive Test for the Creation of a Covenant that Runs with the Land. ............................6

III. The Gathering Agreements Do Not Grant Estates in Real Property. ..................................8

    A. The Plain Language of the Gathering Agreements Unambiguously Does Not Grant Estates in Real Property. ......................................................................12

    B. Emerald Did Not Convey a Grant of an Estate in Real Property to the Defendants. ....................................................................................................15

    C. The Gathering Commitments Do Not Directly Benefit Emerald's Working Interests. ......................................................................................................25

IV. The Gathering Commitments Do Not Create Equitable Servitudes as a Matter of Law. ............................................................................................................................31

    A. The Only Equitable Servitudes Recognized under North Dakota Law Arise in the Condominium Context. ..............................................................31

    B. Even if Equitable Servitudes Are Recognized under North Dakota Common Law, the Gathering Commitments Would Not Create Equitable Servitudes as a Matter of Law. ..........................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Minot Amusement Corp.*,
　312 N.W.2d 698 (1981) ...................................................................................................33

*Amman v. Frederick*,
　257 N.W.2d 436 (N.D. 1977) ...........................................................................................8

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986)..........................................................................................................3

*In re Arithson*,
　175 B.R. 313 (D.N.D. 1994)....................................................................................16, 30

*Barton v. Fred Netterville Lumber Co.*,
　317 F.Supp.2d 700 (S.D. Miss. 2004)..............................................................................27

*Beeter v. Sawyer Disposal LLC*,
　771 N.W.2d 282 (N.D. 2009) ................................................................................ *passim*

*Beulah Coal Mining Co. v. Heihn*,
　180 N.W. 787 (N.D. 1920) ..............................................................................................17

*Bice v. Petro-Hunt, LLC*,
　768 N.W.2d 496 (N.D. 2009) ............................................................................................6

*Bilby v. Wire*,
　77 N.W.2d 882 (N.D. 1956) ............................................................................................23

*Bull v. Beiseker*,
　113 N.W. 870................................................................................................................12

*Burtch v. Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.)*,
　453 B.R. 518 (Bankr. D. Del. 2011) .................................................................................3

*Celotex Corp. v. Catrett*,
　477 U.S. 317 (1986)..........................................................................................................3

*City of Dickenson v. Thress*,
　290 N.W. 653 (N.D. 1940) ................................................................................................6

*Corbett v. La Bere*,
　68 N.W. 2d 211 (N.D. 1955) ....................................................................................10, 17

*Doyle v. Sprynczynatyk*,
   621 N.W.2d 353 (N.D. 2001) ...................................................................................6

*Eakman v. Robb*,
   237 N.W.2d 423 (N.D. 1996) ............................................................................25, 26

*Matter of Estate v. Murphy*,
   554 N.W.2d 432 (N.D. 1996) ........................................................................ *passim*

*Fed. Land Bank of St. Paul v. State*,
   274 N.W.2d 580 (N.D. 1979) ...........................................................................16, 18, 30

*Gadeco, LLC v. Indus. Comm'n of State*,
   812 N.W.2d 405 (2012) ...................................................................................10

*In re Great Plains Petroleum, Inc.*,
   113 B.R. 570 (Bankr. D.N.D. 1990) ...............................................................29

*Greenfield v. Thill*,
   521 N.W.2d 87 (N.D. 1994) ...............................................................................6

*Habeck v. MacDonald*,
   520 N.W.2d 808 (N.D. 1994) ...............................................................................4

*Hunt Oil Co. v. Kerbaugh*,
   283 N.W.2d 131 (N.D. 1979) ...........................................................................6, 19

*Johnson v. Armour & Co.*,
   291 N.W. 113 (N.D. 1940) ...............................................................................12

*Martin v. Rath*,
   589 N.W.2d 896 (N.D. 1999) ...............................................................................7

*McKenzie Cnty. v. Reichman*,
   812 N.W.2d 332 (N.D. 2012) ...........................................................................12

*Miller v. Schwartz*,
   354 N.W.2d 685 (N.D. 1984) ...........................................................................18

*Monaco v. Bennion*,
   585 P.2d 608 (Idaho 1999)...............................................................................15

*Mullendore Theatres, Inc. v. Growth Realty Investors Co.*,
   39 Wash.App. 64, 691 P.2d 970 (1984)...........................................................27

*Nagel v. Emmons Cnty. N. D. Water Resource Dist.*,
   474 N.W.2d 46 (N.D. 1991) ...........................................................................12

*Northern Pac. R. Co. v. McClure*,
　81 N.W. 52 (N.D. 1899) ..................................................................................7, 8

*Reagan Nat'l Advert. of Austin, Inc. v. Capital Outdoors, Inc.*,
　96 S.W.3d 490 (Tex. App. 2002) ........................................................................34

*Red River Human Scvs. Found. v. State.*,
　477 N.W.2d 225 (N.D. 1991) .............................................................................4

*Reichart v. Weeden*,
　618 P.2d 1216 (Mont. 1980) ............................................................................26

*Reliance Ins. Co. v. Colonial Penn Franklin Ins. Co. (In re Montgomery Ward &*
　*Co., Inc.)*,
　344 B.R. 256 (D. Del. 2006) ..............................................................................3

*Riverwood Commercial Park, LLC v. Standard Oil Co., Inc.*,
　698 N.W.2d 478 (N.D. 2005) ...........................................................................11

*In re Sabine Oil & Gas Corp.*,
　550 B.R. 59 (Bankr. S.D.N.Y May 3, 2016) .......................................................5

*Sargent Cnty. Water Resource Dist. v. Mathews*,
　871 N.W.2d 608 (N.D. 2015) ...........................................................................12

*Slawson v. N.D. Indus. Com'n*,
　339 N.W.2d 772 (N.D. 1983) ...........................................................................10

*West v. Alpar Res., Inc.*,
　298 N.W.2d 484 (N.D. 1980) .............................................................................6

*Wheeler v. Southport Seven Planned Unit Dev.*,
　821 N.W.2d 746 ................................................................................................8

*Wild Rice River Estates, Inc. v. City of Fargo*,
　705 N.W.2d 850 (N.D. 2006) ...........................................................................11

**Statutes**

11 U.S.C. § 365(a) ...................................................................................................1

N.D. Cent. Code § 1-01-06 ......................................................................................6

N.D. Cent. Code § 1-02-01 ......................................................................................6

N.D. Cent. Code § 41-09-05(1)(h) ....................................................................18, 21

N.D. Cent. Code § 47-04-26 ........................................................................... *passim*

iv

N.D. Cent. Code § 47-04.1-04 .................................................................................................32

N.D. Cent. Code § 47-05-02.1 ................................................................................................33

N.D. Cent. Code § 47-10-06 ...................................................................................................12

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................3

**Other Authorities**

38 Am. Jur. 2d Gas and Oil § 71.............................................................................................10

3 Tiffany Real Prop. § 756 (3d ed.) ........................................................................................11

Restatement (First) of Property § 9 (1936) .............................................................................11

Richard R. Powell, *Powell on Real Property § 60.07*
    (Michael Allan Wolf ed., 2005).........................................................................................33

Thomas W. Merrill & Henry E. Smith, *Why Restate the Bundle: The
    Disintegration of the Restatement of Property* BROOK. L. REV. 681 (2014) .............................5

Touch and Concern, the Restatement (Third) of Property: Servitudes, and a
    Proposal, 122 HARV. L. REV. 938 (2009) ........................................................................5, 10

## INTRODUCTION

1.  The Bankruptcy Code generally authorizes a bankruptcy trustee, with court approval, to assume or reject any executory contract or unexpired lease of the debtor. *See* 11 U.S.C. § 365(a). A bankruptcy court's general authority to authorize the rejection of executory contracts, however, applies only to contractual rights, not to rights in real property. Needless to say, this creates a strong incentive for a party seeking to avoid rejection to argue that an executory contract created a real property right that cannot be rejected. And, that is precisely what the Defendants are trying to do here: they attempt to transform their executory contracts with Emerald Oil, Inc. and Emerald Oil WB LLC (collectively, "Emerald") for the provision of oil, gas, and water gathering services into rights in real property—covenants running with the land.

2.  The problem for the Defendants is that, as a matter of black-letter North Dakota law, the contractual commitments in the Gathering Agreements[2] to exclusively use the Defendants to gather and process Emerald's severed oil, gas, and water (the "Gathering Commitments") do not run with the land.[3] They are merely performance obligations under prepetition service agreements.

3.  To establish that a covenant runs with the land under North Dakota law, a party must establish two independent elements provided by statute: (a) the covenant must be contained in a grant of an estate of real property (also known as "horizontal privity"); and (b) the

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the *Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment* [Docket No. 7] (the "Brief"), the Complaint [Docket No. 1] commencing the above-captioned adversary proceeding, or the Gathering Agreements, as applicable.

