## Exhibit 1

### Sample Emerald Oil & Gas Lease

Return to:

| | |
|---|---|
| COPPERHEAD CORPORATION | County Recorder |
| PO BOX 3086 | McKenzie County |
| | Watford City ND 58854 |
| MINOT ND 58702-3086 | Page   1 of   6 |

**RETURN TO:**
**Copperhead Corporation**
**P.O. Box 3086**
**Minot, ND 58702-3086**

COUNTY RECORDER, MCKENZIE COUNTY, ND

I certify that this instrument was filed and recorded,  **397425**

Ann M Johnsrud, County Recorder    Fee   $41.00

By *Jodi Hanson, Deputy*    Feb 04, 2010  08:33 AM



PRODUCERS 88-PAID UP
Rev. 5-60, No. 2 4-89

## OIL AND GAS LEASE

AGREEMENT, Made and entered into the **30th** day of **December, 2009**, by and between **James P. Cross, a single man**, whose post office address is **15042 Highway 68, Alexander, ND  58831**, hereinafter called Lessor (whether one or more) and **XTO Energy Inc.** whose post office address is **810 Houston St., Fort Worth, TX 76102**, hereinafter called Lessee:

WITNESSETH, That the Lessor, for and in consideration of **Ten and more ($10.00+)**  DOLLARS cash in hand paid, the receipt of which is hereby acknowledged, and the covenants and agreements hereinafter contained, has granted, demised, leased and let, and by these presents does grant, demise, lease and let exclusively unto the said Lessee, the land hereinafter described, with the exclusive right for the purpose of mining, exploring by geophysical and other methods, and operating for and producing therefrom oil and all gas of whatsoever nature or kind, with rights of way and easements for laying pipe lines, and erection of structures thereon to produce, save and take care of said products, all that certain tract of land situated in the County of **McKenzie**, State of **North Dakota** described as follows, to-wit:

> **Township 148 North, Range 102 West**
> Section 07: SE¼SE¼
> Section 17: W½NW¼
> Section 18: E½NE¼, SW¼NE¼
>
> **Township 148 North, Range 103 West**
> Section 01: Lots 1, 2, 3, 4, S½N½, SE¼, SW¼
> Section 02: Lots 1, 2, S½NE¼, S½SW¼
> Section 11: NE¼, E½SE¼
> Section 12: NE¼, NW¼, SW¼, SE¼
> Section 13: N½NW¼
>
> **Township 149 North, Range 102 West**
> Section 27: SW¼
> Section 28: N½
> Section 33: SE¼
>
> **Subject to attached Exhibit "A"**

and containing **2,616.17**  acres, more or less.

1. It is agreed that this lease shall remain in force for a term of **Four (4)** years from this date and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. ~~If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling or reworking operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and operations shall be considered to be continuously prosecuted if not more than ninety (90) days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well.~~ If after discovery of oil or gas on said land or on acreage pooled therewith, the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or reworking operations within ninety (90) days from the date of cessation of production or from date of completion of dry hole.  If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this

lease shall continue in force so long as oil or gas is produced from the lease premises or on acreage pooled therewith.

2.   This is a PAID-UP LEASE.   In consideration of the down cash payment, Lessor agrees that Lessee shall not be obligated, except as otherwise provided herein, to commence or continue any operations during the primary term. Lessee may at any time or times during or after the primary term surrender this lease as to all or any portion of said land and as to any strata or stratum by delivering to Lessor or by filing for record a release or releases, and be relieved of all obligation thereafter accruing as the acreage surrendered.

3.   In consideration of the premises the said Lessee covenants and agrees:

1st.   To deliver to the credit of Lessor, free of cost in the pipe line to which Lessee may connect wells on said land, the equal **eighteen percent (18%)** part of all oil produced and saved from the leased premises.
2nd.   To pay Lessor **eighteen percent (18%)** of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found, while the same is being used off the premises and if used in the manufacture of gasoline a royalty of **eighteen percent (18%)** payable monthly at the prevailing market rate for gas.
3rd.   To pay Lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of **eighteen percent (18%)** of the proceeds, at the mouth of the well, payable monthly at the prevailing market rate.

Any interest in production from the lands herein described to which the interest of Lessor may be subject, shall be deducted from the lessor's royalty herein reserved.

4.   Where gas from a well capable of producing gas is not sold or used, Lessee may pay or tender as royalty to the royalty owners One Dollar per year per net royalty acre retained hereunder, such payment or tender to be made on or before the anniversary date of this lease next ensuing after the expiration of 90 days from the date such well is shut in and thereafter on or before the anniversary date of this lease during the period such well is shut in. If such payment or tender is made, it will be considered that gas is being produced within the meaning of this lease.

5.   If said Lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties (including any shut-in gas royalty) herein provided for shall be paid the said Lessor only in the proportion which Lessor's interest bears to the whole and undivided fee.

6.   Lessee shall have the right to use, free of cost, gas, oil and water produced on said land for the Lessee's operations thereon, except water from wells of Lessor.   This Lease does not provide for the drilling of fresh water source wells without a separate written agreement between Lessor and Lessee. Lessee shall give the surface owners the right to take possession of any water wells it drills on the surface owners land after Lessee is no longer using said water well or wells to benefit minerals covered by this lease.   Thereafter the surface owner shall have exclusive possession of the water well or wells.

7.   ~~When requested by Lessor~~, Lessee shall bury Lessee's pipelines below plow depth.

8.   No well shall be drilled nearer than 800 feet to the house or any other buildings now on said premises without written consent of the Lessor.   See attached Exhibit "B" for location of current structures.

9.   Lessee shall pay for damages caused by Lessee's operations ~~to growing crops on said land~~.

10.   Lessee shall have the right ~~at any time~~ to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing within 9 months of termination of lease.

11. The rights of Lessor and Lessee hereunder may be assigned in whole or part. No change in ownership of Lessor's interest (by assignment or otherwise) shall be binding on Lessee until Lessee has been furnished with notice, consisting of certified copies of all recorded instruments or documents and other information necessary to establish a complete chain of record title from Lessor, and then only with respect to payments thereafter made. No other kind of notice whether actual or constructive, shall be binding on Lessee. No present or future division of Lessor's ownership as to different portions or parcels of said land shall operate to enlarge the obligations or diminish the rights of Lessee, and all Lessee's operations may be conducted without regard to any such division. If all or any part of this lease is assigned, no leasehold owner shall be liable for any act or omission of any other leasehold owner.

12. Lessee, at its option, is hereby given the right and power at any time and from time to time as a recurring right, either before or after production, as to all or any part of the land described herein and as to any one or more of the formations hereunder, to pool or unitize the leasehold estate and the mineral estate covered by this lease with other land, lease or leases in the immediate vicinity for the production of oil and gas, or separately for the production of either, when in Lessee's judgment it is

**397425**

County Recorder
McKenzie County
Watford City ND 58854

Page   2 of   6

necessary or advisable to do so, and irrespective of whether authority similar to this exists with respect to such other land, lease or leases. Likewise, units previously formed to include formations not producing oil or gas, may be reformed to exclude such non-producing formation. The forming or reforming of any unit shall be accomplished by Lessee executing and filing of record a declaration of such unitization or reformation, which declaration shall describe the unit. Any unit may include land upon which a well has theretofore been completed or upon which operations for drilling have theretofore been commenced. Production, drilling or reworking operations or a well shut in for want of market anywhere on  a unit which includes all or a part of this lease shall be treated as if this lease were producing, drilling or reworking operations or a well shut in for want of a market under this lease. In lieu of the royalties elsewhere herein specified, including shut-in gas royalties, Lessor shall receive on production from the unit so pooled royalties only on the portion of such production allocated to this lease; such allocation shall be that proportion of the unit production that the total number of surface acres covered by this lease and included in the unit bears to the total number of surface acres in such unit. In addition to the foregoing, Lessee shall have the right to unitize, pool, or combine all or any part of the above described lands as to one or more of the formations thereunder with other lands in the same general area by entering into a cooperative or unit plan of development or operation approved by any governmental authority and, from time to time, with like approval, to modify, change or terminate any such plan or agreement ~~and, in such event, the terms, conditions, and provisions of this lease shall be deemed modified to conform to the terms, conditions, and provisions of such approved cooperative or unit plan of development of operation and, particularly, all drilling and development requirements of this lease, express or implied, shall be satisfied by compliance with the drilling and development requirements of such plan or agreement and this lease shall not terminate or expire during the life of such plan or agreement.~~ In the event that said above described lands or any part thereof, shall hereafter be operated under any such cooperative or unit plan of development or operation whereby the production therefrom is allocated to different portions of the land covered by said plan, then the production allocated to any particular tract of land shall, for the purpose of computing the royalties to be paid hereunder to Lessor, be regarded as having been produced from the particular tract of land to which it is allocated and not to any other tract of land; and the royalty payments to be made hereunder to Lessor shall be based upon production only as so allocated. ~~Lessor shall formally express Lessor's consent to any cooperative or unit plan of development or operation adopted by Lessee and approved by any governmental agency by executing the same upon request of Lessee.~~

13. All express or implied covenants of this lease shall be subject to all Federal and State Laws, Executive Orders, Rules and Regulations, and this lease shall not be terminated, in whole or in part, nor Lessee held liable in damages, for failure to comply therewith, if compliance is prevented by, or if such failure is the result of, any such Law, Order, Rule or Regulation.

14. Lessor hereby ~~warrants and agrees to defend the title to the lands herein described, and~~ agrees that the Lessee shall have the right at any time to redeem for Lessor, by payment, any mortgages, taxes or other liens on the above described lands, in the event of default of payment by Lessor, and be subrogated to the rights of the holder thereof, and the undersigned Lessors, for themselves and their heirs, successors and assigns, hereby surrender and release all right of dower and homestead in the premises described herein, insofar as said right of dower and homestead may in any way affect the purposes  for which this lease is made, as recited herein.

15. Should any one or more of the parties hereinabove named as Lessor fail to execute this lease, it shall nevertheless be binding upon all such parties who do execute it as Lessor. The word ""Lessor"," as used in this lease, shall mean any one or more or all of the parties who execute this lease as Lessor. All the provisions of this lease shall be binding on the heirs, successors and assigns of Lessor and Lessee.

IN WITNESS WHEREOF, this instrument is executed as of the date first above written.

_James P. Cross_

_____

By: James P. Cross

_____

County Recorder

McKenzie County

Watford City ND 58854

397425

Page   3 of   6

STATE OF    *North Dakota*    )
                                              )SS          (Individual Acknowledgement)
COUNTY OF    *McKenzie*    )

BE IT REMEMBERED, That on this *4th* day of *January* _____, 20*10*, before me, a Notary Public, in and for said County and State, personally appeared **James P. Cross, a single man**, to me known to be the identical person described in and who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act and deed for the uses and purposes therein set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year last written above.

My commission expires_____

Notary Public

```
MIKE FITZMAURICE
Notary Public
State of North Dakota
My Commission Expires Feb. 5, 2010
```

County Recorder

McKenzie County
Watford City ND 58854

**397425**

Page    4 of    6

## EXHIBIT "A"

THIS AGREEMENT is attached to and by reference made a part of the Oil and Gas Lease dated **December 30, 2009**, by and between **James P. Cross, a single man**, Lessor, and **XTO ENERGY, INC.**, as Lessee:

Notwithstanding the provisions of this lease to the contrary:

(a) This lease shall terminate at the end of the primary term as to all of the leased premises except those included within a production or spacing unit prescribed by law or administrative authority on which is located a well producing oil and/or gas ~~and for which Lessor is receiving royalty payments~~, unless lessee is then engaged in drilling or reworking operations in accordance with the provisions of this lease. In the event that lessee is engaged in said drilling or reworking operations at the expiration of the primary term, the lease shall remain in full force and effect as to all the leased premises so long as a continuous drilling program is maintained whereby not more than 180 days shall elapse from the completion or abandonment of drilling or completion operations upon the last well to the commencement of another well. Upon failure to maintain said continuous drilling program, this lease shall then automatically terminate as to such nonproductive part of the leased premises as provided herein.

(b) The right to pool or unitize is limited to the spacing unit established by the State oil and gas regulatory commission. Production from a well producing oil and/or gas from a unit which contains a part of the leased premises shall be considered production under the lease.

(c) If Lessee assigns all or part of this lease, both assignor and assignee shall remain subject to the terms of this agreement including but not limited to any implied covenants of exploration, development and protection from drainage until the lessor is provided with a copy of the assignment which shows the mailing address of the assignee, excepting, however, responsibility for environmental damage as hereinafter provided shall not be avoided by any assignment with or without furnishing copies thereof, if such damage was caused by Lessee.

(d) Provisions of any State surface owner protection compensation laws, such as North Dakota Century Code Chapter 38-11.1 shall apply. None of the provisions of this lease nor consideration paid to Lessor pursuant to the terms of this lease shall be considered compensation to any surface owner, including Lessor, for any surface damages that result from operations pursuant to the terms of this lease.

(e) Wherever the lease requires the Lessee to commence additional drilling or reworking operations, it is also required that such drilling or reworking operations be diligently prosecuted.

(f) Production under terms of this lease is intended to be paying production under which the income from production exceeds expenses allocated to such production by the operator unless otherwise agreed in writing by the parties. Determination of whether a well drilled pursuant to this lease is producing paying production, there must not be more than a 6 month continuous period that the well income to Lessee does not exceed the well production expenses to Lessee.

(g) The right to shut-in a well capable only of producing gas provided in this lease shall not continue for a period beyond two (2) years after such well is shut-in pursuant to the terms of this lease.

(h) Nothing in this Exhibit is intended to relieve the Lessee from any implied covenants or from any obligation to act as a reasonable prudent operator giving due regard to the interests of the Lessor.

(i) The Lessee undertakes to and does hereby agree to defend, hold harmless and indemnify Lessor, their successors, heirs or assigns, from any and all liability, costs, and attorneys' fees the Lessor may suffer as a result of claims, demands, costs or judgments against Lessor arising out of activities undertaken by Lessee during operations conducted on the leased premise including any environmental damage caused by the Lessee on this lease or Lessee's noncompliance with any environmental law, order, administrative law or rule, adopted or promulgated by the State of North Dakota or the United States of America, or any board, agency or commission of either.

(j) This lease shall not apply to coal bed methane.

(k) Lessee agrees, upon the completion of any test as a dry hole or upon the abandonment of any producing well, to remove all installations within six (6) months after cessation of drilling or reworking operations.

(l) Lessee agrees that this Lease does not grant Lessee the right to dispose of salt water and other fluids into the subsurface strata without prior written consent of Lessor.

Dated this ___4th___ day of ___January___, 20_10_.

_James P. Cross_
James P. Cross

Copperhead Corporation
P.O. Box 3086
Minot, ND 58702-3086



**USDA** **United States Department of Agriculture**
**Farm Service Agency**

**Program Year**

**1-148-103**

*McKenzie County, ND*

USDA FSA maps are for FSA Program administration only. There is no guarantee or representation to the user as to the accuracy, currency, suitability or reliability. FSA MAPS DO NOT REPRESENT A LEGAL SURVEY. The user accepts the data 'as is' and assumes all risks associated with its use. Wetland points reflect records available with NRCS and may or may not constitute a full inventory of the property. The USDA Farm Service Agency assumes no responsibility for actual or consequential damage incurred as a result of any user's reliance on this data.

