1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - -x

In the Matters of:                    Lead Case No.

EMERALD OIL, INC., et al.,            16-10704(KG)

         Debtors.

- - - - - - - - - - - - - - - - - -x

EMERALD OIL, INC., et al.,

                 Plaintiffs,       Adv. Proc. No.

   -against-                          16-50998(KG)

DAKOTA MIDSTREAM, LLC, et al.,

                 Defendants.

- - - - - - - - - - - - - - - - - -x

           United States Bankruptcy Court

           824 North Market Street

           Wilmington, Delaware

           October 28, 2016

           1:32 PM

B E F O R E:

HON. KEVIN GROSS

U.S. BANKRUPTCY JUDGE

ECR OPERATOR:   GINGER MACE

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts with the Dakota Midstream Parties and (II) Granting Related Relief [Filed: 6/3/16] (Docket No. 362).

Plaintiff's Motion for Summary Judgment [Filed: 6/17/16] (Adv. Pro. No. 16-50998, Docket No. 6).

Debtors' Motion for Entry of an Order Authorizing the Debtors to Enter Into a Contract Operating Agreement with the Purchaser [Filed: 10/21/16] (Docket No. 831).

Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of the Debtors' Assets, (B) Approving the Form and Manner of Notice Thereof, (C) Scheduling an Auction and Sale Hearing, (D) Approving Procedures for Assumption and Assignment of Contracts, and (E) Granted Related Relief and (II) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, and (B) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief [Filed: 5/25/16] (Docket No. 336).

3

A P P E A R A N C E S :

PACHULSKI STANG ZIEHL & JONES LLP

    Attorneys for Debtors

BY:   LAURA DAVIS JONES, ESQ.

      JOSEPH M. MULVIHILL, ESQ.


KIRKLAND & ELLIS LLP

    Attorneys for Debtors

BY:   RYAN B. BENNETT, ESQ.

      TRAVIS M. BAYER, ESQ.

      WILLIAM E. ARNAULT, ESQ.


AKIN GUMP STRAUSS HAUER & FELD LLP

    Attorneys for Official Committee of Unsecured Creditors

BY:   DAVID H. BOTTER, ESQ.


BARNET B. SKELTON JR. PC

    Attorneys for Dakota Midstream, LLC

BY:   BARNET B. SKELTON, JR., ESQ.

BROWNSTEIN HYATT FARBER SCHRECK LLP

      Attorneys for Slawson Exploration Company

BY:   STEVEN A. ABELMAN, ESQ. (TELEPHONICALLY)


CHIPMAN BROWN CICERO & COLE, LLP

      Attorneys for A2D Technologies, Inc.

BY:   MARK D. OLIVERE, ESQ.


COLE SCHOTZ P.C.

      Attorneys for Koch Exploration

BY:   NICHOLAS J. BRANNICK, ESQ.


CONNOLLY GALLAGHER LLP

      Attorneys for FMC Technologies Inc., et al.

BY:   N. CHRISTOPHER GRIFFITHS, ESQ.


COOCH AND TAYLOR ATTORNEYS AT LAW

      Attorneys for Power Service

BY:   R. GRANT DICK, IV, ESQ.

FOX ROTHSCHILD, LLP

    Attorneys for McKenzie Electric Cooperative, Inc.

BY:   L. JOHN BIRD, ESQ.

    CARL D. NEFF, ESQ.

HAYNES AND BOONE, LLP

    Attorneys for USG Wheatland Pipeline

BY:   STEPHEN M. PEZANOSKY, ESQ. (TELEPHONICALLY)

MORRIS JAMES LLP

    Attorneys for Cache Trucking

BY:   CARL N. KUNZ, III, ESQ.

POLSINELLI

    Attorneys for USG Wheatland Pipeline

BY:   JUSTIN K. EDELSON, ESQ.

RICHARDS, LAYTON & FINGER, PA

    Attorneys for Cortland Capital Market Services

BY:   ZACHARY SHAPIRO, ESQ.

    MARK D. COLLINS, ESQ.

SHAW FISHMAN GLANTZ & TOWBIN, LLC

     Attorneys for Slawson Exploration Company

BY:   JOHNNA DARBY, ESQ.

     THOMAS M. HORAN, ESQ. (TELEPHONICALLY)

     KURT PETERSEN, ESQ. (TELEPHONICALLY)


SHEPPARD MULLIN RICHTER & HAMPTON, LLP

     Attorneys for New Emerald Holdings

BY:   TED A. COHEN, ESQ. (TELEPHONICALLY)


SIMPSON THACHER & BARTLETT LLP

     Attorneys for Intrepid Financial Partners

BY:   BRYCE L. FRIEDMAN, ESQ.

     ELISHA D. GRAFF, ESQ. (TELEPHONICALLY)


WEIL, GOTSHAL & MANGES LLP

     Attorneys for Cortland Capital Market Services

BY:   JOSEPH H. SMOLINSKY, ESQ.

     AMY MICHELLE ODEN, ESQ.

WHITEFORD TAYLOR PRESTON LP

        Attorneys for the Official Creditors' Committee

BY:   CHANTELLE MCCLAMB, ESQ.


YOUNG CONAWAY STARGATT & TAYLOR, LLP

        Attorneys for Dakota Midstream LLC

BY:   M. BLAKE CLEARY, ESQ.

        CRAIG D. GREAR, ESQ.

ranscribed by:  Clara Rubin

P R O C E E D I N G S

THE CLERK:  Please rise.

THE COURT:  Good afternoon, everyone.  You may be seated.  Thank you.  It's good to see you all.  And maybe we're there.

MR. BENNETT:  Good to see you, Your Honor.  Ryan Bennett on behalf of the debtors.  Good afternoon.

THE COURT:  Good afternoon, Mr. Bennett.

MR. BENNETT:  Your Honor, first of all, thank you very much for the Court's flexibility as we were moving forward with the sale motion.  There were --

THE COURT:  Yes.

MR. BENNETT:  -- a lot of variables that needed to be sorted out between the debtors, the purchaser, and various other parties, in order for us to come to you with a tight sale deal and one that the debtors believe, through a lot of diligence and effort, will ensure as much as possible a confirmable liquidating plan on the end --

THE COURT:  All right.

THE COURT:  -- so that we will not have an administratively insolvent estate.

THE COURT:  Good.

MR. BENNETT:  We submitted a declaration of our chief restructuring officer --

THE COURT:  Yes.

MR. BENNETT: -- Wade Stubblefield, that speaks to those funding components. And the debtors believe that the cash purchase component that will now be part of the purchase price of the otherwise credit bid will be enough to satisfy those obligations in addition to the cash on hand that the company has.

THE COURT: Okay.

MR. BENNETT: Your Honor, I am going to yield, for a little bit more specificity, to my colleague, Mr. Bayer, who will walk Your Honor through a couple more components of the motion -- sale motion, and then also we have the motion to assume the operating agreement -- or approve the operating agreement between the oldco and the newco, to allow for a transition period.

THE COURT: That's right.

MR. BENNETT: All right, thank you --

THE COURT: Thank you --

MR. BENNETT: -- thank you, Your Honor.

THE COURT: Thank you, Mr. Bennett.

Mr. Bayer, good afternoon.

MR. BAYER: Good morning (sic), Your Honor. Or good afternoon. Travis Bayer, for the record, from Kirkland & Ellis, on behalf of the debtors.

THE COURT: Yes.

MR. BAYER: I do have a copy of the sale order --

proposed sale order --

THE COURT:  All right.

MR. BAYER:  -- and a copy of the contract-operating-agreement order, if you'd like me to bring them up.

THE COURT:  Yes, why don't you.  Thank you.

Thank you, Mr. Bayer.

MR. BAYER:  So, there are a few components of the sale order that are still moving around.  You'll notice that the APA is not attached to it.  We do intend to submit that.  We're working on the final details of that --

THE COURT:  Okay.

MR. BAYER:  -- right now.

So, Your Honor, as you know, we're here to approve Debtors' sale of substantially all their assets --

THE COURT:  Yes.

MR. BAYER:  -- to New Emerald Energy LLC; it's an entity that was created by the agent, under the debtors' pre-petition and post-petition credit facilities.

As a matter of initial housekeeping, Your Honor, we did file the declaration of Wade Stubblefield earlier this morning.  His declaration generally describes the marketing process.  In effect, sufficient funds will be left in the estates to pay all administrative claims and allow the debtors to get to the end of these cases.

He's in the court today but, unless anybody has any

questions for him, I would ask that his declaration be moved into evidence.

THE COURT:  All right.  Does anyone object to admitting Mr. Stubblefield's declaration?

MR. BOTTER:  Your Honor, David Botter, Akin Gump Strauss --

THE COURT:  Yes.

MR. BOTTER:  -- Hauer & Feld.  Good morning --

THE COURT:  Good --

MR. BOTTER:  Or good afternoon.  Your Honor --

THE COURT:  Good afternoon, Mr. Botter.

MR. BOTTER:  -- the committee has no objection, based upon Mr. Bennett's affirmation that in fact the funds set forth -- the amounts set forth in paragraph 15 will actually be paid.  With that, Your Honor, we have no objection to the submission of the declaration.

THE COURT:  All right.

THE COURT:  Will that amount be paid?

MR. BAYER:  The amount'll be paid?

UNIDENTIFIED SPEAKER:  Yes.

MR. BAYER:  Yeah.  Yes --

THE COURT:  Okay.

MR. BAYER:  -- Your Honor.  Sorry.

UNIDENTIFIED SPEAKER:  If they're ultimately due, we'll have the funds to pay.

MR. BOTTER:  If they're ultimately due, Your Honor.

THE COURT:  All right.  That's right.

MR. BAYER:  That's right.

THE COURT:  All right.

MR. BAYER:  Allowed claims.

THE COURT:  Yes.  Come forward.

MR. FRIEDMAN:  Good afternoon, Your Honor.  My name is Bryce Friedman.  I'm from Simpson Thacher.  I represent Intrepid Financial Partners, the financial advisors.

We had some questions and have no objection to the admission of Mr. Stubblefield's declaration but are unclear as to whether all the professional expenses that have been submitted to the debtor are going to be able to be paid out of the sums that are described in Mr. Stubblefield's declaration, as it was not made clear -- and, I'm sorry, I couldn't understand whether it was clear that, for example, the amounts due to my client are going to be paid as part of that exercise.

THE COURT:  Well, the amount is listed for estimated professional fees.  And are you suggesting that perhaps that isn't high enough?

MR. FRIEDMAN:  That is -- it is unclear.  So, therefore, if the issue -- and as I understood when I came into court, that issue hadn't been resolved.  If it still hasn't been resolved, we'd like the opportunity to ask Mr. Stubblefield, if it's been resolved, if we need to do that.

THE COURT:  All right.

MR. BAYER:  Yeah, so the issue had been resolved.  The amount of his client's claim is incorporated into that amount.

MR. FRIEDMAN:  I'm perfectly happy to take my colleague's word for that.  I guess I'd like to see the sale order to make sure that that's the case and that we could get it incorporated in there, pursuant to the things that were under discussion between the parties.

THE COURT:  All right, Mr. Friedman.  We'll certainly make sure you see the sale order.

MR. FRIEDMAN:  Thank you.

THE COURT:  Absolutely.

All right.

MR. BAYER:  All right.

THE COURT:  Anyone else wish to be heard on this?

Okay.

MR. BAYER:  If Your Honor will recall, the debtors engaged in extensive negotiations with several interested parties months ago, who were interested in running -- who were in the running to serve as a stalking-horse bidder.  Ultimately the debtors selected New Emerald Holdings, who emerged from that process with a bid of about 110 million dollars.

THE COURT:  Yes.

MR. BAYER:  Following the selection of the stalking horse, the debtors also engaged, as I'm sure you recall, in

extensive litigation with DMS.  As Your Honor is aware, the debtors were able to reach a commercial resolution of that litigation.  With the added certainty of that resolution, the debtors were able to move forward with their sale process and in the coming months will file and consummate a Chapter 11 plan.

Your Honor, in support of our request to approve the sale to the purchaser, we'd like to highlight a few key points for you and for the record.

THE COURT:  All right.

MR. BAYER:  As an initial matter, two weeks ago we did identify approximately one hundred parties that held mineral interests in undeveloped acreage who had not been served with a sale notice.  Because the debtors inherited a number of those leases from other entities and had not yet developed that acreage it was unproducing (ph.), it just -- it didn't get picked up in our service.  Understanding the need to provide these parties with twenty-one days' notice, we immediately FedEx'd these parties overnight; that occurred on October 14th and 17th.