[3]  Section 1.2 of the Gathering Agreements states: "[Emerald] covenants to deliver all of [Emerald's] [Crude/Gas/Water] to [Defendants] at the Receipt Points without other disposition except as otherwise provided in this Agreement."

covenant must provide a direct benefit to the real property subject to the covenant. N.D. Cent. Code Ann. § 47-04-26. If either of these independent elements is not met, the covenant does not run with the land. Considering the unambiguous language of each of the Gathering Agreements in their entirety, the Defendants cannot meet either element as a matter of law. First, the Gathering Commitments are not contained within a grant of an estate in real property. Specifically, the dedications of the Gathering Agreements do not grant the Defendants *any* estate in real property; instead, the Gathering Agreements explicitly disclaim any such grant. Second, based on the undisputed record, the Gathering Commitments do not directly benefit the estate in real property allegedly granted to the Defendants. The Gathering Commitments concern and benefit the Defendants personally.

4.      In order to obfuscate this straightforward question of law, the Defendants spend over 80 pages "trying to force this 'square peg' [services] covenant into 'round hold' theories in an attempt to bind" Emerald. *Beeter v. Sawyer Disposal LLC*, 771 N.W. 282, 287 (N.D. 2009). They rely heavily on the law of foreign jurisdictions (including Montana and Idaho) and secondary sources, such as the Restatement (Third) of Property: Servitudes (the "Restatement"), which do not restate the law of North Dakota, and strain the plain language of the Gathering Agreements to manufacture at least three possible real property grants where none exist. The Defendants go so far as to wholly invent a new real property estate never before recognized in North Dakota, or any other state—the right to transport oil, gas, and water.

5.      Emerald respectfully requests that this Court apply the test established by the North Dakota legislature for what constitutes a covenant running with the land to the unambiguous language of the Gathering Agreements, decline the Defendants' invitation to recognize a new property right under North Dakota law, and hold that the Gathering

2

Commitments do not create covenants that run with the land under North Dakota law or otherwise create equitable servitudes.

## SUMMARY JUDGMENT STANDARD

6.      As is set forth in detail in the Brief, reviewing courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The existence of some factual dispute will not defeat summary judgment; rather, the requirement is that no *genuine* issue of *material* fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added); *Celotex Corp.*, 477 U.S. at 327. Where the movant has produced evidence in support of its motion for summary judgment, the nonmoving party cannot rest on the allegations of pleadings and "must do more than create some metaphysical doubt." *Burtch v. Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.)*, 453 B.R. 518, 525 (Bankr. D. Del. 2011).

7.      Here, although the Brief sets forth legal arguments demonstrating the absence genuine issues of material fact, the Defendants have failed to come forward with disputed evidence that would "reasonably permit the finder of fact to find in his favor on a material question." *Reliance Ins. Co. v. Colonial Penn Franklin Ins. Co. (In re Montgomery Ward & Co., Inc.)*, 344 B.R. 256, 258–59 (D. Del. 2006).

8.      Additionally, the Defendants are simply precluded from introducing contextual facts outside the four corners of the Gathering Agreements when the Objection fails to argue that any of the contracts are ambiguous. Of course, the Defendants' attempt to read a transfer of novel (and as yet unrecognized) real property estates into the Gathering Agreements clouds the issues at hand, but it does not make the Gathering Agreements ambiguous. Again, Under North Dakota law, construction of written contracts to determine their legal effect is a pure question of

law.  *Red River Human Scvs. Found. v. State.*, 477 N.W.2d 225, 227 (N.D. 1991) (citations omitted).  Pursuant to N.D. Cent. Code Ann. § 9-07-02, "the language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity."  Whenever possible, reviewing courts ascertain the intent of the parties from the writing alone.  *Habeck v. MacDonald*, 520 N.W.2d 808, 811 (N.D. 1994) (citations omitted); *Red River.*, 477 N.W.2d at 227–28 ("[W]e must be guided first by the language of the contract itself, and where the contract is clear and unambiguous there is no reason to go further." (citations omitted)).  Because the Defendants fail to introduce facts or otherwise argue the ambiguity of the contracts, the plain language of the agreements governs to determine the parties' intent at the time they entered into the Gathering Agreements.

9.      The Defendants cannot point to evidence demonstrating the existence of a genuine, disputed fact issue, and thus the Defendants' *Objection Answering Brief in Opposition to Plaintiffs' Motion for Summary Judgment* [Docket No. 30] (the "<u>Objection</u>") must be overruled and summary judgment must be granted in the Emerald's favor.

<b><u>REPLY</u></b>

**I.      North Dakota Law Governs this Dispute.**

10.      The Defendants devote substantial portions of the Objection applying secondary and foreign sources of law.  (Obj., ¶¶ 17–24).  But these sources do not purport to describe or otherwise restate North Dakota law, and cannot substitute for North Dakota authorities.

11.      The Restatement that the Defendants cite is known for being devoted more to law reform than to a faithful restatement of the law and has been largely ignored by courts.  *See, e.g.*, Thomas W. Merrill & Henry E. Smith, *Why Restate the Bundle: The Disintegration of the Restatement of Property*, 79 BROOK. L. REV. 681, 681–82, 692-95 (2014) ("The ratio of reform to restatement has increased over time, to the point where significant portions of the *Third*

4

*Restatement* consist of repudiating what was done in the *First* and *Second Restatements ....*"); *id.* at 681 n.1 ("[T]he THIRD RESTATEMENT repudiates the FIRST RESTATEMENT's version of servitudes . . . ."); *id.* at 693–94 ("To date, the courts have largely ignored the reforms urged by the *Restatements (Third) of Servitudes* and have instead continued to apply the 'outmoded' common law in determining when servitudes run with the land."); Note, *Touch and Concern, the Restatement (Third) of Property: Servitudes, and a Proposal*, 122 HARV. L. REV. 938, 938 (2009) ("As of this writing, only one line of cases has used the ALI's new test.").

12.     Moreover, the Defendants specifically point out in footnotes 20 and 26 of the Objection that the Restatement disclaims and runs counter to each of the two main elements the North Dakota legislature has drafted into the statute for covenants to run with the land—both horizontal privity and the rule that a covenant must touch and concern the land.  (Obj., FN. 20, 26).  The Objection goes so far as to state that there is "literally no purpose" for the horizontal privity requirement.  (Obj., ¶ 74)  There is a "purpose," of course, and that is that the North Dakota legislature has mandated that a covenant running with the land must be contained in a grant of an estate in real property.  Adopting the Defendants' approach would effectively abrogate North Dakota law and end the analysis—an untenable proposition.

13.     Despite borrowing legal concepts from other jurisdictions (and secondary sources), the Defendants refuse to give any credence to a recent decision ruling on Texas covenants and servitudes in the midstream context that is factually similar and applies an almost identical legal framework, *In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 63 (Bankr. S.D.N.Y May 3, 2016).  (Obj., ¶¶ 3, 11, 25).  But Defendants' refusal to give credence to *Sabine* is at odds with North Dakota Supreme Court cases, including those which the Defendants themselves cite approvingly, which routinely cite Texas law favorably in the oil and gas context.  *See, e.g.*, *Hunt*

*Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 135 (N.D. 1979) (adopting mineral estate law developed by the Texas Supreme Court); *West v. Alpar Res., Inc.*, 298 N.W.2d 484, 490–91 (N.D. 1980) (citing approvingly to the Texas Court of Appeals on a question of mineral lease interpretation); *Greenfield v. Thill*, 521 N.W.2d 87, 91 (N.D. 1994) (approvingly citing to the Texas approach on a question of oil and gas lease termination); *Bice v. Petro-Hunt, LLC*, 768 N.W.2d 496 (N.D. 2009) (citing to major oil and gas producing states, including Texas, regarding royalty calculations).

**II.     Under North Dakota Law, North Dakota Century Code § 47-04-26 Provides the Exclusive Test for the Creation of a Covenant that Runs with the Land.**

14.     The Defendants attempt to avoid the requirements set out by statute under North Dakota law for the creation of a covenant running with the land—which they cannot satisfy—by arguing that some separate, purely common law species of covenant running with the land remains. This argument is contrary to the express direction of both the North Dakota Legislature and Supreme Court.

15.     "The North Dakota Century Code established the law of this state respecting the subjects to which it relates." N.D. Cent. Code § 1-02-01. Additionally, "there is no common law in any case in which the law is declared by the code." N.D. Cent. Code § 1-01-06. Applying the statutes, the North Dakota Supreme Court has held that "courts are not free to disregard the letter of a statute under the pretext of pursuing its spirit." *Doyle v. Sprynczynatyk*, 621 N.W.2d 353, 357 (N.D. 2001). And common law cannot contradict enacted North Dakota statutes. *City of Dickenson v. Thress*, 290 N.W. 653, 657 (N.D. 1940) ("It must be presumed that the Legislature intended all that it said, and that it said all that it intended to say."); *Martin v. Rath*, 589 N.W.2d 896, 901 (N.D. 1999) ("[S]tatutory principles govern over general common law if there is a conflict.").