**Boundary Descriptions**

CLU Field Boundary
Tract Boundary
⬜ Section Lines

**Wetland Determination Identifiers**
O   Restricted Use
▽   Limited Restrictions
⬜   Exempt from Conservation
     Compliance Provisions

**1:9,012**                    Apr 09, 2008

**<u>Exhibit 2</u>**

**NDIC Order 24665, dated July 1, 2014**

BEFORE THE INDUSTRIAL COMMISSION

OF THE STATE OF NORTH DAKOTA

CASE NO.     22058
(CONTINUED)
ORDER NO.    24665

IN THE MATTER OF A HEARING CALLED ON A MOTION OF THE COMMISSION TO CONSIDER AMENDING THE CURRENT BAKKEN, BAKKEN/THREE FORKS, AND/OR THREE FORKS POOL FIELD RULES TO RESTRICT OIL PRODUCTION AND/OR IMPOSE SUCH PROVISIONS AS DEEMED APPROPRIATE TO REDUCE THE AMOUNT OF FLARED GAS.

ORDER OF THE COMMISSION

THE COMMISSION FINDS:

(1)    This cause originally came on for hearing at 9:00 a.m. on the 22nd day of April, 2014.

(2)    North Dakota Industrial Commission (Commission) Order No. 24392, signed May 14, 2014 continued the decision in this matter for an additional ninety days.

(3)    This hearing was called on a motion of the Commission to consider amending the current Bakken, Bakken/Three Forks, and/or Three Forks Pool field rules to restrict oil production and/or impose such provisions as deemed appropriate to reduce the amount of flared gas.

This special hearing was scheduled to address the Commission's newly-adopted policy on reducing gas flaring.  The policy goals were to reduce the flared volume of gas, reduce the number of wells flaring, and reduce the duration of flaring from wells.

Action items to reach the policy goals included requiring Gas Capture Plans for increased density, temporary spacing, and proper spacing cases; requiring Gas Capture Plans for all applications for a permit to drill; schedule semi-annual meetings with midstream gas gathering companies to gauge the effect of Gas Capture Plans, production curtailments, contracts, and service interruptions; dedicate information technology resources to develop a web-based pipeline incident report form to better assess right-of-way issues; direct the Pipeline Authority to track flaring on/off the Fort Berthold Indian Reservation and report capture status versus goals; and docket this hearing to review and revise Bakken, Bakken/Three Forks, and/or Three Forks Pool rules governing production curtailment.

(4)    Prior to the hearing, the Commission indicated it was seeking testimony of technical nature for input on the following:

    a.    Length of time wells should be allowed to produce at maximum while flaring?

    b.    What production rate restrictions are appropriate for wells connected to gas gathering or beneficial uses?

    c.    What types of administrative approval of exemptions from production restrictions are appropriate?

    d.    What consideration should be given to ambient air quality regarding production rates or restrictions?

    e.    Should production rates and restrictions be adjusted for well economics and percentage of gas captured by well site, field-pool, region or operator?

    f.    Should production rates for wells not connected to gas gathering or beneficial uses be reduced in stages or set at a low rate after payout?

Written comments were allowed no later than 5:00 p.m., Monday, April 21, 2014.

(5)    The Commission received written comments from Toby Schweitzer of Bakken Frontier LLC, Caleb Young employed in the oil and gas industry, Srini Raghavan of Navi Reliance Group LLC, Gary Preszler of the North Dakota Chapter of the National Association of Royalty Owners, Alexis Brinkman of the North Dakota Petroleum Council, Roger Kelley of Continental Resources Inc. representing the Domestic Energy Producers Alliance, Tex Hall of the Mandan Hidatsa and Arikara Nation, Gordon Vaskey of Zavanna LLC, Taylor Reid of Oasis Petroleum North America LLC, Kenneth Klanika of Statoil Oil and Gas LP, Danette Welsh of ONEOK Inc., Dominic Spencer of Triangle USA Petroleum Corporation, Andrew Logan of Ceres, Mark Borla of SM Energy Company, Lisa Casarez a member of the Fort Berthold Indian Reservation, Adam Bishop of Hunt Oil Company, Abby Sharp and Kimberly Croll of Caliber Midstream Partners LP, Mark Wald of Blaise Energy, Jeremy Conger of WPX Energy Williston LLC, James Kennedy of Fidelity Exploration & Production Company, Ralph Castille of ConocoPhillips Company, Jeff Herman of Petro-Hunt LLC, Joel Noyes of Hess Corporation, Don Morrison of the Dakota Resource Council, Brent Miller of Whiting Oil and Gas Corporation, Stephanie Chase of the Environmental Law & Policy Center, and Wessel Nel of Hatch Ltd.

The following concerned land/royalty owners also submitted written comments: Tim Stroh and Eugene Bardal.

The following concerned citizens also submitted written comments: Wally Stephens, Peggy Klein, Al Coen, Susan and Paul Bultsma, Carol Nelson, Lyle and Susan Best, Pete and Vawnita Best, Galen Grote, Norma Stenslie, Joletta Bird Bear, James Stewart, Corinne L., Shelly Ventsch, Candance Kraft, Rose Veeder, Cedar Gillette, and Curtis Bardal.

(6)    The Commission received oral comments at the hearing from Lyle Best a landowner near Watford City, Ron Ness of the North Dakota Petroleum Council, Brad Aman of Continental Resources Inc., Roger Kelley of Continental Resources Inc. representing the Domestic Energy Producers Alliance, Jeremy Conger of WPX Energy Williston LLC, Brent Miller of Whiting Oil and Gas Corporation, Danette Welsch of ONEOK Inc., Brian Cebull of GUIT LLC, Ralph Castille of ConocoPhillips Company, Theodora Bird Bear of the Dakota Resource Council, Scott Skokos of the Dakota Resource Council, Lance Langford of Statoil Oil & Gas LP, Tony Lucero of

Case No.    22058
(Continued)
Order No.    24665

Enerplus Resources USA Corporation, Tom Wheeler of Northwest Landowners Association, Mark Borla of SM Energy Company, Bryant Winn of Petro-Hunt LLC, Dan Grossman of the Environmental Defense Fund, Jerrold Mayer of Zavanna LLC, Walter Breidenstein of Gas Technologies, Wayde Schafer of the Sierra Club, Andy Peterson of the Greater North Dakota Chamber, Toby Schweitzer of Bakken Frontier LLC, Carey Doyle of the Mandan Hidatsa and Arikara Nation, and William McCabe of Missouri River Resources.

(7)    Having allowed all interested persons an opportunity to be heard and having heard, reviewed, and considered all testimony and evidence presented, the Commission makes the following conclusions.  Much of the testimony was relevant, but did not address the six topics on which the Commission sought testimony.

(8)    The typical Bakken, Bakken/Three Forks, and/or Three Forks Pool is defined as that accumulation of oil and gas found in the interval from 50 feet above the Bakken Formation to above the top of the Birdbear Formation within the limits of any given field.  To ease confusion, the Pool will collectively be hereinafter referred to as the Bakken Pool.

(9)    Development of Bakken Pools in North Dakota is currently ongoing and encompasses over 15,000 square miles of land.  Total gas plant capacity in North Dakota exceeds total gas production in the state although many bottlenecks exist in the current gas gathering infrastructure due to the high liquid content of the gas, the prolific volumes of oil and gas during initial production, increasing pipeline pressure that requires installation of additional compressors, and in some cases undersized pipe.  Most operators are prudently attempting to connect their wells to a gas gathering system, but due to many aforementioned constraints in the gas gathering systems, much of the gas is not processed.

(10)    Bakken Pools producing in North Dakota are oil reservoirs and gas is produced in association with the oil at the wellhead as a by-product of oil production.  The value of the oil produced far exceeds the value of any gas produced in association with the oil.

(11)    Leasehold interests in some Bakken Pool spacing units are not yet held by production.  The initial horizontal well drilled in such spacing units should be allowed to produce at its maximum efficient rate, regardless if the well is connected to a gas gathering system.  Allowing such wells to produce at a maximum efficient rate will allow valuable information to be obtained in order to make decisions with regard to future wells and infrastructure requirements in the spacing unit.

(12)    Some Bakken Pool spacing units are being developed where the operator is aware that the existing gas gathering infrastructure is insufficient to allow surplus gas to be processed through the gas gathering system.  In instances where significant amounts of surplus gas is flared due to the insufficient collection system, production should be restricted unless significant amounts of surplus gas is captured for beneficial consumption, or utilized in a value-added process.

(13)    Some Bakken Pools could have up to five separate horizontal targets, resulting in as many as twenty-eight wells within the same spacing unit.

(14)    Various time frames for maximum efficient rates were suggested.  North Dakota's production of Bakken Pool associated gas is typically associated with an unusually high

(3)

Case No.      22058
(Continued)
Order No.      24665

temperature, pressure, and liquid content.  Initial production decline is also very rapid, due to the highly fractured nature of the completion interval.

(15)  The Commission believes the North Dakota Petroleum Council's Flaring Task Force's targets of capturing 74% of the gas by October 1, 2014; 77% by January 1, 2015; 85% by January 1, 2016; and 90% by October 1, 2020 with potential for 95% capture are attainable and should be adopted as gas capture goals by the Commission.  The restrictions imposed by this order will strive to meet such goals.

(16)  Production restrictions imposed by the Commission will constitute force majeure in most producer/gas gatherer contracts and excuse parties from performing certain parts of the contract while production restrictions are imposed.

(17)  Delineation drilling activity versus multi-well development requires separate and unique solutions.

(18)  Pipeline construction across rough topography or around surface waters causes delays in connecting wells to a gas gathering system.

(19)  Flexibility is required due to surface landowner, tribal, and federal government right-of-way delays; temporary midstream down-time for system upgrades and maintenance; federal regulatory restrictions or delays; safety issues; delayed access to electrical power; and possible reservoir damage.

(20)  Well payout and economics should not be used to determine production restrictions.

(21)  Some well site value-added processes that utilize the surplus gas in a beneficial manner are economic.

(22)  Commission production records indicate the majority of gas flared in North Dakota is from wells already connected to a gas gathering system.  Such wells should not be excluded from gas capture goals adopted by the Commission.

(23)  Some flared gas contains components that if improperly combusted could cause air quality degradation and health issues.

(24)  On the Fort Berthold Indian Reservation, many Bakken Pools are also within the jurisdiction of the Mandan Hidatsa and Arikara (MHA) Nation and Bureau of Land Management (BLM).  In some cases, companies must comply with MHA Nation, BLM, and Commission rules. The Commission should work with federal and tribal authorities to ensure that restrictions imposed herein provide clarity and protection of correlative rights for the oil and gas companies operating in the respective jurisdictions.

(25)  The production allowances and restrictions imposed herein will provide for the effective and efficient recovery of oil from the Bakken Pool, encourage rapid development, avoid the drilling of unnecessary wells, and prevent waste in a manner that will protect correlative rights.

(4)

Case No.     22058
(Continued)
Order No.    24665

IT IS THEREFORE ORDERED:

(1)    All Commission orders allowing wells completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool to produce at a maximum efficient rate shall remain in full force and effect through September 30, 2014.  All wells completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool are hereafter allowed to produce at a maximum efficient rate through September 30, 2014.  After September 30, 2014, the gas capture from all existing wells shall be evaluated and oil production from all existing and future wells shall not exceed the production allowances herein.

(2)    The first horizontal well completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool non-overlapping spacing unit shall be allowed to produce at a maximum efficient rate.

(3)    All wells completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool that have received an exemption to North Dakota Century Code Section 38-08-06.4 shall be allowed to produce at a maximum efficient rate.

(4)    All infill horizontal wells, including overlapping spacing units, completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool, shall be allowed to produce at a maximum efficient rate for a period of 90 days commencing on the first day oil is produced through well-head equipment into tanks from the ultimate producing interval after casing has been run; after that, such wells shall be allowed to continue to produce at a maximum efficient rate if the well or operator meets or exceeds the Commission approved gas capture goals.  The gas capture percentage shall be calculated by summing monthly gas sold plus monthly gas used on lease plus monthly gas processed in a Commission approved beneficial manner, divided by the total monthly volume of associated gas produced by the operator.  The operator is allowed to remove the initial 14 days of flowback gas in the total monthly volume calculation.  The Commission will accept compliance with the gas capture goals by well, field, county, or statewide by operator.   If such gas capture percentage is not attained at maximum efficient rate, the well(s) shall be restricted to 200 barrels of oil per day if at least 60% of the monthly volume of associated gas produced from the well is captured, otherwise oil production from such wells shall not exceed 100 barrels of oil per day.

The Commission will recognize the following as surplus gas being utilized in a beneficial manner:

       a.    Equipped with an electrical generator that consumes surplus gas from the well;
       b.    Equipped with a system that intakes the surplus gas and natural gas liquids volume from the well for beneficial consumption by means of compression to liquid for use as fuel, transport to a processing facility, production of petrochemicals or fertilizer, conversion to liquid fuels, separating and collecting the propane and heavier hydrocarbons; and
       c.    Equipped with other value-added processes as approved by the Director which reduce the volume or intensity of the flare by more than 60%.

(5)    If the flaring of gas produced with crude oil from a Bakken, Bakken/Three Forks, and/or Three Forks Pool is determined by the North Dakota Department of Health as causing a

(5)

violation of the North Dakota Air Pollution Control Rules (North Dakota Administrative Code Article 33-15), production from the respective pool may be further restricted.

(6)    This order shall remain in full force and effect until further order of the Commission.


Dated this 1st day of July, 2014.


INDUSTRIAL COMMISSION
STATE OF NORTH DAKOTA

/s/  Jack Dalrymple, Governor

/s/  Wayne Stenehjem, Attorney General

/s/  Doug Goehring, Agriculture Commissioner


(6)

# North Dakota Industrial Commission Order 24665 Policy/Guidance Version 102215

## Policy Goals:
1) reduce the flared volume of gas
2) reduce the number of wells flaring
3) reduce the duration of flaring from wells

## Action items:
1) require Gas Capture Plans for increased density, temporary spacing, and proper spacing cases
2) require Gas Capture Plans for all applications for a permit to drill
3) semi-annual meetings with midstream gas gathering companies
4) annual review of gas capture goals, gas capture progress, and extenuating circumstances to be presented by Department of Mineral Resources each December
5) develop a web-based pipeline incident report form to better assess right-of-way issues
6) direct the Pipeline Authority to track flaring on/off the Fort Berthold Indian Reservation
7) report capture status versus goals
8) conduct a hearing to review and revise Bakken, Bakken/Three Forks, and/or Three Forks Pool rules governing production curtailment

The initial horizontal well drilled in each spacing unit should be allowed to produce at its maximum efficient rate, regardless if the well is connected to a gas gathering system. Allowing such wells to produce at a maximum efficient rate will allow valuable information to be obtained in order to make decisions regarding future well and infrastructure requirements in the spacing unit.

Commission production records indicate the majority of gas flared in North Dakota is from wells already connected to a gas gathering system. Such wells should not be excluded from gas capture goals adopted by the Commission.

Well payout and economics should not be used to determine production restrictions.

Some spacing units are being developed where the operator is aware that the existing gas gathering infrastructure is insufficient to allow surplus gas to be processed through the gas gathering system. In instances where significant amounts of surplus gas are flared due to the insufficient collection system, production should be restricted unless significant amounts of surplus gas are captured for beneficial consumption, or utilized in a value-added process.

Some flared gas contains components that if improperly combusted could cause air quality degradation and health issues.

On the Fort Berthold Indian Reservation, many Bakken Pools are also within the jurisdiction of the Mandan Hidatsa and Arikara (MHA) Nation and Bureau of Land Management (BLM). In some cases, companies must comply with MHA Nation, BLM, and Commission rules. The Commission should work with federal and tribal authorities to ensure that restrictions imposed herein provide clarity and protection of correlative rights for the oil and gas companies operating in the respective jurisdictions.