We would propose giving these parties until closing, which we anticipate will be Monday, October 31st, to object.  And the debtors would be happy to work with any of these parties to resolve their objections.

We have received no objections from any oil-and-gas

lessors, and we don't anticipate that any of these parties would receive -- or would file an objection.

THE COURT:  Have you heard from any of them, Mr. Bayer?

MR. BAYER:  None.

THE COURT:  Okay.

MR. BAYER:  Other than that particular subset of potential interested parties, the debtors believe that they served all other parties-in-interest; specifically, the debtors served their whole creditor matrix, all contracts counterparties, and every party who has since appeared in these cases.  And we published notice of the sale, in The Denver Post, USA Today, and the Daily Deck (ph.).  Your Honor, with that, the debtors believe notice of the sale was appropriate and provided all parties a reasonable opportunity to object and be heard.

Second, Your Honor, I'd like to cover briefly contracts to be assumed and assigned.

THE COURT:  Yes.

MR. BAYER:  Your Honor, the debtors are party to a considerable number of contracts.  On September 22nd, we served a cure notice on these parties, and then again on October 12th we served a supplemental cure notice on a few additional counterparties.  With respect to those parties served, the debtors received only a handful of cure objections.  Since

those objections were received, the debtors worked with those counterparties to either resolve their objections or, in consultation with the purchaser, decide that they were not going to assume and assign those contracts.

THE COURT:  Okay.

MR. BAYER:  Your Honor, I think a few of those contract counterparties would like me to read some of the resolutions that they have into the record --

THE COURT:  Of course.

MR. BAYER:  -- if you wouldn't mind.  One of those parties, Wheatland, or NextEra -- the debtors will be assuming the contract with them, as amended, with a formal amendment to be executed at or before the closing of the sale.  The terms of that amendment are as follows:

The minimum-volume commitments under that agreement will be adjusted downwards.  NextEra will be waiving its pre-petition cure claim.  The contract would be extended for one year to 2020, without an additional rate commitment.  For the six months until March 2017, the rate has been increased by $0.69.  For the years 2017, 2018 and 2019, the shipping rates will be $1.30, $1.35 and $1.40 respectively, and these rates will not be subject to a FERC rate escalator.

Believe we also received an objection from A2D, or TGS Geological.  Spoke with their attorney here.  I think the businesspeople have resolved that objection.  We are not

assuming and assuming that contract.

THE COURT:  Okay.

MR. BAYER:  But we resolved certain other concerns that they may have.

I think McKenzie Electric, who's in the court today, also would like me to note that the cure notice that we filed for them was short 2,000 dollars from what we agreed subsequently that would be their curing amount.

All right, Your Honor, the debtors and the purchaser are still working to determine which contracts of those we include on the cure notice will ultimately be assumed and assigned.  Attached to the sale order is an initial list of assumed contracts, and we intend to file a notice, subsequently, of any contracts that will be assumed at a later date, and assigned.

Next, Your Honor, I'd like to discuss good faith under 363(m).

THE COURT:  Well, let me just ask if any of the cure parties wish to be heard at this point.

MR. BAYER:  Of course.

THE COURT:  Yes.

MR. PEZANOSKY:  Your Honor, this is Steve Pezanosky with Haynes and Boone, on the phone, and I represent USG Wheatland Pipeline, which is a subsidiary of Nex -- a subsidiary of NextEra Energy Resources.  And I just want

confirm that the points that were -- that Mr. Bayer read onto the record are accurate and we are in agreement with that.

THE COURT:  All right.  Thank you.

Good afternoon.

MR. BRANNICK:  Good afternoon, Your Honor.  Nicholas Brannick from Cole Schotz, on behalf of Koch Exploration.

Koch filed a cure objection at docket number 753.  My understanding is that a deal's been reached with the debtors. There's some language that's been added to the order.  And if I can get a chance to actually look at the order before it's entered --

THE COURT:  Of course.

MR. PEZANOSKY:  -- to confirm that the language corresponds.

But we did have one question.  There was a late change, at about 10:30 last night, to the language that was agreed to, that changed the language from the purchaser or the debtors will make the cure payments, to just the debtors.  And I think what we're looking for is a representation from the debtors that they're actually going to have the money to make the cure payments, that the purchasers aren't sort of on the hook, if you will, to make the cure payments.

THE COURT:  All right.

Mr. Bayer, can you help us?

MR. BAYER:  Yes, I can make that representation.  That

is included in the costs -- the closing budget we have prepared.

THE COURT:  All right.

MR. PEZANOSKY:  Great.  Thank you, Your Honor.

THE COURT:  Thank you.  Thank you.

Good afternoon.

MR. NEFF:  Good afternoon, Your Honor.  Carl Neff from Fox Rothschild --

THE COURT:  Yes, sir.

MR. NEFF:  -- on behalf of McKenzie Electric Cooperative, Inc.

Your Honor, Mr. Bayer's correct that the parties -- McKenzie and the debtors -- reached a resolution on the cure amount listed on the cure notice in connection with McKenzie's contract.  We've agreed to an amount of $403,782.17, which is consistent with the amount of McKenzie's proof of claim filed in this action.

THE COURT:  All right.  Thank you -- thank you, Mr. Neff.

MR. NEFF:  Thank you, Your Honor.

THE COURT:  Mr. Kunz, good afternoon.

MR. KUNZ:  Good afternoon, Your Honor.  Carl Kunz on behalf of Cache Trucking.

Your Honor, we also have an agreement.  Obviously, need to see the sale order.  Our cure's a little different

because it includes some cash and also some exchange of equipment that we negotiated that was going to be listed on the exhibit -- I think it's 2 to the sale order -- as well as language, in the sale order, to resolve our issues.

So, just, obviously, we all need to see the sale order, so --

THE COURT:   That's right.

MR. KUNZ:  All right.

THE COURT:  All right, thank you, Mr. Kunz.

MR. KUNZ:  Thank you.

THE COURT:  I certainly understand.

MR. BAYER:  And that language is in there; but, yes.

THE COURT:  Good.

MR. KUNZ:  And, again, I'm assuming they have money to pay the cure, so --

THE COURT:  Yes.

MR. BAYER:  That is correct, Your Honor.

THE COURT:  Are there any other -- any other cure parties, Mr. Bayer?

MR. BAYER:  No.

THE COURT:  Okay.

MR. BAYER:  Don't believe so.  We also received informal comments from the Bureau of Land Management, but we did work through their cure comments; and the same with AES Drilling Fluids.  So, I -- there are no outstanding issues on

cures.

THE COURT:  All right.

MR. BAYER:  Your Honor, moving on to a good-faith finding.  The debtors assert that the purchaser is entitled to protections of a good-faith purchaser, under 363(m) of the Bankruptcy Code.  Specifically, the purchaser is a result of a robust and productive marketing process in which both the debtors and the purchaser were represented by separate, sophisticated counsel.  We're not aware of any arrangements that would preclude the finding of good faith.

Your Honor, as discussed, we had -- we did have a robust marketing process with a number of interested parties.  As the auction day was extended through the process, the bid deadline was similarly extended to allow for additional parties to come forward, submit their bids.  By the bid deadline, however, there were only two bids, which is the stalking horse and a bid made by the lenders --

THE COURT:  Yes.

MR. BAYER:  -- by the agent.  The lenders' bid provided for, among other things, a purchase price of 110,500,000; provided for the DMS contracts to be assumed as amended, pursuant to the settlement of that litigation.  And it will provide cash funds to the debtors, sufficient to consummate a Chapter 11 plan and close out these cases.

After the lender bid had been submitted, the stalking

horse indicated it would not participate in the auction. Therefore, the debtors determined that the lender bid was the highest and best and cancelled the auction.

THE COURT:  All right.

MR. BAYER:  And that is how we find ourselves here today.

THE COURT:  Yes.

MR. BAYER:  The last thing, Your Honor, I would like to cover is with respect to a few other objections that were filed that weren't specifically cure objections.  We've resolved the majority of these objections filed by lienholders, and that includes objections filed by FMC Technologies, Liberty Oilfield Services, and Cache Trucking.

There are a few outstanding lienholder objections that were filed but, as part of the amount that we budgeted for closing the case, we are having -- we will have sufficient funds, as necessary, to cover those secured claims, if and to the extent that they actually end up being valid secured claims.

THE COURT:  And Mr. Stubblefield's declaration makes that clear.

MR. BAYER:  That's right.

With respect to the objection raised by Slawson --

THE COURT:  Yes.

MR. BAYER:  -- it's a little different than some of

the others.

THE COURT:  Yes.

MR. BAYER:  The debtors and the purchaser and Slawson have reached an agreement that's contained in the sale order.

THE COURT:  Okay.

MR. BAYER:  There're a couple paragraphs in there. The sum of it is that the purchaser and Slawson have agreed to do a delayed briefing schedule, to have the matter resolved at a later date, but don't see the need to have it resolved today or to hold up entry of a sale order.  They've outlined the terms of the proposed briefing and determination of that.

Your Honor, I also want to cover --

THE COURT:  Is anyone here --

MR. BAYER:  I'm sorry.

THE COURT:  -- for Slawson?  Or on the phone?

MR. ABELMAN:  Yes, Your Honor.  This is Steve Abelman at Brownstein Hyatt Farber Schreck.

THE COURT:  Yes, sir.  And is that acceptable to you?

MR. ABELMAN:  Yes, Your Honor.  The proposed language provided is acceptable to Slawson.

THE COURT:  All right.  Thank you.

MR. BAYER:  Thank you, Your Honor.  I did forget one other party:  Quinn and Lufkin, who did not file an objection but did reach out to us with respect to their claims.  We did reach an agreement with them to settle their claims.

THE COURT:  All right.

MR. BAYER:  Just want to note that for the record.

THE COURT:  Good.

MR. BAYER:  Your Honor, moving on.  Before I conclude the sale motion, I also want to move on and cover the operating-agreement motion, since it works hand in hand --

THE COURT:  I'm sorry; the what?

MR. BAYER:  Sorry.  The operating-agreement --

THE COURT:  Oh, I'm sorry.

MR. BAYER:  -- motion.

THE COURT:  I'm sorry --

MR. BAYER:  Um-hum.

THE COURT:  -- Mr. Bayer.

MR. BAYER:  No, no.  Of course.

We filed that last Friday at docket number 831.

THE COURT:  Yes.

MR. BAYER:  So, the debtors anticipate closing by October 31st but, in spite of being able to do that, the purchaser is still waiting to obtain certain governmental and regulatory approvals --

THE COURT:  Yes.

MR. BAYER:  -- necessary to transfer operatorship over to the purchaser.  So, while we can transfer the assets, they will not be able to operate the assets.

THE COURT:  Right.

MR. BAYER:  So, we have set forth a form of contract operating agreement that will allow the debtors to continue operating those wells and leases safely and make sure no disruptions occur, until the necessary approvals for the purchaser to operate the wells are obtained.

THE COURT:  And of course, the Court entered an order --

MR. BAYER:  Shorten --

THE COURT:  -- granting your shortening of time.

MR. BAYER:  Yes, that's correct, Your Honor.

THE COURT:  Yes.

MR. BAYER:  Thank you for that.

The basic outline of that agreement is that the term is for sixty days --

THE COURT:  Right.

MR. BAYER:  -- subject to adjustment by the parties. It provides that the purchaser will pay all operating costs directly to vendors.  And the purchaser will also pre-fund the debtors' G&A on a monthly basis during the case.  So, although the debtors will still be operating, the purchaser, of course, will be in charge of the funding of the assets.

THE COURT:  That's right.

MR. BAYER:  Your Honor, entering into the operating agreement is the only way the debtors will be able to consummate the sale and, as such, we believe it's in the best

interest of all stakeholders.

THE COURT:  All right.

MR. BAYER:  Your Honor, that covers my presentation on the sale and the contract operating agreement.  Understanding that we still have a few pieces to move on the APA and the sale order itself, I'd like to see if you have any questions that we can answer.

THE COURT:  I don't, Mr. Bayer.  I see Mr. Friedman would like to be heard again.  Mr. --

MR. FRIEDMAN:  I'm sorry I'm back, Your Honor.

THE COURT:  That's all right.

MR. FRIEDMAN:  Again, we had this issue we were trying to address in connection with the sale order, and it's obvious we're not going to get to see it before the end of the hearing.  So I wanted to make sure the terms of the agreement were addressed on the record, because --

THE COURT:  You will see it before I sign it.