16.    Here, N.D. Cent. Code § 47-04-26 governs the subject matter at-issue—covenants running with the land—and expressly sets forth the test for covenants to run with the land—they must both be "contained in a grant of an estate in real property" and "made for the direct benefit of the property or some part of it then in existence."    N.D. Cent. Code Ann. § 47-04-26.  The Defendants claim to seek to use the common law to interpret statutes and case law only where both are silent.  (Obj., ¶¶ 18, 24).  In reality, however, the Defendants repeatedly seek to use the common law to abrogate governing North Dakota statutes and governing law.  (*See* Obj., ¶¶ 74 (arguing based on the common law that "there is *literally no purpose* that would be served by enforcement of the horizontal privity requirement in this case" because it is somehow a "pointless legal technicality"), 78–80 (arguing that a restrictive covenant is itself a grant of an estate in real property)).

17.    In doing so, the Defendants rely entirely on a late 19th century case, *Northern Pac. R. Co. v. McClure*, 81 N.W. 52 (N.D. 1899).  *McClure*, however, is inapposite.  In *McClure*, the North Dakota Supreme Court addressed whether the enumerated covenants that run with land under N.D. Cent. Code § 47-04-26 was exhaustive.  *Id.* at 54.  The Court determined that ***the statutory language itself*** suggested that this list was non-exhaustive because, for example, the statute looks to covenants that "are incidental thereto."  *Id.* at 54–55.  *McClure*, however, did not—and cannot be interpreted to—recognize an alternative, common law covenant running with the land that could be created without meeting the two elements expressly listed in § 47-04-26.  To the contrary, *McClure* expressly states that "[these sections] declare the test as to what constitutes a covenant which runs with the land . . . ."  *Id.* at 54.  The Defendants can cite to no case in the over 100 years since *McClure* holding that a covenant ran with the land without meeting the statutory test.  Indeed, the North Dakota Supreme Court has relied solely on

7

the test provide in § 47-04-26 to determine whether a covenant runs with the land under North Dakota law, as should this Court.  *See, e.g.*, *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282 (N.D. 2009); *see also Wheeler v. Southport Seven Planned Unit Dev.*, 821 N.W.2d 746 (citing the statutory test without applying it); *see Amman v. Frederick*, 257 N.W.2d 436, 441 (N.D. 1977) (same).

18.   As a result, the Court must determine whether the Gathering Commitments are (a) "contained in a grant of an estate in real property"; and (b) "made for the direct benefit of the property or some part of it then in existence."   N.D. Cent. Code Ann. § 47-04-26.  Because the Defendants cannot prove either element of this test as a matter of law, the Gathering Commitments do not run with the land, and the Court must grant Emerald's Motion for Summary Judgment.

**III.   The Gathering Agreements Do Not Grant Estates in Real Property.**

19.   Under North Dakota law, a covenant can only run with the land if it is contained within a grant of the estate in real property to which it purports to attach.  *See* N.D. Cent. Code Ann. § 47-04-26; *Matter of Estate v. Murphy*, 554 N.W.2d 432, 436 (N.D. 1996) (holding that, to be enforceable, the covenant that burdens the real estate also be drafted into the same document conveying the estate in real property).  The Defendants rely on the following "dedicate and commit" language in section 1.2 of the Gathering Agreements to satisfy this element:

> [Emerald] hereby dedicates and commits to the performance of this Agreement and all of the terms and conditions herein for the Primary Term, as defined herein, as a covenant running with the land the following: (i) all of [Emerald's] working interest share of [Crude/Gas] produced from the Wells operated by [Emerald]; and (ii) all of [Emerald's] working interest share of [Crude/Gas] from wells operated by parties other than [Emerald] in which [Emerald] takes its share of production in kind, if applicable."[4]

---

[4]   Notably, the Water Gathering Agreement omits a reference to Emerald's working interest, despite using similar "dedicate and commit" language:  "[Emerald] hereby dedicates and/or commits to the performance of this

Specifically, the Defendants maintain that this language grants at least three separate estates in real property: (i) Emerald's right to transport its future production of hydrocarbons and water; (ii) easements; and (iii) a restrictive covenant permitting only the Defendants to transport oil, gas, and water in the Dedicated Area. (Obj., ¶¶ 4, 77).[5]

20. Taking the Gathering Agreements as a whole, however, none of these alleged property rights were granted by the plain language of section 1.2, or anywhere else in the Gathering Agreements, as a matter of law. Indeed, none of the alleged property rights are even mentioned in section 1.2, and as set forth herein, the Gathering Agreements expressly disclaim any transfer of Emerald's real property interests in its leases or otherwise. Moreover, the real property with which the Gathering Commitments allegedly run is Emerald's "working interest share of the [Crude/Gas] produced from the Wells operated by [Emerald]."[6] Therefore, under the statute, Emerald's working interest—part of the mineral estate[7]—must be the estate in real property granted in the Gathering Agreements. None of the real property interests the

---

Agreement and all of the terms and conditions herein for the Primary Term, as defined herein, as a covenant running with the land all of [Emerald's] Water produced from the Wells." Water Gathering Agreement § 1.2.

[5] Of course, even these "estates" do not include any payment obligations. The "dedication" language in the Gathering Agreement is divorced from Emerald's obligations to pay the Defendants a fixed price for its services or to live with the terms of the Gathering Agreements' onerous minimum volume commitments.

[6] That the Water Gathering Agreement does not use the term "working interest" is of no apparent concern to the Defendants.

[7] Defendants misstate North Dakota law in representing that working interests are treated as a profit á prendre. (Obj., ¶¶ 27, 34, 86.) In *Corbett v. La Bere*, 68 N.W. 2d 211 (N.D. 1955), cited by Defendants, the North Dakota Supreme Court cited a California court stating that an operating lessee under a lease for a term of years has an interest in real property in the nature of a profit á prendre during a survey of other states law regarding royalty interests. *Id.* at 214. Unlike California, however, North Dakota treats all leases for operating or working interests as a fee simple determinable. *See, e.g.*, *Slawson v. N.D. Indus. Com'n*, 339 N.W.2d 772, 776 n.3 (N.D. 1983) (describing a royalty interest in terms of a common law estate, including in fee simple determinable); 38 Am. Jur. 2d Gas and Oil § 71 ("The typical oil and gas lease grants to the lessee a fee simple determinable interest in the subsurface minerals within a designated area."). If working interests are in fact treated as profit á prendre under North Dakota law, then, according to the Defendants' oft-cited Restatement, working interests would not constitute estates in real property because profits are servitudes, or nonpossessory interest in real property. *See, e.g.*, Restatement (Third) of Property (Servitudes) § 1.2 (2000) ("The benefit of an easement or profit is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose.").

Defendants suggest were granted here, however, could actually constitute part of Emerald's working interest leases—the only estate in real property that Emerald owns in the Dedicated Area.

21.    Emerald has never conveyed any share of its working interests to the Defendants, including as part of the Gathering Agreements. If they had, Defendants would have the right to explore or develop the minerals subject to Emerald's working interest. *See Slawson v. N. Dakota Indus. Comm'n*, 339 N.W.2d 772, 776 (N.D. 1983) ("The owner of the working interest has the exclusive right to exploit the minerals on the land"). Defendants, however, simply do not have that right. For this reason, the Defendants have never offered to share in any of the costs of exploring or developing Emerald's working interests. *See Gadeco, LLC v. Indus. Comm'n of State*, 812 N.W.2d 405, 407 (2012) ("When separately owned interests are embraced within a spacing unit . . . the working interest owners must pay their share of the costs of drilling, operating, and supervising the well on the spacing unit.").

22.    Critically, even if Emerald had desired to transfer any share of its working interest to the Defendants, it could not have done so without its secured lenders' consent. Emerald's working interests are subject to its secured lenders' liens. Without going through the predicate act of securing lien releases on these working interests, the Defendants essentially seek to seize collateral from Emerald's secured lenders without any compensation and place themselves ahead of similarly situated unsecured creditors. Such a result would defeat the entire purpose of the Bankruptcy Code's priority scheme and upend the risk structure of commercial secured lending. *See In re Sabine Oil & Gas Corp.*, 550 B.R. 59, 82 (Bankr. S.D.N.Y. 2016) (noting that the fact that debtors' lienholders "did not approve a conveyance of any interest in the land subject to the

10

liens, and they were not informed of any interest being created in those properties . . . strongly militate against a finding that the covenants at issue [run with the land]").