The Commission establishes the following gas capture goals:
> 74% October 1, 2014 through December 31, 2014
> 77% January 1, 2015 through March 31, 2016
> 80% April 1, 2016 through October 31, 2016
> 85% November 1, 2016 through October 31, 2018
> 88% November 1, 2018 through October 31, 2020
> 91% beginning November 1, 2020

The gas capture percentage is calculated by summing monthly gas sold plus monthly gas used on lease plus monthly gas processed in a Commission approved beneficial manner, divided by the total monthly volume of associated gas produced.

In order to allow operators the maximum flexibility to manage their drilling, operation, and gas capture plans within the gas capture goals established by the Commission, the Commission will evaluate compliance with the gas capture goals statewide, by county, by field, then by well for each operator.

1) All infill horizontal wells, including overlapping spacing units, completed in a Bakken, Bakken/Three Forks, and/or Three Forks Pool are allowed to produce at a maximum efficient rate for 90 days.

2) The operator is allowed to remove the initial 14 days of flowback gas from the total monthly volume calculation.

3) The operator is allowed to remove from the total monthly volume calculation gas volumes flared from wells already drilled and completed on the date a force majeure event occurs if the event is properly documented in writing by the gas gathering company.

4) An operator is allowed to accumulate credits for volumes of gas captured during the most recent three months in excess of the current gas capture goal.
   a. The commission may apply all or a portion of the credit to a month in which the operator cannot meet the current gas capture goal upon application by the operator.
   b. Credits cannot be transferred to another operator.
   c. Unused credits expire after three months.
   d. Credits may be applied only if one or more of the extenuating circumstances exist.

5) The Commission recognizes the following as surplus gas being utilized in a beneficial manner that may be considered as captured gas:
   a. Equipping the well(s) with an electrical generator that consumes surplus gas from the well
   b. Equipping the well(s) with a system that intakes the surplus gas and natural gas liquids volume from the well for beneficial consumption by means of compression to liquid for use as fuel, transport to a processing facility, production of petrochemicals or fertilizer, conversion to liquid fuels, separating and collecting the propane and heavier hydrocarbons
   c. Equipping the well(s) with other value-added processes as approved by the Director which reduce the volume or intensity of the flare by more than 60%.

If an operator is unable to attain the Commission's gas capture goals at maximum efficient rate, well(s) will be restricted to 200 barrels of oil per day if at least 60% of the monthly volume of associated gas produced from the well is captured, otherwise oil production from such wells shall not exceed 100 barrels of oil per day.

Flexibility will be provided in the form of temporary exemptions from production restrictions after notice and hearing if the following extenuating circumstances are validated:

1) surface landowner, tribal, or federal government right-of-way delays
2) temporary midstream down-time for system upgrades and/or maintenance
3) federal regulatory restrictions or delays
4) safety issues
5) delayed access to electrical power
6) possible reservoir damage

Flexibility in the form of temporary exemptions from production restrictions may be considered for other types of extenuating circumstances after notice and hearing if the effect of such flexibility is a significant net increase in gas capture within one year of the date such relief is granted.

## **Penalty provisions:**

Production and flaring data is two months old when filed (Jan 2014 data filed Mar 2014) and data is frequently amended.

Timely communication between operators and midstream companies as well as with the Commission is of the essence.  Lack of compliance with the following requirements will be considered violations:

1) Failure to file an application for hearing with the Commission within the month following the month in which the operator was unable to attain the Commission's gas capture goals and oil production exceeded production restrictions may result in a civil penalty of $1,000 per month up to a maximum of $12,500 per month beginning at $1,000 the first month and doubling each additional month that the operator is in violation.

2) Failure to implement production restrictions within the month following the month in which the operator was notified by Commission staff that gas capture goals were not attained and oil production from listed well(s) is to be restricted will result in a verbal notice of violation.  The Commission will issue a written notice of violation with a compliance deadline if an operator fails to implement production restrictions for a second month.  A third month in violation of production restrictions may result in a civil penalty of up to $12,500 per well for each day the well has been in violation.

**Exhibit 3**

**Brief of Appellant,** *Beeter v. Sawyer Disposal LLC*, **No. 20080346,**
**2009 WL 1023586 (N.D. Feb. 2009) (Appellate Brief)**

Case 16-50998-KG   Doc 43-1   Filed 09/21/16   Page 19 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

2009 WL 1023586 (N.D.) (Appellate Brief)
Supreme Court of North Dakota.

Brian BEETER, Dennis Beeter, and Larry Beeter, Plaintiffs/Appellees,

v.

SAWYER DISPOSAL LLC, Defendant/Appellant.

No. 20080346.
February, 2009.

(Ward County Case No. 51-03-C-1566)
Appeal from the October 23, 2008 Judgment & July 26, 2006, Interlocutory Judgment,
District Court, Ward County, North Dakota, The Honorable William W. McLees, Presiding

**Brief of Appellant**

Attorneys for Appellant: Thomas D. Kelsch, State Bar ID No. 03918, Kelsch, Kelsch, Ruff & Kranda, 103 Collins Ave, P.O. Box 1266, Mandan ND 58554-7266, (701) 663-9818; Whitton E. Norris III, Davis, Malm & D'Agostine, P.C., One Boston Place, Suite 3700, Boston MA 02108, (617) 367-2500.

**\*2** *TABLE OF CONTENTS*

| | |
|---|---|
| Table of Authorities | 3 |
| Issue Presented for Review | 6 |
| Statement of Case | 7 |
| Statement of Facts | 9 |
| Law and Argument | 17 |
| 1. | 17 |
| a. | 17 |
| b. | 22 |
| 2. | 25 |
| a. | 25 |
| b. | 30 |
| Conclusion | 33 |

**\*3** *TABLE OF AUTHORITIES*

*Cases*

| | |
|---|---|
| Burlington Northern Railroad Company v. Fail, 2008 N.D. 114, ¶ 5, 751 N.W. 2d 188 (N.D. 2008) | 18 |
| Marra v. Aetna Const. Co., 101 P.2d 490, 492 (Cal. 1949) | 19 |
| Allen v. Minot Amusement Copr., 2006 ND 243, ¶ 701, 312 N.W.3d 698 | 19 |
| AG Services of America, Inc. vs. Midwest Investment Ltd. Partnership, 1998 ND 189, ¶ 11 n. 1. 585 N.W.2d 571 | 19 |
| Pedro v. Humboldt County, 19 P/2d 776, 777 (cal. 1933) | 19 |
| Anderson v. Marshall-Malaise Lumber Co., 66 N.D. 216, 263 N.W. 721, 723 (1935) | 20, 25 |
| Flying Diamond Oil Corp. v. Newton Sheep Co., 776 P.2d 618, 622-23 (Utah 1989) | 20, 21, 22, 23 |
| Northern Pac. Ry. Co. v. McClure, 9 N.D. 73, 81 N.W. 52, 54-55 (1899) | 20 |
| Sacramento Suburban Fruit Lands Co. v. Whaley, 194 P. 1054, 1056 (Cal. App. 3 Dist. 1920) | 21 |
| Richardson v. Callahan, 3 P.2d 927, 930 (Cal. 1931) | 21 |

Case 16-50998-KG   Doc 43-1   Filed 09/21/16   Page 20 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

*4 Shaber, Adm'x v. St. Paul Water Co., 14 N.W. 874, 874 (Minn. Supreme Ct. 1883) ....................................... 21

California Packing Corp. v. Grove, 196 P. 891 (Cal. App. 3 Dist. 1921) ....................................... 21

Gibson v. Holden, 3 N.E. 282, 285 (Ill. 1885) ........................... 21, 22

Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership, 862 P.2d 1048, 1057 (Haw. 1993) ........................... 21

Kettle River R.Co. v. Eastern Ry. Co., 43 N.W. 469, 473 (Minn. 1889) ....................................... 21

Barton v. Fred Netterville Lumber Co., 317 F.Supp.2d 700, 701 (So.D.Miss.2004) ........................... 22

Mullendore Theatres, Inc. v. Growth Realty Investors Co., 691 P.2d 970, 971-72 (Wash.App.Ct. 1984) ........................... 22

Epting v. Lexington Water Power Co., 181 S.E. 66, 102 ALR 773 (S.C. 1935) ....................................... 23

Wayne Harwell Properties v. Pan American Logistics Center, Inc., 945 S.W.2d 216 (Tex.Ct.App.1997) ........................... 23

Montgomery v. Creager, 22 S.W.2d 463 (Ct.App.Tex.1929) ........ 23

Trengen v. Mongeon, 206 N.W.2d 284 (N.D. 1973) .................... 24

Gajewski v. Bratcher, 221 N.W. 614 (N.D. 1974) ........................ 24

Sorenson v. Olson, 235 N.W. 2d 892 (N.D. 1975) ....................... 24

Slawson v. North Dakota Industrial Commission, 339 N.W.2d 772, 776 (1983) ....................................... 25

Texaro Oil Company v. Mosser, 299 N.W.2d 191, 194 (N.D. 1980) ....................................... 26, 27, 29

Stratman v. Stratman, 204 Kan. 658, 465 P.2d 938 (1970) ........... 26

Acoma Oil Corporation v. Wilson, 471 N.W.2d 476, 481 (N.D. 1983) ....................................... 26

Selman v. Bristow, 402 S.W.2d 520 (TexCiv.App.1966) .............. 27

*5 Finstrom v. First State Bank of Buxton, 525 N.W.2d 675 (N.D. 1994) ....................................... 27

GeoStar Corp. v. Parkway Petroleum, Inc., 495 N.W.2d 61, 67 (N.D. 1993) ....................................... 26, 27

Corbett v. La Bere, 68 N.W.2d 211, 214 (N.D. 1955) ................... 27

Van Sickle v. Hallmark & Associates, Inc., 2008 N.D. 12, 744 N.W.2d 532................................................................... 28

The Bell Drilling Company & Producing Co. v. Kilbarger Construction, Inc., 1997 WL 361025 (Ohio App. 4 Dist 1997) ...... 30

White v. Republic Services, Inc., 2004 WL 2754687 (Mich. App. 2004) ....................................... 30

Mueller v. Stangeland, 340 N.W. 450, 453, n.1 (N.D. 1983) ......... 30, 31, 32

*North Dakota Century Code*

Section 09-07-03 ....................................... 15

Section 09-07-07 ....................................... 15, 24

Section 47-04-01 ....................................... 18

Section 47-04-24 ....................................... 18

Section 47-04-25 ....................................... 18

Section 47-04-26 ....................................... 18, 19, 20

Section 47-16-39 ....................................... 29

Section 47-10-25 ....................................... 29, 31

Section 47-10-24 ....................................... 30, 31

*6 *ISSUES PRESENTED FOR REVIEW*

1. Notwithstanding the trial judge's correct holding that a deed covenant did not qualify as a covenant running with the land, did the trial judge commit reversible error when he concluded that the subjective intent of the parties to the deed was conclusive of whether such deed covenant would be binding on successors in title to the conveyed land?

Case 16-50998-KG   Doc 43-1   Filed 09/21/16   Page 21 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

2. Did the trial judge commit reversible error by concluding that a deed provision entitling the Seller of real property to 6% of the gross revenue from waste disposal operations of the Buyer on the deeded property, or within a five mile radius thereof, was an interest in real property "retained" by the Seller?

**\*7**  *STATEMENT OF THE CASE*

In September 2002, appellant, Sawyer Disposal, LLC (hereinafter, "Sawyer"), acquired title to certain real property in Sawyer, North Dakota known as the Echo Mountain Landfill ("Echo Mountain") that Sawyer's grantor had previously acquired from the appellees (hereinafter, the "Beeters"). In October, 2003, the Beeters commenced an action against Sawyer seeking (1) an accounting of the waste disposal activities of Sawyer at Echo Mountain since May 5, 2003, (2) a money judgment against Sawyer in the amount established by such accounting, and (3) a declaratory judgment affirming the existence of a perpetual covenant in favor of the Beeters and running with land known as Echo Mountain. Appendix, at p. 5 (hereinafter, references to the Appendix shall be to A- ___, with the numeric page of the Appendix inserted in the blank). The Beeters alleged that in conveying Echo Mountain to Municipal Services Corporation ("MSC") they retained for themselves "a real property interest in Echo Mountain, in the form of a perpetual covenant running with the land, which required the owner of the remaining interest in Echo Mountain [now, Sawyer] to pay to the Beeters a royalty payment 'from all waste disposal activity including tipping fees, solidification, and or treatment fees.' " Complaint, ¶ 4, A-5. The parties filed a joint motion for summary judgment (A-17) and entered into, and filed, a Stipulation of Undisputed Material Facts (the "Stipulation"), A-19, and agreed that such facts as were contained in the Stipulation were all of the relevant and material facts needed to resolve their dispute. Stipulation Preamble, A-19. All of the relevant documentary evidence was annexed to the Stipulation as Exhibits A through F. See A-26 through A-167.Following oral argument, the trial judge ruled that the deed covenant was not a covenant that runs with the land, A-182, nor did it qualify as a *profit aprendre* (A-182) or a ground lease. A-183. Nevertheless, the trial judge ruled, "by the greater weight of the evidence, that ——— whatever term one wants to use to describe the 'six percent (6%) provision' —— the Beeters and MSC intended that the Beeters were to receive six percent (6%) of the gross revenues from waste disposal activities conducted at Echo Mountain (or within a five-mile radius of that facility) *for as long as such activities were* conducted *there*, no matter who, or what entity, was actually conducting those activities." A-186. Following the submission of an updated accounting by Sawyer to the trial judge, A-232, on October 23, 2008, the trial judge entered judgment in favor of the Beeters and against Sawyer in the amount of $618,998.62, with interest at the rate of 10.5% per annum until January 1, 2009, whereupon the interest rate shall be re-determined pursuant to the procedure specified in NDCC 28-20-36. A-236. On December 23, 2008, Sawyer timely filed notice of its appeal of the Judgment. A-238. On January **\*8**  13, 2009, the trial court granted Sawyer's Motion for a Stay of the Judgment Pending Appeal. A-239.

*STATEMENT OF FACTS*[1]

*1. The Option.*

Beeter Farms is a partnership consisting of Larry Beeter and his two sons, Dennis Beeter and Brian Beeter. A-19. The Beeters, by a Contract for Deed with the Federal Land Bank in January 1988, acquired rights in Echo Mountain, which consists of approximately 940 acres of land, for a bid price of $135,000. A-19. On August 15, 1988, the Beeters obtained an initial 24-month permit (SU-096) for waste disposal. A-19.On January 24, 1990, the Beeters entered into a certain "Option to Purchase Real Estate" ("Option") with MSC. A-20. Under the Option, MSC acquired the exclusive right to purchase Echo Mountain and the SU-096 permit, the purchase price for which was stated to be "$300,000 plus 6% of the total gross revenue derived and collected from MSC's operating of the premises from all waste disposal activity including tipping fees, solidification, and/or treatment fees, provided that, however, in no event shall such payment be less than $1.20 per cubic yard of waste disposed of in the Facility by MSC." See Exhibit A, paragraph (1)(b), beginning at A-26. The Option also provided that, "reasonable revenues received by MSC from transportation or related sources shall be

Case 16-50998-KG   Doc 43-1   Filed 09/21/16   Page 22 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

excluded in computing said six percent (6%)." *Id.*, at A-27. Section 5(c) of the Option provided, "In the event the purchase of the PREMISES is consummated, MSC shall use good faith efforts to operate and maintain the facility existing on the PREMISES and the permits as currently required for use of PREMISES as an industrial disposal facility." A-32. Section 5(c) also provided that, "MSC will also endeavor to promote the sale and volumes of waste for disposal upon the PREMISES which are consistent with MSC's intended use of the PREMISES as represented to SELLERS and the North Dakota State Department of Health and Consolidated Laboratories. *Id.*, At A-32. Section 5(g) of the Option provided:

In the event this Option to Purchase Real Estate is exercised by MSC, in addition to the purchase price as set forth in Article (1) (b), MSC or assigns agrees to pay Seller six percent (6%) of the total gross revenue derived from any expansion or extension of MSC's operation of a waste disposal facility, whether by extension of existing permits or otherwise, within a five mile radius of PREMISES. The right to receive the six percent (6%) of the total gross revenue derived from the operation of a waste disposal facility is perpetual and a covenant running with the real estate.A-33.