MR. FRIEDMAN:  May I just put three terms that I think --

THE COURT:  Yes.

MR. FRIEDMAN:  -- we've agreed to, on the record, so there's no confusion later on?

THE COURT:  Sure.

MR. FRIEDMAN:  As I understand it in connection with the sale, the company has agreed to pay Intrepid the adjusted

sale fee, as defined in your retention order, eighty percent of that amount, 1.608 million in cash, on the closing of the sale. The company's also agreed to deposit into a segregated escrow account an amount equal to twenty percent of the adjusted sale fee, 402,000 dollars, which escrowed amount shall be released to Intrepid upon approval, by the bankruptcy court, of Intrepid's final fee application.  And the company shall pay to Intrepid $498,010.45 of fees and expenses earned pursuant to the engagement letter and the retention order, but which have not yet paid to Intrepid upon cash -- in cash, on the closing of the sale.

          And just briefly, two more points:  And Intrepid shall be reimbursed by the company, for its unpaid documented costs and expenses, in an amount not to exceed 65,000 dollars in cash upon the closing of the sale.  And Intrepid will file a final fee application in respect of all fees and expenses paid to Intrepid during the pendency of the Chapter 11 cases, in accordance with the procedures set forth in any applicable orders of this Court and consistent with the terms I've mentioned.

          And I understand that that's the agreement that has been reached without objection by the parties-in-interest, and I thank Your Honor for hearing from me on this point.

          THE COURT:  Of course, Mr. Friedman.

          Mr. --

MR. BAYER:  So -- Your Honor, I'm happy to let others speak.  So, our intention is to work to finalize the sale order, the APA.  And there are actually two other orders that we'd be submitting, and we'll probably do it under COC; those are -- will provide for final resolution of Dakota's administrative-claims motion --

THE COURT:  All right.

MR. BAYER:  -- and the debtors' turnover motion.  So, we will get those to you, I think -- as soon as we can; realistically, likely Sunday or Monday -- early Monday.

THE COURT:  Okay.  All right --

MR. BAYER:  And --

THE COURT:  -- thank you --

MR. BAYER:  -- of course we'll provide --

THE COURT:  -- Mr. Bayer.

MR. BAYER:  -- all parties the opportunity to see.

THE COURT:  Very well.  Thank you.

Who would like to be heard on the sale motion?

Mr. Botter.

MR. BOTTER:  Yes, Your Honor.  For the record, David Botter, Akin --

No.  No, take your time.

I'll start again.  Good afternoon again, Your Honor.  David Botter, Akin Gump, on behalf of the creditors' committee.

I have just very brief comments:  one with respect to

the sale and the second with respect to Mr. Friedman's comments.  I think we all know, who've been working on this case since the outset, that to say that this case was challenging would be an understatement.  I think it's fair to say, and I'd like to speak for my colleague, Mr. Smolinsky, that the creditors, both secured and unsecured, would be hard-pressed to say there was a success here.  But the debtors and the secured lenders, to their credit, made a deal with the general unsecured creditors for a small distribution and, importantly, I think, to all of the parties in this courtroom, for an orderly wind-down of this case through a liquidating plan.  And I'm pleased to be here today and to have the debtors represent to the Court that they're in fact living up to that obligation.

So, with that, Your Honor, assuming, of course, that we get to an appropriate asset-purchase agreement and sale order over the weekend, our reservation of rights would disappear and we would be in favor of going forward.

THE COURT:  All right.

MR. BOTTER:  Your Honor, I heard the terms of the arrangement with respect to Intrepid's fees, just before I arrived here.  And again, assuming in the context of the payments that Mr. Stubblefield said in his declaration will be made, I don't know that we have an objection.  Obviously, have not talked with our clients, because, literally just heard

about it.  But I will note for Your Honor that I believe that Intrepid still has an obligation to file a fee application, and I believe the U.S. Trustee still has a reasonableness review under their existing order.

So, with that, Your Honor, I would like to compliment Mr. Bennett, Mr. Bayer and Mr. Smolinsky, and Ms. Jones of course.  And I'm hopeful that we will come to the appropriate conclusion as we all anticipated.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Botter.

Mr. Smolinsky.

MR. SMOLINSKY:  Good afternoon.

THE COURT:  You're the man of the hour.

MR. SMOLINSKY:  Joe Smolinsky from Weil, Gotshal, Manges, on behalf of Cortland Capital Markets LLC, the agent for the pre-petition secured creditors as well as the DIP lenders.

THE COURT:  Yes.

MR. SMOLINSKY:  To echo Mr. Botter's words, this was indeed a very difficult case for the lenders.  I just want to put some things in perspective.  At the time that we arrived on the scene and the lenders arrived on the scene, we were of the understanding that at the end of the sale process, the estate would have about twelve million dollars in cash and would have liens of about six million dollars.  That's the construct under which we agreed to pay the unsecured creditors two million

dollars.  We resolved the management issues.  To a certain extent, we resolved the AMESAS (ph.) issues.

In late September we were told that the estate needed about twenty-eight million dollars to close the sale.  Our reaction's probably not surprising that we said this dog don't hunt.  Apologize; I've been spending a lot of time in Texas.

THE COURT:  That's all right.

MR. SMOLINSKY:  Your Honor will note that we adjourned the hearing many times.

THE COURT:  Yes.

MR. SMOLINSKY:  The debtors did an admirable job cutting down those liens and settling cure claims; you heard about several of them here today.

We had agreed with the company, about a week to ten days ago, that we were prepared to pay a cash purchase price of 15 million dollars to supplement about 4.7 million dollars of cash that was expected to be on the company's balance sheet that of course is our cash collateral --

THE COURT:  Right.

MR. SMOLINSKY:  -- at closing.  We proceeded down that path and learned yesterday that those funds were yet insufficient to do what we had to do.  Since yesterday, we agreed to increase the cash purchase price from 15,000,000 to 15,500,000.  We also agreed to waive -- maybe "waive" is a strong word; it'll be part of our deficiency claim that --

don't think we'll ever see.

THE COURT:  Yeah.

MR. SMOLINSKY:  But we agreed to waive October interest under the DIP loan, which is another approximately 600,000 dollars.  So, since yesterday we've improved the purchase price by yet another 1.1 million dollars.

I think you're sensing that we're at the end of our line.  There are still some mechanics in the asset-purchase agreement that we're still working out, as to where receivables and payables are going as of the closing date.  And we over the weekend may end up coming back to you and saying that we are going to increase the cash purchase price to sixteen million dollars, yet have a different resolution of the accounts payable and accounts receivable.

So, the purchase price will either be 15.5 or 16 million, depending on how that case comes out.  That would of course mean that in our minds, we're paying another 1.6 million dollars --

THE COURT:  Yes.  Yes.

MR. SMOLINSKY:  -- as then compared to yesterday.

So, all that being said, we look forward to trying to close this within the next one or two business days and moving on.

THE COURT:  All right.

MR. SMOLINSKY:  Thank you.

THE COURT:  Thank you, Mr. Smolinsky.

Mr. Cleary.

MR. CLEARY:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. CLEARY:  May it please the Court.  Blake Clearly of Young Conaway Stargatt & Taylor, LLP

Your Honor, I thought we'd just kind of fold in the agenda items, because agenda item number 1 and 2 are the debtors' motion to reject the DMS agreement.

THE COURT:  Right.

MR. CLEARY:  And item number 2 is the summary-judgment pleading, which I believe we have resolved, as you know.  We filed an LOI, which is on the docket at 754; the debtors did that.  But I think Your Honor got a flavor for what that litigation was all about.  And the resolution of that kind of paved, assisted -- assisted in paving the way to get here today.  And we appreciate everybody's efforts --

THE COURT:  It had to be resolved before you got here, of course.

MR. CLEARY:  -- in resolving all that.

THE COURT:  Yes.

MR. CLEARY:  And I think Your Honor is probably curious to know, and I'm not sure if you have a copy of the form of order, but in the form of order, you're being asked to approve that settlement agreement, in paragraphs 51 through 57.

THE COURT:  All right.

MR. CLEARY:  So, I wanted to point those out to you. But in terms of the documentation of the settlement agreement, it is contained in the LOI that was filed with the docket -- on the docket, at 754.  And in essence, it's recited in that document as well as in this form of order, and in that sense it provides for a two-million-dollar payment to Dakota at closing. It also provides -- you'll recall we had a hearing before Your Honor with respect to the minimum-volume commitments, where we asked for immediate payment of an administrative claim with respect to those.  Your Honor took that into evidence and put it on the shelf, awaiting further direction from the parties whether you needed to rule.  And, so --

THE COURT:  Right.

MR. CLEARY:  -- that was one of the other items that Mr. Bayer had mentioned to you.  It's a companion to this order, and that will dictate and kind of resolve that motion fully and finally as part of the global settlement.

And also you may recall, at the same time there was an issue about certain stored crude that Dakota was holding.  It's now been monetized and the proceeds are going to be -- half of those proceeds will go to Dakota as part of that settlement.

By the way, with respect to the MVC, those amounts that are in escrow through the end of September will be released to Dakota.  But --

THE COURT:  Right.

MR. CLEARY:  -- that's all going to be documented in that order that comes to you.  But just so you know, they're all -- they all need to be kind of executed contemporaneous --

THE COURT:  Understood.

MR. CLEARY:  -- because they're all part of being --

THE COURT:  Yes.

MR. CLEARY:  -- the entire deal.

The other component about that -- of that settlement was that Dakota would receive five-percent equity interest in the purchaser.

THE COURT:  Yes.

MR. CLEARY:  There's been some -- as you can imagine, an evolution of the documents that's happened over the course of the last period of time.  And we're still trying to finalize and get answers to our questions with respect to those documents.  I don't anticipate there a problem, but obviously I wanted to reserve rights with respect to the LLC documents and part of the consideration that we are receiving in connection with that global settlement.

So, that would be the LLC agreement.  It's also contained in the APA.  I think there's some small issues that we've raised with that that we're waiting for confirmation. Again, I don't anticipate this is going to be a problem.  I wanted to make sure Your Honor was aware of it.  So, if for

some reason we need to get Your Honor involved on Monday, we would -- I would have alerted you today.

THE COURT:  Okay.

MR. CLEARY:  One of the issues deals with a contract which -- there's a couple -- there's a lot of schedules to the APA, as you can imagine; one of them is Schedule -- well, it's Exhibit C, which is the assigned contract list.  And we're requesting that one of the -- one of the contracts that the debtor is party to, go onto that Exhibit C.  It's currently on Exhibit 6.6, which means it's remaining in limbo and capable of being assigned to the purchaser.  But, again, we're working through that issue, but I wanted to let you know, Your Honor, to the extent that flows out, it may be an additional contract that's going to come over on Exhibit C when the form of order makes its way to Your Honor.

THE COURT:  All right.

MR. CLEARY:  I think I will pause -- and I didn't go through each piece of consideration of the LOI, so I do want to make clear -- I'm happy to do it, but it has been documented in the order; it's in document -- or docket item 754.  If there's -- and we get a couple of other pieces of consideration.

THE COURT:  I know that the parties had anticipated filing a global-settlement agreement.  This is the settlement agreement essentially in the order?

MR. CLEARY:  Yes.

THE COURT:  Okay.

MR. CLEARY:  So, really what was contemplated was that we would consummate the transaction and kind of -- the LOI was nonbinding at the time, but that's why all these things, what -- they're all happening now.  This is the settlement right now.

THE COURT:  Right.

MR. CLEARY:  Whenever all these things are all put together, that is the settlement.  At least that's how I understand.  That's why I ask that Your Honor consider those two additional orders when they come over with the sale order, so they can be entered on the docket simultaneously, because they are pieces of the consideration that are conditioned precedent to the settlement going effective and the closing being able to occur, along with amendments, obviously, to the dedication agreements that we've worked out between the purchaser and Dakota.  And those will be implemented at the time there's an assignment to the purchaser.  The purchaser then will get the benefit of the amended contracts and we'll entered into amended contracts, at closing, with the parties.

I think I've covered everything I wanted to cover, Your Honor, but I also wanted, obviously, to reserve the rights to look at all these documents, make sure all these documents are consistent with our LOI, which is in essence our agreement

to stand down.

THE COURT:  All right.  Mr. Cleary, thank you.

MR. CLEARY:  Thank you, Your Honor.

THE COURT:  Mr. Smolinsky, did you hear anything that causes you concern?

MR. SMOLINSKY:  No, Your Honor.

THE COURT:  All right.