23.     Additionally, even if the alleged property interests were granted in the Gathering Agreements, the Gathering Commitments would not run with the land because none of those property interests are "estates in real property."  An estate in real property is an interest in land that is, or may become, possessory.  *See* Restatement (First) of Property § 9 (1936); *cf. Wild Rice River Estates, Inc. v. City of Fargo*, 705 N.W.2d 850, 855 (N.D. 2006) (citing Restatement (First) of Property § 9).  In other words, a person who owns an estate has the right to possess and enjoy the property, either presently or in the future.

24.     None of the real property interests Defendants allege to have been granted, however, are possessory interests.  Instead, they are all servitudes (such as easements or covenants) or rights to the use of the land for a specific, limited purpose.  *See, e.g.*, *Riverwood Commercial Park, LLC v. Standard Oil Co., Inc.*, 698 N.W.2d 478, 482 (N.D. 2005) ("The major distinction between a lease and an easement or license is that a lease confers exclusive use and possession of the property against the world, including the landowner, whereas an easement or license merely grants a right or permission to nonexclusive use of the land for a specific, limited purpose.").  In fact, the North Dakota Century Code even provides separate chapters governing "Estates in Real Property" and "Servitudes."  *Compare* N.D. Cent. Code Ann. Ch. 47-04 ("Estates in Real Property"), *with* N.D. Cent. Code Ann. Ch. 47-05 ("Servitudes").  Consequently, such easements and rights are not estates in real property as a matter of law.  *See, e.g.*, Restatement (First) of Property § 9 cmt. b ("Such interests as easements, profits, restrictive covenants and agreements affecting the use of land, powers of appointment and rents are not possessory interests and are not interests which may become possessory."); 3 Tiffany Real Prop.

§ 756 (3d ed.) ("[A]n easement is not an estate in land."); The Law of Easements & Licenses in Land § 1:21 ("[A]n easement is an interest in land, but it is not an estate.").[8]

**A.    The Plain Language of the Gathering Agreements Unambiguously Does Not Grant Estates in Real Property.**

25.    In order to convey an estate in real property, a contract must provide for a granting clause or other language indicating the intent to grant the real property at issue—such as a "grant" of an "interest" in any leasehold, fee, or other property interest. *Bull v. Beiseker*, 113 N.W. 870, 872 (holding that for a covenant to run with the land, it is "apparent that some interest in the property must be granted");[9] *see also* N.D. Cent. Code § 47-10-06 ("A grant of an estate in real property may be made in substances as follows: ***This grant made*** the _____ day of _____, in the year of _____, between A.B., of _____, of the first part, and C.D., of _____, of the second part . . . ." (emphasis added)). By the Gathering Agreements plain language, no such estate was transferred pursuant to the Gathering Agreements.

26.    Emerald's express disclaimer of any transfer of interest in its Leases to Defendants provides further support. Pursuant to section 2.8 and 2.9, "[Emerald] expressly does not by the terms of this Agreement, sell, transfer or assign unto [Defendants] any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by [Emerald] in the operation of [Emerald's] Wells and the Leases." (Gas Gathering Agreement §§

---

[8]    *Cf. Sargent Cnty. Water Resource Dist. v. Mathews*, 871 N.W.2d 608, 612 (N.D. 2015) ("[W]e conclude the plain language of the deeds conveys an easement, not an estate in fee."); *McKenzie Cnty. v. Reichman*, 812 N.W.2d 332, 339 (N.D. 2012) ("[A]dverse possession involves the acquisition of a present possessory estate while prescription concerns itself wholly with the acquisition of rights in the land of another, such as by an easement."); *Nagel v. Emmons Cnty. N. D. Water Resource Dist.*, 474 N.W.2d 46, 49 (N.D. 1991) ("An easement is a burden on one estate for the benefit of another."); *Johnson v. Armour & Co.*, 291 N.W. 113, 116 (N.D. 1940) ("An easement is a charge or burden upon one estate, the servient, for the benefit of another, the dominant.").

[9]    Although North Dakota law does not require "magic words" to grant an estate in real property, there must be language sufficient to identify the estate in real property to be conveyed and to indicate that ownership of that estate is to change hands. *Some interest* in real property must be granted—the sentence making the grant or conveyance must end with a direct object and not a blank line.

12

2.8; 2.9; Crude Oil Gathering Agreement §§ 2.8, 2.9; Water Gathering Agreement §§ 2.8, 2.9). The "Leases," in turn, are defined in the recitals of each of the Gathering Agreements as "interests in oil and gas leases and/or lands within the Area of Dedication during the term of this Agreement." (Gas Gathering Agreement Recital A; Crude Oil Gathering Agreement Recital A; Water Gathering Agreement Recital A).

27.      The Defendants argue in the Objection that the Gathering Agreements' disclaimer language is both irrelevant and immaterial to the analysis of whether the Gathering Agreements contain a grant of an estate in real property. (Obj., ¶ 94). In making that argument, the Defendants reason as follows: Because the Gathering Agreements convey three separate estates in real property, the disclaimer language in sections 2.8 and 2.9 of the Gathering Agreements must cede to the grants of an estate in real property. (Obj., ¶¶ 94–97). The Defendants would effectively read out the disclaimer sections from each of the Gathering Agreements because that language does not square with the estates in real property they think the Gathering Agreements convey. By doing, the Defendants assume what they seek to prove regarding grants of an estate in real property in North Dakota.

28.      Contrary to the Defendants' assumptions, as set forth in greater detail in Part III.B herein, the Gathering Agreements do not convey any estates in real property under North Dakota law. Neither restrictive covenants nor the right to transfer personal property are themselves estates in real property. (*See infra*, Part III.B.1, III.B.3). Further, the disclaimer language is not at odds with the "express assignment" of easements pursuant to Section 2.2, (Obj., ¶ 97), because there was no "express assignment" of easements in the Gathering Agreements. Section 2.2 of the Gathering Agreements merely provides that Emerald will secure easements and attempt to transfer those easements to the Defendants. (*See infra*, Part II.B.2).

13

29.    Properly read in the context of the Gathering Agreements and North Dakota real property law, the disclaimer language in sections 2.8 and 2.9 of each of the Gathering Agreements is read in harmony with the remaining portions of the Gathering Agreements to expressly prevent the Defendants from taking "any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by [Emerald] in the operation of [Emerald's] Wells and the Leases." (Gas Gathering Agreement §§ 2.8; 2.9; Crude Oil Gathering Agreement §§ 2.8, 2.9; Water Gathering Agreement §§ 2.8, 2.9). The disclaimer language is not "repugnant to the grant itself" when there is not a grant of any estate in the Gathering Agreements. (Obj., ¶ 95; *see supra*, Part II.C).

30.    Indeed, the Defendants knew how to expressly and unequivocally grant real property interests when they chose to do so. For example, the "Form of Partial Assignment and Assumption of Pipeline Rights-of-Way and Easement" (the "Form of Partial Assignment") attached as Exhibit G to the Gathering Agreements included a provision in the "***Grant***" section stating that: "Assignor does hereby ***assign, transfer and convey*** unto Assignee, on a non-exclusive basis, such portion of its right, title and interest in and to the Rights-of-Way . . . ." Form of Partial Assignment ¶ A. And the oil and gas lease the Defendants quote in their Objection contains similar express language: "Lessor . . . by these presents does ***grant, demise, lease and let*** exclusively unto the said Lessee, the land herein described . . . .") (Obj., ¶¶ 30). Because the Defendants did not draft language in the Gathering Agreements indicating the intent to grant an estate in real property, the Defendants did not take a grant of any estates in real property pursuant to the Gathering Agreements.

14

B.    **Emerald Did Not Convey a Grant of an Estate in Real Property to the Defendants.**

1.    **The Right to Transport under a Service Contract Is Not an Estate in Real Property.**

31.    Without citing any applicable law in support of its novel interpretations of North Dakota law, the Defendants argue that a service provider's contractual right to transport personal property is somehow an estate in real property. (Obj., ¶¶ 3, 25, 89).  On the contrary, this "right to transport" has never been recognized as a real property right, and it is certainly not a real property right that can be severed from Emerald's working interests.

32.    Again, the Defendants rely on section 1.2 of the Gathering Agreements to manufacture a "grant" of this alleged estate:  "[Emerald] hereby dedicates and commits to the performance of this Agreement and all of the terms and conditions herein for the Primary Term, as defined herein, as a covenant running with the land the following:  (i) all of [Emerald's] working interest share of [Crude/ Gas] *produced* from the Wells operated by [Emerald] . . . ." (Gas Gathering Agreement § 1.2; Crude Oil Gathering Agreement § 1.2 (emphasis added)). While the Objection seeks to place focus on the meaning of the word "dedication" in order to determine whether the Gathering Agreement convey a grant of an estate in real property (Obj., ¶¶ 91–92), that argument ignores the fundamental reality regarding the actual interests at-issue— severed goods constitute personal property.[10]  As Emerald argued in the Brief, a service contract to transport natural gas, crude oil, and water is not the same as the grant of an estate in real property—the natural gas, crude oil, and water at issue in the Gathering Agreements are severed from the ground by the time the Defendants transport those produced hydrocarbons and water.