*The Deed.*

The Beeters conveyed Echo Mountain to MSC by Warranty Deed (the "Deed"), on May 17, 1990, and MSC paid the Plaintiffs the unpaid balance of the $300,000 cash portion of the Purchase Price. Stipulation ¶ 12, A-36. The Deed provides that the consideration for the sale is "$1.00 and other good and valuable consideration," in return for which the Beeters granted, bargained, sold and conveyed to MSC and their assigns "FOREVER" all of Echo Mountain. Exhibit B, at A-36.The Deed provided further:In addition to the **\*9**  purchase price first party [Beeters] shall receive 6% of the total gross revenue derived and collected from the second parties [MSC] operating of the premises from all waste disposal activity, including tipping fees, solidification, and/or treatment fees, provided that, however, in no event shall such payment be less than $1.20 per cubic yard of waste disposed of in the facility by second party. Reasonable revenues received by second party [MSC] from transportation or related sources shall be excluded in computing said 6%.In addition second party [MSC] or assigns shall pay to first party [Beeters] 6% of the total gross revenue derived from any expansion or exten*t*ion of second parties' operation of a waste disposal facility, whether by exten*t*ion of existing permits or otherwise, within a five mile radius of the premises. The right to receive the 6% of the total gross revenue derived from the operation of a waste disposal facility is perpetual and a covenant running with the real estate. A-36.The Deed does not contain any "good faith efforts" clause such as that which is found in the Option. Compare A-26 to A-35 and A-36 to A-37. In addition, the Beeters, on behalf of themselves, their heirs, executors and administrators, covenanted in the Deed that the Beeters are . . . well seized in fee of the land and premises aforesaid and have good right to sell and convey the same in manner and form aforesaid; that the same are free from all encumbrances, except installments of special assessments or assessments for special improvements which have not been certified to the County auditor for collection, and the above bargained and granted lands and premises in the quiet peaceable possession of [MSC], their assigns, against all persons lawfully claiming or to claim the whole or any part thereof, [Beeters] will warrant and defend. A-36.Beeter Farms, both at the time of the Deed and at all times since, did not own any land either abutting, or within a 5-mile radius of, Echo Mountain and such other land as Beeter Farms did own was not benefited in any way by the sale of Echo Mountain to MSC. Stipulation ¶ 13, A-21. [2]

*The 1992 Modification.*

Subsequent to the recording of the Deed, but before MSC had begun any meaningful waste disposal activity at Echo Mountain, the Beeters complained that MSC was not living up to its "best efforts" obligations [under section 10] of the Option. Stipulation ¶ 16, A-22. Those parties reached a settlement agreement on January 15, 1992 (the "1992 Modification") in which they resolved the Beeters' complaint arising from the "good faith efforts" clause of the Option. Stipulation ¶ 17, A-22, and Exhibit C, A-38 to A-41. In Section 2 of the 1992 Modification (Exhibit C to the Stipulation, at A-38 to A-41), the Beeters and MSC agreed to modify the 6% Deed covenant so as to provide the Beeters with a "Prepaid Premises Royalty" of One Hundred Thousand ($100,000.00) Dollars in consideration of waste to be disposed

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 23 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

on the premises." A-39 to A-40. The Deed covenant was further amended to provide that MSC would receive a "credit for such Prepaid Royalty against Premises Royalties hereafter due under the Deed at the rate of $50,000 for each of two periods, the first period ending on July 31, 1993 and the second on July 31, 1994, it being understood that if premises royalty due Beeters during either of these two periods should exceed the $50,000 credit, that additional royalty shall be timely paid to Beeters, and should it be less than the $50,000 during either of the periods, the difference may be retained by Beeters with no further credit given therefore against royalties earned thereafter." A-40. The Beeters and MSC did not record the 1992 **\*10** Settlement Agreement, Stipulation ¶ 18, A-22, and, in fact, agreed to keep its terms secret. Exhibit C, Section 5, A-40.

*The 1996 Modification.*

Again in 1994, the Beeters and MSC disagreed about the Beeters' rights under the Option and Deed, and the Beeters sued MSC and its corporate parent in Ward County District Court (Civil Action No. 94-CV-85). Stipulation ¶ 19, A-22. On May 15, 1996, the Beeters and MSC reached an agreement settling their continuing disputes (the "1996 Modification"). Stipulation ¶ 20, A-22, and Exhibit D, A-42. In the 1996 Modification, MSC and the Beeters abandoned the six percent (6%) Deed covenant entirely in favor of a per-ton rate made effective back to the date of the Deed conveyance. A-44. Indeed, Section 9 of the 1996 Modification expressly provides:9. *Agreement Effect*. This Agreement amends both the nature and method for calculating royalty due from MSC to BEETER under the Option to Purchase and Warranty Deed from one based on a percent of revenues to one based on a per ton/rate for tons permanently disposed of, and in consideration therefore, BEETER waives all royalty claims other than provided for herein, and MSC and USPCI withdraw, settle, compromise, and trade off all of their defenses to the validity and enforceability of those agreements, whether pled or not, and in particular, the claims that the agreements are void or voidable as being contrary to public policy or barred by statute or case law. Further, the parties agree that: * * * D. Whether MSC, USPCI, LES, or any of their affiliates, has any future duties to be performed by it under Paragraph 5 (C) of the Option to Purchase is uncertain, and because its meaning and future application presents an undesirable potential for litigation, this subparagraph will cease to have further force and effect; and E. This Agreement does not supercede the Option to Purchase and Warranty Deed, and the parts thereof not inconsistent with the terms of this Agreement remain in force and effect. This Agreement may be amended only by written agreement signed by the parties and shall be binding upon the successors and assigns of the parties and is executed on the dates indicated below.Once again, the Beeters and MSC did not record the 1996 Modification. Stipulation ¶ 21, A-22.

*Appellant's Acquisition of Echo Mountain.*

In June 2000, MSC's successor by merger, Safety-Kleen Services, Inc. ("Safety-Kleen"), filed for bankruptcy court reorganization relief under Chapter 11 of Title 11 of the U.S. Code. Stipulation ¶¶ 22-25, A-22 and A-23. On February 22, 2002, Clean Harbors, Inc. ('Clean Harbors") and Safety-Kleen entered into an Acquisition Agreement, Stipulation ¶ 26, A-23, and Exhibit E, A-49. On June 18, 2002, having received no higher or better offers for Safety Kleen's assets, the Bankruptcy Court entered an order authorizing and approving the consummation of the sale contemplated by the Acquisition Agreement (the "Sale Order"). Stipulation ¶ 27, A-23, and Exhibit F, A-133. On September 7, 2002 (the "Closing Date"), Clean Harbors and Safety-Kleen closed the transaction contemplated by the Acquisition Agreement, and title to Echo Mountain was transferred to the Appellant, Sawyer Disposal Services, LLC ("Sawyer"), an indirect subsidiary of Clean Harbors. [3]

**\*11** *The Trial Judge's Memorandum Decision*

The parties entered into a Stipulation of Undisputed Material Facts (A-19 to A-24), which was submitted with a Joint Motion for Summary Judgment (A-17). After oral argument, on February 16, 2006, the trial judge (McLees, D.J.) issued a 19-page Memorandum and Order (the "Memorandum Decision"), see, A-168 to A-186, granting partial summary

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 24 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

judgment to the Beeters and against Sawyer. In Sections 1 through 3 of the Memorandum Decision, covering the first 15 1/3 pages of the Memorandum Decision, the trial judge discussed the various positions taken by the litigants and explained why he (the trial judge) agreed with Sawyer that the six percent (6%) Deed covenants were not "covenants that run with the land," A-182, and why he believed that the Deed covenants did not qualify as a *profit aprendre*, A-182, or as a ground lease, A-183. In Section 4 of the Memorandum Decision, captioned "royalty interest," beginning on page 16 of the Memorandum Decision, the trial judge set out his reasoning as to why Sawyer nevertheless was liable to the Beeters under the Deed covenants. The trial judge did not define what he meant by the term "royalty interest," nor did he hold that the Beeters owned a "royalty interest" in Echo Mountain. Indeed, although expressing "intrigue" with the Beeters' "volume of space" analogy to a mineral royalty interest, and stating that "space is a resource with value —— in much the same way as a pool of oil in the ground is a resource with value," [4] and after expressing how common are reservations and exceptions in conveyances for mineral interests, the trial judge expressly did not use such analogies as a justification for granting summary judgment in favor of the Beeters. A-186.Instead, the trial judge relied on N.D.C.C. §9-07-03 [5] and N.D.C.C. § 9-07-07 [6] to review certain language in the Deed and in the Option to conclude that, "In the final analysis, the Court finds, by the greater weight of the evidence, that —— whatever term one wants to use to describe the 'six percent (6%) provision' —— the Beeters and MSC intended that the Beeters were to receive six percent (6%) of the gross revenues from waste disposal activities conducted at Echo Mountain (or within a five-mile radius of that facility) *for as long as such activities were* conducted *there*, no matter who, or what entity, was actually conducting those activities." A-186.

### ARGUMENT

**1. The trial judge erroneously concluded that the intent of the original parties to the deed alone controlled whether MSC's obligation would be binding on its successors in title.**

**a. The trial judge correctly held that the Deed covenant did not qualify as a covenant running with the land.**

Despite holding that the Deed covenants at issue could not run with the land, "[b]ecause there is no conceivable way the 'six percent (6%) provision' could directly benefit Echo Mountain," A-182, the trial judge then committed reversible error when he nevertheless ignored his own holding and "found" that the six percent (6%) Deed covenants were binding on Sawyer as successor in title to MSC because that was the intent of the parties to the original deed. The trial judge did not explain how, under North Dakota law, the undisputed intent of the Beeters and MSC was binding on Sawyer, an entity not a party to **\*12** their contract nor even in existence at the time of the contract. A-186. [7] Although the trial judge's conclusion was stated to be a finding, A-186, the parties agreed that there were no disputes as to the material facts, there was no trial and it was certainly apparent from the words of the Deed that the Beeters, as grantors, and MSC, as the accepting grantee, subjectively intended (at least initially) that the six percent (6%) Deed covenants would run with the land. [8] The error of law asserted is that their subjective intent, as expressed in the Deed, alone was sufficient to be binding on Sawyer as successor in title to MSC. Conclusions of law are fully reviewable by this Court under the *de novo* standard. *Burlington Northern Railroad Company v. Fail*, 2008 N.D. 114, ¶ 5, 751 N.W. 2d 188 (N.D. 2008). In order to better understand the trial judge's error, it is useful to review the applicable North Dakota law on deed covenants presented below. The law of North Dakota governs real property within the State. N.D.C.C. § 47-04-01. [9] Section 47-04-24 of N.D.C defines the effect of "covenants running with the land" as:covenants contained in grants of estates in real property [that] are appurtenant to such estates and pass with them so as to bind the assigns of the covenantor and to vest in the assigns of the covenantee in the same manner as if they personally had entered into them.

By statute, the only covenants that may run with land in North Dakota are those specified in N.D.C.C. Chapter 47-04 and those that are incidental thereto. N.D.C.C. § 47-04-25. [10] N.D.C.C. §47-04-26 then sets out the necessary characteristics of covenants that run with the land:All covenants contained in a grant of an estate in real property, *which are made for the direct benefit of the property or some part of it then in existence*, run with the land. Such covenants include covenants: (1)

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 25 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

Of Warranty; (2) For Quiet Enjoyment; (3) For further assurance on the part of a grantor; or (4) For the payment of rent, taxes, or assessments upon the land on the part of a grantee. (emphasis added).N.D.C.C. § 47-04-26 prohibits the running of covenants when no land is directly benefited. See, *Marra v. Aetna Const. Co.*, 101 P.2d 490, 492 (Cal. 1949) (under Cal. Civ. Code § 1462, burdensome deed covenant not benefiting property conveyed is not binding at law on grantee's transferees). [11] Section 47-04-26 therefore modifies the common law by allowing only covenants that benefit land (and not those burdening land) to legally qualify as covenants running with the land. [12] A covenant in a deed that does not benefit the land conveyed, and thus does not run with the land, is a personal covenant of the grantee/covenantor, given as part of the consideration for the deed. *See Pedro v. Humboldt County*, 19 P.2d 776, 777 (Cal.1933). This Honorable Court has held that whether the covenant was made for the direct benefit of the property is a question of intent. *Anderson v. Marshall-Malaise Lumber Co.*, 66 N.D. 216, 263 N.W. 721, 723 (1935). It is imperative to point out that in *Anderson*, this Court held that it is the *objective* intent of the parties, discernable from the nature of the covenant and the circumstances attendant at the time of the grant, that are relevant to this Court's determination whether the parties intended to create a perpetual covenant running with the land. *Id.* For this reason alone, the trial court's reliance on the *subjective* intent of MSC and the Beeters clearly constitutes reversible error.North Dakota law conflates what have often been described as two separate, but interrelated, elements of common law governing covenants that run with land: (i) that the covenanting parties intend that the covenant run with the land; and (ii) that the covenant "touch and concern" the land. *See e.g.*, *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 622-23 (Utah 1989) **\*13** ("Although the touch and concern and intent requirements are somewhat interrelated, the absence of any one of the requirements prevents a covenant from running with the land."). The exact nature of the covenant is not critical, [13] provided that it was "made for the direct benefit of the property or some part of it then in existence." N.D.C.C. §47-04-26. In determining whether the statutory test has been satisfied, each case must be determined on its own facts. *Northern Pac. Ry. Co. v. McClure*, 9 N.D. 73, 81 N.W. 52, 55 (1899). Although this Court has not interpreted the words "direct benefit of the property," the same provision in a similar California statute, Cal. Civil Code § 1462, [14] has been interpreted to mean physically benefit the property or for the direct benefit of the estate or interest of the covenantee in the property. *Sacramento Suburban Fruit Lands Co. v. Whaley*, 194 P. 1054, 1056 (Cal. App.3 Dist.1920) (mortgage provision requiring mortgagee to provide partial releases upon payment of stated sum benefits mortgagor's title and thus runs with land); quoted with approval by California Supreme Court in *Richardson v. Callahan*, 3 P.2d 927, 930 (Cal. 1931). A covenant benefits an estate or interest in land where it is something to be done, or refrained from, about, touching, concerning, or affecting the covenantee's land and increases its value. *Shaber, Adm'x. v. St. Paul Water Co.*, 14 N.W. 874, 875 (Minn. Supreme Ct. 1883). [15] The trial judge also correctly held that, where a covenant is not of a nature that the law permits it to run with the land, it cannot be made so by agreement of the parties. A-182, relying on *California Packing Corp. v. Grove*, 196 P. 891 (Cal. App. 3 Dist. 1921) for the proposition that, "just because the contracting parties *agree* that a covenant will run with the land, the covenant will nevertheless *not* be construed as such if it does not directly benefit the property." A-182 (italics are those of the trial judge); *also*, *Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 623 (Utah 1989); *Gibson v. Holden*, 3 N.E. 282, 285 (Ill. 1885); *Kettle River R.Co. v. Eastern Ry. Co.*, 43 N.W. 469, 473 (Minn.1889) (no mere form of words is sufficient; the nature of the covenant and its relation to the estate must permit the stated intention to be effectual). Covenants that secure personal privileges or impose a burden on real estate for the benefit of the grantor personally are customarily regarded as personal covenants. *Covenants*, 20 Am Jur 2d § 21; *Barton v. Fred Netterville Lumber Co.*, 317 F.Supp.2d 700, 701 (So.D.Miss.2004)("In summary, if a covenant or deed restriction benefits the grantor personally, and serves no real benefit to the land, then the covenant is personal in nature and does not 'run with the land' upon a subsequent sale of the property."). Because MSC's payments to the Beeters are not dedicated to the benefit of the Echo Mountain land, but are dedicated to be used by the Beeters personally and without restriction, the trial judge correctly held that MSC's agreement to make those payments was not a covenant that could run with the land. A-182; *see also, Mullendore Theatres, Inc. v. Growth Realty Investors Co.*, 691 P.2d 970, 971-72 (Wash.App.Ct. 1984) ("In order to be a running covenant, a promise to pay money must restrict the use of the funds to the benefit of the property. [citations omitted]"); *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d at 625 (whether promise to pay money runs with land depends on whether purpose of payment was intended to benefit land).