MR. SMOLINSKY:  But --

THE COURT:  Good.

MR. SMOLINSKY:  But I did want to note, something that Mr. Cleary said was very important and I wanted to make sure Your Honor was aware of it, because it's not inconsistent but it's a supplement to what was provided in the sale motion.  The executory contracts are actually going to be in three buckets: there're ones that we are taking on day one; there are those that are going to remain in limbo, as Mr. Cleary put it, where during the period of the contract operating agreement, we're going to be working to determine whether or not those contracts are going to come over or not; and then the last category of contracts that --

THE COURT:  You're rejecting.

MR. SMOLINSKY:  -- are going to be -- are going to be rejected.

THE COURT:  Right.

MR. SMOLINSKY:  So, there is -- there is a little lag

in the assumption of certain of the contracts.

THE COURT:  Okay.

MR. SMOLINSKY:  Thank you.

THE COURT:  All right, thank you.  Thank you, Mr. Smolinsky.

MR. BRANNICK:  Your Honor, Nicholas Brannick on behalf of Koch Exploration.

If we could just get a little more clarity on when cure payments are going to be made, especially based on the representation that there are three buckets of executory contracts being assumed.  I think that might be helpful.  Thank you.

THE COURT:  Can you be helpful, Mr. Bayer?

MR. BAYER:  So, for the contracts being assumed and assigned on day one, in terms of payments made to those counterparties, they're --

THE COURT:  Yes.

MR. BAYER:  -- they're all listed as here on the agreement, with respect -- except with respect to cash, which will be made at closing.  With respect to --

THE COURT:  So, payments -- cure payments will be made at closing?

MR. BAYER:  For the contracts that are assumed --

THE COURT:  Right.

MR. BAYER:  -- immediately.

THE COURT:  Okay.

MR. BAYER:  For -- I think probably counsel for Koch is interested in when we're going to be able to remove the liens on the wells that are covered by the Koch agreements.

THE COURT:  Yes.

MR. BAYER:  And that will be an ongoing process that will happen as soon as reasonably practicable.

THE COURT:  All right.

MR. BAYER:  And we've --

THE COURT:  Thank --

MR. BAYER:  -- already made substantial progress on that front.

THE COURT:  All right, thank you.

Mr. Kunz?

MR. KUNZ:  Your Honor, I'm sorry; I heard "cash" and I'm not sure whether we meant cash, C-A-S-H, or --

THE COURT:  Or --

MR. KUNZ:  -- Cache, C-A-C-H-E.  And the expectation of my client, Cache, is expected to be paid in cash at closing. So, I just wanted to make sure that was --

THE COURT:  And Mr. Bayer --

MR. KUNZ:  Okay.

THE COURT:  -- is nodding his head yes.

MR. KUNZ:  Got it.

THE COURT:  So that's the representation.

MR. KUNZ:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Kunz.

Anyone else?

MR. BAYER:  I did also want to note -- I think everybody's been pretty clear about this, but we did hand out drafts of the sale order.  Those are drafts.  So, for everybody's benefit in the room, if you see a changed version over the next few days.  I just wanted to make sure that was on the record.

THE COURT:  All right.  Thank you, Mr. Bayer.

Well, I guess it's time for me to approve the sale. It's been a very difficult process, I know, and I know it's caused Mr. Smolinsky and his client a lot of angst.  And we're not fully there yet, I don't think.  There're some issues to be resolved.  But at least in the broad scheme, I'm prepared to approve the sale as being in the best interest of the debtors' estates.  And of course I want to review the sale order, for specifics.  And I'll want to see changes to the sale order and all the other documentation that will come with it.  But otherwise, I think that the objections have either been resolved or have been put off to another day.  And that satisfies me.

As far as the settlement is concerned, which is incorporated in the sale order, I will also approve it as being fair and equitable and in the debtors' best interest and as

meeting the requirements for settlements.  I think it's a good settlement.  I was very much prepared for the hearing on that matter, and I'm not going to say where I was going with it, because I hadn't fully decided.  But it was an interesting issue, and I'm glad the parties have resolved it.

All right.  So, that's the sale order.  Is there any -- oh, I also have to approve the operating agreement.  And of course I approve that.  I understand it, its terms.  It's necessary for the sale.  And I will sign that operating agreement.  I don't know if that's to be submitted to me today or on Monday.

UNIDENTIFIED SPEAKER:  Part of the sale --

UNIDENTIFIED SPEAKER:  Part of the sale order.

UNIDENTIFIED SPEAKER:  Part of the sale order.

MR. BAYER:  Well, it's a different order but we'll submit it with all the other orders.

THE COURT:  Okay.  Thank you, Mr. Bayer.

MR. BENNETT:  Your Honor, Ryan Bennett again.

THE COURT:  Mr. Bennett.

MR. BENNETT:  Sure.  Again, thanks very much, Your Honor.  We've -- I know we've been challenging on the Court's schedule, at times, with number of adjournments and --

THE COURT:  You clogged up my schedule.

MR. BENNETT:  And we appreciate your accommodating, and appreciate the plenty of homework I'm sure you did with

respect to the --

THE COURT:  Yes.

MR. BENNETT:  -- the gathering-agreement litigation.

THE COURT:  Yes.

MR. BENNETT:  So, Your Honor, I think our plan is to --

THE COURT:  Do you need time on Monday --

MR. BENNETT:  I --

THE COURT:  -- just in case?

MR. BENNETT:  I don't -- I don't think so, Judge.  I mean, I -- I guess, if Your Honor's willing and we can -- like, we'll coordinate with chambers and maybe get a time.  If -- I think --

THE COURT:  It would be in the afternoon, because I'm actually speaking with your colleagues at the University of Pennsylvania, in the mor --

MR. BENNETT:  Oh, great.  Great.

THE COURT:  -- in the morning.

MR. BENNETT:  That course that Jamie (ph.) teaches.  Right.

THE COURT:  That's right.

MR. BENNETT:  The -- that's good to hear.

So, I think, Your Honor, we should be able to rationalize the documents over the weekend and make sure that everyone in the courtroom who's interested gets to look at the

language and gets comfortable.  But, yeah, we'll coordinate with chambers and get a time if necessary.

THE COURT:  All right.

MR. BENNETT:  I think our hope is to be in a closing position by the end of the day Monday.  Probably it kicks to Tuesday.  But we'll make sure we get the package to Your Honor by the time you get back from Philly.

THE COURT:  All right.  And if there are issues the parties have, obviously try to work them out; if not, then I'll hear from you.

MR. BENNETT:  Great.

THE COURT:  Anything further, counsel?

MR. BENNETT:  Thanks very much, Judge.

THE COURT:  Well, I know how hard you've worked, and it's -- you've achieved a good result here; not the best, but a good result.  And of course, that's what you were looking for.  And I know that there're still some issues to resolve, but I'm sure you'll do that over the weekend.

All right?  And if you need me over the weekend, for anything, I can be reached.  All right?

All right, everyone.  Thank you much.

UNIDENTIFIED SPEAKER:  Thank you.

MR. BENNETT:  Yes, Judge.

THE COURT:  With that, we'll stand in recess.

MR. BENNETT:  Thank you.  Have a nice weekend.

THE COURT:  You too.  Everyone have a good weekend. Safe travel.

(Whereupon these proceedings were concluded at 2:13 PM)

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**I N D E X**

RULINGS

| | Page | Line |
|---|---|---|
| The sale is approved. | 41 | 16 |
| The settlement is approved. | 41 | 24 |
| The operating agreement is approved. | 42 | 8 |

C E R T I F I C A T I O N

I, Clara Rubin, certify that the foregoing transcript is a true
and accurate record of the proceedings.

October 31, 2016

_____          _____

CLARA RUBIN                                DATE

eScribers, LLC

700 West 192nd Street, Suite #607

New York, NY 10040

**$**

**$0.69 (1)**
16:20
**$1.30 (1)**
16:21
**$1.35 (1)**
16:21
**$1.40 (1)**
16:21
**$403,782.17 (1)**
19:15
**$498,010.45 (1)**
27:8

**A**

**A2D (2)**
4:8;16:23
**ABELMAN (4)**
4:4;23:16,16,19
**able (9)**
12:13;14:2,4;
24:18,24;25:24;
37:16;40:3;43:23
**Absolutely (1)**
13:12
**acceptable (2)**
23:18,20
**accommodating (1)**
42:24
**accordance (1)**
27:18
**account (1)**
27:4
**accounts (2)**
32:13,14
**accurate (1)**
18:2
**achieved (1)**
44:15
**acreage (2)**
14:13,16
**action (1)**
19:17
**actually (7)**
11:14;18:10,20;
22:18;28:3;38:14;
43:15
**added (2)**
14:3;18:9
**addition (1)**
9:5
**additional (5)**
15:23;16:18;
21:14;36:13;37:12
**address (1)**
26:13
**addressed (1)**
26:16
**adjourned (1)**
31:8

**adjournments (1)**
42:22
**adjusted (3)**
16:16;26:25;27:4
**adjustment (1)**
25:16
**administrative (2)**
10:23;34:10
**administrative-claims (1)**
28:6
**administratively (1)**
8:21
**admirable (1)**
31:11
**admission (1)**
12:11
**admitting (1)**
11:4
**advisors (1)**
12:9
**AES (1)**
20:24
**affirmation (1)**
11:13
**afternoon (19)**
8:3,7,8;9:20,22;
11:10,11;12:7;18:4,
5;19:6,7,21,22;
28:23;30:11;33:3,4;
43:14
**again (11)**
15:22;20:14;26:9,
12;28:23,23;29:22;
35:24;36:11;42:18,
20
**agenda (2)**
33:8,8
**agent (3)**
10:17;21:19;30:14
**ago (3)**
13:19;14:11;31:15
**agreed (12)**
17:7;18:17;19:15;
23:7;26:21,25;27:3;
30:25;31:14,23,24;
32:3
**agreement (27)**
9:12,13;10:4;
16:15;18:2;19:24;
23:4,25;25:2,13,24;
26:4,15;27:21;
29:16;32:9;33:9,25;
34:3;35:21;36:24,
25;37:25;38:17;
39:19;42:7,10
**agreements (2)**
37:17;40:4
**Akin (3)**
11:5;28:21,24
**al (1)**
4:18
**alerted (1)**
36:2

**allow (4)**
9:13;10:23;21:14;
25:2
**Allowed (1)**
12:5
**along (1)**
37:16
**although (1)**
25:19
**amended (4)**
16:12;21:22;
37:20,21
**amendment (2)**
16:12,14
**amendments (1)**
37:16
**AMESAS (1)**
31:2
**among (1)**
21:20
**amount (13)**
11:18;12:18;13:3,
3;17:8;19:14,15,16;
22:15;27:2,4,5,14
**amount'll (1)**
11:19
**amounts (3)**
11:14;12:16;34:23
**AMY (1)**
6:23
**angst (1)**
41:13
**anticipate (5)**
14:22;15:1;24:17;
35:17,24
**anticipated (2)**
30:8;36:23
**APA (5)**
10:8;26:5;28:3;
35:22;36:6
**Apologize (1)**
31:6
**appeared (1)**
15:11
**applicable (1)**
27:18
**application (3)**
27:7,16;30:2
**appreciate (3)**
33:17;42:24,25
**appropriate (3)**
15:14;29:16;30:7
**approval (1)**
27:6
**approvals (2)**
24:20;25:4
**approve (9)**
9:12;10:13;14:7;
33:25;41:11,16,24;
42:7,8
**approximately (2)**
14:12;32:4
**around (1)**

**10:8**
**arrangement (1)**
29:21
**arrangements (1)**
21:9
**arrived (3)**
29:22;30:20,21
**assert (1)**
21:4
**asset-purchase (2)**
29:16;32:8
**assets (4)**
10:14;24:23,24;
25:21
**assign (1)**
16:4
**assigned (6)**
15:18;17:12,15;
36:7,11;39:15
**assignment (1)**
37:19
**assisted (2)**
33:16,16
**assume (2)**
9:12;16:4
**assumed (8)**
15:18;17:11,13,
14;21:21;39:11,14,
23
**assuming (6)**
16:11;17:1,1;
20:14;29:15,22
**assumption (1)**
39:1
**attached (2)**
10:9;17:12
**attorney (1)**
16:24
**Attorneys (17)**
4:3,8,13,18,22,23;
5:2,8,13,18,23;6:3,
10,15,21;7:3,8
**auction (3)**
21:13;22:1,3
**awaiting (1)**
34:12
**aware (4)**
14:1;21:9;35:25;
38:12