---

[10]    The Defendants cite *Monaco v. Bennion* for the proposition that a dedication may be interpreted as a grant of an estate in real property. (Obj., ¶¶ 91–92).  *Monaco*, however, actually found that the dedication of a *private road* to landowners was an enforceable easement—which right to access a private road is in no way analogous to a service provider's right to transport hydrocarbons and associated water severed from the ground. 585 P.2d 608 (Idaho 1999).  *Monaco* did not address whether the dedication of such an easement constituted a grant of an estate in real property sufficient to create a covenant running with the land.

15

*Fed. Land Bank of St. Paul v. State*, 274 N.W.2d 580, 583 (N.D. 1979) (holding that "produced or severed minerals are personal property, not real estate"); *In re Arithson*, 175 B.R. 313 (D.N.D. 1994) (holding that "at the moment of extraction or severance from the subsurface estate, however, mineral interests immediately transform from realty into personalty"). Additionally, the Gathering Agreements do not otherwise grant an estate in real property from Emerald to the Defendants for the following five reasons.

33.      ***First***, the Defendants argue that because the Gathering Agreements provide for the transportation of crude oil, natural gas, and water "*yet to be* removed from the ground," that the Gathering Agreements convey real property interests. (Obj., ¶ 15). Again, sections 1.2 of each of the Gathering Agreements limit the Defendants' transportation rights to *produced* hydrocarbons and water. Each of the Gathering Agreements definitions for natural gas, crude oil, and water expressly reference severed interests. "Gas" is defined in Exhibit C of the Gas Gathering Agreement as "effluent vapor stream including all of the constituents thereof, including liquefiable hydrocarbons associated with the vapor stream, ***as produced from a Well*** . . . ." (Gas Gathering Agreement, Exh. C § 1(k) (emphasis added)). "Crude Oil" is defined in the Crude Oil Gathering Agreement as "the mixture of hydrocarbons that exist in natural underground reservoirs ***after passing through surface separation and well site treatment facilities*** and remain liquid at atmospheric pressures."   (Crude Oil Gathering Agreement, Exh. C. § 1(f) (emphasis added)). Water is defined in the Water Gathering Agreement as "water originating from subsurface formations ***produced concurrently*** with oil and gas from wells operated by [Emerald]." (Water Gathering Agreement, Exh. § 1(g) (emphasis added)).

34.      Additionally, the Gathering Agreements do not give the Defendants any right to interfere with Emerald's use or enjoyment of their real property.   For example, the Gas

16

Gathering Agreement specifically reserves Emerald's rights "to operate its Leases and Wells free of any control by [the Defendants] and in such a manner as [Emerald], in their sole discretion, may deem advisable . . . ." Section 1.3(ii) of the Crude Oil Gathering Agreement and 1.3 of the Water Gathering Agreement state substantially the same. The express terms of the Gathering Agreements thus impose no limitations on Emerald's use of its real property, further demonstrating that the Defendants' right to transport *produced* hydrocarbons and water does not mean that it has any right to the *unproduced* mineral rights.[11]

35.    ***Second***, the Defendants argue that their right to transport hydrocarbons and water byproducts is a real property interest because that right may be split off from the bundle of real property interests that Emerald holds through its leases and working interests in the wells in the Dedicated Area. (Obj., ¶¶ 3, 6, 25–29, 89). But that argument ignores that mineral interests, royalty interests, and leases are actually ownership interests the mineral estate that may be separated from a fee interest. *See, e.g.*, *Beulah Coal Mining Co. v. Heihn*, 180 N.W. 787, 790 (N.D. 1920) (holding title ownership in mineral interests may be separated from ownership in surface interests); *Corbett v. LaBere*, 68 N.W.2d 211 (N.D. 1955) (holding that royalties are interest in real property). On the other hand, the Defendants' "right to transport" does not and cannot give the Defendants a title interest or ownership in the *produced natural gas, crude oil, or water byproducts*. The Defendants do not own a title interest in the *proceeds* of the produced hydrocarbons. The Defendants do not own a title ownership interest in the *wells*. The

---

[11]    The Objection argues that an "*unaccrued* royalty, by contract, is an 'estate in real property in the nature of an incorporeal hereditament.'" (Obj., ¶ 28 (citations omitted)). With this, the Defendants apparently seek to create an inference that because royalty interests relating to unaccrued hydrocarbons might constitute real property, that the right to transport unaccrued hydrocarbons similarly constitute a real property right. That ignores the simple truth that a royalty interest is generally an ownership interest in the land. *See Corbett v. LaBere*, 68 N.W.2d 211 (N.D. 1955). The Defendants cannot cite to law demonstrating that a right to transport goods creates the same general ownership interest in the subject minerals.

17

Defendants do not own a title interest in the *surface* of the land beyond right to access the surface. The Defendants do not own any *working interests in the wells* in the Dedicated Area.[12]

36.    At most, the Defendants hold the exclusive, contractual right to provide gathering and transportation services for Emerald in the Dedicated Area. Because the exclusive right to gather and transport severed personal property is not an estate in real property, the Gathering Agreements cannot grant an estate in real property. *See Fed. Land Bank of St. Paul,* 274 N.W.2d at 583 (deciding for tax purposes that "'produced' or 'severed' minerals are personal property, not real estate"); N.D. Cent. Code Ann. § 41-09-05(1)(h) (Supp. 1993) (defining "goods" for UCC purposes to include "all things which are movable at the time the security interest attaches," and not including "minerals or the like (including oil and gas) *before* extraction") (emphasis added).

37.    The Defendants' reliance on *Miller v. Schwartz* for the proposition that the right to transport may be severed from a working interest simply because a working interest may be conveyed in fractions (e.g., by assigning 50 percent of a working interest) is unavailing. *See Miller v. Schwartz*, 354 N.W.2d 685 (N.D. 1984). The widely accepted notion that parties may own joint interests in the same estate cannot support the open-ended proposition that the right to transport personal property may be severed from a working interest owner's lease as a stand-alone estate.

38.    ***Third***, the Defendants argue that a working interest owner's rights are "meaningless" and "worthless" without having implied surface access rights—somehow

---

[12]    The Objection argues that working interests may be conveyed as overriding royalty interests, non-participating royalty interests, net profits interests, production payment rights, and similar interests. (Obj., ¶ 29). What the Defendants omit is that all of the referenced mineral interests are leasehold rights constituting ownership interests in the mineral estate. However, the Objection does not argue that the Defendants ever received a grant of an interest of any of these mineral interests. The Objection instead creates a real property right to transfer out of thin air and then seeks to analogize it to recognized ownership interests in minerals and their proceeds. (Obj., ¶¶ 3, 6, 25–29, 89).

inferring or implying that this principle means the Defendants' service contract creates real property interests. (Obj., ¶¶ 27–28). Even non-producing wells have value because their leases may be sold. In any case, the Defendants' fundamental premise is unsound. The Objection cites *Hunt Oil Co. v. Kerbaugh*, 283 N.W.2d 131, 135 (N.D. 1979) for the proposition that a working interest or mineral interest implies a right to transport. (*See* Obj., ¶ 26, FN 6). However, the "right to transport" the Defendants claim was discussed in *Hunt* was actually the "right to use the surface estate" as necessary to be able to develop and exploit the mineral estate—not a separate and distinct right to transport. *Hunt Oil Co.*, 283 N.W.2d at 135 ("In the absence of other rights expressly granted or reserved, the rights of the owner of the mineral estate are limited to so much of the surface and such use thereof as are reasonably necessary to explore, develop, and transport the minerals."). Simply because a working interest owner or lessee has an implied easement to access the surface of the land to develop and exploit their mineral estate does not mean those rights may be granted separate from ownership in the mineral estate itself. *Matter of Estate v. Murphy*, 554 N.W.2d 432, 436 (N.D. 1996) (holding that, to be enforceable, the covenant that burdens the real estate also be drafted into the same document conveying the estate in real property). Otherwise, ***all exclusive service providers*** would have an interest in the real property of their counterparties.