Case 16-50998-KG  Doc 43-1  Filed 09/21/16  Page 26 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

b. The trial judge's conclusion that the six percent (6%) deed covenants were binding on Sawyer because MSC and the Beeters intended them to be is erroneous as a matter of law.

**\*14** Because the trial judge held that "the Beeters cannot satisfy the 'touch and concern' test ———— and that MSC's promise to pay the Beeters six percent (6%) of the gross revenues generated from waste disposal activities conducted at Echo Mountain does not *directly benefit the property*," A-186, the trial judge should have held that MSC's promise to pay the Beeters 6% of their revenue from waste-disposal operations on and within 5 miles of Echo Mountain was a personal covenant of MSC, and not binding on Sawyer as its successor-in-title. *See Gibson v. Holden*, 3 N.E. 282, 286-87 (Ill. 1885)(to benefit the covenantee as landowner, the covenant must be of a character to in some way affect the value or quality or the use and enjoyment of the land; it is not enough that it simply enriches the covenantee). *See also, Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d at 624 ("If the performance of a covenant can be enforced regardless of one's status as an owner of an interest in the land, the covenant is personal."). Indeed, it has been held that a grantee's covenant to assume and pay an existing mortgage is viewed as personal in nature. *Covenants*, 20 Am Jur 2d § 21 at n. 33. Likewise, a covenant to pay for land in a particular way is a personal covenant that does not run with the land. *Id.* at n. 34, citing *Epting v. Lexington Water Power Co.*, 181 S.E. 66, 102 ALR 773(S.C. 1935)(covenant must satisfy "touch and concern" requirement and is not converted into a real covenant because it forms part of the consideration). MSC's covenant, relating to payment of the consideration due the Beeters for Echo Mountain, is just such a personal covenant.There was no "good faith efforts" clause in the Deed that was binding on Sawyer. As such, the promise to make the payments was not binding on Sawyer as successor in title. *See Wayne Harwell Properties v. Pan American Logistics Center, Inc.*, 945 S.W.2d 216 (Tex.Ct.App.1997)(20-year assignment of 15% of "net cash flow interest" from the land is only a personal covenant and cannot run with or burden that land). The Deed covenant related to an assignment of income from landfill operations; the location of the landfill merely identified the operations subject to the agreement. *See Montgomery v. Creager*, 22 S.W.2d 463 (Ct.App.Tex.1929) (agreement for exclusive purchase of gasoline for filling station did not run with land; filling station only important as identifying the subject-matter of the contract: the gasoline sold at the station). Having correctly concluded that the Beeters were not the holders of a covenant that runs with the land, nor of a profit or leasehold estate, the trial judge's inquiry should have ended, and judgment should have been entered in favor of Sawyer. As the trial judge noted, the Beeters' virtually abandoned their 'covenant running with the land' allegation (See A-171), and because the Beeters could not convince the trial judge that the 6% deed covenant fell within any other form of real property recognized in North Dakota, Sawyer should have prevailed on that basis alone. That the Beeters and MSC intended the covenants to run with the land and to be binding on successors in title was never at issue, but nowhere has it been shown why such a fact is dispositive of Sawyer's liability under such a covenant. Decisions such as *Trengen v. Mongeon*, 206 N.W. 2d 284 (N.D. 1973) and *Gajewski v. Bratcher*, 221 N.W. 614 (N.D. 1974) supporting the use of N.D.C.C Section 09-07-07 in construction of deeds are inapt because those cases involved a determination only of the rights of the parties to the original deed, and not a successor. Neither are the facts in this case like those in *Sorenson v. Olson*, 235 N.W. 2d 892 (N.D. 1975) where the defendant challenged a deed to the plaintiff as being in actuality a mortgage, and the Court relied on Section 09-07-07 to read the mortgages and deeds together to find an ambiguity justifying the trial judge to look to parol evidence for the **\*15** intent of the parties. Here, fee simple absolute title was unquestionably conveyed to Sawyer, even though the Beeters would like this Court to create for them an entirely new form of real property interest so as to undermine Sawyer's absolute fee simple title. Neither the trial judge, nor the Beeters, offered any explanation why the subjective intent of MSC and the Beeters should be dispositive as to Sawyer's liability, and Sawyer has cited specific North Dakota precedent (*Anderson*, *supra*) to contradict such a theory. Therefore, the trial judge should have found for Sawyer based on the clear, unequivocal language of the Deed, and North Dakota law, and this Court must reverse the trial judge's judgment and order the entry of judgment in favor of Sawyer.

**2. The trial judge's reference to a "royalty interest" under North Dakota law was misplaced.**

While the "royalty interest" discussion of the trial judge was apparently only *dictum*, out of an abundance of caution, Sawyer will show that the trial judge's "intrigue" was misplaced and inapt. a. The term "royalty" has been defined under North Dakota law to be the opposite of what was reserved to the Beeters under the Deed.

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 27 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

In a case determining the royalty interest for owners of an unleased mineral interest, this Court provided us with the following definitions: "*Royalty interest*": "The property interest created in oil and gas after a severance by royalty deed. Its duration is like that of common law estates, namely, in fee simple, in fee simple determinable, for life or for a fixed term of years. It is distinguished from a mineral interest by the absence of operating rights. The owner of a royalty interest is entitled to a share of production, if, as and when there is production, free of the costs of production." *Slawson v. North Dakota Industrial Commission*, 339 N.W.2d 772, 776 (1983); *quoting* 8 H. Williams and C. Meyers, Oil and Gas Law, Manual of Terms, (1982 Ed.). "*Landowner royalty*": "A share of the gross production of minerals free of the costs of production. Occasionally the term is used to describe an interest in production created by a landowner independently of a lease as distinguished from a lessor's royalty, which arises under a lease. In this sense, the landowner royalty may have a perpetual or any other *specified* duration. In most instances the two terms, landowner royalty and lessor's royalty, are used synonymously." *Id.* (emphasis added) "*Royalty*": "(1) The landowner's share of production, free of expenses of production. (2) A share of production, free of expenses of production, e.g., an overriding royalty of 1/8 of the 7/8 working interest. The landowner's royalty is frequently 1/8 th production, but it may be any other fractional share of production...." *Id.* In *Texaro Oil Company v. Mosser*, 299 N.W.2d 191, 194 (N.D. 1980), this Court held as follows: The terms "mineral" and "royalty" are totally separable terms with distinct characteristics. This distinction is dealt with at length in I Williams and Meyers, Oil and Gas Law, § 302-307.4. The term "royalty interest" generally refers to the landowner's share in the production of oil and gas at severance. Stratman v. Stratman, 204 Kan. 658, 465 P.2d 938 (1970). A royalty interest is personal property and refers to the owner's right to receive a certain part of the proceeds from oil and gas, leases if and when there is production. Stratman v. Stratman, supra. A "mineral interest" is a real property interest created in oil and gas in place. Stratman v. Stratman, supra. The prime characteristic of a mineral interest is the right to enter the land to explore, drill, produce and otherwise carry on **\*16** mining activities. Stratman, supra. It is the attribute of operating rights that distinguishes a mineral interest from a royalty interest. *Id.* [16] In *Acoma Oil Corporation v. Wilson*, 471 N.W.2d 476, 481 (N.D. 1983), this Court stated as follows:A mineral interest is a property interest created after an oil and gas severance from the surface and generally includes the right to sell all or part of the estate, the right to explore and develop the estate, the right to execute oil and gas leases, and the right to create fractional shares of the mineral estate. 1 Williams & Meyers, *supra*, at § 301; 8 Williams & Meyers, *supra*, p. 562. Mineral rights generally include those same basic interests. 8 Williams & Meyers, *supra*, p. 563. A royalty interest is a smaller interest in a mineral estate which is a share of the product or proceeds reserved to the owner for permitting another to develop or use the property. 1 Williams & Meyers, *supra*, at § 301; 8 Williams & Meyers, *supra*, p. 564. Mineral and royalty interests are separate property interests with different characteristics. *Texaro Oil Company v. Mosser*, 299 N.W.2d 191 (N.D. 1980). Although royalty interests are part of the full spectrum of a mineral estate, the interest in minerals in place and the interest in royalty based on the production of those minerals are separate and distinct estates. Selman v. Bristow, 402 S.W.2d 520 (TexCiv.App.1966).In *Finstrom v. First State Bank of Buxton*, 525 N.W.2d 675 (N.D. 1994), this Court further reviewed the nature of a "royalty interest" under North Dakota law. We have held "that an unaccrued oil and gas royalty is an interest in real property." *GeoStar Corp. v. Parkway Petroleum, Inc.*, 495 N.W.2d 61, 67 (N.D. 1993). The gravel royalties in the instant case are analogous to petroleum royalties. *Compare* NDCC § 38-11-01(2) (1987) *with* NDCC § 38-11.1-03(5) (1987) (recognizing both oil and gas as well as other "valuable inert lifeless substance[s] . . . found within the earth" as minerals yet promulgating different regulations for their extraction); *see also* NDCC § 47-10-24 (Supp. 1993) (recognizing what when specifically included, gravel is treated like all other minerals). [omitted]. Before severance of the gravel, the unaccrued royalty was an interest in real property. *GeoStar Corp.*, 495 N.W.2d at 67, *see also*, *Corbett v. La Bere*, 68 N.W.2d 211, 214 (N.D. 1955) (stating that royalties in oil and gas, until brought to the surface and reduced to possession are interests in real property). However, once Jeffers has extracted the gravel, Finstrom's royalty interest had accrued. *See Black's Law Dictionary*, 20-21 (6th ed. 1990) (defining "accrue" as meaning created, vested or matured). * * * Upon severance of the gravel, the royalty interest accrues and becomes a personal property interest. *Id.*, at 677.Here, the Deed provides only that the title of the grantors is "subject to mineral reservations or conveyances of record." A-36, at the end of the legal description of the land being conveyed. Neither the Beeters nor the trial judge have referenced any mineral interests or conveyances of record that impair the title of Sawyer. Neither the Beeters nor the trial judge have cited to any language in the Deed excepting from the grant, or reserving from the grant, any interest in Echo Mountain in favor of

Case 16-50998-KG Doc 43-1 Filed 09/21/16 Page 28 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

the Beeters. Therefore, the concept of "accrual" arguably has no application since even the Beeters do not contend that they retain any right to *take* anything *from* Echo Mountain. Neither do the Beeters argue that they have any operating right to put anything into the ground at Echo Mountain, or to explore or develop it. Both the trial judge and the Beeters seemingly concede that the Beeters' sole remedy is money damages, unlike the holder of a royalty interest, whose claim to money damages does not arise until the minerals are mined out of the ground. Most recently, this Court, in *dicta*, acknowledged that, after severance of minerals from the land, a "royalty interest" may be a contract obligation that is dischargeable in bankruptcy. *Van Sickle v. Hallmark &* **\*17** *Associates, Inc.*, 2008 N.D. 12, 744 N.W.2d 532. Neither the Beeters nor the trial judge have cited to any North Dakota statute or case for the proposition that a deed covenant reserving to the grantor a percentage of revenue from discretionary waste disposal operations at or within five miles of real property conveyed by the Beeters, even if called a "royalty interest" (which it was not) [17] gives rise to a recognized form of interest in real property that is binding on all successors in title, such as Sawyer. Indeed, neither the Beeters nor the trial judge have suggested that N.D.C.C. § 47-16-39.1 applies to the Beeters' alleged six percent (6%) "royalty interest." [18] The reason such an argument is not available is because the Beeters' six percent (6%) gross revenue right is so unlike a mineral interest or royalty interest as to make unavailing other statutory protections prescribed just for such holders. The so-called "royalty interest" analogy is utterly unfounded, at least insofar as North Dakota's real property law is concerned.The Beeters' "volume of space" theory of liability, and the trial judge's assertion that space is a valuable and depletable commodity, are wholly inapt to the recognized concept of a royalty interest under North Dakota law. Indeed, the "volume of space" theory proffered by the Beeters is the converse of a "royalty interest" under North Dakota law. A royalty interest contemplates an in place real property interest that is transformed into a personal property right upon severance from the estate conveyed. *Texaro, supra*. There is no "space" at Echo Mountain that was "severed" from the landed estate the Beeters conveyed, and the right of operations there were clearly contemplated by the Deed to be the right of the grantee, MSC. The operations contemplated in the Deed involved putting inert material *into* the ground, not its removal. In any event, as is discussed below, North Dakota law requires that, with the exception of gravel, clay and scoria, all minerals pass to the grantee of a conveyance except those minerals specifically excluded by name from such grant. *See*, N.D.C.C. § 47-10-25 and discussion *infra* in section 2.b. For these reasons, the Beeters' attempt to analogize their Deed reservation to a mineral interest, or royalty interest, and the trial judge's apparent "intrigue" over the same, must be rejected by this Court as wholly unsupported by North Dakota law.Additionally inapt was the trial judge's reference to *The Bell Drilling Company & Producing Co. v. Kilbarger Construction, Inc.*, 1997 WL 361025 (Ohio App. 4 Dist 1997); and *White v. Republic Services, Inc.*, 2004 WL 2754687 (Mich. App. 2004), since both of those cases, unlike this case, involved contracts that referred to the purchase price as a royalty, and neither case, unlike this one, involved a dispute other than between the two parties to the contracts, or their affiliates. Sawyer is not an affiliate of MSC.b. The Beeters' "royalty interest" analogy is fatally flawed because the language of the Deed failed expressly to reserve to the Beeters a "royalty interest."