**B**

**back (3)**
26:10;32:11;44:7
**balance (1)**
31:17
**Bankruptcy (2)**
21:6;27:6
**BARTLETT (1)**
6:14
**based (2)**
11:12;39:9
**basic (1)**

**25:13**
**basis (1)**
25:19
**Bayer (85)**
9:9,20,21,22,25;
10:3,6,7,12,16;
11:19,21,23;12:3,5;
13:2,14,17,24;14:11;
15:4,5,7,20;16:6,10;
17:3,20;18:1,24,25;
20:12,17,19,20,22;
21:3,19;22:5,8,22,
25;23:3,6,14,22;
24:2,4,8,10,12,13,14,
17,22;25:1,8,10,12,
16,23;26:3,8;28:1,8,
12,14,15,16;30:6;
34:16;39:13,14,18,
23,25;40:2,6,9,11,
21;41:4,10;42:15,17
**Bayer's (1)**
19:12
**behalf (8)**
8:7;9:23;18:6;
19:10,23;28:24;
30:14;39:6
**benefit (2)**
37:20;41:7
**BENNETT (29)**
8:6,7,8,9,13,23;
9:1,8,16,18,19;30:6;
42:18,18,19,20,24;
43:3,5,8,10,17,19,22;
44:4,11,13,23,25
**Bennett's (1)**
11:13
**best (5)**
22:3;25:25;41:16,
25;44:15
**bid (8)**
9:4;13:22;21:13,
15,17,19,25;22:2
**bidder (1)**
13:20
**bids (2)**
21:15,16
**BIRD (1)**
5:3
**bit (1)**
9:9
**BLAKE (2)**
7:9;33:5
**BOONE (2)**
5:7;17:23
**both (2)**
21:7;29:6
**Botter (13)**
11:5,5,8,10,11,12;
12:1;28:19,20,21,24;
29:20;30:9
**Botter's (1)**
30:18
**BRANNICK (5)**

4:14;18:5,6;39:6,6
**brief (1)**
    28:25
**briefing (2)**
    23:8,11
**briefly (2)**
    15:17;27:12
**bring (1)**
    10:4
**broad (1)**
    41:15
**BROWN (1)**
    4:7
**BROWNSTEIN (2)**
    4:2;23:17
**BRYCE (2)**
    6:16;12:8
**buckets (2)**
    38:14;39:10
**budget (1)**
    19:1
**budgeted (1)**
    22:15
**Bureau (1)**
    20:23
**business (1)**
    32:22
**businesspeople (1)**
    16:25

**C**

**Cache (5)**
    5:13;19:23;22:13;
    40:18,19
**C-A-C-H-E (1)**
    40:18
**came (1)**
    12:22
**can (12)**
    18:10,24,25;
    24:23;26:7;28:9;
    35:13;36:6;37:13;
    39:13;43:11;44:20
**cancelled (1)**
    22:3
**capable (1)**
    36:10
**Capital (3)**
    5:23;6:21;30:14
**CARL (4)**
    5:4,14;19:7,22
**case (9)**
    13:6;22:16;25:19;
    29:3,3,11;30:19;
    32:16;43:9
**cases (4)**
    10:24;15:12;
    21:24;27:17
**cash (18)**
    9:3,5;20:1;21:23;
    27:2,10,10,14;30:23;
    31:15,17,18,23;

32:12;39:19;40:15,
    16,19
**C-A-S-H (1)**
    40:16
**category (1)**
    38:19
**caused (1)**
    41:13
**causes (1)**
    38:5
**certain (5)**
    17:3;24:19;31:1;
    34:20;39:1
**certainly (2)**
    13:9;20:11
**certainty (1)**
    14:3
**challenging (2)**
    29:4;42:21
**chambers (2)**
    43:12;44:2
**chance (1)**
    18:10
**change (1)**
    18:16
**changed (2)**
    18:17;41:7
**changes (1)**
    41:18
**CHANTELLE (1)**
    7:4
**Chapter (3)**
    14:5;21:24;27:17
**charge (1)**
    25:21
**chief (1)**
    8:23
**CHIPMAN (1)**
    4:7
**CHRISTOPHER (1)**
    4:19
**CICERO (1)**
    4:7
**claim (5)**
    13:3;16:17;19:16;
    31:25;34:10
**claims (7)**
    10:23;12:5;22:17,
    19;23:24,25;31:12
**Clara (1)**
    7:25
**clarity (1)**
    39:8
**clear (5)**
    12:15,16;22:21;
    36:19;41:5
**Clearly (1)**
    33:5
**CLEARY (22)**
    7:9;33:2,3,5,11,20,
    22;34:2,15;35:2,6,8,
    13;36:4,17;37:1,3,9;
    38:2,3,11,16

**CLERK (1)**
    8:2
**client (3)**
    12:17;40:19;41:13
**clients (1)**
    29:25
**client's (1)**
    13:3
**clogged (1)**
    42:23
**close (3)**
    21:24;31:4;32:22
**closing (17)**
    14:21;16:13;19:1;
    22:16;24:17;27:2,10,
    15;31:20;32:10;
    34:7;37:15,21;39:20,
    22;40:19;44:4
**COC (1)**
    28:4
**Code (1)**
    21:6
**COHEN (1)**
    6:11
**COLE (3)**
    4:7,12;18:6
**collateral (1)**
    31:18
**colleague (2)**
    9:9;29:5
**colleagues (1)**
    43:15
**colleague's (1)**
    13:5
**COLLINS (1)**
    5:25
**comfortable (1)**
    44:1
**coming (2)**
    14:5;32:11
**comments (4)**
    20:23,24;28:25;
    29:2
**commercial (1)**
    14:2
**commitment (1)**
    16:18
**commitments (2)**
    16:15;34:9
**Committee (3)**
    7:3;11:12;28:24
**companion (1)**
    34:16
**Company (7)**
    4:3;6:3;9:6;26:25;
    27:7,13;31:14
**company's (2)**
    27:3;31:17
**compared (1)**
    32:20
**compliment (1)**
    30:5
**component (2)**

9:3;35:9
**components (3)**
    9:2,10;10:7
**CONAWAY (2)**
    7:7;33:6
**concern (1)**
    38:5
**concerned (1)**
    41:23
**concerns (1)**
    17:3
**conclude (1)**
    24:4
**concluded (1)**
    45:3
**conclusion (1)**
    30:8
**conditioned (1)**
    37:14
**confirm (2)**
    18:1,13
**confirmable (1)**
    8:18
**confirmation (1)**
    35:23
**confusion (1)**
    26:22
**connection (4)**
    19:14;26:13,24;
    35:19
**CONNOLLY (1)**
    4:17
**consider (1)**
    37:11
**considerable (1)**
    15:21
**consideration (4)**
    35:19;36:18,22;
    37:14
**consistent (3)**
    19:16;27:19;37:25
**construct (1)**
    30:24
**consultation (1)**
    16:3
**consummate (4)**
    14:5;21:24;25:25;
    37:4
**contained (3)**
    23:4;34:4;35:22
**contemplated (1)**
    37:3
**contemporaneous (1)**
    35:4
**context (1)**
    29:22
**continue (1)**
    25:2
**contract (11)**
    16:7,12,17;17:1;
    19:15;25:1;26:4;
    36:4,7,13;38:17
**contract-operating- (1)**

10:3
**contracts (18)**
    15:10,18,21;16:4;
    17:10,13,14;21:21;
    36:8;37:20,21;38:14,
    18,20;39:1,11,14,23
**COOCH (1)**
    4:22
**Cooperative (2)**
    5:2;19:11
**coordinate (2)**
    43:12;44:1
**copy (3)**
    9:25;10:3;33:23
**corresponds (1)**
    18:14
**Cortland (3)**
    5:23;6:21;30:14
**costs (3)**
    19:1;25:17;27:13
**counsel (3)**
    21:9;40:2;44:12
**counterparties (5)**
    15:11;24;16:2,7;
    39:16
**couple (4)**
    9:10;23:6;36:5,21
**course (18)**
    16:9;17:20;18:12;
    24:14;25:6,20;
    27:24;28:14;29:15;
    30:7;31:18;32:17;
    33:19;35:14;41:17;
    42:8;43:19;44:16
**COURT (167)**
    8:3,8,12,19,20,22,
    25;9:7,15,17,19,24;
    10:2,5,11,15,25;
    11:3,7,9,11,17,18,22;
    12:2,4,6,18,23;13:1,
    9,12,15,23;14:10;
    15:3,6,19;16:5,9;
    17:2,5,18,21;18:3,
    12,23;19:3,5,9,18,
    21;20:7,9,11,13,16,
    18,21;21:2,18;22:4,
    7,20,24;23:2,5,13,15,
    18,21;24:1,3,7,9,11,
    13,16,21,25;25:6,6,9,
    11,15,22;26:2,8,11,
    17,20,23;27:6,19,24;
    28:7,11,13,15,17;
    29:13,19;30:9,12,17;
    31:7,10,19;32:2,19,
    24;33:1,4,5,10,18,
    21;34:1,14;35:1,5,7,
    12;36:3,16,23;37:2,
    8;38:2,4,7,9,21,24;
    39:2,4,13,17,21,24;
    40:1,5,8,10,13,17,21,
    23,25;41:2,10;42:17,
    19,23;43:2,4,7,9,14,
    18,21;44:3,8,12,14,

24;45:1
**courtroom (2)**
29:10;43:25
**Court's (2)**
8:10;42:21
**cover (6)**
15:17;22:9,17;
23:12;24:5;37:22
**covered (2)**
37:22;40:4
**covers (1)**
26:3
**CRAIG (1)**
7:10
**created (1)**
10:17
**credit (3)**
9:4;10:18;29:8
**creditor (1)**
15:10
**creditors (4)**
29:6,9;30:15,25
**Creditors' (2)**
7:3;28:24
**crude (1)**
34:20
**cure (20)**
15:22,23,25;
16:17;17:6,11,18;
18:7,18,21,22;19:13,
14;20:15,18,24;
22:10;31:12;39:9,21
**cures (1)**
21:1
**cure's (1)**
19:25
**curing (1)**
17:8
**curious (1)**
33:23
**currently (1)**
36:9
**cutting (1)**
31:12

**D**

**Daily (1)**
15:13
**Dakota (7)**
7:8;34:7,20,22,25;
35:10;37:18
**Dakota's (1)**
28:5
**DARBY (1)**
6:4
**date (3)**
17:15;23:9;32:10
**David (3)**
11:5;28:20,24
**day (5)**
21:13;38:15;
39:15;41:21;44:5

**days (4)**
25:14;31:15;
32:22;41:8
**days' (1)**
14:18
**deadline (2)**
21:14,15
**deal (3)**
8:16;29:8;35:8
**deals (1)**
36:4
**deal's (1)**
18:8
**debtor (2)**
12:13;36:9
**debtors (39)**
8:7,14,16;9:2,23;
10:23;13:17,21,25;
14:2,4,14,23;15:8,9,
14,20,25;16:1,11;
17:9;18:8,18,18,20;
19:13;21:4,8,23;
22:2;23:3;24:17;
25:2,20,24;29:7,12;
31:11;33:13
**Debtors' (7)**
10:14,17;25:19;
28:8;33:9;41:16,25
**decide (1)**
16:3
**decided (1)**
42:4
**Deck (1)**
15:13
**declaration (10)**
8:23;10:20,21;
11:1,4,16;12:11,14;
22:20;29:23
**dedication (1)**
37:17
**deficiency (1)**
31:25
**defined (1)**
27:1
**delayed (1)**
23:8
**Denver (1)**
15:12
**depending (1)**
32:16
**deposit (1)**
27:3
**described (1)**
12:14
**describes (1)**
10:21
**details (1)**
10:10
**determination (1)**
23:11
**determine (2)**
17:10;38:18
**determined (1)**

22:2
**developed (1)**
14:15
**DICK (1)**
4:24
**dictate (1)**
34:17
**different (4)**
19:25;22:25;
32:13;42:15
**difficult (2)**
30:19;41:12
**diligence (1)**
8:17
**DIP (2)**
30:15;32:4
**direction (1)**
34:12
**directly (1)**
25:18
**disappear (1)**
29:18
**discuss (1)**
17:16
**discussed (1)**
21:11
**discussion (1)**
13:8
**disruptions (1)**
25:4
**distribution (1)**
29:9
**DMS (3)**
14:1;21:21;33:9
**docket (7)**
18:7;24:15;33:13;
34:4,5;36:20;37:13
**document (2)**
34:6;36:20
**documentation (2)**
34:3;41:19
**documented (3)**
27:13;35:2;36:19
**documents (6)**
35:14,17,18;37:24,
24;43:24
**dog (1)**
31:5
**dollars (14)**
13:22;17:7;27:5,
14;30:23,24;31:1,4,
16,16;32:5,6,13,18
**down (3)**
31:12,20;38:1
**downwards (1)**
16:16
**drafts (2)**
41:6,6
**Drilling (1)**
20:25
**due (3)**
11:24;12:1,17
**during (3)**