39.      ***Fourth***, the Objection further attempts to confuse the issues by citing to a number of clauses in the Gathering Agreement referencing the Defendants' exclusive rights to transport produced crude oil, natural gas, and water byproducts from the wells in the Dedicated Area. (Obj., ¶ 89–90).[13] The Objection relies upon these clauses arguing that they would not have been

---

[13]   The Defendants overlook the fact that section 1.5 of the Crude Oil Gathering Agreement gives Emerald the right to transport crude oil itself, as long as it is willing to pay a 15 percent penalty for doing so. (Crude Oil Gathering Agreement § 1.5).

necessary if the Gathering Agreements merely governed a service contractor's obligations to transfer personal property. (*Id.*).  In so doing, the Defendants ignore the fundamental distinction between a real property right or interest and a contractor's exclusive right to perform services. Even though Emerald did not grant the Defendants an estate in real property necessary to create covenants running with the land, Emerald did grant the Defendants the exclusive contractual right to perform services in the Dedicated Area.  For that reason, Gathering Agreement sections 1.2 (carving out prior exclusive agreements from the Defendants' exclusive right to transport in the Dedication Area), 1.3 (reserving Emerald's rights "to operate its Leases and Wells free of any control by [the Defendants] and in such a manner as [Emerald], in their sole discretion, may deem advisable . . . ."), 1.4 (providing an escape from the Defendants' exclusive rights to transport), and others were necessary in the Gathering Agreements to provide the Defendants with the exclusive right to transport produced hydrocarbons and water.  The Defendant's "textual analysis" is not probative, let alone dispositive.  (Obj., ¶ 90).[14]

40.    On the other hand, if the Defendants were correct that the Gathering Agreements contained covenants running with the land, then section 8.1 of the Gathering Agreements would not be necessary.  Section 8.1 of the Gathering Agreements provides that "no sale, assignment, conveyance or other transfer (collectively, a "Transfer") of Producer's Leases or Wells, or any part thereof or interest therein, or any part of Transporter's Crude System, shall be made unless the transferee thereof shall assume and agree to be bound by this Agreement insofar as the same shall affect and relate to the Leases, Wells, Transporter's Crude System or interests so

---

[14]    Neither is the Defendants' similar argument in paragraph 101 of the Objection probative, wherein the Defendants cite to several similar paragraphs arguing that the parties intended to create covenants running with the land in the Gathering Agreement.  (Obj., ¶ 101).  The Defendants ignore that the North Dakota Supreme Court has held that it is a "settled principle that the parties' intent, no matter how clearly expressed, cannot make a personal covenant run with the land . . . ." *Beeter v. Sawyer Disposal LLC*, 771 N.W.2d 282, 286 (N.D. 2009) (the original intent of the parties in attempting to create a perpetual covenant running with the land, no matter how clearly expressed, did not make the covenant binding upon subsequent purchasers).

Transferred." (Gas Gathering Agreement § 8.1; Crude Oil Gathering Agreement § 8.1; Water Gathering Agreement § 8.1). In other words, if the covenants contained in the Gathering Agreements already ran with the land, then section 8.1 of the Gathering Agreements—requiring that the Defendants' exclusive right to provide transportation services in the Dedicated Area be contractually assumed by Emerald's successor to the contracts—would be unnecessary.

41.    *Fifth*, the Objection cites to various rules of interpretation to argue that the Gathering Agreements conveyed real property interests. (Obj., ¶ 93). No rule of interpretation can change the fact that none of the cases cited by the Defendants hold that a mere service provider's right to transport severed and produced crude oil, natural gas, and water—once it reaches the transporter's receipt points—is more than the right to transport goods in the nature of personal property. *See* N.D. Cent. Code Ann. § 41-09-05(1)(h) (Supp. 1993). Rules of interpretation cannot otherwise create substantive rights.

### 2.    No Easements Were Granted Under the Gathering Agreements.

42.    To facilitate the Defendants' construction of the Gathering System, Emerald secured rights-of-way within the DMS Service Area "authorizing the construction, installation and operation of multiple pipelines within the same right-of-way corridor" and agreed to later assign, to the extent possible, those rights-of-way to the Defendants. Gathering Agreements, § 2.2. The Objection notes that Emerald "caused the assignment to Dakota of 33 separately recorded rights of way and/or easements." (Obj., ¶ 63.) The Objection, however, attempts to transmute these separate assignments into grants under the Gathering Agreements of estates in Emerald's working interests. This approach fails for several reasons.

43.    *First*, these assignments were not "conveyed under and pursuant to" the Gathering Agreements. (Obj., ¶ 86.) Rather, the Gathering Agreements generally provide that Emerald would secure rights-of-way "*from certain landowners* within the Area of Dedication"

and assign those rights-of-way to the Defendants so that the Defendants could construct a pipeline to Emerald's receipt points upon the landowner's land. *See* Gathering Agreements, § 2.2 ("Producer ***shall be able to*** assign the ROWs in part to Transporter, so as to grant Transporter the right to install a . . . gathering line and related facilities in the corridor of the ROW." (emphasis added)).  Put simply, Emerald obtained these easements from third-parties and assigned them to the Defendants through separate instruments. To be sure, the Gathering Agreements did contain the Form of Easement as Exhibit G to the agreements.  But this Form of Easement is not a grant of an easement itself (much less 33 separate easements).

44.    Further, because of the Gathering Agreements' merger clause,[15] the parties cannot look to the existence of the partial easements assigned to the Defendants as evidence of any grant of an estate in real property that occurred part in parcel with the Gathering Agreements. Accordingly, because the easements are outside of the Gathering Agreements, any notion that those easements constituted the necessary conveyance in order to attach a real covenant fail.

45.    ***Second***, because the easements burden the surface—and not mineral—estates, they do not constitute a grant of any property right in a mineral estate or any part of Emerald's working interest, let alone an estate in real property.  (Obj., ¶ 86)  The Form of Easement is telling.  Pursuant to the Form of Easement, the Defendants' sole right with respect to the easement was to "lay, construct, install, operate, maintain, replace, maintain [sic] repair, and remove" the Gathering System.  In addition, the Form of Easement made clear that all rights and interests assigned were non-exclusive and only insofar as necessary to above-described rights.

---

[15]    Pursuant to the section 8.4 of the Gathering Agreements:  "Subject to Section 8.3 of this Agreement ***together with the Exhibits attached hereto***, constitutes the entire agreement and understanding between the Parties hereto and supersedes and renders null and void and of no further force and effect any prior proposals, understandings, negotiations or agreements between the Parties relating to the subject matter hereof, and all amendments and letter agreements in any way relating thereto." (emphasis added)  Notably, the Exhibits attached to the Gathering Agreements were incorporated into the agreements, not any executed easements.

22

The easements here simply grant the Defendants the right to lay pipes upon the surface a third party's land, and do not extend to any of Emerald's mineral rights or any other real property estates owned by Emerald.

46.      To be clear, conveyance of the easements cannot satisfy the privity requirement of a real covenant because the conveyance did not involve the same interest with which the covenant purports to run—the mineral estate.  There are two distinct estates at issue here:  (a) the landowner's surface rights; and (b) Emerald's interest in a mineral estate.  *See Bilby v. Wire*, 77 N.W.2d 882 (N.D. 1956) ("severance of the mineral estate from the surface creates two estates which are as distinct as if they contained two parcels of land").  The easements are not upon the working interests held by Emerald.  To the contrary, the easements are upon the landowner's estate—*i.e*., real property that does not belong to Emerald.  As a result, these easements cannot constitute the necessary conveyance for the purposes of horizontal privity because they are on a wholly different estate from which the Defendants allege that a real covenant attaches.  This highlights the absurdity of the Defendants' position—if indeed, as the Objection posits, these easements were "not 'distinct from' Emerald's Working Interests," (Obj., ¶ 86), there would have been no reason for Emerald to obtain the easements from third-parties and then assign them to the Defendants.[16]  Even assuming, *arguendo,* that the granting of an easement is a real property interest that was transferred pursuant to the Gathering Agreements, then it is only the easement that would be burdened by the alleged real covenant, not the mineral estate.

---

[16]    Here again, the Objection attempts to distinguish *Sabine* by noting that the agreements in Sabine did not actually convey easements to the midstream company and that the easements were distinct from Sabine's mineral rights.  (Obj., ¶ 86)  As discussed above, the facts are identical here, as is the legal framework.

**3.      Restrictive Covenants Are Not, and Do Not Grant, Estates in Real Property.**

47.      The Objection argues that the Gathering Agreements create negative or restrictive covenants because, pursuant to section 1.2, Emerald agrees to deliver its production of the hydrocarbons and water to the Defendants "without other disposition except as provided in this Agreement." (Obj., ¶ 78).  That argument assumes both that the grant of an estate in real property and the covenant appurtenant to that estate can be one and the same.  (*Id.*).  The plain language of N.D. Cent. Code Ann. § 47-04-01, however, states that covenants that run with the land are those covenants "contained in grants of estates in real property [and] are appurtenant to such estates," and which "pass with them so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them"—which means that the covenant must be separate and apart from the conveyance of an estate in real property.  A grant of an estate in real property is still required to create a restrictive covenant.  *Matter of Estate v. Murphy*, 554 N.W.2d 432, 436 (N.D. 1996) ("In this case, there was no reference to the $300 payment in the deed from Red Murphy to Tom Murphy.").  The Defendants cannot satisfy this requirement here.