Under North Dakota law, a mineral interest must be expressly reserved in the deed or other conveyance document. *Mueller v. Stangeland*, 340 N.W. 450, 453, n.1 (N.D. 1983). N.D.C.C. § 47-10-25, titled as, *Meaning of minerals in deed, grant, or conveyance of title in real property*, provides, in pertinent part, as follows:In all deeds, grants, or conveyances of the title to the surface real property executed on or after July 1, 1983, in which all or any portion of the minerals are reserved or excepted and thereby effectively precluded from being transferred with the surface, all minerals, of any nature whatsoever, shall be construed to be reserved or excepted except those minerals specifically excluded by name in the deed, grant, or conveyance and their compounds and byproducts. Gravel, **\*18** clay, and scoria shall be transferred with the surface estate unless specifically reserved by name in the deed, grant, or conveyance.Likewise, N.D.C.C. § 47-10-24, titled as *Description and definition of minerals in leases and conveyances*, in pertinent part, provides:All conveyances of mineral rights or royalties in real property in this state, excluding leases, shall be construed to grant or convey to the grantee thereof all minerals of any nature whatsoever except those minerals specifically excluded by name in the deed, grant, or conveyance, and their compounds and by products, but shall not be construed to grant or convey to the grantee any interest in gravel, clay, or scoria unless specifically included by name in the deed, grant, or conveyance.In *Mueller v. Stangeland*, 340 N.W. 450, this Court said the following about these statutes:Sometime subsequent to the date of the deed in the instant case and until amended in 1983, § 47-10-24, N.D.C.C., and § 47-10-25, N.D.C.C., required that

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 29 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

conveyances, reservations, and exceptions specifically name minerals to be conveyed separate from the surface or to be reserved or excepted from a grant of the surface. We note that the Forty-Eighth Session of the Legislative Assembly, however, amended those sections of the North Dakota Century Code to provide an opposite result, except for gravel, clay, and scoria. Now, other than gravel, clay and scoria, all minerals will pass to the grantee, or be retained by the grantor through reservation or exception, except those minerals specifically excluded by name. *Mueller v. Stangeland*, 340 N.W. 450, 453, n.1 (N.D. 1983).Thus, if the Beeters (or the trial judge) wish to equate their 6% gross revenue right in the Deed to a "royalty interest," they would need to show how the Deed description satisfies the above statutory requirements. It doesn't. The Deed doesn't name any "volume of space" being excepted or reserved by the Beeters, nor is the right of disposal operations reserved by the Beeters. The only reservation is one for money, and such a reservation has already been shown to be a personal contractual obligation of the specific grantee, and not of subsequent grantees. In order to create a mineral interest the deed must clearly contain either an "exception to the warranty" or a "reservation of minerals." *See Mueller* at 453. The terms "exception" and "reservation" are used to express the "intent to deduct something from the thing granted." *Mueller* at 452. There is absolutely no language in the Deed that states that any portion of Echo Mountain was being reserved or excepted from the Beeters' warranty, other than mineral rights or conveyances of record. Furthermore, nothing even arguably may be removed from the land by the Beeters. A mineral interest is unique as there is a reservation of something with value that will vest upon its removal from the ground. The right to use the "space" beneath the ground itself can also be of value, but if the "analogy" is to be applied, then the Beeters must be held to the same standard as all grantors. Here, the Deed specifically contemplates the right of the *grantee* to conduct operations beneath the ground. Thus, the "analogy," even if it were proper, must fail. Quite simply, the Beeters, when they conveyed all of their right, title and interest in and to Echo Mountain to MSC in fee simple absolute, reserved no recognized real property right to themselves, nor did they obtain from MSC an assignment of any interest in the land. The Beeters reserved only the personal right of the grantor to collect from his grantee a percentage of gross revenue from certain discretionary operations by the grantee on land fully conveyed to MSC by the Beeters as part of the sale price for the land conveyed. There is nothing in North Dakota real property law to support the Beeters' argument that such a limited "reservation" constitutes retained ownership of any of the sub-surface lands at Echo Mountain, or the "air" above the surface lands conveyed to the **\*19** successor by the Beeters. The Beeters retained absolutely no rights to use any of the Echo Mountain land, or to remove sub-surface elements, nor any right of reversion if MSC failed to pay the so-called "royalty." As matter of North Dakota law, the undisputed material facts do not support a finding of either an estate in land, a profit, a servitude or a covenant running with land, in favor of the Beeters. The trial judge's judgment to the contrary is erroneous as a matter of law, and must be reversed, with instructions to enter judgment in favor of Sawyer.*CONCLUSION*

The Beeters simply did not satisfy the statutory requirement in North Dakota that the Deed covenant in any way benefits the land they conveyed to MSC, and therefore the reference thereto in the Deed cannot be enforced as a covenant that runs with the land as against Sawyer. Further, there is no recognized concept of North Dakota law cited by either the Beeters or the trial judge that explains why Sawyer is liable to the Beeters under these undisputed facts. The trial judge's judgment should be vacated with instructions to award judgment in favor of Sawyer and against the Beeters.Dated this ___ day of February, 2009.

Footnotes

1    The undisputed material facts are set forth in the Stipulation found at A-19 through A-25. Additional facts, gleaned from the Exhibits to the Stipulation, will be identified by reference to the relevant Exhibit in the Appendix.

2    Prior to the Deed, Beeter Farms was involved in farming, cattle and the waste disposal business, and it had a 3-year contract with the U.S. Bureau of Reclamation to farm the Lonetree Reservoir owned by the U.S. Government, but the farming and cattle operations of Beeter Farms at Echo Mountain ceased upon the sale of Echo Mountain to MSC. Stipulation ¶ 14, A-21.

3    Sawyer conceded below that a bankruptcy court sale "free and clear of liens and other interests" pursuant to 11 U.S.C. §363(f) has no impact on restrictions of record that run with the land.

4    The trial judge went on to state, "Both of these resources are finite, and both are depletable." A-183.

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 30 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023586...

That statute provides: "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting so far as the same is ascertainable and lawful." *See*, A-185.

The trial judge cited to so much of that statute as follows: "several contracts relating to the same matters between the same parties and made as parts of substantially one transaction are to be taken together." *See, id.*

As set forth in the Order authorizing and approving the sale of Safety-Kleen, Inc.'s assets to Clean Harbors, Inc. or its nominee (in this case, the Appellant), which is set forth as Exhibit F to Stipulation of Undisputed Material Facts at A-133 through A-165 (the "Sale order"), except as provided in the Sale Order or the Sale Agreement (Exhibit E to the Stipulation of Undisputed Material Facts at A-49 through A-132), the asset sale to Sawyer was to be free and clear of all liens, claims and encumbrances of any kind or nature. Therefore, the Beeters only arguments proffered to the trial court were raised as title limitations that would pass through to successors in title such as Sawyer. Sawyer challenges the trial court's conclusion that such a title limitation exists here, under North Dakota law.

Their subsequent contractual modifications belie that expressed intent, but it has never been argued that such contract modifications in any way are binding upon Sawyer.

N.D.C.C. § 47-04-1 is entitled, "Jurisdiction -- State laws," and provides: "Real property within this state is governed by the law of this state."

N.D.C.C. § 47-04-25 is entitled, "Covenants Running With The Land," and provides: "The only covenants which run with the land are those specified in this chapter and those which are incidental thereto."

Section 47-04-26, N.D.C.C., was, per its source note, codified as Sections 821 and 822 of the Civil Code of 1877. It and the like California Civil Code Sections 1462 and 1463, enacted in 1872, were both drawn from the Field Code proposed for New York in 1865. Cal.Civ.C. § 1462 is entitled, "Covenants Running with Land; Direct Benefit of Existing Property," and reads: "Every covenant contained in a grant of an estate in real property, or some part of it then in existence, runs with the land." Cal.Civ.C. § 1463 is entitled, "Covenants Running with Land; Direct Benefit of Existing Property; List," and reads: "The last section includes covenants 'of warranty,' 'for quiet enjoyment,' or for further assurance on the part of a grantor, and covenants for the payment of rent, or of taxes or assessments upon the land, on the part of a grantee." (N.D.C.C. § 47-04-26 was, like Cal.Civ.C. §§ 1462, 1463, formerly split into two sections: Civil Code 1877, §§ 821, 822; Rev. Code §§ 3786, 3787.). Indeed, in analyzing N.D.C.C. § 47-04-26, this Court has observed that the California Supreme Court in *Marra v. Aetna Const. Co.*, 101 P.2d 490 (1940) was "interpreting a California statute similar to N.D.C.C. § 47-04-26." *Allen v. Minot Amusement Corp.*, 2006 ND 243, ¶ 701, 312 N.W.3d 698. Because they share a common derivation in the Field Code, California court decisions construing Field Code sections, while not binding, are entitled to "respectful consideration, and may be 'persuasive and should not be ignored'." *AG Services of America, Inc. v. Midwest Investment Ltd. Partnership*, 1998 ND 189, ¶ 11 n. 1, 585 N.W.2d 571. For the Court's convenience, and because Sawyer relies heavily on case law from other states interpreting Field Code statutes similar to that at issue here in North Dakota, Sawyer has prepared and filed herewith (with a copy to Beeters' counsel) a Supplemental Appendix containing copies of all statutes and cases cited herein.

Section 47-05 of N.D.C.C. discusses what land burdens or servitudes may be attached to other land as incident or appurtenances in North Dakota, but neither the Beeters nor the trial judge argued that the Beeters' 6% Deed covenants were any kind of recognized servitude under North Dakota law.

It is well settled that the statute's list of covenants is not exclusive of the long list of other covenants recognized by the common law as running with the land. *Northern Pac. Ry. Co. v. McClure*, 9 N.D. 73, 81 N.W. 52, 54-55 (1899).

See 11.

*See also Waikiki Malia Hotel, Inc. v. Kinkai Properties Ltd. Partnership*, 862 P.2d 1048, 1057 (Haw.1993)("For a covenant to run with the land, it must extend to the land so that the condition required to be performed affects the quality or value of the land.")

In *Geostar Corporation v. Parkway Petroleum, Inc.*, 495 N.W.2d 61, 67 (N.D. 1993), this Court "disavowed" as dictum its statement in *Texaro* that a "royalty interest" was personal property, and "reaffirmed" that an unaccrued royalty interest was real property.

Neither the Deed nor the Option used the term "royalty". In the 1992 Settlement, the Beeters and MSC for the first time referred to the first 6% gross revenue right as the "Premises Royalty" and the second 6% gross revenue right as the "Five Mile Royalty".

That statute, in pertinent part, states, "the obligation . . . to pay oil or gas royalties to the mineral owner or the mineral owner's assignee . . . is of the essence in the lease contract, and breach of the obligation may constitute grounds for cancellation of the [oil and gas] lease."

**End of Document**                                                                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit 4**

**Brief of Appellee, *Beeter v. Sawyer Disposal LLC*, No. 20080346,
2009 WL 1023585 (N.D. Feb. 2009) (Appellate Brief)**

Case 16-50998-KG   Doc 43-1   Filed 09/21/16   Page 32 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

2009 WL 1023585 (N.D.) (Appellate Brief)
Supreme Court of North Dakota.

Brian BEETER, Dennis Beeter, and Larry Beeter, Appellees/Plaintiffs,

v.

SAWYER DISPOSAL LLC, Appellant/Defendant.

No. 20080346.
February, 2009.

Civil No. 51-03-C-1566
Appeal from the October 23, 2008 Judgment & July 26, 2006, Interlocutory Judgment,
District Court, Ward County, North Dakota, The Honorable William W. McLees, Presiding

**Appellees' Brief**

Nevin Van de Streek (I.D. # 02983), Attorney at Law, Eaton, Van de Streek, and Ward, Attorneys for the Plaintiffs/ Appellees, P.O. Box 1697, Minot, ND 58702-1697, (701) 852-4837 (Voice) (701) 839-5629 (Fax), Nevin@srt.com.

**\*2** *TABLE OF CONTENTS*

Table of Contents ...................................................................................... Page 2
Table of Authorities ................................................................................. Page 3
Statement of the Issues ........................................................................... Page 4
Conclusion ................................................................................................ Page 25

**\*3** *TABLE OF AUTHORITIES*

*CASES:*

*Allied Group Mortg. Corp. v. Dewing*, 498 N.W.2d 196, N.D. App., 1993 ................... 12
*Bell Drilling Co. v. Kilbarger*, 1997 WL 361025 (Ohio App. 4 Dist. 1997) ................... 14
*Gordon v Dooley*, 3 Hughes 182, 10 F. Cas 783 (Circuit Court, E.D. Virginia, 1879) ... 17
*Horner v Dellinger*, 18 F. 495 (Circuit Court, E.D. Wisconsin, 1883) ......................... 17
*Lyon v Odell*, 65 N.Y. 28, 1875 WL 10933 (Ct. of Appeals, N.Y., 1875) ..................... 17
*Pronzato v. Guerrina*, 400 Pa. 521, 163 A2d 297 (Pa. 1960) ........................................ 17
*State ex rel. North Dakota Housing Finance Agency v. Center Mut. Ins. Co.*, 2006 ND     26
175, 720 N.W.2d 425) .......................................................................................
*Wells v Savannah*, 87 Ga. 397, 13 S.E. 442 (Ga., 1891) ............................................... 17
*White v. Republic Services, Inc.*, 2004 WL 2754687 (Mich. App. 2004) ........................ 14
*Williams Co. v. Hamilton*, 427 N.W.2d 822, 823 (N.D. 1988) ..................................... 9
*STATUTES:*
NDCC 01-01-25 .................................................................................................... 11
NDCC 47-05-02 ................................................................................................... 15, 16
NDCC 47-16-02 ................................................................................................... 17, 18
*OTHER:*
*Commentaries on the Laws of England*, in Book II, Chapter III, Part X .16
*http://avalon.law.yale.edu/subje ct_menus/blackstone.asp* ............................................. 16
*http://lonang.com/exlibris/blackston/* ............................................................................ 16
*http://oil.libertyfund.org* .............................................................................................. 16

**\*4** *Statement of the Issues*

1. Whether -- under North Dakota real property law -- grantors (the Beeters) may convey land used for an industrial landfill, but retain the right in their deed of conveyance to receive a portion of future revenues from such use, in such

a manner as to bind a later grantee of the land (Sawyer Disposal), when and if Sawyer Disposal puts the land to that particular use?

2. Whether -- under North Dakota contract law -- and without regard to how the first issue is resolved, Sawyer has under the facts of this case assumed the original grantee's obligation (as set forth in the Beeters' deed of conveyance of the landfill with later agreed-to modifications), to share with the Beeters a portion of future revenues derived from using the land as a landfill?

*1. The parties to the original option and deed manifested an unmistakable, objective intent that the obligation imposed therein to pay a 6% share of revenues to the grantors was to be in the future an incident of ownership of the land referred to in the option and conveyed by the deed.*

Sawyer speaks a great deal in its brief about the original parties to the option and deed having a "subjective" intention that the six percent share of revenues reserved in the deed (hereafter the "6%" or the "Beeters' 6%"), would be binding on successor owners of the land being conveyed. This is true, but misleading. That is, although the parties had such a subjective intent, this likewise was their objective intent.

Moreover, it was the objective intent and only the objective intent of the parties on this point about which the trial judge concerned himself. If he had intended to delve into subjective intentions it would have been necessary for him to consider testimony from the parties to the original agreements about their thought processes when negotiating, drafting, and executing the various instruments in the case. Or the judge would have examined other evidence of the states of mind of the parties to the original agreements, such as contemporaneous written or oral statements made by them. Possibly, too, the trial judge might have been called upon to consider the actual performance by the parties as being indicative of their subjective intentions. The judge in the case at bar did none of this.

It is clear from the trial judge's memorandum opinion that he drew his conclusions concerning the intent of the original contracting parties solely from the text of the written documents which he was construing. Thus whatever conclusions he reached in that **\*5** fashion -- right or wrong -- are conclusions in respect to the parties objective intentions in entering into the arrangement reflected in and established by the documents.

*2. The intent of the original contracting parties, that the Beeters would receive 6% payments from future use of the landfill which the Beeters had built and were selling, was made binding on later owners of the landfill.*

It is worth noting that Sawyer does not claim that the original transaction between the Beeters and MSC was in any way tainted with illegality or was harmful to the public wellbeing. Rather its argument boils down to this: "King's X! It doesn't apply to us as a matter of North Dakota real property law."

The Beeters will demonstrate in this portion of their argument that this is not so.

Much of the difficulty and confusion presented by the present case could have been avoided, perhaps, if the contracting parties had chosen a more exactly apt term to use to express their intention other than "covenant running with the land." [1] Although this phrase captured the intent of the parties in general terms, it very likely was inapposite in its more technical usages.

In fact as seen hereafter either the term "royalty" or "perpetual rent" more closely approximates what the parties to the original transaction had in mind.