25:19;27:17;38:17

**E**

**earlier (1)**
10:20
**early (1)**
28:10
**earned (1)**
27:8
**echo (1)**
30:18
**EDELSON (1)**
5:19
**effect (1)**
10:22
**effective (1)**
37:15
**effort (1)**
8:17
**efforts (1)**
33:17
**eighty (1)**
27:1
**either (3)**
16:2;32:15;41:20
**Electric (3)**
5:2;17:5;19:10
**ELISHA (1)**
6:17
**Ellis (1)**
9:23
**else (2)**
13:15;41:3
**Emerald (3)**
6:10;10:16;13:21
**emerged (1)**
13:21
**end (9)**
8:18;10:24;22:18;
26:14;30:22;32:7,
11;34:24;44:5
**Energy (2)**
10:16;17:25
**engaged (2)**
13:18,25
**engagement (1)**
27:9
**enough (2)**
9:4;12:20
**ensure (1)**
8:17
**entered (4)**
18:11;25:6;37:13,
21
**entering (1)**
25:23
**entire (1)**
35:8
**entities (1)**
14:15
**entitled (1)**
21:4

**entity (1)**
10:17
**entry (1)**
23:10
**equal (1)**
27:4
**equipment (1)**
20:2
**equitable (1)**
41:25
**equity (1)**
35:10
**escalator (1)**
16:22
**escrow (2)**
27:3;34:24
**escrowed (1)**
27:5
**especially (1)**
39:9
**ESQ (23)**
4:4,9,14,19,24;5:3,
4,9,14,19,24,25;6:4,
5,6,11,16,17,22,23;
7:4,9,10
**essence (2)**
34:5;37:25
**essentially (1)**
36:25
**estate (3)**
8:21;30:22;31:3
**estates (2)**
10:23;41:17
**estimated (1)**
12:18
**et (1)**
4:18
**everybody's (3)**
33:17;41:5,7
**everyone (4)**
8:3;43:25;44:21;
45:1
**evidence (2)**
11:2;34:11
**evolution (1)**
35:14
**example (1)**
12:16
**exceed (1)**
27:14
**except (1)**
39:19
**exchange (1)**
20:1
**executed (2)**
16:13;35:4
**executory (2)**
38:14;39:10
**exercise (1)**
12:17
**exhibit (5)**
20:3;36:7,9,10,14
**existing (1)**

Case 16-50998-KG   Doc 77   Filed 10/31/16   Page 51 of 56

EMERALD OIL, INC., et al.
Case No. 16-10704(KG)

October 28, 2016

30:4
**expectation (1)**
40:18
**expected (2)**
31:17;40:19
**expenses (4)**
12:12;27:8,14,16
**Exploration (5)**
4:3,13;6:3;18:6;
39:7
**extended (3)**
16:17;21:13,14
**extensive (2)**
13:18;14:1
**extent (3)**
22:18;31:2;36:13

**F**

**facilities (1)**
10:18
**fact (2)**
11:13;29:13
**fair (2)**
29:4;41:25
**faith (2)**
17:16;21:10
**far (1)**
41:23
**FARBER (2)**
4:2;23:17
**favor (1)**
29:18
**FedEx'd (1)**
14:19
**fee (5)**
27:1,5,7,16;30:2
**fees (4)**
12:19;27:8,16;
29:21
**Feld (1)**
11:8
**FERC (1)**
16:22
**few (8)**
10:7;14:8;15:23;
16:6;22:9,14;26:5;
41:8
**file (7)**
10:20;14:5;15:2;
17:13;23:23;27:15;
30:2
**filed (10)**
17:6;18:7;19:16;
22:10,11,12,15;
24:15;33:13;34:4
**filing (1)**
36:24
**final (4)**
10:10;27:7,15;
28:5
**finalize (2)**
28:2;35:15

**finally (1)**
34:18
**Financial (3)**
6:15;12:9,9
**find (1)**
22:5
**finding (2)**
21:4,10
**FINGER (1)**
5:22
**first (1)**
8:9
**FISHMAN (1)**
6:2
**five-percent (1)**
35:10
**flavor (1)**
33:14
**flexibility (1)**
8:10
**flows (1)**
36:13
**Fluids (1)**
20:25
**FMC (2)**
4:18;22:12
**fold (1)**
33:7
**Following (1)**
13:24
**follows (1)**
16:14
**forget (1)**
23:22
**form (5)**
25:1;33:24,24;
34:6;36:14
**formal (1)**
16:12
**forth (4)**
11:14,14;25:1;
27:18
**forward (6)**
8:10;12:6;14:4;
21:15;29:18;32:21
**FOX (2)**
5:1;19:8
**Friday (1)**
24:15
**FRIEDMAN (14)**
6:16;12:7,8,21;
13:4,9,11;26:8,10,
12,18,21,24;27:24
**Friedman's (1)**
29:1
**front (1)**
40:12
**fully (3)**
34:18;41:14;42:4
**funding (2)**
9:2;25:21
**funds (6)**
10:22;11:13,25;

21:23;22:17;31:21
**further (2)**
34:12;44:12

**G**

**G&A (1)**
25:19
**GALLAGHER (1)**
4:17
**gathering-agreement (1)**
43:3
**general (1)**
29:9
**generally (1)**
10:21
**Geological (1)**
16:24
**gets (2)**
43:25;44:1
**giving (1)**
14:21
**glad (1)**
42:5
**GLANTZ (1)**
6:2
**global (2)**
34:18;35:20
**global-settlement (1)**
36:24
**Good (34)**
8:3,4,6,7,8,22;
9:20,21,21;11:8,9,
10,11;12:7;17:16;
18:4,5;19:6,7,21,22;
20:13;21:10;24:3;
28:23;30:11;33:3,4;
38:9;42:1;43:22;
44:15,16;45:1
**good-faith (2)**
21:3,5
**GOTSHAL (2)**
6:20;30:13
**governmental (1)**
24:19
**GRAFF (1)**
6:17
**GRANT (1)**
4:24
**granting (1)**
25:9
**GREAR (1)**
7:10
**Great (4)**
19:4;43:17,17;
44:11
**GRIFFITHS (1)**
4:19
**guess (3)**
13:5;41:11;43:11
**Gump (2)**
11:5;28:24

**H**

**half (1)**
34:21
**HAMPTON (1)**
6:9
**hand (4)**
9:5;24:6,6;41:5
**handful (1)**
15:25
**happen (1)**
40:7
**happened (1)**
35:14
**happening (1)**
37:6
**happy (4)**
13:4;14:23;28:1;
36:19
**hard (1)**
44:14
**hard- (1)**
29:6
**Hauer (1)**
11:8
**HAYNES (2)**
5:7;17:23
**head (1)**
40:23
**hear (3)**
38:4;43:22;44:10
**heard (10)**
13:15;15:3,16;
17:19;26:9;28:18;
29:20,25;31:12;
40:15
**hearing (5)**
26:14;27:23;31:9;
34:8;42:2
**held (1)**
14:12
**help (1)**
18:24
**helpful (2)**
39:11,13
**high (1)**
12:20
**highest (1)**
22:3
**highlight (1)**
14:8
**hold (1)**
23:10
**holding (1)**
34:20
**Holdings (2)**
6:10;13:21
**homework (1)**
42:25
**Honor (77)**
8:6,9;9:8,10,18,21;
10:13,19;11:5,10,15,

23;12:1,7;13:17;
14:1,7;15:13,17,20;
16:6;17:9,16,22;
18:5;19:4,7,12,20,
22,24;20:17;21:3,11;
22:8;23:12,16,19,22;
24:4;25:10,23;26:3,
10;27:23;28:1,20,23;
29:15,20;30:1,5,8;
31:8;33:3,7,14,22;
34:9,11;35:25;36:1,
12,15;37:11,23;38:3,
6,12;39:6;40:15;
41:1;42:18,21;43:5,
23;44:6
**Honor's (1)**
43:11
**hook (1)**
18:22
**hope (1)**
44:4
**hopeful (1)**
30:7
**HORAN (1)**
6:5
**horse (3)**
13:25;21:16;22:1
**hour (1)**
30:12
**housekeeping (1)**
10:19
**hundred (1)**
14:12
**hunt (1)**
31:6
**HYATT (2)**
4:2;23:17

**I**

**identify (1)**
14:12
**III (1)**
5:14
**imagine (2)**
35:13;36:6
**immediate (1)**
34:10
**immediately (2)**
14:18;39:25
**implemented (1)**
37:18
**important (1)**
38:11
**importantly (1)**
29:10
**improved (1)**
32:5
**Inc (4)**
4:8,18;5:2;19:11
**include (1)**
17:11
**included (1)**

19:1
**includes (2)**
20:1;22:12
**inconsistent (1)**
38:12
**incorporated (3)**
13:3,7;41:24
**increase (2)**
31:23;32:12
**increased (1)**
16:19
**indeed (1)**
30:19
**indicated (1)**
22:1
**informal (1)**
20:23
**inherited (1)**
14:14
**initial (3)**
10:19;14:11;17:12
**insolvent (1)**
8:21
**insufficient (1)**
31:22
**intend (2)**
10:9;17:13
**intention (1)**
28:2
**interest (5)**
26:1;32:4;35:10;
41:16,25
**interested (6)**
13:18,19;15:8;
21:12;40:3;43:25
**interesting (1)**
42:4
**interests (1)**
14:13
**into (8)**
11:2;12:22;13:3;
16:8;25:23;27:3;
34:11;37:21
**Intrepid (10)**
6:15;12:9;26:25;
27:6,8,10,12,15,17;
30:2
**Intrepid's (2)**
27:7;29:21
**involved (1)**
36:1
**issue (7)**
12:22,23;13:2;
26:12;34:20;36:12;
42:5
**issues (9)**
20:4,25;31:1,2;
35:22;36:4;41:14;
44:8,17
**item (3)**
33:8,11;36:20
**items (2)**
33:8;34:15

**J**

**JAMES (1)**
5:12
**Jamie (1)**
43:19
**job (1)**
31:11
**Joe (1)**
30:13
**JOHN (1)**
5:3
**JOHNNA (1)**
6:4
**Jones (1)**
30:6
**JOSEPH (1)**
6:22
**Judge (3)**
43:10;44:13,23
**JUSTIN (1)**
5:19

**K**

**key (1)**
14:8
**kicks (1)**
44:5
**kind (5)**
33:7,15;34:17;
35:4;37:4
**Kirkland (1)**
9:22
**Koch (6)**
4:13;18:6,7;39:7;
40:2,4
**KUNZ (15)**
5:14;19:21,22,22;
20:8,9,10,14;40:14,
15,18,22,24;41:1,2
**KURT (1)**
6:6

**L**

**lag (1)**
38:25
**Land (1)**
20:23
**language (8)**
18:9,13,16,17;
20:4,12;23:19;44:1
**last (5)**
18:16;22:8;24:15;
35:15;38:19
**late (2)**
18:15;31:3
**later (3)**
17:14;23:9;26:22

**IV (1)**
4:24

**LAW (1)**
4:22
**LAYTON (1)**
5:22
**learned (1)**
31:21
**leases (2)**
14:15;25:3
**least (2)**
37:10;41:15
**left (1)**
10:22
**lender (2)**
21:25;22:2
**lenders (5)**
21:17;29:8;30:16,
19,21
**lenders' (1)**
21:19
**lessors (1)**
15:1
**letter (1)**
27:9
**Liberty (1)**
22:12
**lienholder (1)**
22:14
**lienholders (1)**
22:11
**liens (3)**
30:24;31:12;40:4
**likely (1)**
28:10
**limbo (2)**
36:10;38:16
**line (1)**
32:8
**liquidating (2)**
8:18;29:11
**list (2)**
17:12;36:7
**listed (4)**
12:18;19:14;20:2;
39:18
**literally (1)**
29:25
**litigation (5)**
14:1,3;21:22;
33:15;43:3
**little (5)**
9:9;19:25;22:25;
38:25;39:8
**living (1)**
29:13
**LLC (6)**
6:2;7:8;10:16;
30:14;35:18,21
**LLP (11)**
4:2,7,17;5:1,7,12;
6:9,14,20;7:7;33:6
**loan (1)**
32:4
**LOI (5)**