48.      First, although the Defendants point to North Dakota and Montana cases in support of the proposition that a restrictive covenant can itself constitute a grant of an estate in real property (Obj. ¶¶ 78–82), neither case supports their proposition.  In *Eakman v. Robb*, the North Dakota Supreme Court held that a covenant restricting a lot owner's ability to further re-subdivide and build improvements upon such re-subdivided land was a restrictive covenant running with the land because it was contained in the filed plat.  *Eakman v. Robb*, 237 N.W.2d 423, 436 (N.D. 1996).  The North Dakota Supreme Court held "that under North Dakota law, imposition of restrictive covenants by the *filing of a plat* is a 'conveyance.'" *Id. Eakman* did not

24

hold that a stand-alone covenant in an agreement between homeowners was a grant of an estate in real property or otherwise was a restrictive covenant running with the land. *Eakman* instead held that the plat was the real property interest to which the restrictive covenant attached. *See id.*

49. The Defendants similarly place reliance on a Montana case, *Reichart v. Weeden*, to argue that a restrictive covenant can be one and the same as the grant of an estate in real property. But *Reichart* simply held that a restrictive covenant not to sell liquor ran with the land only when the court found that the right to sell liquor constituted an interest in the land. *Reichart v. Weeden*, 618 P.2d 1216, 1219 (Mont. 1980) (holding that the "interest in the land is the right to sell liquor or operate a bar on the land after a particular date" and that the "plaintiffs took away from the land that interest and conveyed it to defendants by means of a written, recorded agreement"). The Defendants cannot bootstrap a grant of an estate into existence—even under the limited *Reichart* holding, a restriction on the right to transport oil hydrocarbons and water is a real property right *only if* the right to transport is itself a real property right. As described in more detail above, the right to transport is not a real property estate. In any case, North Dakota has not cited to or otherwise adopted *Reichart v. Weeden*. The Defendants' exclusive right to gather hydrocarbons and water thus cannot run with the land when it is not drafted into a grant of an estate in real property as required under North Dakota law. *Matter of Estate v. Murphy*, 554 N.W.2d 432, 436 (N.D. 1996).

**C.     The Gathering Commitments Do Not Directly Benefit Emerald's Working Interests.**

50. The Gathering Commitments are not covenants that run with the land for the additional and independent reason that they do not provide a "direct benefit" to the working interest the Objection alleges they burden. Pursuant to North Dakota law, a covenant running with the land must provide a direct benefit to real property subject to the covenant. N.D. Cent.

§ 47-04-26. The North Dakota Supreme Court has held this to mean that "if a covenant contained in a deed does not directly benefit the land . . . it is personal and is enforceable only between the original parties to the deed." *Beeter*, 771 N.W.2d. at 285.

51.     In coming to this holding, the North Dakota Supreme Court took note of two cases to explain this statutory requirement: *Barton v. Fred Netterville Lumber Co.*, 317 F.Supp.2d 700, 704 (S.D. Miss. 2004) and *Mullendore Theatres, Inc. v. Growth Realty Investors Co.*, 691 P.2d 970, 971 (Wash. 1984). In *Barton*, the court held that "if a covenant or deed restriction benefits the grantor personally, and serves no real benefit to the land, then the covenant is personal in nature and does not 'run with the land' upon a subsequent sale of the property." 317 F.Supp.2d at 705. The *Mullendore Theatres* court held that a covenant that is not "so related to the land as to enhance its value and confer a benefit upon it" does not run with the land, and "is a collateral and personal obligation." 691 P.2d at 971.

52.     The Gathering Commitments do not directly benefit the working interest because (a) any benefit provided by Gathering Commitments depends entirely on collateral circumstances, such as commodity prices; and (b) the Gathering Commitments relate to the severed oil, gas, and water (*i.e.*, personal property) and not the working interest (*i.e.*, real property), benefiting the grantor personally.

### 1.     The Gathering Commitments Do Not Directly Benefit the Land Independently of Collateral Circumstances.

53.     The Gathering Commitments do not impact the value of Emerald's mineral estate independently of collateral circumstances, and thus there is no "direct benefit" as required under North Dakota law for the commitments to run with the land. The Objection asserts that because of the Gathering Commitments "the value of Emerald's Working Interests was increased by the construction of the Dakota infrastructure pursuant to the Dedication Agreements, which

26

infrastructure provides take-away to markets, high grading of production, and disposal of wastes." (Obj., ¶ 7.)  However, as commodity prices rise and fall and the market rates for the services covered by the Gathering Agreements adjust to that change, the value of having an exclusive contractual right to these services at a set price will necessarily change.

54.     This impact on the alleged value set forth in the Objection fails to meet the test for providing a "direct benefit" to Emerald's working interest because it is not independent of collateral circumstances.  Put another way, any benefit is merely incidental and not "direct."  The value of the Gathering Agreements is entirely dependent upon commodity prices and the market rate for the agreed-to services, which are circumstances collateral to the Gathering Agreements themselves.  Indeed, the proposed value is so dependent on circumstances collateral to the Gathering Agreements that, depending on market conditions, they could be of great benefit, great detriment, or no value at all to Emerald's working interest, with no alteration to the Gathering Agreements.

55.     Moreover, the Gathering Agreements do not impact the value of Emerald's working interests.  At most, the agreements affect Emerald.  Specifically, Emerald's ability to transport and process its produced hydrocarbons and water does not affect the value of the minerals in the ground; rather, it affects Emerald's ability to process and sell those minerals once extracted.  The value of the mineral estate is largely dependent on commodity prices, not the Gathering Agreements.

56.     Even if the Gathering Agreements impacted the value of the land independently of collateral circumstances, they would not provide a direct benefit to Emerald's working interests because those commitments are a "collateral and personal obligation."  *Beeter,* 771 N.W.2d at 285 (*citing Mullendore Theaters, Inc.,* 691 P.2d 971).  The Gathering Agreements do

27

not burden, or affect, Emerald's property interests because those agreements do not concern—and are not triggered by—an action affecting the land itself, but rather by the Defendants' receipt of the produced hydrocarbons and water after it is severed from the land. *See*, *e.g.*, Gathering Agreement § 3.2.

57.    This is a key distinction that remains important because the obligations for transportation are not triggered by extraction, but by the Defendants' receipt of the already produced hydrocarbons. The amount to be transported cannot be determined unless and until an accounting of the amount that is delivered by Emerald to the Defendants, if any, may be determined. Under the Gathering Agreements, Emerald could extract hydrocarbons and opt not to transport or deliver those hydrocarbons to the Defendants. *See* Gathering Agreements, § 1.5. The act of extracting these hydrocarbons does not affect or trigger any Gathering Commitment under the Gathering Agreements. Because the Gathering Agreements do not compel nor preclude Emerald from doing anything on the land itself, they cannot be said to affect the land's value independently of collateral circumstances.

58.    Moreover, any covenant contained in the Gathering Agreements is completely collateral to Emerald's status as operator of its leases. Returning again to section 1.2 of the Gathering Agreements on which the Defendants place so much weight, the only dedicated and committed products are Emerald's working interest share of the crude, gas, and water "produced from the Wells *operated by* [Emerald] . . . ." But Emerald's status as operator is wholly independent of its working interests. An "operator" is the party who actually controls and conducts the day-to-day operations for the owners who are non-operators who have working interests or royalty interests in the property. Operators, in North Dakota, are appointed by the Oil and Gas Division of the Industrial Commission of North Dakota—a regulatory appointment

28

not based on property ownership. Indeed, "the concept of an operator must remain distinguished from an operating interest for, while some operators may also be working or operating interest owners, many are not but are merely employed by the working interest owners to manage the daily well operations." *In re Great Plains Petroleum, Inc.*, 113 B.R. 570, 571 n.1 (Bankr. D.N.D. 1990). That Emerald may transfer operatorship of its leases to a third party with a simple form submitted to the Industrial Commission and thereby eliminate its dedications and commitments under the Gathering Agreements shows the collateral nature of these obligations.

### 2. Because the Gathering Commitments Relate to Personal Property and Not Real Property, Any Benefit is Incidental and Is Not a "Direct Benefit" to the Mineral Estate.

59. The fact that the Gathering Commitments concern the *produced* hydrocarbons and water that the Defendants receive from Emerald means that those commitments do not directly benefit Emerald's working interest for an additional reason: they affect rights in *personal*, not *real*, property. Once minerals are produced, they cease to be real property and instead become personalty. *Fed. Land Bank of St. Paul*, 274 N.W.2d at 583 (holding that "produced or severed minerals are personal property, not real estate"); *In re Arithson*, 175 B.R. at 313 (holding that "at the moment of extraction or severance from the subsurface estate, however, mineral interests immediately transform from realty into personalty"). As such, the Gathering Agreements have no "direct benefit" on the land itself.