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 34 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

Sawyer vigorously and at length disparages the Beeters' claim that the property interest which they are seeking to assert is at least first cousin to a conventional oil and gas royalty, and perhaps even a full sibling thereto. However in so doing Sawyer somewhat muddles its attempted explanation of the law of royalties, and thereby confuses itself into error. More specifically, Sawyer confounds itself by failing to observe and preserve in its own mind a clear distinction as to the two different ways in which a royalty interest can be created. The Beeters will attempt to untangle this confusion on Sawyer's part.

First, a royalty interest can arise when the owner of minerals in place -- whether the surface owner or the owner of severed minerals -- enters into an agreement (typically an oil and gas lease), with a mineral development and production company. Under the agreement the company will capture and market the minerals in return for the delivery in kind, or payment of the cash equivalent, of a specified share of the production to the mineral owner. The right to a delivery in kind or cash equivalent payment is what is meant by a "royalty" and in this instance it can be thought of as being "coupled" to the ownership of the minerals from which it is or will be derived.

But a royalty interest can also be "decoupled" from the ownership of the minerals from which it is or will be derived. That is, the owner of the minerals -- whether a severed mineral owner or surface owner with mineral rights -- can grant a royalty interest to a person or entity, which person or entity owns only the royalty interest and no interest whatsoever in the minerals to which the royalty attaches. Thus, for example, Farmer Brown may deed Blackacre to Farmer Greene and reserve no minerals, but reserve a **\*6** royalty interest such as a one-eighth of a one-eighth or 1/64th royalty (whereby Brown would be entitled to one out of every sixty-four barrels of oil produced from the land which was conveyed by the deed).

In this second type of royalty interest ownership, the "decoupled" type, the owner of the royalty interest cannot enter on the land to seek to capture his or her share of the minerals (because he or she does not own any minerals), nor is he or she entitled to bonus payments, delay rental payments, etc. Only if and when there is production does the owner of this sort of "decoupled" royalty interest become entitled to delivery in kind or payment of the cash equivalent.

With these thoughts in mind it becomes readily apparent that much of Sawyer's argument to the effect that there is no analogy whatsoever between a typical mineral royalty interest and the Beeters' 6% is premised upon confusion in its mind between a "coupled" royalty interest and a "decoupled" royalty interest, or perhaps even a complete failure to appreciate that there is such a distinction (notwithstanding its quotations in its brief from authorities which discuss the same),

Why else would Sawyer make statements like the following (from page 31 of its brief)? "The Deed doesn't name any 'volume of space' being excepted or reserved by the Beeters, nor is the right of disposal operations reserved by the Beeters." Obviously in this passage Sawyer is drawing an analogy to a retention of minerals, whereas the proper analogy (which governs this case), is to a retention of a royalty interest in minerals, which retention does not require a recitation that the grantor reserves right of entry for exploration and production, etc. (Indeed, it would be antithetical to a reservation of a mineral royalty to so provide.)

To be sure, it appears that Sawyer is also arguing that the Beeters failed to use the necessary "magic words" to create an exception or reservation of a royalty interest in waste disposal activities being conducted at Echo Mountain. That is, the deed does not specifically refer to either a "reservation" nor an "exception."

Concededly it would have been better practice if the scrivener had employed either or both these terms, and if one term only, that of "reserved" would be preferred (although the modern practice seems to be to treat them as being interchangeable). Nevertheless, it must be recalled that this court has said: "The primary purpose in construing a deed is to ascertain and effectuate the intent of the grantor, and deeds are construed in the same manner as contracts." *Williams Co. v. Hamilton*, 427 N.W.2d 822, 823 (N.D. 1988).

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 35 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

If one assumes -- for the moment -- that a royalty interest of the sort which the Beeters seek to assert in this case is a valid real property interest under North Dakota law, then there can be little doubt in reading the deed from the Beeters to MSC that this is what in essence or in substance they sought to preserve to themselves by employing the language, the effect of which is in dispute in this case. This is made abundantly clear by the employment of the term "covenant running with the land," which the Beeters have **\*7** already conceded may be technically clumsy, but which nevertheless conveys unmistakably (and *objectively*) what they had in mind.

Moreover, it is to be remembered that there was a written option agreement which preceded the deed, and which provides further illumination on what the Beeters intended in their deed. On page 5 of that agreement [Apx. pg. 30] it is stated (with emphasis added): "Such deeds shall convey an unencumbered, marketable title in fee simple absolute to MSC subject *only to the retention by SELLERS* of six percent (6%) of gross disposal revenues with a $1.20 per cubic yard minimum . . ."

Here the use of the term "retention" is for all practical purposes equivalent to the term "reservation."

It may be objected, however, that the option agreement cannot be binding on Sawyer because it was not a party thereto (or even in existence at the time it was formulated). Such objection would have a great deal of force if Sawyer had been an innocent third party purchaser of Echo Mountain with no notice of the existence of, let alone the contents of, the option agreement between Beeters and MSC.

It is to be recalled, however, that the sale to Sawyer was not a sale in the ordinary course of business between two parties dealing in an established market. Rather the sale was conducted in bankruptcy in respect to a failed company, so Clean Harbors (Sawyer's parent or grandparent corporate owner), in its own interests of avoiding contamination by such failure had every incentive to examine the teeth of the horse it was buying very carefully. That it did so is reflected in the eighty page (exclusive of schedules) "Acquisition Agreement" it entered into with Safety-Kleen. In that agreement [Apx. pg. 36], Safety-Kleen agreed to provide, with exceptions not here relevant, Clean Harbors with access to all its records.

Moreover, although Sawyer argues in its brief that by virtue of its status as an asset purchaser from Safety-Kleen -- as opposed to be a corporate "successor" to Safety-Kleen, it should not be bound by the Beeter/MSC option agreement, Sawyer does not claim that its parent or grandparent Clean Harbors had no knowledge of the existence and contents of the option agreement, prior to consummating its purchase of assets from Safety-Kleen.

Indeed, in the "Stipulation of Undisputed Material Facts" starting with paragraph 28 on page 5 thereof [Apx. pg. 23] it is recited that in a "Third Amendment" to the Acquisition Agreement [which is not part of the appendix] Clean Harbors agreed explicitly with Safety-Kleen to pay, and that it did pay, the Beeters on behalf of Safety-Kleen from the time of closing for up to six months thereafter. [2] Although not so explicitly stated in the Stipulation, it is only logical to infer that the "Third Amendment" preceded the date of closing (for it would be locking the stable door after the horse was stolen, otherwise). It follows logically that Clean Harbors would not have agreed in the TSA to perform Safety-Kleen's obligations to the Beeters without familiarizing itself with at least the most recent version of the "Settlement Agreement" giving rise to such obligations. [Apx. pg. 42.] The settlement agreement on page 6 thereof [Apx. pg. 47] specifically references **\*8** the Option to Purchase. Moreover it sates "This Agreement does not supersede the Option to Purchase and Warranty Deed, and the parts thereof not inconsistent with the terms of this Agreement remain in force and effect."

Thus under the doctrine of "constructive notice" [3]

Case 16-50998-KG   Doc 43-1   Filed 09/21/16   Page 36 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

Clean Harbors, the indirect parent corporation of Sawyer, is charged with knowledge of the Option Agreement, including the language therein referring to the Beeters' "retention" of the claim to a share of revenues, in other words a royalty interest in waste disposal.

So although it might have been better practice to use the term "reservation" or "exception" in carving out the Beeters' 6%, it would appear from the foregoing discussion that under the "other relief" clause of the prayer for relief in the complaint [Apx pg. 6] the court would have been justified -- if in addition to entering a money judgment -- it had also exercised its equitable powers to "reform" the deed by making the Beeters' reservation of a waste disposal royalty more explicit.

That it did not do so, however, should not be fatal to the Beeters' money judgment. This conclusion follows from *Allied Group Mortg. Corp. v. Dewing*, 498 N.W.2d 196, (N.D.App., 1993), wherein it was held that it would "exalt form over substance" to find that the trial court committed error by not ordering the reinstatement of a mortgage -- which mortgage had been mistakenly satisfied of record -- when the judge went on to find that the mortgage was valid and to order the foreclosure of the mortgage, which finding and which order were entirely proper under the circumstances.

Here in view of the money judgment against Sawyer, it would exalt form over substance to order the deed reformed to recite more clearly a reservation of a royalty, although, of course, if this court thought it were proper that this be done, it could be done on remand.

The foregoing discussion -- as to whether *under the particular and peculiar* facts of the instant case it was necessary to use the exact term "reservation" or "exception" in order to reserve a royalty interest in waste disposal -- presupposed, of course, that such an interest is a valid property interest. Whether this in fact is so is the proposition to which the Beeters now turn.

The Beeters can and do concede that if, for example, they had attempted to reserve six percent of the revenues from the land they were conveying without regard to the source of such revenues, then it would be difficult to contend properly that such reservation was a reservation of a "royalty" interest. In would seem almost inescapable that in order for there to be a true royalty interest, either a mineral royalty or, as here, a royalty akin to a mineral royalty, such interest must relate to a resource of some sort which inheres in the real estate to which the royalty interest attaches. However, the Beeters would beg to differ if it is contended that such a "resource" must be a "natural resource." Rather they submit to the court that the resource in respect to which a royalty may be established can be an "artificial resource," as was true here. [4]

**\*9** Sawyer's brief would have one believe that the Beeters' are claiming a royalty in respect to some vague and undifferentiated "space" or "void" hovering above the surface of the land or to be produced in the future when certain excavations are performed. In other words, Sawyer seems to be equating the Beeters claim to a claim for "air rights." This presentation distorts what really happened here. The facility which the Beeters sold was a fully engineered, fully functioning, and (most importantly), *fully state licensed* non-hazardous industrial waste landfill. Such facilities are hard to come by, given all the federal, state, and local permissions and permits which must be obtained, not to mention frequent and vigorous NIMBY ("*N*ot *I*n *M*y *B*ack *Y*ard"), objections lodged by neighboring landowners. So insofar as the Beeters are claiming a royalty "in a volume of space," it must be noted that such space is very special indeed. [5]

Moreover, as aptly recognized by the trial court, the licensed waste-disposal space under consideration here is similar to minerals underlying land in that it is an exhaustible and non-renewable resource. That is, unless Sawyer or some later owner of Echo Mountain devises a workable and governmentally-acceptable program of launching industrial waste into

Case 16-50998-KG   Doc 43-1   Filed 09/21/16   Page 37 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

outer space, in time landfill operations will cease at Echo Mountain as the portions thereof which may be profitably be put to such use are all used up.

That the concept of paying royalties in respect to landfill operations is not entirely a fanciful and absurd flight of imagination on the part of the Beeters is evidenced by two decisions cited by the trial court, *Bell Drilling Co. v. Kilbarger*, 1997 WL 361025 (Ohio App. 4 Dist. 1997), and *White v. Republic Services, Inc.*, 2004 WL 2754687 (Mich. App. 2004), in which the facts, if not necessarily the holdings of those cases, demonstrate that other and presumably savvy business entities have bargained at arms-length for such arrangements.

*3. Even if the Beeters' retained property right was not a royalty, it qualifies as a legitimate perpetual rent on the land.*

NDCC 47-05-02 provides (with emphasis added):

47-05-02. Servitudes not attached to land. The following land burdens or servitudes upon land may be granted and held, though not attached to land:

1. The right to pasture, and of fishing and taking game.

2. The right of a seat in church.

3. The right of burial.

4. *The right of taking rents and tolls*.

5. The right of way.

6. The right of taking water, wood, minerals, or other things.

 **\*10**  7. A historic easement granted with respect to a state historic site and buildings and structures thereon, or property listed in the national register of historic places, in accordance with the provisions of section 55-10-08.

If the Beeters' claim to payments under the warranty deed and option to purchase do not fit neatly within the legal pigeonhole of a "royalty interest," then such right surely qualifies as a "rent" within the meaning of NDCC 47-05-02.

Before proceeding further with this analysis and discussion, it bears merit to clear up a misconception on the part of Sawyer. That is, on page 19 of its brief, in 12, Sawyer states the following: "Section (*sic*.) 47-05 of N.D.C.C. discusses what land burdens or servitudes may be attached to other land as incident (*sic*.) or appurtenances in North Dakota, but neither the "Beeters nor the trial judge argued that the Beeters' 6% Deed covenants were any kind of recognized servitude under North Dakota law." Sawyer is mistaken in asserting that the Beeters did not make this argument below.

This argument was fully aired by Beeters in their brief in support of their motion for summary judgment (Docket # 73, pg. 4-10), and in their reply brief (Docket #80, principally, but not exclusively, pg. 7-10). In these trial-level briefs the Beeters argued that the claim which they were asserting resembled, or partook in part of the characteristics of, a "*profit à prendre*," (more precisely, *profit à prendre* in gross), and that it resembled, or partook in part of the characteristics of, "ground rent."

Both of these interests arise or are recognized by Ch. 47-05 of the Century Code. An oil and gas royalty is a particular instance of a *profit à prendre* (as would be a waste disposal royalty), and as the legal principles applicable thereto have already been discussed in part 2 hereof, the Beeters now turn to the "rent" analysis.

Sir William Blackstone in his *Commentaries on the Laws of England*, in Book II, Chapter III, Part X, has the following to say concerning rents (italics in the original, s omitted): [6]

There are at common law three manner of rents, rent-service, rent-charge, and rentseck. *Rent-service* is so called because it hath some corporeal service incident to it, as at the least fealty or the feodal oath of fidelity. For, if a tenant holds his land by fealty, and ten shillings rent, or by the service of ploughing the lord's land, and five shillings rent, these pecuniary rents, being connected with personal services, are therefore called rent-service. And for these, in case they be behind, or arrere, at the day appointed, the lord may distrein of common right, without reserving any special power of distress; provided he hath in himself the reversion, or future estate of the lands and tenements, after the lease or particular estate of the lessee or grantee is expired. A *rent-charge* is where the owner of the rent hath no future interest, or reversion expectant in the land: as where a man by deed maketh over to others his *whole* estate in fee-simple, with a certain rent payable thereout, and adds to the deed a covenant or clause of distress, that if the rent be arrere, or behind, it shall be lawful to distrein for the same. In this case the land is liable to the distress, not of common right, but by virtue of the clause in the deed; and therefore it is called a rent-*charge*, because in this manner the land is charged with a distress for the **\*11** payment of it. *Rent-seck, reditus siccus*, or barren-rent, is, in effect, nothing more than a rent reserved by deed, but without any clause of distress.

It is the last form of rent (sometimes called "dry rent," for "sec" or "seck" means "dry" in French, which term is often used in respect to wines), mentioned by Blackstone, which the Beeters contend fits the facts of their claim.

Of course, when the subject "rents" is mentioned, no doubt everyone -- layperson and legal practitioner alike -- tends to think immediately of a lease or of a month to month tenancy. However, rents may also arise from a deed which provides for their payment, which payment may be made a perpetual obligation, as the courts of several states have recognized: *Pronzato v. Guerrina*, 400 Pa. 521, 163 A2d 297 (Pa. 1960); *Wells v. Savannah*, 87 Ga. 397, 13 S.E. 442 (Ga., 1891); *Horner v. Dellinger*, 18 F. 495 (Circuit Court, E.D. Wisconsin, 1883); *Gordon v. Dooley*, 3 Hughes 182, 10 F. Cas 783 (Circuit Court, E.D. Virginia, 1879); *Lyon v. Odell*, 65 N.Y. 28, 1875 WL 10933 (Ct. of Appeals, N.Y., 1875). Other states have accepted the same principle in essence, by allowing for lease terms of 99 years or 999 years, renewable automatically in perpetuity.