33:13;34:4;36:18;
37:4,25
**look (4)**
18:10;32:21;
37:24;43:25
**looking (2)**
18:19;44:16
**lot (5)**
8:13,16;31:6;36:5;
41:13
**LP (1)**
7:2
**Lufkin (1)**
23:23

**M**

**majority (1)**
22:11
**makes (2)**
22:20;36:15
**man (1)**
30:12
**Management (2)**
20:23;31:1
**MANGES (2)**
6:20;30:14
**many (1)**
31:9
**March (1)**
16:19
**MARK (2)**
4:9;5:25
**Market (2)**
5:23;6:21
**marketing (3)**
10:21;21:7,12
**Markets (1)**
30:14
**matrix (1)**
15:10
**matter (4)**
10:19;14:11;23:8;
42:3
**may (7)**
8:3;17:4;26:18;
32:11;33:5;34:19;
36:13
**maybe (3)**
8:4;31:24;43:12
**MCCLAMB (1)**
7:4
**McKenzie (4)**
5:2;17:5;19:10,13
**McKenzie's (2)**
19:14,16
**mean (2)**
32:17;43:11
**means (1)**
36:10
**meant (1)**
40:16
**mechanics (1)**

32:8
**meeting (1)**
42:1
**mentioned (2)**
27:20;34:16
**MICHELLE (1)**
6:23
**Midstream (1)**
7:8
**might (1)**
39:11
**million (12)**
13:22;27:2;30:23,
24,25;31:4,16,16;
32:6,12,16,17
**mind (1)**
16:10
**minds (1)**
32:17
**mineral (1)**
14:12
**minimum-volume (2)**
16:15;34:9
**Monday (7)**
14:22;28:10,10;
36:1;42:11;43:7;
44:5
**monetized (1)**
34:21
**money (2)**
18:20;20:14
**monthly (1)**
25:19
**months (3)**
13:19;14:5;16:19
**mor (1)**
43:16
**more (4)**
9:9,10;27:12;39:8
**morning (4)**
9:21;10:21;11:8;
43:18
**MORRIS (1)**
5:12
**motion (13)**
8:11;9:11,11,11;
24:5,6,10;28:6,8,18;
33:9;34:17;38:13
**move (3)**
14:4;24:5;26:5
**moved (1)**
11:1
**moving (5)**
8:10;10:8;21:3;
24:4;32:22
**much (6)**
8:10,17;42:2,20;
44:13,21
**MULLIN (1)**
6:9
**MVC (1)**
34:23

## N

**name (1)**
12:7
**necessary (5)**
22:17;24:22;25:4;
42:9;44:2
**need (9)**
12:25;14:17;
19:25;20:5;23:9;
35:4;36:1;43:7;
44:19
**needed (3)**
8:13;31:3;34:13
**NEFF (6)**
5:4;19:7,7,10,19,
20
**negotiated (1)**
20:2
**negotiations (1)**
13:18
**New (3)**
6:10;10:16;13:21
**newco (1)**
9:13
**Nex (1)**
17:24
**Next (3)**
17:16;32:22;41:8
**NextEra (3)**
16:11,16;17:25
**nice (1)**
44:25
**NICHOLAS (3)**
4:14;18:5;39:6
**night (1)**
18:16
**nodding (1)**
40:23
**nonbinding (1)**
37:5
**None (1)**
15:5
**note (6)**
17:6;24:2;30:1;
31:8;38:10;41:4
**notice (11)**
10:8;14:14,18;
15:12,14,22,23;17:6,
11,13;19:14
**number (8)**
14:14;15:21;18:7;
21:12;24:15;33:8,
11;42:22

## O

**object (3)**
11:3;14:22;15:15
**objection (11)**
11:12,15;12:10;
15:2;16:23,25;18:7;

22:23;23:23;27:22;
29:24
**objections (11)**
14:24,25;15:25;
16:1,2;22:9,10,11,
12,14;41:20
**obligation (2)**
29:14;30:2
**obligations (1)**
9:5
**obtain (1)**
24:19
**obtained (1)**
25:5
**obvious (1)**
26:13
**Obviously (7)**
19:24;20:5;29:24;
35:17;37:16,23;44:9
**occur (2)**
25:4;37:16
**occurred (1)**
14:19
**October (5)**
14:19,22;15:22;
24:18;32:3
**ODEN (1)**
6:23
**off (1)**
41:21
**officer (1)**
8:24
**Official (1)**
7:3
**oil-and-gas (1)**
14:25
**Oilfield (1)**
22:13
**oldco (1)**
9:13
**OLIVERE (1)**
4:9
**one (15)**
8:16;14:12;16:10,
17;18:15;23:22;
28:25;32:22;34:15;
36:4,6,8,8;38:15;
39:15
**ones (1)**
38:15
**ongoing (1)**
40:6
**only (3)**
15:25;21:16;25:24
**onto (2)**
18:1;36:9
**operate (2)**
24:24;25:5
**operating (11)**
9:12,12;25:2,3,17,
20,23;26:4;38:17;
42:7,9
**operating-agreement (2)**

24:6,8
**operatorship (1)**
24:22
**opportunity (3)**
12:24;15:15;28:16
**order (41)**
8:15;9:25;10:1,4,
8;13:6,10;17:12;
18:9,10;19:25;20:3,
4,6;23:4,10;25:7;
26:6,13;27:1,9;28:3;
29:17;30:4;33:24,
24;34:6,17;35:3;
36:14,20,25;37:12;
41:6,17,18,24;42:6,
13,14,15
**orderly (1)**
29:11
**orders (4)**
27:19;28:3;37:12;
42:16
**others (2)**
23:1;28:1
**otherwise (2)**
9:4;41:20
**ourselves (1)**
22:5
**out (11)**
8:14;12:13;21:24;
23:24;32:9,16;34:2;
36:13;37:17;41:5;
44:9
**outline (1)**
25:13
**outlined (1)**
23:10
**outset (1)**
29:3
**outstanding (2)**
20:25;22:14
**over (11)**
24:22;29:17;
32:10;35:14;36:14;
37:12;38:19;41:8;
43:24;44:18,19
**overnight (1)**
14:19

## P

**PA (1)**
5:22
**package (1)**
44:6
**paid (8)**
11:15,18,19;12:13,
17;27:10,16;40:19
**paragraph (1)**
11:14
**paragraphs (2)**
23:6;33:25
**part (11)**
9:3;12:17;22:15;

31:25;34:18,22;35:6,
19;42:12,13,14
**participate (1)**
22:1
**particular (1)**
15:7
**parties (27)**
8:15;13:8,19;
14:12,18,19,21,24;
15:1,8,15,22,24;
16:11;17:19;19:12;
20:19;21:12,14;
25:16;28:16;29:10;
34:12;36:23;37:21;
42:5;44:9
**parties-in-interest (2)**
15:9;27:22
**Partners (2)**
6:15;12:9
**party (4)**
15:11,20;23:23;
36:9
**path (1)**
31:21
**pause (1)**
36:17
**paved (1)**
33:16
**paving (1)**
33:16
**pay (8)**
10:23;11:25;
20:15;25:17;26:25;
27:7;30:25;31:15
**payable (1)**
32:14
**payables (1)**
32:10
**paying (1)**
32:17
**payment (2)**
34:7,10
**payments (8)**
18:18,21,22;
29:23;39:9,15,21,21
**PC (1)**
4:12
**pendency (1)**
27:17
**Pennsylvania (1)**
43:16
**percent (2)**
27:1,4
**perfectly (1)**
13:4
**perhaps (1)**
12:19
**period (3)**
9:14;35:15;38:17
**perspective (1)**
30:20
**PETERSEN (1)**
6:6

**petition (2)**
10:18;16:17
**PEZANOSKY (5)**
5:9;17:22,22;
18:13;19:4
**ph (4)**
14:16;15:13;31:2;
43:19
**Philly (1)**
44:7
**phone (2)**
17:23;23:15
**picked (1)**
14:17
**piece (1)**
36:18
**pieces (3)**
26:5;36:21;37:14
**Pipeline (3)**
5:8,18;17:24
**plan (5)**
8:18;14:6;21:24;
29:12;43:5
**pleading (1)**
33:12
**Please (2)**
8:2;33:5
**pleased (1)**
29:12
**plenty (1)**
42:25
**PM (1)**
45:3
**point (3)**
17:19;27:23;34:2
**points (3)**
14:8;18:1;27:12
**POLSINELLI (1)**
5:17
**position (1)**
44:5
**possible (1)**
8:17
**Post (1)**
15:13
**post-petition (1)**
10:18
**potential (1)**
15:8
**Power (1)**
4:23
**practicable (1)**
40:7
**pre- (2)**
10:17;16:16
**precedent (1)**
37:15
**preclude (1)**
21:10
**pre-fund (1)**
25:18
**prepared (4)**
19:2;31:15;41:15;

42:2
**pre-petition (1)**
    30:15
**presentation (1)**
    26:3
**pressed (1)**
    29:7
**PRESTON (1)**
    7:2
**pretty (1)**
    41:5
**price (7)**
    9:4;21:20;31:15,
    23;32:6,12,15
**probably (5)**
    28:4;31:5;33:22;
    40:2;44:5
**problem (2)**
    35:17,24
**procedures (1)**
    27:18
**proceeded (1)**
    31:20
**proceedings (1)**
    45:3
**proceeds (2)**
    34:21,22
**process (9)**
    10:22;13:22;14:4;
    21:7,12,13;30:22;
    40:6;41:12
**productive (1)**
    21:7
**professional (2)**
    12:12,19
**progress (1)**
    40:11
**proof (1)**
    19:16
**propose (1)**
    14:21
**proposed (3)**
    10:1;23:11,19
**protections (1)**
    21:5
**provide (4)**
    14:17;21:23;28:5,
    14
**provided (5)**
    15:15;21:20,21;
    23:20;38:13
**provides (3)**
    25:17;34:7,8
**published (1)**
    15:12
**purchase (8)**
    9:3,3;21:20;31:15,
    23;32:6,12,15
**purchaser (22)**
    8:14;14:8;16:3;
    17:9;18:17;21:4,5,6,
    8;23:3,7;24:19,23;
    25:5,17,18,20;35:11;

36:11;37:18,19,19
**purchasers (1)**
    18:21
**pursuant (3)**
    13:7;21:22;27:8
**put (6)**
    26:18;30:20;
    34:11;37:9;38:16;
    41:21

**Q**

**Quinn (1)**
    23:23

**R**

**raised (2)**
    22:23;35:23
**ranscribed (1)**
    7:25
**rate (3)**
    16:18,19,22
**rates (2)**
    16:20,21
**rationalize (1)**
    43:24
**reach (3)**
    14:2;23:24,25
**reached (5)**
    18:8;19:13;23:4;
    27:22;44:20
**reaction's (1)**
    31:5
**read (2)**
    16:7;18:1
**realistically (1)**
    28:10
**really (1)**
    37:3
**reason (1)**
    36:1
**reasonable (1)**
    15:15
**reasonableness (1)**
    30:3
**reasonably (1)**
    40:7
**recall (4)**
    13:17,25;34:8,19
**receivable (1)**
    32:14
**receivables (1)**
    32:9
**receive (2)**
    15:2;35:10
**received (5)**
    14:25;15:25;16:1,
    23;20:22
**receiving (1)**
    35:19
**recess (1)**
    44:24

**recited (1)**
    34:5
**record (9)**
    9:22;14:9;16:8;
    18:2;24:2;26:16,21;
    28:20;41:9
**regulatory (1)**
    24:20
**reimbursed (1)**
    27:13
**reject (1)**
    33:9
**rejected (1)**
    38:23
**rejecting (1)**
    38:21
**released (2)**
    27:5;34:25
**remain (1)**
    38:16
**remaining (1)**
    36:10
**remove (1)**
    40:3
**represent (3)**
    12:8;17:23;29:13
**representation (4)**
    18:19,25;39:10;
    40:25
**represented (1)**
    21:8
**request (1)**
    14:7
**requesting (1)**
    36:8
**requirements (1)**
    42:1
**reservation (1)**
    29:17
**reserve (2)**
    35:18;37:23
**resolution (6)**
    14:2,3;19:13;28:5;
    32:13;33:15
**resolutions (1)**
    16:8
**resolve (5)**
    14:24;16:2;20:4;
    34:17;44:17
**resolved (16)**
    12:23,24,25;13:2;
    16:25;17:3;22:11;
    23:8,9;31:1,2;33:12,
    18;41:15,21;42:5
**resolving (1)**
    33:20
**Resources (1)**
    17:25
**respect (17)**
    15:24;22:9,23;
    23:24;27:16;28:25;
    29:1,21;34:9,11,23;
    35:16,18;39:19,19,