60. The Objection attempts to circumvent this conclusion by claiming that the Gathering Agreements obligate Emerald to "deliver to Dakota all of [their] production of oil, gas and saltwater within the [Service Area] 'without other disposition except as otherwise provided in the [Gathering Agreements].'"[17] (Obj., ¶ 117.) Put another way, the Defendants and Emerald

---

[17] One notable weakness in this statement is that while recognizing the "as otherwise provided" language, the Objection fails to realize that Section 1.5 of the Gathering Agreements *implicitly authorizes Emerald to dispose*

disagree over whether the Gathering Commitments at issue burden Emerald's working interests (i.e., an estate in real property), or if instead the Gathering Commitments merely burden Emerald's produced, out-of-ground personal property. The Objection argues that, even though the Gathering Agreements only delineate what Emerald may do with its produced minerals once removed from the ground, the Gathering Agreements nevertheless "touch and concern" the land. This is supposedly because: (a) Emerald dedicated to the Defendants all of its produced oil, gas, and water within the Service Area and is bound to deliver to the Defendants all of its production and (b) the covenant at issue touches and concerns Emerald's working interest. (Obj., ¶ 117.) This novel argument does not find support in North Dakota law.

61.     *First*, the contention that Emerald dedicated all of their production ignores other provisions of the Gathering Agreements that make clear Emerald is free to do what it wishes with its produced hydrocarbons and water, subject only to paying a fee and a penalty. The Objection's efforts to obfuscate this point are unavailing. A commitment to use another's exclusive services to transport or process extracted minerals for a fee does not benefit the underlying mineral estate because, as discussed above, it is not an estate in property under North Dakota law. At most, it could benefit the the severed oil, gas, and water—Emerald's personal property. Indeed, the Gathering Agreements expressly state that they do not impose *any* limitations on Emerald's use of the mineral estate or the production of the mineral estate, and that no rights to the Leases are transferred pursuant to the agreements. *See, e.g.*, Gathering Agreements §§ 1.3 (Emerald may operate its leases and wells free of any control by the Defendants), 1.5 (Emerald may dispose of hydrocarbons and produced water by other means than by delivery to the Defendants), 2.8 (stating that Emerald does not sell, transfer, or assign

---

*of their hydrocarbons and water by other means*, so long as the Defendants are paid according to those volumes disposed.

30

unto the Defendants any title or interest whatsoever in the Leases or any pipelines or other equipment of any nature owned or used by Emerald in the operation of its wells and lease).  A covenant that affects only personal property cannot directly benefit an estate in real property.

62.     ***Second***, although some interests in later-produced and saved minerals may be interests in real property (such as a royalty), it does not mean that any obligation related to later-produced and saved minerals is automatically an interest in real property.  The Defendants do not appear to—and cannot—claim a royalty interest, or a right to royalty payments,  in Emerald's minerals, nor can they claim any other identifiable interest or real property rights in mineral estates that exist under North Dakota law.  *See supra* Part III.B.1.  None of the cases the Objectors cite support their assertion that an agreement for the gathering of another's hydrocarbons and water for a fee directly benefits the mineral estate.   The Gathering Agreements cannot plausibly be read to convey such broad rights to the oil, gas, and water in Emerald's mineral estates; otherwise, Emerald would not have the right to exploit or possess the very gas and condensate it is to deliver to the Defendants under the Gathering Agreements and to which Emerald expressly retains title.  Accordingly, because any alleged benefit under the Gathering Agreements is a benefit to personal property and not real property, the Gathering Commitment cannot run with the land under North Dakota law.

**IV.     The Gathering Commitments Do Not Create Equitable Servitudes as a Matter of Law.**

> **A.     The Only Equitable Servitudes Recognized Under North Dakota Law Arise in the Condominium Context.**

63.     The Defendants do not dispute that the only reported cases in North Dakota that explicitly pertain to equitable servitudes are the handful cited by Emerald in its Motion for Summary Judgment, all of which relate exclusively to N.D. Cent. Code § 47-04.1-04 and condominiums.  (*See* Obj., ¶ 120).  Instead, the Defendants argue (a) that there exists some

ancient common-law conception of equitable servitudes that—going back as far as 150 years ago—has never been mentioned by any North Dakota court of record and (b) that this undescribed, inchoate law of equitable servitudes should be applied in the present case. (*See id.*, ¶ 121). In support, the Defendants point only to the chapter of the North Dakota Century Code on "Servitudes" and the North Dakota Supreme Court's grant of injunctive relief in *Allen v. Minot Amusement Corp.*, 312 N.W.2d 698 (1981). (*See id.*, ¶ 122–25). Again, the Defendants attempt to force a "square peg" into a "round hole."

64.     ***First***, the existence of statutory provisions governing "Servitudes" under North Dakota law is not evidence of the existence of equitable servitudes beyond that explicitly provided by the same Code. The provisions governing "Servitudes" provide for the creation and application of servitudes at law—such as easements—and not servitudes under equity. *See, e.g.*, N.D. Cent. Code § 47-05-02.1. They are entirely inapposite.

65.     ***Second***, as the Defendants concede, *Allen* does not hold that the covenants at issue created equitable servitudes or discuss equitable servitudes at all. (*See* Obj., ¶¶ 122–25). Instead, the Defendants erroneously conclude that because the *Allen* court granted an injunction—an equitable remedy—for the breach of the restrictive covenant at issue, the court implicitly held that those covenants created an equitable servitude under the North Dakota common law. (*See id.*). Even where covenants run with the land and are not equitable servitudes, however, both legal and equitable remedies are often made available by courts. *See* 9 Richard R. Powell, Powell on Real Property § 60.07 (Michael Allan Wolf ed., 2005) ("The modern union of law and equity, as well as the judicial confusion over which covenants should run at law and which should run in equity, have caused courts, in general, to grant the relief they feel is appropriate without regard to the real or equitable nature of the covenant. . . . Therefore,

32

the remedy for breach of a covenant, as requested or as granted, rarely provides a clue as to the real or equitable nature of the covenant."). As a result, there is no basis to believe that by holding that an injunction for a breach of a covenant running with the land was proper *Allen* recognized the existence of equitable servitudes beyond the context contemplated by express North Dakota statute and case law.

66. The fact remains that the North Dakota Supreme Court has never recognized equitable servitudes outside of in the context of condominiums, and the present case does not involve condominiums. Therefore, any decision by this Court that the Gathering Commitments create equitable servitudes in the present case, or attempting to define the contours of the "common law" equitable servitudes conjured by Defendants, would constitute entirely novel law. As this Court is well aware, its mandate is to interpret North Dakota law, not to create it.

**B.    Even if Equitable Servitudes Are Recognized under North Dakota Common Law, the Gathering Commitments Would Not Create Equitable Servitudes as a Matter of Law.**

67. In granting Emerald's Motion for Summary Judgment, the Court need not determine whether equitable servitudes exist under North Dakota common law outside of that recognized by statute. Even if some form of traditional common-law conception of equitable servitudes existed, as argued by Defendants, the Gathering Commitments would not create equitable servitudes as a matter of law.

68. Traditionally equitable servitudes required that the covenants at issue benefited (or touch and concerned) the land of the party seeking to enforce it. (*See* Obj., at ¶ 127); *see, e.g.*, *Reagan Nat'l Advert. of Austin, Inc. v. Capital Outdoors, Inc.*, 96 S.W.3d 490, 495 (Tex. App. 2002) (holding that an equitable servitude exists only if the (a) the covenant "benefits the land of the party seeking to enforce it"; (b)  the covenant "limits the use of the burdened"; and the successor to the burdened land taking its interest with notice of the restriction). As

33

discussed in detail above, the Gathering Commitments do not directly benefit the land. *See supra* Part III.C. They benefit the Defendants personally, not the land of the parties seeking to enforce these commitments. Under the Gathering Agreements, the Defendants have a contractual right to gather the oil, gas, and water produced from a specified area, and to receive a fee for performing that service, nothing more.

69. Therefore, Emerald respectfully requests the Court hold that if equitable servitudes are recognized under North Dakota law, the Gathering Commitments do not constitute such equitable servitudes as a matter of law.

## **CONCLUSION**

In light of the foregoing, the Motion for Summary Judgment must be granted as a matter of law. The Gathering Agreements are quintessentially service contracts pursuant to which the respective Defendants named therein agreed to gather minerals severed from the land and water produced in connection therewith. Because none of the Gathering Agreements contain a grant of an estate in real property or otherwise contain covenants that benefit the land, none of the agreements contain covenants or equitable servitudes running with the land as a matter of law.

Wilmington, Delaware
Dated:  September 19, 2016

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:           ljones@pszjlaw.com
                      crobinson@pszjlaw.com
                      jmulvihill@pszjlaw.com

- and -

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett (admitted *pro hac vice*)
Travis M. Bayer (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
Email:           james.sprayregen@kirkland.com
                      ryan.bennett@kirkland.com
                      travis.bayer@kirkland.com

*Counsel to the Debtors*

35