North Dakota by implication recognizes the concept of a conveyance of land with a perpetual reservation of rent, for otherwise the use of the word "grant" in NDCC 47-16-02 ("Limitations on leases"), would be inexplicable. That statute reads (with emphasis added): "No lease or *grant* of agricultural land reserving any rent or service of any kind for a longer period than ten years shall be valid. No lease or *grant* of any city lot reserving any rent or service of any kind for a longer period than ninety-nine years shall be valid." [7]

*4. Even if the Beeters' right to payment is considered to be a covenant on the part of the original grantee in the deed giving rise to such payment, and not any sort of charge on, or property interest in, the land conveyed by such deed, nevertheless, Sawyer assumed the original grantee's personal obligation, and is indebted to the Beeters on that basis.*

Sawyer argues strenuously, at length, and exclusively, that it is not obligated to the Beeters in respect to the "6%" language in the deed to MSC, because, it contends, such language gave rise to a personal covenant only on the part of MSC.

This claim on the part of Sawyer is somewhat startling, for two reasons. First, if it was a personal covenant on the part of MSC solely, then one has to wonder why Clean Harbors did not go into bankruptcy court to obtain an injunction against this lawsuit, as it threatened to do? (See Docket # 14, "Brief in support of Rule 60(b) motion to vacate," Exhibit

5, for the threat, and pg. 158-159 of the appendix for the portion of the bankruptcy court order which in part prohibits claimants against Safety-Kleen from interfering with Clean Harbor's "use and enjoyment" of the acquired assets, which no doubt the present lawsuit under appeal does.)

Second, Sawyer's claim that the Beeters 6% was a personal covenant only on the part of MSC and its corporate successors is inconsistent with 3 of its brief on appeal wherein it **\*12** states "Sawyer conceded below that a bankruptcy court sale 'free and clear of liens and other interests' pursuant to 11 U.S.C. §363(f) has no impact on restrictions of *record that run with the land*." (Emphasis added.) This concession should be read in connection with paragraph 5 of Sawyer's answer [Apx. pg. 9], to wit: "Delaware Bankruptcy Court authorized the sale of certain assets of Safety-Kleen Services Inc. (Safety-Kleen), including Echo Mountain, to Clean Harbors Environmental Services Inc. (Clean Harbors) free and clear of all liens and encumbrances." As Sawyer is no longer raising this "free and clear of liens" defense, for the reason which it itself states in 3, it is difficult to see how it can consistently therewith claim that the obligation from Safety-Kleen was a personal obligation only.

Nevertheless, for purposes of this argument, the Beeters will assume without conceding that the covenant between the Beeters and MSC was a personal covenant only. If this were so (which, again, the Beeters are willing to assume for analytical purposes only, but which they do not concede), then it would follow as a matter of real property law that a purchaser of assets from MSC or its corporate successors would not be bound by such personal covenant. Even under this assumption, as it turns out, Sawyer is nevertheless obligated to the Beeters under MSC's personal convenant -- it stands in the shoes of Safety-Kleen on this score -- because it has assumed such obligation under the Acquisition Agreement between it (or more precisely, its father or grandfather Clean Harbors), and Safety-Kleen.

Before analyzing in detail the language in the Acquisition Agreement which so provides, it is probably useful to ask and answer the question why the parties to such an agreement would have employed such a stipulation?

The answer to this question from the perspective of the bankrupt seller (the "debtor" in modern bankruptcy law parlance) is quite simple and straightforward. The debtor has every incentive to shed obligations and liabilities, as to do so will have the effect of decreasing the total amount of creditors' claims which it must deal with, either in liquidation or reorganization. More specifically, and using the Beeters as an example, once Safety-Kleen arranged for Clean Harbors (Sawyer) to take over the Beeters 6%, then the Beeters lost any creditor's claim in bankruptcy which they might have had against Safety-Kleen for the future non-performance by Safety-Kleen of such obligation. (If the obligation had not been assumed by an outside party, then the Beeters could have filed a claim in bankruptcy court for the present discounted value of the anticipated future revenues under the 6% agreement, although, to be sure, they would have been lucky to have obtained pennies on the dollar in respect to such claim.)

The incentive from the perspective of the buyer in bankruptcy (Clean Harbors) to agree to assume Safety-Kleen's obligation to the Beeters is simply that such assumption is part of the purchase price, and if the entire purchase price -- including this particular component -- is less than the value of the assets which the buyer is acquiring (as far as the buyer is able to determine), then the buyer has no particular concern whether it pays in one form (cash) or another (assuming an ongoing obligation). Indeed, there may be occasions where the buyer would prefer to pay a portion of the purchase price in the form of **\*13** assumed obligations, because it can ease its cash flow needs (and thus its bank financing needs) by discharging such an obligation over future years instead of paying the cash equivalent immediately at the time of purchase.

So having established that it is not contrary to either common sense or wise business practices for Clean Harbors to have assumed Safety-Kleen's obligation to the Beeters, the question becomes, did it in fact do so? The wording of the Acquisition Agreement tells us that it did.

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 40 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

The parties' "Form of Assumption Agreement" is set forth as Exhibit B to the Acquisition Agreement [Apx. pg. 130-131]. Section 1 thereof provides in pertinent part: "As of the date hereof, Obligor [Clean Harbors], pursuant to *Section 1.3* of the Acquisition Agreement, hereby covenants and agrees to assume and thereafter pay, perform or otherwise discharge the Assumed Liabilities, in accordance with their terms, as set forth in *Section 1.3* of the Acquisition Agreement." (Emphasis in the original.)

Turning now to Section 1.3 of the Acquisition Agreement [Apx. pg. 63], one finds that it provides in pertinent part (after substituting "Safety-Kleen" for "Seller and the Selling Subs" and substituting "Clean Harbors" for "Purchaser and Purchasing Subs" and adding emphasis):

. . . Clean Harbors shall assume from Safety-Kleen and thereafter pay, perform or otherwise discharge in accordance with their terms, . . . all of the liabilities and obligations (of any nature or kind, and whether based in common Law (*sic.*) or statute or arising under written contract or otherwise, known or unknown, fixed or contingent, accrued or unaccrued, liquidated or unliquidated, real or potential) of Safety-Kleen with respect to, *arising out of or relating to*, the ownership, possession or *use of the Acquired Assets and the operation of the Business* other than the Excluded Liabilities, but including without limitation, other than the Excluded Liabilities, the following: (i) *liabilities and obligation with respect to, arising out of or relating to, the ownership, possession, or use of the Acquired Assets and the operation of the Business and arising after the Closing Date*, . . . [8]

In simple English, the foregoing passage says: After the Closing Date, Clean Harbors will pay the obligations which Safety-Kleen would have incurred, had it, rather than Clean Harbors, been making use of the Acquired Assets [which includes Echo Mountain] in the conduct of the "Business" except insofar as such obligations are defined as "Excluded Liabilities."

In the view of the foregoing, the crucial question becomes is whether the Beeters' 6% is an Excluded Liability?

Excluded liabilities is a term defined on page 62 of the Acquisition Agreement [Apx. pg. 62], which with emphasis added by bold italics (to distinguish the added emphasis from italics in the original and underlined emphasis in the original), reads as follows:

 **\*14** *Excluded Liabilities* means any liabilities and obligations with respect to, arising out of or relating to, the ownership, possession *or use of* the Acquisition Assets and the operation of the Business *prior to the Closing Date* (i) which are to be discharged by the Bankruptcy Court in accordance with *Section 3.8* hereof, (ii) with respect to fines imposed by any Governmental Entity, (III) with respect to injuries suffered by Employees of the Seller or any Business Sub, (iv) with respect to tort (other than environmental clean-up) and common law claims for which post-1986 general liability insurance containing pollution exclusions normally would provide coverage, (v) which are amounts due from the Business to BSSD or (vi) which are Taxes (other than Taxes for which the Purchaser is expressly liable pursuant to the terms of this Agreement) *arising out of or relating to any period or any portion thereof ending on or prior to the Closing Date without regard to when asserted, commenced or identified.*

It is patently obvious from the foregoing that "excluded liabilities" are only those liabilities which arise before the Closing Date, so that Beeters claim in the present lawsuit -- which relates exclusively to post-Closing Date activities on the part of Sawyer -- is not part of the "excluded liabilities."

Nevertheless, in an excess of caution, the Beeters will proceed to demonstrate that the only fragment of this definition of "excluded liabilities" which might point in the other direction; does not in fact do so. The remarks just made refer to these words in the definition, to wit: "which are to be discharged by the Bankruptcy Court in accordance with Section 3.8 hereof." In Section 3.8 [pg. 20 of the Acquisition Agreement, Apx. pg. 74] one finds the following:

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 41 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

Section 3.8. *Title to Property.* Upon the entry of the Section 363/365 Order and, if applicable, the Confirmation Order, at the Closing the Seller and each of the Selling Subs will sell, assign, transfer, convey and deliver, as the case may be, to the Purchaser and the Purchasing Subs the Acquired Assets, and the Acquired Assets and the assets held by the Domestic Transferred Subs will be free and clear of all liens, claims, encumbrances and security interests other than Permitted Exceptions.

The definition of "permitted exceptions" begins on page 65 of the Acquisition Agreement [Apx. pg. 119], with the most salient portion thereof being paragraph (h) thereof which (with emphasis in the original) reads as follows:

(h) any exception that currently exists at the Owned Real Property or the Real Property Leases which do not materially interfere with the operation of the Business at each such site and for which the Purchasser shall not have provided the Seller with an Exception Notice pursuant to *Section 5.11(a)*; and

Section 5.11 (a) of the Acquisition Agreement is too lengthy to quote verbatim, but may be summarized insofar as important to the present litigation thus: Safety-Kleen is to provide Clean Harbors with title insurance policies for the land being acquired by Clean Harbors from Safety-Kleen, and then, within 35 days after the receipt of the last of these, Clean Harbors is to notify (pursuant to the so-called "Exception Notice"), which **\*15** exceptions noted by the title insurer on the various policies it will not accept as Permitted Exceptions. If an exception written by the title insurer is not timely identified by Clean Harbors in the Exception Notice, then it shall be deemed to be a Permitted Exception.

Although not part of the record -- because part of Discovery which is not ordinarily filed with the court in the absence of a dispute concerning the same -- Clean Harbors was asked to provide a copy of its Echo Mountain title insurance policy and any Exception Notice which it made in respect to such policy. It provided the policy, which listed the Beeters' covenant or claim, but was unable to provide any Exception Notice thereto [9]

Finally it should be noted that the Beeters are not taking, and need not take, the position that they are "third party beneficiaries" of the Acquisition Agreement. They are parties to the original agreement with MSC in their deed, and by virtue of the Acquisition Agreement Clean Harbors and Sawyer are stepping into the shoes of MSC (or more precisely, its corporate successor Safety-Kleen) in respect to the performance of that obligation. So after the Acquisition Agreement is consummated there are no "third parties" lurking about, but rather there are only *two* parties to the 6% agreement, the Beeters collectively as one party and Sawyer as the other party.

In other words, if A agrees in a contract to provide certain continuing services to B, and if C agrees with A that it will provide such services to B in the place and stead of A, and if B consents to this new arrangement, then B is not a "third party beneficiary" to the agreement between A and C, but rather there has a substitution by mutual consent of C for A in the original two-party agreement. If the disclaimer of obligations to third parties which is found in Section 8.12 of the Acquisition Agreement [Apx. pg. 111] was intended to apply to the parties with which Safety-Kleen had contracted -- in respect to Safety-Kleen's contracts which Clean Harbors was assuming under the Acquisition Agreement -- then such assumption would be a mere nullity.

Thus even if the covenant in favor of the Beeters in their deed to MSC created only a personal obligation on the part of MSC and its corporate successors, the Acquisition Agreement was so framed that Clean Harbors and Sawyer assumed the performance of this covenant. [10]

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 42 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

*5. The judgment below should be affirmed even if this court does not endorse the reasoning of the trial judge leading to that judgment, as long as this court's analysis and reasoning support the same result.*

The Beeters in this brief diverge considerably from the reasoning and analysis which the trial judge employed to reach the result which he did. Nonetheless, the result reached below was the right one, for the reasons stated herein. Therefore, even if this court itself should find that it cannot endorse wholeheartedly the memorandum opinion authored by the trial court, nevertheless, this court enjoys an ample basis on which it can affirm the judgment entered below. In so doing this court will be going down a path it has trod many a time before. That is, it has been repeatedly announced by this court that it will not set aside a correct result merely because the district court assigned an incorrect reason, if **\*16** the result is the same under the correct law and reasoning. See, for example, *State ex rel. North Dakota Housing Finance Agency v. Center Mut. Ins. Co.*, 2006 ND 175, 720 N.W.2d 425 (trial judge misapplied one section of the Uniform Commercial Code but the ultimate result reached by the trial court was correct under another section of the UCC).

## CONCLUSION

The judgment below should be affirmed.

Footnotes

1    The Beeters were represented by other counsel at the time the option and deed were negotiated.

2    Sawyer has called this side-agreement the "Transition Services Agreement" or "TSA."

3    In this connection see NDCC 1-01-25 which states: "Every person who has actual notice of circumstances sufficient to put a prudent person upon inquiry as to a particular fact and who omits to make such inquiry with reasonable diligence is deemed to have constructive notice of the fact itself."

4    The controlling question is not whether the resource to which the royalty is sought to be attached is natural or artificial, but rather whether the resource itself is attached to the land or inheres therein.

5    Although in a sense the Beeters are claiming a royalty in respect to a quantum of space,A in the ordinary operation of Echo Mountain as a landfill, such space would migrate from time to time around the land as one "cell" is filled in with waste and another is constructed to take the place of the sated cell.

6    Because there are so many different editions of Blackstone's Commentaries, the Beeters thought it would be more useful to cite this work in the manner just stated, rather than by reference to a particular page in a particular volume of one particular edition (there being between one and four volumes depending on the edition). However, online versions of this work may be found at *http://oll.libertyfund.org*, *http://avalon.law.yale.edu/subject_ menus/blackstone.asp*, and *http://lonang.com/exlibris/ blackstone/*, just to mention a few websites.

7    In its brief in support of its motion to vacate a default judgment which was initially entered against it, Sawyer made the concession that NDCC 47-16-02 is inapplicable to this case. See Docket #14, pg. 12.

8    The term "Business" is defined on page 1 of the Acquisition Agreement [Apx. pg. 55] as "providing hazardous and non-hazardous waste collection, treatment and disposal services in the United States and Canada through the operation of incinerators, landfills . . ."

9    The Beeters do not anticipate that counsel for Sawyer will dispute this assertion, but if they do, then the Beeters obviously will have no choice but to ask the court to disregard their assertion, as it admittedly is not part of the record on appeal.

10    This theory of recovery differs from the theory upon which the Beeters succeeded in the trial court. However Sawyer cannot claim to be blindsided by this theory or argument, because it was in contention at the trial level as is acknowledged by the first sentence of 3 of "Defendant's Memorandum in Support of Summary Judgment" (Docket No. #75) which reads: "Plaintiffs' (*sic*.) have previously contended that the Acquisition Agreement required Defendant to pay them." The goes on to argue otherwise. Of course, if the trial court's judgment is sustained solely on the basis that this court finds that Sawyer assumed MSC's obligation to the Beeters as a matter of contract law and not as a matter of real property law, on remand it will be necessary for the court to find or the parties to stipulate as to the amount of the judgment computed on the "per ton" basis provided for in the 1996 settlement agreement.

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.                11

Case 16-50998-KG    Doc 43-1    Filed 09/21/16    Page 43 of 43

Brian BEETER, Dennis Beeter, and Larry Beeter,..., 2009 WL 1023585...

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.