20;43:1
**respectively (1)**
    16:21
**restructuring (1)**
    8:24
**result (3)**
    21:6;44:15,16
**retention (2)**
    27:1,9
**review (2)**
    30:3;41:17
**RICHARDS (1)**
    5:22
**RICHTER (1)**
    6:9
**right (63)**
    8:19;9:15,16;10:2,
    12;11:3,17;12:2,2,3,
    4;13:1,9,13,14;
    14:10;17:9;18:3,23;
    19:3,18;20:7,8,9;
    21:2;22:4,22;23:21;
    24:1,25;25:15,22;
    26:2,11;28:7,11;
    29:19;31:7,19;
    32:24;33:10;34:1,
    14;35:1;36:16;37:7,
    8;38:2,7,24;39:4,24;
    40:8,13;41:10;42:6;
    43:20,21;44:3,8,19,
    20,21
**rights (3)**
    29:17;35:18;37:23
**rise (1)**
    8:2
**robust (2)**
    21:7,12
**room (1)**
    41:7
**ROTHSCHILD (2)**
    5:1;19:8
**Rubin (1)**
    7:25
**rule (1)**
    34:13
**running (2)**
    13:19,20
**Ryan (2)**
    8:6;42:18

**S**

**Safe (1)**
    45:2
**safely (1)**
    25:3
**sale (52)**
    8:11,15;9:11,25;
    10:1,7,14;13:5,10;
    14:4,8,14;15:12,14;
    16:13;17:12;19:25;
    20:3,4,5;23:4,10;
    24:5;25:25;26:4,5,

13,25;27:1,2,4,11,
15;28:2,18;29:1,16;
30:22;31:4;37:12;
38:13;41:6,11,16,17,
18,24;42:6,9,12,13,
14
**same (2)**
    20:24;34:19
**satisfies (1)**
    41:22
**satisfy (1)**
    9:4
**saying (1)**
    32:11
**scene (2)**
    30:21,21
**schedule (4)**
    23:8;36:6;42:22,
    23
**schedules (1)**
    36:5
**scheme (1)**
    41:15
**SCHOTZ (2)**
    4:12;18:6
**SCHRECK (2)**
    4:2;23:17
**seated (1)**
    8:4
**Second (2)**
    15:17;29:1
**secured (5)**
    22:17,18;29:6,8;
    30:15
**segregated (1)**
    27:3
**selected (1)**
    13:21
**selection (1)**
    13:24
**sense (1)**
    34:6
**sensing (1)**
    32:7
**separate (1)**
    21:8
**September (3)**
    15:21;31:3;34:24
**serve (1)**
    13:20
**served (6)**
    14:13;15:9,10,21,
    23,24
**Service (2)**
    4:23;14:17
**Services (3)**
    5:23;6:21;22:13
**set (4)**
    11:13,14;25:1;
    27:18
**settle (1)**
    23:25
**settlement (13)**

21:22;33:25;34:3,
18,22;35:9,20;36:24;
37:6,10,15;41:23;
42:2
**settlements (1)**
42:1
**settling (1)**
31:12
**several (2)**
13:18;31:13
**shall (3)**
27:5,7,12
**SHAPIRO (1)**
5:24
**SHAW (1)**
6:2
**sheet (1)**
31:17
**shelf (1)**
34:12
**SHEPPARD (1)**
6:9
**shipping (1)**
16:20
**short (1)**
17:7
**Shorten (1)**
25:8
**shortening (1)**
25:9
**sic (1)**
9:21
**sign (2)**
26:17;42:9
**similarly (1)**
21:14
**SIMPSON (2)**
6:14;12:8
**simultaneously (1)**
37:13
**six (2)**
16:19;30:24
**sixteen (1)**
32:12
**sixty (1)**
25:14
**Slawson (7)**
4:3;6:3;22:23;
23:3,7,15,20
**small (2)**
29:9;35:22
**SMOLINSKY (24)**
6:22;29:5;30:6,10,
11,13,13,18;31:8,11,
20;32:3,20,25;33:1;
38:4,6,8,10,22,25;
39:3,5;41:13
**soon (2)**
28:9;40:7
**sophisticated (1)**
21:9
**Sorry (9)**
11:23;12:15;

23:14;24:7,8,9,11;
26:10;40:15
**sort (1)**
18:21
**sorted (1)**
8:14
**speak (2)**
28:2;29:5
**SPEAKER (6)**
11:20,24;42:12,13,
14;44:22
**speaking (1)**
43:15
**speaks (1)**
9:1
**specifically (3)**
15:9;21:6;22:10
**specificity (1)**
9:9
**specifics (1)**
41:18
**spending (1)**
31:6
**spite (1)**
24:18
**Spoke (1)**
16:24
**stakeholders (1)**
26:1
**stalking (3)**
13:24;21:16,25
**stalking-horse (1)**
13:20
**stand (2)**
38:1;44:24
**STARGATT (2)**
7:7;33:6
**start (1)**
28:23
**STEPHEN (1)**
5:9
**Steve (2)**
17:22;23:16
**STEVEN (1)**
4:4
**still (12)**
10:8;12:23;17:10;
24:19;25:20;26:5;
30:2,3;32:8,9;35:15;
44:17
**stored (1)**
34:20
**Strauss (1)**
11:6
**strong (1)**
31:25
**Stubblefield (4)**
9:1;10:20;12:25;
29:23
**Stubblefield's (4)**
11:4;12:11,14;
22:20
**subject (2)**

16:22;25:16
**submission (1)**
11:16
**submit (3)**
10:9;21:15;42:16
**submitted (4)**
8:23;12:13;21:25;
42:10
**submitting (1)**
28:4
**subsequently (2)**
17:8,14
**subset (1)**
15:7
**subsidiary (2)**
17:24,25
**substantial (1)**
40:11
**substantially (1)**
10:14
**success (1)**
29:7
**sufficient (3)**
10:22;21:23;22:16
**suggesting (1)**
12:19
**sum (1)**
23:7
**summary-judgment (1)**
33:11
**sums (1)**
12:14
**Sunday (1)**
28:10
**supplement (2)**
31:16;38:13
**supplemental (1)**
15:23
**support (1)**
14:7
**sure (18)**
13:6,10,25;25:3;
26:15,23;33:23;
35:25;37:24;38:11;
40:16,20;41:8;42:20,
25;43:24;44:6,18
**surprising (1)**
31:5

**T**

**talked (1)**
29:25
**TAYLOR (4)**
4:22;7:2,7;33:6
**teaches (1)**
43:19
**Technologies (3)**
4:8,18;22:12
**TED (1)**
6:11
**TELEPHONICALLY (6)**
4:4;5:9;6:5,6,11,

17
**ten (1)**
31:14
**term (1)**
25:13
**terms (9)**
16:13;23:11;
26:15,18;27:19;
29:20;34:3;39:15;
42:8
**Texas (1)**
31:6
**TGS (1)**
16:23
**THACHER (2)**
6:14;12:8
**thanks (2)**
42:20;44:13
**therefore (2)**
12:22;22:2
**There're (4)**
23:6;38:15;41:14;
44:17
**THOMAS (1)**
6:5
**thought (1)**
33:7
**three (3)**
26:18;38:14;39:10
**tight (1)**
8:15
**times (2)**
31:9;42:22
**today (10)**
10:25;15:13;17:5;
22:6;23:9;29:12;
31:13;33:17;36:2;
42:10
**together (1)**
37:10
**told (1)**
31:3
**took (1)**
34:11
**TOWBIN (1)**
6:2
**transaction (1)**
37:4
**transfer (2)**
24:22,23
**transition (1)**
9:14
**travel (1)**
45:2
**Travis (1)**
9:22
**Trucking (3)**
5:13;19:23;22:13
**Trustee (1)**
30:3
**try (1)**
44:9
**trying (3)**

26:12;32:21;35:15
**Tuesday (1)**
44:6
**turnover (1)**
28:8
**twelve (1)**
30:23
**twenty (1)**
27:4
**twenty-eight (1)**
31:4
**twenty-one (1)**
14:18
**two (7)**
14:11;21:16;
27:12;28:3;30:25;
32:22;37:12
**two-million-dollar (1)**
34:7

**U**

**ultimately (4)**
11:24;12:1;13:20;
17:11
**Um-hum (1)**
24:12
**unclear (2)**
12:11,21
**under (9)**
10:17;13:8;16:15;
17:16;21:5;28:4;
30:4,24;32:4
**understatement (1)**
29:4
**understood (2)**
12:22;35:5
**undeveloped (1)**
14:13
**UNIDENTIFIED (6)**
11:20,24;42:12,13,
14;44:22
**University (1)**
43:15
**unless (1)**
10:25
**unpaid (1)**
27:13
**unproducing (1)**
14:16
**unsecured (3)**
29:6,9;30:25
**up (7)**
10:4;14:17;22:18;
23:10;29:13;32:11;
42:23
**upon (4)**
11:13;27:6,10,15
**USA (1)**
15:13
**USG (3)**
5:8,18;17:23

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

EMERALD OIL, INC., et al.
Case No. 16-10704(KG)

October 28, 2016

## V

**valid (1)**
22:18
**variables (1)**
8:13
**various (1)**
8:14
**vendors (1)**
25:18
**version (1)**
41:7

## W

**Wade (2)**
9:1;10:20
**waiting (2)**
24:19;35:23
**waive (3)**
31:24,24;32:3
**waiving (1)**
16:16
**walk (1)**
9:10
**way (4)**
25:24;33:16;
34:23;36:15
**week (1)**
31:14
**weekend (7)**
29:17;32:11;
43:24;44:18,19,25;
45:1
**weeks (1)**
14:11
**WEIL (2)**
6:20;30:13
**wells (3)**
25:3,5;40:4
**weren't (1)**
22:10
**Wheatland (4)**
5:8,18;16:11;
17:24
**Whenever (1)**
37:9
**Whereupon (1)**
45:3
**WHITEFORD (1)**
7:2
**whole (1)**
15:10
**who's (2)**
17:5;43:25
**who've (1)**
29:2
**willing (1)**
43:11
**wind-down (1)**
29:11
**wish (2)**

13:15;17:19
**within (1)**
32:22
**without (2)**
16:18;27:22
**word (2)**
13:5;31:25
**words (1)**
30:18
**work (4)**
14:23;20:24;28:2;
44:9
**worked (3)**
16:1;37:17;44:14
**working (6)**
10:10;17:10;29:2;
32:9;36:11;38:18
**works (1)**
24:6

## Y

**year (1)**
16:18
**years (1)**
16:20
**yesterday (4)**
31:21,22;32:5,20
**yield (1)**
9:8
**YOUNG (2)**
7:7;33:6

## Z

**ZACHARY (1)**
5:24

## 1

**1 (1)**
33:8
**1.1 (1)**
32:6
**1.6 (1)**
32:17
**1.608 (1)**
27:2
**10:30 (1)**
18:16
**11 (3)**
14:5;21:24;27:17
**110 (1)**
13:22
**110,500,000 (1)**
21:21
**12th (1)**
15:22
**14th (1)**
14:19
**15 (2)**
11:14;31:16
**15,000,000 (1)**

31:23
**15,500,000 (1)**
31:24
**15.5 (1)**
32:15
**16 (1)**
32:15
**17th (1)**
14:20

## 2

**2 (3)**
20:3;33:8,11
**2,000 (1)**
17:7
**2:13 (1)**
45:3
**2017 (2)**
16:19,20
**2018 (1)**
16:20
**2019 (1)**
16:20
**2020 (1)**
16:18
**22nd (1)**
15:21

## 3

**31st (2)**
14:22;24:18
**363m (2)**
17:17;21:5

## 4

**4.7 (1)**
31:16
**402,000 (1)**
27:5

## 5

**51 (1)**
33:25
**57 (1)**
33:25

## 6

**6.6 (1)**
36:10
**600,000 (1)**
32:5
**65,000 (1)**
27:14

## 7

**753 (1)**
18:7

**754 (3)**
33:13;34:5;36:20

## 8

**831 (1)**
24:15